UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS
EASTERN DIVISION

| | |
|---|---|
| In re:<br><br>AUTO SALES & SERVICE, INC.,<br><br>    Debtor. | Chapter 11<br>Case No. 10-14528-JNF |
| In re:<br><br>GENERAL TRADING COMPANY,<br><br>    Debtor. | Chapter 11<br>Case No. 10-14532-JNF |
| In re:<br><br>FRANK SAWYER CORPORATION,<br><br>    Debtor. | Chapter 11<br>Case No. 10-14533-JNF |
| In re:<br><br>100 STUART STREET LLC,<br><br>    Debtor. | Chapter 11<br>Case No. 10-14534-JNF |
| In re:<br><br>SW BOSTON HOTEL VENTURE LLC,<br><br>    Debtor. | Chapter 11<br>Case No. 10-14535-JNF<br><br>*(Joint Administration Request Pending)* |

**MOTION FOR AUTHORIZATION OF (1) THE INTERIM AND PERMANENT
USE OF CASH COLLATERAL, (2) THE GRANTING OF REPLACEMENT
LIENS, (3) ENTRY OF SCHEDULING ORDER REGARDING
CONTINUED USE OF CASH COLLATERAL AND (4) ADDITIONAL RELIEF**

Pursuant to Sections 105 and 363 of the United States Bankruptcy Code (the "Bankruptcy Code"), Federal Rules of Bankruptcy Procedure 2002, 4001, and 9014, and MLBR 4001-2, SW Boston Hotel Venture LLC ("SW Boston"), General Trading Company ("General Trading"),

Frank Sawyer Corporation ("Sawyer Corporation"), 100 Stuart Street LLC ("Stuart Street") and Auto Sales & Service, Inc. ("Auto Sales" and together with SW Boston, General Trading, Sawyer Corporation and Stuart Street the "Debtors"), the debtors and debtors-in-possession, move this Court for the entry of an order authorizing the use of Cash Collateral (as defined below) to maintain the Debtors' value of the Debtor's property through continued operations in the ordinary course of business. The Debtors request:

(i) The entry of an interim Order authorizing the use of Cash Collateral on an emergency basis in an amount necessary to avoid immediate and irreparable harm;

(ii) The entry of a permanent Order authorizing use of Cash Collateral in the ordinary course of business;

(iii) The granting replacement liens to parties asserting liens on Cash Collateral to the extent described in this motion; and

(iv) The entry of an Order setting a final hearing date on the continued use of Cash Collateral.

SW Boston owns the W Hotel Boston and Residences project, which includes the W Boston Hotel (the "Hotel"), 122 the condominiums above the Hotel, and a parking garage located underneath the Hotel and the condominium units. The Debtors require the use of Cash Collateral to continue their operations, including the operation of the Hotel and the parking garage and the continued marketing and sale of the condominium units, while they reorganize their businesses. Immediate relief is necessary to prevent any interruption in the Debtors' business, services to the Hotel's guests and guests of the destination restaurant located in the Hotel, and to residents of the condominium units and prospective buyers of the condominium units.

In further support of this motion, the Debtors aver as follows:

2

# I. BACKGROUND

1. On April 28, 2010 (the "Petition Date"), the Debtors each filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code ("Code") in the United States Bankruptcy Court for the District of Massachusetts (the "Court").

2. The Debtors continue to operate as debtors in possession pursuant to Sections 1107 and 1108 of the Code. As of the date of this Motion, no official committee of creditors has been appointed in any of the Debtors' cases.

### A. The Project.

3. The W Boston Hotel and Residences project (the "Project") opened on October 29, 2009, and comprises a 350,650 square foot, 26-story building located at 100 Stuart Street in the heart of Boston's Theatre District. The Project contains the 235–room, four-star Hotel, the 122 condominium units, and a two-level underground parking garage with capacity for 142 vehicles (the "Garage").

4. The Project was designed by the internationally-known architectural firm of William Rawn and Associates Architects, together with the architect of record TRO/Jung Brannen, Inc.

5. The Hotel is branded as a "W" Hotel – the only W Hotel in New England – and serves Boston's many national and international business travelers and tourists. The Hotel is operated by Starwood Hotels and Resorts Worldwide, Inc. ("Starwood") through its affiliate, W Hotel Management, Inc. (the "Hotel Operator"). The Hotel includes a retail store operated by Wink Retail Group, Inc., an affiliate of Starwood, a signature restaurant operated by Cullinary Concepts (Boston) LLC (the "Restaurant Operator") at a prominent location along Tremont Street, and will also include a second floor spa with a first floor entrance and related retail space

on the Stuart Street side of the Project (the "Spa"). The Hotel is also planned to include a below-grade theme bar/lounge with an entrance adjacent to the spa entrance on Stuart Street (the "Theme Lounge"). The Spa is in the final stages of construction and the Theme Lounge is planned to open in the fall. The Hotel Operator will operate the Spa and the Theme Lounge.

6. The Hotel restaurant, Market by Jean-Georges Vongrichten, is a 6,000 square foot, first-class, full-service restaurant that occupies the entire first floor of the Hotel along Tremont Street. Market is an important amenity for the city's visitors and theatre-goers.

7. The condominium units consist of 122 studio, one (1), two (2) or three (3) bedroom luxury condominium units. The list prices for the condominium units range from $600,000 to over $4,000,000. As of the Petition Date, SW Boston had sold twelve (12) of the condominium units and had entered into binding purchase and sale contracts for eleven (11) units.[1]

### B. The Debtors.

8. SW Boston is a Delaware limited liability company formed by a local family, descendants of the late taxicab/parking businessman Frank Sawyer, to develop and own the Project.

9. Stuart Street is a Delaware limited liability company that owns 100% of the membership interests in SW Boston. Stuart Street is a single purpose entity formed to own the membership interests in SW Boston.

10. Sawyer Corporation is a Massachusetts corporation that owns approximately sixty-five percent (65%) of Stuart Street. Sawyer Corporation manages Stuart Street.

---

[1] Details regarding the pending sales are more fully described in the *Debtors' Motion For Authority to (A) Assume And Consummate Pending Purchase And Sale Agreements For Condominium Units; (B) Make And Consummate New Sales For Condominium Units; And (C) For Related Relief*, which has been filed contemporaneously with this motion.

4

11.  General Trading is a Massachusetts corporation all of whose stock is owned by the Trust. General Trading does business as Sawyer Enterprises, and provides administrative services for the Debtors as well as various non-debtor affiliates of the Debtors. The Chief Executive Officer of General Trading is Carol Sawyer Parks, and the Vice President in charge of overseeing the development and operation of the Project is John P. Connolly.

12.  Auto Sales is a Massachusetts corporation.

**C.    Management of The Hotel And Parking Garage.**

13.  The Hotel is managed and operated by the Hotel Operator pursuant to a management contract with SW Boston dated August 23, 2005, as amended (the "Hotel Contract"). Pursuant to the Hotel Contract, the Spa and the Theme Lounge will also be managed and operated by Starwood. A copy of the Hotel Contract is attached as Exhibit A.

14.  Starwood is one of the nation's premier hotel operators. Starwood operates the Westin, St. Regis, and Le Meridian families of hotels, as well as hotel properties operating under the Sheraton and Sherwood banners and 28 first-class hotels carrying the "W" brand. Boston has one of the largest concentrations of Starwood-affiliated hotels in the country, including the Westin Copley Square hotel, Westin Convention Center hotel, and Sheraton hotels, as well as numerous hotels outside of Boston proper.

15.  Under the Hotel Contract, the Hotel's revenue (the "Hotel Revenue") is maintained in operating accounts in the name of SW Boston from which the expenses of operating the Hotel, including Starwood's management fee, are paid by Starwood. The employees of the Hotel are employees of Starwood. Starwood disburses to SW Boston the Hotel revenue remaining after the payment of the operating expenses of the Hotel. Pursuant to the

5

Hotel Contract, SW Boston and the Hotel Operator agreed to an annual operating plan prior to the Petition Date, and the Hotel is operating in accordance with that plan.

16. The Garage is managed and operated by Ultimate Parking, LLC ("Ultimate") pursuant to a contract with SW Boston dated September 30, 2009, as amended (the "Garage Contract"). A copy of the Garage Contract is attached as <u>Exhibit B</u>.

17. Under the Garage Contract, the Garage's revenue (the "Garage Revenue") is maintained in an operating account in the name of SW Boston from which the expenses of operating the Garage, including Ultimate's management fee, are paid by Ultimate. The employees of the Garage are employees of Ultimate. Ultimate disburses to SW Boston the Garage revenue remaining after the payment of the operating expenses of the Garage. Pursuant to the Garage Contract, SW Boston and Ultimate agreed to an annual operating plan prior to the Petition Date, and the Garage is operating in accordance with that plan.

**D.    Events Precipitating The Bankruptcy Filings.**

18. The Hotel (including the restaurant) and the Garage opened on October 29, 2009, and have operated at or better than projected. Construction of a portion of the condominium units was completed and closings on those floors commenced immediately. Construction of the remaining floors of the condominium units was completed in January 2010. Sales of the condominium units, however, have been slower than initially projected at the time of the closing of the senior loan on the Project (January 2008) due largely to the nearly unprecedented global economic crisis, the near-collapse of the national capital markets, and the accompanying softening of the residential real estate market.

19. Prior to the Petition Date, SW Boston had extensive discussions with The Prudential Insurance Company of America, on behalf of and solely for the benefit of, and with its

liability limited to the assets of, its insurance company separate account, PRISA ("Prudential") the senior lender on the construction loan for the Project (the "Senior Loan") regarding the restructuring of the Senior Loan to reflect the dramatic downturn in the global economy, the near collapse of the national and international capital markets for commercial real estate and the dramatic downturn in the local real estate market. Prudential declined to restructure its loan on terms acceptable to the Debtor, thereby exposing the Debtors' bank accounts and assets to seizure, forcing the Debtors to file these bankruptcy proceedings in order to preserve the value of their assets and their opportunity to reorganize and restructure the Senior Loan.

## II. THE CAPITALIZATION OF THE PROJECT AND CLAIMS AGAINST THE DEBTORS[2]

20. Formed in 2004, SW Boston was capitalized with the land, which had an approximate value of $18,000,000, on which the Project was built, and approximately $25,000,000 in cash.

21. Additional capital in the form of a $17,300,000 letter of credit, cash, securities and mortgages on real property pledged or given to Prudential and the City was contributed by the Debtors and certain of their affiliates.

### A. Prudential's Claims.

22. The construction financing for the Project was provided by Prudential pursuant to a *Construction Loan Agreement Between SW Boston Hotel Venture LLC and The Prudential Insurance Company of America*, dated January 15, 2008, as amended (the "Prudential Loan Agreement"). As of the Petition Date, SW Boston owed Prudential approximately $180,800,000 on account of the Senior Loan. As collateral for the Prudential Loan, SW Boston granted

---

[2] The Debtors have not determined the amount of any claims against them and/or the extent, priority or validity of any of the liens asserted against their respective assets, and reserves the right to challenge any claims and liens on any grounds.

Prudential a mortgage on and an assignment of leases and rents and security interest in the Project.

23.  Sawyer Corporation, General Trading and Auto Sales have guaranteed SW Boston's obligations under the Prudential Loan Agreement, and provided collateral to secure such guaranties with approximate values, as of the Petition Date, as follows: (a) a pledge of a securities owned by General Trading with an approximate value of $1,400,000; (b) a pledge of a securities owned by Sawyer Corporation with an approximate value of $6,900,000; (c) a pledge of Sawyer Corporation's membership interests in Stuart Street; and (d) a pledge of securities owned by Auto Sales with an approximate value of $220,000.

24.  On April 20, 2010, SW Boston executed pledge agreements and control agreements in favor of Prudential with respect to two (2) bank accounts in SW Boston's name at Sovereign Bank. As of the Petition Date, there was approximately $1,500,000 in those two accounts.

25.  The following non-debtor affiliates of the Debtors guaranteed and/or provided additional credit support for the Prudential Loan:

   a.  SE Berkeley Street, LLC and SE McClellan Highway, LLC obtained a letter of credit from Sovereign Bank in favor of Prudential in the face amount of $17,300,000 (the "Letter of Credit");

   b.  30-32 Oliver Corp. ("Oliver Corp.") granted Prudential a mortgage on real property located at 25 and 27 Pinckney Street, Boston, Massachusetts;

   c.  The 131 Arlington Trust (the "Arlington Trust"), a Massachusetts business trust, granted Prudential a mortgage on real property located at 131 Arlington Street, Boston, Massachusetts; and

   d.  General Land Corporation ("GLC") granted Prudential a mortgage on real property located at 109 and 121-127 Arlington Street, Boston, Massachusetts.

8

26. Following the Petition Date, Prudential made a draw on the Letter of Credit and, upon information and belief, Sovereign Bank has paid that draw, thereby reducing Prudential's claim by approximately $17,300,000.

**B.    The City of Boston.**

27. On December 9, 2009, SW Boston and the City of Boston (the "City") entered into a *Subordinate Loan Agreement* (the "City Loan Agreement") whereby the City agreed to provide a $10,500,000 loan of HUD Section 108 funds (the "City Loan") to finance the construction completion of the Hotel restaurant as well as the Spa and the Theme Bar.

28. As collateral for the City Loan, SW Boston granted the City a second mortgage on and assignment of leases and rents in the Project. Sawyer Corporation provided the City with a guaranty of the City Loan and pledged $4,000,000 in cash to the City to secure the guaranty.

29. The following non-debtor affiliates of the Debtors guaranteed and/or provided additional credit support for the City Loan:

   a. SE Berkeley Street, LLC granted a second mortgage on real property located at 142 Berkeley Street, Boston, Massachusetts;

   b. SE McClellan Highway, LLC granted a second mortgage on real property located at 415 McClellan Highway, Boston, Massachusetts;

   c. Oliver Corp. granted a second mortgage on real property located at 25 and 27 Pinckney Street, Boston, Massachusetts;

   d. The Arlington Trust granted a second mortgage on real property located at 131 Arlington Street, Boston, Massachusetts; and

   e. GLC granted a second mortgage on real property located at 109 and 121-127 Arlington Street, Boston, Massachusetts.

30. As of the Petition Date, the outstanding balance of the Boston Loan was approximately $10,500,000.

31.   Pursuant to the City Loan Agreement, the entire amount of the City Loan was funded into an account (the "Fidelity Account") in the name of SW Boston at Fidelity National Title Insurance Company in Boston, Massachusetts. Under the City Loan Agreement and related City Loan documents, requisitions for funds from the City Loan are made by SW Boston and then reviewed by International Valuation & Inspection, Inc. ("IVI"), the City's construction consultant. IVI also provides Prudential with construction consulting on the Project.

32.   As of the Petition Date, there was approximately $2,670,000 in the Fidelity Account.

C.   **The Condominium Associations.**

33.   Pursuant to applicable Massachusetts law, up to six (6) months of unpaid condominium fees may constitute a lien on the real property on which the condominiums exist.

34.   As of the Petition Date, SW Boston owed approximately $229,800 in unpaid condominium fees (the "Pre-petition Condominium Fees") to the 100 Stuart Street Primary Condominium Association and the 110 Stuart Street Residential Condominium Association (collectively the "Condominium Associations"). This amount constitutes a lien on the Project. As is described below, the Debtors are requesting authority to pay the Condominium Fees from the proceeds of the sales of condominium units.

D.   **Priority And Unsecured Claims.**

35.   As of the Petition Date, General Trading owed approximately $26,300 in unpaid wages and vacation pay that are entitled to priority treatment pursuant to Section 507(a)(4) of the

10

Bankruptcy Code.[3] Any taxes associated with those unpaid wages are be entitled to priority treatment pursuant to Section 507(a)(8) of the Bankruptcy Code. As of the Petition Date, the Hotel and the Garage were paying sales, hotel, meals and other taxes in the ordinary course of business.

36.     As of the Petition Date and exclusive of claims related to the Hotel and the Garage, the non-priority, non-insider unsecured claims against the Debtor aggregated approximately $1,200,000.

37.     As of the Petition Date, there were various inter-company claims among the Debtors and their affiliates, which amounts have not yet been determined.

### III.    REQUESTED USE OF CASH COLLATERAL

38.     The Debtors request the use of cash collateral, as that term is defined in Section 363(a) of the Bankruptcy Code, including without limitation, all cash in the Debtors' various bank accounts (including pledged accounts and the Fidelity Account, all securities owned by the Debtors, the Hotel Revenue, the Garage Revenue and the proceeds of the sales of condominium units (collectively the "Cash Collateral").

39.     Attached hereto as Exhibits C are consolidated and individual budgets for the Debtors non-Hotel and non-Garage operations (collectively the "Administrative Budget"). Attached as Exhibit D are budgets for the Hotel's operations and the Garage's operations (referred to collectively with the Administrative Budget as the "Budgets"). The Budgets set forth estimated receipts and disbursements for the period from May 1, 2010 through May 31,

---

[3] Contemporaneously with the filing of this motion, the Debtors have filed a motion requesting to pay the unpaid pre-petition wages and vacation pay, to the extent such claims are entitled to priority under the Bankruptcy Code. Carol Sawyer Parks, Hana Parks, Joseph Parks and Librada Parks are insiders of the Debtors and are among the employees of General Trading who are owed pre-petition wages and vacation pay.

2010 (the "Budget Period"). As the Budgets demonstrate, the Debtors have sufficient Cash Collateral to fund their operations during the Budget Period.

40.     The Debtors request the authority to utilize the Cash Collateral to fund their operations during the Budget Period. SW Boston requests the authority to use the Cash Collateral generated by the Hotel to pay the expenses of the Hotel in accordance with the Hotel Contract and in the ordinary course of business of the Hotel. Likewise SW Boston requests the authority to use the Cash Collateral generated by the Garage to pay the expenses of the Garage in accordance with the Garage Contract and in the ordinary course of business of the Garage.

41.     Cash Collateral in the Fidelity account will be used in accordance with the requisition process set forth in the City Loan Agreement and related City Loan agreements and will be used to complete the construction of the Spa and the Theme Bar.

42.     The Administrative Budget provides, among other things:

a.  For the payment of the Pre-petition Condominium Fees, which will be paid from the Cash Collateral generated by the proceeds of the sale of condominium units. The payment of the Pre-petition Condominium Fees is appropriate because they constitute a senior lien on the Project and because the payment of Pre-petition Condominium Fees is necessary to assure the current residents and potential buyers of the condominium units that the Condominium Association will have sufficient funds to provide the services and maintenance attendant to the condominium units. Providing such assurance to potential buyers will promote the sale of the condominium units and will both preserve and enhance the value of the Project.

b.  For the payment of usual and ordinary closing costs associated with the sales of condominium units, including attorneys' fees and costs and broker's commissions, provided that the Debtors will not pay any professional fees until the retention of such professionals is approved by the Court.

43.     General Trading provides administrative services for the Debtors and for non-debtor affiliates of the Debtors. General Trading's costs and expenses are allocated among the Debtors and the non-debtor affiliates. As is reflected on the Administrative Budget under the

line item "Reimbursement from Related Entities," the non-debtor affiliates will reimburse General Trading for their share of General Trading's administrative services.

44. Approval of the use of the Cash Collateral on the terms set forth in this motion is in the best interests of the Debtors, the Debtors' estates and their creditors. The use of Cash Collateral will enable the Debtors to pay post-petition obligations, maintain the continuity of management of the Hotel and the condominium units and preservation of the Project's reputation as a premium hotel and residential community while the Debtors reorganize.

45. Absent the use of the Cash Collateral, the Debtors would be required to cease operations, including the Hotel and Garage operations, resulting in a disruption of services to guest and residents, and significant diminution of value of the Project to the detriment of all parties - the Debtors, the Debtors' estates, Prudential, the City and all other creditors and interest holders.

### IV.    ADEQUATE PROTECTION

46. Section 363(e) of the Code provides that a party with an interest in property proposed to be used, sold or leased by the debtor must receive adequate protection for such interest before the debtor may use, sell or lease such property. 11 U.S.C. § 363(e).

47. Section 361 of the Code provides that when adequate protection is required under Section 363 of the Code, such adequate protection may be provided by, *inter alia*, "providing to such entity an additional or replacement lien to the extent that such stay, use, sale, lease, or grant results in a decrease in the value of such entity's interest in such property." 11 U.S.C. § 361(2).

48. The entitlement to and measure of the protection required is always determined by the extent of the anticipated or actual decrease, if any, in the value of the secured creditor's

13

collateral during course of the bankruptcy case. *See In re First South Savings Assoc.*, 820 F.2d 700, 710 (5th Cir.1987).

49. Adequate protection requires only that the value of the creditor's interest in the cash collateral be protected from diminution while the Debtors are using the cash collateral. *United Savings Association of Texas v. Timbers of Inwood Forest Assoc., Ltd.*, 484 U.S. 365 (1988). Said another way, it is "intended by the Bankruptcy Code only to assure that a secured creditor, during the pendency of a bankruptcy case, does not suffer a loss in the value of its interest in property of the bankruptcy estate." *In re Markos Gurnee Partnership*, 252 B.R. 712, 716 (Bankr.N.D.Ill.1997).

50. In order to provide Prudential, the City and the Condominium Association (collectively the "Lienholders") with adequate protection on account of the use of the Cash Collateral, the Debtors propose to grant Lienholders replacement liens (the "Replacement Liens") on the same types of post-petition property of the estate against which the Lienholders held liens as of the Petition Date. The Replacement Liens shall maintain the same priority, validity and enforceability as the Lienholders' respective pre-petition liens. The Replacement Liens shall be recognized only to the extent of the diminution in value of the Lienholders' prepetition collateral after the Petition Date resulting from the Debtors' use of the Cash Collateral during the bankruptcy case.

51. The Cash Collateral will be used by the Debtors to maintain and preserve the value of the Project consistent with prior practice. The Hotel and Garage will continue to operate and SW Boston will close the pending sales of the condominium units and pursue the sale of the unsold condominium units. The Debtors use of the Cash Collateral for the operation and maintenance of the Project constitutes additional adequate protection. *See In re Prichard*

*Plaza, L.P.*, 84 B.R. 298 (Bankr. D. Mass. 1988)(use of rents to maintain and preserve property constitutes adequate protection).

52.  Since SW Boston continues to generate revenue from the Hotel and the Garage, granting the Replacement Liens suffices as adequate protection entitling SW Boston to use Cash Collateral. "This is because the lien on each month's rents replaces the lien on the prior month's rents, so there is a replacement lien of equal value under Section 361 of the Bankruptcy Code. Therefore, as long as the debtor generates a continuous income stream, the debtor's use of the rental income does not diminish the value of the collateral. The rationale is that the protected cash proceeds are being used to generate new collateral which will be of at least equivalent value of those replaced." In re *Wrecclesham Grange, Inc.*, 221 B.R. 978, 981 (Bankr. M.D. Fla. 1997) (Use of continuous income stream does not diminish value of collateral because cash is used to generate new collateral subject to replacement liens) (citations omitted); *In re Mullen*, 172 B.R. 473, 477-78 (Bankr. D. Mass. 1994) (Use of rental stream provides adequate protection by creating new collateral to replace collateral used).

53.  Absent the consent of the Lienholders or a further order of this Court, SW Boston will not sell any condominium units for less than the minimum release prices set forth in the Prudential Loan Agreement. By converting the condominium units to cash, SW Boston is providing additional adequate protection inasmuch as the retail sale of condominium units exceeds the liquidation value of the Lienholders' interests in the condominium units.

54.  The value of the Lienholders' secured position will therefore be adequately protected during the Budget Period and the Replacement Liens constitute adequate protection within the meaning of the Code.

## V.     NOTICE

55.    Pursuant to MLBR 4001-2(b), the Debtors will serve this Motion on (a) the Lienholders, (b) any taxing authority that has a claim against the estates, (c) the 20 largest unsecured creditors of each Debtor, (e) the Office of the United States Trustee, and (f) all parties who have filed a notice of appearance in these cases. The Debtors believe that such service provides sufficient notice in light of the nature of the relief requested and request that the Court approve such notice.

**WHEREFORE**, the Debtors respectfully request that this Court enter an Order, substantially in the form attached as <u>Exhibit E</u>:

A.    Approving the notice of this motion as described above;

B.    Authorizing the Debtors to use Cash Collateral on an emergency basis pending the scheduling of a hearing on the continuing use of Cash Collateral;

C.    Authorizing the Debtors to use Cash Collateral on a continuing basis in an amount necessary to conduct ordinary business operations;

[this space intentionally left blank]

  D.  Granting the Lienholders replacement liens in accordance with the terms of this Motion;

  E.  Granting such other relief as is just and proper.

                Respectfully Submitted,

                AUTO SALES & SERVICE, INC.,
                GENERAL TRADING COMPANY,
                FRANK SAWYER CORPORATION, 100
                STUART STREET LLC, and SW BOSTON
                HOTEL VENTURE LLC,
                By its proposed counsel,

                /s/ Harold B. Murphy
                Harold B. Murphy (BBO #362610)
                D. Ethan Jeffery (BBO #631941)
                Natalie B. Sawyer (BBO #660072)
                HANIFY & KING, P.C.
                One Beacon Street
                Boston, MA 02108-3107
                Tel: (617) 423-0400
                Fax: (617) 556-8985
                nbs@hanify.com

Dated: May 3, 2010
::ODMA\PCDOCS\DOCS\562061\1

Pursuant to 28 U.S.C. § 1746, I, Steven Kravetz, hereby declare under oath that I have personal knowledge regarding the facts set forth above, and that such facts are true and correct to the best of my knowledge and belief.

Signed this 3rd day of May, 2010.

                /s/ Steven Kravetz
                Steven Kravetz