**UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS
EASTERN DIVISION**

|  |  |
|---|---|
| In re | ) |
|  | ) |
|  | )   **Chapter 11** |
| **SW BOSTON HOTEL VENTURE LLC,** *et al*, | )   Case No. 10-14535 (JNF) |
|  | ) |
| Debtor. | ) |
|  | ) |

**OPPOSITION OF THE CITY OF BOSTON TO
PRUDENTIAL INSURANCE COMPANY OF AMERICA'S
MOTION FOR RELIEF FROM THE AUTOMATIC STAY
PURSUANT TO 11 U.S.C. § 362(d)**

The City of Boston, a Municipal Corporation in the Commonwealth of Massachusetts, acting by and through its Public Facilities Commission by the Director of the Department of Neighborhood Development (the "City of Boston"), by and through its attorneys, hereby opposes the motion of Prudential Insurance Company of America on behalf of and solely for the benefit of and with its liability limited to the assets of, its insurance company separate account, PRISA ("Prudential") for relief from the automatic stay pursuant to 11 U.S.C. §362(d).  In support of its opposition and pursuant to Federal Rules of Bankruptcy Procedure 4001, and MLBR 4001-1 and 9013-1, the City of Boston states as follows:

**I.    BACKGROUND**

1. In 2009, SW Boston Hotel Venture, LLC ("SW Boston" or "Debtor") requested a loan from the City of Boston under the *Boston Invests in Growth Loan Pool* ("Loan Pool") which is an innovative program structured by the City of Boston under the United States Department of Housing and Urban Development ("HUD") Section 108 Loan Guaranty program to stimulate local real estate development.  The developments assisted by the Loan

        Pool help the City of Boston meet a number of important economic development goals, including the promotion of tourism, which remains a crucial aspect of Boston's economy, and the generation of additional retail activity.  Furthermore, such developments are important generators of jobs and tax revenues for the City of Boston and have a variety of secondary economic impacts.  One of the purposes of the Loan Pool is to provide economic assistance to projects which are having difficulty obtaining conventional commercial financing.  Due to the economic downtown in 2009, the need was especially acute.

2. After reviewing the W Boston Hotel and Residences project (the "Project") the City of Boston issued a Letter of Interest, and later, on October 19, 2009, a Commitment Letter, to provide funding to complete specifically defined spaces in the Project, namely, the Restaurant, Spa and Theme Bar (collectively,"Completion Spaces" ) which needed to be finished in order for the Hotel to be opened.  The City of Boston determined that the proposed funding for the Completion Spaces met the criteria of the Loan Pool.  The City of Boston was very aware that the Project needed to be finished quickly (including the Completion Spaces), and that there would be an immediate positive economic impact.  If finished, the Project would create new jobs and provide significant economic development in Boston's Theatre District.

3. The Project, located at 100 Stuart Street (the "Property), was to consist of 123 residential condominium units ("Condos") and the W Hotel, (together with affiliated parking and the Completion Spaces, the "Hotel").

4. As part of the documentation of the City of Boston's $10,500,000 loan, the City of Boston

required the execution of an Employment Initiative Agreement which resulted in the hiring over of 200 persons, a large percentage of whom were required to be low and moderate income people and residents of the City of Boston.

5. On December 9, 2009, the City of Boston and SW Boston entered into numerous loan documents including a Note and a Subordinate Loan Agreement (collectively, "City Loan Agreements") by which the City of Boston agreed to lend $10,500,000 to build-out the Completion Spaces ("City Loan"). The City of Boston borrowed that $10,500,000 from HUD, pursuant to its Section 108 program.

6. As security for the HUD 108 Loan, municipal borrowers, including The City of Boston, are required to provide to HUD a pledge of future Community Development Block Grant funding (CDBG). CDBG funding is critically important to the City of Boston because it funds important affordable housing and economic development programs.

7. On January 8, 2010, in connection with the closing of the City Loan, the City of Boston advanced the sum of $10,500,000 into Fidelity National Title Insurance Company ("Fidelity") for disbursement in accordance with an Escrow Agreement and a Letter Agreement with Fidelity.

8. As collateral for the City Loan, SW Boston granted to the City of Boston a second priority security interest and mortgage on and an assignment of leases and rents from the Property.

9. In order to further protect its investment in the Project, the City of Boston demanded additional security from other affiliated and related entities. Specifically, the City of Boston took second mortgages and assignments of leases and rents from the following co-

debtors:

– 30-32 Oliver Street Corporation

– 131 Arlington Street Trust

– General Land Corporation

It also took second mortgages and assignments of leases and rents from two non-debtor affiliates:

– SE McClellan Highway LLC

– SE Berkeley Street LLC

In the aggregate, the appraisals of all the properties securing the City of Boston's second mortgages was in excess of $200 million.

10. Additionally, the City of Boston required a pledge of $4,000,000 in cash. The cash was provided by debtor Sawyer Corporation, which executed a Payment Guaranty, a Completion Guaranty and a Carveout Guaranty to benefit the City of Boston. The funds are held in an FDIC insured, non-interest bearing account standing solely in the name of the City of Boston at Boston Private Bank and Trust Company ("Boston Private Account") pursuant to a Pledge and Security Agreement and an Agency Agreement.

11. The City of Boston has a perfected first priority security interest in the Boston Private Account. Pursuant to Intercreditor Agreements between the City of Boston and other secured lenders, each of them agreed that they had no interest in the Boston Private Account and would not acquire any lien on the Boston Private Account.

A.  **Use of City Loan Proceeds to Increase Value of Project, to Prudential's Benefit**.

12. The completion of the build-out and the opening of the Hotel's signature restaurant, "Market by Jean-Georges Vongrichten," became possible as a result of the Commitment Letter issued by the City of Boston. The restaurant is a 6,000 square foot, first-class, full-service restaurant and lobby bar (collectively the "Restaurant") that occupies the first floor of the Hotel along Tremont Street. The Restaurant and lobby bar opened for business in October 2009. The W Hotel was not permitted to open unless and until the Restaurant was completed and opened for business.

13. The Debtor's use of the City Loan proceeds added significant value to the Project. Without it, the Project would have stalled because the Debtor indicated that it needed the City of Boston's Commitment Letter to ensure completion of the build-out of the Restaurant and to have funds available for the completion of the Theme Bar and Spa; otherwise the Hotel would not be allowed to open under the "W" flag.

14. Thereafter, more of the City Loan proceeds were used to complete the Spa, which is located on the second floor of the Hotel and has a separate street level entrance. The Spa will conduct business under the brand name, Bliss Spa®. The Spa is scheduled to open on August 18, 2010.

15. The City Loan proceeds relative to the Spa build-out have significantly enhanced the value of the Project.

16. SW Boston is using the remaining City Loan proceeds (approximately $2 million) to complete the build-out of the Theme Bar, the last of the Completion Spaces. The Theme Bar is a nightclub with a separate, street level entrance. Work on the Theme Bar was

halted prior to the Petition Date when, as a result of a change to the Boston Building Code, the plans for the Theme Bar no longer complied with the egress requirements of the new Building Code. On or about July 15, 2010, SW Boston obtained a variance to permit the resumption of construction on the Theme Bar. SW Boston reports that it plans to complete construction and open for business by the end of the year.

17. The use of the City Loan proceeds to complete the Theme Bar will add yet more value to the Project.

18. The use of the City of Boston funds has added, and continues to add, value to the Project, all to Prudential's direct benefit, and at absolutely no cost to Prudential.

19. Further, the opening of each of the Completion Spaces generates a further income stream that has benefitted and will continue to benefit the Debtor in its reorganization effort, again to Prudential's benefit.

20. Without the City of Boston's participation, the Project would have stalled completely.

**B.    City of Boston Appraisal.**

21. On July 28, 2009, the City of Boston, by and through its attorneys, commissioned an appraisal of the Project ("City Appraisal"). The appraisal was conducted by Pinnacle Advisory Group under economic conditions prevailing on July 30, 2009. (City Appraisal at 12). A true copy of the appraisal is attached hereto as Exhibit A. The City Appraisal valued the Hotel (with parking) at $57.7 million as of October 22, 2009. (Id. at 3), or $245,532 per room (Id. at 64). Further, at the stabilization of the Hotel on October 22, 2013, the value was projected to have risen to $76.7 million. (Id. at 3), or $326,383 per room (Id. at 64). The City Appraisal valued the Condo Units as of December 31, 2009

(the projected completion date) at $136.8 million using the income approach. (Id. at 56).

**C.    Hotel Value.**

22.    According to Debtor's Second Statement Regarding Continued Use of Cash Collateral (Docket Entry 219-1 Exhibit A), the Hotel's actual operations since the Petition Date to August 8, 2010 exceeded Debtor's forecast by approximately $827,000. Indeed, Debtor's performance through June 2010 exceeds the predictions of W Hotel Management, Inc., the Hotel manager by about $1.2 million.

23.    Prudential's own appraisal[1] indicates that the Hotel is performing above expectations, and that there is every reason to expect this trend to continue. Occupancy rates in the area are expected to increase by 12.5% during calendar year 2010, and to increase in smaller increments each year thereafter through 2015 (Hotel Appraisal at 37).

24.    The appraiser makes the following positive notations about the Hotel's value and performance:

   a.    The Hotel is in a location that "supports a full service hotel" (Hotel Appraisal at 15);

   b.    It "is in excellent condition and appears to meet current W brand standard" (Id. at 19);

   c.    "The quality and condition of the guestrooms is excellent" (Id. at 19);

   d.    The average daily room rate ("ADR") is expected to increase by 10% during 2010. ADR is currently $220.00, and the appraiser expects it to increase as

---

[1] Prudential attached the appraisals of the Hotel ("Hotel Appraisal") and the Condominiums ("Condo Appraisal") to its Motion for Relief from the Automatic Stay.

        occupancy of the new Hotel increases and introductory rates and room discounts are phased out. (Id. at 42);

e.   Other competitive hotels in the area had an average market ADR of $210.46 in 2009. The Hotel is already outperforming the market in terms of ADR. (Id.).

25.   Furthermore, the Hotel Appraisal does not even take into consideration the effect of the opening of the Theme Bar, which is expected to open later this year. The opening of the Theme Bar will only serve to add further value to the Hotel and generate additional income.

26.   The Hotel Appraisal assumes stabilization by May 24, 2013, at which time the net operation income is projected to be $5.26 million and room occupancy to be 74%. (Hotel Appraisal at page 56). The net income projection does not even contemplate the value that will be added with the opening of the Theme Bar.

**D.**   **Condominium Value**.

27.   Prudential's Condo Appraisal indicates that the Condo Units are part of a "luxury high-rise residential condominium project located in Boston's Theater District". (Condo Appraisal at 35). Further, it is in a superior location, compared to its closest competition at 45 Province. (Id. at 35). The Condo Appraisal anticipates that the luxury condominium market will perform well, and notes that there is a very limited supply of new luxury units available in Boston. No additional luxury units will be coming on-line within the next 36 months (Id. at 35-36). "Based on our analysis we conclude that the subject is well positioned within its market area and the prospect for net appreciation in real estate values is expected to be good over the long-term." (Id. at 48).

28.  According to the Condo Appraisal the value of the remaining Condo Units owned by Debtor as of May 24, 2010 was $86,000,000 using the Income Capitalization Approach. (Condo Appraisal at page IV and 62).  However, this assumes a sale of all remaining condominium units at a discount rate to a single investor – in essence, a fire sale.[2]

29.  The Condo Appraisal further indicates a general up-tick both in condominium traffic and average unit prices.  (Id. at 34).  To date, Debtor has closed on 5 Condo Units since the Petition Date, and the proceeds were used to pay down the principal debt to Prudential in accordance with the Cash Collateral Order.  Debtor reports that it continues to move existing purchase and sale agreements to closing, and is actively marketing the units and entering into new agreements.

30.  Based on the Condo Appraisal, it appears that the market for luxury condominiums such as those offered at the Project is good.  There is no reason to believe that the value of the individual Condo Units is plummeting, as suggested by Prudential, and hence there is no basis for apply fire sale prices to them.  Further, the City Appraisal belies the valuation offered by Prudential.

## II.    ARGUMENT

### A.    The Stay Should Not be Lifted Pursuant to Bankruptcy Code Section 362(d)(1).

31.  Prudential's interests, as well as the interests of the City of Boston, are adequately protected, thereby negating the propriety of relief pursuant to Bankruptcy Code §362(d)(1). Here, the Court should consider not only Prudential's interest in the Project,

---

[2] Of course, Prudential has a vested interest in its appraisal values being very conservative, giving it greater leverage in these bankruptcy proceedings.

but also the value of the entire collateral package furnished by the Debtor and the Affiliated Debtors to secure Prudential's and the City of Boston's loans. See In re Colonial Center, Inc., 156 B.R. 452, 460-462 (Bankr. E.D. Pa. 1993); In re Cardell, 88 B.R. 627, 631-32 (Bankr. D.N.J. 1988); In re Diaconx Corp., 69 B.R. 333, 339 (Bankr. E.D. Pa. 1987); Nationsbank of Virginia, N.A. v. DCI Publ'g of Alexandria, Inc., 160 B.R. 538, 540 (E.D. Va. 1993). This was never a project in which either Prudential's or the City of Boston's loans would be secured by a single asset. It always was contemplated, both by Prudential and the City of Boston, that multiple sources of collateral would be required to secure the loans.

32. Here, it is clear that, when considered in its entirety, the Debtor, together with its Affiliated Debtors have given sufficient collateral to secure Prudential's claim. This bankruptcy involves eight debtors, all of whom have given security for loans made on the Project. Like the City of Boston, Prudential was not relying solely on the Project as collateral for its sizeable loan, but rather it also looked to the Debtor's related entities to furnish security in the form of guarantees, mortgages and assignments of leases and rents. Furthermore, the Project is increasing in value, as the Hotel and Completion Spaces move toward stabilization.

33. After post-petition pay-down of the principal loan amount to Prudential (through Condo sales proceeds and the $17.3 million line of credit drawn by Prudential), Debtor reports owing approximately $159 million to Prudential. According to Debtor's preliminary appraisal as of the Petition Date, of that balance, $155 million is secured by the Project. Debtor's preliminary estimate does not factor in the added value of the Spa or Theme Bar.

34. The City Appraisal (see Exhibit A) indicates that the total value of the Project is $194.5 million as of October 22, 2009 (Hotel) and December 31, 2009 (Condo Units), indicating that Prudential's claim is entirely secured. Assuming $159 million is owed to Prudential and $10.5 million is owed to the City of Boston, that would still leave an equity cushion of about $25 million.

35. Beyond the security given to Prudential in the Project, Debtor also reports that the other mortgages and/or pledged property given to Prudential are worth about $14 million, thereby providing yet another layer of equity cushion to secure Prudential's loan. Accordingly, Prudential is adequately protected.

36. Even if the Debtors lacked a sufficient equity cushion, thereby necessitating adequate protection for Prudential, that protection is available: Debtor reports generating more revenue than expected (and will presumably generate yet more when the Spa and Theme Bar are operational), thereby enabling it to make adequate protection payments. Additionally, in its latest budget, Debtor indicated that it planned to begin renting out certain of the Condo Units, thereby generating additional value for the secured creditors until all Condo Units can be sold.

B.  **The Stay Should Not be Lifted Pursuant to Bankruptcy Code Section 362 (d)(2).**

37. Bankruptcy Code §362(d)(2) allows the stay to be lifted if (a) the debtor lacks equity in the property and (b) such property is not necessary for an effective reorganization.

38. As discussed in paragraph 34, *supra*, based on the City Appraisal, it is clear that the debtor possess a great deal of equity in the Project – about $25 million in equity. Furthermore, it is absolutely apparent that the Property is necessary to an effective

reorganization. Because Prudential cannot establish the necessary factors under §362(d)(2), the stay should not be lifted.

39. Debtor's continued ownership of the Project, including the Hotel, Parking Garage, Retail Shop, Restaurant, Spa, Theme Bar and Condo Units is, quite simply, pivotal to its reorganization efforts. As discussed in detail above, the Hotel is operating well above expectations, and all indications are that that trend will continue. Likely, the forecast will be even better with the upcoming opening of the Spa and Theme Bar. Indeed, the City Appraisal concluded that at stabilization on October 22, 2013, the value of the Hotel will be $76.7 million. (City Appraisal at 3).

40. The Debtor's continued sale of Condo Units, at or above the minimum sales price set forth in the Prudential and City of Boston loan documents, will enable the Debtor to reorganize while still making good on its payment obligations to its secured and unsecured creditors.

41. Finally, it would be simply unconscionable for Prudential to wipe out, through foreclosure proceedings, all of the value that it has watched the City of Boston pour into the Project through the build-out of the Restaurant, Spa and Theme Bar. Prudential has been sitting on the sidelines since the Petition Date, watching the City of Boston invest public money into the Project for the benefit of the City and its residents, and now seeks to implement foreclosure proceedings that, under Prudential's analysis, would allow it to benefit from the value added by public funds, while wiping out the City of Boston's interest in the Project completely.

### III. RESPONSES TO SPECIFIC ALLEGATIONS PURSUANT TO MLBR 4001-1(c)

42. Attached as Exhibit B hereto is the City of Boston's response to the specific allegations in the Motion for Relief.

WHEREFORE the City of Boston requests that this Honorable Court deny Prudential Insurance Company of America's Motion for Relief from the Automatic Stay pursuant to 11 U.S.C. §362(d).

                          Respectfully submitted,

By:   /s/ Joseph F. Ryan
Joseph F. Ryan (BBO #435720)
LYNE, WOODWORTH & EVARTS LLP
12 Post Office Square, 2nd Floor
Boston, MA 02109
Telephone: (617) 523-6655
Facsimile (617) 248-9877
Email: jryan@lwelaw.com
*Counsel for the City of Boston*

By:   /s/ E. Kate Buyuk
E. Kate Buyuk (BBO #642777)
LYNE, WOODWORTH & EVARTS LLP
12 Post Office Square, 2nd Floor
Boston, MA 02109
Telephone: (617) 523-6655
Facsimile (617) 248-9877
Email: kbuyuk@lwelaw.com
*Counsel for the City of Boston*

Dated:
August 17, 2010