UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS
(Eastern Division)

| | |
|---|---|
| In re:<br><br>SW BOSTON HOTEL VENTURE, LLC, *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 10-14535-JNF<br><br>(Jointly Administered) |

**MEMORANDUM REGARDING MOTION BY SW BOSTON HOTEL VENTURE, LLC FOR AUTHORITY TO LEASE CONDOMINIUM UNITS <u>IN THE ORDINARY COURSE OF BUSINESS</u>**

**I. INTRODUCTION**

The matter before the Court for determination is the Motion (the "Motion") of SW Boston Hotel Venture, LLC (the "Debtor"), one of the above-captioned debtors and debtors-in-possession (collectively the "Debtors") for entry of an Order, pursuant to Section 363 of the Bankruptcy Code, authorizing the Debtor to lease a select number of condominium units located at the W Boston Hotel and Residences (the "Property").  The Debtor requested expedited determination of the Motion, which the Court granted.

The holder of the Debtor's first mortgage on the Property, Prudential Insurance Company ("Prudential"), filed an Objection to the Motion asserting two reasons: first, that the information that the Debtor has provided in support of its leasing proposal is inadequate, and that

---

[1] The other Debtors in the jointly administered cases are Auto Sales & Service, Inc. (Case No. 10-14528-JNF), General Trading Company (Case No. 10-14532-JNF), Frank Sawyer Corporation (Case No. 10-14533-JNF), 100 Stuart Street, LLC (Case No. 10-14534-JNF), 30-32 Oliver Street Corporation (Case No. 10-16173-JNF), General Land Corporation (Case No. 10-16174-JNF), and 131 Arlington Street Trust (Case No. 10-16177-JNF).

the Debtor has not shown a proper business justification for the proposal; and second, that Prudential's prior consent to leasing is required, which the Debtor did not obtain, either before or after filing the Motion, and which consent Prudential does not give.  The holder of the Debtor's second mortgage on the Property, the City of Boston, filed a Statement in support of the Motion. Starwood Hotels & Resorts Worldwide, Inc.  ("Starwood") filed a Reply to the Motion, which the Debtor and Starwood reported resolved at the hearing held on August 26, 2010, with the Debtor agreeing to comply with the provisions of the Condominium Marketing Licensing Agreement executed by the Debtor and Starwood in all respects, including terms with respect to leasing activity.

Prudential requested an evidentiary hearing, which the Court held on an emergency basis on August 26, 2010.  At the outset of the hearing, the Court directed, and the parties agreed, that in lieu of direct testimony of witnesses, the Debtor would present an offer of proof through its counsel, Prudential would conduct cross-examination of the Debtor's witnesses, and the Debtor would have the opportunity to conduct redirect examination.  Prudential did not call any witnesses. Based upon the evidence presented, the Court now makes the following findings of fact and conclusions of law in accordance with Fed. R  Bankr. P 7052.

## II.  FINDINGS OF FACT

The Debtor's Property is a 26 story four–star hotel and luxury condominium development in downtown Boston.   In addition to a 235 room W Hotel, the Property has 122 condominium units.  The Debtor's initial business plan was to sell all of the units and not engage in leasing. The Debtor has sold 22 of the condominiums, but sales are "behind pace," according to the Debtor's financial advisor, Derek Flanagan ("Flanagan"). Because the market for rentals is currently better than the market for sales, the Debtor has embarked on a leasing strategy for up to

2

573780-v1

25 of its condominium units, which approximates 25 percent of its inventory of available units. The Debtor contemplates renting the units for terms of six months to one year. The Debtor submits that there are a number of reasons for leasing a select number of units: namely, that leasing will provide significant income for the Debtor, enhance the activity in the complex, and create a pool of potential purchasers.

Kevin Ahearn ("Ahearn"), a licensed real estate broker with thirty years of real estate sales and leasing experience, of the Boston firm Otis & Ahearn, has been employed by the Debtor to market its condominium units. He testified that the Debtor currently has three pending offers to purchase condominium units. Describing the Property as a "fluid situation," Ahearn explained that the leasing of the units will generate revenue in the form of monthly rent, will generate interest in the development, and will enhance the prospects for sales of units to lessees who may be interested in purchasing once they have occupied the premises.

As to the generation of revenue from the proposed leasing plan, the Debtor's Second Statement Regarding Continued Use of Collateral filed with the Court on August 13, 2010 and served on Prudential's Counsel contained the following projections of rental revenues: $37,000 for October 2010; $67,000 for November 2010; $95,000 for December 2010; and $128,000 for January 2011. Ahearn indicated that it would take approximately six months to obtain full occupancy of all units offered for lease. He testified that the Debtor proposes to list the following units for lease for the following monthly rent: four studios for the sum of $2,250 per month; five standard one bedroom units for $3,650 per month; three large one bedroom units for rent for $4,500 per month; three standard 2 bedroom units for rent for $5,500 per month; six large two bedroom units for $9,000 per month; and a penthouse unit for the sum of between

3

$10,000 and $12,500 per month.  According to Ahearn, these prices are competitive with other comparable rentals.

Ahearn's firm does not circulate marketing materials for expensive apartments, preferring instead to market high end units by word of mouth and through other real estate brokers. Ahearn further explained that his firm pre-qualifies prospective tenants through analysis of their cash flow, employment information, and credit reports.  His firm does not intend to obtain personal financial statements from tenants, which is not industry practice. The Debtor will present to prospective tenants the standard form of lease of the Greater Boston Real Estate Board, who will be required to pay first month's and last month's rent and a security deposit, all of which are customary in the industry.  In addition, the leases will contain an Addendum by which tenants would agree to be bound by the condominium documents, including their restrictions on use, and the rules and regulations of the condominium association. The proposed leases do not contain provisions giving a tenant any credit for lease payments in the event of a purchase.

Ahearn explained that in addition to generating revenue, the leasing strategy will generate interest in the Property. Moreover, the Debtor is optimistic that once a tenant occupies a unit pursuant to a lease, the tenant will be incentivized to purchase the leased unit. Ahearn explained that this phenomenon has occurred in several other upscale condominium properties in Boston, including Battery Wharf and the Intercontinental.

Flanagan testified that the Debtor has entered into negotiations with Ajax Consulting Services, LLC ("Ajax"), a project and construction manager to real estate owners and developers, to expand services to include the management of the leased units.  According to Flanagan, Ajax has experience in property management and is capable and competent to render

4

573780-v1

property management services. It is expected that Ajax's compensation for the new services will be a fee of $2,000, according to Flanagan, this is "de minimis" compensation. However, the specific details of Ajax's proposed employment have not been finalized.

**III. ISSUE PRESENTED**

The issue presented is whether the Debtor has shown that its decision to lease up to 25 condominium units at the Property is based on reasonable business judgment.

**IV. DISCUSSION**

Although the Debtor denominates the Motion as "a Motion by SW Boston Hotel Venture, LLC Authority to Lease Condominium Units in the Ordinary Course of Business," the Debtor's argument in the Motion focuses on the standard for approval of use and lease of property of a debtor other than in the ordinary course of business. As approval by the Court is required for a transaction out of the ordinary course of business, the Court assumes that the Debtor concedes that the decision to lease and not sell units is such a transaction.

Section 363(b) of the Bankruptcy Code provides that a trustee "after notice and a hearing, may use, sell, or lease other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b). A Chapter 11 debtor in possession has the power of a trustee to use or lease property of the estate under § 363(b). *See* 11 U.S.C. §§ 1107, 1108. Courts approve a Chapter 11 debtor in possession's use, sale or lease of property of the estate where the debtor has used reasonable business judgment and articulated a business justification for such use. *See, e.g.,* In re Chateaugay Corp., 973 F. 2d 141, 143 (2d Cir. 1992). Commonly referred to as the "business judgment" test, the standard applies to a debtor's decision to enter into a postpetition lease of real

5

573780-v1

estate. *See* In re Six Forks LHDH, LLC, No. 10-01254-8-SWH, 2010 WL 1740544, at *1-2 (Bankr. E.D. N.C. April 28, 2010) (recognizing that the business judgment test applies to a proposed lease and denying the debtor's request for authority to enter into the lease for lack of information regarding the lessee's financial viability and the lease's long-term market terms). Evidence that a debtor in possession has used reasonable business judgment and has articulated a business justification for a lease transaction includes generation of revenue which will benefit the estate. *See, e.g.*, In re Ernst Home Ctr., 209 B.R. 974, 980 (Bankr. W.D. Wash. 1997). In evaluating a debtor's exercise of business judgment, courts afford that debtor some deference because the debtor is familiar with its business and industry. "A debtor's business decision should be approved by the court unless it is shown to be so manifestly unreasonable that it could not be based upon sound business judgment, but only on bad faith, or whim or caprice." In re Cadkey Corp., 317 B.R. 19, 22-3 (D. Mass. 2004); *see* In re Aerovox, Inc., 269 B.R. 74, 80 (Bankr. D. Mass. 2001) (internal quotations and citations omitted).

In the present case, the evidence presented by the Debtor establishes that its decision to lease selected units is supported by sound business judgment and there is ample justification for the leasing program. The evidence is unrebutted that the leasing program is projected to generate substantial revenue for the estate and is likely to enhance sales of other units. The proposed rental rates comport with industry standards. Unlike the lease in In re Six Forks, in which the property could be locked in to the same rental rate for ten years, the leases proposed by the Debtor are for periods of six months to a year. There is no evidence that the short-term nature of the proposed lease agreements will disrupt the ability to sell units. The Debtor has provided evidence that tenants will be screened through a careful vetting process, which includes a credit check and verification of employment. This process will improve the likelihood that a lessee has

6

573780-v1

the ability to pay rent. The expert testimony that the leasing program is likely to enhance unit sales was credible and unrebutted.

Contrary to Prudential's assertion, the Debtor has outlined a coherent leasing strategy. During the evidentiary hearing, the Debtor presented evidence on all of the categories of information sought by Prudential. The Debtor agreed to provide, and the Court directed the Debtor to produce, documentation concerning proposed leases. Through the evidence adduced at the hearing, the Debtor has sufficiently addressed Prudential's concerns that the leasing strategy was not a reasonable plan.

Prudential insists on the right to approve the leasing program and each lease with every tenant. The provision in the loan documents that the Debtor shall not enter into a lease without Prudential's prior consent is subject to the condition that such consent shall not be unreasonably withheld or delayed. In view of the evidence submitted at the hearing, any decision by Prudential not to consent to the leasing program at this point would be unreasonable. Prudential does not have the right to approve each and every lease entered into by the Debtor, because once the leasing program is approved, such individual transactions become ordinary course of business transactions of the debtor in possession. In the event Prudential believes that the Debtor has mismanaged the process once leasing is implemented, Prudential has a number of remedies under bankruptcy law available to it.

Finally, the Court notes that much time was spent on this contested matter and the expenses of litigating this Motion were substantial. The details of the leasing program were not set forth in the Motion. Apparently, counsel to the Debtor and Prudential did not communicate with each other about the Motion before or after its filing and it does not appear that they communicated with each other even after Prudential filed its objection. This evidentiary hearing

7

573780-v1

would have been unnecessary had counsel effectively communicated with each other.   In the future, prior to filing any pleading with the Court, the Court directs counsel to Prudential and the Debtor  to confer and make a reasonable and good faith effort to resolve any dispute without the necessity of an evidentiary hearing.

Based upon the foregoing, the Court grants the Motion. A separate order will be entered.

Dated:  August 27, 2010

By the Court,

_____

Joan N. Feeney
United States Bankruptcy Judge

8

573780-v1