# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MASSACHUSETTS

```
==============================
IN THE MATTER OF:             .  Case #10-14535
                              .
  SW BOSTON HOTEL VENTURE,    .  Boston, Massachusetts
  LLC, AND GENERAL LAND CORP. .  November 9, 2010
                    Debtors .  1:06:08 p.m. O'clock
==============================
```

**DAY 2**

**TRANSCRIPT OF CONTINUED EVIDENTIARY HEARING AND TRIAL ON:
(#201) MOTION BY PRUDENTIAL INSURANCE CO. OF AMERICA FOR RELIEF
FROM STAY RE : 100 STUART STREET, BOSTON, MASS;
(#199 & #205) AFFIDAVIT OF ERIC B. LEWIS RE: [#201];
(#202) AFFIDAVIT OF RANDELL L. HARWOOD;
(#227) OPPOSITION BY DEBTOR; (#229) OPPOSITION BY CITY OF BOSTON;
(#307) SUPPLEMENTAL OPPOSITION BY DEBTORS;
(#338) JOINT PRE-TRIAL MEMORANDUM;
(#343) OBJECTION BY PRUDENTIAL INSURANCE CO., TO TESTIMONY OF
RANDELL HARWOOD AND JAMES PEKO
BEFORE THE HONORABLE JOAN N. FEENEY, J.U.S.B.C.**

**APPEARANCES:**

For the Debtor:                          HAROLD B. MURPHY, ESQ.
                                         CHARLES BENNETT, ESQ.
                                         Hanify & King, P.C.
                                         One Beacon Street
                                         Boston, MA 02108
                                              -------continued--------->

Electronic Sound Recording Operator:   Kaida M. Patterson

Proceedings Recorded by FTR Gold Digital Recording
Transcript Produced by Certified Transcription Service

GCI TRANSCRIPTION SERVICES
**210 Bayberry Avenue
Egg Harbor Township, NJ  08234-5901
1-609-927-0299      FAX 1-609-927-9768      1-800-471-0299
e-mail - irwingloria@comcast.net**

APPEARANCES - Continued


For Prudential Insurance Company of America:          EMANUEL C. GRILLO, ESQ.
                                                      JOHN B. DAUKAS, ESQ.
                                                      Goodwin Procter, LLP
                                                      The New York Times Building
                                                      620 Eighth Avenue
                                                      New York, NY 10018


Electronic Sound Recording Operator:    Kaida M. Patterson

Proceedings Recorded by FTR Gold Digital Recording
Transcript Produced by Certified Transcription Service

GCI TRANSCRIPTION SERVICES
**210 Bayberry Avenue
Egg Harbor Township, NJ  08234-5901
1-609-927-0299      FAX 1-609-927-9768      1-800-471-0299
e-mail - irwingloria@comcast.net**

## *I N D E X*

| WITNESSES | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| **KEVIN J. AHEARN** | | | | |
| By Mr. Murphy | 3 | | 80 | |
| By Mr. Grillo | | 42 | | |
| | | | | |
| **PAUL BOYD GRIESMER** | | | | |
| By Mr. Bennett | 82 | | 139 | |
| By Mr. Daukas | | 79 | | 153 |

| Exhibits | | Ident. | Evid. |
|---|---|---|---|
| D-6 | Otis & Ahearn Real Estate weekly report, "Connect the Dots. Abbreviated Weekly Market Watch, Revised as of 10-29-10." | | 7 |
| D-7 | Weekly report | 6 | 6 |
| P-5 | Sales & marketing strategy letter dated 10/15/07 | 41 | 41 |
| P-6 | FTI condominium appraisal | 45 | |
| P-H | Mihalko Letter | 58 | |
| P-7 | Year-end report for 2008 prepared by Mr. Ahearn | 70 | 70 |
| Defendant-Chalk #7 | RE: Theme Bar Capital Expenditure analysis | | 147 |

1  (At 1:06:08 p.m.)

2           THE COURT:  Are the parties ready in SW?

3           MR. BENNETT:   We are, Your Honor.

4           MR. MURPHY:   Your Honor, if I may, I'd like to call

5  Kevin Ahearn.

6           **KEVIN J. AHEARN, DEBTORS' WITNESS, DULY SWORN**

7                      **DIRECT EXAMINATION**

8  **BY MR. MURPHY:**

9      Q.   Mr. Ahearn, would you give your name and address for

10 the record, please?

11     A.   Kevin Joseph Ahearn, 174 Morrow Street, Boston,

12 Mass.

13     Q.   Are you employed, sir?

14     A.   Yes.

15     Q.   With whom?

16     A.   My own company, Otis & Ahearn.

17     Q.   Are you the owner of that firm?

18     A.   I am.

19     Q.   And what does Otis & Ahearn do?

20     A.   We're involved in the residential market in downtown

21 Boston in both the resale market and in on-site marketing.

22     Q.   And how long has Otis & Ahearn been in existence?

23     A.   Essentially thirty-two years.

24     Q.   Were you a founder of the firm, sir?

25     A.   Yes.

1      Q.   And what have you been doing for all -- have you

2   been employed with Otis & Ahearn during the last thirty-two

3   years?

4      A.   Yes.

5      Q.   And can you give me some brief -- and the Court -- a

6   brief background of your experience at Otis & Ahearn as it

7   particularly relates to the development and sale of new

8   condominium Boston -- units in the City of Boston?

9      A.   We've done two major cycles in the downtown market

10  where we've been very active, in the Eighties -- late

11  Eighties, where we did a number of on-site marketing

12  developments.   And then beginning in 2000 with Trinity Place,

13  we've in succession done a number of major buildings,

14  including Trinity Place, Belvedere, 500 Atlantic Avenue, the

15  Intercontinental, 360 Newbury Street -- about 25 to 30

16  developments of on-site marketing.

17     Q.   And those on-site marketing are for luxury

18  condominiums within the City.

19     A.   Yes, from a -- in a range of price.

20     Q.   And what in particular do you do with respect to a

21  new development in --

22     A.   There are usually four to five phases or steps, if

23  you will.   The first one is project viability.   We'll get

24  involved very early with both the developers and the debt to

25  evaluate the viability of the development.

1          The second phase has to do with what we call unit

2    programming, which essentially works it backwards, identifying

3    who will be buying in a building and what type of unit we

4    would recommend that schematic design be done.

5          And then the third phase would be having to do with

6    finishes and features to both the building and the units to

7    enhance the marketability; and then the next phase would have

8    to do with conceptualizing sales and marketing program, and

9    then executing the sales and marketing program.

10        Q.   And this is the job you've done -- your firm has

11   done for a number of these developments you previously

12   testified to.

13        A.   Yes.

14        Q.   Does Otis & Ahearn as well keep track of market

15   trends, sales, and the like?

16        A.   Yes, we've been doing market studies since 1989.

17   More recently in the last four years we've been doing it

18   almost on a weekly basis, if not a weekly basis.

19        Q.   And let me show you --

20        MR. MURPHY:   If -- Your Honor, I may point you to

21   Exhibit -- Debtor's Exhibit G for identification.   It's a

22   report of Otis & Ahearn Real Estate, "Connect the Dots.

23   Abbreviated Weekly Market Watch, Revised as of 10-29-10."

24   BY MR. MURPHY:

25        Q.   Do you have a copy of that, sir?

**KEVIN J. AHEARN - Direct/ Murphy**                                          **Page 6**

1       A.   I do not.

2       Q.   (Pause)  Excuse me, Mr. Ahearn.  (Pause)   And what

3   is this report, sir?

4       A.   As we said, it's a weekly report that tracks sales

5   transactions, condominiums exclusively, on a year-to-date

6   basis from 2000 through 2010.   In addition to that, it has

7   other data points, including the total volume of sales,

8   average, median, and then there are other high-end data points

9   that are incorporated into the following pages.

10      Q.   And what information do you utilize to prepare this

11  report, sir?

12      A.   We -- we utilize it in many ways.  First and

13  foremost, we utilize it with prospective buyers to help them

14  and advise them as to what is actually happening in the

15  marketplace in terms of values and trends.   We use it with

16  the media a great deal.   We also use it obviously with our

17  developer/clients, and it's also used with various other

18  sources in the marketplace.

19      Q.   And you prepare this in the ordinary course of your

20  business.

21      A.   Yes.

22      Q.   And you've been preparing that weekly for the last

23  four years?

24      A.   At least.

25           MR. MURPHY:   Your Honor, I'd ask that this be

1  marked as Defendant's Exhibit 6.

2          CLERK:   7.

3          MR. MURPHY:   7.

4          THE COURT:   Any objection?

5          MR. GRILLO:   Oh, no objection to it being offered

6  into evidence, Your Honor.

7     **WHEREUPON EXHIBIT #D-7 MARKED AND ADMITTED INTO EVIDENCE**

8  BY MR. MURPHY:

9     Q.   Briefly, Mr. Ahearn, could you walk the Court and

10 the rest of us through the report, and the particular pages --

11 I guess the first page of the information is contained in

12 Section 1.1, sir?

13    A.   Yes.

14    Q.   And what does that show?

15    A.   Well, this is -- this shows that the, contrary to

16 perception, that the downtown market has not only held value,

17 but has probably actually expanded in certain segments.   The

18 far right-hand side that's circled compares 2010 through 2009.

19 One other thing that has happened in the marketplace is as

20 sales have slowed down with fewer developments closing, and

21 obviously some impact on some segments of the market on the

22 financial crisis, the values have still held, which is very

23 contrarian and very unique.

24          So the absorption number, for instance, has gone up

25 16 per cent, from a billion two and change in '09 to a billion

1 four.   If you look at 2000, 2001, and '02, you can see this

2 year it exceeds those prior years, which were active:

3 Trinity, Belvedere, and so forth.

4        The averages are plus-13.4 per cent, recently

5 reported in the press as a record.  The median is plus-6.4 per

6 cent.   So this page we use to frame up essentially what is

7 holding of the value.   Most importantly, if you look at the

8 left-hand chart -- lower left-hand side -- the dark line shows

9 the average price and the trajectory from 2000 through 2010;

10 and as you can see that, that's an enviable escalation or

11 holding of values *and* escalation of values.

12        There's a dip in 2006, and there's a slight dip

13 after a peak market in '08 to '09, and the last dot is a

14 recovery in '10.  So that's -- that is, as a visual, a very

15 important thing that captures the essence of the market.

16        The median is the burgundy or the red, and that

17 shows a similar trajectory and trend to the average.

18        So that's primarily what we use this page for.

19   Q.   And turn to the next page, if you will, up in the

20 upper right-hand corner, Section 1.2.   What does this show,

21 sir?

22   A.   This is a neighborhood breakdown by neighborhood on

23 both transactions and sales volume, and what has happened also

24 in a very contrarian way is the marketplace I refer to as

25 "parochial," meaning there's tremendous stability and

1  predictability neighborhood-to-neighborhood, year-to-year,

2  even with the inclusion and closing of large developments.

3  After a large development will close the market --neighborhood

4  will go back to its traditional trending in terms of market

5  absorption, so this is what we use this page for.

6      Q.   And the following page, Section 1.3, first I'd ask

7  you about the footnote in the bottom, and that's in red, sir.

8  Is that correct, sir?

9      A.   No.  This note should have been cleaned up by the

10  analyst.   Every week we keep updating it, and this is

11  obviously an old note.

12     Q.   And there are certain numbers circled on this chart,

13  sir.  Can you tell me what you intended to show by those

14  circled numbers?

15     A.   This -- this page is very, very important and

16  germane to the W and all high-end luxury condominiums in

17  downtown Boston.   The far right-hand side, year-to-date 2010,

18  it shows there are 91 transactions year-to-date.   And then if

19  you go to the left, you'll have -- you'll see the year-end in

20  white, or in blue circled the year-to-date.   So in '09 there

21  were 78 transactions year-end over 1,000 a foot.   2008 was

22  the high water mark in Downtown Boston, and we had seven

23  record data points.   We never got credit for it, and it was

24  overshadowed by the national housing bubble.

25          In 2007, a very strong year, you had 87 transactions

1    year-to-date.      '06, 79; and in 2005, 93.    So in framing up

2    the $1,000 a square-foot trend on which buildings are under it

3    in a great deal, we are going to be the second record year in

4    the last ten, in 2010.

5         Q.    And the chart on page 1.4, sir.

6         A.    The next page has to do with what we call price

7    segmentation.  We break down the transaction activity:  0 to

8    499; 5 to 9; and so on and so forth, the far left-hand side.

9    But what's very important about this page are really two

10   things:    On the low end of the market, at the top of the

11   first box in pink, if you see 2004, you see 2,547

12   transactions, 0 to 499.    In 2010 you see 1,214.

13        What has been happening in the marketplace is we've

14   been losing the under half a million dollar market.    So

15   that's where the transaction slide has been.    The other

16   segments of the market have held or gone up and expanded,

17   demonstrated by a million plus -- a million to a million nine,

18   far left-hand side in 2000 is 45.  This year it's 73.

19        The next thing that we look at and deal with a lot

20   is sales over two and three and a million dollars.  The far

21   right-hand side in green with the arrow is 76 transactions,

22   year-to-date, over two million dollars.    The 29 below it to

23   the left, underlined in red, is 29 transactions year-to-date,

24   over three million dollars.    The prior year 2009 you can see

25   they are respectively 53 and 18.    So we've have a tremendous

  — 

1  rebound in the high end of the market.

2        In addition to that we have in blue, in the next box

3  down, the million dollar-plus sales.   Year-to-date they're

4  292, and to the right of that is 13.41 per cent.  If you go to

5  the far right-hand side in that box, you have 169 transactions

6  in 2000, when Trinity was closing; and you have 8.1 per --

7  8.15 per cent.   So the -- I think that's 6.   6.15, excuse

8  me.  So the high end of the market has expanded dramatically

9  is the -- is the bullet here.  So that's what we use this page

10 for.

11      Q.   And the last pages, Section 1.5, there are several

12 of them, sir.  What are those intended to convey?

13      A.   This is a group of what we call sample full-service

14 buildings.   They're some of the top buildings in the

15 marketplace that we chart on a weekly basis to trend on sales

16 activity, and most importantly, on values.   So, for instance,

17 the Ritz, Millenium, thirteen transactions year-to-date, three

18 over 1,000-a-foot.   The average is 932.

19      All the banks underwrite on average per square foot,

20 so we watch this carefully.

21      Ritz Carlton, the next building, only one

22 transaction.  1045.   Belvedere, 1174.   Rowes Wharf.  And

23 then you hit One Charles, a comparable project, 899 a foot,

24 fifteen transactions, three over 1,000-a-foot.

25      Trinity Place, 992; Four Seasons, 1137; 45 Province,

1  another competitor on the next page, is at 811 a foot, nine

2  transactions year-to-date.   Grandview, Atelier, the South

3  End, Burroughs Wharf, Heritage, and so forth.

4       The last page has both 500 Atlantic Avenue that

5  we're just finishing, with two units left in that building;

6  and $900 a foot is what the sales year-to-date have been in

7  that building on average.   The Mandarin is 1,572; Battery

8  Wharf, another development we're working on --

9       Q.   A little bit back -- maybe you just want to put that

10  microphone a little bit back --

11       A.   Am I blowing you out, Harry?

12       Q.   I'm fine.

13       A.   Sorry.

14       Q.   I can hear you well, Mr. Ahearn.

15       A.   Okay, Harry.  500 Atlantic Avenue, we're at $900 a

16  foot; eleven transactions.  Mandarin, 1,572; Battery Wharf is

17  another development in which we're involved, 1,105 a foot.

18  We've sold thirty and a half million dollars there this year.

19  We've had a good year, so that's 1,105.

20       The Bryant, recently in the news as an auction

21  development, we'll probably talk about that: 720 a foot.  So

22  it's the low yield in the marketplace.

23       Q.   So what -- what -- what can you summarize, based

24  upon --

25       A.   I'm sorry, I didn't finish with the report.

1        Q.   Can you summarize for all of us, based upon your

2   report, your belief or understanding or opinion as to the

3   current real estate market in the City of Boston for products

4   similar to the products being offered the the W, that is

5   luxury condominiums?

6        Q.   We've definitely been through the most challenging

7   period of time in my thirty-odd years with the Great Recession

8   and the financial crisis, no questions about it.   The

9   marketplace paused -- it paused.   It didn't have diminution in

10  value.   It just stopped, so we had a very quiet fourth quarter

11  of '08, very quiet first half of '09 as the market was in

12  pause.

13        However, the data markedly demonstrates a holding of

14  value.   So from my perspective in doing this thirty-odd

15  years, it's probably about to enter, in my opinion, the best

16  period of time for development that I've ever seen, because of

17  the confluence of factors.

18        Q.   And does -- does -- how does existing inventory play

19  into that?

20        A.   Current inventory is about six months' supply, which

21  is universally respected as a balance market.   That inventory

22  is going to drop rather quickly because there's no development

23  pipeline, and the full service buildings are working off

24  inventory regularly, as each week goes by.   We have a current

25  72 in this group of buildings, with pieces of real estate for

**KEVIN J. AHEARN - Direct/ Murphy**                    **Page 14**

1  sale, which is about five per cent of the turn of those units.

2      Q.   And how does interest rates affect that?

3      A.   Well, the interesting thing is that the interest

4  rates, when they were high, didn't really slow down the

5  market.  But they do help a little bit more for sure when they

6  go to record lows.

7           Now we've studied that at length with what we call a

8  leverage trend where we analyze all the transactions.  That's

9  because you have as very affluent market with tremendous

10 afforda -- that they can afford what they're looking at.  So

11 the interest rates' swing has very little impact, and it's

12 also a non-point market, the mortgage brokers will tell you --

13 meaning you can get in and out of refinancing quickly without

14 that much cost.

15     Q.   All right, let me back to the W, if I may.   When

16 were you -- when was Otis & Ahearn retained by the W?

17     A.   We started working on it in 2006, about 2006, middle

18 third-quarter.

19     Q.   And what did -- what work did you do then, sir?

20     A.   We were starting to work with John Connolly and

21 Carol on the planning for the project.

22     Q.   And what goes into that planning phase?

23     A.   The big part in the beginning has to do with what's

24 called the inter-programming, which is conceptualizing what it

25 is we think should be in the building in terms of unit types;

1 how many of each unit type; and what we feel we're going to

2 achieve as a sell-out number.

3    Q.   Okay.  What else is involved in the planning?

4    A.   We get very involved with what's called "schematic

5 design."  I'm not a trained architect, but I actually do

6 eighth-inch scale drawings.  So what happens is the

7 architects, when they start the program, we'll tell them we

8 want X amount of studios, one-bedrooms, whatever.   As the

9 schematic design evolves, I'm annotating the plans and turning

10 them back with what I think are the solutions to the

11 deficiencies and the layouts, so that takes up a tremendous

12 amount of time.

13        We also get involved in what's called the branding,

14 the finishes, and the features for the building, which would

15 include hardwood floor, stones, plumbing fixturing -- anything

16 that's going to position and brand the development in the

17 marketplace.

18    Q.   Okay.  So can you tell the Court a little bit about

19 what the -- what your -- what ultimately turned out to be the

20 plan and the program or the division, if you will, for the W

21 residences?

22    A.   When we got involved with the developer -- it was

23 easy to see that it was going to have a competitive advantage

24 on views over many of the resales in the luxury buildings --

25 Heritage, Four Seasons -- that are lower-rise.

**KEVIN J. AHEARN - Direct/ Murphy**                    **Page 16**

1              So what we were trying to do was take that footprint

2    and that building mix, so that we would offer units in the

3    marketplace that you couldn't get in some of the other

4    buildings; i.e., a studio or a one-bedroom with a view.  Very

5    hard commodity to find.   Two-bedroom at-home office.

6              So we very, very -- you know, from a planning

7    standpoint we very much wanted to add in the mix of studios,

8    ones, twos, and then the penthouse units to attract a broad

9    range of buyer profiles.

10         Q.   And with respect to finishes.

11         A.   When we first got involved in the building -- it's

12   called a glass-and-curtain-wall building, which means that the

13   curtain wall is snapped onto the frame of the building, and

14   it's a lot of glass.   These buildings are all about views,

15   reflectivity, and sunlight.

16              It's a unusual building architecture for Boston.

17   Usually it's what we call punched windows with smaller

18   windows.   This is all about views, so the Ritz Millennium was

19   the first residential building that was done like this.   The W

20   followed it.   And they're very, very much in demand because

21   of the features that I mentioned.

22         Q.   And what about in terms of our efforts -- so you

23   started that process in late '06, sir?

24         A.   Give or take.

25         Q.   And that continued through '07?

1      A.    Yes.

2      Q.    And were you ultimately -- Otis & Ahearn -- selected

3  as sales agent and signed a contract in that regard?

4      A.    Yes, we did.

5      Q.    And when did you start marketing the units for sale?

6      A.    We have a problem with the financing that fell

7  through, and so we got delayed a bit on our formal start of

8  selling.   So we were getting ready and getting a pre-sale

9  marketing center built out in the end of 2008, and we hired

10  our first staff person I believe in September or October of

11  '08.

12      Q.    What happened then, sir?

13      A.    What happened then was obviously the financial

14  crisis hit with a vengeance.   We did not see that coming, and

15  we thought we were by that housing bubble that was -- was --

16  had overtaken the country and the world, but we had avoided it

17  through 2008, first half.   And then that hit with a

18  vengeance, and the market -- marketplace stopped.   It just

19  stopped to digest what was happening, so we -- we -- our

20  timing was not good for the beginning part of the marketing

21  effort.

22      Q.    So at the time of the filing of the -- ultimately,

23  the company -- strike that.   How many units were sold prior

24  to the company's Chapter 11 filing in April --

25      A.    Thirteen -- thirteen closings.

**KEVIN J. AHEARN - Direct/ Murphy**                                    **Page 18**

 1       Q.   Maybe I can show you that exhibit, sir.  I believe

 2   it's Exhibit 2.

 3            THE COURT:   Exhibit 2?

 4            MR. MURPHY:   Defendant's Exhibit 2.

 5       (Pause)

 6            MR. GRILLO:   Excuse me, Your Honor, are we -- I

 7   apologize, are we putting them up on the screen to be seen?

 8            THE COURT:   Well, sure.

 9            MR. MURPHY:   (Not near microphone)

10            MR. GRILLO:   Thank you.

11       (Pause)

12   BY MR. MURPHY:

13       Q.   Does this Exhibit 2 accurately reflect the activity

14   (unclear, not near microphone)

15            MRS. PATTERSON:   Mr. Murphy, could you please stand

16   at the podium --

17            MR. MURPHY:   I'm sorry.

18   BY MR. MURPHY:

19       Q.   Does that -- does Exhibit 2 accurately reflect the

20   sales activity a The W Hotel through November 1, 2010, sir?

21       A.   Yes.

22       Q.   And at the time of the filing of the Chapter 11 did

23   the company have certain pending purchase and sale agreements?

24       A.   Yes, we did.

25       Q.   And ultimately how many of those purchase and sale

1  agreements did the company ultimately close?

2      A.   Eight.

3      Q.   And what happened to the remaining four?

4      A.   They're under purchase and sale agreement.   One is

5  a double unit, 16-C and D; and another is 17 -- I'm sorry,

6  16-H; and another 17-H, and we're fully expecting to close

7  those in the fairly -- in fairly immediate future in that all

8  the buyers are very much interested in going forward with the

9  purchase.

10     Q.   And how many sales has the company had post-

11 bankruptcy?

12     A.   I believe that's twelve.

13     Q.   Twelve.  And that includes one that's not listed on

14 this sheet, isn't that correct?

15     A.   21-I, yes.

16     Q.   And how are sales proceeding now, sir?

17     A.   We had difficulty in the beginning obviously, when

18 the filing occurred -- it being a very rare occurrence in

19 Boston; and so we spent 30, 90, 120 days at least answering a

20 lot of questions and understanding what was going on and

21 trying to help people understand what's going on.

22          We've had a tremendous run of late, so that we -- we

23 -- we had another setback when we had the motion for relief,

24 which isn't making things easier by any stretch of the

25 imagination; but we've had a very consistent, regular

1  appointment activity with about forty people a month, and

2  we're converting that -- we're going through a big run right

3  now.  We're working on, as we speak, two reservations from the

4  weekend beyond the current ones we have under reservation and

5  working on a third one as well.

6     Q.   Let me show you the -- I believe it's been marked as

7  Debtors' Exhibit 3, which is the pending Reservations and

8  Purchase and Sale Agreements, sir.   And does that reflect

9  some of the recent activity at the buildings?

10     A.   I don't have one, Harry.

11          CLERK:   Exhibit 2?

12          MR. MURPHY:   Exhibit 2.

13     (Pause; conversations away from microphones)

14  BY MR. MURPHY:

15     Q.   Before we get to Exhibit 3 (not near microphone) --

16  how does The W sales in 2010 (unclear, away from microphones;

17  other microphones being bumped) compare with some if its

18  (unclear, not near microphone)  developments?

19     A.   Well, the interesting thing is post-filing, April

20  28th, 45 Province has closed eight units in 7.8 million of

21  deeded recorded prices.

22     Q.   Excuse me, could you say that again, sir?

23     A.   45 Province has closed since April 28th eight units,

24  and 7.8 million in recorded sales prices.   The Clarendon has

25  closed nine units, and 11.6 million in recorded prices.   And

**KEVIN J. AHEARN - Direct/ Murphy**                    **Page 21**

1   The W has topped those with twelve and 13.2 million in gross

2   sales since April 28th.

3       Q.   Notwithstanding the bankruptcy filing and the

4   pendency of the motion for relief, The W has sold more than

5   both those developments?

6       A.   Absolutely.

7       Q.   Sir, with respect to the pending purchase and sale

8   agreements and reservations, is there another unit that is not

9   on that list that was signed over the weekend?

10      A.   Yes.   22-F.

11      Q.   How much is that for, sir?

12      A.   That's for 785,000.

13      Q.   Is there a buyer credit on that?

14      A.   Is there a buyer credit?

15      Q.   For that particular (unclear)

16      A.   Oh, I'm sorry.   No.   That's 785 net.   I'm sorry.

17  You're referring -- not referring to 22.   You're referring to

18  J.   Okay.   I'm sorry.   23-J went under agreement last week.

19  A couple from Hawaii, family here; cash deal.   That went for

20  762, without parking, with a buyer credit of 40,000.

21      Q.   That's the -- that was the additional one.   And on

22  top of those reservations, have -- are you in discussions with

23  other prospective purchasers of the units?

24      A.   We are.   We're working on two -- 22-F, and we're

25  also working on a G unit.

**KEVIN J. AHEARN - Direct/ Murphy**                                **Page 22**

1      Q.    Explain to the Court these letters.  What is an "F"

2  unit, sir?

3      A.    That's a one-bedroom on the Park side, with a view

4  of The Common and The State House.   The G unit is the prow of

5  the building, towards the Ritz Millennium, with a view of the

6  central business district, one of the larger units.   Plus we

7  have two to three very strong prospective buyers for G units,

8  that were actually under reservation, or contemplating a

9  reservation, at the time of the filing that have been watching

10  us in our progress.

11          So we've sold two B units, we've sold -- obviously

12  we closed on Penthouse 4.   We have a reservation on Penthouse

13  2, a new -- new deal; and that's also a cash purchase, so

14  we've had -- we've had a very good run here of late.

15      Q.    Sir, do you know what the square footage of these

16  units that are under reservation is?   And could you calculate

17  the square footage price on those units?

18      A.    Take 5-6-9-4-8-5-1, divide it by 5-2-2-2.   1090 a

19  foot.

20      Q.    And which unit is that, sir?

21      A.    That's  -- well, those are the three -- the

22  aggregate is 1091 a foot, but if you take 19-D, or do you want

23  to do the P&Ses?

24      Q.    Just D reservations.

25      A.    Reservations, okay.   385, one, two, three --

1  divided by 427 feet -- 385 one, two, three -- divide 427.

2  901.63 a foot.   A million eight twenty, one, two, three.   A

3  couple from Thailand, cash deal, divided by 1713 -- 1062.46 a

4  foot.

5       Q.   (unclear, not near microphone) penthouse, sir?

6       A.   3489 -- cash deal -- repeat client -- 3082 -- hold

7  on.  3-4-8-9-8-5-1 -- divide 3082 -- 1132.33 a foot.

8       Q.   Now are you familiar with the -- are you familiar

9  with the appraisal prepared by FTI for the debtors in these

10 proceedings?

11      A.   Yes.

12      Q.   Were you involved in any way with Mr. Griesmer in

13 terms of --

14      A.   We had discussions about the overall market.

15      Q.   And did you discuss in particular the -- the status

16 of sales of the unit, and what had happened at the

17 development, and what was going on at the development

18 regarding condominium sales?

19      A.   Yes.

20      Q.   And are you familiar with what the square foot value

21 he ascribed to the remaining unsold units?

22      A.   Yes.

23      Q.   And what was that square-foot value?

24      A.   925, 926 a foot, I believe.

25      Q.   And in your opinion, will The W be able to achieve

**KEVIN J. AHEARN - Direct/ Murphy**                    **Page 24**

1  that number from the sale of the remaining units?

2      A.   Yes.

3      Q.   And why do you believe that, sir?

4      A.   Well, we've done a lot of buildings over the years

5  in different cycles -- three to four recessions.  We've been

6  through this before.  9-11 was not as severe, but we were

7  doing the Belvedere at that point in time, so we had a similar

8  pause and then moved forward and achieved the sell-out

9  numbers.

10        We've had a lot of experience with this.  We work

11  hard at it, so it's based on experience, and it's based on the

12  macro factors in the marketplace are very solid, and it's the

13  big story that people have not heard yet.  It's beginning to

14  come with the press.  Recently this third-quarter *The Globe*

15  wrote a positive article about the Link (phonetic) Report,

16  first quarter the same way.

17        So the story's starting to come out, and then the

18  marketplace will move off the sidelines and move forward with

19  the purchasing.

20      Q.  Are you familiar as well with the "pace," and what

21  can you tell the Court what the pace means with respect to

22  this (unclear)

23      A.   Sales absorption.  It's a monthly pace, a monthly

24  sales absorption on sales of units.

25      Q.  And how would you characterize The W's current pace,

 1  sir?

 2      A.   Well, the interesting thing again is if you look at

 3  the post-filing absorption, we're at -- I'm sorry -- post-C-

 4  of-O.

 5      Q.   And when did the company receive its Certificate of

 6  Occupancy, sir?

 7      A.   December of '09.  And if you look at post-C-of-O

 8  closings, we're at 2.3 month -- 2.3 units a month absorption.

 9  The 45 Province is at 1.4, same period; and the Clarendon,

10  which has 36 sales, is at -- now -- is at 3.1.

11      Q.   Let me go back on those numbers, sir.  Are you

12  comparing The W's performance post-CO versus P-CO performance

13  of The Clarendon and The Province?

14      A.   Correct.

15      Q.   When did 45 Province get their Certificate of

16  Occupancy?

17      A.   The Certificate of Occupancy was in May of 2008 --

18  sorry -- two thousand -- 45 province was May of '09.

19      Q.   Approximately six months before The W?

20      A.   Yes.

21      Q.   And how many units has it sold post-CO?

22      A.   Eight.

23      Q.   Only eight units?

24      A.   Eight units.

25      Q.   And how many --

1      A.    I'm sorry -- post-CO.  Excuse me.   I stand

2  corrected.  In '0 -- in '09 they sold fifteen units, and

3  they've sold eight to date.  They have a total of 24.

4      Q.    They have 24 units, and The W has 25, correct?

5      A.    Not including reservations.

6      Q.    And The W -- and, if you will, Province has been

7  opened for six months longer in terms of having a Certificate

8  of Occupancy, is that correct?

9      A.    The -- actually they started their sales in 2006.

10      Q.    And if you remember, sir -- because you have all

11  these numbers in your head -- comparing -- are you familiar

12  with the performance of the Clarendon, sir?   When did the

13  Clarendon get its Certificate of Occupancy?

14      A.    December of '09, very close to ours.

15      Q.    And do you know how many total units The Clarendon

16  has sold?

17      A.    Thirty-six.

18      Q.    And you compare it at 25?

19      A.    Plus P&Ses and reservations.

20      Q.    Sir, I'm going to ask you perhaps, if you may -- I

21  have a couple of slides, if you could just show the Court --

22          MR. MURPHY:    -- if the Court permit, to Mr. Ahearn

23  to come up to the projector and just show and describe some of

24  the slides of the building, Your Honor; because in particular

25  reference I'd like to ask the Court to desc -- Mr. Ahearn to

1  describe what is known as the "designer program," that so-

2  called "20ᵗʰ Floor," to understand how that is working at The

3  W.

4           THE COURT:   Any objection?

5           MR. GRILLO:   None, Your Honor.

6  BY MR. MURPHY:

7      Q.   (unclear, not at microphone) first describe the

8  views.

9      A.   (unclear, not at microphone)

10          THE COURT:   Do you have them on a -- do you have

11 them on a laptop?

12          MR. MURPHY:   (unclear) unfortunately don't, Your

13 Honor.

14 BY THE WITNESS:

15     A.   The view -- the building is blessed with views

16 really 360.   So this is the west view looking towards the

17 Prudential Center, and it has the river in the top right-hand

18 corner, sunset views.

19          The north faces towards the Boston Common, the State

20 House, and Beacon Hill, so it has a very unusual view as well,

21 and it gets the lights of the central business district, or

22 the mid-town, in the evening.

23          The east facing towards the harbor gets the skyline

24 obviously of the south side of the central business district

25 and the waterfront, and then the airport beyond, and the

1  harbor.  You don't have one of the south, but the south faces

2  the Blue Hills, and you can see down into Marina Bay.

3       Q.   Now some of these finishes -- Mr. Ahearn, let me

4  just ask you -- what is the -- what did the company do with

5  respect to the 20th floor of The W?

6       A.   Well, we didn't have any budget to really do

7  anything dramatic with furnished models.  So with a friend of

8  mine from the design center we came up with an approach which

9  was to approach designers and vendors, including furniture

10 vendors, to do -- let me just get this up (unclear) -- to do

11 what we ended up being able to achieve, which was an entire

12 floor of seven furnished models for a fairly modest investment

13 on Sawyers' part of 150,000; so we probably have a million and

14 a half in value.

15       So these seven models, we've selected seven interior

16 designers in Boston, all of whom spec'd everything that you

17 see in place, for the exposure that they would get from the

18 sales and marketing effort.  So to the best of my knowledge

19 it hadn't been done elsewhere in the country -- certainly

20 furnished models have, but nothing like this concept, which we

21 call "Inspired Concepts by D-V-C," designers, vendors, and

22 contractors.

23       Q.   Now you have testified, sir, that obviously the

24 recession that started in late '08 and continued through '09

25 had a negative effect on sales, is that correct?

1       A.    Correct.

2       Q.    What steps have you taken, or are you currently

3    taking, to overcome those negative trends as well as the

4    issues surrounding the company's reorganization?

5       A.    Well, we've worked very, very hard at helping people

6    understand what's happened with the data, first and foremost.

7    The banks as well.   So immediately we started meetings with

8    everybody that we could speak to, to explain some of what we

9    just went over, and the basic fundamentals of the marketplace

10   that are so solid.

11          The banks -- the local community banks really hung

12   in there, without any portfolio problems.   They don't have any

13   problem loans, and so they're anxious for this "paper,"

14   they'll call it -- they're anxious for this borrower, so we

15   have Boston Private, we have First Republic, we have

16   Wainwright Bank, and others -- guaranteed rate -- that are --

17   that are lending for us.   So the end loans were an important

18   component to get everybody comfortable with.

19          In addition to that, we -- you have to work very,

20   very hard with the brokerage community -- meaning the general

21   brokers.   They tend to not keep up to the degree they should

22   with what's going on in the marketplace, so we've had a number

23   of broker events, and we've had good participation with the

24   brokers in the sales and marketing effort.

25          In addition to that, we've used the 20th floor as a

1  venue for events, a variety of high-profile events, including

2  an anniversary party for "Boston Common" magazine.  It's a

3  coffee table full-color, high-gloss magazine.  It comes out

4  six times a year.  They're in Manhattan, Las Vegas, and other

5  markets.  And it made a big impact here, so we hosted their

6  party.

7         We had "Design New England," which is *The Globe's*

8  design magazine, with an event with Patti Austin, the

9  (unclear) singer, just recently, and had another 250 people

10 up.

11        So we've used that floor for a couple of different

12 reasons:   First and foremost, to build traffic and create a

13 buzz in the marketplace.

14        So those would be the major components.

15     Q.   And what about your sales team, sir?

16     A.   We -- we made a -- we made a change recently.  We

17 had a good team.   We had the opportunity by just good timing

18 to get what I considered to be the top on-site sales director

19 in Boston, whose name is Dinny Herron, and she was working at

20 500 Atlantic Avenue and executed the last sale, which is a six

21 million dollar sale.   And she was available, and I just made

22 the decision and recommendation to Carol that we make a move.

23 Dinny is now on board, so we have certainly enhanced the sales

24 team as well.

25     Q.   And these are -- and you have two on -- the debtor

1  has two on-site sales personnel --

2       A.   Yes.

3       Q.    -- that are working under your direction and The

4  W's -- and SW Boston's direction on --

5       A.   Yes.

6       Q.    -- (unclear, microphone bumped) sales and leasing

7  of units?

8       A.   Yes.

9       Q.   And with respect to advertising, are any plans on

10  (unclear) on advertising?

11      A.   Yes.  The first -- first-of-all, we try to keep the

12  advertising fresh, to keep people coming back in to see a

13  different part of the development.  The first was the 20th

14  floor.  Furnished models sell real estate, they build

15  traffic; and we had this group of seven, and it's worked very,

16  very well as a first-phase add.

17       We now, with the sale and closing of Penthouse 4,

18  the reservation of Penthouse 2, two upper B units, we now have

19  -- we now have enough sales activity at the top of the

20  building and more to come to really push the view factor of

21  the building; and we've got a good story to tell there.

22       So the next ad campaign that we'll be rolling out

23  very shortly is a -- is a series of view ads.

24       Q.   Is the company also planning another model unit,

25  sir?

1      A.   We -- fortunately, yes.   Fortunately, with the

2  success of the 20th floor and the buzz that it's created in the

3  interior design community, we've been approached by multiple

4  interior designers that will spec an additional model for us,

5  which we will do on the 27th floor, the C unit, that we do not

6  have as a furnished model on the 20th floor, because it's

7  serving as a sales office.   So it's not being presented and

8  marketed to its full potential right now, so we're making the

9  plans for that right now.

10      Q.   And, sir, in terms of unit mix, can you tell the

11 Court briefly the mix between studios, one-bedroom, two-

12 bedrooms, three-bedrooms, penthouses -- in the building?

13      A.   22 studios, 47 one-bedrooms, 51 two-bedrooms, and

14 three pent -- and three three-bedrooms.

15      Q.   Thank you.  And how  -- were you involved in

16 developing that mix?

17      A.   Very definitely.

18      Q.   And can you tell us how that mix works in terms of

19 the seller?

20      A.   Well, as I stated earlier, you play offense in some

21 situations; you play defense -- it's like sports.  We have the

22 opportunity with the view to pay offense with smaller units

23 and both studios and one-bedrooms that could offer a view that

24 you could not have in other buildings.

25           So at the same time that we were offering larger

1  units for which there's a big demand, we wanted to offer the

2  smaller units; and we knew that we'd be able to achieve a high

3  yield, a high price per square foot for those units, to keep

4  the average at the end of the deal up.

5          So it's -- the mix serves many purposes.  It targets

6  a big net of buyers.  Obviously if you have just two-bedroom

7  units, you're going to be targeting an empty-nester buyer.

8  If you have studios, ones, a smaller two, larger two,

9  penthouse, you've got a bigger net that you're going after

10  more buyer profiles.   That's what unit programming is all

11  about.

12      Q.   And how would you describe the unit program of The W

13  as compared to the 45 Province or the Clarendon?

14      A.   Well, it's interesting in that 45 Province has 108

15  two-bedroom units -- about 69 per cent.   The Clarendon has

16  71.   So both of those -- and both of those buildings have to

17  go after and achieve higher what we call capture rate --

18  higher capture rate for that particular unit type -- two-

19  bedroom.   So we were able to, by design, build in a broader

20  mix of units at The W.

21      Q.   And could you tell me how parking fits in with the

22  sales strategy and the parking situation in particular at The

23  W?

24      A.   Well, the -- first of all, parking on downtown

25  Boston is essentially valet-only, of the current new

**KEVIN J. AHEARN - Direct/ Murphy**                    **Page 34**

1  developments -- meaning you can't park your car.

2          Back in the Eighties, Heritage, Four Seasons had

3  what is called self-park.  The demand for parking is huge,

4  and the demand for two spaces with expensive units is

5  significant.  So what we did by design with the unit program

6  is to build in studios and one-bedrooms which wouldn't come

7  with parking, so there were 22 studios and five one-bedrooms

8  that did not come with parking in the beginning.

9          Fortunately, we've also sold six -- it might be

10 seven now -- one-bedrooms that did have parking; and we were

11 able to get the parking back by deducting a value of 100,000

12 for the unit that we can now sell with bigger units, and we're

13 going to encourage that as we -- as we go forward.

14          So the parking in the building is only valet.  There

15 are 142 spaces in the building, 110 with the residential

16 units.

17      Q.   And 123 total residential units --

18      A.   And 123 total residential units.

19      Q.   And so you've been able to build up additional

20 parking spaces that are available as you sell the larger

21 units.

22      A.   Which was one of the strategies from the beginning,

23 as I outlined that to the team.   One of the -- we were

24 fortunate, one of the penthouses -- Penthouse 4 -- also sold

25 with only one space.

**KEVIN J. AHEARN - Direct/ Murphy**                    **Page 35**

1     Q.    Now with respect to the sell-out, are you familiar

2   as well with Mr. Griesmer's and FTI's projection as to length

3   of the sell-out of the units?

4     A.    I am.

5     Q.    Well, what is your understanding of that projection?

6     A.    Thirty-six months.

7     Q.    And do you believe that is achievable by The W?

8     A.    I do.

9     Q.    SW Boston?

10    A.    I do.

11    Q.    And why do you believe that, sir?

12    A.    Well, the -- the -- I contend, and the data would

13  support me, that the marketplace held value, and it avoided

14  what the housing bubble was all about.  We had no sub-prime

15  problem, we had no foreclosure problem.   So now that that

16  story is being told, I contend in my experience that you'll

17  have a pent-up demand that comes off the market, off the

18  sidelines, and starts to buy in more significant numbers more

19  quickly.

20        The best example is, last week first-time

21  appointment, two buyers bought units.  First appointment.

22  One's from Hawaii, one's from Thailand.   They hired the two

23  designers that are showcased on the 20th Floor.   They'll turn

24  the key, cash, quick closings.

25    Q.    You want to -- those two buyers want to replicate

1  the model units exactly?

2      A.    The J unit is -- they're turning the whole key

3  exactly and hired the designer for exactly what you see on the

4  20th floor.   We have that off the market, so they bought a 22nd

5  floor J, and they hire Meichi Peng, the designer, on the C and

6  D combination.   It's a couple from Thailand.   One son is in

7  Boston, one's in London; and they're going to use it as a

8  family home, and they're converting it to a three-bedroom, so

9  the C and D combination is also going to be directed by Ally

10  Coulter, who did the D model.

11      Q.    And this is -- what is a C unit?   Two-bedroom?

12      A.    Two-bedroom, 1,258 feet.

13      Q.    And what is a D unit, sir?

14      A.    Studio, 427 feet.

15      Q.    So this particular buyer is going to buy a two-

16  bedroom and a studio, which are adjacent to each other, and

17  combine them into a three-bedroom unit?

18      A.    We designed it that way.   There's no HVAC or steel

19  in that wall, so there are two places in the building, we

20  anticipated the ability to do a larger unit.  F and G is the

21  other one, where you're not dealing with bracing walls; and

22  we've done two C and D combinations.   We had at the time of

23  the filing a buyer upgrade from 16-C and D to 17-F and G,

24  another half a million dollars above what their contract price

25  was for 16-C and D.   And we've done a floor plan of what that

 1  would look like as well.

 2      Q.   We talked little bit about leasing, sir -- leasing

 3  of units; and I'll show you what's been marked as Exhibit 4?

 4  (Pause.  Unclear, walked away from all microphones)

 5          MR. MURPHY:   (unclear, not near microphones)

 6          THE COURT:   What is it?

 7          MR. MURPHY:   It's a list of the (unclear) leases.

 8          THE WITNESS:   E.

 9          SPEAKER: I think it's 4 -

10          SPEAKER:   4- (unclear)

11          MR. MURPHY:   That's Defendant's 4, Your Honor.

12          THE COURT:   4.

13          MRS. PATTERSON:   Mr. Murphy, (unclear)

14          THE COURT:   You have to --

15          MR. MURPHY:   Take the microphone.

16          THE COURT:   I should talk to you about the digital

17  recording system.

18          MR. MURPHY:   I was told, Your Honor, I could use

19  this.

20          THE COURT:   You may.  You have to stand near a

21  microphone; or, if you're going to walk towards the witness,

22  you have to use the walk-around microphone.

23          MR. MURPHY:   I will, Your Honor.  Let me see if I

24  can stay right here, then.

25  BY MR. MURPHY:

1      Q.   Mr. Ahearn, I'm almost finished, please.  Just tell

2  the Court about the leasing program and how is it gone, and

3  what's this exhibit show?

4      A.   We have seven, and there's an eighth lease being

5  signed on Sunday.   A little bit behind where we projected,

6  but we're doing it carefully with prospective buyers, people

7  interested in purchasing.   But we're pleased with the

8  profile, first and foremost, that we're getting.  We have a

9  doctor from MGH; we have an entrepreneur who sold start-up

10  companies in V.C. moving here.   We have one of Boston's best

11  trainers that's written up every year in "A."   We have a

12  signed purchase and sale agreement with people that are

13  purchasing 21-J but leasing for a year.

14      Q.   And so one of the -- one of the tenants who signed a

15  lease has also simultaneously signed a separate purchase and

16  sale agreement?

17      A.   Yes.

18      Q.   To purchase at the end of their lease term?

19      A.   Yes.  And we have another empty-nester client from

20  Maine that's using it as an in-town home.

21      Q.   And do you reference that there is a lease that you

22  intend to sign, that's in the process of being signed for this

23  weekend?

24      A.   Yes.

25      Q.   And can you tell me how much that lease is going to

1    be for?

2          A.    7,900.

3          Q.    $7,900 a month?

4          A.    Yes.

5          Q.    Is that a two-bedroom unit?

6          A.    Two-bedroom.

7          Q.    And can you tell the Court how much that is per

8    square foot for that?

9          A.    $4.40.

10         Q.    And so you believe ultimately as we finish the

11   leasing program of twenty to 25 units you'll be able to get in

12   the four dollar range approximately four to 4.50?

13         A.    Yes.

14         Q.    (Pause) And have you found -- have you found a

15   leasing program to be a positive or negative effect *vis-á-vis*

16   sales efforts?

17         A.    Positive.  We've done it before.  We're currently

18   doing it at Battery Wharf.  We've converted six  -- of a total

19   of eleven leases, we converted six to sales.   We've done it

20   at 500 Atlantic Avenue.   It's a very effective way for a

21   prospective buyer to, you know, try the shoe on, so to speak,

22   first, and see if they like the building; and it's a

23   compelling way to close a sale, in our opinion, if you get a

24   high -- you know, profile -- a high-profile -- you get a high

25   -- high percentage-type buyer that's capable of purchasing and

1    needs to purchase, it's worked very well for us.

2           MR. MURPHY:   Thank you very much, Mr. Ahearn.

3           THE COURT:   Before you begin, could we take a five-

4    minute break?

5           MR. GRILLO:   Sure.  Absolutely.

6                [Off the record at 2:00:16 p.m.]

7                     * * * * * * * *

8                [On the record at 2:05:22 p.m.]

9           MRS. PATTERSON:   All rise.

10          CLERK:  All rise.

11          THE COURT:   Please be seated.  Go ahead, Mr.

12   Grillo.

13      (Long pause)

14          MR. GRILLO:   May I approach?  I would like to have

15   an exhibit marked, [please].  (unclear, walked away from

16   microphone) not in the agreed exhibit (unclear)

17          THE COURT:   Where is it?  In the disputed --

18          MR. GRILLO:   It's not an agreed exhibit, Your

19   Honor.  I believe this first one is Exhibit B in the

20   Prudential book.

21          THE COURT:   All right.  It's a letter dated October

22   15th, 2007?

23          MR. GRILLO:   It is, Your Honor.

24          THE COURT:   Okay.  You can take it.

25          CLERK:   Do you want it marked for identification?

1          MR. GRILLO:   Yes, I want it marked for

2   identification.

3          THE COURT:   Well, we're going to G --

4          CLERK:   E.

5          MR. GRILLO:   I'm sorry.

6          CLERK:   For identification, the ones I'm keeping,

7   and then are you going to bring it in as an exhibit (unclear,

8   not near microphone)

9          MR. GRILLO:   Potentially, if you're -- if it's

10   decided that's admitted by Her Honor, then, yes.

11          CLERK:   (unclear, low-voiced conversation)

12          THE COURT:   Is it G for identification?

13          CLERK:   Yeah.   Well, the last one we --

14          MR. GRILLO:   I believe that --

15          CLERK:   -- did was G.   So this would be E.

16          MR. BENNETT:   To make it easy, Your Honor, they can

17   mark it --

18          THE COURT:   H.

19          MR. BENNETT:   -- as their next exhibit.   There's no

20   objection.

21          THE COURT:   No objection?   Okay.

22          MR. GRILLO:   Okay.

23          CLERK:   Okay, that will be 5, Plaintiffs' 5.

24   **WHEREUPON EXHIBIT #P-5 MARKED AND ADMITTED INTO EVIDENCE**

25          THE COURT:   Okay.   Mr. Grillo, take this one and

1  I'll take that.

2          CLERK:   Mmhmm.  Here you go.

3      (Pause)

4          MR. GRILLO:   May I approach the witness with the

5  exhibit, Your Honor?

6          THE COURT:   Yes.

7                    **CROSS EXAMINATION**

8  **BY MR. GRILLO:**

9      Q.  Mr. Ahearn, I would ask if you could identify for the

10 Court and for the parties what has been marked as -- and I

11 forgot what it was marked as.

12         THE COURT:   Plaintiffs' 5.

13 BY MR. GRILLO:

14     Q.  Plaintiffs' 5.  It's a sales and marketing strategy

15 letter written by me.  And based on all your testimony, would

16 this be something that was prepared at the beginning of your

17 engagement by the debtors?

18     A.  Yes.

19     Q.  And directing your attention to the second full

20 paragraph there, you indicate that the -- the desire was to

21 reach a -- where you projected perhaps a -- a sale value of 50

22 to 60 per cent of pre-sales at Certificate of Occupancy,

23 correct?

24     A.  Yes.

25     Q.  And was that ultimately achieved as a Certificate of

 1  Occupancy here?

 2      A.  No.

 3      Q.  And with respect to the next sentence, you indicated

 4  that you -- that the strategy that was set forth in this

 5  proposal that you put forward was that the gross sell-out

 6  period, or the highest gross revenue sell-out, would be within

 7  30 to 36 months commencing with the beginning of construction,

 8  correct?

 9      A.  Yes.

10      Q.  And construction was commenced at or around the time

11  the Prudential loan was signed, isn't that correct?

12      A.  Yes.

13      Q.  So that would have been, based on your testimony,

14  approximately January of 2008, isn't that correct?

15      A.  January of 2008, yes.

16      Q.  Okay.  So by January of 2011, so two months from now,

17  we would have been at the end of that first 36-month cycle,

18  correct?

19      A.  Yes.

20      Q.  And to this point in time we've only sold 27 units,

21  closed, excuse me, closed.

22      A.  Not including P&Ses and reservations.

23      Q.  Right.  We've close 27 units in that time.

24      A.  Yes.

25      Q.  So this first projection as set forth in your

**KEVIN J.  AHEARN - Cross/Grillo**                    **Page 44**

 1  original sales proposal was not achieved, correct?

 2       A.   Correct.  You meant 25, didn't you, closings?

 3       Q.   25, if that's what you --

 4       A.   You said 27.

 5       Q.   I said 27, yes, but --

 6       A.   It's 25.

 7       Q.   -- if you tell me 25 is the right number, 25 is the

 8  right number.

 9            MR. GRILLO:   Your Honor, I don't know if it's been

10  introduced yet or not separately.  It's on the agreed exhibit

11  list.  I'd like to go to the FTI appraisal for the

12  condominiums.

13            THE COURT:   Was Plaintiffs' 2?  That was Cushman &

14  Wakefield was Plaintiffs' 4, that was yours.  Plaintiffs' 2

15  was FTI's yes.

16            MR. BENNETT:   That's for the hotel, Your Honor.

17            THE COURT:   Okay.

18            MR. BENNETT:   The residence, if that's what he's

19  looking for, has not as yet been offered into evidence.

20            THE COURT:   So would you like to introduce that

21  now?

22            MR. GRILLO:   I -- I would, Your Honor, and I don't

23  know that based on that this was an agreed exhibit and is

24  going to be discussed with Mr. Griesmer, I don't know if

25  there's any question --

1          MR. BENNETT:   There is no objection to having that

2   marked, Your Honor, as the next exhibit.

3          THE COURT:   That would be Plaintiffs' 6.

4          MR. GRILLO:   Your Honor, would you like me to bring

5   this one forward to have it marked?

6          THE COURT:   Yes.

7          MR. GRILLO:   Okay.  And if Your Honor would like to

8   retain that copy, I can give the witness another copy.

9          THE COURT:   Yeah, I'm in the wrong book.  Just give

10  me a minute.

11          MR. GRILLO:   Okay, sure.

12          MR. BENNETT:   And that's the last -- that's the one

13  we provided you, right?  That's your -- That's the one we gave

14  you as part of the agreed exhibits (unclear)

15          MR. GRILLO:   Agreed, yes.

16          MR. BENNETT:   Okay.

17          THE COURT:   This would have been agreed Exhibit #8

18  in this book, so it will now be Plaintiffs' --

19          COURTROOM DEPUTY:   6.

20          MR. BENNETT:   No, it would have been agreed Exhibit

21  #9.

22          THE COURT:   9, excuse me.

23          MR. BENNETT:   #9.  It's now Plaintiffs' 6.

24          **WHEREUPON EXHIBIT P-6 MARKED FOR IDENTIFICATION**

25          THE COURT:   Do you have it now?  Do you have it in

1    front of you, or do you need the bench copy?

2             MR. GRILLO:   No, I -- I have two mikes.  I have one

3    in front of me.  I'm going to give an extra one to the witness

4    unless Your Honor wants me to give that one to the witness.

5             THE COURT:   I know, I'm good.  I'm going to keep

6    the originals.

7             MR. GRILLO:   Okay.  Do you want me to take that one

8    to the witness?

9             THE COURT:   Yes.

10        (Pause)

11   BY MR. GRILLO:

12        Q.  Mr. Ahearn, you testified earlier that you had some

13   familiarity with the preparation of the FTI appraisal for the

14   condominiums that is the subject of -- that -- well, strike

15   that, -- that is presently in front of you at this time and

16   has been marked for entry into evidence, is that correct?

17        A.  Yes.

18        Q.  And it was your prior testimony that through much of

19   2009, I believe, that the market essentially locked up, that

20   there weren't sales, in fact, being done during that time,

21   isn't that correct?

22        A.  Slowed it down.  There were sales, but at a reduced

23   level.

24        Q.  I'd ask you to direct your attention to -- did you

25   partici -- I'm sorry.  Did you participate in the preparation

1   of this report?

2       A.   No, I spoke with Paul Griesmer about drilling down on

3   the data and marketplace.

4       Q.   Okay.  I'd ask you to direct your attention -- well,

5   strike that.  Where you talked about the -- the unit mix

6   that's left at The W at this particular point in time, how

7   many two-bedroom units remain unclosed upon at this point in

8   time?

9       A.   Let's see, working backwards, 44 less --

10      Q.   Well, there were 47 units, isn't that correct?

11      A.   47 total, yeah, I'm -- I'm going far right-hand side

12  on a piece of paper I'm thinking of and coming this way.

13      Q.   Okay.

14      A.   All right.  So I believe we have 44 left that would

15  not include -- let's see, we have 23-C, which is a two-

16  bedroom --

17      Q.   Mmhmm.

18      A.   -- that's on reservation.  We --

19      Q.   I'm asking for closed ones, all right?  So I'm trying

20  to figure out how many have not closed.

21      A.   We -- The --

22      Q.   How many have -- How many have --

23      A.   Have -- act -- have closed.  20 -- It's 26 and 27-B;

24  you have 22-C, which is combined with D, that's a two-bedroom

25  and a studio.  Let's see, I think that's it.  I'm trying to

1  think.  Well, of course, you have the Penthouse 4, which is a

2  three bedroom.

3       Q.  Right.  I'm only talking about the -- the straight

4  two bedrooms, not the penthouse bedrooms.

5       A.  Okay.

6       Q.  Right.  Is it safe to say that thereafter November 7th

7  in terms of closed units that you'd have 45 remaining?

8       A.  I think it's 44, but I'll -- it's either 44 or 45.

9       Q.  I think 44 or 45 for this purpose out of a -- out of

10 a starting number of 47 or 48, isn't that correct?

11       A.  I believe it was 51.

12       Q.  Of the -- of the two bedrooms.

13       A.  Two bedrooms.

14       Q.  Okay.  By my count, I've got 22 studios, 48 one-

15 bedrooms, 48 two-bedrooms, three -- excuse me, three two-

16 bedroom penthouses, and two three-bedroom penthouses, does

17 that sound right to you?

18       A.  I have 22 studios, right, 47 --

19       Q.  40 --

20       A.  -- 47 --

21       Q.  -- 40 one-bedrooms.

22       A.  47 one bedrooms.

23       Q.  47

24       A.  51 two-bedrooms, and three three-bedrooms.  So --

25       Q.  Okay.  So you're counting the two -- the two -- the

1   Penthouse 3 and two bedrooms, correct?

2        A.   Penthouse 3 is --

3        Q.   3 -- 3 Penthouse, two-bedrooms.

4        A.   3 penthouse, two --

5        Q.   That's how you get to 51, just to sort of --

6        A.   Yes.

7        Q.   -- differentiate between my number and yours.  Okay.

8   And as I said earlier, your -- your position was that -- that

9   the market locked up essentially in 2009, isn't that correct?

10       A.   Yes.

11       Q.   If we look at the -- page 57, and I'll put that up on

12  the screen so that people can see it, (pause) according to the

13  FTI appraisal that's here, this is a record of sales from

14  January 2009 through June 2010, and the break-out of the sales

15  that are there show the majority of the sales, in fact, over

16  the course of an 18-month period being studios and one-

17  bedrooms, isn't that correct?

18       A.   Yes.

19       Q.   So we didn't, in fact, move during that period of

20  time a lot of two-bedrooms, is that a fair statement?

21       A.   It doesn't -- It does not include 16-C & D that's

22  under purchase and sale agreement.

23       Q.   16C, and that would be the Noble (phonetic)

24  apartment, correct?

25       A.   Correct.

1       Q.  And that's been in default because that's a pre-

2  petition agreement, isn't that correct?

3       A.  It's a sale.  Well, it's a purchase --

4       Q.  It's a defaulted contract, isn't it?

5       A.  It -- It is.  It's under purchase and sale agreement

6  and we've been in communication with them.  We think it's

7  going to culminate in a deal.

8       Q.  But it hasn't closed yet.

9       A.  It has not closed yet.

10       Q.  The contract is a pre-petition agreement, too.

11       A.  It's another sale, however.

12       Q.  But I'm just -- and please answer the question that I

13  asked you.  It's a pre-petition contract, is it not?

14       A.  Yes.

15       Q.  So that means the contract at a minimum is at least

16  six months old, isn't that correct?

17       A.  Yes.

18       Q.  Okay.  So looking again at the chart there are, by my

19  count, 11 one-bedrooms sold during that 18-month period,

20  correct?

21       A.  I'm -- I'll count them, if you want.  One, two,

22  three, four, five, six, seven, eight, nine, ten, eleven, yes.

23       Q.  And a quick count of studios is six units, correct?

24       A.  One, two, three, four, five, yes.

25       Q.  And during the same period, only two two-bedrooms

1  were sold, isn't that correct?

2       A.   Plus the penthouse.

3       Q.   And then the penthouse -- well, I was going to get to

4  that, but the penthouse is -- is a three-bedroom, correct?

5       A.   Yes.

6       Q.   If you turn to page 59, (pause) this is the data for

7  the same period of time for 45 Province which you had

8  identified in your testimony as a competitive property,

9  correct?

10      A.   Yes.

11      Q.   And during that same period of time in which the

12 market was essentially locked up, can you tell me how many

13 two- bedrooms they moved during that period of time?

14      A.   I'm sorry, I was counting.  Would you ask the

15 question again?

16      Q.   Sure.  During the same period of time, how many two-

17 bedroom units did -- did 45 Province close upon?

18      A.   One -- It wasn't the same period of time.

19      Q.   I believe it's -- according to the report, it's for

20 January 2009 through June 2010.

21      A.   I'm referring to the sales period.

22      Q.   Okay, I'm referring to closings.

23      A.   Okay.

24      Q.   To make it clear.  My apologies (unclear)

25      A.   One, two, three, four, five, six, seven, eight, nine,

 1 | ten.

 2 |     Q.  So they moved ten during the same period of time in

 3 | which the W only moved two two-bed -- two two-bedrooms,

 4 | correct?  Or three two-bedrooms, correct?

 5 |     A.  Not including Noble.

 6 |     Q.  Right, which is a defaulted contract.  And I'll ask

 7 | you to turn to page 60.

 8 |     A.  (Pause while reviewing document)

 9 |     Q.  And page 60 represents the sales for the Clarendon

10 | during the same period of time, does it not?

11 |     A.  Yes.

12 |     Q.  And can you tell me how many two bedrooms were moved

13 | during that period of time?

14 |     A.  Four, five, six, eight, nine, ten, eleven, twelve,

15 | thirteen, fourteen, fifteen -- fifteen, I believe.

16 |     Q.  So they moved at least five to seven times the number

17 | of two bedrooms that the two -- that The W moved during the

18 | same period of time, isn't that correct?

19 |     A.  Yes.

20 |     Q.  Another project you mentioned was Battery Wharf, is

21 | it not?

22 |     A.  Yes.

23 |     Q.  That's a project with which you're familiar because

24 | you're the broker for that building as well, isn't that

25 | correct?

1      A.   On-site marketing.

2      Q.   I'd ask you to take a look at the data here for

3   Battery Wharf covering the same period of time, and I would

4   ask you how many units -- how many two-bedroom units were

5   moved by Battery Wharf --

6      A.   Twelve.

7      Q.   -- during the same period of time?   Twelve.  So

8   again, that's six times, or five to six times the number of

9   units that The W moved during that same period of time.

10     A.   Yes.

11     Q.   So notwithstanding the economic downturn then that

12  occurred during 2009, competitive properties to The W moved

13  two-bedroom units at a multiple in each instance of what -- or

14  a substantial multiple in each instance of what The W moved

15  during that period of time, isn't that correct?

16     A.   Yes.

17     Q.   And now where you talked about meeting the existing

18  sales goal, you're now entering into your second 36-month

19  period, correct?

20     A.   Yes.

21     Q.   Okay.  And now, even though during the first 36-month

22  period, you've moved a small handful of two-bedroom units,

23  you're projecting, or your testimony is that you expect that

24  you will now the remaining 40-plus units in the next 36

25  months, is that correct?

**KEVIN J. AHEARN - Cross/Grillo**                    **Page 54**

1      A.  Yes.

2      (Long pause)

3           MR. GRILLO:   Your Honor, I'd like to sort of go

4  back to what had been marked as Prudential Exhibit A, from our

5  testimony.  I have extra copies which -- if that would make it

6  easier, I can hand it --

7           THE COURT:  Well, it -- in -- in the disputed book?

8           MR. GRILLO:   I don't think it was the disputed --

9  Yes, chalk 5.  It would have been part of the one --

10          THE COURT:   The chalk by Mr. Peko.

11          MR. GRILLO:   I -- o I have copies --

12          THE COURT:   It's been introduced as a chalk -- it's

13 been --

14          MR. GRILLO:   Introduced as a chalk.

15          THE COURT:   -- put in the chalk file?

16          MR. GRILLO:   Yes, correct.

17          THE COURT:   All right.  What -- Could you describe

18 the document, please?

19          MR. GRILLO:   Yes, I can, Your Honor.  It's

20 "Condominium Sale Price Trends" on the top.

21          (Pause - low-voiced conversations)

22          THE COURT:   Okay.  I have it.

23          MR. GRILLO:   (unclear, not near microphone) Your

24 Honor, I can give the witness that one, or I can give the

25 witness a copy, whichever you prefer.

 1              THE COURT:   Give him that one, please.

 2              MR. GRILLO:   Okay.

 3              THE COURT:   He has a monitor on the witness box,

 4  too.

 5              MR. GRILLO:   Oh, I --

 6              THE COURT:   You don't have to give him one.

 7              MR. GRILLO:   Okay.  Whichever he prefers, Your

 8  Honor.  Sometimes it's harder to see the numbers on the screen

 9  if they don't show up clearly.

10  BY MR. GRILLO:

11     Q.  Mr. Ahearn, I'd ask you to take a look at the

12  schedule that's -- that's been put in front of you which

13  represents the post-bankruptcy sales of units that have

14  occurred to this point in time.  I think your testimony

15  earlier was that based on the trends you saw that the -- that

16  the pricing was moving favorably, was it not?

17     A.  Yes.

18     Q.  If you look at the sales that have occurred from

19  basically 8/20 forward, all but one of those sales was, in

20  fact, at a discount to the minimum contract price, wasn't it?

21     A.  This group, yes.

22     Q.  Okay.  But -- and this group represents, other than

23  the ones that may have been closed in the next several days

24  are the closings that have taken place, this is clearly, you

25  know, all discounts to the minimum price that's set forth in

**KEVIN J.  AHEARN - Cross/Grillo**                    **Page 56**

1 the agreement, isn't that correct?

2      A.  We've -- we've increased prices in a number of

3 situations and we've decreased prices in others.

4      Q.  Okay.  But -- but this represents, other than

5 anything that may have closed in the last several days, this

6 represents everything that has closed post-bankruptcy,

7 correct?

8      A.  One, two, three, four -- I believe so.

9      Q.  And, in fact, if you look at the data a little more

10 closely, if you take a look at the larger sale units, those

11 are, in fact, on a percentage basis the biggest discounts, are

12 they not?  By way of example, if you take a look at 27-B,

13 right, which was an adjusted contract price of 1.8 million,

14 that represents a ten per cent discount or $206,000.

15      A.  Yes.

16      Q.  And then if you take a look at 26-B, that represents

17 more than a ten per cent discount on the price, does it not?

18      A.  It was a multiple sale deal, yeah.

19      Q.  Right.  And then if you take a look at 17-A on 10/25,

20 that also represents a 15 per cent discount off the purchase

21 price, does it not, of minimum sales price?

22      A.  Did not include parking.  So I don't know whether

23 it's been offset there.

24      Q.  Okay.  But -- but either way, the bottom line is, is

25 even if you take out the parking, based on the valuations that

1  you've given to the parking, still represents, you know,

2  prices being sold -- excuse me, your larger apartments being

3  sold as a -- at a discount to the minimum contract price.

4      A.  As I said, we've increases prices on 18 units.  We

5  decreased prices on 12 until we're at the number.

6      Q.  Right.  But the bottom line is, is on all of the

7  sales that have closed on your biggest units, not only have

8  you taken discounts, but those have also been the largest

9  discounts that have been given on a percentage basis.

10     A.  Some of them, but not across the board, to my

11  knowledge.

12     Q.  Okay.

13     A.  Of -- Of everything that's -- of everything that's

14  sold, age, for instance, we've increased age dramatically, a

15  million dollar sale is -- a million dollar sale is an

16  expensive property.  So --

17     Q.  Right; but the bottom line is, is those that have

18  closed in the last several months, all of them have been at

19  material discounts with the exception of 21-I, correct?

20     A.  (Pause) One, two -- Yes.

21     (Long pause)

22         MR. GRILLO:  I'd like to have another Prudential

23  exhibit marked, Your Honor.  This is not an agreed exhibit,

24  but, in fact, is in the book as Exhibit DD, in the Prudential

25  book.

**KEVIN J. AHEARN - Cross/Grillo**                              **Page 58**

1          THE COURT:   Letter dated August 17th?

2          MR. GRILLO:   That's correct, Your Honor.  May I --

3          THE COURT:   You want to mark it for identification

4 or do you want it --

5          MR. GRILLO:   I want -- I'd like to have it marked

6 for identification, not offering it at this time, Your Honor,

7 but I'd just like to have the witness speak to it.

8          THE COURT:   Marked as -- for identification as H.

9   **WHEREUPON PLAINTIFFS' EXHIBIT #H MARKED FOR IDENTIFICATION**

10     (Long pause)

11          MR. GRILLO:   May I approach the witness, Your

12 Honor?

13 BY MR. GRILLO:

14     Q.  (Pause)  Mr. Ahearn, I'd ask you to take a look at

15 what has been placed in front of you as an exhibit and ask if

16 you can identify it for me, please?

17     A.   It's a letter from the -- one of the original sales

18 team members.

19     Q.   And -- and that would be Ms. Mihalko, is that

20 correct?

21     A.   Mihalko.

22     Q.   Okay.  And this letter is something that you, in

23 fact, did receive?

24     A.   Yes.

25     Q.   And, in fact, if you read the letter, it appears from

1  the letter that she was, in fact, fired from her position as

2  director of sales, isn't that correct?

3       A.  We've -- we've since agreed to disengage.

4       Q.  Agree to disengage?  I doesn't look like it was, at

5  least, from her perspective, looked like she was surprised by

6  it, does it not?

7       A.  Talked about a number of different things that she

8  could entertain at the time.

9       Q.  Certainly if sales, at least in August of 2010, if

10  they had been proceeding apace, it wouldn't have been a reason

11  to fire the director of sales, would there?

12       A.  Well, it -- it -- it's really one of timing on what

13  was happening and who was -- who was achieving sales results

14  and who was available on the marketplace, and Dinny Herron

15  became available, and she's a more experienced successful on-

16  site person, and so had to make that decision.

17       Q.  But had you been sort of meeting your targets you

18  probably wouldn't have fired the sales director, isn't that --

19       A.  Not so sure.

20       Q.  -- a fair statement?

21       A.  Not so sure.

22       Q.  Okay  At the -- the end of the letter, she indicated

23  at the very end apparently that she wanted  -- that you give

24  careful consideration to her concerns and lobby on behalf to

25  the Sawyer team.   In fact, she was probably looking to get

1 her job back, wasn't that correct.

2    A.  I'm not sure -- I did not have a conversation with

3 her after this.  She chose to speak directly with Sawyer and

4 Sawyer's counsel.

5    Q.  But from the letter did you take away the presumption

6 that she was looking to come back?  She wasn't please with --

7 She wasn't pleased with being released.  Isn't that a fair

8 statement?

9    A.  Yes.

10    MR. GRILLO:   Your Honor, we just -- we have no

11 intention of marking this into evidence, since we've spoken to

12 the issue; we don't need to put it into evidence at this time

13 since it came from Ms. Mihalko, and she's not before the Court

14 today.

15 BY MR. GRILLO:

16    Q.  Mr. Ahearn, everyone has spoken -- well, strike that.

17 In the report that you had prepared that Mr. Murphy took you

18 through, the "Weekly Market Watch" dated 10/29, you have a

19 listing of sales that are here, correct, for the entire

20 marketplace, isn't that correct?

21    A.  No.  They're select full-service buildings.

22    Q.  Right.  But interestingly, what's not included in

23 this list is The W, isn't that right?

24    A.  Or the Clarendon.

25    Q.  Or the Clarendon.  So then it -- if it doesn't

1  include them, then it's not really representative of the

2  select service of the market, isn't that correct?

3      A.  A big majority of it.

4      Q.  Okay.  Turning to, it's called Section 1.4 of this

5  chart.

6      A.  Yes.

7      Q.  (Pause) The -- the chart that's -- I direct your

8  attention to the second to last column, which is year to date

9  sales and the composition of the year to date sales, and,

10  specifically, the information that relates to --

11      A.  Let me look at --

12      Q.  Maybe we can do it from this side, so I'll hold the

13  mike from here so I can look at it.  Sales at a million or

14  more for this year is approximately 10 per cent of the market,

15  isn't that correct?

16      A.  13.41 in the blue box.

17      Q.  Yeah, well, let me -- maybe we should do it a little

18  bit more slowly.  In the 2010 year-to-date column there is

19  2010 year-to-date, and then there's a percentage share, isn't

20  that correct?

21      A.  2 -- 2000 year-to-date -- 2000 -- yes, yeah.

22      Q.  Right.  And if you take a look you've got the number,

23  143, and the number 73, where my finger is here?

24      A.  The -- The 73 represents a million five to a million

25  99.

1       Q.   Right.  And in the million to a million 49 is 143,

2   correct?

3       A.   Give it to me again?  The million to what?

4       Q.   The -- the million to a million 499 is 143, or 6.57

5   per cent of the market, isn't that right, --

6       A.   Yes.

7       Q.   -- for this year?

8       A.   Yes.

9       Q.   Okay.  And the number below that is 73 and 3.35 per

10  cent of the market, and that's 1.5 million to 1.99 million.

11      A.   Correct.

12      Q.   So roughly that -- that piece is approximately ten

13  per cent of the overall sales market, isn't that correct?

14      A.   A million to two million.

15      Q.   A million to two million, correct.

16      A.   Not over a million.  You said over a million.

17      Q.   Okay.  Then I stand corrected.  A million to two

18  million is approximately ten per cent of the market.

19      A.   Correct.

20      Q.   Okay.  So that's ten per cent of the market, and then

21  if you go back historically it's -- in 2008 it was

22  approximately just under ten per cent.  In 2007 it was eight

23  or nine per cent.  In 2006, it was approximately almost eight

24  per cent, but inevitably it's somewhere between historically

25  eight and ten per cent of the market, is that a fair

**KEVIN J.  AHEARN - Cross/Grillo**                    **Page 63**

1  statement?

2       A.   Year-to-date.

3       Q.   Inclusively of year-to-date, going back historically

4  to year-to-date.

5       A.   Yes.

6       Q.   And even at the peak of the market in '07, '08, it

7  wasn't more than ten per cent of the market, isn't that

8  correct?  In fact, it's less in '07 and '08.

9       A.   Year-to-date, okay.

10      Q.   Right.

11      A.   But you obviously, more sales (unclear), okay.  Yep.

12      Q.   So that being said, the market for those apartments

13  -- well, the two-bedrooms that you have at this point in time

14  that would equate to a significant portion of that market,

15  that's the still the lion's share of what remains to be sold,

16  in fact, in terms of the remaining inventory at The -- at The

17  W, isn't that correct?

18      A.   Yes.

19      Q.   Okay.  So as a result, you've got to sell, you know,

20  at least 40 units, okay, which is something under 30 to 40 per

21  cent of your inventory into only ten per cent of the overall

22  market, isn't that correct?

23      A.   A lot less competition than in prior years.

24      Q.   And is that because some of your competition has

25  outsold you historically; i.e., the Clarendon and 45 Province,

1  because they've moved four --

2      A.  It's --

3      Q.  -- units?

4      A.  It's -- It's predicated on a lot less in the number

5  of developments in the marketplace mostly.

6      Q.  But the bottom line is, is that you still have a lot

7  of those units to move, and you're responsible for the unit

8  mix, and yet that's still the lion's share of what you have to

9  sell.

10     A.  We're -- we're building a new residential location in

11 the mid-town theater district and we're -- we recognize it

12 takes a bit longer, and we also recognize that we've been in a

13 bankruptcy filing and we've had this motion for relief.  So

14 it's not -- it's not a typical period of time.

15     Q.  But in the year, in the year and a half, you know,

16 most of which was before the bankruptcy in January 2009 to

17 June 2010 of which only six weeks overlaps the bankruptcy

18 case, your competitor sold way more two bedrooms than you did,

19 isn't that (unclear)

20     A.  They started way ahead of us, way ahead of us.

21     Q.  But in those same periods of time they moved more

22 units.

23     A.  They have to.  They got 109 two-bedroom units at 45

24 Province, they've got 71 at the Clarendon, they have to move

25 more.

1     Q.  Well, then let's -- if that's the case, let's go back

2  and take a look at the FTI appraisal one more time.  (Pause)

3          Notwithstanding the fact that you said they *had* to

4  move those units, can you tell me over the whole lot of units

5  what the per price -- per square foot price was achieved at

6  Battery Wharf during that period of time because they moved

7  more units (unclear, overspeaking)

8     A.  What page are you on, please?

9     Q.  I'm on page 63.

10     A.  And the question again, please?

11     Q.  Your point was that they had to move more units, and

12  my question to you is, what was the average price per square

13  foot during that time period that was achieved by Battery

14  Wharf, for example?

15     A.  Battery Wharf has an average price of 9.46.

16     Q.  Thanks.

17     A.  For all the units including some one-beds.

18     Q.  And with respect to the Clarendon, what was the price

19  per square foot for the Clarendon during that same period of

20  time?

21     A.  All units, or two-beds?  All units?

22     Q.  All units.

23     A.  11.49 -- 11.94, it says here.

24     Q.  Okay.  Turning the page over to 59, which is 45

25  Province, what was the price per square foot for -- that they

1  achieved during that period of time?

2      A.  And number of page again?

3      Q.  Sure, 59.

4      A.  9.82.

5      Q.  And again, for The W, which is page 57, the price

6  during the initial sell-out period, what was achieved during

7  that period of time?

8      A.  8.61.

9      Q.  And these are, across all of these properties, either

10 a mix of all of the units, isn't that correct, that we're

11 (unclear)

12     A.  Different selling periods, but, yes.

13     Q.  Well, the same selling period -- is it -- different

14 -- same closing period, is it not?

15     A.  Different than same selling period.

16     Q.  Bottom line is, these are the deals that closed for

17 everybody during that period of time.

18     A.  45 Province started in 2006.  They had fewer closings

19 in -- since '06 than we have in little over the year plus.

20 It's a different period of time.

21     Q.  The bottom line is though, they closed deals during

22 that period of time, and The W didn't for two-bedroom units,

23 isn't that correct?

24     A.  In that closing period of time.

25     (Long pause)

1           MR. GRILLO:   Your Honor, I'd like to turn to

2   Debtors' -- Debtors' or Defendants' #3, Summary of Pending

3   Purchases and Reservations.  And in the original book, Your

4   Honor, --

5           THE COURT:   It's --

6           MR. GRILLO:   -- that was at Debtors' E.

7           THE COURT:   It's in evidence as Defendants' 3,

8   correct?

9           MR. GRILLO:   I believe that's correct, Your Honor.

10          THE COURT:   Yeah.  Go ahead.

11      (Long pause)

12          MR. GRILLO:   I'm just looking for a clean one, Your

13   Honor, to put up on the screen.  I think I have one here.

14          THE COURT:   You can take this.

15          MR. GRILLO:   Okay.

16          CLERK:   May I have that, please?  (unclear) chalk.

17   Thank you.  Is this the only one we had?  I don't think

18   that's ours.

19          MR. GRILLO:   Yes.

20          CLERK:   That one's got writing on it.

21          MR. GRILLO:   Mr. Ahearn marked that up, Your Honor,

22   the one that I handed back.  Sorry.

23          (Pause - low-voiced conversations)

24   BY MR. GRILLO:

25      Q.  And this was the list that was introduced earlier

**KEVIN J.  AHEARN - Cross/Grillo**                              **Page 68**

1  that you testified to with respect to the pending

2  reservations, correct?

3        A.  Yes.

4        Q.  But it's not all of them, but --

5        A.  Right.

6        Q.   Yeah, I think you indicated there were one or two

7  more at least that were either ending purchase and sale

8  agreements or pending reservations, correct?

9        A.  Correct.

10       Q.  But this is the one that the debtors prepared --

11       A.  Yes.

12       Q.  -- and submitted to the Court.  Okay.  With respect

13  to Penthouse 2, similar, in fact, to the ones that were listed

14  on the chalk that we looked at before, there's a significant

15  discount off -- the price that's listed here is a significant

16  discount off the minimum's contract price, isn't that correct?

17       A.  Yes.

18       Q.  And, in fact, it's -- the original contract price was

19  approximately 3.77 million, was it not?

20       A.  I believe so.

21       Q.  So again, notwithstanding your observations about the

22  market and the upward pressure on prices, that, in fact, yet

23  again is below the minimum sales price and yet represents one

24  of the more current sales that you're hoping to close, isn't

25  that correct?

1    A.   $1,132 a foot is a deal that we can build on and it's

2  very good yield.

3    Q.   Right.  But the bottom line is, is that if you wind

4  up below the minimum sales price for the remainder of these

5  sales, you won't hit the FTI valuation (unclear, both speaking

6  at the same time on the same channel)

7    A.  Of course not, but we're not -- we -- we've done this

8  a number of times.  We -- we're going to be increasing prices

9  as we go along.

10    Q.   But the historical record to this point in time says

11  that, at least of six or seven prices -- please, let me finish

12  the question -- that of six or seven of the last sales they

13  were -- six of the last seven and this reservation were all

14  below the minimum sales price.

15    A.   For the period of time, yes, but the period of time,

16  you know, I would say that it's a pretty good performance.

17         MR. GRILLO:   I'd like to present to the Clerk, Your

18  Honor, from the book, the Prudential exhibit book, Exhibit KK.

19    (Pause - low-voiced conversations)

20         CLERK:   Are you going put it in as an Exhibit?

21         THE COURT:   Well, are you offering it, or do you

22  want to mark it for I.D.?

23         MR. GRILLO:   I would mark for I.D.  My intention is

24  to offer it.  It's a report prepared by Mr. Ahearn, assuming

25  we get over the evidentiary issues --

1              THE COURT:   Is there an objection?

2              MR. GRILLO:    -- my guess is we'll be marking --

3    marking it.

4              MR. MURPHY:   No objection, Your Honor.

5              THE COURT:   That will be Plaintiffs' --

6              CLERK:   I believe it's 7.

7              THE COURT:   -- 7.

8     **WHEREUPON EXHIBIT #P-7 MARKED AND ADMITTED INTO EVIDENCE**

9              THE COURT:   Do you need an extra one?

10             MR. GRILLO:   I can -- I can give him one that I

11   have.  If Your Honor wants me to give him that one, I can do

12   that, too.

13             THE COURT:   Well, just go ahead.

14        (Long pause)

15             MR. GRILLO:   Your Honor, before we begin, our

16   intention ultimately is to offer this into evidence.  It's a

17   report prepared by Mr. Ahearn.  I can take him through it

18   first, or I can ask the debtors if they have any objection to

19   the entry of this as evidence.

20             MR. BENNETT:   We already agreed to it.  You can --

21   We just said no objection.

22             THE COURT:   We just marked it as Plaintiffs' 7.

23             MR. GRILLO:   I didn't hear him say no objection.  I

24   was --

25             THE COURT:   Oh.

1            MR. GRILLO:   My apologies.

2            THE COURT:   It's been marked, it's in evidence.

3            MR. GRILLO:   Thank you.

4    BY MR. GRILLO:

5        Q.  Mr. Ahearn, I'd ask you if you can identify for the

6    record what's been marked as the current exhibit that's before

7    you?

8        A.  It's a mid-year report -- sorry, year-end report for

9    2008.

10       Q.  And is this a report that you prepared?

11       A.  Yes, with an analyst and myself.

12       Q.  And is this something that you prepared as part of

13   your regular reports that you had mention that you had

14   discussed with Mr. Murphy earlier?

15       A.  Yes.

16       Q.  I'd like to bring your attention -- well, before we

17   go there, I think what you testified to earlier was that

18   starting at the end of 2008 and into 2009 turned out to be a

19   very weak period, isn't that correct?

20       A.  Yes.

21       Q.  Your testimony earlier?  And, in fact, at the end of

22   2008, you issued this report and -- is that correct?

23       A.  Yes.

24       Q.  And having issued the report, you made some

25   observations in the report about the current -- the state of

1  the market at that time, is that correct?

2      A.  Yes.

3      Q.  I'd ask you to direct your attention to page 6 of the

4  report?  I'd like to direct your attention to the third --

5  well, to the third hash mark on the left where it says,

6          "Unlike the 2000-2005 period, we have a limited

7          number of new developments proposed or under

8          construction.  The inventory will trend to a very

9          tight two to three months' supply."

10 That's what the report says, correct?

11     A.  Yes.

12     Q.  And so your observation at that point in time,

13 according to what's in the report here, is that there should

14 be upward pressure on pricing into 2009, isn't that correct?

15     A.  Uh --

16     Q.  That's what you guessed at that time.

17     A.  2009.

18     Q.  Well, it says,

19          "The inventory will trend to a very tight two- to

20          three-months' supply going into 2010 and 2011."

21 Right.

22     A.  Right.

23     Q.  (Reading),

24          "Good for existing property owner and upward

25          pressure on pricing appreciation."

1       A.   Mmhmm.

2       Q.   Correct?

3       A.   Yes.

4       Q.   And, in fact, notwithstanding the fact that there's

5  been upward pressure on pricing as far as The W is concerned

6  of the majority of sales that have been completed or closed in

7  the time since the bankruptcy filing, they haven't even met

8  their minimum sales price, isn't that correct?

9       A.   The -- the effects of the financial crisis certainly

10 were not felt yet by the end of 2008, it was for all intents

11 and purposes just continuing.  So we -- we had no idea that

12 going forward we were going to get into that type of

13 environment that we experienced, which slowed down the sales

14 activity dramatically in 2009.

15      Q.   Right.  But the bottom line is, some of your

16 competitors moved -- built -- move in 2009, moved units at

17 higher prices than The W did, notwithstanding that, correct?

18      A.   Longer period of time to sell.

19      Q.   Okay.  And, in fact, so your assessment, at least, as

20 to how it would affect The W, as set forth in this report, was

21 incorrect, at least, to this point in time because there's no

22 upward pressure on prices at The W if they're selling below

23 the minimum, true?

24      A.   We had no knowledge that we'd be selling in a -- in a

25 bankruptcy situation.

1      Q.  But in 2009 you weren't selling in a bankruptcy

2   situation, correct?

3      A.  No, but you had the financial crisis aftermath.

4      Q.  Right.  But the bottom line is you weren't -- the

5   question was, you weren't selling in the bankruptcy at 2009,

6   correct?

7      A.  No.

8      Q.  So the observation that you made about the

9   marketplace, at least in that period of time, looking

10  prospectively, turned out to be wrong, at least as it affected

11  The W.

12     A.  Yes.

13     Q.  And, in fact, as a salesman -- well, strike that.  In

14  fact, as -- as the -- as the marketing consultant or the

15  broker at The W, you get a commission on sales, don't you?

16     A.  Correct.

17     Q.  All right.  So it's in your interest essentially to

18  always say that the outlook, no matter what it really looks

19  like, is always positive because the bottom line is, that's

20  how you get remunerated, isn't it?

21     A.  Well, we're known for evaluating the data and -- and

22  making judgments as to what it means to the best of our

23  ability.

24     Q.  But in this instance you get paid for moving units,

25  don't you?

1      A.   We've got -- we get paid for moving units for the

2   last thirty years.

3      Q.   Right.  So the bottom line is, is that they don't pay

4   independently for the advice, your clients pay you for moving

5   units.

6      A.   In addition to consulting fees.

7      Q.   Correct.  But in this deal, for example, the -- the

8   consulting fee is a monthly rate of something like 7,000 a

9   month, isn't that correct.

10     A.   More recently.  It was 15,000 to begin with.

11     Q.   Okay.  And you get a, I think, a one per cent

12   commission, is that correct?

13     A.   Correct.

14     Q.   So if a hundred -- excuse me, a hundred million

15   dollars of unites were sold, you make over a million dollars

16   that way.

17     A.   For a seven-year, five-, six-, seven-year commitment,

18   yes.

19     Q.   That's right.  I'd ask you to go back to Debtors' #7,

20   and I'll put that back up on the screen.  (Pause) I'd ask you

21   to take a look at the average selling price and the median

22   selling price from 2008-2009 and year-to-date 2010, which is

23   the last three sets of numbers in the bottom right-hand corner

24   of the page.

25     A.   (Pause while reviewing document)  Yes.

1      Q.  And as much as you've indicated that there's going to

2  be a prospective upward pressure on pricing inasmuch as

3  pursuant to your 2008 year-end report that you would have

4  upward pressure on pricing, in fact, if you look at the

5  average selling price that's in your table, you went in 2008

6  from 78 -- $718,000 to year-end 2009 of $592,000, correct?

7      A.  Numbers are skewed in 2008.

8      Q.  Okay.  But this is an average selling price, correct?

9      A.  These were skewed numbers by the closing of two

10  developments in '08.

11      Q.  But -- but you didn't -- you didn't somehow mark that

12  here.  You just kind of took the average and put it in your

13  report, correct?

14      A.  It's -- it's one indication, but it -- the numbers

15  for 2008 are skewed.  If you look at them over a ten-year

16  period of time, they jump off the charts because of two

17  closings, Mandarin and Battery Wharf.

18      Q.  Well, let's take -- let's go back then to -- to 2007

19  then, and it's 616,000, isn't that correct?

20      A.  Correct.

21      Q.  And then 2010 it's 652,000.  So you're still in less

22  than a $30,000 swing over $600,000, which is approximately

23  five per cent, isn't it?

24      A.  In the middle of a financial crisis?

25      Q.  No, I'm talking about comparing 2010 year-to-date.

1  We've talked about after the financial crisis versus 2007, --

2      A.  Right.

3      Q.  -- which is a five-per cent movement in price,

4  correct?

5      A.  Yes, in a very difficult economic world environment.

6  We're in a recession, correct, a 9.6 --

7      Q.  (unclear)

8      A.  -- a 9.6 per cent unemployment.

9      Q.  I know very well, I'm a bankruptcy lawyer, I know

10 what the unemployment rate is, sir.  My point to you is that

11 as much as you have been predicting rosy scenarios on a

12 prospective basis, you haven't been correct as far as 2009 and

13 2010 as it affects The W; and it's part of your business, or

14 your business interest to predict that the market is always

15 going up like you did in 2008 and like you're projecting here

16 now today, isn't that correct?

17     A.  I would -- in my opinion, there's been upward

18 pressure on pricing in various segments.  We haven't achieved

19 what we're trying to do yet at The W, but that still does not

20 -- does not change my opinion on what's going on in the

21 marketplace when you look at it comprehensively top to bottom.

22     Q.  You -- you expressed earlier that -- you started to

23 play offense and defense, isn't that correct, in terms of

24 trying to do the pricing.  That was the analogy that you use?

25     A.  I think we were referring to unit programming.

1      Q.  Correct, with respect to unit programming, a little

2  bit of this, a little bit of that.

3      A.  Yes.

4      Q.  The bottom line is, is with respect to that unit

5  programming, notwithstanding the fact that you're concluding

6  your first 36-month period, and now looking to another 36-

7  month period in order to sell out, which would make it 72

8  months from when the project was started, that you still have

9  only moved three to four of the two-bedroom units, and you

10  still have more than 40 of them to sell, isn't that correct?

11      A.  We have a number of units on reservation, interested

12  party for the two-bedroom units.

13      Q.  And so the bottom line is, is you used a football

14  analogy before, do you know who Bill Parcells is?

15      A.  Yes.

16      Q.  Okay.  And who is he, just for the record?

17      A.  A football coach.

18      Q.  Okay.  And that you're familiar with his statement

19  that you are what your record says you are?

20      A.  I'm not familiar with that, no.

21      Q.  Okay.  Well his statement is,

22          "You are what you says -- what you say you are."

23  So the bottom line is, if you compare your sales, frankly,

24  versus your projections, The W has not been the beneficiary,

25  has it, of an increase in sales prices, as it has not met it's

 1 minimum sale prices for the sales that have closed in the last

 2 four months, isn't that correct?

 3      A.  Not yet.

 4           MR. GRILLO:   No further questions.

 5           THE COURT:   Redirect?

 6           MR. MURPHY:   Just a couple.

 7           THE COURT:   Before you start, could you look on

 8 your tables and see if you have Exhibit 3, --

 9           MR. GRILLO:   I --

10           THE COURT:   -- Debtors' Exhibit 3?

11           MR. GRILLO:   I do.

12           THE COURT:   Okay.  Could you hand it up, please?

13 Thank you.  And --

14           MR. GRILLO:   Just making sure that's the only one

15 you're missing from -- since we went back and forth with the

16 numbers --

17           THE COURT:   Yes, it is the only one I'm missing.

18           MR. GRILLO:   -- numbering.

19           THE COURT:   But --

20           MR. GRILLO:   (unclear)

21           THE COURT:   And also, do you have a clean copy of

22 the chalk condominium sales price trends?

23           CLERK:   I (unclear)

24           THE COURT:   Does anyone have a clean copy of that?

25           SPEAKER NOT NEAR MICROPHONE: 7

1          THE COURT:   Condominium sales price trends.   Would

2   you replace the marked up one?  Go ahead, Mr. Murphy.

3                  **REDIRECT EXAMINATION**

4   **BY MR. MURPHY:**

5      Q.  Mr. Ahearn, you -- you were asked, and you made some

6   statements about differentiating between different selling

7   periods versus different closing periods.   Could you explain

8   what you meant by that, sir?

9      A.  The 45 Province as it relates to non-W, is that what

10  you --

11     Q.  Yes.

12     A.  Okay.

13     Q.  (unclear) that Mr. Grillo was asking you about sales

14  and different periods, *vis-á-vis* the -- as comparisons to The

15  W, and you made several statements that they had different

16  selling periods --

17     A.  Right.

18     Q.  -- versus different closing periods.

19     A.  45 Province opened their sales office on May 22nd,

20  2006.  So we opened our sales office in December, the end of

21  the year in '08.  So they came out very much in front of us

22  and were selling in a whole different environment.  The market

23  was still, you know, moving along and -- and you hadn't had

24  the financial crisis occur.  So they had a much longer selling

25  period, and they'd yet had, you know -- you know, less success

1  when you look at the total number of sales.

2      Q.  And what about the Clarendon, when did they open

3  their sales office, sir?

4      A.  They opened up their office on Newbury Street I

5  believe in the spring of '08, early spring, give or take.

6      Q.  And, again, they had a longer pre-sale period --

7      A.  They had a longer -- longer pre-sale period than we

8  did.

9      Q.  And that pre-sale period occurred at a time when the

10 economy was in a much stronger position than when The W was

11 started.

12     A.  Correct.

13          MR. MURPHY:   Thank you.  That's all I have.

14          THE COURT:   Recross?

15          MR. GRILLO:   Nothing, Your Honor.  Thank you.

16          THE COURT:   All right.  Thank you.  You're excused.

17 Next witness, please.

18     (Pause)

19          MR. GRILLO:   Your Honor, could I clear out the

20 remaining exhibits that are over there?

21          THE COURT:   Please, yes.

22          Would you raise your right hand, please?

23     **PAUL BOYD GRIESMER, DEBTORS' WITNESS, DULY SWORN**

24     (Pause)

25     (Microphone being bumped and moved around loudly)

1          MR. GRILLO:   Before Mr. Bennett begins, Your Honor,

2    the projections that are there you don't need them, I presume?

3    I'll just hang onto them.

4                         **DIRECT EXAMINATION**

5    **BY MR. BENNETT:**

6         Q.  Sir, would you please state your full name and spell

7    your last name?

8         A.  Certainly.  Paul Boyd Griesmer, spelled P-A-U-L  B-O-

9    Y-D   G-R-I-E-S-M-E-R.

10        Q.  By whom are you currently employed?

11        A.  FTI Consulting.

12        Q.  At some time was FTI Consulting retained by SW

13   Boston?

14        A.  Yes, I believe it was May of this year.

15        Q.  For what purpose was FTI retained by S.W. Boston?

16        A.  Real estate consulting, valuation, and restructuring

17   expertise.

18        Q.  In connection with that retention, did you prepare

19   any documents?

20        A.  I did.

21        Q.  And what did you prepare?

22        A.  I prepared an appraisal of the unsold individual

23   condominium residences at the subject property, at the W, and

24   I prepared a -- an appraisal of the commercial condominium and

25   the garage condominium at the W, the commercial condominium,

1  including the -- which includes the hotel.

2          MR. BENNETT:   Your Honor, those two appraisals have

3  already been marked in evidences at Plaintiffs' Exhibit 2,

4  which is the appraisal for the hotel and Plaintiffs' Exhibit

5  6, which is the appraisal for the residence.  And at this

6  point, under the Court's procedural order, I'll turn it over

7  to cross examination.

8          MR. DAUKAS:  Thank you.  And I -- excuse me, just

9  for clarification, I have the hotel appraisals as Plaintiffs'

10 Exhibit 3.  Am I in error?

11         THE COURT:   No, it's 2.

12         MR. DAUKAS:   It's 2?

13         THE COURT:   Mmhmm.  May I have the list, please?  I

14 have it marked as 2.  3 -- 3 is somewhat unclear to me.  What

15 do you have marked as 3?

16         MR. DAUKAS:   I --(unclear, not near microphone)

17         THE COURT:   (unclear)

18         MR. DAUKAS:   I may be confused.  I thought, Your

19 Honor, there's a one-page --

20         THE COURT:   Page --

21         MR. DAUKAS:   -- 100 --

22         THE COURT:   Plaintiffs' Exhibit 3 is page 105 with

23 new calculations.

24         MR. DAUKAS:   Thank you, Your Honor.  That's my

25 confusion, I had flipped those two, but I understand.

1          THE COURT:   But could you clarify further what it

2  -- what it's page 105 of?

3          MR. DAUKAS:   Page -- I'm sorry, it's page 105 of

4  Plaintiffs' Exhibit 3 -- Plaintiffs' Exhibit 2 and --

5          THE COURT:   So it's the --

6          MR. GRILLO:   The appraisal itself, Your Honor.

7          MR. DAUKAS:   Yes.

8          THE COURT:   It's a revised page with new

9  calculations with respect to Plaintiffs' Exhibit 2, correct?

10          MR. DAUKAS:   That's correct.

11          MR. BENNETT:   May I see that, Your Honor?  That

12  doesn't sound right.  (unclear, not near microphone) Let --

13          THE COURT:   Do you want to see the exhibit?

14          MR. BENNETT:   Yes (unclear)

15      (pause while reviewing document).

16          MR. BENNETT:   Actually, Your Honor, that's not a

17  revised or substitute page for the Prudential -- I mean, that

18  is not a substitute page or revised page from the FTI

19  appraisal.  It is a page from the FTI appraisal which the --

20  Mr. --

21          THE COURT:   Plaintiffs' witness revised.

22          MR. BENNETT:   -- which another witness marked on,

23  Your Honor.

24          THE COURT:   Right, correct.

25          MR. BENNETT:   Right.

**PAUL B. GRIESMER - Cross/Daukus**                              **Page 85**

1        MR. DAUKAS:   Yeah.  That's correct, Your Honor.

2        THE COURT:   That's more precisely what it is.  But

3  the appraisal of the hotel -- of the real estate is 2.

4        MR. DAUKAS:   Yes, Your Honor.  As I understand,

5  that's Plaintiffs' 2.  And, --

6        THE COURT:   Okay.  Go ahead, please.

7        MR. DAUKAS:   -- Your Honor, may I approach the

8  witness so -- and to provide him with a copy of Plaintiffs'

9  Exhibit 2, which is his appraisal of the hotel and Plaintiffs'

10 Exhibit 6, which is his appraisal of the condominiums?

11       THE COURT:   Go ahead.

12       MR. DAUKAS:   Good afternoon, Your Honor.  John

13 Daukas again on behalf of Prudential.

14                    **CROSS EXAMINATION**

15 **BY MR. DAUKAS:**

16    Q.  Good afternoon, Mr. Griesmer.  We've met before?

17    A.  We have.

18    Q.  I took your deposition in this case on October 28th,

19 correct?

20    A.  I don't recall if that was the exact date, but you

21 took my deposition.

22    Q.  You prepared a valuation of the W Boston Hotel with a

23 valuation date of August 1, 2010, correct?

24    A.  That is correct.

25    Q.  And you prepared a valuation of the W Boston

1  Residences with a valuation date of August 1, 2010, correct?

2       A.  Yes.

3       Q.  And after your deposition you provide to us some

4  handwritten notes of conversations that you testified you had

5  with individuals concerning the real estate industry that you

6  used in the course of your work in this matter, correct?

7       A.  That is correct.

8       Q.  One of the products you addressed in those notes was

9  the Newton Marriott?

10      A.  That is correct.

11      Q.  And you redacted or blacked out certain information

12  on those notes, correct?

13      A.  I believe that is incorrect.

14      Q.  Is it your understanding that counsel blacked out or

15  redacted certain information on those notes?

16      A.  I don't know.

17      Q.  I'd like to have you look at pages 1 -- at page 113

18  of Plaintiffs' Exhibit 2, which is a copy of your appraisal

19  for The W Hotel.

20      A.  Excuse me, did you say page one-one-three-- 113?

21      Q.  That's correct.  It should be your biography, your

22  background.

23      A.  (Pause wile reviewing document)

24      Q.  Do you have that in front of you, Mr. Griesmer?

25      A.  Yes.

Case 10-14535    Doc 383    Filed 11/19/10    Entered 11/19/10 15:19:49    Desc Main
Document      Page 88 of 158
PAUL B. GRIESMER - Cross/Daukus                          Page 87


1      Q.   That's the section of the report that describes your

2   professional background, correct?

3      A.   It summaries my professional background.

4      Q.   And you claim to have experience in valuation and

5   analysis of a broad range of real property types and interest,

6   correct?

7      A.   Yes.

8      Q.   Right.  I'd like to talk to you about your broad

9   range of appraisals.  You've appraised hotels?

10     A.   Yes, sir.

11     Q.   You've appraised resorts?

12     A.   Correct.

13     Q.   You've appraised office buildings?

14     A.   Correct.

15     Q.   You've appraised industrial buildings?

16     A.   Correct.

17     Q.   You've appraised manufacturing buildings?

18     A.   Yes.

19     Q.   And you've appraised retail properties.

20     A.   That is correct.

21     Q.   You've appraised residential rental and condominium

22   projects, correct?

23     A.   Yes.

24     Q.   You've appraised marinas?

25     A.   Yes.

#10-14535              Day 2                           11-9-2010

1        Q.   You've appraised golf courses.

2        A.   Yes.

3        Q.   And you've appraised a variety of different legal

4   interests, correct.

5        A.   That is correct.

6        Q.   Now unlike Mr. Lewis who we heard from yesterday,

7   you're not a specialist who focuses exclusively in appraising

8   hotel properties, correct?

9        A.   I do not focus exclusively on hotels.

10       Q.   You're a generalist?

11       A.   I'm not sure what you mean by generalist.  I have a

12   -- I have -- My background is as stated.  I have a broad range

13   -- excuse me -- of capability.

14       Q.   You're not the head of your firm's hotel valuation

15   group, are you?

16       A.   For all practical purposes, yes, I am.

17       Q.   You don't list on your biography yourself as being

18   head of FTI's hotel valuation group, correct?

19       A.   I do not, that's correct.

20       Q.   Now you moved to Massachusetts in 1991?

21       A.   Yes, sir.

22       Q.   Welcome to New England.  You've got --

23       A.   Belatedly.

24       Q.   You've got dual offices in Boston and New York City,

25   correct?

1       A.   That is correct.

2       Q.   And before moving to Massachusetts in 1991, you had

3    not resided in Massachusetts, correct?

4       A.   That is correct.

5       Q.   Your experience actually working in the hotel

6    industry as a hotel employee is limited to less than one year,

7    and that was in 1980 when you were an assistant front office

8    manager with Marriott, correct?

9       A.   That is correct.

10      Q.   You don't consider yourself to be an expert in the

11   operation of restaurants, correct?

12      A.   I do not.

13      Q.   You cannot tell us what percentage of your time

14   you've sent during your career in appraising different types

15   of properties that you've listed on page 113 of your expert

16   report, correct?

17      A.   As I stated in my deposition, not with access to

18   detailed time records, many of which I no longer possess.

19      Q.   And you cannot tell us what percentage of your career

20   you've spent valuing hotels, correct?

21      A.   Same answer.

22      Q.   You cannot tell us whether you've spent more or less

23   than 50 per cent of your career valuing hotels, correct?

24      A.   As a total, no.

25      Q.   In the last five years, you have spent less than 50

1    per cent of your time valuing hotels, correct?

2        A.  I believe that's correct.

3        Q.  And you can't tell us how much of your time you've

4    spent in the last five years valuing hotels; that is, what

5    percentage of your time?

6        A.  Again, not without access to the records I mentioned

7    in my prior answer.

8        Q.  And, in fact, you can't tell us whether you spent

9    more or less than ten per cent of your time during the last

10   five years valuing hotels.

11       A.  I believe it's more than ten, but not specifically.

12   I couldn't answer it without those records.

13       Q.  Well, during your deposition do you recall that you

14   told us you could not tell us whether you had spent more than

15   ten per cent of your time in the last five years.

16       A.  I believe that's the answer that I just gave.  I'd be

17   hazarding a guess.  I could not tell you conclusively.

18           MR. DAUKAS:   Your Honor, I'd like to approach the

19   witness and give him a copy of his deposition transcript,

20   please.

21           THE COURT:   Go ahead.  Can you tell opposing

22   counsel what page?

23           MR. DAUKAS:   Yes, Your Honor.  (unclear, not near

24   microphone) Yes, Your Honor, and I will hand them a copy of

25   the transcript as well, and Your Honor a copy if you'd like

1  one as well?

2          THE COURT:   Yes.

3  (Low-voiced conversations)

4          MR. BENNETT: (unclear) the page (unclear)

5          MR. DAUKAS:   The page that I'm going to be

6  referring the witness to is page 17, lines 12 through 18.

7      (Pause)

8  BY MR. DAUKAS:

9      Q.  Do you have a copy of your transcript in front of

10 you?  Did I not make it that far yet?

11     A.  No.

12     Q.  (Long pause)  Mr. Griesmer, you've had an opportunity

13 to review your deposition transcript, correct?

14     A.  I did.

15     Q.  And, in fact, you prepared an *errata* sheet which you

16 signed and provided to counsel for the debtors, correct?

17     A.  That is correct.

18         MR. DAUKAS:   And we received a copy of that this

19 morning, Your Honor.

20 BY MR. DAUKAS:

21     Q.  I draw your attention to page 17 of your deposition

22 at page -- line 12, the question was,

23         "What percentage of your time during the last five

24         years did you spend value hotels?"

25 Your answer,

1              "I don't know.

2              Q.  Is it more or less than 20 per cent?

3              A.  I don't know, sir.

4              Q.  Is it more or less than ten per cent?

5              A.  I don't know, sir."

6    Did I read that correctly?

7         A.  Which page are you on?

8         Q.  Page 17.

9         A.  I have it, thank you.  That's correct, I stand by

10   those answers.  I stand by everything that's on that page.

11        Q.  At the top of your deposition you could only recall

12   three Boston hotels that you had valued in the last five years

13   in addition to W, correct?

14        A.  That is correct.

15        Q.  The hotels were The Seaport Hotel, the Ritz Carlton

16   Boston, and the Marriott at Copley, correct?

17        A.  That is correct.

18        Q.  So unlike Mr. Lewis, you've not appraised over 30

19   Boston hotels in the last five years, correct?

20        A.  I don't know Mr. Lewis's log of appraisal experience.

21        Q.  You have not appraised any W hotels other than the W

22   Boston, correct?

23        A.  That is correct.

24        Q.  And you've not appraised -- And so I take it then is

25   the case, you've not appraised 15 of the 28 W hotels in North

1  America.

2      A.  If I didn't appraise any of them, I didn't appraise

3  15 of them.

4      Q.  From 1995 to 2009 you were employed by Ernst & Young?

5      A.  That is correct.

6      Q.  And you can't estimate how much of your time you

7  spent doing appraisal work during that period of time that you

8  were at Ernst & Young, correct?

9      A.  That is correct.

10     Q.  You can't say whether you spent more or less than

11 half your time performing appraisals from 1995 to 2009 while

12 at Ernst & Young.

13     A.  In -- which year were you referring to?

14     Q.  1995 to 2009, when you were employed by Ernst &

15 Young.

16     A.  That is correct, sir.

17     Q.  You're familiar with an industry conference known as

18 American Lodging Investment Summit or ALIS.

19     A.  It's known as the ALIS Conference.

20     Q.  You're not a regular attendee of that.

21     A.  No, I'm not.

22     Q.  In fact, you've never attended that conference?

23     A.  That is correct.

24     Q.  You've testified at trial twice before, correct?

25     A.  I believe that's correct.  I didn't refresh that

**PAUL B. GRIESMER - Cross/Daukus**                     **Page 94**

1  prior to today.

2      Q.  And while you're not sure, you do not believe you've

3  ever testified in a Bankruptcy Court, correct?

4      A.  That -- that is correct.

5      Q.  In valuing the W Hotel, you considered the types of

6  entities that might be interested in investing in or buying in

7  The W, correct?

8      A.  That is correct.

9      Q.  And those entities are drawn nationally, correct?

10     A.  That is correct.

11     Q.  You also considered the types of -- excuse me, strike

12 that.  And that is the buyers who would be interested in The W

13 Hotel could be based anywhere in the United States.

14     A.  That is correct.

15     Q.  On the other hand, potential buyers for the unsold

16 condominiums of The W would be drawn regionally, not

17 nationally, correct?

18     A.  More likely regionally than nationally.

19     Q.  I'd like to ask you a few questions about the

20 Cushman/Wakefield Real Estate appraisals.  You have read the

21 two real estate appraisals prepared by Cushman & Wakefield in

22 this case?

23     A.  Yes, I have.

24     Q.  And you read those reports before you finished your

25 report, correct?

1        A.   I believe that I did, yes.

2        Q.   And the reason that sections of your report are very

3    similar to Cushman & Wakefield is because you relied on the

4    Cushman/Wakefield report?

5        A.   That is incorrect.

6        Q.   At the time of your deposition you had not reviewed

7    any appraisals for either the hotel or the condominium

8    residences, other than the ones prepared by Cushman &

9    Wakefield, correct?

10       A.   That is correct.

11       Q.   In addition to performing your appraisals, the debtor

12   also asked you to have an -- to give an opinion as to the sale

13   of four condominiums to Mr. Haddad (phonetic)?

14       A.   They asked me to analyze that deal.

15       Q.   You were asked to evaluate that transaction to

16   determine if it was a good deal.

17       A.   That's correct.

18       Q.   And initially it was during the deposition, it was

19   unclear to you whether a discount was being given for those

20   properties, correct.

21       A.   I don't think it was unclear to me during the

22   deposition, no.

23       Q.   Well, let me refer you to page 50 of your deposition

24   then, lines 3 through 8.  (Pause) I'm sorry, lines 7 through

25   11.

 1      A.   That's correct.

 2      Q.   So I asked you,

 3           "Was the discount being given because it was a

 4           multi-unit transaction?"

 5  And you said,

 6           "That's unclear."

 7  I said,

 8           "How is it unclear?"

 9  You said,

10           "I think it depends on how you deal with it."

11  Correct?

12      A.   That is correct.

13      Q.   But you are aware that the discount was given on the

14  Haddad transaction, correct?

15      A.   I believe it's as my answer is stated on the balance

16  of page 50 in the lines that you did not refer to.

17      Q.   And what is that answer?

18      A.   That it depends on how you view it.  I mean, if you

19  view it as four separate unrelated sales, you could say that

20  there is a discount that is applied to the price.  If you view

21  it as one sale moving four units simultaneously in the context

22  of the valuation, no, it's consistent with my valuation.

23      Q.   At the time of the deposition, you did not know

24  whether the four units were being sold to Mr. Haddad below the

25  minimum price, correct?

1      A.   That's correct.  I didn't look to check whether --

2   where it was relative to any pre-petition contract minimums.

3      Q.   And when I asked you during the deposition whether

4   the price paid by Mr. Haddad for those four units was a market

5   price, you did not understand my question because you did not

6   know what market price means, correct?

7      A.   I believe that's incorrect, sir.

8      Q.   Well, let me direct you to page 53, lines 11 through

9   15 of your deposition, I asked you,

10          "Did you determine whether the price paid for those

11          four units was a market price?"

12  Your answer,

13          "Again, I'm not sure that I understand that

14          question.  Market price means -- I don't know what

15          you mean by it."

16     A.   I didn't know what you --

17     Q.   Did I read that correctly?

18     A.   You -- You read the deposition transcript correctly,

19  sir.

20     Q.   In the end you testified that the price paid by Mr.

21  Haddad was slightly discounted for the fact that you get all

22  four done in one deal.

23     A.   That is correct.

24     Q.   Now your appraisals have a valuation date of August

25  1, 2010, correct?

1      A.   They do.

2      Q.   And you use that date because Mr. Murphy asked you to

3   use that date, correct?

4      A.   That is correct.

5      Q.   You do not have an opinion as to the value of The W

6   properties at any time after August 1, 2010.

7      A.   I do not.

8      Q.   In preparing your appraisals, you consulted several

9   times with Mr. Ahearn or people working for his company,

10  correct?

11     A.   That is correct.

12     Q.   It's fair to say there's some typographical errors in

13  your report?

14     A.   I believe that you pointed them out to me in the

15  deposition, and I agreed with you.

16     Q.   For example, on the second page of the report the

17  value stated for the condominium appraisal, and this is

18  Plaintiff's Exhibit 6, is listed as $90,800?

19     A.   No, it's shown -- it's -- No, that's incorrect.  It's

20  shown as 90,600,000 in Arabic numerals which is the correct

21  number, and the written number should be 90,600,000.

22     Q.   And the written number was $90,800, correct?

23     A.   That's correct.

24     Q.   You did not consider the Haddad deal in valuing the

25  condominium project, correct?

1        A.   I did not.

2        Q.   In your appraisals you note that the overall health

3   of the economy and state of the housing market has

4   significantly improved from the beginning of 2009?

5        A.   Yes.

6        Q.   But you do not have a belief as to whether that still

7   holds true, that the health of the economy and the housing

8   market continues to improve?

9        A.   I have not performed a subsequent market analysis,

10  no.

11       Q.   So you'd have no basis to disagree with Mr. Ahearn

12  when he says we're in a recession and points to the

13  unemployment figures that you just gave a few minutes ago.

14       A.   I think I was in the men's room if he was talking

15  about unemployment.

16       Q.   You've not undertaken a study of the market

17  subsequent to your appraisal reports, correct?

18       A.   Other than reading the third quarter Link report, no.

19       Q.   You'd not read that as of the time of your

20  deposition, had you?

21       A.   That is correct.

22       Q.   Did you see the *Boston Globe* article this morning

23  that said,

24            "Don't expect the Massachusetts housing market to

25            make a broad recovery anytime soon"?

1       A.   No, I didn't get to either *The Globe* or *The Journal*

2  today.

3       Q.   It's fair to say that those buying a condo at The W

4  is a primary residence in order to down-size from a larger

5  home in the suburbs aren't going to buy that condo until

6  they've sold their other home, correct?

7       A.   I think it would depend on individual buyers'

8  financial situations and what their ability to purchase a unit

9  would be without having to have a sale contingency on a

10 previous residence.

11      Q.   Now I'd like to talk to you a little bit about

12 pricing.  You received pricing sheets and information from

13 Mr. Ahearn, correct?

14      A.   I did.

15      Q.   And, in fact, the sheets -- were you in the room at

16 the time that Mr. Ahearn was shown various sheets on the

17 screen from your report concerning comparable properties?

18      A.   I believe I was, yes.

19      Q.   And the information that you have in those pages came

20 from Mr. Ahearn from (unclear, microphone continues to be

21 bumped and obliterating words)

22      A.   Came through Mr. Ahearn's office and also though the

23 Link system, that is correct.

24      Q.   So it's your understanding that Mr. Ahearn would be

25 very familiar with those numbers because they came from his

1  office.

2      A.  I bel -- whether he was personally familiar with them

3  or people in his office were, the source was his company, as

4  well as the Link system.

5      Q.  Now in addition to that sort of information, you also

6  received pricing sheets for The W condos from Mr. Ahearn,

7  right?

8      A.  Correct.

9      Q.  And in your opinion the prices stated in those

10 pricing sheets were too high relative to the market as of

11 August 1, 2010, correct?

12     A.  I received several pricing sheets, and there -- with

13 several different columns of pricing numbers, and some of

14 those I thought were numbers that were higher than what I

15 thought could be achieved in the current market.

16     Q.  If you turn to page 85 of your deposition transcript,

17 please, referring you to lines 11 through 14?  The question

18 was,

19          "Do you believe that the prices stated in those

20          pricing sheets were too high?

21          A.  Relative to the market conditions as of August

22          1st, yes."

23 Did I --

24     A.  That's correct.

25     Q.  -- read that correctly?

1        A.   You read it correctly.

2        Q.   Now you do not have an opinion as to why the less

3   expensive units are the ones that have been selling at The W

4   condos as opposed to the higher priced units.

5        A.   That -- that's correct.

6        Q.   In order to value the condominiums, you came up with

7   a price per square foot, an average price per square foot,

8   correct?

9        A.   That is correct.

10        Q.   And you used that in a discounted cash flow to arrive

11   at your value for the condominiums.

12        A.   That is correct.

13        Q.   That's one of the factors that goes into your

14   discounted cash flow, correct?

15        A.   Yes.

16        Q.   And in order to come up with that price per square

17   foot, you considered comparable properties in Boston, correct?

18        A.   That is correct.

19        Q.   And those properties are cited in your report,

20   beginning at pages 59, and this is Plaintiffs' Exhibit 6,

21   which is the valuation of The W residences.

22        A.   I believe the comparables are on 59 through 70 or

23   something -- something like that.  They are in that sec --

24   general section of the report.

25        Q.   Do those comparables include 45 Province?

1        A.   They do.

2        Q.   And the Clarendon?

3        A.   They do.

4        Q.   And a number of other properties, correct?

5        A.   That is correct.

6        Q.   At your deposition, you could not say whether you

7   would expect the average per square foot price at 45 Province

8   to be higher or lower than the average per square foot price

9   at The W residences in terms of how the market valuates them,

10  correct?

11       A.   No, I think I -- what I said was that I didn't

12  understand your question as to which averages you were

13  referring to.  I think we went over that for several pages in

14  the dep -- in the deposition.

15       Q.   Okay.  Would you please turn to page 87 of your

16  deposition?  And I'm looking at line 18, the question was,

17            "So you can't say whether the average price per

18            square foot at 45 Province should be higher than or

19            equal to or less than the average per square foot

20            price at The W residences in terms of how the market

21            evaluates them."

22  and you asked for the question to be read back and it was, --

23       A.   I'm sorry, what page are you -- I don't -- I don't.

24       Q.   Page -- Page 87.

25       A.   Page 87.

1    Q.  Line 18 (unclear)

2    A.  Oh, I'm sorry, I was on -- I thought you said line 8.

3    Q.  Are you with me?

4    A.  I'm with you.

5    Q.  And you asked for the question to be read back,

6  correct?

7    A.  That is correct.

8    Q.  And by the way, you asked for the questions to be

9  read back about -- over ten times during your deposition.

10    A.  I haven't counted how many times I needed to have the

11  question read back.

12    Q.  Okay.  And your response was,

13          "I mean, that's such a loaded question, I've got to

14           tell you that I don't understand what you mean."

15  Right?

16    A.  That's correct.

17    Q.  And as of the time of your deposition, you did not

18  have an opinion as to whether all things -- all things being

19  equal, a condominium at 45 Province would sell for more or

20  less than a condominium at The W, correct?

21    A.  That is -- that is correct.  I believe that it was --

22  I didn't agree with the premise to your question.

23    Q.  Okay.  Well, let's look at page 95 at lines 8 through

24  12 of your deposition.  The question was --

25    A.  95 what through 12?

1      Q.   All right.  Lines 8 through 12.  Are you with me?

2      A.   Yes.

3      Q.   The question was,

4           "All things being equal, would you expect a

5           condominium at 45 Province to sell for more or less

6           than a condominium at the W?"

7  And your answer was,

8           "I can't answer that question because all things are

9           not equal."

10     A.   That's correct; that's my answer.

11     Q.   And you also could not say whether all things being

12  equal you would expect a condominium at Clarendon to sell for

13  mor or less than a condominium at the W, correct?

14     A.   That's correct.

15     Q.   And that's despite the fact that you used the

16  Clarendon in 45 Province as comparables to the W in your

17  report, correct?

18     A.   I used specific units at the Clarendon and the --

19  these other comparables as -- as comparables.  I did not use

20  the overall building.

21     Q.   And, in fact, your deposition, you could not say

22  whether you would expect a condominium at any of your

23  comparables to sell for more or less than a condominium at The

24  W, correct?

25     A.   No, I believe that's incorrect.  I believe my answer

 1  on page 96 is,

 2              "It depends on the unit."

 3      Q.  Well, let's look at page 95, line 23, going over to

 4  page 96.  Do you have page 95?

 5      A.  I do.

 6      Q.  (Reading),

 7              "Q.  Would you expect a condominium at the

 8              comparable to sell for less than or more than a

 9              condominium at the W?

10              A.  It depends on the unit.

11              Q.  All things being equal, would you have an

12              opinion as to whether a condominium at any of your

13              comparables would sell for more than or less than a

14              unit at the W?"

15  You said,

16              "A.  Again, not all things are equal.

17              Q.  So you can't answer the question?

18              A.  That's correct."

19      A.  You -- you read it well.

20      Q.  And, in fact, you didn't have an opinion as to

21  whether a condominium at The W would sell for more than a

22  condominium in Brockton, Massachusetts, correct?

23      A.  Not an opinion, but I think I gave you what my

24  initial premise and starting point would be.

25      Q.  Mr. Griesmer, maybe I'm missing something, but don't

1  you consider it your job as a real estate appraiser to do

2  exactly that, which is to value properties and to be able to

3  say whether one property is worth more or less than another?

4      A.   That wasn't the scope of my engagement, Mr. Daukas.

5  I was not engaged to value the Clarendon.  I was not engaged

6  to value 45 Province.  I wasn't engaged to value any of the

7  comparables, and I was not engaged to value a condominium in

8  Brockton.

9      Q.   Those were your comparables that you used to assist

10 you in calculating a per square foot value for the W, correct?

11     A.   Absolutely not.  I used no comparable from the city

12 of Brockton, Massachusetts.

13     Q.   How about the comparables you used in your report?

14     A.   Those I did use.

15     Q.   But you can't say whether those buildings are more

16 value -- those condominiums were more valuable or less

17 valuable than a condominium at The W.

18     A.   Which condominiums?

19     Q.   Let's talk about the (unclear)

20     A.   Are you talking about the unsold units, or are you

21 talking about the sold units?  Are you're talking about a

22 particular unit, or you're talking about generic units in

23 general?

24     Q.   Talk about that -- I gave you some specifics, and you

25 did not have an opinion as to whether a condominium at one of

1  your comparable properties would have a higher or lower market

2  value as compared to The W condos, do you remember that?

3      A.  I do not ever give -- I do not recall you ever giving

4  me a specific on another properties -- another unit at another

5  property.

6      Q.  Would you --

7      A.  If I missed that in the deposition, you could point

8  it out to me.

9      Q.  Would you please turn to page 99, and I'm looking at

10  line 21?

11          "Q.  Let's take a one bedroom, 1,000 square foot,

12          south-facing unit on the 18th floor of the Clarendon

13          and compare that to a 1,000 square-foot one-bedroom

14          south-facing unit on the 18th floor of The W, do you

15          have an opinion as to which of those would have a

16          higher value in the market?

17          A.  Again, I would need reference to the floor plans

18          of the specific comparables.

19          Q.  And without that, you cannot form an opinion.

20          A.  Without that, I'm not going to communicate that

21          opinion here."

22  And let me refer you while we're here to page 101 and the next

23  page, 102, in the middle of your answer you said,

24          "The question is, do I have an opinion on a specific

25          price of a specific unit in the Clarendon versus a

 1              specific -- not a specific unit, a generic one-

 2              bedroom unit at Clarendon to a generic one-bedroom

 3              unit at The W on the 18th floor."

 4    I responded, "Yes," and your answer was,

 5              "No, I do not have that specific opinion."

 6    Was that your testimony, sir?

 7         A.   You lost me when you jumped off of page 99.

 8         Q.   By the way, you didn't actually personally inspect

 9    condominium units at each of the properties that you used as

10    comparables, did you?

11         A.   Not at each of them, no.

12         Q.   In your appraisal to condominiums you used an initial

13    price per square foot of $928, correct?

14         A.   As a blended average, that is correct.

15         Q.   And in valuing The W, you assumed that the condos

16    would sell out at an initial -- would sell at an initial price

17    of $928 a square foot, right?

18         A.   On a blended average basis, yes.

19         Q.   That's the value that you plugged in to your

20    discounted cash flow.

21         A.   The value that I used as the starting point in my

22    discounted cash flow.

23         Q.   And you increased that value as time went on in your

24    discounted cash flow, correct?

25         A.   That is correct.

1      Q.   You increased that value to the point that beginning

2  in November 2012, you estimated that units at The W would sell

3  for $1,044 per square foot, correct?

4      A.   If -- which date is that, which month?

5      Q.   This is your report, why don't we look at your

6  report, page 83 through 85 in which you did your discounted

7  cash flow, and that is Plaintiff's Exhibit 6.

8      A.   (Pause)  Which is the month again that you had the

9  question about, sir?

10      Q.   It's beginning in November -- well, can you see that

11  number?

12      A.   Yes, I do.  That number is 1,044, 1-0-4-4.

13      Q.   And so essentially what you did is, you derived at a

14  number of $928 as your starting point and you increased that

15  by four per cent every time 25 per cent of the remaining units

16  had sold.

17      Q.   As the building would progress through the sell out,

18  that's correct.

19      Q.   Now you're aware that the actual price per square

20  foot of the units sold at the W as of the time of your dep --

21  as of the time of your valuation was only $861 per square

22  foot, correct?

23      A.   I don't recall the number offhand, but I believe it's

24  in my report if you'll give me a moment to get to it.  What

25  was the number you used again, sir?

1        Q.   $861 per square foot.

2        A.   That is correct.

3        Q.   But you did not use the actual average sales price;

4   instead you used one that you came up with yourself, correct?

5        A.   Absolutely.

6        Q.   And in your view, estimating what the future sales

7   price might be as more appropriate in valuing the property

8   than using the actual sales figures for the units already

9   sold, is that correct?

10        A.   You -- Absolutely.  You have to look at what the mix

11   of units are that have sold to date and which ones have --

12   whether they have parking or do not have parking, and you have

13   to look at the -- the mix of the units that have sold and

14   their attributes and the look -- the mix of the units that are

15   remaining that are unsold and their attributes.

16        Q.   Now at the time you did your report you considered a

17   figure for the monthly absorption rate at The W residences?

18        A.   Yes, mmhmm.

19        Q.   And absorption means how many units had sold per

20   month, correct?

21        A.   That is correct.

22        Q.   And you calculated that absorption rate for the

23   period January 2009 to June 2010, at page 57 of your report?

24        A.   That is correct.

25        Q.   And the absorption rate you came up with was .89

1 units per month.

2     A.   I believe that's correct.

3     Q.   That's less than one unit per month.

4     A.   That is correct.

5     Q.   And that's less than Mr. Ahearn testified to.

6     A.   I think I was in the men's room twice when Mr. Ahearn

7 was on the stand.  So --

8     Q.   Let's talk --

9     A.   -- I'm not going to dispute his testimony.

10    Q.   In appraising the condominium residences at The W,

11 you did not take into account rental income in calculating the

12 value of the ho -- of the residences, correct?

13    A.   That is correct.

14    Q.   And part of the reason you did not do that was that

15 you had analyzed the highest and best use of the overall

16 project, and you concluded that a rental of the entire project

17 was not the appropriate premise for the valuation.

18    A.   That is correct.

19    Q.   And that's because you felt that renting out units

20 the property would, in the end, depress the valuation.

21    A.   I believe that the premise of valuing the property as

22 a conversion to rental apartments in its entirety would result

23 in a lower value.

24    Q.   And you assumed to a sell-out horizon of 36 months in

25 your report?

1      A.   Yes, sir.

2      Q.   And pricing and the sell-out period are -- are

3   factors that are interrelated, correct?

4      A.   Could you repeat that question, I'm sorry?

5      Q.   Yes.   Pricing and the sell-out period are factors

6   that are interrelated.

7      A.   That is correct.

8      Q.   The owner or seller of a property can hold out for a

9   higher price and have a longer sell-out period, or an owner

10  can try to accelerate the sell-off quickly at a much lower

11  price, correct?

12     A.   They could do that.

13     Q.   And, by the way, you do not -- I think you may have

14  told us this:   you don't have an opinion as to whether the

15  recovery in the Boston real estate marketplace is taking

16  longer than you anticipated in your valuation back in August,

17  right?

18     A.   I did not update the -- the appraisal report of the

19  market conditions assessment.

20     Q.   Now as to taxes, is it fair to say that the longer

21  the units remain unsold the greater the taxes that the

22  property developer has to pay?

23     A.   That is correct.

24     Q.   Let's talk for a moment about discount rates.   You

25  used a 17 per cent discount rate in valuing the condominiums.

1      A.   That is correct.

2      Q.   And if we turn to the report at page 80, if you'd do

3  that for me now, there's a table where you list some different

4  discount rates.

5      A.   That's correct.

6      Q.   And let me just get that up on the screen.    Okay,

7  this is the table from page 80 of your report, correct?

8      A.   Yes.

9      Q.   And it looks at discount rates.

10     A.   Correct.

11     Q.   And the applicable table in your -- the applicable

12  line in your view is the discount rate for high-rise urban

13  townhouses.   That's the one that The W would fall within?

14     A.   It would be the more relevant on this page, yes.

15     Q.   And now when you did your report you assumed that the

16  buyers of The W would be -- W condos would be buying those as

17  primary residences, correct?

18     A.   Do you mean the -- the buyer of the remaining unsold

19  units in their entirety, or the buyer of individual units?

20     Q.   The buyer of individual units.

21     A.   I didn't make a specific assumption about whether

22  people were buying for primary residence or secondary

23  residence purposes.

24     Q.   Okay.   So in other words you did not consider whether

25  the buyers might be buying these condominiums as secondary

**PAUL B. GRIESMER - Cross/Daukus**                    **Page 115**

1  residences perhaps like the people from Thailand or Hawaii

2  that we heard that earlier today.

3       A.   Not specifically.  I didn't make an assumption as to

4  what any particular buyer would be.

5       Q.   This table from your report, page 80, has different

6  discount rates depending on whether the property is intended

7  as a primary residence, or as a resort or second home,

8  correct?

9       A.   That is correct.

10       Q.   For example, if we look at the actuals under the

11  primary residence for high-rise urban townhouse, the average

12  rate shown there is 22.38 per cent, correct?

13       A.   Which number are you on, sir?  On which row?

14       Q.   Let me see if I can do this without my big fingers

15  getting --

16       A.   I'll follow your finger, thank you.

17       Q.   I'll try to use it appropriately then.

18       A.   I see 22.38 per cent above your index finger.

19       Q.   Right.  That's the actual average rate, discount rate

20  shown for high-rise urban townhouses for primary residence,

21  correct?

22       A.   That's correct.

23       Q.   And the rate for secondary residences for high rises

24  is 24.14 per cent, correct?

25       A.   For resorts and second homes.

1        Q.   Yes.   That's correct?

2        A.   That's correct.

3        Q.   Now when you did your report and your analysis, the

4   number that you incorporated was the *pro forma* average number

5   of approximately 17 per cent, correct?

6        A.   Of the numbers that are on this particular page, that

7   is the number that I felt was more relevant.

8        Q.   You didn't use the actual discount rate of 22.38 per

9   cent, correct?

10       A.   That is correct.

11       Q.   And it's fair to say that if you had used a 22 per

12   cent discount rate in your income analysis, all other the

13   things being equal, that would have reduced the value of the

14   property that you ascertained.

15       A.   If I had used that rate, -- yes, that's -- that would

16   be the math.

17       Q.   In performing your sales velocity analysis, it could

18   make a difference if the more expensive units were sold later

19   in the project as to be -- being sold earlier in the project,

20   correct?

21       A.   I did not make that assumption in performing my

22   analysis.   I mean, I'm trying to understand your question.

23   Was your question that I made that assumption in my analysis?

24   Which I did not do.

25       Q.   No.   But in doing your analysis it -- it could make a

1  difference, correct, if you assumed that the higher priced

2  units were going to sell later in the sell-out period than the

3  lower priced units?

4      A.  If you made that assumption and you altered my

5  analysis, it could -- it might make a difference.

6      Q.  And you did not incorporate any assumptions about the

7  types of units that were going to sell at different points in

8  time during the sell-out period and during your analysis,

9  correct?

10     A.  Other than through the overall average for the

11 building, no.

12     Q.  You just took an average, correct?

13     A.  That is correct, took -- took a weighted average of

14 the remaining unsold units.

15     Q.  Right.  So you didn't consider the fact that the two-

16 bedroom units are moving much more slowly than the less

17 expensive units.

18     A.  I considered the -- the sales history at the subject

19 property, if that's what you mean.

20     Q.  But you didn't factor in your discounted cash flow

21 analysis the assumption that the two-bedroom more expensive

22 units were going to sell later in the life cycle of the

23 project.

24     A.  No, I did not.

25     Q.  In your report you refer to the decline in the real

**PAUL B. GRIESMER - Cross/Daukus**                    **Page 118**

1  estate market, correct?

2      A.  I believe it's in both reports in a couple of

3  different places.

4      Q.  And in your view the decline began in 2008 and

5  remained pronounced into 2009, correct?

6      A.  I think that that's fair.

7      Q.  And in your view also there were earlier signs of the

8  potential stall in the marketplace in 2007, but 2008 was the

9  onset of what you described as a national cardiac arrest,

10 correct?

11     A.  I think about two years and one month ago, the -- in

12 maybe three years and two months ago in September and October

13 of 2008, I think those were very dark days for the financial

14 markets globally.

15     Q.  Prior to the decline in the real estate market, it

16 was the norm for properties like The W to pre-sell 25 to 50

17 per cent of the units, correct?

18     A.  Yes.

19     Q.  And during that period, that is prior to the decline

20 of the economy, it was the norm for projects to sell at a rate

21 of three to six units per month.

22     A.  Depending upon the project.

23     Q.  And in your opinion though, things are clearly

24 different now, correct?  I mean, this is a different time that

25 we're in compared to those halcyon days where things were

1  selling so well.

2       A.   Yes.

3       Q.   Though the monthly velocity is slower because the

4  condition of the market and the national economy and -- and

5  the Massachusetts economy as such as it is, correct?

6       A.   Slower than -- Slower than 2009, or slower than 2006?

7       Q.   Slower than it had been before the cardiac arrest

8  that you described.

9       A.   Generally speaking, yes.

10      Q.   Now the fact of the bankruptcy does not have much

11 impact on your valuation of the hotel, correct?

12      A.   That's correct.

13      Q.   And as to the unsold condominiums, you did not

14 analyze whether the fact of the bankruptcy has a downward

15 impact on the market value of the property, correct?

16      A.   No, I valued the property assuming that it was sold

17 as of the effective date of August 1st to a buyer in a fair

18 transaction.

19      Q.   So you did not analyze whether the fact of the

20 bankruptcy has a downward impact on the market value of the

21 project, correct?

22      A.   That's correct.

23      Q.   In terms of what's happened in the hotel market, in

24 your report you noted that the per -- the value per room

25 peaked in 2006 at $100,000 per room and has since declined to

 1  $56,000 per room.

 2       A.  As a national average.

 3       Q.  Yes --

 4       A.  Of -- of all properties including Red Roof and budget

 5  ends. ??

 6       Q.  That's correct, is that right?

 7       A.  That's correct.

 8       Q.  And that's at page 50 of your report which is --

 9       A.  If you'll excuse me, I'm in the condo report, if you

10  want me to shift gears, give me a moment.

11       Q.  That's Plaintiff's Exhibit 3, page 2.

12          THE COURT:   2.  Exhibit 2, for the record.

13          MR. DAUKAS:   Oh, I'm sorry, Exhibit -- I'm sorry,

14  Your Honor, thank you, Exhibit 2.  At least I'm consistent,

15  I've mis-marked it on all my copies.

16  BY THE WITNESS:

17       A.  P-2?

18       Q.  Yes, Plaintiff's Exhibit 2.

19       A.  Which page?

20       Q.  Page 50.

21       A.  (Pause to review document)  Correct.

22       Q.  And there's a -- my error, I believe, in your report

23  that I won't quibble with you with, but basically that's a 44

24  per cent decline, right, from $100,000 to $56,000?

25       A.  Roughly.

1      Q.  So it's fair to say that from 2006 to 2010 the value

2  of hotels plummeted really almost in half.

3      A.  I think that's -- as a -- that is a true statement as

4  to the national overall market.

5      Q.  And would you agree with me that the hotel market has

6  been fairly volatile in the last four years?

7      A.  If you define volatility as fluctuations in the place

8  and number of transactions, I would agree with that.

9      Q.  In fact, you've described what's happened in the

10  lodging market as a, quote, "free fall," is that a fair

11  characterization?

12      A.  I believe that was true as of a year ago when I was

13  interviewed on CSNBC as a national expert in discussing the

14  hotel industry.  I believe it was a year ago this -- it would

15  be a year ago this coming Friday after Thanksgiving.

16      Q.  And luxury hotels were the hardest hit nationally for

17  most of the recession?

18      A.  I -- that is -- that is true.

19      Q.  You do not have an opinion, however, as to the

20  overall hotel market in the United States, correct?

21      A.  That's correct.

22      Q.  The reason you do not have an opinion of the overall

23  hotel market in the United States is that you don't -- you

24  don't personally -- you're not personally in that business,

25  correct?

1       A.   That is correct.

2       Q.   And I -- I think we established earlier that buyers

3  of the hotel projects, like The W, come from the entire

4  nation, right?

5       A.   They do, yes.

6       Q.   Now let's talk a little bit about the operating

7  history.  The W hotel had a very limited operating history at

8  the time of your valuation, correct?

9       A.   It had a limited operating history, yes.

10      Q.   It was less than twelve months.

11      A.   That is correct.

12      Q.   And through February of this past year the W Hotel

13 actually was losing money on --

14      A.   I think I -- I'd have to double-check the monthly

15 financial statements, but I believe that is correct.

16      Q.   Your valuation was the -- was as of August 1, 2010,

17 correct?

18      A.   That is correct, sir.

19      Q.   So at the time you derived that your value for the W

20 Hotel, that was based on only five months of positive cash

21 flow, right?  That's March, April, May, June, July?

22      A.   I believe that's right.

23      Q.   Operating history of a hotel is an -- is important to

24 prospective buyers as an indication of hotel performance,

25 correct?

1      A.   Is one of the indicators, yes.

2      Q.   And all of the things being equal, a hotel with a

3   longer history of stabilized operations would command a higher

4   price in the market.

5      A.   If all other things were equal --

6      Q.   Okay, that's my question.

7      A.   But they -- tut they -- the premise of your question,

8   they can't be.

9      Q.   By the way, that's kind of the nature of real estate,

10   right, that all real estate properties are unique in some

11   sense.

12      A.   Yes.

13      Q.   And so part of what you have to do as an appraiser is

14   try to sort through those differences to come up with values

15   for whatever you're valuing, correct?

16      A.   That is correct.

17      Q.   Now I'd like to direct you to page 104 of your

18   report, and this is the report on the whole hotel --

19   Plaintiff's Exhibit 2.   (Pause)  Do you see where I am, sir?

20      A.   You're on page 104.

21      Q.   Yes.  And in this part of your report you were doing

22   an analysis of comparable sales of hotels in the Boston

23   marketplace?

24      A.   That is correct.

25      Q.   And you relied most heavily on two of those sales in

1  performing your analysis, correct?

2      A.  That -- more heavily on two of them, yes.

3      Q.  And in making the adjustments that you made on page

4  104, what you did is you -- you adjusted the actual value, the

5  actual sales price of those two properties, the Hyatt and the

6  Copley, correct?

7      A.  That is correct.

8      Q.  And the final adjustments you made were subjective.

9      A.  Some were subjective and some were quantitative.

10     Q.  And as to the quantitative or empirical adjustments

11  that you made, you consider those to be made not with great

12  precision but more something in the range of estimating,

13  correct?

14     A.  Not all of them.  The adjustment for the Cap Ex, the

15  capital expenditures that were going into the Copley Plaza was

16  fairly precise.

17     Q.  As to other of the empirical adjustments, you'd agree

18  that they -- you didn't do them with great precision, but you

19  were estimating within a range, correct?

20     A.  No, I don't think that -- I didn't develop a range of

21  adjustments to the -- to the -- to the comparables.

22     Q.  Which --

23     A.  But my -- help me out with the question again because

24  I'm going to try and answer it, but I'm not sure -- I'm not

25  sure that I understand it.

1      Q.  Why don't we do this: Why don't we look at your

2  deposition testimony at page 170 and into page 171, and I'm

3  starting with line 10 on page 170, and please let me know when

4  you're with me.

5      A.  Line 10, one -- and of page 170.

6      Q.  The question was,

7          "In making the adjustment from 225,000 to 290,000,

8          did you perform some sort of empirical calculation,

9          or were you applying subjective factors which you

10         used in your experience?

11         A.  Both, both.

12         Q.  What empirical calculations did you perform to

13         make that adjustment?

14         A.  Improvement in the market, improvement in the

15         overall market conditions, sometimes referred to as

16         an adjustment for time, and adjustment for location,

17         and an adjustment for parking.  And a -- when you

18         talk about a empirical set of adjustments in certain

19         situations you can make those with a great deal of

20         precision.  In other instances, you're estimating it

21         in a range.  In this particular instance, it was in

22         an range and the final adjustment was subjective."

23     A.  That is correct.

24     Q.  And just so I'm clear, Mr. Griesmer, you were able to

25  make these fine adjustments to come with different numerical

1    figures for a per-room comparison with the hotels, but you

2    weren't able to do a similar adjustment with the comparable

3    condominiums we talked about earlier.

4         A.  No, that's not correct at all.

5         Q.  Let me ask you about the Theme Bar, at page -- why

6    don't you turn to page 84 of your report, please, which is

7    Plaintiff's Exhibit 2?

8         A.  I have it.

9         Q.  This is your -- what -- what you do on the pages is

10   analyzing your *pro forma* of a hotel performance, correct?

11        A.  Correct.

12        Q.  And there's a note that says

13             "Theme Bar to open April 1, 2010"?

14        A.  That's 2011, sir.

15        Q.  So that note's in error, correct?

16        A.  It's 2011.

17        Q.  Because you know that the Theme Bar did not open as

18   of April 1, 2010, correct?

19        A.  No, and I didn't that put date to fool you either.

20        Q.  You did not perform an independent analysis of the

21   Theme Bar's projected revenue, correct?

22        A.  That is incorrect.

23        Q.  You based your projections for the Bar, the Theme

24   Bar, on the original budget provided by Starwood, correct?

25        A.  Which I evaluated and discussed with management,

1  including the detailed build-up back-up that they had to it

2  and concluded it, that it was, in my opinion, was reasonable.

3       Q.   Okay.  And when you say "with management," that's

4  management of the SW Boston?

5       A.   No, that's the management of the hotel itself.

6       Q.   Okay.  So you relied on the original budget figures

7  that were provided to you by Starwood, the management of the

8  hotel, and you spoke with them and reviewed their back-up, is

9  that correct?

10      A.   That's correct.

11      Q.   Now you also looked into the operating history of the

12  restaurant, correct?

13      A.   Absolutely.

14      Q.   And at page 74 of your report you assumed that the

15  restaurant would implement cost and operating efficiency

16  measures, and if you want to take a minute to get there,

17  please go ahead.

18      A.   I'm on page 74.

19      Q.   And now this is your report, do you recall that you

20  assumed that the restaurant would implement Boston operating

21  efficiency measures?

22      A.   Yes, I did.

23      Q.   Now you were here yesterday, correct?

24      A.   Yes.

25      Q.   And you don't have any reason to doubt what Mr.

1   Flanagan testified to that the restaurant's struggling?

2        A.   I think it's clear -- clearly has been.

3        Q.   And although it --

4        A.   Otherwise, it wouldn't need to implement these

5   measures.

6        Q.   And although its top-line revenue is -- is above

7   projections, it's having a tough time breaking even, correct?

8        A.   That is correct.  I believe that's right.

9        Q.   So it's fair to say that at least as of today the

10  cost and operating efficiencies that you assumed as of August

11  1, 2010 have not been successful or have not been implemented?

12       A.   I haven't evaluated the financial statements

13  subsequent to the date of my report.

14       Q.   Now you just told us that in looking at the Theme

15  Bar, you used Starwood's projections for the Theme Bar,

16  correct?

17       A.   I thought that they were credible and reasonable and

18  had good back-up, yes.

19       Q.   And now those are the same people who were operating

20  the restaurant, right?

21       A.   That is incorrect.

22       Q.   So to your mind the difficulty that's being

23  experienced in operating the restaurant doesn't cause you to

24  question whether Starwood's budgeted numbers for the Theme Bar

25  are likely to be achieved?

**PAUL B. GRIESMER - Cross/Daukus**                    **Page 129**

1      A.  Starwood is not running the restaurant and Starwood

2  is not budgeting the restaurant.  The restaurant is run by

3  Culinary Concepts by John George.

4      Q.  Do you know how much off budget the ori -- off the

5  original budget the restaurant is -- is running at present?

6      A.  No, not as of today.

7      Q.  Mr. Griesmer, you've not stayed as an overnight guest

8  at the W Hotel Boston.

9      A.  That -- that's actually incorrect.

10     Q.  You *have* stayed there.

11     A.  Yes.

12     Q.  Have you -- in the last five years have you stayed in

13 any of the hotels that you used as comparables in your

14 appraisal?

15     A.  Personally, no.

16     Q.  As to the condos, I know I'm jumping back and forth a

17 little bit between the hotels and the condos; I want to focus

18 you on the condos right now.  Your valuation for the condos

19 was $90,600,000, correct.

20     A.  Correct.

21     Q.  And that's for the unsold condominiums.

22     A.  That's correct.

23     Q.  And Mr. Harwood's valuation for the condominiums, the

24 unsold condominiums, was $86,000,000, right?

25     A.  That is correct.

1      Q.   So the difference is $4,600,000.

2      A.   Correct.

3      Q.   Would you agree that Mr. Harwood's valuation of

4  $86,000,000 is within a range of reasonableness for the value

5  of the condominiums?

6      A.   No, I think his discount rate is actually too high.

7      Q.   I'm asking you about the total figure.  Do you agree

8  that $86,000,000 is within a range of reasonableness for the

9  value of the unsold condominiums?

10     A.   If you -- I -- I actually would, if you take it that

11  way, because I think it's with -- the values are within five

12  per cent of one another.

13     Q.   So you would?

14     A.   Yes, yeah.

15     Q.   Just so we're --

16     A.   I'm not going to -- I'm not going to quibble with you

17  on that.  I agree with you.

18     Q.   I just want to make sure we're not talking over one

19  another.  So you agree that Mr. Harwood's valuation of

20  $86,000,000 is within a range of reasonableness for the value

21  of the condominiums.

22     A.   I believe it's on the lower end of the reasonable

23  range, yes.

24     Q.   And now jumping to the hotel, you appraised the hotel

25  as having a value of $65,600,000.

1       A.   That is correct.

2       Q.   And Mr. Lewis valued it at $55,000,000.

3       A.   That is correct.

4       Q.   Would you agree that Mr. Lewis's valuation of

5   $55,000,000 is within a range of reasonableness?

6       A.   No.

7       Q.   Now let's go back to the condominiums.  Is it fair to

8   say that each sale of a condominium from the project decreases

9   the value of the remaining unsold stock of the condominiums?

10      A.   Yes, it re -- because it decreases the remaining

11  unsold stock.

12      Q.   So what -- you valued the condominiums as of August

13  1, 1010, correct?

14      A.   That's correct.

15      Q.   And at that time the property had 103 unsold units

16  according to the numbers that you used, correct?

17      A.   No, I believe there were other units that were under

18  contract.  We -- I think we covered this in the deposition

19  between contract units and closed units, you -- you have

20  unsold, unreserved units.  You have units under reservation.

21  You have units under -- under contract, and you have sold

22  units that have actually gone to closing of record.

23      Q.   Well, I don't want to make things that complicated,

24  so let me refer you back to your report, Plaintiffs' Exhibit

25  6, page 15, and tell me when you're there an I'll point you to

1  a particular portion of that report.

2       A.   Under "Property Description," 103.

3       Q.   (unclear, not near microphone) Yes, so what you wrote

4  is

5            "The appraisal, subject to the remaining unsold 103

6            units,"

7  -- correct?

8       A.   That is correct.  That is what is written there.

9       Q.   So that's what you were appraising when you did your

10 report:   103 condominium units.

11      A.   No.  Plus, as you -- on page 83, the units that were

12 under contract.

13      Q.   Well, here you wrote,

14           "The appraisal is subject remaining unsold 203

15 units,"

16 -- do you wish to correct that?

17      A.   Give me a moment.  (Pause)  I would.  That does --

18 That 103 does not include the units that were under contract

19 as of August 1st.

20      Q.   And in any event you agree that every time a unit is

21 sold, it decreases the value of the remaining stock units,

22 correct?

23      A.   It decreases the -- the remaining stock, and

24 therefore there is less real estate to sell, yes.

25      Q.   And is it fair to say that you have not performed a

1   calculation to find how much the value of the property has

2   decreased from August 1, 2010 when you valued the property to

3   today based simply on the sale of units during that period.

4        A.  No, I haven't valued the cash or the remaining unsold

5   units.  I don't know if you're referring to just the real

6   property or the personal property that would include the cash,

7   but I've been -- I have valued neither subsequent to August

8   1st.

9        Q.  And is it fair to say that if you were going to do a

10  valuation as of today what you would focus on is how many

11  units are remaining at the property, correct?  How many unsold

12  units remain at the property.

13       A.  If I was doing a valuation of the real property, that

14  is correct.

15       Q.  Now back to the rental program, would the W need to

16  reduce the sales price of used units, in other words,

17  condominiums that someone has been renting in order to sell

18  them?

19       A.  I haven't done that analysis, but I think that that

20  would depend upon on how long the units had been rented for,

21  what condition that they were in, and whether or not one of

22  the renters would actually end up being the buyer.

23       Q.  Well, in a situation with one of the renters is the

24  buyer, if what the W does is credit that renter with the rent

25  they've paid for the sales price, what number would be proper

**PAUL B. GRIESMER - Cross/Daukus**                                    **Page 134**

1  to use in valuing the property in terms of valuation you've

2  done here?

3           MR. BENNETT:   Objection, Your Honor.

4           THE COURT:   Just a minute, please.

5           MR. BENNETT:   The Court ordered it -- I believe

6  the Court order would prohibit that, and there's no plan to

7  credit the rent, so we're talking beyond more than just a

8  hypothetical question.

9           MR. DAUKUS:   Well, I'm sorry.  I didn't realize

10  that.  So as long as the price is not going to be reduced

11  because of rent paid --

12           THE COURT:   Rephrase your question.

13           MR. DAUKAS:    -- I'll withdraw the question.

14           THE COURT:   You'll withdraw the question?

15           MR. DAUKAS:   I'll withdraw the question, Your

16  Honor.

17           THE COURT:   Go ahead.

18  BY MR. DAUKAS:

19     Q.  Fair to say in your experience as an expert in real

20  estate, buyers are likely to pay less for a used unit than

21  they will pay for a brand new unit where they're the first

22  occupier of that unit.

23     A.  All other things being equal, that would be my

24  belief.

25     Q.  Now in your analysis of the hotel's value, you

1   assumed that the Trigen lease had been paid off, correct?

2       A.   No, I did not assume that it had been; I assumed that

3   it would be.

4       Q.   Okay.  So in -- in coming up with your value for the

5   hotel property, you -- your assumption was that the lease

6   would be paid off and not -- and you did not -- well, strike

7   that.  Let me stop right there.  Your assumption was that the

8   lease would be paid off, correct?

9       A.   That is correct.

10      Q.   And so you did not include an expense for payment of

11  the Trigen lease when you did the analysis of net operating

12  income that you used to value the hotel, correct?

13      A.   Yes and no.  I did not include it in the net

14  operating income; I did include it in the value.  It would

15  inappropriate to include a capital expenditure of that nature

16  as an operating income or expense item.

17      Q.   Do you know where the debtor would be able to come up

18  with $2,500,000 to pay out the Trigen lease?

19      A.   I didn't make an assumption that the debtor would do

20  it or that anybody else would do it, other than a typical

21  buyer buying the hotel would look -- or buying the commercial

22  condominium, would -- would look to pay that off.

23      Q.   And --

24      A.   It's expensive debt.  It's, you know, it's got a -- I

25  believe there's an imbedded constant of somewhere in the

1  neighborhood of 14 plus per cent which exceeds both my

2  discount rate and Mr. Lewis's.  So it would be inappropriate

3  to leave it sitting in the cash flow to get to a fair market

4  value.

5      Q.  It's -- In your mind it would be unreasonable to

6  enter into a deal like that.

7      A.  I didn't evaluate the purpose or the background of

8  entering into the deal.  I just evaluated what someone would

9  do if they were purchasing the property.

10     Q.  Now do you agree that Mr. Ahearn is an expert

11 salesman in the Boston area for luxury condominiums?

12     A.  I -- I do, yes.  I've worked with him before.

13     Q.  And he's a well respected salesman in the luxury

14 condominium area?

15     A.  I believe so.

16     Q.  You are aware that Mr. Ahearn has been unable to sell

17 condominiums at the W at the sales velocity that you've

18 assumed in your report, correct?

19     A.  I haven't evaluated the sale, the actual sales pace

20 of the subject property subsequent to the date of my value.

21     Q.  Well, in your report you calculated the sales

22 velocity to be only .89 units per month from January 2009

23 through June 2010, correct?

24     A.  That's the historical rate, yes.

25     Q.  And do you understand that that's a far slower rate

1   than the debtor had projected or that the -- and the debtor

2   projected at the time of bankruptcy?

3       A.   I haven't looked at that, no.

4       Q.   Well, let me ask you this:  In your expert opinion,

5   is Mr. Ahearn doing a poor job in selling units, or is he

6   doing the best that is possible in the current market

7   conditions?

8       A.   I have -- I believe that he is doing a good job, but

9   that -- that's a personal opinion, not a professional opinion.

10  I have not evaluated his performance as the listing or

11  representative broker on the property; wasn't engaged to do it

12  and have no plans to do so.

13      Q.   Would it be fair to say that reason that sales have

14  been slow at the property is because of market conditions, not

15  because of the quality of Mr. Ahearn?

16      A.   I would -- market conditions through what point in

17  time?

18      Q.   Well, let's take to the time of your valuation,

19  August 1, 2010.

20      A.   Okay.  Up through -- up to that point, I believe it's

21  a combination of market conditions and I also think that the

22  publicity after the bankruptcy was not a positive factor for

23  sales absorption in the -- in the months from May -- May,

24  June, and into July.

25      Q.   Well, you've testified that you didn't do anything to

1    analyze the effect of the bankruptcy on the value of the

2    condominiums.

3         A.   That is correct, sir.  I valued a -- I estimated a

4    fair market value of those properties, not the value of those

5    properties as affected and encumbered and continuing into

6    bankruptcy.

7              MR. DAUKAS:   Could I have just a moment, please,

8    Your Honor?  (Pause)  I have one or two more questions.

9    BY MR. DAUKAS:

10        Q.   Referring you to your report on the condominiums at

11   page 81.

12        A.   With you.

13        Q.   Okay.  There's a discussion there, under "Final

14   Valuation" you state,

15             "The model below contains a final valuation estimate

16             of the retrospective market value as of August 1,

17             2010 of the remaining unsold residential condominium

18             units in total of $90,600,000."

19   And then you say,

20             "The analysis assumes that as of August 1, 2010,

21             there were 107 available condominium units, four of

22             which were under contract."

23        A.   Yes, sir.

24        Q.   So what was it you were valuing?  Were you valuing

25   103 units, or 107 units as having a value of $90,600,000?

1    A.   The 107, if you go over to page 83, which is the cash

2  flow, you will see two separate -- two distinct lines, one

3  where the  contract units are included, which is in the August

4  10, "month one" column about two-thirds of the way down the

5  page, "Proceeds from units under contract."  And then you will

6  also see that there is an estimate for proceeds from projected

7  unit sales.

8    Q.   Okay.  I see.  And so the $90,600,000 figure is for

9  107 units that have not sold yet, correct?

10    A.   Yes, that's correct.

11      MR. DAUKAS:   Thank you.  I have no further

12  questions at this time.

13      THE COURT:   Mr. Bennett.

14      MR. BENNETT:   Very briefly, Your Honor.

15                **REDIRECT EXAMINATION**

16  **BY MR. BENNETT:**

17    Q.   Mr. Griesmer -- do I (not near microphone)  -- Mr.

18  Griesmer, do I understand that you used the same methodology,

19  the same sellout period, and the same definition of market,

20  fair market value, market values as Mr. Howard?

21    A.   Yes, that is correct.

22    Q.   And I understand that the variance between you and

23  Mr. Howard are about five per cent?

24    A.   That is correct.

25    Q.   And the fact that I have another hours' worth of

1    questions on redirect on the residences could be passed on?

2         A.  I think so.

3         Q.  Move on then to the hotel.  With respect to the --

4    just in your experience, could you tell us, if you could now,

5    having an opportunity to go back and look at your sort of past

6    work, what hotels in the Boston area have you appraised?

7         A.  The Ritz Carlton Boston Hotel, the Copley Plaza

8    Hotel, the Copley Marriott, the Western at Copley, the

9    Doubletree Guest Quarters, the Marriott Long Wharf, the

10   Charles Hotel, which is actually in Cambridge, the Millennium

11   Boston, --

12            MR. DAUKAS:  Your Honor, excuse me, I --

13   BY THE WITNESS:

14        A.   -- the Backbay Hilton --

15            MR. DAUKAS:  Excuse me, Your Honor.

16            THE WITNESS:  I'm sorry.

17            MR. DAUKAS:  I'm sorry.  I'm going to object and

18   move to strike.  The witness was asked this question at the

19   deposition; he identified only three.  He submitted an *errata*

20   sheet that's dated as of two days ago which we received today

21   in which he did not correct that answer.  So I asked him how

22   many hotels he valued, he told me three, and he identified

23   which three they were.  Now he's coming up with a whole

24   additional list.

25            THE COURT:  May I see the *errata* sheet, please?

1          MR. BENNETT:   Your Honor, we don't suggest that his

2  testimony was incorrect at his deposition.  He recalled at his

3  deposition what he recalled, he testified that's what he

4  recalled.  We don't have any right to correct the deposition

5  by changing his testimony, we didn't intend to change his

6  testimony.

7          THE COURT:   Well, if he submitted this yesterday,

8  why didn't he correct it then?

9          THE WITNESS:   I --

10         MR. BENNETT:   He's not correct -- He's not saying

11 that there's anything wrong with his deposition, Your Honor.

12         THE WITNESS:  I believe it's a different question.

13         THE COURT:   I'll rule on the objection.

14         THE WITNESS:   Oh, I'm sorry.

15         MR. BENNETT:   All I was doing, Your Honor, is, I

16 asked him after the deposition to go back and supplement his--

17         THE COURT:   All right.

18         MR. BENNETT:   -- go back and look at some documents

19 to refresh his recollection.

20         THE COURT:   The objection is overruled.

21 BY MR. BENNETT:

22     Q.  Please continue with your --

23     A.  Where did I leave off?

24     Q.  I have no idea, Mr. Griesmer.

25     A.  All right.  So the Charles Hotel, which is Cambridge,

1  the Millennium Boston Hotel, the Backbay Hilton, and Battery

2  Wharf.  I did Battery Wharf twice, I also did The Seaport

3  Hotel, and I have valued -- I valued The Seaport Hotel every

4  year from and beginning -- from and including 1998 through

5  2009, and valued it twice in 2001, and three times in 2003.

6      Q.  Now with respect to the testimony that Mr. Lewis

7  gave, he said that one of the errors in your report is that

8  you failed to list the Theme Bar as an extraordinary

9  assumption.  Do you agree with that?

10     A.  That's what he said, but --

11     Q.  You --

12     A.  -- I -- I don't agree with him at all.

13     Q.  And why don't you agree that you were required to

14  list the Theme Bar as an extraordinary assumption?

15     A.  It's based on a careful review of the requirements of

16  the Uniform Standards of Professional Appraisal Practice,

17  including The Statement On Standards For Retrospective Value

18  Opinions, and also the Advisory Opinions and the specific Q&A.

19         The Advisory Opinions and the Q&A are technically

20  outside of standards, but they are written by the Appraisal

21  Standards Board and they're very clear on the subject.  When

22  you're doing a retrospective valuation, if something changes

23  -- that is, effectively a subsequent event, you disclose it,

24  but you do not use an extraordinary assumption.

25     Q.  And you already testified on cross-examination that

1  you sim -- you did not merely incorporate The Starwood

2  budgets, but you looked into them in detail.

3      A.  That's correct.

4      Q.  Did your own assessment with respect to the

5  reasonableness of those budgets?

6      A.  That's correct.

7      Q.  Included that Starwood budget --

8          MR. DAUKAS:   Objection.  Leading.

9  BY MR. BENNETT:

10     Q.  What did you conclude with respect to The Starwood

11 budgets, the reasonableness of The Starwood budgets?

12     A.  That it -- that it was both a -- it was a reasonable

13 budget and a reasonable basis for a forecast.

14     Q.  I think you already told us why you didn't include in

15 the operating expenses the Trigen lease.  You also -- did you

16 also include the cost of completion of the spa in your -- and

17 the operating cost in your discounted cash flow?

18     A.  No, I do believe including the -- as of the date of

19 my value, The Spa was already, was already completed; I

20 believe as of the date of the Cushman & Wakefield value, it

21 was not complete.  It may -- it's an appropriate deduction in

22 the Cushman value as of May 24th.  It's not a deduction that I

23 made because it wouldn't have been appropriate as of August

24 1st, because it was already in -- already spent and in the

25 property, but it would not be something that one would include

**PAUL B. GRIESMER - Redirect/Bennett**                                  **Page 144**

1  as an operating expense in either case.

2      Q.   And, sir, did I ask you to look at the lowest

3  appraisal with respect to the hotel and to make an adjustment

4  if the -- if the Theme Bar income was included -- I'm sorry,

5  to make an adjustment if the Trigent lease was included -- oh

6  I -- start again:   Did I asked you to make -- look at Mr.

7  Lewis's appraisal and deduct out the Trigent lease payments?

8      A.   You -- you asked me to perform that chalk, yes.

9      Q.   And what did you conclude if you removed the Trigent

10 lease payments from Mr. Lewis's appraisal?

11     A.   That his value would go up.

12     Q.   From approximately by how much?

13     A.   I believe that -- I believe that there was -- the

14 effect of the Trigen lease itself, I believe, is around 1.6

15 million, but I believe that chalk also has another adjustment

16 on it.

17     Q.   What was the other adjustment you had in that chalk?

18     A.   Having done three of them, I'd need to see the

19 specific one.

20     Q.   I show you the typed version.  (unclear, not near

21 microphone)

22     A.   Okay.

23     Q.   (unclear, not near microphone)

24     A.   Yes, this is the one that deals with the adjustment

25 for adding back the capital expenditures on the spa at --

1  already in the -- the property, and also adjusting for the

2  effect of the Trigen pre-payment.  The Trigen lease -- I'm

3  sorry.

4      Q.  (unclear) get the chalk up and give the Court an

5  opportunity to see it (unclear, not near microphone)

6  Defendant's Chalk 1.

7      (unclear, low-voiced discussion)

8          MR. BENNETT:    Defendant's Chalk 1.

9  BY MR. BENNETT:

10     Q.  Just very quickly, Mr. Griesmer without belaboring

11 the point, could you tell us what Chalk 1 is?

12     A.  Chalk 1 takes the cash flows from the Cushman/

13 Wakefield appraisal, add -- adds back the 1.9 million in

14 capital expenditures for the spa, adjust the homeowner's

15 expense to add back on an annual basis the amount of Trigen

16 sale lease-back debt service that was, I believe,

17 inappropriately included in the Cushman & Wakefield as a

18 deduction, and then comes to a value calculation and then

19 deducts the pre-payment of the -- the Trigen sale lease-back.

20     Q.  Adjusting just for the Trigen lease and for the spa

21 capital expenditures, how would that change Mr. Lewis's

22 appraisal with respect to the hotel?

23     A.  It would increase his discount and cash flow to

24 59,400,000.

25     Q.  That would be the increase in the value of the hotel.

1    A.   That would be the -- that would be the value, I

2  believe that that would be an increase in value of 4.4

3  million.

4    Q.   You also do a chalk for me -- or did I also you --

5  did I also ask you to do a chalk if you just added the Theme

6  Bar income back into Mr. Lewis's appraisal?

7    A.   Yes.

8    Q.   I'm showing you this document.  Is that the chalk

9  that you prepared?

10        MR. DAUKAS:   Excuse me.  May I have a copy of that,

11  please?

12  BY THE WITNESS:

13    A.   No, this is an adjustment to my appraisal, if I did

14  not have a deduction for the cost of the Theme Bar.  It's not

15  Mr. Lewis's appraisal, it's mine.

16    Q.   I'm sorry.  Did you adjust yours for -- What did --

17  what did the -- what does the chalk I just handed you have?

18    A.   It is -- it is my discounted cash flow as presented

19  in my appraisal report with one adjustment, and that is that

20  on the second line, the cost to complete the Theme Bar, which

21  is 1,100,000 in my report, has been taken to zero.

22    Q.   In other words, you made the adjustment on the basis

23  that the Theme Bar would be paid out of the City of Boston

24  money as opposed to net operating income.

25    A.   For the purposes of this illustration, correct?

1      Q.   This is the chalk that I'm putting up on the screen.

2           MR. BENNETT:   Your Honor, I'd offer this -- I would

3  offer this as Defendant's Chalk #2, and it shows the

4  adjustment if you treat the cost to complete the Theme Bar as

5  a capital expenditure are the -- out of the City of Boston as

6  opposed to as an operating expense.

7           MR. DAUKAS:   No objection this being offered as a

8  chalk, Your Honor.

9           **WHEREUPON DEFENDANT'S CHALK #2 ADMITTED**

10 BY MR. BENNETT:

11     Q.   The result of that calculation, what -- what changes

12 would be made to your valuation?

13     A.   The value would increase by approximately a million

14 dollars to 66,600,000.

15          THE COURT:   Say the the number again, please?  Say

16 the number again, please?

17          THE WITNESS:   The value would -- I'm sorry, Ma'am.

18 The value would increase from the appraisal amount of 65.6 to

19 66,600,000.

20 BY MR. BENNETT:

21     Q.   Now, sir, is one of the leases that -- one of the

22 sales that you looked at the Newton Marriott sale?

23     A.   Yes, sir, it is.

24     Q.   And that's obviously not s downtown Boston hotel, why

25 did you look at that sale?

1      A.   For two reasons.  One, it's in the vicinity, but it

2   is -- it's an unusual sale in that it recurs twice within

3   basically a one-year period.  This property sold -- it was

4   sold by House Marriott to a joint venture between the

5   Procaccianti Group and Charles River Realty.  It sold in I

6   believe  June of 2009 for $29,000,000.  The --

7           MR. DAUKAS:   Objection, Your Honor.  My objection

8   is that the witness relied on some notes concerning this

9   property, and they've redacted portions of those notes.  So I

10  object --

11          THE COURT:   The -- the sale is referenced in the

12  report.  There's a chart referencing the sale a year ago and

13  the recent sale, and the difference in price, correct?

14          MR. DAUKAS:   I believe that's right, Your Honor.

15          THE COURT:   What is your objection?

16          MR. DAUKAS:   So my objection is the extent, because

17  the witness has -- or someone has redacted the witness's notes

18  concerning this sale, I don't think it's proper he be allowed

19  to testify further about it.

20          THE COURT:   What notes are you referring to?

21          MR. DAUKAS:   The witness's handwritten notes that

22  were produced after his deposition.

23          THE COURT:   May I see them, please?

24          MR. DAUKAS:   Yep.

25      (Pause)

1                 THE COURT:    There are only three lines, one on each

2 page rejac -- redacted, correct?

3                 MR. DAUKAS:    Yes, Your Honor.

4                 THE COURT:    And this sale is the subject of the

5 report, and the question is simply to explain why he used the

6 sale for the Newton Marriott.  Is that the question?

7                 MR. DAUKAS:    Yes, Your Honor.  That's right.

8                 THE COURT:    The objection is overruled.  You can

9 recross on the issue of the redacted notes.  Your rights are

10 preserved with respect to asking whatever question you'd like

11 on the redaction.

12                 MR. DAUKAS:    Okay.  Thank you, Your Honor.

13 BY MR. BENNETT:

14     Q.  Mr. Griesmer, it does not explain why you reference

15 that sale in your report.  Could you continue with your

16 answer, please?

17     A.  Yes, because it sold basic -- it sold twice within

18 basically a -- a 13-month period.  So it was sold in June of

19 2009 for $29,000,000.  It was a required property improvement

20 program of approximately 12,000,000 that needed to go into the

21 -- I'm sorry, that needed to -- 12,000,000 that needed to go

22 into the property which was done over the balance of 2009 and

23 the early part of 2010; and that would take the -- that

24 buyer's basis in the property up to 41,000,000, that being 29

25 plus 12.  And they sold that property in July of 2010 for, I

1  believe, 77,250,000, almost doubling their money in less than

2  a year.

3      Q.  Would you believe that was indicative of the market

4  or anything else?

5      A.  I believe that -- that it indicates the degree to

6  which the hotel market is recovering both operationally and in

7  terms of investor expectations and in terms of the capital

8  markets, and it shows not only the degree that the -- the

9  direction of that recovery.

10     Q.  Are you also familiar with a certain article known as

11  "Business Briefing" by Cushman & Wakefield?

12     A.  Yes, I am.

13     Q.  And by Mr. Lewis.  And does that article in any way

14  support your (unclear, walked away from microphone) article as

15  of August 10, 1010?

16     A.  Yes, I believe it does.

17     Q.  And you're familiar with that article.  How is that

18  supportive of all your views with respect to the market?

19     A.  In several ways.  It refers to the current

20  environment being one in which investors will pounce on the

21  opportunity to buy and to compete for and bid up the price for

22  any investment grade hotel.  It also refers to the current --

23         MR. DAUKAS:   Objection, Your Honor.  I'm sorry.  I

24  think the document speaks for itself.  If he wants to tell --

25         MR. BENNETT:   Well, if you want --

1           THE COURT:   It hasn't been -- It hasn't been

2  offered yet.

3           MR. DAUKAS:   Yeah, I understand.  So I don't think

4  the witness should be reading from it.  If he wants to say how

5  it -- he thinks it supports his opinion as to --

6           THE COURT:   I thought that was the question.

7           MR. BENNETT:   I will offer the document, Your

8  Honor.

9           MR. DAUKAS:   Is it -- unless it's one of your

10 exhibits, no, then I do object.

11 BY MR. BENNETT:

12    Q.  Then how else does this article help your -- how else

13 is this article indicative of your view that the market is

14 improving?

15    A.  It also has information that generally suggests that

16 in today's environment going-in cap rates are not something

17 that --

18          MR. DAUKAS:   Then, Your Honor, I object on the best

19 evidence rule.

20          THE COURT:   Overruled.

21 BY THE WITNESS:

22    A.  That going in cap --

23          THE COURT:   Wait.

24          THE WITNESS:  I'm sorry, Ma'am.

25          MR. DAUKAS:   I'm sorry.

 1          THE COURT:  Go ahead.  I said you can't have it

 2  both ways.

 3          MR. DAUKAS:  I believe that's the point of the rule

 4  of evidence, Your Honor, that the reason it's not coming in --

 5          THE COURT:  You objected to the question and then

 6  you objected to the document.

 7          MR. DAUKAS:  I object to the documents because it

 8  wasn't disclosed as one of their exhibits.  No, you --

 9          THE COURT:  That isn't what you said.  The question

10  was, "How does this article authored by Mr. Lewis support your

11  opinion?"  That question is allowed.

12          MR. DAUKAS:  But my objection is to him reading

13  from the article.

14          MR. BENNETT:  I don't think he's reading it yet.

15          THE WITNESS:  I don't have it, I'm recalling it.

16          MR. DAUKAS:  Okay.

17  BY THE WITNESS:

18     A.  It also does narrative which refers to going-in

19  capitalization rates and the current environment being low or

20  less relevant to -- and people looking to underwrite hotels

21  around at their recovery and also around their intrinsic

22  value.

23     Q.  You used the word "pounce."  Did you take that from

24  the article?

25     A.  No, that -- that is used in the article by the

1  author.

2

3      (Pause)

4          MR. BENNETT:     Thank you, Mr. Griesmer.  I have no

5  further question, Your Honor.

6                    **RECROSS EXAMINATION**

7  **BY MR. DAUKAS:**

8      Q.  Mr. Griesmer, do you recall anything about the

9  article that (unclear, not near microphone) --  Mr. Griesmer

10 perhaps I can clear up a misunderstanding here.  In the past

11 five years, is it the case you've only appraised three hotels

12 in Boston?

13     A.  That's correct.

14     Q.  And all --

15     A.  One of them being The Seaport Hotel on multiple

16 occasions.

17     Q.  And all those other hotels that you were listing are

18 hotels you had looked at --

19     A.  Prior to those five years.

20     Q.  -- (unclear, both speaking at the same time on the

21 same channel) five years ago.

22     A.  That's correct.

23     Q.  And are you familiar with a good deal of literature

24 suggesting that the economic conditions remain very difficult

25 in the Massachusetts economy right now?

1      A.  I wouldn't say remain.  I would have -- I would say

2   that they are, you know, improving, but they are still not

3   back to what we would call healthy.

4      Q.  You referred -- you referred to a sale of a property

5   that had occurred twice in recent years, is that correct?

6      A.  I did.

7      Q.  And what property was that?

8      A.  The Newton Mariott.

9      Q.  And are you -- are you aware that the Hyatt, the

10  Boston Regency Hyatt has sold twice in recent years, once in

11  February 2009 and once in March 2010?

12     A.  Yes.

13     Q.  And you're aware that the price that it had sold for

14  in February of 2009 was $110,000,000, or $220,000 a room, and

15  that the price it sold for in March of 2010 was only

16  $112,000,000, or $224,000 a room.  Did you know that?

17     A.  I believe that's correct.

18     Q.  And so in that case there was only a two million

19  dollar increase in property -- in the price less than one per

20  cent over a one-year period?

21     A.  Over that -- over that period, I believe that that's

22  correct.  You would have to -- I believe general market

23  sources would look to the months of April, May, and June as

24  when investors began to have really genuine confidence

25  consistent with the August article about buying hotels.

1        Q.  So you'd disagree with what Mr. Ahearn said just a

2    few minutes ago, that we're still in a recession.

3        A.  No, I didn't say that all.  Mr. Ahearn —

4        Q.  My question is, you dis -- do you disagree that we're

5    still in a recession as (unclear, overspeaking)

6        A.  No, I think we're still in a recession.

7            MR. DAUKAS:  Thank you.  Nothing further, Your

8    Honor.

9            THE COURT:  Mr. Bennett, I missed the title of the

10   publication that Mr. Lewis's article was published in.

11           MR. BENNETT:  One second, Your Honor, I have to

12   find the article.  (unclear, not near microphone) It's called

13   "Business Briefings," it's Cushman -- it's issued by Cushman &

14   Wakefield, Global Real Solutions, and the article is

15   captioned, "On the Minds Of Hotel Investors," and --

16           THE COURT:  I -- I just needed the named of the

17   publication.

18           MR. BENNETT:  And it was authored by Mr. Lewis.

19           THE WITNESS:  Anything else for this witness?

20           MR. BENNETT:  I have nothing else, Your Honor.

21   Thank you.

22           THE COURT:  Thank you.  You're excused.

23           THE WITNESS:  Thank you.

24           THE COURT:  Is this an opportune time to break

25   today?

1          MR. MURPHY:   I think so, Your Honor.

2          THE COURT:   We'll begin tomorrow at 11.

3          MR. DAUKAS:   I'm sorry, Your Honor, I couldn't hear

4    you.

5          THE COURT:   We'll begin tomorrow at 11.

6          MR. GRILLO:   When?

7          MR. MURPHY:   Thank you, Your Honor.

8          MR. GRILLO:   11.

9          MR. DAUKAS:   When, 11?

10          MR. MURPHY:   Your Honor, may we leave the materials

11   in the courtroom again?

12          THE COURT:   Yes, it will be locked.  I do have

13   hearings I think beginning at 9:30.  If you'd like, you can

14   leave them in the anteroom, and they will be locked.

15          MR. MURPHY:   Thank you, Your Honor.

16          THE COURT:   Let the Courtroom Deputy know what --

17   what your preference is.

18   (End at 46:46:49 p.m.)

19                    * * * * * * * * * * *

20

21

22

23

24

25

1          I certify that the foregoing is a true and accurate

2   transcript from the digitally sound recorded record of the

3   proceedings.


/s/  Gloria C. Irwin                                    11/16/2010
**GLORIA C. IRWIN**                                     **Date**
**Certified Transcriber NJ AOC200**
**       Federal  CERT #122**
**GCI TRANSCRIPTION SERVICES**
**210 Bayberry Avenue**
**Egg Harbor Township, NJ  08234-5901**
**609-927-0299  1-800-471-0299**
**       FAX  609-927-9768**
**e-mail  irwingloria@comcast.net**
✔gci/SG