# UNITED STATES BANKRUPTCY COURT
## FOR THE
## DISTRICT OF MASSACHUSETTS

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

| | |
|---|---|
| In re: | Chapter 11 |
| **SW BOSTON HOTEL VENTURE LLC, et al.,**[1] | Case No. 10-14535-JNF |
| Debtors | (Jointly Administered) |

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

## MEMORANDUM

## I. INTRODUCTION

The contested matter before the Court is the Motion for Relief from the Automatic Stay pursuant to 11 U.S.C. § 362(d) (the "Motion") filed by Prudential Insurance Company of America ("Prudential" or the "Movant"). SW Boston Hotel Venture LLC ("SW Boston" or the "Debtor"), Auto Sales & Service, Inc. ("Auto Sales"), General Trading Company ("General Trading"), Frank Sawyer Corporation ("Sawyer Corporation"), 100 Stuart Street, LLC ("Stuart Street"), General Land Corporation ("General Land"), 131 Arlington Street Trust ("Arlington Street") and 30-32 Oliver Street Corporation ("Oliver Street") (collectively the "Debtors" and, excluding SW Boston, the "Related Debtors") and the City of Boston filed objections. The Official Committee of Unsecured Creditors filed a Statement of Joinder

---

[1] The other Debtors in these jointly administered cases are Auto Sales & Service, Inc. (Case No. 10-14528-JNF), General Trading Company (Case No. 10-14532-JNF), Frank Sawyer Corporation (Case No. 10-14533-JNF), 100 Stuart Street, LLC (Case No. 10-14534-JNF), 30-32 Oliver Street Corporation (Case No. 10-16173-JNF), General Land Corporation (Case No. 10-16174-JNF), and 131 Arlington Street Trust (Case No. 10-16177-JNF).

1

in Opposition by Debtors and Debtors-in-Possession to Prudential's Motion. At the request

of the Debtor and Prudential, the Court entered a Scheduling Order on August 30, 2010 with

respect to Prudential's Motion. The Scheduling Order contained various deadlines for the

exchange of documents and discovery, as well as a date for the filing of a Joint Pretrial

Statement and a date of November 8, 2010 for the commencement of the trial.[2]

The parties agreed to certain stipulated facts, which they set forth in their Joint

Pretrial Memorandum. The Court conducted an evidentiary hearing over the course of

three days. Nine witnesses testified, and the Court admitted into evidence eight exhibits

on behalf of the Movant; nine exhibits on behalf of the Debtor; and one exhibit on behalf of

the City of Boston.

With respect to the valuation evidence of the parties' expert appraisers, the Court

directed that the appraisal reports would constitute the direct testimony of the experts, and

the parties then could conduct cross-examination, re-direct examination, and re-cross

examination. Prudential objected to the Court's directive and the procedure. The Court

overruled the objection for the reason that the procedure was a commonly used case

management method for expediting the trial. *See* Fed. R. Evid. 611; <u>Lee-Benner v. Gergely

(In re Gergely</u>), 110 F.3d 1448, 1451-52 (9th Cir.1997); <u>Adair v. Sunwest Bank (In re Adair)</u>,

965 F.2d 777, 780 (9th Cir.1992). *See also* 2 Barry Russell, Bankruptcy Evidence Manual, §

611:1 (2010-2011 ed.).

---

[2] Prudential's consent to and execution of the Scheduling Order dated August
30, 2010 constitutes a waiver of the provisions respecting termination of the automatic
stay set forth in 11 U.S.C. § 362(e)(1) and (2).

The issues of law to be determined under 11 U.S.C. § 362(d)(2) are: 1) whether Prudential has sustained its burden that the Debtor does not have equity in the property securing Prudential's claim; 2) whether the Court should consider the value of all of the collateral pledged to Prudential in deciding whether relief from the automatic stay is warranted; and 3) whether the Debtor has shown that it has a reasonable possibility of obtaining confirmation of a plan within a reasonable time, thereby sustaining its burden of showing that it has a plan in prospect and that the property is necessary for an effective reorganization.

Following the conclusion of the evidence, the Court directed the parties to file post-trial briefs. The parties complied with the Court's order and filed briefs with the Court on November 18, 2010. Based upon the documentary evidence, testimony, and legal arguments, the Court now makes the following findings of fact and conclusions of law in accordance with Fed. R. Bankr. P. 7052.

## II. FACTS

### A. Agreed Facts

SW Boston was capitalized with real estate, which the Debtors claim had an approximate value of $18 million; cash in the approximate amount of $25 million; and financing of over $190 million. SW Boston owns and operates the real estate development known as the W Hotel and Residences, a 350,650 square foot, 26-story building located at 100 Stuart Street in the heart of Boston's Theatre District. The following businesses are located at the property: the "W" Hotel (the "Hotel"), 123 condominium units (the

"Condominiums"), a parking garage and valet parking service (the "Garage"), a restaurant, Market by Jean-Georges, and lobby bar (the "Restaurant"), a retail store (the "Store"), a spa (the "Spa"), and eventually a bar (the "Theme Bar").

The W Hotel is managed by an affiliate of Starwood Hotels and Resorts Worldwide, Inc. ("Starwood"). The Spa is managed by Bliss. The Garage is managed by Ultimate Parking, LLC. The Restaurant is managed by Culinary Concepts (Boston), LLC. The Theme Bar has not yet opened for business, but when it is completed it will be managed by an affiliate of Starwood. The real estate development is the first significant hotel and condominium project undertaken by the Debtors.

In 2007, SW Boston obtained a commitment for construction financing for the W Hotel and Residences from HSH Nordbank AG ("HSHN"), a German bank. The HSHN loan was in the amount of $192.2 million. Shortly before the scheduled loan closing, in September of 2007, however, HSHN decided to cease making loans in the United States, withdrew its commitment to make the loan, and paid SW Boston a termination fee for doing so. As a result, SW Boston was required to find an alternate source of financing. Prudential agreed to provide SW Boston with a loan.

On January 15, 2008, Prudential, as lender, SW Boston, as borrower, and other parties entered into a Construction Loan Agreement (the "Prudential Loan Agreement"), pursuant to which Prudential agreed to lend SW Boston up to $192.2 million (the "Prudential Loan") for the construction of the real property located at 100 Stuart Street, Boston, Massachusetts. To secure SW Boston's obligations under the Prudential Loan Agreement, SW Boston and

4

Prudential entered into a Mortgage, Security Agreement, Fixture Filing and Assignment of Sales Contracts and Deposits (together with the Prudential Loan Agreement and all exhibits, schedules, related documents, and supplements thereto, and as may be amended from time to time), granting Prudential a security interest and mortgage on SW Boston's real and personal property, and the proceeds of all of the foregoing (the "Prudential Security Interest"). Prudential holds a perfected security interest in the Property.[3]

In addition to the Prudential Security Interest, the following parties guaranteed and/or pledged collateral as security for the Prudential Loan as follows (collectively, the "Additional Prudential Security"):

a) Frank Sawyer Corporation ("FSC") issued a Payment Guaranty, a Carveout Guaranty and a Completion Guaranty (collectively, the "FSC Guarantees") and executed pledge and control agreements with respect to a securities account. FSC also collaterally assigned its interest in the subscription agreement of the Frank Sawyer Trust;

b) 30-32 Oliver Street Corporation granted Prudential a mortgage on and an assignment of leases and rents from real property located at 25 and 27 Pinckney Street, Boston, Massachusetts and guaranteed FSC's obligations under the FSC Guarantees;

c) Auto Sales & Service, Inc. guaranteed FSC's obligations under the FSC Guarantees and executed pledge and control agreements with respect to a securities account;

d) General Trading Company guaranteed FSC's obligations under the FSC Guarantees and executed pledge and control agreements with respect to a securities account;

---

[3] The parties agreed that any statements about Prudential's liens set forth in the Joint Pretrial Memorandum were without prejudice to the rights of the Debtors and the Official Committee of Unsecured Creditors' to challenge such liens in accordance with the Court's cash collateral orders (as extended).

e) SW Boston additionally executed pledge and control agreements with respect to two accounts at Sovereign Bank;

f) 131 Arlington Street Trust guaranteed FSC's obligations under the FSC Guarantees and granted Prudential a first mortgage on real property located at 131 Arlington Street, Boston, Massachusetts;

g) General Land Corporation guaranteed FSC's obligations under the FSC Guarantees and granted Prudential a first mortgage on real property located at 109 and 121-127 Arlington Street, Boston, Massachusetts;

h) Non-debtors, SE Berkeley Street, LLC and SE McClellan Highway, LLC, obtained a letter of credit from Sovereign Bank in favor of Prudential (the "Letter of Credit"); and

i) 100 Stuart Street LLC pledged 100% of its membership interests in SW Boston Hotel Venture LLC.

In addition to the Prudential Loan Agreement, SW Boston entered into a Subordinate Loan Agreement with the City of Boston, pursuant to which the City of Boston agreed to provide a $10.5 million loan of HUD Section 108 funds (the "City Loan"). The proceeds of the City Loan were intended to finance the completion of the Restaurant, the Spa, and the Theme Bar. As collateral for the City Loan, SW Boston granted to the City of Boston a second priority security interest and mortgage on and an assignment of leases and rents from the Property.

In addition to the stipulated facts set forth above, the parties agreed to the value of the following property in addition to the W Hotel and Condominiums as to which Prudential asserts liens:

a) 131 Arlington Street – The Debtors' appraiser valued 131 Arlington Street at $1,850,000, and Prudential's appraiser valued 131 Arlington Street at $1,200,000. Solely for the purposes of the trial on the Motion for Relief, the

6

parties agreed that the value of 131 Arlington Street is $1,525,000;

b) 109 & 121-127 Arlington Street – The Debtors' appraiser valued 109 & 121-127 Arlington Street at $2,400,000, and Prudential's appraiser valued 109 & 121-127 Arlington Street at $2,800,000. Solely for the purposes of the trial on the Motion for Relief, the parties agreed that the value of 109 & 121-127 Arlington Street is $2,600,000;

c) 25 Pinckney St., Boston – The Debtors' appraiser valued 25 Pinckney St., Boston at $1,160,000, and Prudential's appraiser valued 25 Pinckney St., Boston at $1,200,000. Solely for the purposes of the trial on the Motion for Relief, the parties agreed that the value of 25 Pinckney St., Boston is $1,180,000;

d) 27 Pinckney St., Boston – The Debtors' appraiser valued 27 Pinckney St., Boston at $1,020,000, and Prudential's appraiser valued 27 Pinckney St., Boston at $750,000. Solely for the purposes of the trial on the Motion for Relief, the parties agreed that the value of 27 Pinckney St., Boston is $885,000.

On April 28, 2010 (the "Petition Date"), SW Boston, Auto Sales, General Trading, Sawyer Corporation and Stuart Street filed Chapter 11 petitions. As of the Petition Date, the Debtors owed Prudential approximately $180.8 million. Following the Petition Date, Prudential immediately exercised its right to draw on the Letter of Credit in the amount of $17.3 million. On June 4, 2010, General Land, Oliver Street and Arlington Street filed Chapter 11 petitions.

As of November 3, 2010, the date of the filing of the parties' Joint Pretrial Memorandum, SW Boston had closed 25 condominium sales and 98 units remained to be sold. Between the Petition Date and November 3, 2010, SW Boston closed 12 condominium sales. During that period, the Debtor paid Prudential a total of approximately $9,153,883 from the sales of Condominiums.

The aggregate of all of the allowed, non-insider, unsecured claims against all of the Debtors is estimated to be between $3 million and $4 million.

B.    Amounts Owed to Prudential and the City of Boston

The amount owed to Prudential is approximately $154,000,000, without regard to whether it is entitled to post-petition interest or expenses pursuant to 11 U.S.C. § 506(b). The amount owed to the City of Boston, net of the value of its cash collateral, is $6,000,000.

C. Exclusivity

The  Court granted the Debtor's Motion Pursuant to 11 U.S.C. §§ 1121(d) and 362(d)(3) to Extend the Deadlines to File a Plan of Reorganization and Solicit Acceptances of Plan on August 18, 2010 and entered an agreed order on August 24, 2010.  Thus, the Debtors have the exclusive right to file a plan through and including January 31, 2011 and the exclusive right to solicit acceptances of the plan through and including March 30, 2011.

D.  Value of Collateral

The Court heard testimony and received reports from three valuation experts, each of whom expressed opinions with respect to the fair market value of the W Hotel and Condominiums.  All of the experts' reports were introduced into evidence by agreement. None of the parties disputed the qualifications of the appraisers to testify as experts, although the parties disputed their respective opponents' experts' experience, biases, and assumptions.  The Court found all of the parties' experts to be highly qualified in the fields of real estate and hotel valuation.  Moreover, all of the valuation experts agreed on a number of issues, including the methodologies for valuing the W Hotel and Condominiums,

8

namely the income capitalization/ discounted cash flow approach and the comparable sales approach. Additionally, they agreed that the period for completion of sales of the Condominiums was likely to be three years. The capitalization and discount rates utilized by the experts were within a reasonable range of each other.

### 1. Value of the Condominiums

#### a. Prudential's Evidence

Randell Harwood ("Harwood"), a Senior Managing Director/Regional Manager of Cushman & Wakefield ("C&W"), and Robert N. Skinner, a Director at C&W, prepared an appraisal report in which they expressed the opinion on behalf of Prudential that the Condominiums had a value of $86,000,000 as of May 24, 2010, using the income capitalization approach. C&W's appraisal report for the Condominiums, as noted above, was accepted into evidence as direct testimony. Because Harwood testified at trial, this Court shall refer to him as the author of the appraisal report and shall refer to him or C&W as the source of the information in the report.

In his analysis, Harwood assumed that all units would be sold within 36 months of the appraisal, ie., by May 31, 2013. At the time of C&W's appraisal, there were 100 units available and eight units were under contract. In valuing the Condominiums, C&W made several significant valuation assumptions. It chose a 3% annual price increase and an "average monthly sales velocity" of 2.78. The "available unit sales price" was assumed to be $1,137,986 and the "average under contract sale price" was $1,247,719. Harwood calculated the average available sale price per square foot as $898, and the "average

available unit size" as 1,268 square feet.  C&W made the following assumptions regarding

costs: 5% of  the sale price was allocated to sales and marketing;  $5,000 was attributable to

legal and closing costs per unit; and $30,032 per unit, per year was estimated for carrying

costs.  C&W employed a discount rate of 20%.

In reaching its conclusion, C&W examined comparable condominium sales in the

Boston area.[4]  The sale prices ranged from $336,500 to $3,950,000.  The average unit sale

price was $1,472,792, and the average unit size was 1,490 square feet.  Sale prices per square

foot ranged from $603 to $1,627, with an average of $989.  The average sale price for the

Condominiums was $639,990 per unit, or $809 per square foot for an average unit size of 791

square feet.

C&W examined various surveys to establish the appropriate discount rate.

According to the so-called Korpacz Survey of land and development, discount rates in 2009

ranged from 12% to 30%, with an average of 19.67%.  According to Realtyrates.com, in the

second quarter of 2010, the average discount rate for primary residential hi-rises and urban

townhouses in New England was 22.44%, and the average discount rate for mixed use

primary residential units was 22.51%.  The average discount rate for second home hi-rises

in New England was 24.99%.

In choosing the applicable discount rate, C&W considered rates for other investment

opportunities, including the prime rate ( 3.25%), the federal funds rate ( 0.21%), 3M LIBOR

--------------------------------------------------

[4] The report contained information about the following properties: the
Intercontinental, One Charles, the Ritz Carlton, Battery Wharf, Trinity Place, the
Clarendon, and 45 Province.

(0.54%), 6-Month Treasury Bills (0.16%), U.S. 10-year notes ( 3.27%), and U.S. 30-year notes(4.20%). Based on all of the above, C&W chose a discount rate of 20%. With the assumptions referenced above, C&W calculated the "as-is" present market value of the W Boston Residences to be $86,000,000.

During the trial, Rachel Roginsky ("Roginsky"), on behalf of the City of Boston, testified about a number of flaws in C&W's appraisal. She observed that although C&W's valuation date is May 24, 2010, the Boston Regional Analysis and National Residential Market Analysis upon which Harwood relied contained statistics only through 2009. Likewise, in examining comparable sales data, Roginsky indicated that C&W used data from May of 2009 through May of 2010, when sales of luxury condominiums had declined significantly because of the recession.[5]  When estimating sales projections, Roginsky asserted that C&W failed to make upward adjustments to demonstrate the current improved sales market. She also critiqued C&W's use of One Charles and the Clarendon as comparable luxury residences. She noted that all units sold at One Charles were below the 15th floor, while all of the W Residences are on higher floors. Further, unlike the Condominiums, One Charles has no hotel amenities. Roginsky asserted that C&W should have adjusted the average sale price per square foot of the W Residences upward to account for its superior qualities over those of One Charles.

---

[5] C&W recognized in its report that in 2009 the country was in the "full grips of recession."

Similarly, Roginsky observed that C&W improperly considered the Clarendon as a comparable sale because the location of the W Residences is inferior to that of the Clarendon, although the latter lacks hotel amenities. Consequently, according to Roginsky, the average sale prices of the W Residences and the Clarendon should have been roughly equivalent. Roginsky also criticized C&W's discount rate. C&W's discount rate of 20% was based on Korpacz and Realtyrates.com surveys which factored in construction costs. Roginsky testified that, at the time of C&W's appraisal, construction was virtually complete and, therefore, the discount rate should have been reduced with only marketing and sellout risks considered.

b. The Debtor's Evidence

Paul Griesmer ("Griesmer"), Senior Managing Director of FTI Consulting, Inc. ("FTI"), the Debtor's appraiser, prepared an appraisal report as of August 1, 2010, which was introduced into evidence. He expressed the opinion that the value of the Condominiums was $90,600,000 as of August 1, 2010. Griesmer testified on behalf of FTI at trial. The Court shall refer to Griesmer or FTI as the author of the appraisal report.

Griesmer assumed a sell-out period of 36 months, ending on July 31, 2013. At the time of his appraisal there were 103 available units and four units under contract.

Like C&W, Griesmer made several assumptions in conjunction with his determination of the value of the Condominiums. He used a 4% annual price increase and an average monthly sales velocity of two units per month for the first six months, followed

12

by three  units per month for the majority of the sellout period, followed by four units per month in the last months of the sellout period.  Griesmer assumed an 8% sales cost for fees and expenses associated with marketing and closing the units, including a 4% fee to Starwood pursuant to the Condominium Marketing License Agreement, as well as carrying costs.  Thus, Griesmer assumed $10,708,420 in total sales costs for the 36-month period and total carrying costs of  $4,574,901 for the same period.

Griesmer assumed an average sale price for the Condominiums of $928 per square foot and estimated that there were 128,992 square feet available for sale.  He examined comparable condominium sales in the Boston area that occurred between January of 2009 and June of 2010.[6]  The range in average sales prices per square foot was between $861 and $1,194.  The W Boston Residences had the lowest per square foot average sales price at $861.

Griesmer used the third quarter 2010 Realtyrates.com survey for New England Condominium and Co-Op sales to arrive at a discount rate of 17%.  The average discount rate was $16.94%.  Using the above assumptions, FTI determined that the W Boston Residences' total net cash flow is $118,571,927 and its present value is $90,600,000.

During cross-examination, Prudential attacked several of Griesmer's valuation assumptions.  It suggested to Griesmer that his 17% discount rate was unjustifiably low.  Greismer stated at trial that discount rates for New England condominiums, comprising both primary residence and secondary residence, were between 22.38% and 24%,

---

[6] Griesmer used the following comparable sales:  45 Province, the Clarendon, One Charles, the Intercontinental, Battery Wharf, the Ritz Millennium, Trinity Place, Heritage on the Garden, and the Belvedere.

respectively. If he had used a 20% discount rate, the value of the Condominiums would have been $86,600,000; if he had used a 22% discount rate, the value of the Condominiums would have been $84,100,000.

Prudential cross-examined Griesmer about his assumption of a sellout by August 1, 2013, suggesting that it was unrealistic because SW Boston has not sold the necessary 2.97 condominiums units each month. It also pointed out that units generally have not sold at Griesmer's assumed price per square foot and that since May 24, 2010 half of the units sold have been sold for less than the minimum target price.

c. The City of Boston's Evidence

Roginsky, a Principal of Pinnacle Advisory Group ("Pinnacle"), and Jonathan L. Jaeger prepared an appraisal report for the City of Boston. The Court shall refer to Roginsky as the author of the report or to Pinnacle in discussing its contents.

In her report, Roginsky indicated that as of December 31, 2009 the Condominiums with related parking had a value of $136,800,000, using the income capitalization method. At the time of the Pinnacle appraisal, there were 123 units available, 15 of which were under contract. Roginsky estimated that the sale price per square foot would be $1,100. She projected that in 2009 between 20% and 30% of the units would be sold. Further, Roginsky on behalf of Pinnacle, estimated a sellout period of 18 to 24 months, with sales of 6 units per month. She projected a growth rate in the sales prices of 3% per year and calculated an average unit size of 1,206 square feet.

14

Pinnacle made two sales estimates, one based on 30% of units being sold by the end of 2009, in which the sale price would be discounted by 3% to increase the volume of sales, and the other based on 20% of units being sold by the end of 2009, with no price adjustment. Both estimates yielded the same valuation conclusion. Roginsky estimated total expenses for sales to be $15,000,000 or 9% of gross sales proceeds.

Pinnacle did not provide statistics about sales of specific comparable residential units. Rather, Pinnacle provided generalized information about luxury condominium sales in the Boston area. In general, sales of condominium units in Boston increased through 2004, with the exception of 2001. Sales of condominiums have been declining slightly each year since 2004. Nonetheless, sale prices have increased each year since 2002. In 2008, the median sale price for a luxury condominium was $730,000 and the average sale price was $1,264,000, an increase of 9% and 38%, respectively, over the previous year. The median price of luxury condominium units per square foot in 2008 was $690, and the average price per square foot was $777. The supply of luxury condominiums significantly decreased in the second half of 2008.

Roginsky chose a discount rate of 17%, if 30% of units were sold before the end of 2009, and 15%, if 20% of units were sold by the end of 2009. Roginsky reported that generally discount rates for development sellouts ranged from 20%-25%, but in the case of the W Boston Residences the only risk that remained was marketing, as development and construction were nearly complete. Therefore, Roginsky surmised that the discount rate

15

should be lower than the average.  Discount rates for other types of properties such as apartment buildings, offices and hotels tend to be rather low and often under 12%.  Yet, in the sale of condominiums there is no long term value to capture and, therefore, Roginsky reasoned that the discount rate for the W Residences should be higher.

Roginsky interviewed various condominium converters who suggested a range of discount rates from the mid to high teens.  After applying the appropriate discount rate, Pinnacle estimated the present value of the W Boston Residences to be $136,800,000.

During cross-examination, Prudential challenged several of Roginsky's major assumptions, including the high sales velocity, the 19-month sellout period, the target per square foot price of $1,100, and completed sales of 30% of the units by the end of 2009, which according to Prudential  have not been realized.

  2.  Value of Hotel

   a.  Prudential's Evidence

C&W, through James M. Berry ("Berry"), Senior Director of Cushman  & Wakefield of Massachusetts, Inc., and Eric B. Lewis ("Lewis"), Executive Managing Director - National Practice Leader Hospitality & Gaming Group, produced an appraisal of the W Hotel on behalf of Prudential.  Because Lewis testified at trial, the Court shall refer to him or C&W as the author of the appraisal report.

C&W, valued the W Hotel at $55,000,000 (or $234,043 per room) as of May 24, 2010, using both the sales comparison approach and the income capitalization approach. Lewis

16

calculated the W Hotel's historical operating performance to ultimately determine its projected occupancy and average daily room rate ("ADR"). The W Hotel's occupancy rate for 2009, a partial year, was 31.3% and the year to date occupancy rate, as of April 30, 2010, was 60.5%. The partial year 2009 ADR was $209.66, and the year to date ADR, as of April 30, 2010, was $220.50. By multiplying the occupancy rate by the ADR, C&W determined the revenue per available room (RevPar) was $65.60 for the partial year 2009 and $133.43 as of April 30, 2010.

To determine the W Hotel's projected market share, C&W analyzed the penetration factors for the W Hotel and its competitors.[7] The W Hotel's historic penetration factor is 46.7%. Among its competitors, the W Hotel's historical penetration factor ranks second to last. C&W projected that the W Hotel's penetration factor would steadily rise over the years and reach 102.5% in 2013. C&W projected that the stabilized occupancy rate would be 74%.

Lewis compared the W Hotel's ADR and RevPar to those of its competitors. The historic market average ADR for 2009 was $210.46 and the average RevPar was $140.87. The W Hotel's 2009 ADR and RevPar were $209.66 and $65.60, respectively. Lewis noted that the W Hotel's RevPar was significantly lower than the market average because the hotel was not open for the entire 2009 year. In 2010, the W Hotel's ADR had risen to $220.50, and Lewis forecasted that by the end of 2010 the ADR would increase by 10% to $230.63. Lewis projected that the W Hotel's ADR would steadily increase to $296.47 in 2014. Likewise, it

---

[7] The comparables included the Liberty Hotel, the Langham Hotel, the Taj Boston, the Ritz-Carlton Boston Common, Nine Zero, the Back Bay Hotel, the Hyatt Regency Boston, the Fairmont Copley Plaza, and the Ames Hotel.

projected RevPar would increase to $222.11 in 2014.  Because the W Hotel is new to the

market in Boston, management decreased prices to increase occupancy.  Lewis surmised

that as occupancy has been increasing and will continue to increase, management would

raise prices, increasing ADR and RevPar.  C&W noted that while an ADR near $300 is

competitive, the W Hotel will not be a leader in the market because of the Hotel's less

desirable location.

In appraising the W Hotel under the income capitalization method, Lewis calculated

a ten year projection of income and expenses.  He ultimately projected net cash flow for each

year by calculating the revenue per occupied room, based on fees collected for room rental,

food and beverages, telecommunications, parking and miscellaneous expenses.  From this

figure, Lewis deducted all Hotel expenses, including maintenance costs, marketing costs,

taxes and insurance, calculating the total projected net cash flow for the 2010-2011 year to

be $220,000.  He expected the net cash flow to stabilize in 2013 at $5,256,000 as the

occupancy rate and room rental rate increase.  In addition, Lewis considered a $1.9 million

deduction for the cost to complete the Spa for the 2010-2011 cash flow.

Lewis employed a discount rate of 11% based upon an examination of various

surveys regarding full service hotels, with discount rates ranging from 9% to 26%.  The

Korpacz Real Estate Investor Survey specifically focused on upscale and luxury hotels and

used discount rates of 9% to 18% with an average of 12.3%.  Lewis chose 11% based on the

W Hotel's urban environment and its proximity to desirable locations, including major

employment centers, universities, leisure attractions, and hospitals, as well as the Hotel's

upscale amenities, newness, and opening in the midst of a recession.

Lewis determined that the terminal capitalization rate was 7.5%, with 3% deducted

for closing costs.  In the surveys, the terminal capitalization rates ranged from 7% to 22%

for full services hotels, and from 7% to 12%, with an average of 9.8%, for upscale and luxury

hotels.  According to Lewis, C&W chose a low terminal capitalization rate because the Hotel

was newly constructed.  Furthermore, C&W considered strengths and weaknesses, such as

modern amenities, availability of public transportation, the branding of the W Hotel

franchise, inferior location within Boston, and riskiness of stabilization.  Lewis used a 3%

inflation rate.  With the above statistics, Lewis calculated the total present value of the W

Hotel to be $55,000,000.

Under the sales comparison approach, C&W examined five hotel sales in Boston and

Cambridge that occurred between January 2007 and March 2010.[8]  The sale prices ranged

from $63,200,000 to $330,300,000.  The most recent sale was of the Hyatt Boston Regency,

a direct competitor of the W Hotel, for $112,000,000.  C&W calculated the W Hotel's  market

value range based on the sales comparison approach to be $54,050,000 to $59,925,000.

During cross-examination, SW Boston challenged Lewis's deduction of $1.9 million

from the cash flow for completion of the Spa because the City Loan provided the funds of

---

[8] The following hotels were identified in the report: the Hyatt Boston Regency,
the Hotel @ MIT, the Hilton Boston Back Bay, the Marriott Long Wharf, and the Westin
Boston Harbor.

$1.9 million to complete the Spa, and, therefore, that sum should not have been deducted as an operating expense.  Eliminating that improper deduction, according to the Debtor, would increase C&W's valuation of the W Hotel by $1,500,000 to $1,800,000.

SW Boston also addressed Lewis's continued deduction of the cost of the Trigen equipment lease[9] from the Hotel reserves throughout the 10 year projection period.  SW Boston suggested to Lewis during cross-examination that the appraisal should have accounted for the payoff of the Trigen lease.  According to the Debtor, by deducting the cost for completing the Spa and the Trigen lease fees, C&W's valuation of the W Hotel would increase to $59,400,000.  Finally, SW Boston directed questions to Lewis about why he failed to include  projected revenue from the contemplated Theme Bar in his calculations.  In its view, if all of the above adjustments had been made, C&W's valuation of the Hotel would have been $62.5 million.

In cross-examination by the City of Boston, Lewis acknowledged that, although C&W's appraisal had a valuation date of May 24, 2010, the regional economic data and statistics considered in the report did not extend beyond 2009.  Although C&W noted that hotels in the Theatre District generally had lower ADRs than those in the Back Bay and Financial District, the City of Boston pointed out to Lewis that he did not address the fact that other than the W Hotel, the lodging in the Theatre District is substandard compared to lodging in other areas of the city.  Further, the City of Boston challenged C&W's decision

---

[9]Trigen-Boston Energy Corporation provided steam and energy equipment to the Debtor.

not to  include revenues from the Theme Bar in its cash flow projections, even though the appraisal was intended to be prospective and should have included assumptions that were reasonably likely to occur.

Additionally, like the Debtor, the City of Boston questioned Lewis about the availability of $1.9 million of the City of Boston's loan proceeds to fund completion of the Spa and C&W's inclusion of that sum as an operating expense.  The City of Boston also highlighted that actual figures were available regarding 2008 and 2009 occupancy, ADR and RevPar, and Lewis's decision to use estimates of those statistics when examining the competitive market. Although C&W observed that in the competitive market, a 29.5% increase in demand for hotel rooms was an "astounding" surge in the first quarter of 2010, the City of Boston noted that the first four months of a calendar year tend be the least demanding.  The City of Boston, through its cross-examination, established that C&W should have assumed that demand would continue to increase throughout 2010.  Even if the 29.5% increase of 45,313 hotel rooms remained constant, the increase would result in demand of an additional 136,000 in 2010, not 75,000, as Lewis projected in the appraisal report for Prudential.

The City of Boston also criticized C&W's chart on page 49 of its appraisal report, in which C&W examined seasonal trends of the W Hotel and its competitors since 2004.  The chart did not reflect statistics regarding the W Hotel, as it opened in 2009.  Further, the City of Boston challenged C&W's failure to identify hotels competing with the W Hotel for

purposes of the seasonal trends chart.  Lastly, the City of Boston noted that the chart contained calculations of ADR trends but did not account for inflation.

The City of Boston further noted that C&W stated that the W Hotel's occupancy rate was 60.5%, while that of its competitors was 60.7%, as of April 30, 2010.  C&W, however, projected that the W Hotel's penetration in 2010 would be 93.1% and in 2011 it would be 97.7%.  The City of Boston questioned why the W Hotel's penetration during the beginning of 2010 would be almost 100%, but then would decrease significantly.  The City of Boston attempted to establish that because C&W made inaccurate assumptions regarding hotel room demand and the W Hotel's penetration, Lewis's resulting cash flow calculation was significantly reduced.  C&W indicated that the W Hotel's net cash flow for 2010 would be $220,000, but at the end of July 2010, it had a net cash flow of $1,236,000.

b.  The Debtor's Evidence

Griesmer, on behalf of FTI, which appraised the Hotel on behalf of the Debtor, expressed the opinion that the Hotel and Garage had a value of $65,600,000 as of August 1, 2010, using the income capitalization and sales comparison approaches.  Griesmer determined projected ADR and RevPar by examining historic occupancy statistics.  The W Hotel had an historic occupancy rate ranging from 42.27% in November of 2009 to 82.80% in May of 2010, and an historic ADR ranging from  $190.65 in January of 2010 to $263.32 in May of 2010.  The ADR in November of 2009 was  $214.57.  The W Hotel's historic RevPar ranged from a low of $82.90 in January of 2010 to a high of $218.03 in May of 2010 at the

22

time of the appraisal report.  Griesmer compared the W Hotel's statistics to those in its competitive market.[10]  The historic occupancy rates for the competitive market, including the W Hotel, ranged from 53.80% to 86.42%.  The ADR ranged from $159.51 to $235.38 and the RevPar ranged from $85.81 to $203.42.  Griesmer forecasted that the occupancy rate for the W Hotel would steadily increase from 69.8% in 2010-2011 to 77.7% in 2013.  Likewise, Griesmer forecasted that penetration rates would rise from 92.5% in 2010 to 100% in 2013. The W Hotel's ADR is expected to increase steadily from $240.75 in 2010 to $371.85 in 2021.

In valuing the W Hotel under the income capitalization method, Griesmer made the following assumptions: 1) Starwood would continue to  manage the Hotel in substantially the same manner as it had at the time of appraisal; 2) the Spa would open in August 2010; 3) the Restaurant and Lounge would reduce expenses and increase profits; 4) the $2.5 million attributable to the Trigen equipment lease would be paid off; and 5) $65,000 in punch list items would be completed.  Based upon these assumptions, Griesmer calculated projected net cash flow for 11 years.  In 2010, he projected net cash flow of $2,834,990; in 2011, he projected it at $3,870,352; and thereafter he projected that it would steadily increase over the remaining years to reach $7,219,400 in 2020.

FTI considered roughly the same income and expenses as C&W, except FTI included projected revenues from the Theme Bar, while C&W did not.  Additionally, FTI did not deduct the $1.9 million used to complete construction of the Spa.

---

[10] The following hotels were examined: the Langham Hotel Boston, the Millennium, the Bostonian, the Fairmont Copley Plaza, the Hyatt Regency Boston, the Ritz-Carlton Boston Commons, and the Kimpton Nine Zero

23

Under the income capitalization method, Griesmer chose a discount rate of 10.5%. He examined investor surveys which used discount rates ranging from 9% to 26% with an overall average of 15.35% and an average range of 10.84% to 12.30% for luxury and upscale hotels. Griesmer chose 10.5. Although the surveys indicated that the competitive market is in the recovery process, Griesmer chose 10.5% because the W Hotel is new and has not yet stabilized its operations and performance. He cited surveys indicating recent terminal capitalization rates ranging from 7% to 22%, with an average of 10.17%. The average range of terminal capitalization rates for luxury or upscale hotels was 8.81% to 9.75%. When considering various factors such as region, market and location, Griesmer settled on 7% for the terminal capitalization rate, and he used a 3% inflation rate. After discounting the 11 years of net cash flows, Griesmer calculated the total present value of the W Hotel to be $65,600,000, $10,600,00 more than Prudential's appraiser.

Under the sales comparison approach, Griesmer examined nine hotel sales in Boston, Cambridge, Quincy and Newton, which occurred between January of 2007 and March of 2010.[11] The sales prices ranged from $28,000,000 to $228,000,000. Griesmer focused on the Hyatt Regency transaction, the most recent sale. Based upon a comparison of the W Hotel and the Hyatt Regency sale, other sales, as well as the individual characteristics of the W Hotel, Griesmer concluded that the W Hotel had a value ranging from $64,550,000 to $66,077,500 as of August 1, 2010.

---

[11] These hotels included the Hyatt Regency, the Marriott Boston Long Wharf, the Taj Boston, Boston Quincy Marriott, the Copley Square Hotel, the Fairmont Copley Plaza, the Boston Marriott Newton, and Ritz-Carlton Boston Commons.

On cross-examination, Prudential challenged Griesmer's valuation on the grounds that he lacked substantial experience in appraising hotels.  Greismer conceded that he has spent no more than 10% of his appraisal career valuing hotels, and he was unable to state with certainty how many hotel appraisals he has performed during the past five years.  He also conceded that he had valued only four hotels in the Boston area, including the W Hotel in the last five years.

Prudential cross-examined Griesmer on the revenues and expenses he considered in his appraisal.  Prudential suggested that FTI's appraisal should not have included revenue from the Theme Bar, as the income attributable to the Theme Bar should have been identified and labeled as an extraordinary assumption because the completion date and opening of the Theme Bar was uncertain at the time of his appraisal.  Noting that the Theme Bar has not opened, Prudential observed that Griesmer should have accounted for that risk through higher discount and terminal capitalization rates.

Prudential challenged Griesmer's assumption that the Restaurant would cut costs and increase profits, while noting that no changes have occurred.  Prudential also challenged Griesmer's 10.5% discount rate and 7% terminal capitalization rate, suggesting to Griesmer that they were too low, as the rates do not account for risks associated with the Theme Bar, the Spa and the Market Restaurant.  It also urged Griesmer to concede that the W Hotel is simply too new to justify such low rates.

Prudential concluded that FTI's choice of rates resulted in a $4,000,000 increase in valuation, addressing Griesmer's assumption that SW Boston would pay off most of the Trigen lease via a lump sum payment without any evidence to support that premise. Prudential also suggested to Griesmer that FTI's 2% deduction for sales and closing costs was too low and that 3% is a more typical and accurate estimate. Moreover, Prudential pointed out that FTI provided no valid justification for why taxes would increase at an annual rate of 2.5%. Prudential questioned Griesmer about his emphasis on the sales of the Hyatt Regency and the Fairmont Copley, while casting aside the sales of the other area hotels, as well as his upward adjustment of the sale prices of the hotels when applying the prices to the W Hotel, without a clear justification.

### c.  City of Boston's Evidence

Using the income capitalization and sales comparison approaches, Roginsky, the City of Boston's appraiser, expressed the opinion that the Hotel had a value of $57,700,000 as of October 22, 2009 and would have a value of $76,700,00 as of October 22, 2013.  Construction of the W Hotel had not been completed at the time of the appraisal.  Consequently, Pinnacle examined the historical occupancy rate, RevPar and ADR for the competitive market only.[12] The statistics indicated that in the competitive market supply increased by 3.8%, while demand increased by 3.9%, from 2004 through 2009.  During that same time, the ADR in the market increased by 7.5%.  Nonetheless, occupancy rates declined by 4.2%, and ADR

---

[12] Pinnacle considered the following hotels:  Nine Zero, the Millennium Boston, the Langham Hotel, the Ritz-Carlton Boston Common, the Hyatt Regency, the Fairmont Copley Plaza, and the Liberty Hotel.

decreased by 15.6%, in June 2009 from the rates for 2008. In 2008, the average market occupancy rate was 70.8%, and, in June 2009, the occupancy rate was 62.6%. The market ADR in 2008 was $258.48, while in June of 2009 it was $206.98. In 2008, the market average RevPar was $182.91, which in June of 2009 declined 20.9% to $129.56.

Roginsky calculated projected penetration for the market and the W Hotel. She concluded that the market penetration rate would be 98% in 2010 and 102% in 2012. Market occupancy would be 61% in 2010 and 74% in 2013. The W Hotel's occupancy rate would be 60% in 2010, and 76% in 2014. With the above statistics, Roginsky estimated that the W Hotel's ADR would be $260.57 in 2010 and $329.24 in 2015.

Roginsky used substantially the same revenues and expenses as Griesmer in his income capitalization analysis, including consideration of revenues from the Theme Bar. Pinnacle also considered the following strengths and weaknesses in its analysis: 1) the Hotel will be new and the first W Hotel in Boston; 2) the W Hotel is a strong brand; 3) the Boston hotel market overall is strong; 4) there is limited space in Boston and, therefore, limited opportunity for increased competition; 5) investors find Boston desirable; 6) full-service hotels are competitive in the national hotel market; 7) the W Hotel's location in Boston is not top tier; and 8) the Hotel is opening amidst a major recession. As a consequence, Roginsky's projections were uncertain. She assumed a 3% growth rate for revenues and expenses. With the above assumptions and statistics, she projected the W Hotel's net cash flow for the

years 2010 through 2019.  Roginsky estimated the 2010 cash flow to be $1,736,000, and she expected that to steadily increase each year and reach $6,708,062 in 2019.

Roginsky chose a discount rate of 10% to determine the present value "as complete" on  October, 22, 2009, and a rate of  11% to determine present value "upon attainment of stabilized operations" as of October 22, 2013. She examined various surveys, indicating that the discount rate range was 9% to 14%, with an average range of 10.73% to 12.2%. Roginsky selected 8% for the terminal capitalization rate, and she chose 1.5% for closing costs.  Using the above data and assumptions, Roginsky estimated that as of October 22, 2009, when the W Hotel was slated to open, the present value of the hotel would be $57,700,000, and she estimated the present value to be $76,700,000 as of October 22, 2013.

Under the sales comparison approach, Pinnacle examined comparable sales of the W Hotel in San Francisco, California, the Hyatt Regency in Boston and Le Meridien in Cambridge.  These sales occurred between December 2007 and July 2009.  The unadjusted sale prices for the comparable hotels ranged from $71,652,000 to $113,000,208.  Roginsky estimated that the sale price of the W Hotel would range from $50,900,000 to $69,600,000.

### 3. Value of Prudential's Other Collateral

As stipulated among the parties, the value of the additional collateral owned by the Related Debtors other than SW Boston and which is also the subject of security interests granted to Prudential is $14,754,000.

4. Analysis of Valuation Evidence

The Court has considered and weighed all of the appraisal evidence, and finds that the evidence introduced by all parties had both strengths and weaknesses. The Court neither entirely accepts nor entirely rejects any of the opinions of value expressed by the experts.

a. The Condominiums

As to the value of the Condominiums, the valuation opinions of Prudential's expert and the Debtor's expert were substantially similar. The difference in values between the experts was approximately 5%. Both the Debtor's expert and Prudential's expert agreed that valuation is not an exact science and that, in the field of real estate appraisal, the opinions of value are within a reasonable range of each other. Because the City of Boston's appraisal was completed in September of 2009, prior to completion of construction, it is outdated, and the Court shall not consider it in determining the value of the Condominiums. For the purposes of this Motion, the Court finds that the value of the Condominiums is $88,000,000.

b. The Hotel

Evaluating the reports and testimony with respect to the Hotel, the Court finds that the opinion of the Debtor's expert, although not entirely unassailable and without flaws, was more persuasive and reliable than that of Prudential's appraiser and is entitled to more weight. Griesmer's projections of income were based on historical data supplied by the W

Hotel's franchisor, Starwood, and, thus, have substantial validity. Griesmer's discount and capitalization rates are appropriate and justified. The Court rejects Prudential's suggestion that the rates used by FTI were overly aggressive simply because the W Hotel is new to the market, especially where its occupancy rates and market share are competitive with other comparable luxury hotels. Griesmer's analysis of comparable sales support his valuation, particularly as the comparable sales he utilized were closer in quality to the Debtor's Hotel than those used by C&W. Furthermore, the figures for cash flow utilized by C&W included the cost of completion of the Spa in the sum of $1,900,000. The cost of constructing the Spa, however, is not funded from cash flow and is not an operating expense to be deducted from income because the Spa is being funded from the proceeds of a loan from the City of Boston. Thus, the expenses utilized by C&W were overstated. Moreover, in its cash flow analysis, C&W did not include any projected revenue for the Theme Bar which is a contemplated and integral part of the project. Although it has not yet opened, there was no evidence that it has been eliminated from the business plan and is not on target for opening in the spring as its financing is in place. The testimony relating to the Debtor's plans with respect to opening the Theme Bar was not rebutted.

Although Prudential's appraiser, Lewis, has substantial experience valuing hotels, both locally and nationally, there were several problems with his valuation. As mentioned above, Lewis did not ascribe any projected income to the contemplated Theme Bar, and he improperly considered the costs of completing the Spa as an operating expense when its

construction has been financed by a loan from the City of Boston.  Lewis undervalued the

Debtor's projected cash flow and net income.  In  reaching his mathematical conclusions of

average daily room rates,  Lewis did not give appropriate credit to the luxury nature of the

W Hotel and, instead, unduly emphasized the room rates charged by hotels of inferior

quality to the Debtor's Hotel.  He overly emphasized a subjective consideration that the

Theatre District is a less desirable location than the locations of other hotels.  There was no

evidence that this factor should have been a consideration in the room rate, especially where

the Debtor has been obtaining rates comparable to luxury hotel rates.  In addition, Lewis's

projected figure for increased room demand in 2010 was internally inconsistent with actual

figures, and, thus, was artificially low.   His occupancy rate projections also were

inconsistent with actual historical information from the beginning of 2010.  During his

testimony, Lewis  referenced as a comparable sale the recent sale of the Radisson Hotel,  in

the vicinity of the Debtor's hotel, as support for his valuation, although the sale of the

Radisson Hotel was not analyzed in his report. The Court rejects the Radisson Hotel sale as

a comparable sale to the Debtor's property.  This sale does not reflect the value of the

Debtor's Hotel, as it is older, in need of substantial renovations, and its sales price was

largely attributable to its parking operation.

Lewis's capitalization rate also was too low, as he made an aggressive deduction in

the rate for the Hotel's new construction and urban environment.   These flaws resulted in

a reduced value for the cash flow of the Hotel and depressed the value for the Hotel.

31

Thus the Court accepts the Debtor's expert's valuation of the Hotel, and, for the purposes of Prudential's Motion finds that the Hotel has a value of $65,600,000.

E. <u>Events during the Chapter 11 Case and the Debtor's Reorganization Prospects</u>

Kevin Ahearn ("Ahearn") of Otis & Ahearn, the Debtor's real estate broker and sales agent, testified that the prices being obtained for the Debtor's Condominiums have been stable despite the recession.  He observed, however, that the publicity from the Chapter 11 case and the filing of the Motion have not helped sales.  Prior to the commencement of the Chapter 11 case, there were 13 closings and postpetition there have been 12 closings; there are four units under agreement.  Ahearn spent the first four months of the bankruptcy case answering questions from prospective purchasers.  He testified that now there are 40 showings per month. In his view, $925 per square foot is a feasible price for the unsold units.  The Debtor's sales have been better than several comparables.

Griesmer of FTI, the Debtor's appraiser and Harwood of C&W, Prudential's appraiser, agreed that a reasonable sell-out period for the total inventory of the Condominiums is 36 months.  Ahearn testified that the Condominiums did not become available for sale until after the units in comparable properties, the Clarendon and 45 Province Street, came on the market.  He indicated that despite the chilling effect of the Chapter 11 case, and the recession, the Debtor has sold 25 units, including 12 postpetition, and there are six additional agreements, and four pending offers which have not been reduced to written contracts of sale. Ahearn testified that the Boston real estate market is

32

improving.  Ahearn's projections of improvement in the Debtor's sales are both reasonable

and realistic.  Prudential's attempt to impugn his opinions was unsuccessful.  Although

prior predictions made by Ahearn were not realized, those predictions were prior to the

recession and the Debtor substantially has realized its projections for sales postpetition.

Prudential did not submit independent evidence to rebut Ahearn's opinions respecting

future sales.

During the three year sell-out period, the amount that is expected to be realized from

the proceeds of the sales will be between $116,000,000 and $118,000,000.  In addition, the

Debtor has commenced leasing 25% of the Condominium units, which is projected to

generate $2,500,000.  Ahearn testified that seven leases have been executed over the past

several months and that he expects the balance of the units available for lease will be the

subject of leases.  Although Prudential challenged Ahearn's assertion, the projections for the

success of the leasing program was not rebutted by competent evidence. The Debtor

proposes that the lease revenue will be used to reduce Prudential's mortgage debt over the

next three years.   During the first eight months of this case, the Debtor has paid Prudential

over $9 million.

Derek Flanagan ("Flanagan"), of Argus Management, the Debtor's financial advisor,

testified that during the  six months that the Debtor has been in Chapter 11, it has had net

positive cash flow in excess of $1 million, exceeding its projections.  Although on cross-

examination Flanagan conceded that the Debtor's projections of cash flow do not reflect

payment of condominium fees and real estate taxes for condominium units as operating expenses, he clarified that those expenses are paid in connection with the sales of condominium units. Although the projections include revenue and expenses for the Theme Bar which has not yet opened and for the Restaurant, there was no evidence presented that the objective for opening the Theme Bar in the spring is unlikely to be achieved or that improvement of the Restaurant's bottom line is not attainable. The Court finds that the Debtor's projections of its cash flow are reliable. Since the Debtor commenced its Condominium sales program, it has sold an average of two units per month, and, as noted above, has paid over $9,000,000 to Prudential. Although Flanagan conceded that the price per square foot realized for the Condominiums has been less than originally projected, he projected that the Condominiums will be sold in three years, a fact which was substantially agreed to by the appraisers of both parties.

According to Lawton Bloom ("Bloom"), also of Argus Management, he and Flanagan prepared a restructuring model based on proposed Condominium sales and lease revenue, as well as revenue from Hotel operations. Based on their model, the Debtor will be able to emerge from bankruptcy on or about April 1, 2011 owing Prudential $143,100,000. Bloom indicated that the Debtor will propose a plan to repay Prudential approximately $113 million by the end of 2013 at a rate of 5.25 %, and by 2018 it will owe Prudential $45 million, which will be paid by 2020. The Debtor will be in a position to pay all administrative expenses and priority claims in full upon confirmation, $750,000 will be available for a

dividend to unsecured creditors at confirmation, and all unsecured debt will be paid in full by 2019. He did not perform an exit loan to value ratio, however.

Freddie Reiss ("Reiss"), the Debtor's turnaround expert, testified that based on his review of the Debtor's actual performance and projections, the Debtor has a reasonable possibility of obtaining confirmation of a feasible plan. Although he conceded the Debtor has not drafted or filed a plan at the time of his testimony, Flanagan expressed the view that the Debtors have the financial ability to reorganize.

James Peko ("Peko"), of Grant Thornton, LLP, Prudential's restructuring expert, reviewed the Debtor's projections and actual historical performance, as well as other recent restructuring and refinancing transactions involving hotels. He expressed the opinion that the appropriate interest rate for a restructured loan under a plan of reorganization would be 8%, and, in his view, the Debtor could not support such payments on debt service at that rate. Peko stated that the Debtor's loan to value ratio would be 90%. He did not prepare a loan to value ratio at the end of the three year period within which the various appraisers agree the Condominiums are likely to be sold. He also did not analyze mixed use hotel/condominium projects.

The Debtor has not filed a plan of reorganization or a disclosure statement. The evidence, however, established a general outline of the Debtor's plan: 1) to pay Prudential between $113 million and $120 million in three years and the balance of its secured claim as determined under 11 U.S.C. § 506; 2) to pay the balance of Prudential's secured claim,

estimated to be approximately $50 million, in approximately 10 years, at an interest rate of 5.25%; 3) to pay the City of Boston in accordance with its contract; 4) to pay unsecured creditors in full; and 5) to pay administrative expenses and priority claims in full at confirmation.

In support of their financial ability to propose a plan, the Debtor offered a financial model developed by Argus Management, based on the anticipated proceeds of the sales and leases of the units, and cash flow from the operation of the Hotel.   As explained by Bloom and Flanagan, the Debtor would have sufficient funds to pay down the Prudential debt to approximately $50 million over three years, and, thereafter, pay debt service to Prudential over 10 years at a rate of 5.25%.  The loan to value ratio at the end of three years would be 55%.  Under an earlier version of the model, the Debtor could pay interest up to 6.25% to Prudential given its cash flow.   The Debtor contends that this rate is reasonable. Alternatively, the Debtor's financial advisors indicated that the Debtor could  refinance in several years due to a vastly improved loan to value ratio.  According to Reiss, a nationally recognized restructuring and turnaround consultant, a reorganization of the Debtor's affairs is reasonable and in prospect within a reasonable time. Although Reiss was unable to identify a similar successful reorganization, Prudential offered no evidence that such a plan would be incapable of confirmation or that under the Debtor's proposal Prudential would not be receiving the indubitable equivalent of its claim as required by 11 U.S.C. § 1129.  The

Debtor's experts expressed the view that the Debtor would be filing its plan of reorganization in the spring.

Prudential offered no independent evidence to rebut the outline of a plan of reorganization proffered by Bloom and Flanagan. Peko did not testify about market rates of interest, market conditions, sales, or projections. His testimony was limited to the Debtor's inability to pay debt service to Prudential at an interest rate of 8 to 9%. The Debtor did not propose such an interest rate, and Prudential did not introduce evidence or any reason that the Debtor would be required to pay interest at those rates in order to achieve confirmation of a plan of reorganization.

## III. DISCUSSION

### A. Section 362(d)(1)

Although not argued in its brief, one of the grounds that Prudential asserts in support of its Motion is that it lacks adequate protection because the value of its collateral is declining. *See* 11 U.S.C. § 362(d)(1)("On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay- (1) for cause, including the lack of adequate protection of an interest in property of such party in interest . . . ."). A secured creditor is entitled to adequate protection if it can establish that the value of its interest in collateral is declining as a result of the automatic stay. *See* 11 U.S.C. § 362(g). The United States Supreme Court observed: "It is common ground that the

37

'interest in property' referred to by § 362(d)(1) includes the right of a secured creditor to have the security applied in payment of the debt upon completion of the reorganization; and that that interest is not adequately protected if the security is depreciating during the term of the stay." *See* <u>United Sav. Ass'n of Texas v. Timbers of Inwood Forest Assoc., Ltd.,</u> 484 U.S. 365, 370 (1988).  This does not mean that the creditor is entitled to additional protection simply because the collateral is declining; in the context of an undersecured creditor, the amount of the secured claim must be declining because there is erosion in value beyond the value that existed on the date of the petition to support a finding of lack of adequate protection.  Section 506(a) provides that an allowed claim is "a secured claim to the extent of the value of such creditor's interest in such property . . . and is an unsecured claim to the extent that the value of such creditor's interest . . . is less than the amount of such allowed claim." As recognized by the court in <u>In re Lane</u>, 108 B.R. 6 (Bankr. D. Mass. 1989), "[w]hen § 506(a) is considered in the context of an oversecured creditor, it is apparent that the value of the 'interest in . . . property' which it speaks of is equal to the amount of the debt and not the value of the collateral. Otherwise, the amount of the claim would be the value of the collateral. The 'interest in property' language appearing in § 362(d)(1) must be taken to have the same meaning in order to avoid inconsistency." <u>Id.</u> at 8.  If collateral securing a claim has value greater than the interest of the secured claim holder, the excess value, referred to as an equity cushion, constitutes adequate protection for the secured party's interest.  <u>Id.</u> *See also* <u>Baybank-Middlesex v. Ralar Distribs., Inc.</u>, 69 F.3d 1200, 1203

38

(1st Cir. 1995) (citing <u>First Agric. Bank v. Jug End in the Berkshires, Inc. (In re Jug End in the</u>

<u>Berkshires, Inc.)</u>, 46 B.R. 892, 899 (Bankr. D. Mass. 1985) ("The classic protection for a

secured debt justifying continuation of the stay is the existence of an 'equity cushion.'")).

An oversecured creditor is not entitled to be compensated for an erosion in an equity

cushion.  Moreover, a secured creditor is not entitled to additional adequate protection for

lost opportunities in the use of funds.  <u>Timbers</u>, 484 U.S. at 374-75.

Prudential has not demonstrated "cause" for relief from stay due to lack of adequate

protection under § 362(d)(1).  Prudential did not introduce evidence of lack of adequate

protection at trial and did not address § 362(d)(1) in its brief.  Given the total value of the

collateral package, an equity cushion exists with respect to Prudential's claim in an amount

in excess of $19 million.  Moreover, the Debtor is reducing the amount of debt owed to

Prudential from the proceeds of the sales of the condominiums.  Furthermore,  in view of

the payments made to Prudential during the pendency of this case, the value of its secured

claim is not declining and it does not lack adequate protection at the current time.

    B.  <u>Section 362(d)(2)</u>

Bankruptcy Code Section 362(d)(2) provides that the court shall grant relief from the

automatic stay:

> (d) On request of a party in interest and after notice and a hearing, the court
> shall grant relief from the automatic stay provided under subsection (a) of this
> section . . .
>
> > (2) with respect to a stay of an act against property under
> > subsection (a) of this section, if–

(A) the debtor does not have an equity in such property; and

(B) such property is not necessary for an effective reorganization.

11 U.S.C. § 362(d)(2)(A), (B). The moving party has the burden of proof on the issue of the debtor's equity in the property, and the opposing party has the burden of proof on other issues. 11 U.S.C. § 362(g).

  1. Section 362(d)(2)(A)

  In determining the first prong of § 362(d)(2) in the context of a request to foreclose a mortgage, the Court must compare the amount of debt owed to the value of collateral securing the claim. Courts are in agreement that all liens against encumbered property should be counted in determining whether the debtor has equity in property under § 362(d)(2)(A). Stewart v. Gurley, 745 F.2d 1194 (9th Cir. 1984); In re Jug End of the Berkshires, Inc., 46 B.R. 892, 901 (Bankr. D. Mass. 1985) ("The majority view, on the other hand, defines equity as the difference between the property value and the total amount of liens against it."). In determining whether there is equity in the property for purposes of § 362 (d)(2), however, courts disagree on what property should be included in determining the debtor's equity. The issue is whether the court is limited to consideration of the *subject* property upon which the creditor is seeking to foreclose, or whether the court should consider *all* property subject to the creditor's liens. In reorganization cases, a number of courts have restricted the determination of whether there is equity in property for purposes

40

of § 362(d)(2)(A) to a comparison of the value of the subject property to the debts encumbering that property and that other property held as collateral should not be considered in the calculation of equity under § 362(d)(2)(A).  *See, e.g.*, NationsBank of Virginia, N.A. v. DCI Publishing of Alexandria, Inc., 160 B.R. 538, 540-41 (E.D. Va. 1993) (excluding additional property not belonging to the debtor); In re New Era Co., 125 B.R. 725, 728-29 (S.D.N.Y. 1991);  In re KRC, Inc., 226 B.R. 112, 115 (Bankr. D. Idaho 1998) (excluding real property securing personal guarantees).

In DCI Publishing, the court held that only the value of the collateral pledged by the debtor should be considered in determining the debtor's equity, and the court refused to consider other collateral owned by nondebtor guarantors in determining equity under § 362(d)(2)(A).  Other courts do not restrict the analysis solely to property which is the subject of the motion, but consider the value of other collateral. *See, e.g.*, Graybar Elec. Co., Inc. v Property Techs., Ltd. (In re Property Techs., Ltd.),  263 B.R. 750 (Bankr. E.D. Va. 2001); In re Colonial Center, Inc., 156 B.R. 452 (Bankr. E.D. Pa. 1993) In re Cardell, 88 B.R. 627 (Bankr. N.J. 1988).  One commentator has suggested that courts adopting the latter view have confused the different inquiries under § 362(d)(1) and (d)(2), stating:  "The fact that some of the debt against the property is secured by additional collateral in which the debtor has equity is irrelevant for the purposes of § 362(d)(2), although it may be relevant on the issue of adequate protection under § 362(d)(1)."  Howard J. Steinberg, Bankruptcy Litigation  § 12:69 (June 2010).

41

The language of §§ 362(d)(2)(A) and 362(g) is different. Section 362(g) provides that the party requesting relief from stay has the burden of proof of the issue of the debtor's equity in "property" (not equity in the property or "an equity in such property"), while § 362(d)(2) refers to the debtor not having equity in "such property." Based upon the language of the statute and the authorities noted above, this Court agrees with the majority of courts that it is not appropriate for a court to consider all the collateral available to the secured creditor, such as property pledged by guarantors, in making a determination as to whether "the debtor does not have an equity in such property." The majority view is supported by the plain language of § 362(d)(2), namely the reference to "equity in such property." Evaluation of other collateral, however, is relevant to other issues under § 362(d), including whether cause exists to lift the stay due to the debtor's inability to provide adequate protection, *see* 11 U.S.C. § 362(d)(1), or whether the debtor has a reorganization plan in prospect. *See* 11 U.S.C. § 362(d)(2)(B).

Applying these principles to the present case, the Court finds, based upon the agreed facts set forth in the parties' Joint Pretrial Memorandum, that Prudential and the City of Boston are owed approximately $160 million. Comparing that figure to the total value of the Hotel and Condominiums, which this Court has determined to be $153,600,000, and for the purposes of § 362(d)(2)(A), the Debtor lacks equity in the W Hotel and Residences. The Court notes, however, that there is less than a $1 million shortfall with respect to Prudential's position, which is relevant to the following inquiry under § 362(b)(2), as discussed below.

42

2.  Section 362(d)(2)(B)

Pursuant to the provisions of 11 U.S.C. §§ 362(d)(2) and 362(g), once the party

moving for relief from automatic stay establishes that the debtor lacks equity in the subject

property, the debtor has the burden of establishing that the collateral at issue is necessary

to effective reorganization.  According to the United States Supreme Court in Timbers,

> What this requires is not merely a showing that if there is conceivably to be
> an effective reorganization, this property will be needed for it; but that the
> property is essential for an effective reorganization that is in prospect. This
> means, as many lower courts, including the en banc court in this case, have
> properly said, that there must be "a reasonable possibility of a successful
> reorganization within a reasonable time."

Timbers of Inwood Forest Assocs., Ltd., 484 U.S. at 375-76 (citing In re Timbers of Inwood

Forest Assocs. Ltd., 808 F.2d 363, 370-371 and nn. 12-13 (5th Cir. 1987)).  The Supreme Court

added:

> The cases are numerous in which § 362(d)(2) relief has been provided within
> less than a year from the filing of the bankruptcy petition.  And while the
> bankruptcy courts demand less detailed showings during the four months in
> which the debtor is given the exclusive right to put together a plan, see 11
> U.S.C. §§ 1121(b), (c)(2), even within that period lack of any realistic prospect
> of effective reorganization will require § 362(d)(2) relief.

484 U.S. at 376 (footnotes omitted).

To satisfy its burden, a Chapter 11 debtor need not show that its plan of

reorganization is confirmable; rather it must establish that its proposed plan has a realistic

chance of being confirmed and is not patently unconfirmable.  See In re YL West 87th

Holdings I LLC, 423 B.R. 421, 444 (Bankr. S.D. N.Y. 2010); In re Mullock, 404 B.R. 800, 806

(Bankr. E.D. Pa. 2009) (To demonstrate that there is a reasonable possibility of successfully

43

reorganizing within reasonable period of time, a debtor must show only that confirmation

of plan is within realm of possibility). *See also* <u>In re Thornwood Assocs.</u>, 161 B.R. 367, 368

(Bankr. M.D. Pa.), *aff'd,* 162 B.R. 438 (M.D. Pa.1993).

      The determination as to whether a debtor's prospects for successfully reorganizing

are sufficient to preclude entry of an order granting a motion for relief from the automatic

stay cannot be mechanistic.  As the court in <u>In re Brian Wise Trucking, Inc.</u>, 386 B.R. 215

(Bankr. N.D. Ind. 2008), recognized:

> Some reorganizations might be relatively simple, requiring nothing more than
> restructuring debts to creditors in order to overcome temporary cash flow
> problems. Others will be more complicated and can involve identifying and
> closing down unprofitable lines of business, in order to focus on more
> profitable operations, renegotiating contracts, seeking third party financing,
> and negotiating with large numbers of creditors. Thus, depending upon the
> debtor and what it needs to do in order to reorganize its affairs, a successful
> reorganization can, quite reasonably, be a matter of only a few months, or
> several years, or anywhere in between. In other words, as much as one might
> like to be able to lay out precise road maps and timetables which say that by
> a particular point in time, a debtor must be able to demonstrate thus and so
> with a particular degree of precision, it is not possible to do so. Instead, what
> § 362(d)(2) calls for is much more of a discretionary inquiry, rather than a
> mechanical one, which, at bottom, requires the court to make a judgment call
> as to whether the debtor is making sufficient progress towards a sufficiently
> realistic goal such that its efforts should be allowed to continue.

386 B.R. at 219.  Courts have developed a list of requirements that a debtor must show in

order to meet its burden under the second prong of § 362(d):

> 1. The debtor must be moving meaningfully to propose a plan;
> 2. The plan must provide that the lender's allowed secured claim would be
> valued and payable from the debtor's net operating income generated by its
> property or the ability to propose a plan based on the infusion of new capital,
> sale, or other viable means;
> 3. The plan must have a realistic chance of confirmation;

4. Without deciding the issue with the same scrutiny as a confirmation hearing, the debtor's proposed plan must not be obviously unconfirmable;
5. The reorganization must occur in a reasonable period of time. In this regard the factors to look at are:
    a. the negotiations among the parties;
    b. the amount of time that the debtor has been in possession and operating the business;
    c. the length of time since the expiration of the exclusivity period.

In re Building 2 Ltd. P'ship, 132 B.R. 219, 222 (Bankr. D. Mass. 1991) (quoting In re Ashgrove Apartments of DeKalb County Ltd., 121 B.R. 752 (Bankr. S.D. Ohio 1990)).  The list is illustrative, not exhaustive, and the factors are meant to provide an outline of considerations.  Id.

During the exclusivity period, a Chapter 11 debtor may make a lesser showing that reorganization is probable than if that period has expired.  *See* In re Gunnison Center Apartments, LP, 320 B.R. 391, 402 (Bankr. D. Colo. 2005). "This lesser standard has been referred to as the 'sliding scale' burden of proof."  Id.  "When relief from stay is requested near the expiration of the exclusivity period, the 'sliding scale' or 'moving target' burden of proof requires a greater showing than 'plausibility.' Id. (citing In re Holly's, Inc., 140 B.R. 643, 702 (Bankr. W.D. Mich. 1992)).

Applying these principles to the facts of the present case, the Court notes that the Debtor has not filed a plan of reorganization or a disclosure statement, although the Court granted the Debtor's Motion pursuant to 11 U.S.C. § 1121(d) and § 362(d)(3) to Extend the Deadlines to File a Plan of Reorganization and Solicit Acceptances of Plan on August 18, 2010.  Thus, the Debtors have the exclusive right to file a plan through and including

45

January 31, 2011, and the exclusive right to solicit acceptances of the plan through and

including March 30, 2011.

The Debtor has the support for its reorganization from its major constituencies,

including the City of Boston, the Official Committee of Unsecured Creditors, and Starwood,

the franchisor and manager of the Hotel operations.  Notwithstanding the absence of a plan

of reorganization, the evidence submitted by the Debtor shows that, in addition to the

support of the constituencies noted above, the Debtor is making progress toward proposing

a plan premised on a three-year sales program for the Condominiums and positive cash

flow for the Hotel, which will result in substantial payments to Prudential, the City of

Boston and other creditors.  The Debtor intends to provide for the payment of Prudential's

allowed secured claim from operations and from the revenue generated by the sales of

Condominiums, which will generate revenue for payments to Prudential of between $116

and $118 million.   Moreover, the Debtor's Condominium leasing program likely will

generate approximately $2.5 million.  The experts for both Prudential and the Debtor agreed

that the three-year sales period for the Condominiums  is a reasonable projection.  The

Court accepts the opinion of the Debtor's expert, Ahearn.   During his testimony, he

demonstrated his mastery of the history and trends in the Boston real estate market, based

upon his 30 years of real estate experience in Boston.  He expressed the opinion that the

Debtor's marketing plan and strategy is reasonable.  He testified that the Debtor's track

record in selling units has moved at a reasonable pace and will continue to do so.  He

explained that despite the constraints of the  real estate market in Boston, which like all real

estate markets was affected by the recession, that real estate market is improving.  His

opinions were credible and substantiated.

During the pendency of this case, the Debtor has demonstrated that its marketing

strategy for the Condominiums is reasonable.  Prudential submitted no evidence that

another entity or other professionals could increase sales without substantially reducing

prices.  Despite the worst economy in 80 years, the Debtor has made reasonable progress

in its reorganization.

The outline of a plan described by the Debtor's financial advisors shows that the

Debtor is moving in a meaningful direction to propose a plan that has a reasonable chance

of confirmation within a reasonable amount of time, based upon the anticipated proceeds

from the sales and leases of units and positive cash flow from the Hotel.  The Debtor

showed that it would have sufficient cash to make payments required on confirmation

towards administrative expenses, to make an initial payment to unsecured creditors, and

to maintain debt service to the City of Boston under its second mortgage.  The Debtor

proposes to reduce Prudential's mortgage balance by over $115 million from sales of

Condominiums during the next three years, and the balance due will be paid from the cash

flow of the Hotel at a market rate of interest.  In light of the evidence that in three years, the

Debtor's loan to value ratio would be  55%, the Debtor's financial advisors offered as a

plausible option the refinancing of the balance due to Prudential at that time.  Moreover, the

Debtor's alternative proposal, to pay Prudential its balance over a ten year period, while

retaining its lien, may provide the indubitable equivalent of its claim, as long as the interest

47

rate being paid is a market rate, plus an additional amount that fairly compensates Prudential for the risk of nonpayment.

Prudential's assertion that the Debtor's projections for cash flow lack integrity as they do not include payment of condominium fees and real estate taxes on condominium units as operating expenses lacks merit. Although the Debtor does not reflect such expenses as operating expenses, condominium fees and real estate taxes are and will be paid in connection with sales of condominium units and accordingly the Debtor's cash flow projections are valid.

The expert testimony offered by Prudential's witness, James Peko, with respect to the Debtor's plan prospects consisted of mathematical calculations based on assumptions that were not supported by factual evidence, including his assumption that the Debtor would be required to pay up to 9% interest on Prudential's restructured debt. Prudential did not provide support for that interest rate or Peko's other assumptions. The Court discounts Peko's opinion, and affords more weight to the testimony of the Debtor's expert, Reiss, who testified that the Debtor's plan prospects were reasonable, because of his vast experience as a restructuring advisor and the absence of rebuttal evidence.

The Court rejects Prudential's argument that the treatment of its claim by paying down $115 million over three years and paying the balance due over 10 years at a market rate of interest violates 11 U.S.C. § 1129(b)(2) and cannot form the basis of a confirmable plan. If the plan provides for retention of its mortgage and deferred cash payments totaling the allowed claim, plus a premium to compensate it for the risk of nonpayment, that

48

treatment when set forth in a plan proposed by the Debtor will likely comport with 11

U.S.C. § 1129(b)(2)(A)(i)(I) and (II).  *See* <u>Till v. SCS Credit Corp.</u>, 541 U.S. 465 (2004); <u>In re</u>

<u>Bashas' Inc.</u>, 437 B.R. 874, 919 (Bankr. D. Ariz.  2010). Moreover, the Debtor has other

collateral which it possibly could sell or refinance, thereby providing another alternative

through which Prudential could realize the indubitable equivalent of its secured claim.  *See*

11 U.S.C. §1129(b)(2)(A)(iii).

The Court also rejects Prudential's argument that any reorganization plan filed by

the Debtor which contains provisions for retention of equity interests by the existing holders

of the equity in the Debtor would be unconfirmable. Prudential contends that a plan

permitting  the retention of equity interests is not capable of confirmation because it would

violate the absolute priority rule. *See* 11 U.S.C. § 1129(b)(1)(C).

In <u>Bank of America Nat. Trust & Sav. Ass'n v. 203 North LaSalle Street P'ship</u>, 526

U.S. 434 (1999), the Supreme Court denied confirmation of a reorganization plan in which

the debtor did not propose to pay a mortgagee's unsecured deficiency claim in full,

although the equity holders were to receive new interests. The evidence did not show that

the purchasers of new equity interests were paying the best attainable price for the equity

interest because there was no provision for competing bids or a competing plan. <u>Id.</u> at 450-

52.  The Supreme Court concluded:

> Whether a market test would require an opportunity to offer competing plans
> or would be satisfied by a right to bid for the same interest sought by old
> equity is a question we do not decide here.  It is enough to say, assuming a
> new value corollary, that plans providing junior interest holders with

exclusive opportunities free from competition and without benefit of market valuation fall within the prohibition of § 1129(b)(2)(B)(ii)."

Id. at 458.

At this juncture, it is unclear whether or how the Debtor would craft a plan providing for a class of equity interest holders as a plan has not been filed.  If the plan provides that the Debtor's equity holders pay new and reasonably equivalent value for their equity interests, and the market price for new value is tested through a bidding or third-party plan procedure, there would be no impediment to confirmation of a plan of reorganization. *See* In re Situation Management Systems, Inc., 252 B.R. 859 (Bankr. D. Mass. 2000).

The Court rejects Prudential's contention that the Debtor will be unable to obtain confirmation of any plan by virtue of § 1129(b)(1)(B).  First, the amount of any unsecured claim Prudential may have has not yet been determined or estimated.  Based upon the Court's findings on valuation, and in light of the other collateral securing its loan in addition to the Hotel and Condominiums, it is doubtful that Prudential will have an unsecured claim that would allow it to block confirmation based on an argument that the plan violates § 1129(b)(1)(B).

Considering the totality of the credible evidence, the Court finds that the Debtor has sustained its burden of demonstrating that it has a reorganization in prospect. In this Court's judgment, the Debtor is making sufficient progress towards a realistic goal such that its efforts should be allowed to continue without the threat of foreclosure by Prudential. The Debtor's time is not unlimited, however.  It must continue to make progress in its

50

reorganization efforts, and the Court will hold periodic status conferences to review the

Debtor's finances and to monitor the case.

## IV.  CONCLUSION

In view of foregoing, the Court shall enter an order denying Prudential's Motion for

Relief from the Automatic Stay without prejudice to renewal in the event that a plan filed

by the Debtor or Debtors is patently unconfirmable or that a plan is not confirmed within

a reasonable time.  The Court concludes that there is no cause under § 362(d)(1) to grant

relief from stay and that the Debtor sustained its burden of demonstrating that it has a plan

in prospect.  It  has shown sufficient progress during this Chapter 11 case to support the

conclusion that there is a reasonable possibility of a reorganization within a reasonable time.


By the Court,



Joan N. Feeney
United States Bankruptcy Judge

Dated: January 28, 2011