UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS
(Eastern Division)

|  |  |
|---|---|
| In re: | Chapter 11 |
| SW BOSTON HOTEL VENTURE, LLC[1], *et al.*, | Case No. 10-14535-JNF |
| Debtors. | (Jointly Administered) |

**DEBTOR'S MOTION FOR ORDER (I) AUTHORIZING THE SALE OF THE DEBTOR'S COMMERCIAL UNIT, PARKING GARAGE UNIT AND RELATED ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, INTERESTS AND ENCUMBRANCES, (II) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES IN CONNECTION THEREWITH AND (III) GRANTING RELATED RELIEF**

SW Boston Hotel Venture, LLC ("SW Boston" or the "Debtor"), a debtor and debtor-in-possession in the above-captioned bankruptcy cases, hereby moves this Court, pursuant to Sections 105, 363 and 365 of Chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code"), Rules 2002, 6004 and 6006 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rules 2002-1, 2002-5 and 6004-1 of the Local Bankruptcy Rules of the United States Bankruptcy Court of the District of Massachusetts (the "Local Rules"), for the entry of an order (a) authorizing the Debtor to effectuate the purchase and sale agreement (the "Hotel PSA") with Razorbacks Owner LLC ("Purchaser"), an acquisition subsidiary of Pebblebrook Hotel Trust, a real estate investment trust listed on the New York Stock Exchange (NYSE symbol – PEB) with a market capitalization of over $850,000,000, (b)

---

[1] The other debtors in the jointly administered cases besides SW Boston are Auto Sales & Service, Inc. (Case No. 10-14528-JNF), General Trading Company (Case No. 10-14532-JNF), Frank Sawyer Corporation (Case No. 10-14533-JNF), 100 Stuart Street, LLC (Case No. 10-14534-JNF), 30-32 Oliver Street Corporation (Case No. 10-16173-JNF), General Land Corporation (Case No. 10-16174-JNF) and 131 Arlington Street Trust (Case No. 10-16177-JNF) (these debtors, not including SW Boston, the "Affiliated Debtors").

#592435                                          1

authorizing the sale of certain of the Debtor's assets related to its hotel and garage operations and

all other items defined as "Property" pursuant to the Hotel PSA (the "Sale") by private sale, free

and clear of all liens, claims, interests and other encumbrances, (c) authorizing the Debtor to

assume and assign to Purchaser certain executory contracts and unexpired leases in conjunction

with the proposed Sale, and (d) for related relief.[2]  Except for those liabilities of the Debtor

expressly assumed by Purchaser pursuant to the Hotel PSA, all liens, claims, interests and other

encumbrances shall attach to the proceeds of the proposed Sale to the same extent, and with the

same priority and validity, that existed on the Petition Date (as defined below).

As set forth in the Hotel PSA, Purchaser has agreed to pay $89,500,000 for the Property.

Subject to Bankruptcy Court approval, SW Boston and the Purchaser have executed the Hotel

PSA.  The Hotel PSA provides the estate and prospective counter-offerors, through the Hotel

PSA, with a definitive agreement that will govern the terms of the Sale of the Property.

Consummation of the Hotel PSA will provide the Debtor's bankruptcy estate with a very

significant recovery for the Property that will result in an immediate and substantial reduction in

the Debtor's secured indebtedness, thereby enhancing the ability of SW Boston and the

Affiliated Debtors to satisfy their remaining indebtedness. Accordingly, the Debtor has

contemporaneously filed a separate motion (the "Sale Procedures Motion")[3] requesting, among

other things, on an expedited basis, the approval of expense reimbursement and a break-up fee

---

[2]  Capitalized terms not otherwise defined in this motion shall have the meanings ascribed to them in the
Hotel PSA.

[3]  The full title of the Sale Procedures Motion is *Motion by Debtor for Approval of (A) Sale Procedures, (B)
Break-up Fee and Expense Reimbursement Provisions and (C) (1) Procedures for Assumption and
Assignment of Executory Contracts and Unexpired Leases and (2) Form of Notice of Contract
Assumption and Assignment and Cure Costs in Connection with Sale of the Debtor's Commercial Unit,
Parking Garage Unit and Related Assets Free and Clear of All Liens, Claims, Interests and Encumbrances.*

#592435                                          2

for Purchaser, as well as, (b) certain sale procedures (the "Sale Procedures") and (c) procedures regarding the assumption and assignment of executory contracts and unexpired leases.

In further support of this motion (the "Sale Motion"), the Debtor submits as follows:

## I.    JURISDICTION AND VENUE

1.    This Court has jurisdiction over this Sale Motion pursuant to 28 U.S.C. §§ 1334 and 157.

2.    This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (N) and (O). Venue in this district is proper pursuant to 28 U.S.C. § 1409(a).

3.    The statutory predicates for the relief sought in this Sale Motion are Sections 105, 363 and 365 of the Bankruptcy Code, Federal Rule of Bankruptcy Procedure 2002, 6004 and 6006 and Local Rules 2002-1, 2002-5 and 6004-1.

## II.    THE PROPOSED SALE[4]

4.    Subject to the approval of the United States Bankruptcy Court for the District of Massachusetts (the "Bankruptcy Court"), the Debtor entered into the Hotel PSA with Purchaser. A copy of the Hotel PSA is attached hereto as Exhibit A.

### A.    The Purchase Price And The Assets to be Purchased

5.    The purchase price for the Property is $89,500,000 subject to certain credits and debits as provided in the Hotel PSA (the "Purchase Price"). The Purchase Price is subject to increase or decrease on account of proration and adjustment of income and expenses customarily prorated between a purchaser and a seller of hotel properties. Purchaser has made a good faith, refundable deposit of $5,000,000.00. The Liabilities of the Debtor to be assumed by Purchaser

---

[4] The descriptions in this Sale Motion of the proposed Sale, the Hotel PSA, and the related documents (collectively the "Sale Documents") are summaries only and are not meant to be substitutes for the Sale Documents themselves, which contain additional terms and conditions. In the event of a conflict between this Sale Motion and the Sale Documents, the Sale Documents shall control.

(the "Assumed Liabilities") consist *solely* of the Hotel Payables for which Purchaser shall

receive a credit against the Purchase Price.

6.    The Property includes, among other things, the following:

(a)    all right, title and interest in and to the real property known as the Commercial Unit ("Commercial Unit") and the Parking Garage Unit, subject to certain Parking Easements (defined below) to which the Garage Unit is subject in favor of present and future owners (or lessees) of condominium units at the W Boston Residences (defined below) (the "Garage Unit" and together with the Commercial Unit, collectively, the "Units") of The 100 Stuart Street Primary Condominium (the "Primary Condominium") located at 100 Stuart Street in Boston, Massachusetts, together with such Units' undivided interest in the Primary Common Elements as set forth in the Master Deed of the Primary Condominium (the "Primary Master Deed"), as more particularly described on Schedule 1.1(a) attached to the Hotel PSA, together with all of the right, title and interest of Debtor pertaining to the Units, including without limitation all appurtenant rights and easements, including without limitation any water, air, mineral, oil or gas rights, if any, but subject to the Parking Easements;

(b)    fixtures and other improvements within the Units, including specifically, without limitation, the 235-room hotel commonly known as "W Boston" (the "Hotel"), containing without limitation, the hotel rooms, ballroom and banquet facilities, meeting facilities, bars and lounges, the Market by Jean-Georges restaurant (the "Restaurant"), retail shop (the "Shop"), the spa facility (the "Spa") and the parking facilities located within the Garage Unit (the "Garage") (the Hotel, the Restaurant, the Shop, the Spa and the Garage, collectively, the "Improvements") (the Improvements together with the Units, the "Real Property");

(c)    all tangible personal property owned by the Debtor and located within the Real Property and used solely in connection with the operation of the Real Property including, without limitation, appliances, furniture, furnishings, artwork, equipment, carpeting, draperies and window treatments, computers, computer equipment and manuals, tools and supplies, decorations, china, glassware, linens, silver, utensils, and other items of personal property (excluding cash and deposit accounts) (the "Personal Property");

(d)    subject to proration or adjustment at the Closing, all contracts or reservations for the use of guest rooms, the Restaurant, ballroom and banquet facilities, meeting rooms or other facilities of the Hotel or located within the Improvements ("Bookings");

(e)    the following agreements which are executory contracts that will be assumed and assigned in connection with the sale of the Property (collectively the "Operating Agreements"),

(i)    the Management Contract dated as of August 23, 2005 by and between the Debtor and Starwood Hotels & Resorts Worldwide, Inc. ("Starwood"), as assigned by Starwood to W Hotel Management, Inc., a Delaware corporation

#592435                                                4

("Manager") pursuant to that certain Assignment and Assumption Agreement dated as of December 7, 2007, as amended, pursuant to which Manager operates and manages the Hotel (the "Management Agreement"),

(ii)    the Management Contract for Bliss Spa at W Boston dated as of September 30, 2009 by and between the Debtor and Manager, pursuant to which Manager operates and manages the Spa (the "Spa Agreement"),

(iii)    the Restaurant Management Agreement dated September 11, 2009 between the Debtor and Culinary Concepts (Boston) LLC ("Culinary Concepts"), as amended, pursuant to which Culinary Concepts operates and manages the Restaurant, as most recently amended by that certain Second Amendment to Restaurant Management Agreement, substantially in the form attached to the Hotel PSA as Exhibit K, which amendment is subject to the approval of the Bankruptcy Court (the "Restaurant Agreement"),

(iv)    the Valet Parking Agreement dated September 30, 2009 by and between the Debtor and Ultimate Parking, LLC (the "Parking Operator"), as amended, pursuant to which Parking Operator operates the valet parking for the Units (the "Parking Agreement"),

(v)    the Technical Services Agreement dated as of January 15, 2008 by and between the Debtor and Starwood, as amended and as may be further amended with Bankruptcy Court approval (the "TSA"), and

(v)    the Retail Management Agreement dated September 30, 2009 between the Debtor and Wink Retail Group, Inc. ("Wink"), pursuant to which Wink operates and manages the Shop (the "Retail Agreement");

(f)    all contracts and agreements made by the Debtor or by Manager in the Debtor's name and relating to the development, upkeep, repair, maintenance or operation of the Real Property and/or the Personal Property or other property used in connection with the operation of the Hotel which are (i) listed on Schedule 1.1(f)-1 of the Hotel PSA (collectively, the "Service Contracts") or (ii) listed on Schedule 1.1(f)-2 of the Hotel PSA (collectively, the "Equipment Leases");

(g)    all leases for the lease and occupancy of space at the Hotel, if any (collectively, the "Leases") listed and described on Schedule 1.1(g) of the Hotel PSA, including any deposits relating to any such Leases and held by the Debtor;

(h)    the following rights (collectively, the "Intangibles"),

(i)    all existing warranties and guaranties (expressed or implied) issued to the Debtor in connection with the Improvements or the Personal Property and listed on Schedule 1.1(h)-1 of the Hotel PSA (collectively, the "Warranties") (the warranties subject to the Debtor's contracts with Bovis Lend Lease LMB, Inc. ("Bovis) will, subject to Bankruptcy Court approval, be assigned to the Primary

Condominium Association, pursuant to the *Agreement between SW Boston Hotel Venture LLC and Bovis Lend Lease LMB, Inc.* [Docket No. 460] (the "Bovis Settlement Agreement"));

(ii)     all licenses (other than the Liquor License which is held in the name of an affiliate of the Manager and is in good standing) and permits used in or relating to the ownership, occupancy or operation of the Units, the Improvements or the Personal Property or any part thereof listed on Schedule 1.1(h)-2 of the Hotel PSA;

(iii)    all signage rights, development rights and privileges, general intangibles, business records, site plans, surveys, environmental and other physical reports (subject to any limitations imposed by the applicable consultants with respect to the use of, or reliance upon, such reports by third parties), plans and specifications pertaining to the Real Property and the Personal Property;

(i)     all food and beverages (subject to any legal restrictions pertaining to the sale or transfer of alcoholic beverages), inventory held for sale to Hotel guests and others in the ordinary course of business including all opened and unopened retail inventory in any area at the Hotel conducting retail sales (collectively, "Retail Inventory"), engineering, maintenance and housekeeping supplies, including soap and cleaning materials, stationery and printing items and supplies, and other supplies of all kinds, whether used, unused or held in reserve storage by or on behalf of the Debtor for future use in connection with the maintenance and operation of the Units, the Improvements or the Personal Property, in each case wherever located, together with any additions thereto prior to Closing;

(j)     the Debtor's interest in the funds contained in "house banks" for the Hotel, whether held in the name of Debtor, the Hotel or Manager and owned by the Debtor (collectively, the "House Bank Funds"), in the approximate amount of $35,000 for which the Debtor will receive a credit against the Purchase Price at the Closing, cash contained in the cash register maintained by Parking Operator in the name of the Debtor or Parking Operator for the benefit of the Debtor (the "Parking Funds"), cash contained in the cash register maintained by Culinary Concepts in the name of the Debtor or Culinary Concepts for the benefit of the Debtor (the "CCJG Funds"), and funds in the Hotel FF&E reserve ("FF&E Funds");

(k)     all files and records owned by the Debtor and pertaining to the Units (including but not limited to all files and records relating to the Hotel and the development, operation, management, maintenance and repair thereof, such as financial records and statements, maintenance records, building plans, specifications and drawings, regardless of whether such files and records are stored in paper form, on computer hard drive, computer disk, CD Rom, DVD or other medium); and

(l)     all claims of Seller against third parties relating to the Property or Assumed Contracts (defined below), whether known or unknown, choate or inchoate, and contingent or non-contingent.

#592435                                      6

7.    The Property does not include, among other things:

(a)    cash on hand or on deposit in any operating account or other bank account or reserve, except for security deposits held by the Debtor as landlord with respect to any Lease and the House Bank Funds, the Parking Funds, the CCJG Funds, and the FF&E Funds; and

(b)    any tangible or intangible property (including, without limitations, fixtures, personal property or intellectual property) owned by (A) the supplier, vendor, licensor, lessor or other party under any Service Contracts or Equipment Leases, (B) the tenants under any Leases, (C) the Manager, (D) any employees, or (E) any Garage users or guests or customers of the Hotel;

(c)    All accounts receivable of the Hotel, Garage and related operations which are outstanding as of the Closing Date (collectively, "Receivables") (after the Closing, the Purchaser shall cause Manager and Parking Operator to continue to collect Receivables in the ordinary course of business of the operation of the Hotel and the Garage, respectively, in a manner consistent with the Manager's and Parking Operator's collection of accounts receivable owed to the Purchaser and shall promptly deliver to the Debtor any funds received by the Purchaser, Manager or Parking Operator after the Closing in connection with the Receivables);

(d)    One hundred ten (110) parking easements to which the Garage Unit is subject in favor of present and future owners or lessees of condominium units at the W Boston Residences (defined below) ("Parking Easements"); and

(e)    Anything included in the term "Encumbrance" as defined in the Hotel PSA and the Sale Approval Order.

8.    Except for the Hotel Payables to be assumed by Purchaser, for which the Purchaser shall receive a credit against the Purchase Price at the Closing, the Hotel PSA requires that the Debtor deliver the Property free and clear of all liens, claims, interests and other encumbrances pursuant to Sections 363 and 365 of the Bankruptcy Code.

9.    The Hotel PSA provides that the "Debt Service" obligation contained in the Trigen Agreement in the approximate outstanding amount of $2,500,000 shall be satisfied in full from the proceeds of the Sale such that this obligation will no longer be an operating or capital expense of the Primary Condominium.

**B.    Executory Contracts And Unexpired Leases to be Assumed**

10.    The Hotel PSA requires the Debtor to assume and assign to Purchaser the Service

Contracts (set forth on Schedule 1.1(f)-1 of the Hotel PSA), the Operating Agreements (set forth

in Section 1.1(e) of the Hotel PSA), the Leases (set forth on Schedule 1.1(g) of the Hotel PSA),

the Equipment Leases (set forth on Schedule 1.1(f)-2 of the Hotel PSA), the Intangibles (set forth

in Section 1.1(h) of the Hotel PSA), the Bookings (set forth in Section 1.1(d) of the Hotel PSA)

and the Warranties (set forth on Schedule 1.1(h)-1 of the Hotel PSA) (the "Assumed

Contracts"). The Hotel PSA further provides that all Cure Costs (as defined below) shall be paid

by the Debtor on or before the Closing. Purchaser shall have no liability for such Cure Costs.

The Assumed Contracts and the Cure Costs are listed on Exhibit B to the Sale Procedures

Motion. Any executory contracts or unexpired leases not specifically set forth on Schedules

1.1(d) – (h) of the Hotel PSA will not be an Assumed Contract and will not be assigned to

Purchaser.

11.    In the Sale Procedures Motion filed contemporaneously with this Sale Motion, the

Debtor is seeking, among other things, approval of procedures regarding the assumption and

assignment of the Assumed Contracts including: (a) notice to counter-parties of the Assumed

Contracts of the assumption and assignment of the Assumed Contracts, (b) notice of the

proposed Cure Costs with respect to the Assumed Contracts (as further defined in the Hotel;

PSA, the "Cure Costs"), and (c) objection procedures and notice of the objection deadlines with

respect to the proposed Cure Costs.

12.    As described below, the Debtor is confident that Purchaser will be able to

demonstrate adequate assurance of future performance with respect to the Assumed Contracts.

C.      **Conditions to Closing**

13.      The consummation of the proposed Sale to Purchaser is conditioned, among other

things set forth in the Hotel PSA, on:

> a.      the entry of an order granting the relief sought in the Sale Procedures
> Motion and the entry of the Sale Approval Order approving the Hotel PSA
> and the Sale by the Bankruptcy Court; and
>
> b.      the assumption and assignment to Purchaser of the Assumed Contracts.

14.      Purchaser may terminate the Hotel PSA if the Sale Procedures Motion and the

Expense Reimbursement and Break-Up Fee (defined below) for the protection of the Purchaser

are not approved by the Bankruptcy Court by April 12, 2011 (the date that is fifteen days after

the Effective Date of the Hotel PSA).  In addition, Purchaser may terminate the Hotel PSA if the

Sale Approval Order is not entered by the date that is sixty (60) days after the Effective Date of

the Hotel PSA.  The Hotel PSA provides that the Closing shall occur before 3:00 p.m. on the

fifteenth (15th) day following the entry by the Bankruptcy Court of the Sale Approval Order,

provided that the Sale Approval Order is a Final Order.

D.      **Purchaser's Ability to Consummate the Sale**

15.      Purchaser's obligations under the Hotel PSA are not subject to any financing

contingency.

16.      Purchaser is an affiliate of Pebblebrook Hotel Trust ("Pebblebrook").

Pebblebrook is a real estate investment trust listed on the New York Stock Exchange (NYSE

symbol – PEB) with a market capitalization of over $850,000,000.  Pebblebrook has recently

acquired nine hotels in major markets across the United States including the historic Sir Francis

Drake Hotel in San Francisco and the Hotel Monaco in Washington, D.C., that is a registered

national historic landmark.  The total acquisition price for these eight hotels was over

$700,000,000. These hotels have in aggregate approximately 1700 rooms. Pebblebrook is led

by an experienced management team that has led lodging-related transactions valued at over $3.5

billion, including the acquisition of over 45 hotel properties.

17.    The Debtor believes that Purchaser will be able to consummate the transaction

contemplated by the Hotel PSA.

18.    The Hotel PSA is the product of arms' length negotiations between the Debtor

and Purchaser. The Debtor believes that Purchaser is a good faith purchaser for the purposes of

Section 363(m) of the Bankruptcy Code.

**E.    Marketing and Sale of the Property**

19.    Commencing in December 2010, the Debtor, in conjunction with its real estate

advisor FTI Consulting, Inc. ("FTI"), initiated a process to explore the strategic alternatives and

opportunities with respect to the Hotel. In that regard, FTI reviewed financial and other

information related to the Hotel and the related businesses and prepared materials to be provided

to potentially interested parties. FTI advised that publicly traded real estate investment trusts

("REITs") operating in the United States were most likely to recognize the value of the Hotel.

Confidentiality agreements were executed with a number of REITs, including Pebblebrook, and

detailed financial information and other data was provided to them with respect to the Property.

The Debtor determined to pursue discussions with  Pebblebrook, and permitted Pebblebrook to

undertake extensive diligence with respect to the Hotel. Simultaneously with the due diligence

process, the Debtor and Pebblebrook engaged in extensive negotiations with respect to the terms

of an acquisition of the Hotel, including the Hotel PSA and related documentation. The result of

these efforts is embodied in the Hotel PSA that has no financing contingency or requirement for

further due diligence and contains a committed Purchase Price.

20.    Contemporaneously with the filing of this Sale Motion, the Debtor is filing the Sale Procedures Motion seeking Bankruptcy Court approval for Sale Procedures with respect to the Sale by which interested parties may submit higher and better offers for the Property, as well as approval for the Expense Reimbursement and Break-Up Fee.  The Debtor proposes to provide notice of the Sale, *inter alia*, to (i) all parties who, in the past year, expressed in writing to the Debtor an interest in the Property, (ii) all parties who are known or reasonably believed to have asserted a lien, encumbrance, claim or other interest in the Property, and (iii) all secured and unsecured creditors of the Debtors.

21.    An electronic due diligence room has been established and populated with the materials that the Debtor believes are necessary to conduct due diligence for the purposes of making counter-offers.  Potential qualified counter-offerors may contact the Debtor's representatives for further information regarding the Sale process.

**F.    Protections for the Purchaser as Stalking Horse Bidder**

22.    The Sale Procedures Motion also seeks Bankruptcy Court approval for certain customary protections for the Purchaser because it will be acting as a "stalking horse" bidder.  The  Hotel PSA provides, in the event that Purchaser is not ultimately the successful bidder and in consideration of  Purchaser's having expended considerable time and expense in connection with the negotiation of the Hotel PSA and Purchaser's due diligence investigation of the Hotel and related property, that Purchaser is entitled to reimbursement of its reasonable, out-of-pocket costs and expenses (including reasonable attorneys' and consultants' fees) actually incurred by Purchaser in connection with the Hotel PSA and the related transactions in an amount not to exceed $500,000 (the "Expense Reimbursement").   In addition, Purchaser is entitled to a break-up fee equal to $2,800,000 (the "Break-Up Fee").  The Expense Reimbursement and Break-Up

Fee are subject to Court approval and payable in the event an Alternative Transaction (as defined

in the Sale Procedures Motion) is consummated resulting in the sale of the Property to a third

party. The Hotel PSA further provides that the Expense Reimbursement and Break-Up Fee shall

be paid to Purchaser within one (1) Business Day of the closing of the Alternative Transaction as

an allowed administrative expense claim in the Bankruptcy Case pursuant to Section 503(b)(1)

of the Bankruptcy Code with priority over every other claim allowable under such subsection.

**G.**     **Security Interests in the Property and Assets Retained by the Debtor**

23.     Pursuant to Bankruptcy Code Section 363, the Property will be sold free and clear

of all liens, claims, interests and other encumbrances. The Property is presently encumbered by

security interests in favor of The Prudential Insurance Company of America ("Prudential") and

the City of Boston ("Boston"), as well as by a number of mechanics' liens.

24.     The Debtor estimates that as of [March 22, 2011], Prudential was owed

approximately $148,000,000. This remaining debt is secured against the Property by the

following instruments:

    a.   Mortgage, Security Agreement, Fixture Filing and Assignment of Sales
       Contracts and Deposits from SW Boston Hotel Venture LLC to the Prudential
       Insurance Company of America dated January 15, 2008;

    b.   Assignment of Leases and Rents from SW Boston Hotel Venture LLC to the
       Prudential Insurance Company of America dated January 15, 2008; and

    c.   UCC Financing Statement in which SW Boston Hotel Venture LLC is the
       debtor and The Prudential Insurance Company of America is the secured
       party.

25.     Boston is owed approximately $10,500,000. This debt is secured against the

Property by the following instruments:

    a.   Second Mortgage ($10,500,000.00) from SW Boston Hotel Venture LLC to
       the City of Boston/acting by and through its Public Facilities Commission by

the Director of the Department of Neighborhood Development, dated
December 12, 2009; and

b.  Second Assignment of Leases, Rents and Hotel Revenues from SW Boston
Hotel Venture LLC to the City of Boston/acting by and through its Public
Facilities Commission by the Director of the Department of Neighborhood
Development, dated December 12, 2009.

26.     The following mechanics' liens have been filed against the Property:

a.  Notice of Contract by E.M. Duggan, Inc. dated May 4, 2010;

b.  Notice of Contract by E.M. Duggan, Inc. dated May 5, 2010;

c.  Notice of Contract by Rosario Cabinets, Inc. dated June 3, 2010;

d.  Notice of Contract by Kenvo Floor Co., Inc. dated July 12, 2010; and

e.  Notice of Contract by Front Line, Inc. dated November 22, 2010.

27.     The Property will be sold free and clear of the above liens, claims, interests and

other encumbrances, and any other liens, claims, interests and other encumbrances, with all such

all liens, claims, interests and other encumbrances attaching to the proceeds of the Sale.

28.     The Debtor will retain ownership of the unsold condominium units at the

Residential Unit of the Primary Condominium (the "Residential Condominium" or the "W

Boston Residences").  Holders of valid liens shall retain such liens on the unsold condominium

units at the W Boston Residences and any other property of SW Boston and the Affiliated

Debtors that is subject to their liens, except for the Property subject to the Sale, to secure

repayment of the remaining debt owed to them.  The Debtor will continue to market and sell the

condominium units and remit the net proceeds from such sales to the holders of liens in the order

of their priority.

## H.    Completion of the Theme Bar

29. Subject to Bankruptcy Court approval of the Bovis Settlement, and the assignment of the Theme Bar (defined below) contract (the "Construction Contract") from Bovis to Jones Lang LaSalle Construction, L.P. ("JLL"), construction of the Theme Bar will recommence, pursuant to section 5.4(j) of the Hotel PSA.  SW Boston will be responsible, through and after the Closing, for the completion of the Theme Bar pursuant to a Development Agreement between SW Boston and the Purchaser attached to the Hotel PSA as Exhibit L (the "Development Agreement"). Pursuant to the Development Agreement, SW Boston will have responsibility for, *inter alia*, (i) ensuring that all work contemplated in the Construction Contract is timely completed in accordance with the terms of the Construction Contract, (ii) performing all payment and related obligations under the Construction Contract, (iii) maintaining necessary insurance for the project, (iv) causing the Theme Bar to be fixtured and furnished as a typical "W" theme bar, at SW Boston's sole cost and (v) delivering a completed Theme Bar lien-free and consistent with the project plans, Construction Contract provisions and applicable laws by the completion date.  The Purchaser, pursuant to the Development Agreement, has certain reciprocal obligations including to grant SW Boston and its agents a license to enter the Property to complete the Theme Bar project.

30.    The completion of the Theme Bar will be funded with proceeds remaining from the $10,500,000 loan from Boston.  In the event that the Theme Bar is not completed by the Closing, a portion of the Purchase Price equal to the remaining balance owing to JLL to complete construction of the Theme Bar and the cost of fixturing and furnishing of the Theme Bar will be placed into escrow to ensure the completion of the Theme Bar as a typical "W" theme bar.

### III.    BACKGROUND

31.      On April 28, 2010 (the "Petition Date"), SW Boston and four Affiliated Debtors

filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code in the Bankruptcy

Court.  The other Affiliated Debtors filed their Chapter 11 petitions on June 4, 2010.  The Debtor

continues to operate as a debtor-in-possession pursuant to Sections 1107 and 1108 of the

Bankruptcy Code.

32.      SW Boston is a Delaware limited liability company formed to develop, own and

operate the Hotel, the W Boston Residences and the related businesses.

33.      SW Boston conducts its businesses at a 350,650 square foot, 26-story building

located at 100 Stuart Street in the heart of Boston's Theatre District that opened for business on

October 29, 2009.  The operations of SW Boston, present and planned, consist of the following:

> (i)      The Hotel.  The Hotel is a 235 room, four-star hotel.  The Hotel, branded
> as a "W" Hotel – the only one in New England – serves Boston's many national
> and international business travelers and tourists.   The Hotel is operated by the
> Manager, an affiliate of Starwood.  The Management Agreement between the
> Debtor and the Manager is an executory contract that will be assumed by the
> Debtor and assigned to the Purchaser in connection with the Sale.

> (ii)     The W Boston Residences.  The W Boston Residences consist of 122
> studio, one, two or three bedroom luxury condominium units located on the floors
> above the Hotel.  Construction on the W Boston Residences was completed in
> January 2010, except for certain "punch list" items that were completed after the
> Petition Date.  As of the Petition Date, SW Boston had sold thirteen of the
> condominium units.  Since the Petition Date, SW Boston has closed an additional
> nineteen condominium unit sales.  Another five sales of condominium units are
> expected to be completed within the next 30 days.

> (iii)    The Garage.  Located underneath the Hotel, the Garage is a two-level
> parking garage with the capacity for 142 vehicles.   Through the Parking
> Easements  to which the Garage is subject, 110 parking spaces are reserved for
> present and future owners (or lessees) of the condominium units in the W Boston
> Residences.  The Hotel retains the rights to 32 parking spaces.  The Parking
> Agreement pursuant to which the Parking Operator manages the Garage is an
> executory contract that will be assumed by the Debtor and assigned to the
> Purchaser in connection with the Sale.

(iv)   The Restaurant.   The Hotel restaurant, "Market by Jean-Georges Vongrichten," is a 6,000 square foot, first-class, full-service restaurant and lobby bar (collectively the "Restaurant") that occupies the entire first floor of the Hotel along Tremont Street.   Culinary Concepts operates and manages the Restaurant pursuant to an executory contract, the Restaurant Agreement, that will be assumed by the Debtor and assigned to the Purchaser in connection with the Sale, subject to Bankruptcy Court approval of the Second Amendment to the Restaurant Agreement.

(v)   The Spa.   The Spa is situated on the second floor of the Hotel and has a separate street level entrance.   The Spa was completed after the Petition Date, opening on August 18, 2010.   The Spa Agreement pursuant to which the Manager operates the Spa is an executory contract that will be assumed by the Debtor and assigned to the Purchaser in connection with the Sale.

(vi)   The Shop.   The Shop is operated by Wink pursuant to the Retail Agreement, that is an executory contract that will be assumed by the Debtor and assigned to the Purchaser in connection with the Sale.

(vii)   The Theme Bar.   The Theme Bar is a planned night club with a separate, street level entrance.   The construction of the Theme Bar was interrupted twice, first by a change in the building code that caused the Theme Bar to be out of compliance with the new building code and, second, after SW Boston received a building code variance from the City of Boston, by a *sua sponte* appeal of that variance by the Commonwealth of Massachusetts Building Code Appeals Board (the "State Board").   The State Board subsequently approved the Theme Bar variance.   As discussed above, subject to Bankruptcy Court approval of the Bovis Settlement Agreement, and the assignment of the Construction Contract from Bovis to JLL, construction of the Theme Bar will recommence.

## IV.   REQUEST FOR RELIEF

A.   **Authority to Sell Assets**

34.   The Debtor requests authority to execute the Hotel PSA and sell the Property pursuant to Bankruptcy Code Sections 105 and 363(b).   The Bankruptcy Code requires court approval for the use, sale or lease of a debtor's assets outside the ordinary course of business.   *See* 11 U.S.C. § 363.   In pertinent part, Section 363(b)(1) provides that a "trustee, after notice and a hearing, may use, sell, or lease other than in the ordinary course of business, property of the estate." 11 U.S.C. §363(b)(1).

35.    Courts have approved a sale of a debtor's assets if the proposed transaction

represents a reasonable business judgment on the part of the debtor. *See In re Martin*, 91 F.3d

389, 396 (3d Cir. 1996); *In re Lionel Corp.*, 722 F.2d 1063, 1070 (2d Cir. 1983); *see also*

*Stephens Indus. v. McClung*, 789 F.2d 386, 390 (6th Cir. 1986); *In re Thomas McKinnon*

*Securities, Inc.*, 120 B.R 301 (Bankr. S.D.N.Y. 1990).

36.    Courts typically consider the following factors in determining whether a proposed

sale satisfies this standard: (a) whether a sound business justification exists for the sale; (b)

whether adequate and reasonable notice of the sale was given to interested parties; (c) whether

the sale will produce a fair and reasonable price for the property; and (d) whether the parties

have acted in good faith. *See In re Delaware & Hudson Ry.*, 124 B.R. 169, 176 (D. Del. 1991).

A "debtor's business decision 'should be approved by the court unless it is shown to be 'so

manifestly unreasonable that it could not be based upon sound business judgment, but only on

bad faith, or whim or caprice.'" *In re Aerovox, Inc.*, 269 B.R. 74, 80 (Bankr. D. Mass. 2001)

(Feeney, J.) (quoting *In re Logical Software*, 66 B.R. 683, 686 (Bankr. D. Mass. 1986); *see also*

*Committee of Asbestos-Related Litigants and/or Creditors v. Johns-Manville Corp. (In re Johns-*

*Manville Corp.)*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986) (same).

37.    The Debtor has concluded, in its business judgment, that the Sale of the Property

to Purchaser will result in the highest and best value for the Property. The proceeds from the

Sale of the Property will be paid to Prudential and result in an immediate and substantial

reduction of the Debtor's secured indebtedness. The Sale will significantly enhance the ability

of SW Boston and the Affiliated Debtors to satisfy their remaining indebtedness. The Purchase

Price in the Hotel PSA substantially exceeds the appraisal value for the Hotel submitted by the

Debtor, the value found by the Court for the Hotel in relation to Prudential's motion for relief

from stay, and is more than $30,000,000 greater (or more than 55% greater) than the valuation

for the Hotel submitted by Prudential in November 2010. *See In re SW Boston Hotel Venture*

*LLC, et al.*, 2011 WL 309060, at * 8, 11, 15 (Bankr. D. Mass. January 28, 2011). The sale of the

Property is in the best interest of the Estate and its creditors, and approval of the Sale is

warranted. *See In re Martin*, 91 F.3d at 396; *In re Lionel Corp.*, 722 F.2d at 1070.

38.     Further, pursuant to Section 363(f) of the Bankruptcy Code, the Debtor requests

the authority to sell the Property free and clear of all liens, claims, interests and other

encumbrances. All liens, claims, interests and other encumbrances in and against the Property

will attach to the proceeds from the Sale to the same extent, priority and validity that existed on

the Petition Date.

39.     Section 363(f) of the Bankruptcy Code authorizes the sale of assets free and clear

of liens, claims, interests and encumbrances of an entity if:

a.   applicable non-bankruptcy law permits sale of such property
     free and clear of such interests;

b.   such entity consents;

c.   such interest is a lien and the price at which such property is to
     be sold is greater than the value of all liens on such property;

d.   such interest is in *bona fide* dispute; or

e.   such entity could be compelled, in a legal or equitable
     proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

40.     This provision is supplemented by section 105(a) of the Bankruptcy Code, which

provides that "[t]he Court may issue any order, process or judgment that is necessary or

appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. §105(a).

41.    Because Bankruptcy Code section 363(f) is drafted in the disjunctive, satisfaction of any one of its five requirements will suffice to permit the sale of the Property "free and clear" of liens and interests. *Michigan Employment Sec. Comm'n v. Wolverine Radio Co. (In re Wolverine Radio Co.)*, 930 F.2d 1132, 1147 n.24 (6th Cir. 1991) (holding that the court may approve the sale "free and clear" provided at least one of the subsections of Bankruptcy Code section 363(f) is met); *In re Dundee Equity Corp.*, 1992 Bankr. LEXIS 436, at *12 (Bankr. S.D. N.Y. March 6, 1992) (same).

42.    Here, the Debtor will demonstrate at the Sale Hearing (to the extent necessary) that one or more of the tests of section 363(f) are satisfied with respect to the Sale.  In the first instance, the Debtor has no reason to believe that holders of liens, claims, interests and encumbrances would not consent to the terms of the Sale pursuant to section 363(f)(2) of the Bankruptcy Code.

43.    In addition, the Debtor believes that all such holders could be compelled to accept a money satisfaction of their interests in legal or equitable proceedings in accordance with section 363(f)(5) of the Bankruptcy Code, to the extent that such interests are sought to be discharged in the Sale Approval Order.  This is true even where, as here, the Purchase Price for the Property, although unquestionably fair, is nonetheless smaller than the amount of all liens against the Property.  Pursuant to  the cram down provisions of the Bankruptcy Code, Section 1129(b)(2), holders of liens on collateral may be compelled to accept the value of the collateral, in satisfaction of their liens, even though that value may be less than the liens on the collateral. Section 1129(b)(2) constitutes the "legal or equitable" proceeding under which  lien holders could be compelled to accept a money satisfaction of their interest.  *See  In re Terrace Chalet Apartments, Ltd.*, 159 B.R. 821,829 (N.D. Ill. 1993) ("By its express terms, Section 363(f)(5)

permits lien extinguishment if the trustee can demonstrate the existence of another legal

mechanism by which a lien could be extinguished without full satisfaction of the secured debt.

Section 1129(b)(2) cram down is such a provision."); *In re Healthco Int'l, Inc.*, 174 B.R. 174,

176 (Bankr. D. Mass. 1994) (A cramdown proceeding "complies with the description of

proceedings referred to in subparagraph [363](f)(5), and many courts have held so."); *see also In*

*re Perroncello*, 170 B.R. 189, 191-92 (Bankr. D. Mass. 1994) (allowing sale free and clear of

lien pursuant to Section 363(f)(5) even though lien was not paid in full so long as lien creditor

received the actual value of its claim and debtor established good faith and an absence of unfair

discrimination).

44.    Based upon the foregoing, the Debtor submits that the Sale, free and clear of

liens, claims, interests and encumbrances, should be approved by the Bankruptcy Court upon the

terms requested at the Sale Hearing under section 363(f) of the Bankruptcy Code.

45.    The Debtor requests that the Bankruptcy Court waive the fourteen (14) day stay

provision of Federal Rule of Bankruptcy Procedure 6004(g).

**B.    Authority to Assume Executory Contracts And Unexpired Leases**

46.    As set forth above, the Hotel PSA requires the Debtor to assume and assign to the

Purchaser the Assumed Contracts, specifically: the Service Contracts (set forth on Schedule

1.1(f)-1 of the Hotel PSA), the Operating Agreements (set forth in Section 1.1(e) of the Hotel

PSA), the Leases (set forth on Schedule 1.1(g) of the Hotel PSA), the Equipment Leases (set

forth on Schedule 1.1(f)-2 of the Hotel PSA), the Intangibles (set forth in Section 1.1(h) of the

Hotel PSA), the Bookings (set forth in Section 1.1(d) of the Hotel PSA), and the Warranties (set

forth on Schedule 1.1(h)-1 of the Hotel PSA).  Cure Costs with respect to all such contracts are

listed on Exhibit B to the Sale Procedures Motion.

47.    Subject to court approval, Section 365(a) of the Bankruptcy Code authorizes a
trustee to assume and assign an executory contract or unexpired lease. *See* 11 U.S.C. § 365(a).
The standard for determining whether an executory contract or unexpired lease should be
assumed and assigned is the "business judgment" test. *See In re Logical Software, Inc.*, 66 B.R.
683, 686 (Bankr. D. Mass, 1986) (The debtor's decision to assume or reject a contract "is to be
accorded the deference mandated by the sound business judgment rule as generally applied by
courts to discretionary  actions or decisions of corporate directors."); *see also In re Orion
Pictures Corp.*, 4 F.3d 1095, 1098 (2d Cir. 1993).

48.    Upon finding that a trustee has exercised sound business judgment in determining
that assumption and assignment is in the best interests of its estate, the court should approve the
assumption and assignment under Section 365(a) of the Bankruptcy Code. *See, e.g., In re Child
World, Inc.*, 142 B.R. 87, 89 (Bankr. S.D.N.Y. 1992); *In re Del Grosso*, 115 B.R. 136, 138
(Bankr. N.D. Ill. 1990).

49.    To determine if the business judgment test is met, the court "is required to
examine whether a reasonable business person would make a similar decision under similar
circumstances." *In re Exide Techs.*, 340 B.R. 222, 239 (Bankr. D. Del. 2006).  Specifically, a
court should find that the assumption or rejection has been decided on "an informed basis, in
good faith, and with the honest belief that the assumption ... [is] in the best interests of [the
debtor] and the estate." *In re Network Access Solutions Corp.*, 330 B.R. 67, 75 (Bankr. D. Del.
2005).  Under this standard, a court should approve a debtor's business decision unless that
decision is the product of bad faith or a gross abuse of discretion. *See* Logical Software, 66 B.R.
at 686 (citing *Lubrizol Enters v. Richmond Metal Finishers*, 756 F.2d 1043, 1047 (4th Cir.
1985)).

50.    The assumption and assignment of the Assumed Contracts is necessary for the consummation of the Hotel PSA. The continued performance of the contract counterparties under the Assumed Contracts is essential to permit Purchaser to operate the Hotel and Garage and realize the value reflected in the Purchase Price. Assumption and assignment of the Assumed Contracts is a condition precedent to Purchaser's obligations under the Hotel PSA. Therefore, to realize the significant benefit to the estates of SW Boston and the Affiliated Debtors that would arise from consummation of the Hotel PSA, the Debtor must assume and assign the Assumed Contracts.

51.    For the reasons described above, the Debtor has determined, in its business judgment, that the assumption and assignment of the Assumed Contracts is in the best interest of the Debtor, its creditors and parties in interest. The assumption and assignment of the Assumed Contracts is therefore warranted pursuant to Section 365(a) of the Bankruptcy Code. *See In re Orion Pictures Corp.*, 4 F.3d at 1098.

## V.    NOTICE

52.    Contemporaneously with the filing of this Sale Motion, the Debtor has filed the Sale Procedures Motion with respect to the proposed Sale to Purchaser. A proposed form of Notice of Sale is appended as Exhibit B to the Sale Procedures Motion. The Debtor will serve the Notice of Sale as described in the Sale Procedures Motion or, otherwise, in accordance with the direction of the Bankruptcy Court.

53.    The Debtor has served this Sale Motion on: (i) the Office of the United States Trustee; (ii) counsel for The Prudential Insurance Company of America; (iii) counsel for the City of Boston; (iv) counsel for the Official Committee of Unsecured Creditors; and (v) all parties who have filed a notice of appearance and request for notice in these proceedings. The Debtor

submits that such service is appropriate given the nature of the relief requested in this Sale

Motion.

WHEREFORE, the Debtor respectfully requests that the Court enter the Sale Approval

Order, in the form attached as Exhibit B:

(a)      granting, in full, the relief requested this Motion,

(b)      authorizing the Sale of the Property pursuant to and as contemplated by the Hotel PSA,

(c)      authorizing the Debtor to take all steps necessary or appropriate to the effectuate the Hotel PSA,

(d)      authorizing the Debtor to assume and assign to Purchaser the Assumed Contracts, and to pay all Cure Costs associated with the assumption and assignment of the Assumed Contracts, pursuant to and as contemplated by the Hotel PSA,

(e)      waiving the stay provisions of Federal Rule of Bankruptcy Procedure 6004(g), and

(f)      granting such other relief as this Court deems proper.


Respectfully Submitted,

SW BOSTON HOTEL VENTURE, LLC

By its counsel,


*/s/ John C. Elstad*
Harold B. Murphy (BBO #362610)
D. Ethan Jeffery (BBO #631941)
John C. Elstad (BBO #654469)
MURPHY & KING, P.C.
One Beacon Street
Boston, MA  02108-3107
Tel: (617) 423-0400
Fax: (617) 556-8985
jce@murphyking.com

Dated: March 28, 2011


#592435                                          23