## UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF MASSACHUSETTS
### EASTERN DIVISION

|  |  |
|---|---|
| In re: | ) |
| | ) |
| | ) **Chapter 11** |
| SW BOSTON HOTEL VENTURE LLC, et al, | ) |
| | ) **Case No. 10-14535 (JNF)** |
| Debtors. | ) |
| | ) |
| | ) **(Jointly Administered)** |

**FIRST AMENDED JOINT PLAN OF REORGANIZATION OF
SW BOSTON HOTEL VENTURE LLC, AUTO SALES &
SERVICE, INC., GENERAL TRADING COMPANY, FRANK
SAWYER CORPORATION, 100 STUART STREET, LLC,
30-32 OLIVER STREET CORPORATION, GENERAL
LAND CORPORATION AND 131 ARLINGTON STREET TRUST**

MURPHY & KING, P.C.
One Beacon Street
Boston, MA  02108
Harold B. Murphy, Esq.
D. Ethan Jeffery, Esq.
John C. Elstad, Esq.

Telephone:  (617) 423-0400
Facsimile:  (617) 423-0498

Dated: ~~March 31,~~ _____, 2011

SW Boston Hotel Venture LLC, Auto Sales & Service, Inc., General Trading Company, Frank Sawyer Corporation, 100 Stuart Street, LLC, 30-32 Oliver Street Corporation, General Land Corporation and 131 Arlington Street Trust, the debtors and debtors-in-possession in the bankruptcy proceedings jointly administered under docket number 10-14535-JNF, hereby propose the following joint plan of reorganization under Section 1121 of the United States Bankruptcy Code.  The following shall constitute a separate plan of reorganization proposed by each of the Debtors (as defined below).

# ARTICLE I

## DEFINITIONS AND CONSTRUCTION OF TERMS

For purposes of this Plan, the following terms shall have the meanings specified in this Article I.  A capitalized term used but not defined in this Plan that is also used in the Bankruptcy Code shall have the meaning ascribed to that term in the Bankruptcy Code.  Wherever from the context it appears appropriate, each term stated shall include both the singular and the plural, and pronouns shall include the masculine, feminine and neuter, regardless of how stated.  The words "in this Plan," "this Plan," "hereto," "herein", "hereunder" and other words of similar import refer to the Plan as a whole and not to any particular Section, sub-Section or clause contained in the Plan.  The rules of construction contained in Section 102 of the Bankruptcy Code shall apply to the terms of this Plan.  The headings in the Plan are for convenience of reference only and shall not limit or otherwise affect the provisions this Plan.

**1.1**    "30-32 Oliver Street" shall mean 30-32 Oliver Street Corporation, one of the Debtors and debtors-in-possession.

**1.2**    "100 Stuart Street" shall mean 100 Stuart Street, LLC, one of the Debtors and debtors-in-possession.

**1.3**    "110 Stuart Street" shall mean 110 Stuart Street, LLC, a new Delaware limited liability company to be formed prior to the Effective Date to hold the new equity interests in Reorganized SW Boston.

**1.4**    "131 Arlington Street" shall mean 131 Arlington Street Trust, one of the Debtors and debtors-in-possession.

**1.5**    "Administrative Expense Claim" shall mean a Claim that is Allowed under Section 503(b) of the Bankruptcy Code and that is entitled to priority under Section 507(a)(1) of the Bankruptcy Code, including Professional Fee Claims.

**1.6**    "Adjusted Sale Price" shall mean the purchase price under the applicable purchase and sale agreement less any credits or adjustments provided to the buyer under the purchase and sale agreement.

**1.7**    "Affiliate" shall mean any Person that is an affiliate of the Debtors or the Reorganized Debtors under the Bankruptcy Code.

**1.8**     "<u>Allowed</u>" shall mean, with reference to any Claim or Equity Interest:

(a)     a Claim or Equity Interest that has been listed by the Debtors in their Schedules and (i) is not listed as disputed, contingent or unliquidated, and (ii) is not a Claim or Equity Interest as to which a proof of claim or interest has been filed;

(b)     a Claim or Equity Interest as to which a timely proof of claim or interest has been filed by the Bar Date and either (i) no objection thereto, or application to estimate, equitably subordinate or otherwise limit recovery, has been made on or before any applicable deadline, or (ii) if an objection thereto, or application to estimate, equitably subordinate or otherwise limit recovery has been interposed, the extent to which such Claim has been allowed (whether in whole or in part) by a Non-Appealable Order;

(c)     a Claim arising from the recovery of property under Section 550 or 553 of the Bankruptcy Code and allowed in accordance with Section 502(h) of the Bankruptcy Code; or

(d)     any Claim or Equity Interest expressly allowed under this Plan or pursuant to the Confirmation Order.

**1.9**     "<u>Allowed City Claim</u>" shall mean: (a) $10,704,247 less all payments made to, or received by, the City of Boston on account of its Claims against the Debtors from the Petition Date through the Effective Date, or (b) such other amount that is determined by the Bankruptcy Court.

**1.10**     "<u>Allowed Prudential Claim</u>" shall mean: (a) $180,803,186.86 less all payments made to, or received by, Prudential on account of its Claims against the Debtors from the Petition Date through the Effective Date including, without limitation, (i) the Letter of Credit Draw, and (ii) payments made to Prudential from the proceeds of the sale of Residences and/or Real Estate, or (b) such other amount that is determined by the Bankruptcy Court..

**1.11**     "<u>Asset(s)</u>" shall mean any real or personal property of any Debtor, whether tangible or intangible and wherever situated, together with the proceeds thereof, other than the Residences and the Real Estate.

**1.12**     "<u>Auto Sales</u>" shall mean Auto Sales & Service, Inc., one of the Debtors and debtors-in-possession.

**1.13**     "<u>Avoidance Actions</u>" shall mean Causes of Action arising or held by the Debtors under Sections 502, 510, 541, 544, 545, 547, 548, 549, 550 or 553 of the Bankruptcy Code, or under related state or federal statutes and common law, including fraudulent transfer laws.

**1.14**     "<u>Bankruptcy Cases</u>" shall mean the Debtors' jointly administered cases pending in the Bankruptcy Court.

**1.15**     "<u>Bankruptcy Code</u>" shall mean Title 11 of the United States Code, as amended from time to time.

4

**1.16** "Bankruptcy Court" shall mean the United States Bankruptcy Court for the District of Massachusetts in which the Bankruptcy Cases are pending and, to the extent of any reference under 28 U.S.C. §157, the unit of such District Court specified pursuant to 28 U.S.C. §151.

**1.17** "Bankruptcy Rules" shall mean the Federal Rules of Bankruptcy Procedure as promulgated under 28 U.S.C. § 2075, and any local rules of the Bankruptcy Court.

**1.18** "Bar Date" shall mean November 1, 2010, the date fixed by an order of the Bankruptcy Court as the last date by which Persons asserting certain Claims against the Debtors must file a proof of claim or interest or be forever barred from asserting a Claim against the Debtors or their property, from voting on the Plan and/or sharing in distributions under the Plan.

**1.19** "Bovis" shall mean Bovis Land Lease LMB, Inc., the construction manager for the construction of the W Hotel and Residences.

**1.20** "Bovis Agreement" shall mean the *Agreement Between SW Boston Hotel Venture LLC And Bovis Lend Lease LMB, Inc.* that has been filed with the Bankruptcy Court at docket number 460, as it may be amended.

**1.21** "Bovis Allowed Claim" shall mean Bovis' Allowed Unsecured Claim against SW Boston as provided for in the Bovis Agreement.

**1.22** "Budgeted Expenses" shall mean, with respect to each Debtor, the expenses for such Debtor set forth on the budgets attached to the Disclosure Statement as Exhibits B or C, as applicable.

**1.23** "Business Day" shall mean any day other than a Saturday, Sunday or legal holiday recognized in the Commonwealth of Massachusetts.

**1.24** "Cash" shall mean lawful currency of the United States of America (including wire transfers, cashier's checks drawn on a bank insured by the Federal Deposit Insurance Corporation, certified checks and money orders).

**1.25** "Cash Collateral" shall mean cash, negotiable instruments, documents of title, securities, deposit accounts, or other cash equivalents that are subject to a Lien securing the Allowed Prudential Claim and/or the Allowed City Claim, including, without limitation, the Investment Accounts, the Real Estate Net Sales Proceeds and the Residences Net Sales Proceeds.

**1.26** "Cash Equivalents" shall mean equivalents of Cash in the form of readily marketable securities or instruments issued by a Person other than the Debtors or an Affiliate, including, without limitation, readily marketable direct obligations of, or obligations guaranteed by, the United States of America, commercial paper of domestic corporations carrying a Moody's Rating of "A" or better, or equivalent rating of any other nationally recognized rating service, interest-bearing certificates of deposit, or other similar obligations of domestic banks or other financial institutions having a shareholders' equity or equivalent capital of not less than Two Hundred Million Dollars ($200,000,000).

**1.27** "Causes of Action" shall mean, without limitation, any and all actions, causes of action, choses in action, defenses, liabilities, obligations, rights, suits, debts, sums of money, damages, judgments, Claims or proceedings to recover money or property and demands of any nature whatsoever, whether known or unknown, in law, equity or otherwise including, without limitation, Avoidance Actions.

**1.28** "City Account" shall mean the bank account at Boston Private Bank and Trust Company, with a balance of approximately $4,000,000, that is subject to a Lien in favor of the City of Boston pursuant to the City Loan Documents.

**1.29** "City Collateral" shall mean all of the Debtors' real and personal property against which the City had a properly perfected, valid Lien as of the Petition Date.

**1.30** "City Loan Documents" shall mean the note, loan agreement, mortgages and other documents executed by certain of the Debtors prior to the Petition Date in conjunction with the loan from the City of Boston to SW Boston.

**1.31** "City of Boston" shall mean the City of Boston, a Municipal Corporation in the Commonwealth of Massachusetts.

**1.32** "Claim" shall mean a claim against a Person or its property as defined in Section 101(5) of the Bankruptcy Code, including, without limitation, (a) any right to payment, whether or not such right is reduced to judgment, and whether or not such right is liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured; or (b) any right to an equitable remedy for breach of performance, if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, or is fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured.

**1.33** "Class" shall mean those classes designated in Article III of this Plan.

**1.34** "Collateral" shall mean any property or interest in property of the Estates subject to a Lien to secure the payment or performance of a Claim, which Lien is not subject to avoidance under the Bankruptcy Code or otherwise invalid under the Bankruptcy Code or applicable law.

**1.35** "Confirmation Date" shall mean the date on which the clerk of the Bankruptcy Court enters the Confirmation Order on the docket in these Bankruptcy Cases.

**1.36** "Confirmation Hearing" shall mean the hearing before the Bankruptcy Court on confirmation of this Plan.

**1.37** "Confirmation Order" shall mean the order of the Bankruptcy Court confirming the Plan pursuant to the provisions of the Bankruptcy Code, and any supplementary orders of the Bankruptcy Court issued in furtherance of the Plan.

**1.38** "Convenience Class Claim" shall mean: (a) all Allowed General Unsecured Claims in an amount of $5,000 or less, and (b) all Allowed General Unsecured Claims that elect the treatment set forth in Class 8 of the Plan.

**1.39** "Contingent or Unliquidated Claim" shall mean any Claim for which a proof of claim has been filed with the Bankruptcy Court but which was not filed in a sum certain, or for which the event that would give rise to such a liability or debt has not occurred and is dependent upon a future event that has not occurred or may never occur, and which has not been Allowed.

**1.40** "Covenants" shall mean the covenants attached as Exhibit A.

**1.41** "Creditors' Committee" shall mean the official committee of unsecured creditors appointed in the SW Boston bankruptcy case on May 13, 2010.

**1.42** "Debtors" shall mean, collectively, 30-32 Oliver Street, 100 Stuart Street, 131 Arlington Street, Auto Sales, Sawyer Corporation, General Land, General Trading and SW Boston.

**1.43** "Disclosure Statement" shall mean the disclosure statement relating to the Plan, including, without limitation, all exhibits and schedules thereto, in the form approved by the Bankruptcy Court pursuant to Section 1125 of the Bankruptcy Code.

**1.44** "Disputed Claim" shall mean:

     (a)    if no proof of claim relating to a Claim has been filed, a claim that is listed in the Schedules as unliquidated, disputed or contingent; or

     (b)    if a proof of claim relating to a Claim has been filed, a Claim as to which a timely objection or request for estimation, or request to equitably subordinate or otherwise limit recovery in accordance with the Bankruptcy Code and the Bankruptcy Rules, has been made, or which is otherwise disputed by one or more of the Debtors in accordance with applicable law, which objection, request for estimation, action to limit recovery or dispute has not been withdrawn or determined by Non-Appealable Order; or

     (c)    a Claim that is a Contingent or Unliquidated Claim.

**1.45** "Disputed Claim Amount" shall mean the amount set forth in the proof of claim relating to a Disputed Claim or an amount estimated pursuant to an order of the Bankruptcy Court in respect of a Disputed Claim in accordance with Section 502(c) of the Bankruptcy Code.

**1.46** "Disputed Claims Reserve" shall have the meaning set forth in Section 6.5 of this Plan.

**1.47** "Dispute Resolution Procedures" shall mean the procedures set forth on Exhibit B.

**1.48** "Distribution Record Date" shall mean fifteen (15) days prior to the first scheduled hearing on the approval of the Disclosure Statement or such other date established by the Bankruptcy Court.

**1.49** "Effective Date" shall mean the first Business Day after the later to occur of (a) the fifteenth day following the entry of the Confirmation Order, provided that no stay pending appeal of the Confirmation Order has been granted, or (b) the date that all conditions precedent to the effectiveness of the Plan have been satisfied or waived by the Debtors.

**1.50** "Equity Interest" shall mean the interest of any holder of any general or limited partnership interest in or voting or non-voting shares of any of the Debtors, and all options and/or rights, contractual or otherwise, to acquire at any time any general or limited partnership interest in or voting or non-voting shares of any of the Debtors, as such interests exist immediately prior to the Effective Date.

**1.51** "Estate(s)" shall mean in the singular, with reference to a specific debtor, the estate created in such debtor's Bankruptcy Case pursuant to Section 541 of the Bankruptcy Code, and in the plural all of the Debtor's bankruptcy estates created pursuant to Section 541 of the Bankruptcy Code.

**1.52** "Excess Cash" shall mean, with respect to a Debtor, such Debtor's cash on a book basis, excluding amounts in Investment Accounts held by such Debtor, in excess of the Working Capital Minimum.

**1.53** "General Land" shall mean General Land Corporation, one of the Debtors and debtors-in-possession.

**1.54** "General Trading" shall mean General Trading Company, one of the Debtors and debtors-in-possession.

**1.55** "General Unsecured Claim" shall mean a Claim that is: (a) not a Secured Claim, (b) not entitled to priority of payment under Section 507 of the Bankruptcy Code, (c) not a Claim for an Equity Interest, and (d) not the Bovis Allowed Claim.

**1.56** "Hotel Condominium" shall mean, collectively, the commercial unit of The 100 Stuart Street Primary Condominium, a condominium located at 100 Stuart Street, Boston, Massachusetts, created by a master deed and bylaws dated December 10, 2009 and recorded with the Suffolk County, Massachusetts, Registry of Deeds.

**1.57** "Hotel Operating Reports" shall mean the monthly operating reports of the Hotel Condominium's operations received by SW Boston from the manager of the Hotel Condominium, that have been regularly provided by SW Boston to Prudential.

**1.58** "Internal Revenue Code" shall mean Title 26 of the United States Code, as amended from time to time.

**1.59** "Insider" shall have the meaning set forth in Section 101(31) of the Bankruptcy Code, provided that it shall not include any Debtor.

**1.60** "Investment Account(s)" shall mean the accounts held by certain of the Debtors at UBS Financial Services, Inc. as of the Petition Date.

**1.61** "Letter of Credit Draw" shall mean the draw by Prudential, on or about April 30, 2010, on a letter of credit in the amount of $17.3 million that had been posted by SE Berkeley Street, LLC and SE McClellan Highway, LLC, affiliates of the Debtors, in furtherance of construction of the W Hotel and Residences.

**1.62** "Lien" shall have the meaning set forth in Section 101(37) of the Bankruptcy Code; except that (a) a lien that has been avoided in accordance with Sections 544, 545, 546, 547, 548, 549 or 553 of the Bankruptcy Code shall not constitute a Lien, and (b) no lien shall be valid unless approved by a Non-Appealable order of the Bankruptcy Court or by agreement of the Debtor against whom the lien is asserted.

**1.63** "Mechanics Lien Claims" shall consist of the Allowed Claims secured by valid and perfected mechanics Liens in accordance with M.G.L. c. 254, as amended.

**1.64** "Miscellaneous Secured Claim" shall mean any Claim that is secured by a Lien on Collateral to the extent of the value of such Collateral, as determined in accordance with Section 506(a) of the Bankruptcy Code, or, in the event that such Claim is a claim of setoff under Section 553 of the Bankruptcy Code, to the extent of such setoff, including the Mechanics Lien Claims but excluding the City Allowed Claim and the Prudential Allowed Claim.

**1.65** "Non-Appealable Order" shall mean an order or judgment which has not been reversed, stayed, modified or amended and, as to which (a) the time to appeal or seek review or rehearing has expired and as to which no appeal or petition for certiorari, review or rehearing is pending, or (b) if appeal, review, re-argument or certiorari of the order has been sought, the order has been affirmed or the request for review, re-argument or certiorari has been denied and the time to seek a further appeal, review, re-argument or certiorari has expired, and as a result of which such order shall have become final and non-appealable in accordance with applicable law; provided, however, that the possibility that a motion under Rule 59 or Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed with respect to such order shall not cause such order not to be a Non-Appealable Order.

**1.66** "Organization Documents" shall mean, as applicable, the Debtors' respective operating agreements, trust agreements, articles of incorporation, bylaws, corporate minute books and such other documents evidencing the Debtors' formation and/or operation in such jurisdictions in which the Debtors are authorized to conduct business.

**1.67** "Parking Condominium" shall mean the parking garage unit of The 100 Stuart Street Primary Condominium, a condominium located at 100 Stuart Street, Boston, Massachusetts, created by a master deed and bylaws dated December 10, 2009 and recorded with the Suffolk County, Massachusetts Registry of Deeds, consisting of a 142 space parking garage with thirty-two (32) spaces initially dedicated for use by the Hotel Condominium and 110 spaces initially dedicated for use by the Residences.

**1.68** "Person" shall mean any individual, corporation, partnership, joint venture, association, joint-stock company, trust, unincorporated association or organization, governmental agency or political subdivision.

**1.69** "Personalty" shall mean, collectively, any and all personal property and fixtures owned by the Debtors and at any time attached to, located in or on, or used in connection with, the ownership or operation of the Debtors' Property, including, without limitation, all mechanical, electrical, lighting and plumbing systems, fixtures and equipment, all ventilating, air conditioning and heating systems, fixtures and equipment, all water and power systems, engines boilers, generators, furnaces, motors, landscaping and sprinkler systems and equipment, all furniture, furnishings, appliances, supplies and other personal property (tangible or intangible) of every nature and description, all maintenance equipment, tools and supplies, and all master keys, office keys and other keys used in connection with the Property.

**1.70** "Petition Date" shall mean: (a) April 28, 2010, with respect to SW Boston, Auto Sales, General Trading, Sawyer Corporation and 100 Stuart Street; or (b) June 4, 2010, with respect to General Land, 30-32 Oliver Street and 131 Arlington Street.

**1.71** "Plan" shall mean this *Joint Plan of Reorganization of SW Boston Hotel Venture LLC, Auto Sales & Service, Inc., General Trading Company, Frank Sawyer Corporation, 100 Stuart Street, LLC, 30-32 Oliver Street Corporation, General Land Corporation And 131 Arlington Street Trust*, including, without limitation, all exhibits, supplements, appendices and schedules to this Plan, either in their present form or as the same may be altered, amended or modified from time to time.

**1.72** "Plan Arbitrator" shall mean the individual who will resolve those controversies designated in the Dispute Resolution Procedures. The Plan Arbitrator shall be selected either by the agreement of the Debtors, the City and Prudential prior to the Confirmation Hearing, or, barring such agreement, by the Bankruptcy Court at the Confirmation Hearing.

**1.73** "Plan Obligations" shall mean, for each Debtor, the aggregate amount of the annual payments that are provided for in the Plan to the holders of Allowed Claims, excluding payments on account of the Allowed Prudential Claim and the Allowed City Claim.

**1.74** "Plan Year" shall mean the period of a year measured from the Effective Date and from each subsequent anniversary of the Effective Date.

**1.75** "Priority Claims" shall mean all Claims, if any, entitled to priority under Section 507(a) of the Bankruptcy Code other than Priority Tax Claims and Administrative Expense Claims.

**1.76** "Priority Tax Claims" shall mean any Claim of a governmental unit entitled to priority under Section 507(a)(8) of the Bankruptcy Code.

**1.77** "Proceeds Analysis" shall mean a report showing the proposed distribution of the proceeds of the sale of any Residence or Real Estate, which report shall include, with respect to the sale of any Residence, a calculation of the Adjusted Sale Price.

**1.78**    "Professionals" shall mean those Persons (a) employed pursuant to an order of the Bankruptcy Court in accordance with Sections 327 or 1103 of the Bankruptcy Code and to be compensated for services pursuant to Sections 327, 328, 329, 330 and 331 of the Bankruptcy Code, or (b) for which compensation and reimbursement is allowed by the Bankruptcy Court pursuant to Section 503(b)(4) of the Bankruptcy Code.

**1.79**    "Professional Fee Claims" shall mean the fees and expenses of Professionals under Sections 330, 331, or 503 of the Bankruptcy Code approved by an Order of the Bankruptcy Court.

**1.80**    "Property" shall mean collectively and with reference to a specific Debtor, the real property, improvements, Rights and Personalty owned by such debtor. All references to the "Property" shall be deemed to mean all or any portion of such Property.

**1.81**    "Pro Rata" shall mean, (a) when used with reference to a distribution of property under this Plan, proportionately so that with respect to a particular Allowed Claim, the ratio of (i)(1) the amount of property distributed on account of such Claim to (2) the amount of such Claim, is the same as the ratio of (ii)(1) the amount of property distributed on account of all Allowed Claims of the Class in which such Claim is included to (2) the amount of all Allowed Claims in that Class; and (b) when used with reference to a contribution of property to the Debtors, proportionately so that with respect to a particular Allowed Claim, the ratio of (i)(1) the amount of property contributed by a holder of an Allowed Equity Interest to (2) the amount of such Allowed Equity Interest, is the same as the ratio of (ii)(1) the amount of property contributed by all holders of Allowed Equity interests of the Class in which such Equity Interest is included to (2) the amount of all Allowed Equity Interests in that Class.

**1.82**    "Prudential" shall mean the Prudential Insurance Company of America, on behalf of its insurance company separate account, PRISA.

**1.83**    "Prudential Collateral" shall mean all of the Debtors' real and personal property against which Prudential had a properly perfected, valid Lien as of the Petition Date.

**1.84**    "Prudential Loan Documents" shall mean all documents evidencing or relating to the Debtors' respective obligations to the holder of the Allowed Prudential Claim and all documents evidencing or relating to any Liens on the Prudential Collateral.

**1.85**    "Qualified Sale" shall mean (a) with respect to the sale of a Residence, a sale for an Adjusted Sale Price equal to or greater than the Residence Minimum; (b) with respect to the sale of Real Estate, a sale for an Adjusted Sale Price equal to or greater than the Real Estate Minimum; and/or (c) with respect to any sale of a Residence or Real Property that is not otherwise a Qualified Sale, a sale that has been agreed to by the holders of the Allowed Prudential Claim and the Allowed City Claim.

**1.86**    "Real Estate" shall mean all real property owned by the Debtors other than the Residences, and shall include, without limitation, the Hotel Condominium, the Parking Condominium and the Residential Condominium as a whole.

**1.87** "Real Estate Minimum" shall mean, for each parcel of Real Estate, the minimum sale price shown for such Real Estate on Exhibit C of the Plan.

**1.88** "Real Estate Net Sales Proceeds" shall mean, with respect to the sale of any Real Estate, the proceeds of such sale less the costs and expenses of selling the Real Estate, including, without limitation, applicable taxes, municipal charges, professional fees, broker's fees and costs, and other customary closing costs.

**1.89** "Real Estate Tax(es)" shall mean any amount payable by each Debtor on account of taxes and municipal assessments on real property.

**1.90** "Reorganized Debtors" shall mean the Debtors, from and after the Effective Date, as recapitalized, reconstituted and reorganized pursuant to this Plan and any associated documents.

**1.91** "Representative(s)" shall mean a Person's Affiliates, directors, stockholders, officers, members, managers, employees, controlling persons, agents, counsel and advisors of any kind, and the directors, stockholders, officers, members, managers, employees, controlling persons, agents, counsel and advisors of any kind of all Affiliates of such Person.

**1.92** "Residence(s)" shall mean the 122 luxury condominium units at the W Hotel and Residences that are contained within the Residential Condominium.

**1.93** "Residence Fee(s)" shall mean any amount payable: (a) to The 110 Stuart Street Residential Condominium Association for condominium fees for each unsold Residence, individually or collectively, and (b) for utilities for each unsold Residence, individually or collectively.

**1.94** "Residence Minimum" shall mean, for each Residence, the minimum sale price shown for such Residence on Exhibit D of the Plan.

**1.95** "Residence Net Sales Proceeds" shall mean the Adjusted Sale Price for a Residence less the following amounts paid or reserved in the following order:

(a)    Up to eight percent (8%) of the Adjusted Sale Price, to be used to pay, among other things, the usual and customary costs of closing the sale of the Residence, including, without limitation, brokers' commissions and attorneys' fees and costs, and other fees and costs associated with the sale;

(b)    Accrued and unpaid Real Estate Taxes for all unsold Residences and the amount necessary to reimburse SW Boston's Working Capital Reserve for such Real Estate Taxes to the extent previously paid from SW Boston's Working Capital Reserve and not previously deducted from  the Adjusted Sale Price for a Residence;

(c)    Accrued and unpaid Residence Fees for all unsold Residences and the amount necessary to reimburse SW Boston's Working Capital Reserve for such Residence

Fees to the extent previously paid from SW Boston's Working Capital Reserve and not previously deducted from the Adjusted Sale Price for a Residence; and

(d)  In the event of a sale of the Hotel Condominium, for each sale of a Residence closed after the sale of the Hotel Condominium, SW Boston's accrued and unpaid Budgeted Expenses and the amount necessary to replenish amounts deducted from SW Boston's Working Capital Reserve to fund SW Boston's Budgeted Expenses, other than the Real Estate Taxes and the Residence Fees, to the extent not previously deducted from the Adjusted Sale Price for a Residence.

**1.96** "Residential Condominium" shall mean the residential unit of The 100 Stuart Street Primary Condominium, a condominium located at 100 Stuart Street, Boston, Massachusetts, created by a master deed and bylaws dated December 10, 2009 and recorded with the Suffolk County, Massachusetts Registry of Deeds.

**1.97** "Restaurant" shall mean the restaurant and lobby bar at the W Hotel and Residences.

**1.98** "Retail Store" shall mean the retail store located in the W Hotel and Residences.

**1.99** "Rights" shall mean, collectively, (i) all easements or rights of way now or hereafter affecting or appurtenant to the real property owned by a Debtor and all rights to use the same, (ii) all casualty insurance proceeds, condemnation proceeds and all other proceeds from the Property, and (iii) all of the Debtors' rights, title and interest in any other rights affecting or related to the Property.

**1.100** "Sawyer Corporation" shall mean Frank Sawyer Corporation, one of the Debtors and debtors-in-possession.

**1.101** "Schedules" shall mean the schedules of assets and liabilities, the list of holders of interests and the statements of financial affairs filed by the Debtors under Section 521 of the Bankruptcy Code and Bankruptcy Rule 1007, as such schedules, lists and statements have been or may be supplemented or amended from time to time.

**1.102** "SE Berkeley" means SE Berkeley Street, LLC, an Insider.

**1.103** "SE McClellan" means SE McClellan Highway, LLC, an Insider

**1.104** "Secured Claim" shall mean any Claim that is secured by a Lien on Collateral to the extent of the value of such Collateral, as determined in accordance with Section 506(a) of the Bankruptcy Code, or, in the event that such Claim is a claim of setoff under Section 553 of the Bankruptcy Code, to the extent of such setoff.

**1.105** "Senior" shall mean (a) with respect to an Allowed Claim, any other Allowed Claim that is entitled to a priority of distribution under the Bankruptcy Code over the subject Allowed Claim, and (b) with respect to a Lien, any other Lien on the same Collateral that is entitled to precedence over the subject Lien with respect to such Collateral.

**1.106** "Spa" shall mean the Bliss Spa at the W Hotel and Residences.

**1.107** "SW Boston" shall mean SW Boston Hotel Venture, LLC, one of the Debtors and debtors-in-possession.

**1.108** "Theme Bar" shall mean the theme bar to be constructed at the W Hotel and Residences.

**1.109** "W Hotel" shall mean the "W" hotel that forms part of the W Hotel and Residences.

**1.110** "W Hotel and Residences" shall mean the real estate development located at 100 Stuart Street, Boston, Massachusetts 02116 owned by SW Boston comprised of the Residences, the Parking Condominium and the Hotel Condominium, which includes the Restaurant, the Retail Store, the Spa and the Theme Bar.

**1.111** "Working Capital Minimum" shall mean, with respect to each Reorganized Debtor, the following sums:

(a)    For Reorganized SW Boston, the sum of not more than $1,250,000;

(b)    For Reorganized Sawyer Corporation, the sum of not more than $25,000;

(c)    For Reorganized General Trading Company, the sum of not more than $100,000;

(d)    For Reorganized General Land Corporation, the sum of not more than $100,000;

(e)    For Reorganized 131 Arlington Street Trust, the sum of not more than $25,000;

(f)    For Reorganized 30-32 Oliver Street Corporation, the sum of not more than $50,000; and

(g)    For Reorganized Auto Sales & Service, Inc., the sum of not more than $25,000.

**1.112** "Working Capital Reserve" shall mean the funds maintained by each Reorganized Debtor after the Effective Date in an amount not less than the Working Capital Minimum.

## ARTICLE II

## TREATMENT OF ALLOWED UNCLASSIFIED CLAIMS

**2.1    Non-Classification.**

As provided in Section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims and Priority Tax Claims against each Debtor are not classified for the purposes of voting on, or receiving distributions under, the Plan. All such Claims are instead treated separately in accordance with the terms set forth in this Article II.

## 2.2   Administrative Expense Claims.

(a)   <u>General</u>.  Except for Professional Fee Claims and except as otherwise agreed to by the Debtors and the holder of an Allowed Administrative Expense Claim, each such holder shall be paid in full in Cash on the earlier of: (i) the date such Allowed Administrative Expense Claim becomes due in accordance with its terms; and (ii) the Effective Date.  If the Debtors dispute any portion of an Administrative Expense Claim, the Debtors shall pay the Allowed amount of such Administrative Expense Claim within five (5) days after the entry of a Non-Appealable Order with respect to the allowance of such disputed Administrative Expense Claim.

(b)   <u>U.S. Trustee's Fees</u>.  The outstanding fees due to the United States Trustee pursuant to 11 U.S.C. § 1930 shall be paid in full on or before the Effective Date.

(c)   <u>Professional Compensation and Expense Reimbursement Claims</u>.

(i)   Within thirty (30) days after the Effective Date, each Professional shall file a final application for the allowance of compensation for services rendered or reimbursement of expenses incurred through and including the Effective Date.  Any such application granted by the Bankruptcy Court shall be paid: (1) within fifteen days of the entry of the order of the Bankruptcy Court approving such application, unless a stay of the order approving the application is obtained; or (2) upon such other terms as may be mutually agreed upon between the Professional and the Debtors or Reorganized Debtors.

(ii)   All fees and expenses of Professionals for services rendered after the Effective Date shall be paid by the Reorganized Debtors upon receipt of reasonably detailed invoices in such amounts and on such terms as such Professional and the Reorganized Debtors may agree.  No further order or authorization from the Bankruptcy Court shall be necessary to permit the Reorganized Debtors to pay the fees and expenses of Professionals for services rendered after the Effective Date.

## 2.3   Priority Tax Claims.

At the sole election of the Debtors, each holder of an Allowed Priority Tax Claim against each such Debtor, if any, shall be paid either: (a) upon such terms as may be agreed to between the Debtors and the holder of an Allowed Priority Tax Claim; (b) in full in Cash on the later of the Effective Date or the date that such Allowed Priority Tax Claim would have been due if the Bankruptcy Cases had not been commenced; or (c) in installment payments of Cash commencing on the Effective Date and (i) of a total value as of the Effective Date equal to the Allowed amount of such Claim, (ii) over a period ending not later than five (5) years from the Petition Date, and (iii) in a manner not less favorable than the most favored General Unsecured Claim under the Plan (other than the manner provided to the holders of Convenience Class Claims).

# ARTICLE III

## CLASSIFICATION OF CLAIMS AND EQUITY INTERESTS

The Claims against and Equity Interests in the Debtors are categorized below for all purposes under the Plan including voting, confirmation and distribution pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code. A Claim or Equity Interest is classified in a particular Class only to the extent that the Claim or Equity Interest qualifies within the description of that Class, and is classified in other Classes to the extent that any portion of the Claim or Equity Interest falls within the description of such other Classes. A Claim is placed in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim is an Allowed Claim in that Class and such Claim has not been paid, released or otherwise settled prior to the Effective Date. The claims and Equity Interests with respect to each Debtor are separately classified in their own distinct sub-classes, sub-class A for SW Boston, sub-class B for 30-32 Oliver Street, sub-class C for C 100 Stuart Street, sub-class D for 131 Arlington Street, sub-class E for Auto Sales, sub-class F for Sawyer Corporation, sub-class G for General Land, and sub-class H for General Trading. Nothing in this Plan is intended to effectuate a substantive consolidation of the Debtors or their Estates.

### 3.1    Claim and Equity Interest Categories

Claims against and Equity Interests in the Debtors have been classified as follows:

| Class | Designation | Impairment | Entitled to Vote |
|-------|-------------|------------|------------------|
| 1 A - H | Priority Claims | Unimpaired | No |
| 2 A - H | Prudential Secured Claims | Impaired | Yes |
| 3 A - H | City of Boston Secured Claims | Impaired | Yes |
| 4 A- H | Miscellaneous Secured Claims | Impaired | Yes |
| 5 A | Mechanics Lien Claims | Impaired | Yes |
| 6 A | Bovis Allowed Claim | Impaired | Yes |
| 7 A - H | General Unsecured Claims | Impaired | Yes |
| 8 A - H | Convenience Class | Impaired | No |
| 9 A & C | Equity Interests | Impaired | Yes |
| 9 B & D - H | Equity Interests | Unimpaired | No |

## ARTICLE IV

## TREATMENT OF CLAIMS AND EQUITY INTERESTS

**4.1    Class 1 – Priority Claims.**

(a)    <u>Classification</u>. Class 1 consists of all Priority Claims.

(b)    <u>Impairment and Voting</u>. Class 1 is unimpaired under the Plan. The holder of a Class 1 Claim shall not be entitled to vote to accept or reject the Plan.

(c)    <u>Distributions</u>. In full and complete satisfaction, settlement, release and discharge of any Priority Claims, each holder of an Allowed Priority Claim shall receive payment in full in Cash on the later to occur of the Effective Date or the date such claim becomes an Allowed Claim.

**4.2    Class 2 – Prudential Secured Claims.**

(a)    <u>Classification</u>. Class 2 consists of the Allowed Prudential Claim. No part of the Allowed Prudential Claim is classified in any other Class.

(b)    <u>Impairment and Voting</u>. The Allowed Prudential Claim is impaired under the Plan. The holder of the Allowed Prudential Claim shall be entitled to vote to accept or reject the Plan.

(c)    <u>Allowance</u>. The Claims asserted by Prudential shall be an Allowed Secured Claims in the amount of the Allowed Prudential Claim.

(d)    <u>Claim Treatment</u>. In full and complete satisfaction, settlement, discharge and release of the Allowed Prudential Claim, the holder of the Allowed Prudential Claim shall receive the following treatment:

(i)    <u>Interest</u>. Commencing on the Effective Date, interest shall accrue on the Allowed Prudential Claim at a rate: (a) (i) of four and one quarter percent (4.25%) per annum in the event of a sale of the Hotel Condominium, or (ii) five and one quarter percent (5.25%) per annum, otherwise, (b) as determined by the Bankruptcy Court, or (c) agreed to by the Debtors and Prudential.

(ii)    <u>Payments</u>. The holder of the Allowed Prudential Claim shall receive the following payments until the Allowed Prudential Claim is paid in full:

(1)    The Residence Net Sales Proceeds, payable within one (1) Business Day of a Qualified Sale.

(2)    The Real Estate Net Sales Proceeds, payable within one (1) Business Day of the closing of a Qualified Sale.

(3) The Debtors' Excess Cash, measured at the end of the first full month following the Effective Date, payable on or before the twenty-fifth (25th) day of the second full month following the Effective Date, and continuing monthly thereafter.

(iii) <u>Application of Payments</u>. All payments made on account of the Allowed Prudential Claim shall be applied first to accrued interest on the Allowed Prudential Claim, and second to the principal balance of such Claim.

(e) <u>Maturity and Pre-Payment Privilege</u>. The Allowed Prudential Claim shall mature and be paid in full by December 31, 2016, unless the Hotel Condominium and the Parking Condominium are sold, in which case the Allowed Prudential Claim shall mature and be paid in full by March 31, 2014. The Allowed Prudential Claim may be prepaid at any time without prepayment penalty.

(f) <u>Liens</u>. The Liens held by the holder of the Allowed Prudential Claim shall be treated as follows.

(i) <u>Retention of Liens</u>. The Liens on the Prudential Collateral shall be retained by the holder of the Allowed Prudential Claim to secure the payment of the Allowed Prudential Claim pursuant to the Plan.

(ii) <u>Release of Liens</u>. With respect to any Qualified Sale, the Liens on the Prudential Collateral shall be discharged and released as follows:

(1) <u>Draft Proceeds Analysis/Draft HUD-1</u>. At least two (2) Business Days prior to the scheduled closing of a Qualified Sale, the Reorganized Debtors shall provide the holder of the Allowed Prudential Claim with a draft Proceeds Analysis and, if applicable, a draft HUD-1 settlement statement.

(2) <u>Delivery of Discharge</u>. At least one (1) Business Day prior to the scheduled closing of a Qualified Sale, the holder of the Allowed Prudential Claim shall deliver a discharge and release of its Liens on the property to be sold to the Reorganized Debtors' closing attorney for the sale.

(3) <u>Payment/Recording of Discharge</u>. Within one (1) Business Day after the closing of a Qualified Sale, the Reorganized Debtors shall deliver to the holder of the Allowed Prudential Claim: (A) the Residence Net Sales Proceeds or Real Estate Net Sales Proceeds, as the case may be, (B) the final Proceeds Analysis, and (C) if applicable, the final

HUD-1 settlement statement. Upon the delivery of the Residence Net Sales Proceeds or the Real Estate Net Sales Proceeds, as applicable, to the holder of the Allowed Prudential Claim, the Reorganized Debtors' closing attorney shall cause the discharge and release of the Lien on the property sold to be recorded.

(4)  Disputed Amounts. In the event of a dispute over the distribution of the proceeds of a Qualified Sale, the amount in controversy shall be held by the Reorganized Debtors' closing attorney in escrow until the dispute is resolved by the Plan Arbitrator according to the Dispute Resolution Procedures.

(iii)  Discharge of Liens. Upon payment in full of the Allowed Prudential Claim: (i) all Liens securing the Allowed Prudential Claim shall be deemed canceled, discharged and released, and (ii) the holder of the Allowed Prudential Claim shall be required to deliver to the Reorganized Debtors, within one (1) Business Day of the payment in full of the Allowed Prudential Claim, all UCC terminations, mortgage discharges and any other documents necessary to effect the discharge and release of the Liens on the Property that is the subject of the Qualified Sale.

(g)  Covenants. The Covenants shall apply to the Allowed Prudential Claim.

(h)  Reporting. The Reorganized Debtors shall provide the holder of the Allowed Prudential Claim with the following reporting:

(i)  Monthly Reports. On or before the last Business Day of the first full month following the Effective Date, and continuing monthly thereafter until the Allowed Prudential Claim is paid in full, the Reorganized Debtors shall provide the holder of the Allowed Prudential Claim: (1) an accounting of the Debtors' Excess Cash for the preceding month, (2) the Debtors' financial statements for the preceding month; (3) copies of all leases executed since the prior monthly report, (4) copies of all new purchase and sale agreements with respect to Residences or Real Estate executed since the prior monthly report, (5) copies of account statements for bank accounts and securities accounts that contain Cash Collateral, and (6) prior to any sale of the Hotel Condominium, the Hotel Operating Reports for the previous month.

(ii)  Quarterly Report. On or before the last Business Day of the month following the end of the third full month following the Effective Date, and quarterly thereafter, the Reorganized Debtors shall provide the holder of the Allowed Prudential Claim with a

comparison of the Reorganized Debtors' actual expenses for the reporting period to the Budgeted Expenses for the reporting period in accordance with Covenant A(1).

(iii) <u>Yearly Reports</u>. On or before March 15 of each calendar year following the Effective Date until the Allowed Prudential Claim is paid in full, the Reorganized Debtors shall provide the holder of the Allowed Prudential Claim with unaudited financial statements for the preceding calendar year. The Reorganized Debtors shall provide the holder of the Allowed Prudential Claim with copies of the Reorganized Debtors' tax returns within ten (10) days of their filing.

(iv) <u>Confidentiality</u>. Notwithstanding any Massachusetts freedom of information act or similar statute, Prudential and its Representatives shall keep all reports provided by the Reorganized Debtors strictly confidential and shall be permitted to disclose such reports only to those of its Representatives specifically involved in evaluating the Allowed Prudential Claim who require such reports. If Prudential or any of its Representatives become legally compelled to disclose any of the reports, Prudential shall consult with the Reorganized Debtors and provide the Reorganized Debtors with prompt written notice before any report is disclosed and shall disclose only that portion of the report that is legally required to be disclosed. The Reorganized Debtors may seek a protective order or other appropriate remedy to protect the confidentiality of the reports (including without limitation a narrowing of the scope of disclosure). If the Reorganized Debtors do not obtain a protective order or other appropriate remedy or if the Reorganized Debtors agree to permit disclosure of a report, Prudential shall exercise good faith in cooperating with any efforts of the Reorganized Debtors to obtain appropriate assurances in writing that confidential treatment will be accorded the report.

(i) <u>Events of Default</u>.

(i) <u>Default</u>. Subject to Section 4.2(i)(ii), it shall be an event of default if a Debtor fails to comply with its obligations under the Plan including, with respect to the Allowed Prudential Claim, a breach of the Covenants.

(ii) <u>Notice</u>. No event of default shall occur unless, in the event of a breach of the Debtors' obligations to the holder of the Allowed Prudential Claim under the Plan, the holder of the Allowed Prudential Claim shall provide written notice of such breach to the Reorganized Debtors and such breach is not cured: (i) in the event of a breach that can be cured by the payment of a sum of money, within ten (10) days of the Reorganized Debtors' receipt of such

notice; and (ii) for any other breach, within thirty (30) days of the Reorganized Debtors' receipt of such notice, provided that, if such non-monetary breach cannot reasonably be cured within such 30-day period and the Reorganized Debtors have commenced curing such breach and continue to cure such breach, the thirty (30) day period shall be extended for such time as is reasonably necessary to cure such breach.

(j)  <u>Remedies</u>. Upon the occurrence of an event of default that is not subject to the Dispute Resolution Procedures, the holder of the Allowed Prudential Claim shall be entitled to enforce its rights under applicable law in a court of competent jurisdiction in the County of Suffolk, Commonwealth of Massachusetts.

(k)  <u>Indubitable Equivalent</u>. The holder of the Allowed Prudential Claim shall receive such additional or other treatment as may be necessary, as agreed to between the Debtors and the holder of the Allowed Prudential Claim or as determined by the Bankruptcy Court, to permit the holder of the Prudential Allowed Claim to realize the indubitable equivalent of its Allowed Claim.

(l)  <u>Loan Documents</u>. As of the Effective Date, the Prudential Loan Documents shall be deemed amended and restated, without further action, as necessary to reflect and incorporate the terms of the Plan. To the extent that the Prudential Loan Documents contain any terms, covenants, representations and warranties, and/or remedies that impose obligations upon the Debtors that are inconsistent with or more expansive than the terms of the Plan, such terms, covenants, representations and warranties, and/or remedies are deemed cancelled and any obligations of the Debtors and/or Claims by the holder of the Allowed Prudential Claim arising from such terms, covenants, representations and warranties, and/or remedies shall be discharged upon the Effective Date. To the extent that there is any inconsistency between the Plan and any of the Prudential Loan Documents, the terms of the Plan shall control.

**4.3    Class 3 – City of Boston Secured Claim.**

(a)  <u>Classification</u>. Class 3 consists of the Allowed City Claim. No part of the Allowed City Claim is classified in any other Class.

(b)  <u>Impairment and Voting</u>. The Allowed City Claim is impaired under the Plan. The holder of the Allowed City Claim shall be entitled to vote to accept or reject the Plan.

(c)  <u>Allowance</u>. The Claims asserted by the City shall be an Allowed Secured Claim in the amount of the Allowed City Claim.

(d) <u>Claim Treatment</u>. In full and complete satisfaction, settlement, discharge and release of the Allowed City Claim, the holder of the Allowed City Claim shall receive the following treatment:

    (i) <u>Interest</u>. Commencing on the Effective Date, interest shall accrue on the Allowed City Claim at a rate: (a) of eight percent (8%) per annum, with three percent (3%) deferred in accordance with the City Loan Documents, (b) determined by the Bankruptcy Court, or (c) agreed to by the Debtors and the City.

    (ii) <u>Payments</u>. The holder of the Allowed City Claim shall receive the following payments until the Allowed City Claim is paid in full:

        (1) Commencing on or before the last Business Day of the first full month following the Effective Date and until the Allowed City Claim is paid in full, monthly installments of interest only, based on an interest rate of eight percent (8%) per annum, with three percent (3%) deferred in accordance with the City Loan Documents, which payments shall be made first from the City Account and then from the Reorganized Debtors' Cash Collateral.

        (2) After the payment in full of the Allowed Prudential Claim, monthly payments of principal and interest in accordance with the City Loan Documents.

        (3) On or before the maturity date set forth in Section 4.3(e), a payment of all unpaid principal and interest.

    (iii) <u>Application of Payments</u>. All payments made on account of the Allowed City Claim shall be applied first to accrued interest on the Allowed City Claim, and second to the principal balance of such Claim.

(e) <u>Maturity and Pre-Payment Privilege</u>. The Allowed City Claim shall mature and be paid in full by December 9, 2019. Subject to the terms of the City Loan Documents, the Allowed City Claim may be prepaid at any time.

(f) <u>Liens</u>. The Liens held by the holder of the Allowed City Claim shall be treated as follows:

    (i) <u>Retention of Liens</u>. The Liens on the City Collateral shall be retained by the holder of the Allowed City Claim to secure the payment of the Allowed City Claim pursuant to the Plan.

    (ii) <u>Release of Liens</u>. With respect to any Qualified Sale, the Liens on the City Collateral shall be discharged and released as follows:

(1) <u>Draft Proceeds Analysis/Draft HUD-1</u>. At least two (2) Business Days prior to the scheduled closing of a Qualified Sale, the Reorganized Debtors shall provide the holder of the Allowed City Claim with a draft Proceeds Analysis and, if applicable, a draft HUD-1 settlement statement.

(2) <u>Delivery of Discharge</u>. At least one (1) Business Day prior to the scheduled closing of a Qualified Sale, the holder of the Allowed City Claim shall deliver a discharge and release of its Liens on the property to be sold to the Reorganized Debtors' closing attorney for the sale.

(3) <u>Payment/Recording of Discharge</u>. Within one (1) Business Day after the closing of a Qualified Sale, the Reorganized Debtors shall deliver to the holder of the Allowed City Claim: (A) the final Proceeds Analysis, and (B) if applicable, the final HUD-1 settlement statement. Upon the delivery of the final Proceeds Analysis and the final HUD-1 settlement statement, the Reorganized Debtors' closing attorney shall cause the discharge and release of the Lien on the property sold to be recorded.

(4) <u>Disputed Amounts</u>. In the event of a dispute over the distribution of the proceeds of a Qualified Sale, the amount in controversy shall be held by the Reorganized Debtors' closing attorney in escrow until the dispute is resolved by the Plan Arbitrator according to the Dispute Resolution Procedures.

(iii) <u>Discharge of Liens</u>. Upon payment in full of the Allowed City Claim: (1) all Liens securing the Allowed City Claim shall be deemed canceled, discharged and released, and (2) the holder of the Allowed City Claim shall be required to deliver to the Reorganized Debtors, within one (1) Business Day of the payment in full of the Allowed City Claim, all UCC terminations, mortgage discharges and any other documents necessary to effect the discharge and release of the Liens on the Property that is the subject of the Qualified Sale.

(g) <u>Covenants</u>. The Covenants shall apply to the Allowed City Claim.

(h) <u>Reporting</u>. The Reorganized Debtors shall provide the holder of the Allowed City Claim with the following reporting:

(i) <u>Monthly Reports</u>. On or before the last Business Day of the first full month following the Effective Date, and continuing monthly thereafter until the Allowed City Claim is paid in full, the

Reorganized Debtors shall provide the holder of the Allowed City Claim: (1) an accounting of the Debtors' Excess Cash for the preceding month, (2) the Debtors' financial statements for the preceding month; (3) copies of all leases executed since the prior monthly report, (4) copies of all new purchase and sale agreements with respect to Residences or Real Estate executed since the prior monthly report, (5) copies of account statements for bank accounts and securities accounts that contain Cash Collateral, and (6) prior to any sale of the Hotel Condominium, the Hotel Operating Reports for the previous month.

(ii)    <u>Quarterly Report</u>.  On or before the last Business Day of the month following the end of the third full month following the Effective Date, and quarterly thereafter, the Reorganized Debtors shall provide the holder of the Allowed City Claim with a comparison of the Reorganized Debtors' actual expenses for the reporting period to the Budgeted Expenses for the reporting period in accordance with Covenant A(1).

(iii)    <u>Yearly Reports</u>.  On or before March 15 of each calendar year following the Effective Date until the Allowed City Claim is paid in full, the Reorganized Debtors shall provide the holder of the Allowed City Claim with unaudited financial statements for the preceding calendar year.  The Reorganized Debtors shall provide the holder of the Allowed City Claim with copies of the Reorganized Debtors' tax returns within ten (10) days of their filing.

(iv)    <u>Confidentiality</u>.  Notwithstanding any Massachusetts freedom of information act or similar statute, the City and its Representatives shall keep all reports provided by the Reorganized Debtors strictly confidential and shall be permitted to disclose such reports only to those of its Representatives specifically involved in evaluating the Allowed City Claim who require such reports.  If the City or any of its Representatives become legally compelled to disclose any of the reports, the City shall consult with the Reorganized Debtors and provide the Reorganized Debtors with prompt written notice before any report is disclosed and shall disclose only that portion of the report that is legally required to be disclosed.  The Reorganized Debtors may seek a protective order or other appropriate remedy to protect the confidentiality of the reports (including without limitation a narrowing of the scope of disclosure).  If the Reorganized Debtors do not obtain a protective order or other appropriate remedy or if the Reorganized Debtors agree to permit disclosure of a report, the City shall exercise good faith in cooperating with any efforts of the Reorganized Debtors to

obtain appropriate assurances in writing that confidential treatment will be accorded the report.

(i)    <u>Events of Default</u>.

    (i)    <u>Default</u>. Subject to Section 4.3(i)(ii), it shall be an event of default if a Debtor fails to comply with its obligations under the Plan including, with respect to the Allowed City Claim, a breach of the Covenants.

    (ii)    <u>Notice</u>. No event of default shall occur unless, in the event of a breach of the Debtors' obligations to the holder of the Allowed City Claim under the Plan, the holder of the Allowed City Claim shall provide written notice of such breach to the Reorganized Debtors and such breach is not cured: (i) in the event of a breach that can be cured by the payment of a sum of money, within ten (10) days of the Reorganized Debtors' receipt of such notice; and (ii) for any other breach, within thirty (30) days of the Reorganized Debtors' receipt of such notice, provided that, if such non-monetary breach cannot reasonably be cured within such 30-day period and the Reorganized Debtors have commenced curing such breach and continue to cure such breach, the thirty (30) day period shall be extended for such time as is reasonably necessary to cure such breach.

(j)    <u>Remedies</u>. Upon the occurrence of an event of default that is not subject to the Dispute Resolution Procedures, the holder of the Allowed City Claim shall be entitled to enforce its rights under applicable law in a court of competent jurisdiction in the County of Suffolk, Commonwealth of Massachusetts.

(k)    <u>Indubitable Equivalent</u>. The holder of the Allowed City Claim shall receive such additional or other treatment as may be necessary, as agreed to between the Debtors and the holder of the Allowed City Claim or as determined by the Bankruptcy Court or, to permit the holder of the Allowed City Claim to realize the indubitable equivalent of its Allowed Claim.

(l)    <u>Subordination</u>. The holder of the Allowed City Claim shall subordinate its Liens to any financing that pays in full or in part an Allowed Claim secured by a Senior Lien. The holder of the Allowed City Claim shall, within three Business Days of a request from the Reorganized Debtors, execute and deliver to the Reorganized Debtors such documents to evidence the subordination of its Lien as may be reasonably required by the party providing the financing.

(m) <u>Loan Documents</u>. As of the Effective Date, the City Loan Documents shall be deemed amended and restated, without further action, as necessary to reflect and incorporate the terms of the Plan. To the extent that the City Loan Documents contain any terms, covenants, representations and warranties, and/or remedies that impose obligations upon the Debtors that are inconsistent with or more expansive than the terms of the Plan, such terms, covenants, representations and warranties, and/or remedies are deemed cancelled and any obligations of the Debtors and/or Claims by the holder of the Allowed City Claim arising from such terms, covenants, representations and warranties, and/or remedies shall be discharged upon the Effective Date. To the extent that there is any inconsistency between the Plan and any of the City Loan Documents, the terms of the Plan shall control.

**4.4    Class 4 – Miscellaneous Secured Claims.**

(a) <u>Classification</u>. Class 4 consists of the Allowed Miscellaneous Secured Claims.

(b) <u>Impairment and Voting</u>. The Miscellaneous Secured Claims are impaired under the Plan. Each holder of a Miscellaneous Secured Claim shall be entitled to vote to accept or reject the Plan.

(c) <u>Allowance</u>. The Class 4 Claims shall be Allowed or disallowed through the claims objection process described in Article VI of the Plan.

(d) <u>Claim Treatment</u>. In full and complete satisfaction, settlement, discharge and release of the Miscellaneous Secured Claims, the holders of the Allowed Miscellaneous Secured Claims shall receive, at the sole option of the Debtors and on the later to occur of the Effective Date or the date such Secured Claim becomes an Allowed Claim, one of the following:

   (i) Monthly installments of interest only, based on interest at a rate of four and one quarter percent (4.25 %) per annum, with all unpaid principal and interest due at the end of the 60th month following the Effective Date, <u>provided</u> <u>that</u>, the outstanding amount due may be pre-paid at any time without penalty.

   (ii) The return of the Collateral securing such Secured Claim.

   (iii) The reinstatement of the debt constituting such Secured Claim in accordance with Section 1124(2) of the Bankruptcy Code.

   (iv) Such treatment as is agreed upon in writing between the Debtors and the holder of such Secured Claim.

   (v) Such treatment as determined by the Court.

(e)     Liens. The Liens held by the holder of an Allowed Miscellaneous Secured Claim shall be treated as follows.

(i)     Retention of Liens. Any Liens held by the holder of an Allowed Miscellaneous Secured Claim shall be retained by the holder of an Allowed Miscellaneous Secured Claim to secure the payment of the Allowed Miscellaneous Secured Claim pursuant to the Plan.

(ii)    Release of Liens. With respect to any Qualified Sale that includes Collateral Securing a Miscellaneous Secured Claim, the Liens on the Collateral securing the Miscellaneous Secured Claims shall be discharged and released as follows:

(1)    Draft Proceeds Analysis/Draft HUD-1. At least two (2) Business Days prior to the scheduled closing of a Qualified Sale, the Reorganized Debtors shall provide the holder of the Allowed Miscellaneous Secured Claim on the property to be sold with a draft Proceeds Analysis and, if applicable, a draft HUD-1 settlement statement.

(2)    Delivery of Discharge. At least one (1) Business Day prior to the scheduled closing of a Qualified Sale, the holder of the Allowed Miscellaneous Secured Claim on the property to be sold shall deliver a discharge and release of its Liens on the property to be sold to the Reorganized Debtors' closing attorney for the sale.

(3)    Payment/Recording of Discharge. Within one (1) Business Day after the closing of a Qualified Sale, the Reorganized Debtors shall deliver to the holder of the Allowed Miscellaneous Secured Claim on the property to be sold: (A) the final Proceeds Analysis, and (B) if applicable, the final HUD-1 settlement statement. Upon the delivery of the final Proceeds Analysis and the final HUD-1 settlement statement, the Reorganized Debtors' closing attorney shall cause the discharge and release of the Lien on the property sold to be recorded.

(iii)   Disputed Amounts. In the event of a dispute over the distribution of the proceeds of the sale, the amount in controversy shall be held by the Reorganized Debtors' closing attorney in escrow until the dispute is resolved by the Plan Arbitrator according to the Dispute Resolution Procedures.

(iv)    Discharge of Liens. Upon payment in full of any Allowed Miscellaneous Secured Claim: (1) all Liens securing such Allowed Miscellaneous Secured Claim shall be deemed canceled,

discharged and released, and (2) the holder of such Allowed Miscellaneous Secured Claim shall be required to deliver to the Reorganized Debtors, within one (1) Business Day of the payment in full of such Allowed Miscellaneous Secured Claim, all UCC terminations, mortgage discharges and any other documents necessary to effect the discharge and release of the Liens securing such Allowed Miscellaneous Secured Claim.

(f) <u>Subordination</u>. The holders of Allowed Miscellaneous Secured Claims shall subordinate their Liens to any financing that pays in full or in part an Allowed Claim secured by a Senior Lien. The holders of Allowed Miscellaneous Secured Claims shall, within three Business Days of a request from the Reorganized Debtors, execute and deliver to the Reorganized Debtors such documents to evidence the subordination of their respective Liens as may be reasonably required by the party providing the financing.

(g) <u>Indubitable Equivalent</u>. The holder of any Allowed Miscellaneous Secured Claim shall receive such additional or other treatment as may be necessary, as determined by the Bankruptcy Court or agreed to between the Debtors and the holder of the Allowed Miscellaneous Secured Claim, to permit the holder of the Allowed Miscellaneous Secured Claim to realize the indubitable equivalent of its Allowed Claim.

**4.5 Class 5 – Mechanics Lien Claims.**

(a) <u>Classification</u>. Class 5 consists of the Mechanics Lien Claims.

(b) <u>Impairment and Voting</u>. The Mechanics Lien Claims are impaired under the Plan. Each holder of a Mechanics Lien Claim shall be entitled to vote to accept or reject the Plan.

(c) <u>Allowance</u>. A Claim allegedly secured by a Mechanics Lien shall be included in Class 5 only if it is Allowed.

(d) <u>Claim Treatment</u>. In full and complete satisfaction, settlement, discharge and release of the Mechanics Lien Claims, the holders of Mechanics Lien Claims shall receive, commencing on the later to occur of the Effective Date or the date such Claim becomes an Allowed Claim, payments from Bovis from the funds paid by SW Boston pursuant to the Bovis Agreement.

(e) <u>Discharge of Liens</u>. Upon the Effective Date: (1) all Liens securing all Mechanics Lien Claims shall be deemed canceled, discharged and released, and (2) each holder of a Mechanics Lien Claim shall deliver to the Reorganized Debtors, within ten (10) days of the Confirmation Date, all UCC terminations, mortgage discharges and any other documents necessary to effect the discharge and release of the Liens securing such

Mechanics Lien Claim; provided that, if any holder of a Mechanics Lien Claim fails to deliver any document necessary to effect the discharge and release of the Liens securing such Mechanics Lien Claim within the time set forth above, the Debtor is authorized to execute and file any documents necessary to discharge and release such Liens on behalf of the holder of such Mechanics Lien Claim.

(f)    <u>Indubitable Equivalent</u>.  The holder of any Mechanics Lien Claim shall receive such additional or other treatment as may be necessary, as determined by the Bankruptcy Court or agreed to between the Debtors and the holder of the Mechanics Lien Claim, to permit the holder of the Mechanics Lien Claim to realize the indubitable equivalent of its Allowed Claim.

**4.6    Class 6 – Bovis Allowed Claim.**

(a)    <u>Classification</u>.  Class 6 consists of the Bovis Allowed Claim.

(b)    <u>Impairment and Voting</u>.  The Bovis Allowed Claim is impaired under the Plan.  The holder of the Bovis Allowed Claim shall be entitled to vote to accept or reject the Plan.

(c)    <u>Allowance</u>.  The Claim asserted by Bovis shall be an Allowed Claim against SW Boston in the amount of the Bovis Allowed Claim.

(d)    <u>Claim Treatment</u>.  In full and complete satisfaction, settlement, discharge and release of the Bovis Allowed Claims, the holder of the Bovis Allowed Claim shall receive the treatment described in the Bovis Agreement.

**4.7    Class 7 – General Unsecured Claims.**

(a)    <u>Classification</u>.  Class 7 consists of the Allowed General Unsecured Claims.

(b)    <u>Impairment and Voting</u>.  Class 7 is impaired under the Plan.  Each holder of a General Unsecured Claim shall be entitled to vote to accept or reject the Plan.

(c)    <u>Allowance</u>.  The Class 7 Claims shall be Allowed or disallowed through the claims objection process described in Article VI of the Plan.

(d)    <u>Claim Treatment</u>.  In full and complete satisfaction, settlement, release and discharge, each holder of an Allowed General Unsecured Claim shall receive, commencing upon the later to occur of the Effective Date or the date such Claim becomes an Allowed Claim, the following:

(i)    ~~Twenty-five percent (25%) of the~~<u>Interest.  Commencing on the Effective Date, interest shall accrue on each</u> Allowed General

Unsecured Claim ~~on the Effective Date~~at a rate: (a) of four and one-quarter percent (4.25%) per annum, or (b) determined by the Bankruptcy Court.

(ii)    ~~Twenty-five~~Thirty-three percent ~~(25%) of the Allowed General Unsecured Claim on the first anniversary of the Effective Date.~~

~~(iii)~~(ii)  ~~Twenty-five percent (25~~33%) of the Allowed General Unsecured Claim on the ~~second anniversary of the~~ Effective Date.

(iii)    ~~Twenty-five~~The aggregate of: (1) thirty-three percent (33%) of the principal balance of the Allowed General Unsecured Claim, and (2) all accrued interest, on the first anniversary of the Effective Date.

(iv)    The aggregate of: (1) thirty-four percent (~~25~~34%) of the principal balance of the Allowed General Unsecured Claim, and (2) all accrued interest, on the ~~third~~second anniversary of the Effective Date.

(v)    The unpaid balance of any Allowed General Unsecured Claim may be prepaid at any time without penalty.

(e)    <u>Claims of Insiders</u>.

(i)    <u>Insider Claims Against SW Boston</u>.  In full and complete satisfaction of ~~all~~their Claims ~~of Insiders~~ against SW Boston, the Equity Interests in 110 Stuart Street shall be issued to ~~the Insiders of SW Boston~~SE Berkeley and SE McClellan in proportion to their respective Claims against and contributions to or on behalf of SW Boston.

(ii)    <u>Other Inter-Debtor Claims</u>.  All of the Debtors' respective Claims against each other ~~non-SW Boston Debtors~~ shall be cancelled and discharged on the Effective Date

(iii)    <u>Non-Debtor Insider Claims</u>. ~~All~~ Except as provided in Section 4.7(e)(i) of the Plan, all non-Debtor Insider Claims against ~~non-SW Boston~~the Debtors shall be preserved.

(iv)    <u>No Distribution</u>.  Except as set forth in Section 4.7(e)(i), no Insiders of the Debtors shall receive any distributions on account of their Allowed Claims until the Allowed Claims of all non-Insider creditors have been paid in full under the terms of the Plan.

**4.8    Class 8 – Convenience Class.**

(a)     <u>Classification</u>.  Class 8 consists of the Allowed Convenience Class
Claims.

(b)     <u>Impairment and Voting</u>.  Class 8 is impaired under the Plan.  Each holder
of a Convenience Class Claim shall be entitled to vote to accept or reject
the Plan.

(c)     <u>Allowance</u>.  The Convenience Class Claims shall be Allowed or
disallowed through the claims objection process described in Article VI of
the Plan.

(d)     <u>Claim Treatment</u>.  In full and complete satisfaction, settlement, release
and discharge, each holder of an Allowed Convenience Class Claim shall
receive, upon the later to occur of the Effective Date or the date such
Claim becomes an Allowed Claim, the lesser of:

(i)     One-hundred percent (100%) of the holder's Allowed Class 8
Claim; or

(ii)    $5,000.

(e)     <u>Election</u>.  Any creditor with an Allowed Claim in excess of $5,000,
regardless of the nature of its Claim, may elect to become a Convenience
Class Claim.  Any creditor electing to accept treatment under Class 8 shall
do so on the ballot approved by the Bankruptcy Court not later than the
deadline for voting on the Plan.

**4.9     Class 9 – Equity Interests.**

(a)     <u>Classification</u>.  Class 9 consists of the Allowed Equity Interests in the
Debtors.

(b)     <u>Impairment and Voting</u>.  Classes 9A and 9C are impaired under the Plan
and shall be entitled to vote to accept or reject the Plan.  Classes 9B and
9D through 9H are unimpaired under the Plan, and shall not be entitled to
vote to accept or reject the Plan.

(c)     <u>Allowance</u>.  All Equity Interests in the Debtors shall be Allowed on the
Effective Date.

(d)     <u>Treatment</u>.  The holders of Allowed Equity Interests shall receive the
following:

(i)     Class 9A – On the Effective Date, the Equity Interests in SW
Boston shall be cancelled and new equity interests in SW Boston
shall be issued to 110 Stuart Street.  The equity interests in 110
Stuart Street shall be issued on the Effective Date in accordance
with Section 4.7(e)(i) of the Plan.

(ii)      Class 9C – On the Effective Date, either: (1) the Equity Interests in 100 Stuart Street shall be cancelled and 100 Stuart Street shall be deemed dissolved without the need for further documentation, or (2) 100 Stuart Street shall be merged with 110 Stuart Street.

(iii)     Classes 9B, 9D to 9H – The holders of the Equity Interests in 30-32 Oliver Street, 131 Arlington Street, Auto Sales, Sawyer Corporation, General Land and General Trading shall retain their respective Equity Interests.

**4.10    Reservation of Rights.**

The Debtors reserve the right to, among other things, (a) contest the right of the holder of any Claim to vote on this Plan, or designate the vote of the holder of any Claim (b) contest the right of the holder of any Claim to receive distributions under this Plan, and (c) seek to subordinate any Claim for inequitable conduct or otherwise.

## ARTICLE V

## MEANS FOR IMPLEMENTATION OF THE PLAN

**5.1    Plan Implementation.**

The Plan will be funded from the Debtors' Property, the income derived from that Property, the Cash Collateral, the sale of Real Estate and the sale of Residences. The Debtors shall be authorized to use the Cash Collateral for all purposes provided for in the Plan including, but not limited to: (i) pay the Allowed Prudential Claim, (ii) pay the Allowed Administrative Claims, (iii) provide each Debtor with cash to fund each Debtor's Working Capital Reserve to the Working Capital Minimum, (iv) pay the Budgeted Expenses, and (v) after the payment in full of the Allowed Prudential Claim, pay the Allowed City Claim.

**5.2    Sales of Property.**

Any sale, transfer or other disposition of Property under or in conjunction with the Plan shall be free and clear of all Liens, Claims and interests pursuant to Section 363(f) of the Bankruptcy Code and shall be entitled to the protection of Section 12.2 of the Plan. The Reorganized Debtors need not obtain Bankruptcy Court approval of any post-Effective Date sale, transfer or other disposition of Property.

**5.3    Execution of Necessary Documents.**

(a)    Confirmation of this Plan shall constitute authorization by the Bankruptcy Court for the Reorganized Debtors to enter into all documents, instruments and agreements necessary to effectuate the terms of this Plan. The form and/or content of the documents, instruments and agreements necessary to effectuate the terms of this Plan shall be subject to the approval of the Reorganized Debtors, in their sole discretion.

(b)    All matters provided for in the Plan involving any corporate action required by the Debtors or Reorganized Debtors in connection with the Plan shall be deemed to have occurred, and shall be in effect, without any requirement of further action by the Reorganized Debtors, their agents, representatives, members, managers, officers, directors or Affiliates.

**5.4    Organization Documents and Good Standing.**

As of the Effective Date, the Debtors' respective Organization Documents shall be amended as necessary to effectuate the terms of this Plan and shall become the Organization Documents of the Reorganized Debtors. To the extent that there is any inconsistency between

this Plan and any of the Organization Documents, the terms of this Plan shall control. To the extent any of the Debtors is not in compliance as of the Effective Date with any state or local law requirements necessary to remain as an organized legal entity in good standing and/or remain authorized as an organized legal entity to conduct business in any jurisdiction, the Debtors and/or the Reorganized Debtors, as the case may be, shall be deemed to be in compliance with any such laws if they comply with such laws within six months after the Effective Date.

### 5.5    Revesting of Property.

Except as otherwise provided in this Plan, each of the Reorganized Debtors, as of the Effective Date, shall be vested with all of the assets of each respective Debtor.

### 5.6    Preservation of Causes of Action.

Except as provided in, and unless expressly waived, relinquished, exculpated, released, compromised or settled in this Plan, the Confirmation Order, any Non-Appealable Order, or in any contract, instrument, release or other agreement entered into or delivered in connection with this Plan, the Reorganized Debtors will exclusively retain and may enforce, and the Debtors expressly reserve and preserve for these purposes, in accordance with sections 1123(a)(5)(A) of the Bankruptcy Code, any Claims, demands, rights and Causes of Action that the Debtors or their respective Estates may hold against any person or entity. No preclusion doctrine, including, without limitation, the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise) or laches shall apply to them by virtue of or in connection with the confirmation, consummation of effectiveness of this Plan.

### 5.7    Dissolution of the Committee.

The Committee shall dissolve automatically on the Effective Date. Upon such dissolution, its members, professionals, and agents shall be released from any further duties and responsibilities in the Bankruptcy Case and under the Bankruptcy Code, except with respect to applications for Professional Fee Claims or reimbursement of expenses incurred as a member of the Committee.

### 5.8    Consolidation.

Except as expressly provided in the Plan, the Reorganized Debtors shall continue to maintain their separate corporate existence for all purposes other than the treatment of Claims under the Plan. The Debtors are proposing that the Debtors be substantively consolidated under the Plan on the Effective Date pursuant to Section 1123(ea)(5)(C) of the Bankruptcy Code and the Confirmation Order. The effect of such substantive consolidation would be that: (i) all assets (and all proceeds thereof) and liabilities of each Debtor shall be deemed merged or treated as though they were merged into and with the assets and liabilities of all other Debtors, (ii) except as set forth in Section 4.7(e)(i) of the Plan, no cash distributions shall be made under the Plan on account of intercompany Claims among the Debtors and all such Claims shall be eliminated, (iii) all guarantees of any Debtor of the obligations of any other Debtor shall be deemed eliminated and extinguished so that any Claim against any Debtor and any guarantee thereof executed by the other and any joint and several liability of any Debtor shall be deemed to be one obligation of the consolidated cases, (iv) each and every Claim filed or to be filed in the Chapter 11 Case of

any Debtor shall be deemed filed against the consolidated Debtors, and (v) for purposes of determining the availability of the right of setoff under Section 553 of the Bankruptcy Code, the Debtors shall be treated as one entity so that, subject to the other provisions of Section 553 of the Bankruptcy Code, debts due to any Debtor may be set off against the debts of any other Debtor. Such substantive consolidation shall not (other than for purposes related to the Plan) affect the legal and corporate structures of the Reorganized Debtors.

**5.9    Default.**

No event of default under the Plan shall occur unless, in the event of a breach of the Debtors' obligations under the Plan, the holder of the Allowed Claim asserting the default shall provide written notice of such breach to the Reorganized Debtors and such breach is not cured: (i) in the event of a breach that can be cured by the payment of a sum of money, within ten (10) days of the Reorganized Debtors' receipt of such notice; and (ii) for any other breach, within thirty (30) days of the Reorganized Debtors' receipt of such notice, provided that, if such non-monetary breach cannot reasonably be cured within such 30-day period and the Reorganized Debtors have commenced curing such breach and continue to cure such breach, the thirty (30) day period shall be extended for such time as is reasonably necessary to cure such breach.

## ARTICLE VI

## DISTRIBUTIONS ON CLAIMS AND RESOLUTION OF DISPUTED CLAIMS

**6.1    Method of Distributions Under the Plan.**

(a)    In General.  Subject to Bankruptcy Rule 9010, and except as otherwise provided in this Plan, all distributions under the Plan to be made by, or on behalf of, the Reorganized Debtors to the holder of each Allowed Claim shall be mailed by first class mail, postage prepaid, to the address of such holder as listed on the Schedules unless the Reorganized Debtors have been notified in writing of a change of address as of the Distribution Record Date, including, without limitation, by the filing of a proof of claim or notice of transfer of claim filed by such holder that provides an address for such holder different from the address reflected on the Schedules.  The Reorganized Debtors shall have no obligation to locate such holders whose distributions or notices are properly mailed but nevertheless returned.

(b)    Form of Distributions.  Except as otherwise provided in this Plan, any payment of Cash made by, or on behalf of, the Reorganized Debtors pursuant to the Plan shall be made by check.

(c)    Distributions to be on Business Days.  Any payment or distribution required to be made under the Plan on a day other than a Business Day shall be made on the next succeeding Business Day.

(d)    Fractional Dollars.  Whenever any payment of a fraction of a dollar would otherwise be called for, the actual payment shall reflect a rounding of such fraction to the nearest

whole dollar (rounding down in the case of $0.50 or less, and rounding up in the case of more than $0.50).

(e)    Distributions to Holders as of the Distribution Record Date. As of the close of business on the Distribution Record Date, the claims register shall be closed. The Reorganized Debtors shall have no obligation to recognize any transfer of any Claims occurring after the close of business on the Distribution Record Date, and shall instead be entitled to recognize and deal for all purposes under the Plan with only those holders of record as of the close of business on the Distribution Record Date.

### 6.2    Objections to Disputed Claims.

Prior to the Effective Date, any objections to Claims against the Debtors shall be prosecuted by the Debtors. On and after the Effective Date, any objections to Claims against the Debtors shall be prosecuted by the Reorganized Debtors.

### 6.3    Deadline for Objecting to Disputed Claims.

Except as otherwise provided by order of the Bankruptcy Court, the Debtors, or the Reorganized Debtors as the case may be, may file an objection to a Claim against the Debtors until the later of: (a) the date that such Claim becomes due and payable in accordance with its terms, or (b) sixty (60) days after the Effective Date.

### 6.4    Estimation of Claims.

The Debtors or the Reorganized Debtors may, at any time, request that the Bankruptcy Court estimate any Disputed Claim pursuant to Section 502(c) of the Bankruptcy Code regardless of whether the Debtors or the Reorganized Debtors have previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection. The Bankruptcy Court shall have jurisdiction to estimate a Disputed Claim at any time, including, without limitation, during litigation concerning such Claim or an objection to such Claim. In the event the Bankruptcy Court estimates any Disputed Claim, the estimated amount shall constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court. If the Bankruptcy Court determines the maximum limitation of a Disputed Claim, such determination shall not preclude the Debtors from pursuing any supplemental proceedings to object to any payment of such Claim. All of the aforementioned Claims objections, estimation and resolution procedures are cumulative and not exclusive remedies. Claims may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court.

**6.5    Disputed Claims Reserve.**

(a)    Establishment. The Reorganized Debtors shall maintain a reserve (the "Disputed Claims Reserve") equal to 100% of the distributions to which holders of Disputed Claims would be entitled under the Plan if such Disputed Claims were Allowed Claims or such lesser amount as required by a Non-Appealable Order.

(b)    Investment of Cash. Cash in the Disputed Claims Reserve may be invested by the Reorganized Debtors only in Cash Equivalents having maturities sufficient to enable the Reorganized Debtors to make all necessary payments to holders of Disputed Claims if, and when, such Disputed Claims become Allowed Claims. Any interest, income, distributions or accretions on account of such investment in Cash Equivalents shall be for the sole benefit and account of the Reorganized Debtors, and the Reorganized Debtors shall be solely responsible for the payment of any income or other taxes arising therefrom.

(c)    Distributions Upon Allowance of Disputed Claims. The holder of a Disputed Claim that becomes an Allowed Claim after the Effective Date shall receive distributions of Cash from the Disputed Claims Reserve as soon as practicable following the date on which such Disputed Claim becomes an Allowed Claim pursuant to a Non-Appealable Order. Such distributions shall be made in accordance with the Plan based upon the distributions that would have been made to the holder of such a Claim under the Plan if the Disputed Claim had been an Allowed Claim on or prior to the Effective Date. No holder of a Disputed Claim shall have any claim against the Disputed Claims Reserve or a Reorganized Debtor with respect to such Claim until the Disputed Claim shall become an Allowed Claim.

**6.6    Reversion of Unclaimed Checks and Disputed Claims Reserve.**

The following amounts shall revert and be vested in the Reorganized Debtors free and clear of any claim or interest of any holder of a Claim under the Plan: (a) the amount of any checks issued for distributions under the Plan that remain uncashed for a period of 180 days after the date of such distribution; and (b) to the extent that a Disputed Claim is not Allowed or becomes an Allowed Claim in an amount less than the Disputed Claim Amount, the excess of the amount of Cash or Cash Equivalents in the Disputed Claims Reserve attributable to such Disputed Claim over the amount of Cash actually distributed on account of such Disputed Claim.

**ARTICLE VII**

**VOTING ON THE PLAN AND CRAMDOWN**

**7.1    Voting of Claims.**

Each holder of an Allowed Claim in an impaired Class that retains or receives property under the Plan shall be entitled to vote separately to accept or reject the Plan. Each holder of the foregoing Allowed Claims electing to vote shall do so on a duly executed and delivered ballot and in accordance with procedures set forth in the applicable order of the Bankruptcy Court establishing Plan voting procedures.

## 7.2    Acceptance by Impaired Classes.

An impaired class of Claims or Equity Interests shall have accepted the Plan if (a) the holders (other than any holder designated under section 1126(e) of the Bankruptcy Code) of at least two-thirds in amount of the Allowed Claims or Allowed Equity Interests actually voting in such Class have voted to accept the Plan and (b) the holders (other than any holder designated under section 1126(e) of the Bankruptcy Code) of more than one-half in number of the Allowed Claims or Allowed Equity Interests actually voting in such Class have voted to accept the Plan.

## 7.3    Nonconsensual Confirmation.

If any impaired Class entitled to vote does not accept this Plan by the requisite majorities provided in Sections 1126(c) or 1126(d) of the Bankruptcy Code, as applicable, or if any impaired class is deemed to have rejected the Plan, the Debtors reserve the right (a) to seek confirmation of the Plan under Section 1129(b) of the Bankruptcy Code; and/or (b) to amend the Plan in accordance with Section 12.3 of this Plan.

## ARTICLE VIII

## EXECUTORY CONTRACTS, UNEXPIRED LEASES, POST-PETITION CONTRACTS AND RETIREE AND COMPENSATION BENEFITS

### 8.1    Assumption of Executory Contracts and Unexpired Leases.

Pursuant to Sections 1123(b)(2) and 365(a) of the Bankruptcy Code, any executory contract or unexpired lease (excluding insurance policies) that (i) has not expired by its own terms on or prior to the Confirmation Date, (ii) has not been assumed, assumed and assigned or rejected with the approval of the Bankruptcy Court on or prior to the Confirmation Date, (iii) is not the subject of a motion to assume or reject which is pending at the time of the Confirmation Date, or (iv) is not designated by the Debtors as being an executory contract or unexpired lease to be assumed at the time of confirmation of this Plan, shall be deemed rejected on the Effective Date. The entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of such rejection pursuant to Sections 365(a) and 1123(b)(2) of the Bankruptcy Code.

### 8.2    Payments Related to The Assumption of Executory Contracts And Unexpired Leases.

(a)    <u>Payment of Claims Arising From Assumed Contracts And Leases</u>.  Any Allowed Claims arising from the assumption of an executory contract or unexpired lease will receive, in full and complete satisfaction, settlement, release and discharge of such Claims, payment in the ordinary course of business as and when such Allowed Claims become due pursuant to such executory contract or unexpired lease.

(b)    <u>Disputed Claims and Bar Date</u>.  If there is a dispute regarding (i) the amount of any claim arising from the assumption or rejection of an executory contract or unexpired lease, (ii) the ability of the applicable Debtor or any assignee to provide "adequate assurance of further performance," within the meaning of Section 365 of the Bankruptcy Code, under a contract or

lease to be assumed, or (iii) any other matter pertaining to the assumption or assumption and assignment of any contract or lease, the payment of any Claim related to the foregoing will be made following entry of a Non-Appealable Order resolving the dispute and approving the assumption.

### 8.3     Rejection Damage Claims.

If the rejection of an executory contract or unexpired lease by the Debtors results in a Claim by the other party or parties to such contract or lease, any claim for damages, if not previously evidenced by a filed proof of claim, shall be forever barred and shall not be enforceable against the Estates, the Reorganized Debtors and their respective properties, agents, successors, or assigns, unless a proof of claim is filed with the Bankruptcy Court and served upon counsel for the Debtors on or before thirty (30) days following the later to occur of: (a) the rejection of such executory contract or unexpired lease, and (b) the Confirmation Date.  Unless otherwise ordered by the Bankruptcy Court or provided in the Plan, all such Claims for which proofs of claim are timely filed will be treated as General Unsecured Claims subject to the provisions of the Plan.  The Debtors or the Reorganized Debtors, as the case may be, shall have the right to object to any such Claim for rejection damages in accordance with this Plan.

## ARTICLE IX

## RELEASE AND DISCHARGE OF CLAIMS

### 9.1     Discharge.

Except as otherwise expressly provided in Section 1141 of the Bankruptcy Code or this Plan, the distributions made pursuant to and in accordance with the applicable terms and conditions of this Plan are in full and final satisfaction, settlement, release and discharge as against the Debtors and the Reorganized Debtors of any debt or obligation of the Debtors that arose before the Effective Date, and any debt of the Debtors of a kind specified in Section 502(g), 502(h), or 502(i) of the Bankruptcy Code, and all Claims against the Debtors or their Estates of any nature, including, without limitation, any interest accrued thereon from and after the Petition Date, whether or not (i) a proof of claim based on such debt, obligation or Equity Interest is filed or deemed filed under Section 501 of the Bankruptcy Code, (ii) such Claim is Allowed under Section 502 of the Bankruptcy Code, or (iii) the holder of such Claim has accepted this Plan.

### 9.2     Injunction Relating to the Plan.

As of the Effective Date, all Persons are hereby permanently enjoined from commencing, continuing or enforcing in any manner or in any place, any action or other proceeding, whether directly, indirectly, derivatively or otherwise against the Debtors, their Estates or the Reorganized Debtors, on account of, or respecting any Claims, debts, rights, obligations, Causes of Action or liabilities discharged pursuant to this Plan, except to the extent expressly permitted under this Plan.

### 9.3     Releases.

Except as otherwise set forth in the Plan, as of the Effective Date, in consideration for, among other things, the obligations of the Debtors under this Plan and other contracts, instruments, releases, agreements or documents to be entered into or delivered in connection with this Plan, (a) each holder of a Claim or Interest that votes in favor of the Plan and (b) to the

fullest extent permissible under applicable law, as such law may be extended or interpreted subsequent to the Effective Date, each Person that has held, holds or may hold a Claim or Equity Interest or at any time was a creditor or equity holder of any of the Debtors and that does not vote on the Plan or votes against the Plan, in each case will be deemed to forever release, waive and discharge all claims (including any derivative claims), obligations, suits, judgments, damages, demands, rights, causes of action and liabilities (other than the right to enforce the Reorganized Debtors' obligations under this Plan and the contracts, instruments, releases, agreements and documents delivered under this Plan), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising in law, equity or otherwise, that are based in whole or in part on any act, omission, transaction or other occurrence taking place on or prior to the Effective Date in any way relating to a Debtor, the Bankruptcy Cases or this Plan that such entity has, had or may have against any Debtor, the Estates, the Estate's Assets, the Reorganized Debtors and/or the Reorganized Debtors' Assets.

### 9.4    Cancellation of Existing Indebtedness and Liens.

Except as may otherwise be provided in this Plan, on the Effective Date: (a) all credit agreements, promissory notes, mortgages, security agreements, invoices, contracts, agreements and any other documents or instruments evidencing Claims against the Debtors, together with any and all Liens securing same, shall be canceled, discharged and released without further act or action by any Person under any applicable agreement, law, regulation, order or rule, (b) the obligations of the Debtors thereunder shall be deemed cancelled, discharged and released, and (c) all of the right, title and interest of any holder of such mortgages, deeds of trust, liens or other security interests, including any rights to any collateral thereunder, will revert to the Reorganized Debtors.  To the extent deemed necessary or advisable by the Reorganized Debtors, any holder of a Claim shall promptly provide the Reorganized Debtors with an appropriate instrument of cancellation, discharge or release, as the case may be, in suitable form for recording wherever necessary to evidence such cancellation, discharge or release, including the cancellation, discharge or release of any Lien securing such Claim.

### 9.5    Exculpation.

Except as otherwise set forth in the Plan, neither the Debtors, the Reorganized Debtors, the Committee nor any of their respective present or former members, managers, officers, directors, employees, general or limited partners, advisors, attorneys, agents, successors or assigns, shall have or incur any liability to any holder of a Claim or an Interest, or any other party in interest, or any of their respective agents, employees, representatives, financial advisors, attorneys, or affiliates, or any of their successors or assigns, for any act or omission in connection with, relating to, or arising out of, the administration of these Chapter 11 bankruptcy proceedings, the pursuit of confirmation of this Plan, the Disclosure Statement, the consummation of this Plan, or the administration of this Plan or the property to be distributed under this Plan occurring prior to the Effective Date, provided that the terms of this Section 9.5 shall not apply to any liability for willful misconduct or ultra vires acts.

**9.6     Setoffs.**

Except as otherwise provided in this Plan, nothing contained in this Plan shall constitute a waiver or release by the Estates of any rights of setoff the Estates may have against any Person.

## ARTICLE X

## CONDITIONS PRECEDENT TO THE EFFECTIVE DATE OF THE PLAN

**10.1     Conditions Precedent to Effectiveness.**

Subject to Section 10.2 of the Plan, the following are conditions precedent to the occurrence of the Effective Date:

(a)     The Confirmation Order, in form and substance reasonably acceptable to the Debtors shall have been entered by the Bankruptcy Court and shall not be subject to any stay;

(b)     The Confirmation Order shall have become a Non-Appealable Order;

(c)     All actions, other documents and agreements necessary to implement the Plan shall have been executed, delivered and, if necessary, properly recorded, and shall have become effective.

**10.2     Waiver of Conditions.**

Except for the condition set forth in Sections 10.1(a) of this Plan, the Debtors may, in their sole discretion, waive one or more of the conditions precedent to the effectiveness of the Plan set forth in Section 10.1, without notice to any creditors or parties in interest and without Bankruptcy Court approval.  The failure to satisfy or waive any condition precedent to the occurrence of the Effective Date may be asserted by the Debtors regardless of the circumstances giving rise to the failure of such condition to be satisfied.

**10.3     Effect of Non-occurrence of Conditions to the Effective Date.**

If the Effective Date does not occur, the Plan shall be null and void in all respects and nothing contained in the Plan or Disclosure Statement shall: (a) constitute a waiver or release of any Claims by or against, or any Equity Interests in, the Debtors, or (b) prejudice in any manner the rights of the Debtors, or constitute an admission, acknowledgement, offer or undertaking by the Debtors.

# ARTICLE XI

## RETENTION OF JURISDICTION

From and after the occurrence of the Effective Date, the Bankruptcy Court shall have jurisdiction over the matters arising out of, and related to, the Bankruptcy Cases and the Plan, as legally permissible, pursuant to, and for the purposes of, Sections 105(a) and 1142 of the Bankruptcy Code including, without limitation:

(a)    To hear and determine any and all objections to the allowance, disallowance, determination, liquidation, classification or estimation of any Claims or Equity Interests or any controversies as to the priority and classification of any Claims (or any security with respect thereto) or Equity Interests or to estimate any Disputed Claim;

(b)    To hear and determine any and all applications by Professionals for compensation and reimbursement of expenses, authorized pursuant to this Plan or the Bankruptcy Code;

(c)    To hear and determine any and all applications (whether or not pending at or on the Confirmation Date) related to the rejection, assumption or assumption and assignment of executory contracts and unexpired leases to which any Debtor is a party, and to hear, determine and allow any Claims resulting therefrom;

(d)    To enforce and adjudicate the provisions of the Plan subject to the terms of this Plan;

(e)    To correct any defect, cure any omission, or reconcile any inconsistency in the Plan or in the Confirmation Order as may be necessary to carry out the purpose and the intent of the Plan;

(f)    To determine any Claim or liability to a governmental unit which may be asserted as a result of the transactions contemplated in this Plan;

(g)    To hear and determine matters concerning state, local, and federal taxes in accordance with Sections 346, 505 and 1146 of the Bankruptcy Code;

(h)    To determine such other matters as may be necessary if the Confirmation Order is for any reason modified, stayed, reversed, revoked or vacated;

(i)    To resolve any cases, controversies, suits or disputes that may arise in connection with the consummation, interpretation, enforcement or vacatur of the Plan or any Person's obligations incurred in connection with the Plan;

(j)    To issue injunctions, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Person with consummation or enforcement of the Plan, except as otherwise provided herein;

(k)     To determine any other matters that may arise in connection with this Plan, the Disclosure Statement, the Confirmation Order or any other contract, instrument, release, indenture or other agreement or document created in connection with the foregoing;

(l)     To resolve any cases, controversies, suits or disputes with respect to releases, injunctions and other provisions contained in Article IX hereof and enter such orders as may be necessary or appropriate to implement such releases, injunctions or other provisions;

(m)     To hear and determine any Claims, rights, demands and Causes of Action arising prior to the Effective Date preserved pursuant to Section 5.6 of this Plan; and

(n)     To enter an order and/or final decree concluding the Bankruptcy Cases.

## ARTICLE XII

## MISCELLANEOUS

### 12.1   Continuation of Injunctions or Stays Until Effective Date.

All injunctions or stays provided for in the Bankruptcy Cases under Sections 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Effective Date.

### 12.2   Exemption from Transfer Taxes.

In accordance with Section 1146(c) of the Bankruptcy Code: (a) the issuance, transfer or exchange of any security under the Plan or the making or delivery of any instrument of transfer pursuant to, in implementation of, or as contemplated by the Plan, including any merger agreements or agreements of consolidation, deeds, bills of sale or assignments executed in connection with any of the transactions contemplated under the Plan, or the re-vesting, transfer or sale of any real or personal property of the Debtors pursuant to, in implementation of, or as contemplated by the Plan, (b) the making, delivery, creation, assignment, amendment or recording of any note or other obligation for the payment of money or any mortgage, deed of trust or other security interest under, in furtherance of, or in connection with the Plan, and the issuance, renewal, modification or securing of indebtedness by such means, and (c) the making, delivery or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including, without limitation, with respect to the Residences and the Real Estate, shall not be subject to any document recording tax, stamp tax, conveyance fee or other similar tax, mortgage tax, real estate transfer tax, mortgage recording tax or other similar tax or governmental assessment. Each recorder of deeds or similar official for any county, city or governmental unit in which any instrument under this Plan is to be recorded shall, pursuant to the Confirmation Order, be ordered and directed to accept such instrument, without requiring the payment of any documentary stamp tax, deed stamps, transfer tax, intangible tax or similar tax. This section 12.2 of the Plan and the exemption provided in Section 1146 of the Bankruptcy Code shall apply to, among other things, all sales of Residences and/or Real Estate occurring after the Confirmation Date and until all Allowed Claims have been paid in full.

### 12.3    Amendment or Modification of the Plan.

Alterations, amendments or modifications of this Plan may be proposed in writing by the Debtors jointly at any time prior to the Confirmation Date, provided that this Plan, as altered, amended or modified, satisfies the conditions of Sections 1122 and 1123 of the Bankruptcy Code, and the Debtors shall have complied with Section 1125 of the Bankruptcy Code. This Plan may be altered, amended or modified at any time before or after the Confirmation Date and before substantial consummation, provided that the Plan, as altered, amended or modified, satisfies the requirements of Sections 1122 and 1123 of the Bankruptcy Code and the Bankruptcy Court, after notice and a hearing, confirms the Plan, as altered, amended or modified, under Section 1129 of the Bankruptcy Code. A holder of a Claim that has accepted this Plan shall be deemed to have accepted the Plan, as altered, amended or modified, if the proposed alteration, amendment or modification does not materially and adversely change the treatment of the Claim of such holder. The Debtors or the Reorganized Debtors may, without notice to holders of Claims insofar as it does not materially and adversely affect the interests of any such holders, correct any defect or omission in this Plan and any exhibit to this Plan or in any Plan Document.

### 12.4    Severability.

If, prior to the Confirmation Date, any term or provision of this Plan is determined by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court may, upon the request of the Debtors, alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of this Plan shall remain in full force and effect and shall in no way be affected, impaired or invalidated by such holding, alternation or interpretation. The Confirmation Order shall constitute a judicial determination that each term and provision of this Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable according to its terms.

### 12.5    Revocation or Withdrawal of the Plan.

The Debtors reserve the right to revoke or withdraw this Plan prior to the Confirmation Date. If the Debtors revoke or withdraw this Plan prior to the Confirmation Date, then this Plan shall be deemed null and void.

### 12.6    Binding Effect.

The rights, duties and obligations of any Person named or referred to in this Plan shall be binding upon, and shall inure to the benefit of, the successors and assigns of such Person.

### 12.7    Notices.

All notices, requests and demands to or upon the Debtors or the Reorganized Debtors shall only be effective if in writing and, unless otherwise expressly provided in this Plan, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and confirmed, addressed as follows:

> SW Boston Hotel Venture LLC
> c/o Sawyer Enterprises
> 200 Newbury Street
> Boston, MA 02116
> Attention: Carol S. Parks

With a copy to:

> MURPHY & KING, Professional Corporation
> One Beacon Street
> Boston, MA  02108
> Attn:  Harold B. Murphy, Esq.
> Tel:  617- 423-0400
> Fax: 617-423-0498

### 12.8    Governing Law.

Except to the extent the Bankruptcy Code, Bankruptcy Rules or other federal law is applicable, or to the extent this Plan provides otherwise, the rights and obligations arising under this Plan shall be governed by, and construed and enforced in accordance with, the laws of the Commonwealth of Massachusetts, without giving effect to the principles of conflicts of law of such jurisdiction.

### 12.9    Withholding and Reporting Requirements.

In connection with the consummation of this Plan, the Reorganized Debtors shall comply with all withholding and reporting requirements imposed by any federal, state, local or foreign taxing authority and all distributions hereunder shall be subject to any such withholding and reporting requirements.

### 12.10   Post-Confirmation Fees, Final Decree.

The Reorganized Debtors shall be responsible for the payment of any post-confirmation fees due pursuant to 28 U.S.C. §1930(a)(6) and the filing of post-confirmation reports until a final decree is entered.

### 12.11   Headings.

Headings are used in this Plan for convenience and reference only, and shall not constitute a part of this Plan for any other purpose.

**12.12  Inconsistency.**

In the event of any inconsistency between this Plan and the Disclosure Statement or any other instrument or document created or executed pursuant to this Plan, the terms of this Plan shall govern.

Dated: March 31, 2011

SW BOSTON HOTEL VENTURE LLC,
a Delaware limited liability company

By:    100 Stuart Street LLC,
      a Delaware limited liability company, its Manager

      By:    Frank Sawyer Corporation, its Manager

      By:    /s/ Carol S. Parks
            Carol S. Parks, President


100 STUART STREET LLC,
a Delaware limited liability company

By:    Frank Sawyer Corporation, Manager,
      a Massachusetts corporation


By:    /s/ Carol S. Parks
      Carol S. Parks, President

FRANK SAWYER CORPORATION,
a Massachusetts corporation


By:    /s/ Carol S. Parks
      Carol S. Parks, President


[signatures cont'd on next page]

GENERAL TRADING COMPANY, d/b/a Sawyer Enterprises,
a Massachusetts corporation


By: _/s/ Carol S. Parks_____
        Carol S. Parks, President


30-32 OLIVER STREET CORPORATION,
a Massachusetts corporation


By: _/s/ Carol S. Parks_____
        Carol S. Parks, President


GENERAL LAND CORPORATION,
a Massachusetts corporation


By: _/s/ Carol S. Parks_____
        Carol S. Parks, President


THE 131 ARLINGTON STREET TRUST


_/s/ Carol S. Parks_____

Carol S. Parks, Trustee


_/s/ Hana D. Parks_____

Hana D. Parks, Trustee


[signatures cont'd on next page]

AUTO SALES & SERVICE, INC.,
a Massachusetts corporation

By:  ___/s/_____
        ____Carol S. ~~Parks~~_____
        ~~Carol S.~~ Parks, President

~~/s/ Harold B. Murphy~~_____
MURPHY & KING, P.C.
One Beacon Street
Boston, MA  02108
Attn:   Harold B. Murphy, Esq. (BBO #362610)
        D. Ethan Jeffery, Esq. (BBO #559609)
        John C. Elstad, Esq. (BBO #654469)
Telephone: (617) 423-0400
Facsimile:  (617) 556-8985

~~592165~~593963