THIS IS NOT A SOLICITATION OF ACCEPTANCES OF THE PLAN.  ACCEPTANCE MAY NOT BE SOLICITED UNTIL THE DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT UNDER SECTION 1125 OF THE BANKRUPTCY CODE.  THIS FORM OF DISCLOSURE STATEMENT HAS BEEN SUBMITTED TO THE BANKRUPTCY COURT, BUT HAS NOT BEEN APPROVED.

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MASSACHUSETTS**
**(Eastern Division)**

| | |
|---|---|
| In re: | Chapter 11 |
| SW BOSTON HOTEL VENTURE, LLC, *et al.*, | Case No. 10-14535-JNF |
| Debtors. | (Jointly Administered) |

**[PROPOSED]**
**AMENDED DISCLOSURE STATEMENT WITH RESPECT TO**
**FIRST AMENDED JOINT PLAN OF REORGANIZATION OF**
**SW BOSTON HOTEL VENTURE LLC, AUTO SALES & SERVICE, INC., GENERAL TRADING COMPANY, FRANK SAWYER CORPORATION, 100 STUART STREET, LLC, 30-32 OLIVER STREET CORPORATION, GENERAL LAND CORPORATION AND 131 ARLINGTON STREET TRUST**

MURPHY& KING, PC
One Beacon Street
Boston, MA 02108
Harold B. Murphy, Esq.
D. Ethan Jeffery, Esq.
John C. Elstad, Esq.
Tel:    (617) 423-0400
Fax:    (617) 556-8985

Dated: ~~March 31~~May 5, 2011

# I.   INTRODUCTION

Pursuant to Section 1125 of the United States Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code"), SW Boston Hotel Venture LLC, Auto Sales & Service, Inc., General Trading Company, Frank Sawyer Corporation, 100 Stuart Street, LLC, 30-32 Oliver Street Corporation, General Land Corporation And 131 Arlington Street Trust (collectively the "Debtors") provide this disclosure statement (the "Disclosure Statement") to all of the Debtors' known creditors and parties in interest. The purpose of this Disclosure Statement is to provide the information deemed necessary for creditors to make an informed decision in exercising their rights to vote on the *Joint Plan of Reorganization of SW Boston Hotel Venture LLC, Auto Sales & Service, Inc., General Trading Company, Frank Sawyer Corporation, 100 Stuart Street, LLC, 30-32 Oliver Street Corporation, General Land Corporation And 131 Arlington Street Trust* (the "Plan") dated as of the date of this Disclosure Statement, a copy of which is attached as Exhibit A. The Debtors have filed the Plan simultaneously with the filing of this Disclosure Statement. A summary of the Plan, the estimated claims against the Debtors and the estimated dividend is set forth below.

The Debtors recommend that you vote to accept the Plan. Each creditor should, however, review the Plan and this Disclosure Statement carefully in order to determine whether or not to accept or reject the Plan based upon that creditor's independent judgment and evaluation. The description of the Plan in this Disclosure Statement is in summary form and is qualified by reference to the actual terms and conditions of the Plan, which should be reviewed carefully before making a decision to accept or reject the Plan.

Capitalized terms not otherwise defined in this Disclosure Statement have the meanings ascribed to them in the Plan.

The information contained in this Disclosure Statement has been provided by the Debtors based upon the knowledge of their records, business and affairs. Except as otherwise expressly indicated, such information has not been subject to audit or independent review. Although great effort has been made to be accurate, neither the Debtors nor their respective professional advisors warrant the accuracy of the information contained in this Disclosure Statement.

No representations concerning the Debtors, including the value of their assets or the aggregate dollar amount of claims which may be allowed, are authorized other than as set forth in this Disclosure Statement. Any representations, warranties or agreements made to secure acceptance or rejection of the Plan that differ from those contained in this Disclosure Statement should not be relied upon in voting on the Plan.

Any descriptions of legal principles contained in this Disclosure Statement do not constitute a legal opinion and may not be relied upon by any creditor or party in interest. Each creditor or party in interest should consult with their own legal advisors with respect to any legal principles described in this Disclosure Statement.

This Disclosure Statement has been prepared by the Debtors to provide creditors with adequate information so that they can make an informed judgment about the Plan. Each creditor should read this Disclosure Statement and the Plan in their entirety before voting on the Plan. No solicitation of votes on the Plan may be made except pursuant to this Disclosure Statement, and no person has been authorized to utilize any information concerning the Debtors' businesses or assets other than the information contained in this Disclosure Statement.

The Debtors believe that the Plan provides the quickest recovery to creditors and will maximize the return to creditors on their Claims. **ACCORDINGLY, THE DEBTORS URGE ALL CREDITORS TO VOTE IN FAVOR OF THE PLAN.**

## II.    SUMMARY OF THE PLAN

The Plan provides for the payment in full to the holders of all Allowed, non-Insider Claims from the income generated by the Debtors' operations and the sale of certain of the Debtors' assets. On March 28, 2011, SW Boston filed a motion to sell the Hotel Condominium and the Parking Condominium to a subsidiary of Pebblebrook Hotel Trust ("Pebblebrook") for a purchase price of $89.5 million (the "Hotel Sale"). The net proceeds of the Hotel Sale will be paid to Prudential and will substantially reduce Prudential's Claim. The Residences will be retained by SW Boston and sold in the ordinary course of business with the proceeds paid to creditors in accordance with the Plan. The Debtors and their advisors have prepared projections, attached as Exhibit B, showing the income and expenses and the payment of creditors claims based on the Hotel Sale, the subsequent orderly sellout of the Residences and the use of the Debtors' Excess Cash.

If the Hotel Sale to Pebblebrook does not occur, the Plan will be funded by the sale of the Residences in the ordinary course of business, the income from the Hotel (as defined below) and the Debtors other operations, and the sale or refinancing of the Hotel prior to December 31, 2016, the restructured maturity date of the Allowed Prudential Claim. Attached as Exhibit C are projections that demonstrate the Debtors' ability to pay the holders of Allowed, non-insider Claims in full without the Hotel Sale. Under either scenario, the holders of Allowed, non-insider Claims against the Debtors will be entitled to receive payment in full of their Allowed Claims in accordance with the Plan.

A summary of the types of Claims and the recovery for each type of Claim follows.

| Type of claim | Estimated Amount of Claims at Petition Date | Plan Recovery | Voting Status |
|---|---|---|---|
| Administrative Claims | 0 | Paid in the ordinary course of business | N/A |
| Professional Fee Claims | $500,000 | Paid in full | N/A |
| Priority Tax Claims | 0 | Paid in full | N/A |
| Class 1 A – H  Priority Claims | 0 | Paid in full | Unimpaired |
| Class 2  A – H  Prudential Secured Claim | $180,803,185.93 | Paid in full | Impaired |
| Class 3  A – H  City of Boston Secured Claims | $10,704,247 | Paid in full | Impaired |
| Class 4  A – H  Other Secured Claims | Undetermined | Paid in full | Unimpaired |
| Class 5A Mechanics Lien Claims | $279,847 | Paid under Bovis Agreement | Impaired |
| Class 6A Bovis Unsecured Claim | $1,943,803 | Paid in full | Impaired |
| Class 7 A – H General Unsecured Claims | Non- Insider $1,200,000 | Paid in full | Impaired |
| Class 8  A – H  Convenience Claims | Determined upon election by creditors | Lesser of 100% of Allowed Claim or $5,000 | Impaired |
| Class 9 A & C Equity Interests | N/A | Equity Interests Cancelled | Impaired |
| Class 9 B & D – H  Equity Interests | N/A | Equity Interests Retained | Unimpaired |

The description of the Claims and estimation of the recoveries set forth above does not constitute an admission that the claims are Allowed Claims.  The Plan recovery is a projection and the Debtors reserve all of their rights, claims and defenses with respect to any and all Claims.

### III.    INFORMATION ABOUT THE REORGANIZATION PROCESS

#### 3.1    Purpose Of Disclosure Statement

This Disclosure Statement includes background information about the Debtors and also identifies the classes into which creditors have been placed by the Plan.  The Disclosure Statement describes the proposed treatment of each of those classes if the Plan is confirmed.  In addition, this Disclosure Statement contains information concerning the prospects for creditors in the event of confirmation or, in the alternative, the prospects if confirmation is denied or the proposed Plan does not become effective.

Upon approval by the Bankruptcy Court and in accordance with the provisions of the Bankruptcy Code, this Disclosure Statement and any exhibits will have been found to contain adequate information of a kind and in sufficient detail that would enable reasonable, hypothetical investor typical of a holder of impaired claims or interests to make an informed judgment about the Plan.  Approval of this Disclosure Statement by the Bankruptcy Court, however, does not constitute a recommendation by the Bankruptcy Court either for or against the Plan.

#### 3.2    Voting Procedure

All creditors entitled to vote on the Plan may cast their votes for or against the Plan by completing, dating, signing and causing the Ballot Form accompanying this Disclosure Statement to be returned to the following address in the enclosed envelope:

Ethan Jeffery
Murphy & King, Professional Corporation
One Beacon Street
Boston, MA  02108

_____Ballots must be received **on or before 5:00 P.M. (Eastern Daylight Savings Time) on _____, 2011** to be counted in the voting.  Ballots received after this time will not be counted in the voting unless the Bankruptcy Court so orders.

The Debtors recommend a vote for "ACCEPTANCE" of the Plan.

#### 3.3    Ballots

Accompanying this Disclosure Statement is a ballot for acceptance or rejection of the Plan (a "Ballot"). Each party in interest entitled to vote on the Plan will receive a Ballot. All Classes except Class 1 (Priority Claims), Class _____ and Class _____ are impaired and may vote on the Plan. Each member of a voting Class will be asked to vote for acceptance or rejection of the Plan. A party who holds claims in more than one Class should complete a Ballot for each Class with respect to the applicable portion of its claim included in each Class.

### 3.4     The Confirmation Hearing

The Bankruptcy Court has scheduled a hearing on confirmation of the Plan to commence on _____, 2011 at ___:___ .m., or as soon thereafter as the parties can be heard. The Confirmation Hearing will be held before the Honorable Joan N. Feeney, United States Bankruptcy Judge, Courtroom 1, 12th Floor, 5 Post Office Square, Boston, Massachusetts, 02109.  At the hearing, the Bankruptcy Court will consider whether the Plan satisfies the various requirements of the Bankruptcy Code, including whether it is feasible and whether it is in the best interests of holders of claims and interests.  The Bankruptcy Court will also receive and consider a Report of Plan Voting prepared by the Debtors and summarizing the votes for acceptance or rejection of the Plan by the parties entitled to vote.

### 3.5     Acceptances Necessary to Confirm Plan

At the Confirmation Hearing, the Bankruptcy Court must determine, among other things, whether each impaired Class has accepted the Plan.  Under Section 1126 of the Bankruptcy Code, an impaired Class is deemed to have accepted the Plan if at least 2/3 in amount and more than 1/2 in number of the Allowed Claims of Class members who have voted to accept or reject the Plan have voted for acceptance of the Plan.  Unless there is acceptance of the Plan by all members of an impaired Class, the Bankruptcy Court must also determine that Class members will receive under the Plan property of a value, as of the Effective Date, that is not less than the amount that such Class members would receive or retain if the Debtors were liquidated under Chapter 7 of the Bankruptcy Code on the Effective Date.

### 3.6     Confirmation of The Plan Without The Necessary Acceptances.

The Plan may be confirmed notwithstanding that one or more impaired Classes have not accepted the Plan if the Bankruptcy Court finds that the Plan does not discriminate unfairly against and is fair and equitable as to such Class or Classes.  This provision is set forth in Section 1129(b) of the Bankruptcy Code and requires that, among other things, the claimants must either receive the full value of their claims or, if they receive less, no Class with junior liquidation priority may receive anything unless the junior class provides "new value" or other consideration to the Debtors.  For example, if the holders of Allowed Priority Tax Claims are not paid in full, the holders of General Unsecured Claims are not permitted to receive anything on account of their claims.  This is known as the "absolute priority rule."

The Debtors may, at their option, choose to rely on Section 1129(b) to seek confirmation of the Plan if it is not accepted by all impaired Classes of Creditors.

## IV.    GENERAL INFORMATION

### 4.1    Description of the Debtors

The Bankruptcy Cases were filed to prevent foreclosure upon the Debtors' assets and to accomplish the financial restructuring of the Debtors' businesses. SW Boston owns the W Hotel and Residences. Each of the other Debtors provided credit support for the loans used to construct the W Hotel and Residences and each was forced to file bankruptcy along with SW Boston to restructure its obligations arising from that loan.

### A.    Background

The W Hotel and Residences opened on October 29, 2009, and comprises a 350,650 square foot, 26-story building located at 100 Stuart Street in the heart of Boston's Theatre District. The W Hotel and Residences contains the W Hotel Boston (the "Hotel"), a 235–room, four-star hotel, 122 residential condominiums, and a two-story underground parking garage with capacity for 142 vehicles (the "Garage"). The W Hotel and Residences was designed by the internationally-known architectural firm of William Rawn and Associates Architects, together with the architect of record TRO/Jung Brannen, Inc. The Hotel is branded as a "W"® Hotel – the only W Hotel in New England – and is a first-class hotel serving Boston's national and international visitors and tourists. The Hotel includes a retail store, a signature restaurant at a prominent location along Tremont Street, a second floor spa with a first floor entrance and related retail space on the Stuart Street side of the W Hotel and Residences (the "Spa"), and a theme bar with an entrance adjacent to the spa entrance on Stuart Street (the "Theme Bar"). Construction of the Theme Bar is scheduled to resume this spring with an estimated opening date of late summer. The Hotel restaurant, Market by Jean-Georges Vongreichten, is a 6,000 square foot, first-class, full-service restaurant located on the first floor of the Hotel along Tremont Street. Market is an important amenity for the city's visitors and theater-goers. In addition to Market, the Hotel has a lobby bar located on the first floor. The Residences consist of 122 luxury condominium 1, 2 and 3 bedroom units. Pricing for the Residences ranges from $600,000 to over $4,000,000.

### B.    The Debtors

SW Boston is a Delaware limited liability company formed by a local family, descendants of the late parking/transportation magnate Frank Sawyer, to develop and own the W Hotel and Residences. The membership interests in SW Boston are owned by 100 Stuart Street, a Delaware limited liability company formed to own the membership interests in SW Boston. Approximately Sixty-five percent (65%) of the membership interests in 100 Stuart Street are owned by Sawyer Corporation, a Massachusetts corporation, with the remaining membership interests in 100 Stuart Street owned by non-debtors William Sawyer Corporation (approximately eight percent) and Terminal Taxi Company (approximately twenty-seven percent). Sawyer Corporation manages 100 Stuart Street. The Frank Sawyer Revocable Trust (the "Trust") owns 100% of the stock in Sawyer Corporation.

General Trading is a Massachusetts corporation all of whose stock is owned by the Trust. General Trading provides administrative services for the Debtors as well as various non-debtor affiliates of the Debtors. Auto Sales is a Massachusetts corporation all of whose stock is owned by the Trust. General Land is a Massachusetts corporation which owns and operates three (3) parking lots in Boston, Massachusetts. The Trust owns all of the stock in General Land. 30-32 Oliver Street is a Massachusetts corporation which owns and operates a seven (7) unit residential building located at 25-27 Pinckney Street, Boston, Massachusetts (the "Oliver Street Real Property"). The Trust owns all of the stock in 30-32 Oliver Street. 131 Arlington Street is a Massachusetts business trust which owns a commercial building located at 131 Arlington Street, Boston, Massachusetts. The Trust is the sole beneficiary of 131 Arlington Street.

## C.    Management of The Hotel, Hotel Amenities And Parking Garage

The Hotel is managed and operated by affiliates of Starwood Worldwide Hotels and Resorts, Inc. (collectively "Starwood") pursuant to a management contract with SW Boston dated August 23, 2005, as amended (the "Hotel Contract"). Starwood is one of the nation's premier hotel operators. Starwood operates the Westin, St. Regis, and Le Meridian families of hotels, as well as hotel properties operating under the Sheraton and Sherwood banners and 28 first-class hotels carrying the "W"® brand. Boston has one of the largest concentrations of Starwood-affiliated hotels in the country. Under the Hotel Contract, the Hotel's revenue (the "Hotel Revenue") is maintained in operating accounts in the name of SW Boston from which the expenses of operating the Hotel, including Starwood's management fee, are paid by Starwood. The employees of the Hotel are employees of Starwood. Starwood disburses to SW Boston the Hotel revenue remaining after the payment of the operating expenses of the Hotel. The Spa, which operates under the "Bliss"® brand, is managed by an affiliate of Starwood pursuant to the Hotel Contract. The Theme Bar, when completed, will also be managed by an affiliate of Starwood pursuant to the Hotel Contract. The Restaurant and the lobby bar are operated by Culinary Concepts (Boston) LLC, an entity in which Starwood owns a substantial interest, under a restaurant management agreement with SW Boston.

The Garage is managed and operated by Ultimate Parking, LLC ("Ultimate") pursuant to a contract with SW Boston dated September 30, 2009, as amended (the "Garage Contract"). Under the Garage Contract, the Garage's revenue (the "Garage Revenue") is maintained in an operating account in the name of SW Boston from which the expenses of operating the Garage, including Ultimate's management fee, are paid by Ultimate. The employees of the Garage are employees of Ultimate. Ultimate disburses to SW Boston the Garage revenue remaining after the payment of the operating expenses of the Garage.

## D.    Events Precipitating The Bankruptcy Cases

As is set forth below, the Hotel (including the restaurant) and the Garage opened on October 29, 2009. Construction of a portion of the condominium units had been completed and closings on units on these floors commenced immediately thereafter. Construction of the remaining floors of the condominium units was completed in January 2010. Sales of the condominium units, however, were slower than initially projected at the time of the closing of the senior loan on the Project (January 2008) due largely to the nearly unprecedented global

economic crisis, the near-collapse of the national capital markets, and the accompanying softening of the residential real estate market. The decline in the real estate market occurred in the midst of SW Boston's pre-opening sales push and continued through the completion and opening of the Residences.

Prior to the Petition Date, SW Boston had extensive discussions with Prudential requesting the restructuring of its loan to reflect the dramatic downturn in the global economy, the near collapse of the national and international capital markets for commercial real estate and the dramatic downturn in the real estate market. Prudential declined to restructure its loan on terms acceptable to the Debtor. Because the Debtors' bank accounts and assets were exposed to foreclosure and seizure by Prudential, the Debtors were forced to file these bankruptcy proceedings in order to preserve the value of their assets and their opportunity to reorganize.

## 4.2    The Debtors' Assets[1]

SW Boston's primary assets consist of the W Hotel and Residences and cash in various accounts. In its decision dated January 28, 2011, denying the Prudential's motion for relief from the automatic stay (described in Section 5.5, below), the Court determined that the values of the Hotel and the Residences were $65,600,000 and $88,000,000, respectively. As of the Petition Date, SW Boston had cash in various accounts totaling approximately $3,151,000. Of this amount, approximately $1,660,000 was held in accounts used by Starwood to operate the Hotel. On the Petition Date, SW Boston had an interest in an escrow account, with a balance of approximately $3,375,000, consisting of the remaining proceeds of the City Loan (as defined below) for the completion of the Spa and the Theme Bar and related costs and expenses pursuant to the City Loan Documents. SW Boston also owns various inventory, furniture, fixtures and equipment associated with the operation of the Hotel. Prudential asserts first priority Liens against the W Hotel and Residences and various of SW Boston's bank accounts. The City asserts a second priority Lien against the W Hotel and Residences.

Sawyer Corporation's primary assets consist of securities and cash that totaled approximately $10,845,000 as of the Petition Date, and its membership interest in 100 Stuart Street. Of this amount, approximately $6,834,000 consisted of securities that are subject to Liens in favor of Prudential, and $4,000,000 is cash held in an account that is pledged to the City to secure the Allowed City Claim. Sawyer Corporation's membership interests in 100 Stuart Street are also pledged to Prudential to secure the Allowed Prudential Claim. 100 Stuart Street's sole asset is its membership interests in SW Boston, which are pledged to Prudential to secure the Allowed Prudential Claim. General Trading's primary asset is an account, pledged to Prudential to secure its Allowed Claim, containing securities with a value as of the Petition Date of approximately $1,385,000. Auto Sales' primary asset is an account, pledged to Prudential to secure its Allowed Claim, containing securities with a value as of the Petition Date of approximately $224,000. 30-32 Oliver Street's primary asset is real property located at 25 and 27 Pinckney Street, Boston, Massachusetts with a Debtor appraised value as of September 14,

---

[1] The Debtors have not included inter-Debtor claims in the description of their assets. The inter-Debtor claims are discussed in Section 4.3(F), below.

2010, of $2,180,000. 30-32 Oliver Street's real property is subject to mortgages in favor of Prudential and the City to secure their Allowed Claims. 131 Arlington Street's primary asset is real property located at 131 Arlington Street, Boston, Massachusetts with a Debtor appraised value as of September 14, 2010, of $1,850,000. 131 Arlington Street's real property is subject to mortgages in favor of Prudential and the City to secure their Allowed Claims. General Land owns and manages three (3) parking lots in Boston, Massachusetts, located at (a) 109 & 121-127 Arlington Street (the "Arlington Lot"), (b) India Wharf and Wells Street, and (c) 38 Isabella Street. The parking lot located at 109 & 121-127 Arlington Street had a Debtor appraised value, as of September 14, 2010, of approximately $2,400,000. General Land's parking lots located at India Wharf and Wells Street and 38 Isabella Street have assessed values, for real estate tax purposes of $554,000 and $1,179,000, respectively. General Land owns 100% of the shares of 200 Newbury Street Corporation ("Newbury"), a non-debtor affiliate of the Debtors and the owner of the retail and commercial building located at 200 Newbury Street, Boston, Massachusetts that is subject to a mortgage in favor of Guardian Life Insurance Company of America to secure a loan of approximately $16,000,000.

### 4.3    The Debtors' Liabilities[2]

Upon a motion by the Debtors, the Court entered an order [docket no. 290] establishing November 1, 2010 (the "Bar Date"), as the date by which all parties must file proofs of claim against the Debtors. The description of the Claims in this Disclosure Statement is based on the Debtors' respective Schedules and the proofs of claim filed by creditors by the Bar Date.

### A.    The Prudential Claim

The construction financing for the W Hotel and Residences was provided by Prudential pursuant to a *Construction Loan Agreement Between SW Boston Hotel Venture LLC and The Prudential Insurance Company of America* (the "Prudential Loan Agreement") dated January 15, 2008, as amended. As of the Petition Date, SW Boston owed Prudential approximately $180,800,000 (the "Prudential Loan"). To secure the Prudential Loan, SW Boston granted Prudential a mortgage on, assignment of leases and rents and security interest in the W Hotel and Residences and executed pledge agreements and account control agreements in favor of Prudential with respect to two (2) bank accounts in SW Boston's name at Sovereign Bank.

Sawyer Corporation, General Trading, Auto Sales, General Land, 30-32 Oliver Street and 131 Arlington Street provided full or partial guaranties of SW Boston's obligations under the Prudential Loan Agreement and provided collateral to secure such guaranties as described in Section 4.2, above.

SE Berkeley and SE McClellan, two non-debtor affiliates of the Debtors, provided additional credit support for the Prudential Loan by obtaining a letter of credit from Sovereign

---

[2] The Debtors' description of the claims set forth in this section of the Disclosure Statement does not constitute an admission that the claims are Allowed Claims. The Debtors reserve all of their rights, claims and defenses with respect to any and all claims.

Bank in favor of Prudential in the face amount of $17,300,000 (the "Letter of Credit").
Following the Petition Date, Prudential made a draw on the Letter of Credit and Sovereign Bank
paid Prudential $17,300,000 for application against the Prudential Loan.

Prudential has filed proofs of claim against the Debtors asserting to be owed, as of the
Petition Date, $180,803,186.86. Between the Petition Date and March 30, 2011, Prudential has
been paid $17,300,000 from the Letter of Credit Draw and approximately $15,476,000 from
sales of Residences.[3] Section 506 of the Bankruptcy Code provides that Prudential is not entitled
to post-petition interest, costs or attorneys fees on account of the Prudential Loan because
Prudential is undersecured as to each Debtor. The deadline for the Debtors and/or the
Committee to challenge any of Prudential's Liens is currently May 31, 2011.

### B.    City of Boston Secured Claim

On December 9, 2009, SW Boston and the City entered into a *Subordinate Loan
Agreement* (the "City Loan Agreement") whereby the City agreed to provide $10,500,000 (the
"City Loan") to finance the completion of the Restaurant, Spa and the Theme Bar. As collateral
for the City Loan, SW Boston granted the City a second mortgage on and assignment of leases
and rents with respect to the W Hotel and Residences. Sawyer Corporation, General Land, 30-32
Oliver Street and 131 Arlington Street have partially guaranteed SW Boston's obligations under
the City Loan Agreement and provided second liens on certain of their assets, as described in
Section 4.2, above, to secure such guaranties.

SE Berkeley provided additional credit support for the City Loan by granting the City a
second mortgage on real property located at 142 Berkeley Street, Boston, Massachusetts. SE
McClellan provided additional credit support for the City Loan by granting the City a second
mortgage on real property located at 415 McClellan Highway, Boston, Massachusetts.

Pursuant to the City Loan Agreement, the entire amount of the City Loan was funded into
an escrow account (the "Fidelity Account") in the name of SW Boston at Fidelity National Title
Insurance Company ("Fidelity"). Under the City Loan Agreement and various related
documents, requisitions for funds from the City Loan are made by SW Boston and then reviewed
by International Valuation & Inspection, Inc., the City's construction consultant. As of the
Petition Date, there was approximately $2,670,000 in the Fidelity Account.

As of the Petition Date, the outstanding balance of the City Loan was approximately
$10,704,247. Pursuant to the Loan Escrow Motion (as defined and described in Section 5.3(D)
below), since the Petition Date, the City has received payments from the Fidelity Account
totaling approximately $448,182.

### C.    Other Secured Claims

---

[3] Pursuant to various orders of the Bankruptcy Court, Prudential continues to receive the net proceeds from the sales
of Residences and will receive the net proceeds from the Hotel Sale. As a result, the Allowed Prudential Claim will
be reduced further prior to the Confirmation Hearing.

On or after the Petition Date, four parties (the "Mechanics Lien Claimants") filed notices of mechanics' liens against the W Hotel and Residences as follows: (a) Rosario Cabinets, asserting an amount due of approximately $32,000, (b) Kenvo Floor Co., Inc., asserting an amount due of approximately $41,536, (c) Frontline, Inc., asserting an amount due of approximately $13,311, and (d) E.M. Duggan, Inc., asserting an amount due of approximately $193,000. Each of the Mechanics Lien Claimants assert that they have provided goods or services, as subcontractors of Bovis, relating to the construction of the W Hotel and Residences. SW Boston does not concede the validity of any mechanics lien asserted or the amount claimed to be owed by the Mechanics Lien Claimants. In any event, any lien asserted by the Mechanics Lien Claimants is junior to the Liens held by Prudential and the City. Accordingly, the Plan provides for the discharge of any liens held by the Mechanics Lien Claimants.

As of the Petition Date, SW Boston owed approximately $229,800 in unpaid condominium fees (the "Pre-petition Condominium Fees") to the 100 Stuart Street Primary Condominium Association and the 110 Stuart Street Residential Condominium Association (collectively the "Condominium Associations"). As the Pre-petition Condominium Fees would have constituted a lien on the Residences, SW Boston requested and received authority from the Court to pay the Pre-petition Condominium Fees and subsequently paid the Pre-petition Condominium Fees in full.

Leasing Associates of Barrington, Inc. and Lodgenet Interactive Corporation, both counter-parties to executory contracts with SW Boston, have each filed UCC-1 financing statements against SW Boston with respect to certain equipment that is leased by each of them to SW Boston. SW Boston intends to assume the executory contracts with Leasing Associates of Barrington, Inc. and Lodgenet Interactive Corporation and, if the Hotel Sale occurs, assign those contracts to the purchaser of the Hotel.

### D.   Administrative Claims

Since the Petition Date, the Debtors have been paying their obligations in the ordinary course of business and, therefore, do not believe that there will be any substantial unpaid administrative claims on account of post-petition trade debt.

The Debtors' and the Committee's professionals, whose claims constitute Administrative Claims, have been authorized to be paid ninety percent (90%) of their fees and 100% of their expenses on a monthly basis in accordance with the Bankruptcy Court's order dated June 11, 2010 (the "Interim Compensation Order")[docket no. 140]. Pursuant to orders date November 10, 2010 and March 14, 2011, the Court approved interim fee applications filed by the Debtors' and the Committee's professionals and authorized the Debtors to pay the amount held back from those professionals under the Interim Compensation Order. The Debtors intend to continue to pay the fees and expenses of the Debtors' and the Committee's professionals in accordance with the Interim Compensation Order and any other orders of the Court.

### E.   Priority And Priority Tax Claims

Prior to the Petition Date, and consistent with its recent practice, the Debtors made advance payment to employees for wages and salaries. While the Debtors do not believe that they owe any base wages that may constitute priority claims under Section 507 of the Bankruptcy Code, there may be amounts, accrued in the ordinary course of business, owed on account of overtime pay, expense reimbursement, benefits and vacation and sick pay that may constitute priority claims.

Three creditors have filed proofs of claim against SW Boston asserting Priority Claims. Barbara Mihalko and Lara Rosenburgh have filed proofs of claim asserting Priority Claims of $1,000 and $500, respectively, for pre-petition commissions due on the sale of Residences. On May 4, 2010, the Court authorized the Debtors to pay pre-petition priority wage claims, and SW Boston has paid these claims. Robert Carmel, a counter-party to a purchase and sale agreement for a Residence, filed a proof of claim asserting a priority claim of $2,600 and a non-priority unsecured claim of $78,400. SW Boston intends to object to this claim and does not believe that it will be allowed as either a priority or a non-priority unsecured claim.

The Internal Revenue Service (the "IRS") filed a proof of claim in the amount of $2,000 against SW Boston only. The IRS subsequently amended its proof of claim to state that no amount is due from SW Boston. The Massachusetts Department of Revenue filed proofs of claim against 131 Arlington Street and General Land asserting priority claims of approximately $2,770 and $1,435, respectively.

## F.   General Unsecured Claims

As of the Petition Date, the General Unsecured Claims against SW Boston totaled approximately $40,575,570, exclusive of claims arising from the operation of the Hotel.[4] Of this amount, approximately $37,272,580 consists of Claims held by Insiders, including the Claims of SE Berkeley and SE McClellan that aggregate approximately $27,800,000. Inter-Debtor Claims against SW Boston total approximately $9,472,580. Of the non-Insider General Unsecured Claims against SW Boston, the Claims asserted by Bovis, which are resolved pursuant to the Bovis Agreement, total approximately $2,136,837 and the remaining non-Insider General Unsecured Claims total approximately $1,166,152.

As of the Petition Date, the General Unsecured Claims against Sawyer Corporation totaled approximately $40,276,330. Of this amount, approximately $40,013,236 consists of Claims held by Insiders. Inter-Debtor Claims against Sawyer Corporation total approximately $899,500. Non-Insider General Unsecured Claims against Sawyer Corporation totaled approximately $236,084 on the Petition Date.

As of the Petition Date, the General Unsecured Claims against General Trading totaled approximately $19,205,221. Of this amount, approximately $18,889,157 consists of Claims held by Insiders. Inter-Debtor Claims against General Trading total approximately $122,200. Non-

---

[4] In order to avoid any disruption in the operation of the Hotel, the Debtor requested and received the authority to pay the non-Insider, pre-petition unsecured claims relating to the operation of the Hotel and Parking Garage in the ordinary course of business, and these claims have been paid.

Insider General Unsecured Claims against General Trading totaled approximately $306,653 on the Petition Date.

As of the Petition Date, the General Unsecured Claims against General Land totaled approximately $28,469,046. Of this amount, approximately $28,968,453 consists of Claims held by Insiders. Inter-Debtor Claims against General Land total approximately $183,378. Non-Insider General Unsecured Claims against General Land totaled approximately $123 on the Petition Date.

As of the Petition Date, the General Unsecured Claims against 131 Arlington Street totaled approximately $27,832,251. Of this amount, approximately $27,831,749 consists of Claims held by Insiders. Inter-Debtor Claims against 131 Arlington Street total approximately $31,460. Non-Insider General Unsecured Claims against 131 Arlington Street totaled approximately $502 on the Petition Date.

No non-Insider General Unsecured Claims exist against Auto Sales, 30-32 Oliver Street and 100 Stuart Street. The non-Debtor Insider General Unsecured Claims against these entities total $27,859,000, $27,800,000 and $27,800,000, respectively. The inter-Debtor General Unsecured Claims against Auto Sales total $9,000. There are no inter-Debtor Claims against 30-32 Oliver Street and 100 Stuart Street.

## V.    SIGNIFICANT POST PETITION EVENTS

### 5.1    General Information

On April 28, 2010, SW Boston, General Trading, Frank Sawyer, Stuart Street and Auto Sales filed voluntary petitions for relief under Chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Massachusetts. On June 4, 2010, General Land, Oliver Street and Arlington Street filed voluntary petitions for relief under Chapter 11. By orders of the Court dated May 3, 2010 and June 10, 2010, the Bankruptcy Cases are being jointly administered. The Debtors continue to operate as debtors and debtors-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

### 5.2    Appointment of Creditors' Committee

On May 13, 2010, the Office of the United States Trustee appointed an Official Committee of Unsecured Creditors (the "Committee") in SW Boston's case consisting of the following creditors: (a) Bovis Lend Lease LMB, Inc.; (b) MS Signs Inc.; (c) Meichi Peng Design Studio; (d) GS Associates, Inc.; (e) TRO Jung Brannen; (f) NSTAR Electric and Gas Corp.; and (g) International Valuation & Inspection, Inc. The Committee retained Jager Smith P.C. as counsel.

### 5.3    Chapter 11 Activity

### A.    First Day Motions

Shortly after filing their Chapter 11 petitions, SW Boston, General Trading, Sawyer Corporation, 100 Stuart Street and Auto Sales filed various so-called "first day" motions, including the *Motion For Authorization of (1) The Interim And Permanent Use of Cash Collateral, (2) The Granting of Replacement Liens, (3) Entry of Scheduling Order Regarding Continued Use of Cash Collateral and (4) Additional Relief* (the "Cash Collateral Motion") [docket no. 9], the *Debtors' Motion For Authority to (A) Assume And Consummate Pending Purchase And Sale Agreements For Condominium Units; (B) Make And Consummate New Sales For Condominium Units; And (C) For Related Relief* (the "Unit Sale Motion") [docket no. 10], and the *Motion Filed by Debtor SW Boston Hotel Venture LLC to Pay Prepetition Wages, Salaries And Benefits, And Use Existing Payroll Accounts And Business Forms* (the "Wage Motion") [docket no. 12].

The Cash Collateral Motion requested authority to continue to use cash collateral (as defined in the Bankruptcy Code) to fund the Debtors' ongoing expenses, including the payment of real estate taxes and condominium fees on unsold Residences. The Cash Collateral Motion also requested the authority to pay the pre-petition claims arising from the Hotel's operations in the ordinary course of business. Prudential objected to the Cash Collateral Motion arguing, among other things, that Prudential's interest in the W Hotel and Residences was not adequately protected and that the Debtors should not be permitted to use the proceeds of the sales of Residences to pay real estate taxes and condominium fees on unsold Residences, but should instead deplete the Investment Accounts to pay those charges. The Court overruled Prudential's objection, finding, among other things, that the Debtors' use of cash collateral to pay real estate taxes and condominium fees on unsold Residences benefitted Prudential as those charges would otherwise constitute a lien senior to Prudential's lien.

The Unit Sale Motion requested the authority to consummate pre-petition purchase and sale agreements for Residences, and for the authority to sell Residences free and clear of liens, claims and interests in the ordinary course of business. SW Boston, Prudential and the City were able to reach agreement on a form of order granting the Unit Sale Motion, and the Court then granted the Unit Sale Motion.

The Wage Motion sought permission to pay pre-petition wages and benefits that would otherwise constitute priority unsecured claims pursuant to Section 507(a)(4) of the Bankruptcy Code. The Court granted the Wage Motion by order dated May 4, 2010 [docket no. 39].

### B.    Continued Use of Cash Collateral

Following the June 4, 2010, filing of the Chapter 11 petitions for General Land, 30-32 Oliver Street and 131 Arlington Street, these three debtors requested the use of cash collateral to fund operations in the ordinary course of business. The Debtors negotiated a form of cash collateral order with Prudential, the City and the Committee that permitted the continued use of cash collateral through August 31, 2010. On August 18, 2010, the Court held a hearing on the

continued use of cash collateral for all of the Debtors. Prior to the hearing, the Debtors were able to negotiate with Prudential, the City and the Committee, a form of order that permitted the consensual use of cash collateral through November 30, 2010.

On November 10, 2010, the Debtors filed their Third Statement Regarding Continued Use of Cash Collateral, requesting the use of cash collateral through June 30, 2011. On November 15, 2010, Prudential objected to the Debtors' continued use of cash collateral arguing, among other things, that the Debtors had failed to meet their financial projections, that the value of Prudential's collateral was eroding and that Prudential's interests were not adequately protected. The City and the Committee supported the Debtors' continued use of cash collateral. After a hearing on November 17, 2010, the Court overruled Prudential's objection and granted the use of cash collateral through June 30, 2011.

### C.    Completion of Punch List

Although construction of the Hotel and the Residences was largely complete on the Petition Date, there were still punch list items left to finish. SW Boston sought and obtained approval from the Court to use cash collateral to complete the punch list items. The punch list items were completed without any interruption of or adverse effect on the operation of the Hotel or the sale of Residences.

### D.    Completion of the Spa

As of the Petition Date, the Spa was only partially complete. The Spa, which would operate under the Bliss® trade name, was an important amenity for both the Hotel and the Residences. The balance of the City Loan had been funded into escrow at the time of the loan, and was earmarked for completion of the Spa and the Theme Bar. In light of the filing of the Debtors' bankruptcy cases, the balance of the City Loan could not be accessed without Court approval. After discussions with the City, on June 9, 2010, the Debtors filed the *Motion by Debtors For Order Authorizing Release of Funds in Accordance With Escrow Agreement* (the "Loan Escrow Motion") [docket no. 128] seeking authority to utilize the escrowed proceeds of the City Loan pursuant to the pre-petition loan agreements. The Court approved the Loan Escrow Motion on June 11, 2010, and SW Boston obtained access to the proceeds of the City Loan to fund the completion of the Spa. The Spa was completed and it opened on August 18, 2010.

### E.    The Lease Motion

On August 20, 2010, SW Boston filed the *Motion by SW Boston Hotel Venture, LLC For Authority to Lease Condominium Units in The Ordinary Course Of Business* (the "Lease Motion") [docket no. 241] requesting the authority to lease up to twenty-five (25) of the unsold Residences for terms of more than six (6) months but less than one (1) year. The proposed leasing program would generate income from SW Boston' Residences inventory, enhance activity at the project and create a pool of potential buyers who might be in a position to purchase at the end of their lease term. Prudential objected to the Lease Motion arguing, among other things, that SW Boston had not established a basis for approval of the leasing motion and was incapable of conducting a "forthright" leasing program. After an evidentiary hearing, the Court approved the Lease Motion, finding that the unrebutted evidence provided at the hearing established ample justification for SW Boston's leasing program and that the program was well within SW Boston's business judgment. Since the Petition Date, SW Boston has leased twelve (12) Residences, which generate rental income of approximately $62,060 per month.

### F.    Sale And Lease of Residences

Since the Petition Date, SW Boston has closed nineteen (19) sales of Residences resulting in payments to Prudential totaling $15,476,000. As of the date of this Disclosure Statement, SW Boston has pending purchase and sale agreements for the sale of an additional six (6) Residences.

### G.    The Hotel

Since its opening, the Hotel has performed above expectations. This trend continued in the first two months of 2011. Revenue per available room (RevPAR) from the Hotel was twenty-three percent (23%) above budget for February, 2011 and twenty percent (20%) above budget year to date for 2011. Revenue and gross operating profit were, respectively, $176,000 and $141,000 above budget for February and, respectively, $255,000 and $240,000 above budget year to date for 2011. With the traditionally strong spring and graduation season approaching, SW Boston anticipates that the Hotel will continue to perform above expectations.

### H.    The Theme Bar

The construction of the Theme Bar was interrupted twice by conditions beyond SW Boston's control. The first interruption was caused by a change in the State Building Code that created the need for changes in the Theme Bar plans. After SW Boston received a building code variance from the City, a second interruption was caused by a *sua sponte* appeal of that variance by the Commonwealth of Massachusetts Building Code Appeals Board (the "State Board"). SW Boston then obtained a variance for the Theme Bar plans from the State Board. Since Bovis was under contract to complete the Theme Bar, SW Boston had to resolve Bovis' Claims against SW Boston. Under the Bovis Agreement (described in Section 5.3(G), below), the contract for the Theme Bar will be assigned to a new contractor for completion. The completion of the Theme Bar will be funded from the City Loan and will provide another important amenity for both the Hotel and the Residences.

### I.    The Bovis Settlement

Bovis was the construction manager for the construction of the W Hotel and Residences. The W Hotel and Residences was substantially completed prior to the filing of these cases, with only the build-out of the Spa and Theme Bar, and punch-list work on the remaining spaces, yet to be performed. As a result of Bovis' role as construction manager, Bovis holds the largest non-priority unsecured claim against SW Boston. Bovis, in turn, has subcontractors with claims for work performed on the W Hotel and Residences.

Prior to the Petition Date, SW Boston and Bovis executed American Institute of Architects contracts with respect to the construction of the W Hotel and Residences, including the following (collectively referred to as the "Bovis Contracts"):

(a)    September 12, 2007, relating to the construction of the W Hotel and Residences building;

(b)    July 27, 2009, relating to the construction of the Restaurant;

(c)    September 29, 2009, relating to the construction of the Spa;

(d)    September 29, 2009, relating to the construction of the Theme Bar (the "Theme Bar Contract"); and

(e)    March 16, 2010, relating to repair of the heating, ventilation and air
conditioning system.

Pursuant to the Bovis Contracts, upon payment of the contract price, the warranties
issued by Bovis' subcontractors for various items were to be assigned to SW Boston, and SW
Boston will thereafter assign the warranties to The 100 Stuart Street Primary Condominium, the
primary condominium association for the W Hotel and Residences. As of the Petition Date,
subcontractors who had issued warranties were still owed money for goods and services
provided in the construction of the W Hotel and Residences. The Spa was completed after the
Petition Date.

On November 1, 2010, Bovis filed a proof of claim against SW Boston in the amount of
$2,478,447 for pre-petition goods and services provided in the construction of the W Hotel and
Residences (the "Bovis Pre-Petition Claim"). Bovis also asserted that it was owed
approximately $400,000 for post-petition services under the Bovis Contracts (with the Bovis Pre-
Petition Claim, the "Bovis Claim"). SW Boston disputed the amount of the Bovis Claim and
asserted that it has counterclaims and offsets against Bovis' asserted claims.

After lengthy negotiations, SW Boston and Bovis reached an agreement, subject to Court
approval, to the amount of Bovis' Allowed Claim, a mechanism for the assignment to the
remaining warranties to the W Hotel and Residences, and the assumption and assignment of the
Theme Bar contract, subject to amendment, to a new contractor who would complete the Theme
Bar. The Court approved the Bovis Agreement on March 30, 2011. Pursuant to the Bovis
Agreement, Bovis' Allowed Claim to be paid under the Plan is $1,943,803, which will be paid
either in three equal installments or, in the event that the Hotel Sale closes before the Effective
Date, two equal installments commencing on the Effective Date.

## J.    Prudential's Motion For Relief From Stay

On August 2, 2010, Prudential filed a motion for relief from the automatic stay (the
"Prudential MFR")[docket no. 197] as to only the W Hotel and Residences. In the Prudential
MFR, Prudential asserted that it was entitled to relief from the automatic stay because, among
other things, SW Boston did not have sufficient Residence sales, had not completed the Theme
Bar, could not close existing Residence sales or obtain new sales and did not have the ability to
successfully emerge from Chapter 11. SW Boston opposed the motion for relief asserting,
among other things, that Prudential's interest in the W Hotel and Residences was more than
adequately protected by the Prudential Collateral and by SW Boston's continued operation of the
Hotel and sales and leases of Residences. SW Boston pointed out that, among other things,
Prudential's interest in the W Hotel and Residences was being enhanced by the completion of the
Spa and Theme Bar using the proceeds of the City Loan and that the Debtors successful
reorganization was in prospect. The City and the Committee joined SW Boston in opposing the
Prudential MFR.

The Court conducted a three day evidentiary hearing on the Prudential MFR that
involved, among other things, multiple expert witnesses and extensive exhibits. On January 28,
2011, the Court denied the Prudential MFR. Among other things, the Court found that
Prudential's interest in the W Hotel and Residences was adequately protected because the value

of the W Hotel and Residences was not declining and because Prudential was receiving the proceeds of Residence sales. The Court found that the value of the Hotel was $65,600,000 and the value of the Residences was $88,000,000, and that Prudential was, therefore, undersecured as to SW Boston. The Court also held that SW Boston proved that a plan of reorganization was in prospect. Prudential filed a notice of appeal of the Court's order denying the Prudential MFR, and SW Boston has filed a motion to dismiss the appeal, which is currently pending.

### K.    Extension of The Exclusivity Periods

On August 3, 2010, the Debtors filed the *Motion by Debtors Pursuant to 11 U.S.C. §§ 1121(D) And 362(D)(3) to Extend The Deadlines to File a Plan Of Reorganization And Solicit Acceptances of Plan* (the "First Exclusivity Motion")[docket no. 203] requesting an extension of the exclusive deadlines for the Debtors to file and solicit a plan of reorganization (collectively the "Exclusivity Deadlines"). Prudential opposed the First Exclusivity Motion, asserting, among other things, that SW Boston had not met its Residence sales projections, that SW Boston's projections did not support a confirmable plan of reorganization and that the Bankruptcy Cases were simple. The Debtors were able to negotiate a consensual extension of the Exclusivity Deadlines to November 26, 2010 and January 25, 2011, respectively.

On November 10, 2010, the Debtors filed the *Second Motion by Debtors Pursuant to 11 U.S.C. §§ 1121(D) And 362(D)(3) to Extend The Deadlines to File a Plan Of Reorganization And Solicit Acceptances of Plan* (the "Second Exclusivity Motion")[docket no. 350] requesting a second extension of the Exclusivity Deadlines. In its objection to the Second Exclusivity Motion, Prudential raised essentially the same objections lodged to the First Exclusivity Motion, but added, among other things, the assertions that SW Boston was "manipulating" its budget and projections, and that "all" creditors would surely oppose the plan outline described in the Second Exclusivity Motion. At a hearing on November 17, 2010, less than a week after the Court concluded the evidentiary hearing on the Prudential MFR, the Court overruled Prudential's objection to the Second Exclusivity Motion and granted an extension of the Exclusivity Deadlines to March 31, 2011, and May 31, 2011, respectively. Prudential filed a notice of appeal of the Court's order granting the Second Exclusivity Motion. All appellate briefs have been filed in that appeal and the parties are awaiting a further order or decision from the appellate court.

### L.    The Hotel Sale

On March 28, 2011, SW Boston filed the *Debtor's Motion For Order (I) Authorizing The Sale of The Debtor's Commercial Unit, Parking Garage Unit And Related Assets Free And Clear of All Liens, Claims, Interests And Encumbrances, (II) Authorizing The Assumption And Assignment of Certain Executory Contracts And Unexpired Leases in Connection Therewith And (III) Granting Related Relief* (the "Hotel Sale Motion") [docket no. 495] requesting the sale of the Hotel to Pebblebrook for a price of $89,500,000. SW Boston also filed an accompanying motion to establish bid procedures, approve an expense reimbursement and a break-up fee to Pebblebrook of $500,000 and $2,800,000, respectively, and to establish various other sale procedures. SW Boston and Pebblebrook signed, subject to Court approval, a purchase and sale agreement (the "P&S") containing the proposed terms and conditions of the Hotel Sale. A copy

of the P&S is attached to the Hotel Sale Motion.  The P&S requires that the Hotel be sold free and clear of liens, claims and interests pursuant to Section 363(f) of the Bankruptcy Code, with all valid liens attaching to the proceeds of the sale to the same extent, priority and validity of such liens as existed on the Petition Date.  The Hotel Sale, if approved by the Court, will substantially reduce the Allowed Prudential Claim.  The Court has established May 12, 2011, as the deadline for both the filing of objections to the Hotel Sale and the submission of counter-offers for the purchase of the Hotel.  A hearing on the Hotel Sale has been scheduled for May 18, 2011, at 1:00 p.m.  In the event the sale of the Hotel is approved by the Court, SW Boston intends to pay the net proceeds of the sale of the Hotel to Prudential.  SW Boston does not believe that it will incur any adverse tax consequences as a result of the sale of the Hotel.

        In connection with the Hotel Sale, SW Boston is obligated to deliver to the Purchaser, and the Purchaser's obligations to close are conditioned upon receipt of, assignment of various executory contracts including, but not limited to, the Hotel Management Agreement executed by SW Boston and Starwood as amended to set forth the terms relating to operation and management of the spa, the Technical Services Agreement executed by SW Boston and Starwood, and the Restaurant Management Agreement executed by SW Boston and Culinary Concepts (Boston) LLC.  Culinary Concepts (Boston) LLC has already objected to the assumption and assignment of the Restaurant Management Agreement to the Purchaser and SW Boston is informed that Starwood also intends to file an objection to the assumption and assignment of the Hotel Management Agreement and the Technical Services Agreement to the Purchaser.  SW Boston intends to commence substantive discussions with Starwood and Culinary Concepts to resolve their objections, barring which consensual resolution the objections will be ruled upon by the Court.

## VI.    DESCRIPTION OF THE PLAN

        The following is a summary of the significant provisions of the Plan and is qualified in its entirety by the provisions of the Plan, a copy of which accompanies this Disclosure Statement.  In the event and to the extent that the description of the Plan contained in this Disclosure Statement is inconsistent with any provisions of the Plan, the provisions of the Plan shall control and take precedence.  All creditors are urged to carefully read the Plan.

### 6.1    Unclassified Claims.

        As provided in Section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims and Priority Tax Claims are not classified for the purposes of voting on, or receiving distributions under, the Plan.  All such Claims are instead treated separately in accordance with the terms set forth in Article II of the Plan.

### A.    Administrative Expense Claims.

(1)    General.  Except for Professional Fee Claims and except as otherwise agreed to by the Debtors and the holder of an Allowed Administrative Expense Claim, each such holder shall be paid in full in Cash on the earlier of: (i) the date such Allowed Administrative Expense Claim becomes due in accordance with its terms; and (ii) the Effective Date.  If the Debtors dispute any portion of an Administrative Expense Claim, the Debtors shall pay the Allowed amount of such Administrative Expense Claim within five (5) days after the entry of a Non-Appealable Order with respect to the allowance of such disputed Administrative Expense Claim.

(2)    U.S. Trustee's Fees.  The outstanding fees due to the United States Trustee pursuant to 11 U.S.C. § 1930 shall be paid in full on or before the Effective Date.

(3)    Professional Compensation and Expense Reimbursement Claims.

    (i)    Within thirty (30) days after the Effective Date, each Professional shall file a final application for the allowance of compensation for services rendered or reimbursement of expenses incurred through and including the Effective Date.  Any such application granted by the Bankruptcy Court shall be paid: (1) within fifteen days of the entry of the order of the Bankruptcy Court approving such application, unless a stay of the order approving the application is obtained; or (2) upon such other terms as may be mutually agreed upon between the Professional and the Debtors or Reorganized Debtors.

    (ii)    All fees and expenses of Professionals for services rendered after the Effective Date shall be paid by the Reorganized Debtors upon receipt of reasonably detailed invoices in such amounts and on such terms as such Professional and the Reorganized Debtors may agree.  No further order or authorization from the Bankruptcy Court shall be necessary to permit the Reorganized Debtors to pay the fees and expenses of Professionals for services rendered after the Effective Date.

**B.    Priority Tax Claims.**

At the sole election of the Debtors, each holder of an Allowed Priority Tax Claim against each such Debtor, if any, shall be paid either: (a) upon such terms as may be agreed to between the Debtors and the holder of an Allowed Priority Tax Claim; (b) in full in Cash on the later of the Effective Date or the date that such Allowed Priority Tax Claim would have been due if the Bankruptcy Cases had not been commenced; or (c) in installment payments of Cash commencing on the Effective Date and (i) of a total value as of the Effective Date equal to the Allowed amount of such Claim, (ii) over a period ending not later than five (5) years from the Petition Date, and (iii) in a manner not less favorable than the most favored General Unsecured Claim under the Plan (other than the manner provided to the holders of Convenience Class Claims).

**6.2    Classification.**

The Claims against and Equity Interests in the Debtors are categorized as set forth on page 4, above, for all purposes under the Plan including voting, confirmation and distribution pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code. A Claim or Equity Interest is classified in a particular Class only to the extent that the Claim or Equity Interest qualifies within the description of that Class, and is classified in other Classes to the extent that any portion of the Claim or Equity Interest falls within the description of such other Classes. A Claim is placed in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim is an Allowed Claim in that Class and such Claim has not been paid, released or otherwise settled prior to the Effective Date. The claims and Equity Interests with respect to each Debtor are separately classified in their own distinct sub-classes, sub-class A for SW Boston, sub-class B for 30-32 Oliver Street, sub-class C for C 100 Stuart Street, sub-class D for 131 Arlington Street, sub-class E for Auto Sales, sub-class F for Sawyer Corporation, sub-class G for General Land, and sub-class H for General Trading. Nothing in the Plan is intended to effectuate a substantive consolidation of the Debtors or their Estates.

———

**6.3**    **Class 1 – Priority Claims.**

**A.**    **Classification.**  Class 1 consists of all Priority Claims.

**B.**    **Impairment and Voting.**  Class 1 is unimpaired under the Plan.  The holder of a Class 1 Claim shall not be entitled to vote to accept or reject the Plan.

**C.**    **Distributions.**  In full and complete satisfaction, settlement, release and discharge of any Priority Claims, each holder of an Allowed Priority Claim shall receive payment in full in Cash on the later to occur of the Effective Date or the date such claim becomes an Allowed Claim.

**6.4**    **Class 2 – Prudential Secured Claim.**

**A.**    **Classification.**  Class 2 consists of the Allowed Prudential Claim.  No part of the Allowed Prudential Claim is classified in any other Class.

**B.**    **Impairment and Voting.**  The Allowed Prudential Claim is impaired under the Plan.  The holder of the Allowed Prudential Claim shall be entitled to vote to accept or reject the Plan.

**C.**    **Allowance.**  The Claims asserted by Prudential shall be an Allowed Secured Claims in the amount of the Allowed Prudential Claim.

**D.**    **Claim Treatment.**  In full and complete satisfaction, settlement, discharge and release of the Allowed Prudential Claim, the holder of the Allowed Prudential Claim shall receive the following treatment:

(1)    Interest.  Commencing on the Effective Date, interest shall accrue on the Allowed Prudential Claim at a rate: (a) (i) of four and one quarter percent (4.25%) per annum in the event of a sale of the Hotel Condominium, or (ii) five and one quarter percent (5.25%) per annum, otherwise, (b) as determined by the Bankruptcy Court, or (c) agreed to by the Debtors and Prudential.

(2)    Payments.  The holder of the Allowed Prudential Claim shall receive the following payments until the Allowed Prudential Claim is paid in full:

    (a)    The Residence Net Sales Proceeds, payable within one (1) Business Day of a Qualified Sale.

    (b)    The Real Estate Net Sales Proceeds, payable within one (1) Business Day of the closing of a Qualified Sale.

    (c)    The Debtors' Excess Cash, measured at the end of the first full month following the Effective Date, payable on or before the twenty-fifth (25th)

day of the second full month following the Effective Date, and continuing monthly thereafter.

(3)     <u>Application of Payments</u>.  All payments made on account of the Allowed Prudential Claim shall be applied first to accrued interest on the Allowed Prudential Claim, and second to the principal balance of such Claim.

**E.     Maturity and Pre-Payment Privilege.**  The Allowed Prudential Claim shall mature and be paid in full by December 31, 2016, unless the Hotel Condominium and the Parking Condominium are sold, in which case the Allowed Prudential Claim shall mature and be paid in full by March 31, 2014 .  The Allowed Prudential Claim may be prepaid at any time without prepayment penalty.

**F.     Liens.**  The Liens held by the holder of the Allowed Prudential Claim shall be treated as follows:

(1)     <u>Retention of Liens</u>.  The Liens on the Prudential Collateral shall be retained by the holder of the Allowed Prudential Claim to secure the payment of the Allowed Prudential Claim pursuant to the Plan.

(2)     <u>Release of Liens</u>.  With respect to any Qualified Sale, the Liens on the Prudential Collateral shall be discharged and released as follows:

(a)     <u>Draft Proceeds Analysis/Draft HUD-1</u>.  At least two (2) Business Days prior to the scheduled closing of a Qualified Sale, the Reorganized Debtors shall provide the holder of the Allowed Prudential Claim with a draft Proceeds Analysis and, if applicable, a draft HUD-1 settlement statement.

(b)     <u>Delivery of Discharge</u>.  At least one (1) Business Day prior to the scheduled closing of a Qualified Sale, the holder of the Allowed Prudential Claim shall deliver a discharge and release of its Liens on the property to be sold to the Reorganized Debtors' closing attorney for the sale.

(c)     <u>Payment/Recording of Discharge</u>.  Within one (1) Business Day after the closing of a Qualified Sale, the Reorganized Debtors shall deliver to the holder of the Allowed Prudential Claim: (A) the Residence Net Sales Proceeds or Real Estate Net Sales Proceeds, as the case may be, (B) the final Proceeds Analysis, and (C) if applicable, the final HUD-1 settlement statement.  Upon the delivery of the Residence Net Sales Proceeds or the Real Estate Net Sales Proceeds, as applicable, to the holder of the Allowed Prudential Claim, the Reorganized Debtors' closing attorney shall cause the discharge and release of the Lien on the property sold to be recorded.

(d)     <u>Disputed Amounts</u>.  In the event of a dispute over the distribution of the proceeds of a Qualified Sale, the amount in controversy shall be held by the Reorganized Debtors' closing attorney in escrow until the dispute is

resolved by the Plan Arbitrator according to the Dispute Resolution
Procedures.

(3)    <u>Discharge of Liens</u>.  Upon payment in full of the Allowed Prudential Claim: (i) all
Liens securing the Allowed Prudential Claim shall be deemed canceled,
discharged and released, and (ii) the holder of the Allowed Prudential Claim shall
be required to deliver to the Reorganized Debtors, within one (1) Business Day of
the payment in full of the Allowed Prudential Claim, all UCC terminations,
mortgage discharges and any other documents necessary to effect the discharge
and release of the Liens on the Property that is the subject of the Qualified Sale.

**G.    Covenants.**  The Covenants shall apply to the Allowed Prudential Claim.

**H.    Reporting.**  The Reorganized Debtors shall provide the holder of the Allowed
Prudential Claim with the following reporting:

(1)    <u>Monthly Reports</u>.  On or before the last Business Day of the first full month
following the Effective Date, and continuing monthly thereafter until the Allowed
Prudential Claim is paid in full, the Reorganized Debtors shall provide the holder
of the Allowed Prudential Claim: (1) an accounting of the Debtors' Excess Cash
for the preceding month, (2) the Debtors' financial statements for the preceding
month; (3) copies of all leases executed since the prior monthly report, (4) copies
of all new purchase and sale agreements with respect to Residences or Real Estate
executed since the prior monthly report, (5) copies of account statements for bank
accounts and securities accounts that contain Cash Collateral, and (6) prior to any
sale of the Hotel Condominium, the Hotel Operating Reports for the previous
month.

(2)    <u>Quarterly Report</u>.  On or before the last Business Day of the month following the
end of the third full month following the Effective Date, and quarterly thereafter,
the Reorganized Debtors shall provide the holder of the Allowed Prudential Claim
with a comparison of the Reorganized Debtors' actual expenses for the reporting
period to the Budgeted Expenses for the reporting period in accordance with
Covenant A(1).

(3)    <u>Yearly Reports</u>.  On or before March 15 of each calendar year following the
Effective Date until the Allowed Prudential Claim is paid in full, the Reorganized
Debtors shall provide the holder of the Allowed Prudential Claim with unaudited
financial statements for the preceding calendar year.  The Reorganized Debtors
shall provide the holder of the Allowed Prudential Claim with copies of the
Reorganized Debtors' tax returns within ten (10) days of their filing.

(4)    <u>Confidentiality</u>.  Notwithstanding any Massachusetts freedom of information act
or similar statute, Prudential and its Representatives shall keep all reports
provided by the Reorganized Debtors strictly confidential and shall be permitted
to disclose such reports only to those of its Representatives specifically involved
in evaluating the Allowed Prudential Claim who require such reports.  If

Prudential or any of its Representatives become legally compelled to disclose any of the reports, Prudential shall consult with the Reorganized Debtors and provide the Reorganized Debtors with prompt written notice before any report is disclosed and shall disclose only that portion of the report that is legally required to be disclosed. The Reorganized Debtors may seek a protective order or other appropriate remedy to protect the confidentiality of the reports (including without limitation a narrowing of the scope of disclosure). If the Reorganized Debtors do not obtain a protective order or other appropriate remedy or if the Reorganized Debtors agree to permit disclosure of a report, Prudential shall exercise good faith in cooperating with any efforts of the Reorganized Debtors to obtain appropriate assurances in writing that confidential treatment will be accorded the report.

**I.**     **Events of Default.**

(1)     Default. Subject to Section 4.2(i)(ii) of the Plan, it shall be an event of default if a Debtor fails to comply with its obligations under the Plan including, with respect to the Allowed Prudential Claim, a breach of the Covenants.

(2)     Notice. No event of default shall occur unless, in the event of a breach of the Debtors' obligations to the holder of the Allowed Prudential Claim under the Plan, the holder of the Allowed Prudential Claim shall provide written notice of such breach to the Reorganized Debtors and such breach is not cured: (i) in the event of a breach that can be cured by the payment of a sum of money, within ten (10) days of the Reorganized Debtors' receipt of such notice; and (ii) for any other breach, within thirty (30) days of the Reorganized Debtors' receipt of such notice, provided that, if such non-monetary breach cannot reasonably be cured within such 30-day period and the Reorganized Debtors have commenced curing such breach and continue to cure such breach, the thirty (30) day period shall be extended for such time as is reasonably necessary to cure such breach.

**J.     Remedies.** Upon the occurrence of an event of default that is not subject to the Dispute Resolution Procedures, the holder of the Allowed Prudential Claim shall be entitled to enforce its rights under applicable law in a court of competent jurisdiction in the County of Suffolk, Commonwealth of Massachusetts.

**K.     Indubitable Equivalent.** The holder of the Allowed Prudential Claim shall receive such additional or other treatment as may be necessary, as agreed to between the Debtors and the holder of the Allowed Prudential Claim or as determined by the Bankruptcy Court, to permit the holder of the Prudential Allowed Claim to realize the indubitable equivalent of its Allowed Claim.

**L.     Loan Documents.** As of the Effective Date, the Prudential Loan Documents shall be deemed amended and restated, without further action, as necessary to reflect and incorporate the terms of the Plan. To the extent that the Prudential Loan Documents contain any terms, covenants, representations and warranties, and/or remedies that impose obligations upon the Debtors that are inconsistent with or more expansive than the terms of the Plan, such terms, covenants, representations and warranties, and/or remedies are deemed cancelled and any

obligations of the Debtors and/or Claims by the holder of the Allowed Prudential Claim arising from such terms, covenants, representations and warranties, and/or remedies shall be discharged upon the Effective Date. To the extent that there is any inconsistency between the Plan and any of the Prudential Loan Documents, the terms of the Plan shall control.

**6.5     Class 3 – City of Boston Secured Claim.**

**A.     Classification.** Class 3 consists of the Allowed City Claim. No part of the Allowed City Claim is classified in any other Class.

**B.     Impairment and Voting.** The Allowed City Claim is impaired under the Plan. The holder of the Allowed City Claim shall be entitled to vote to accept or reject the Plan.

**C.     Allowance.** The Claims asserted by the City shall be an Allowed Secured Claim in the amount of the Allowed City Claim.

**D.   Claim Treatment.** In full and complete satisfaction, settlement, discharge and release of the Allowed City Claim, the holder of the Allowed City Claim shall receive the following treatment:

(1)   Interest. Commencing on the Effective Date, interest shall accrue on the Allowed City Claim at a rate: (a) of eight percent (8%) per annum, with three percent (3%) deferred in accordance with the City Loan Documents, (b) determined by the Bankruptcy Court, or (c) agreed to by the Debtors and the City.

(2)   Payments. The holder of the Allowed City Claim shall receive the following payments until the Allowed City Claim is paid in full:

(a)   Commencing on or before the last Business Day of the first full month following the Effective Date and until the Allowed City Claim is paid in full, monthly installments of interest only, based on an interest rate of eight percent (8%) per annum, with three percent (3%) deferred in accordance with the City Loan Documents, which payments shall be made first from the City Account and then from the Reorganized Debtors' Cash Collateral.

(b)   After the payment in full of the Allowed Prudential Claim, monthly payments of principal and interest in accordance with the City Loan Documents.

(c)   On or before the maturity date set forth in Section 4.3(e), a payment of all unpaid principal and interest.

(3)   Application of Payments. All payments made on account of the Allowed City Claim shall be applied first to accrued interest on the Allowed City Claim, and second to the principal balance of such Claim.

**E.   Maturity and Pre-Payment Privilege.** The Allowed City Claim shall mature and be paid in full by December 9, 2019. Subject to the terms of the City Loan Documents, the Allowed City Claim may be prepaid at any time.

**F.   Liens.** The Liens held by the holder of the Allowed City Claim shall be treated as follows.

(1)   Retention of Liens. The Liens on the City Collateral shall be retained by the holder of the Allowed City Claim to secure the payment of the Allowed City Claim pursuant to the Plan.

(2)   Release of Liens. With respect to any Qualified Sale, the Liens on the City Collateral shall be discharged and released as follows:

(a)   Draft Proceeds Analysis/Draft HUD-1. At least two (2) Business Days prior to the scheduled closing of a Qualified Sale, the Reorganized

Debtors shall provide the holder of the Allowed City Claim with a draft Proceeds Analysis and, if applicable, a draft HUD-1 settlement statement.

(b)    <u>Delivery of Discharge</u>.  At least one (1) Business Day prior to the scheduled closing of a Qualified Sale, the holder of the Allowed City Claim shall deliver a discharge and release of its Liens on the property to be sold to the Reorganized Debtors' closing attorney for the sale.

(c)    <u>Payment/Recording of Discharge</u>.  Within one (1) Business Day after the closing of a Qualified Sale, the Reorganized Debtors shall deliver to the holder of the Allowed City Claim: (A) the final Proceeds Analysis, and (B) if applicable, the final HUD-1 settlement statement.  Upon the delivery of the final Proceeds Analysis and the final HUD-1 settlement statement, the Reorganized Debtors' closing attorney shall cause the discharge and release of the Lien on the property sold to be recorded.

(d)    <u>Disputed Amounts</u>.  In the event of a dispute over the distribution of the proceeds of a Qualified Sale, the amount in controversy shall be held by the Reorganized Debtors' closing attorney in escrow until the dispute is resolved by the Plan Arbitrator according to the Dispute Resolution Procedures.

(3)    <u>Discharge of Liens</u>.  Upon payment in full of the Allowed City Claim: (1) all Liens securing the Allowed City Claim shall be deemed canceled, discharged and released, and (2) the holder of the Allowed City Claim shall be required to deliver to the Reorganized Debtors, within one (1) Business Day of the payment in full of the Allowed City Claim, all UCC terminations, mortgage discharges and any other documents necessary to effect the discharge and release of the Liens on the Property that is the subject of the Qualified Sale.

G.     **Covenants.**  The Covenants shall apply to the Allowed City Claim.

H.     **Reporting.**  The Reorganized Debtors shall provide the holder of the Allowed City Claim with the following reporting:

(1)     Monthly Reports.  On or before the last Business Day of the first full month following the Effective Date, and continuing monthly thereafter until the Allowed City Claim is paid in full, the Reorganized Debtors shall provide the holder of the Allowed City Claim: (1) an accounting of the Debtors' Excess Cash for the preceding month, (2) the Debtors' financial statements for the preceding month; (3) copies of all leases executed since the prior monthly report, (4) copies of all new purchase and sale agreements with respect to Residences or Real Estate executed since the prior monthly report, (5) copies of account statements for bank accounts and securities accounts that contain Cash Collateral, and (6) prior to any sale of the Hotel Condominium, the Hotel Operating Reports for the previous month.

(2)     Quarterly Report.  On or before the last Business Day of the month following the end of the third full month following the Effective Date, and quarterly thereafter, the Reorganized Debtors shall provide the holder of the Allowed City Claim with a comparison of the Reorganized Debtors' actual expenses for the reporting period to the Budgeted Expenses for the reporting period in accordance with Covenant A(1).

(3)     Yearly Reports.  On or before March 15 of each calendar year following the Effective Date until the Allowed City Claim is paid in full, the Reorganized Debtors shall provide the holder of the Allowed City Claim with unaudited financial statements for the preceding calendar year.  The Reorganized Debtors shall provide the holder of the Allowed City Claim with copies of the Reorganized Debtors' tax returns within ten (10) days of their filing.

(4)     Confidentiality.  Notwithstanding any Massachusetts freedom of information act or similar statute, the City and its Representatives shall keep all reports provided by the Reorganized Debtors strictly confidential and shall be permitted to disclose such reports only to those of its Representatives specifically involved in evaluating the Allowed City Claim who require such reports.  If the City or any of its Representatives become legally compelled to disclose any of the reports, the City shall consult with the Reorganized Debtors and provide the Reorganized Debtors with prompt written notice before any report is disclosed and shall disclose only that portion of the report that is legally required to be disclosed.  The Reorganized Debtors may seek a protective order or other appropriate remedy to protect the confidentiality of the reports (including without limitation a narrowing of the scope of disclosure).  If the Reorganized Debtors do not obtain a protective order or other appropriate remedy or if the Reorganized Debtors agree to permit disclosure of a report, the City shall exercise good faith in cooperating with any efforts of the Reorganized Debtors to obtain appropriate assurances in writing that confidential treatment will be accorded the report.

I.    **Events of Default.**

(1)    <u>Default</u>. Subject to Section 4.3(i)(ii) of the Plan, it shall be an event of default if a Debtor fails to comply with its obligations under the Plan including, with respect to the Allowed City Claim, a breach of the Covenants.

(2)    <u>Notice</u>. No event of default shall occur unless, in the event of a breach of the Debtors' obligations to the holder of the Allowed City Claim under the Plan, the holder of the Allowed City Claim shall provide written notice of such breach to the Reorganized Debtors and such breach is not cured: (i) in the event of a breach that can be cured by the payment of a sum of money, within ten (10) days of the Reorganized Debtors' receipt of such notice; and (ii) for any other breach, within thirty (30) days of the Reorganized Debtors' receipt of such notice, provided that, if such non-monetary breach cannot reasonably be cured within such 30-day period and the Reorganized Debtors have commenced curing such breach and continue to cure such breach, the thirty (30) day period shall be extended for such time as is reasonably necessary to cure such breach.

J.    **Remedies.** Upon the occurrence of an event of default that is not subject to the Dispute Resolution Procedures, the holder of the Allowed City Claim shall be entitled to enforce its rights under applicable law in a court of competent jurisdiction in the County of Suffolk, Commonwealth of Massachusetts.

K.    **Indubitable Equivalent.** The holder of the Allowed City Claim shall receive such additional or other treatment as may be necessary, as agreed to between the Debtors and the holder of the Allowed City Claim or as determined by the Bankruptcy Court or, to permit the holder of the Allowed City Claim to realize the indubitable equivalent of its Allowed Claim.

L.    **Subordination.** The holder of the Allowed City Claim shall subordinate its Liens to any financing that pays in full or in part an Allowed Claim secured by a Senior Lien. The holder of the Allowed City Claim shall, within three Business Days of a request from the Reorganized Debtors, execute and deliver to the Reorganized Debtors such documents to evidence the subordination of its Lien as may be reasonably required by the party providing the financing.

M.    **Loan Documents.** As of the Effective Date, the City Loan Documents shall be deemed amended and restated, without further action, as necessary to reflect and incorporate the terms of the Plan. To the extent that the City Loan Documents contain any terms, covenants, representations and warranties, and/or remedies that impose obligations upon the Debtors that are inconsistent with or more expansive than the terms of the Plan, such terms, covenants, representations and warranties, and/or remedies are deemed cancelled and any obligations of the Debtors and/or Claims by the holder of the Allowed City Claim arising from such terms, covenants, representations and warranties, and/or remedies shall be discharged upon the Effective Date. To the extent that there is any inconsistency between the Plan and any of the City Loan Documents, the terms of the Plan shall control.

**6.6**     **Class 4 – Miscellaneous Secured Claims.**

**A.**     **Classification.** Class 4 consists of the Allowed Miscellaneous Secured Claims.

**B.**     **Impairment and Voting.** The Miscellaneous Secured Claims are impaired under the Plan. Each holder of a Miscellaneous Secured Claim shall be entitled to vote to accept or reject the Plan.

**C.**     **Allowance.** The Class 4 Claims shall be Allowed or disallowed through the claims objection process described in Article VI of the Plan.

**D.**     **Claim Treatment.** In full and complete satisfaction, settlement, discharge and release of the Miscellaneous Secured Claims, the holders of the Allowed Miscellaneous Secured Claims shall receive, at the sole option of the Debtors and on the later to occur of the Effective Date or the date such Secured Claim becomes an Allowed Claim, one of the following:

(1)     Monthly installments of interest only, based on interest at a rate of four and one quarter percent (4.25 %) per annum, with all unpaid principal and interest due at the end of the 60th month following the Effective Date, provided that, the outstanding amount due may be pre-paid at any time without penalty.

(2)     The return of the Collateral securing such Secured Claim.

(3)     The reinstatement of the debt constituting such Secured Claim in accordance with Section 1124(2) of the Bankruptcy Code.

(4)     Such treatment as is agreed upon in writing between the Debtors and the holder of such Secured Claim.

(5)     Such treatment as determined by the Court.

**E.**     **Liens.** The Liens held by the holder of an Allowed Miscellaneous Secured Claim shall be treated as follows:

(1)     Retention of Liens. Any Liens held by the holder of an Allowed Miscellaneous Secured Claim shall be retained by the holder of an Allowed Miscellaneous Secured Claim to secure the payment of the Allowed Miscellaneous Secured Claim pursuant to the Plan.

(2)     Release of Liens. With respect to any Qualified Sale that includes Collateral Securing a Miscellaneous Secured Claim, the Liens on the Collateral securing the Miscellaneous Secured Claims shall be discharged and released as follows:

(a)     Draft Proceeds Analysis/Draft HUD-1. At least two (2) Business Days prior to the scheduled closing of a Qualified Sale, the Reorganized Debtors shall provide the holder of the Allowed Miscellaneous Secured

Claim on the property to be sold with a draft Proceeds Analysis and, if applicable, a draft HUD-1 settlement statement.

(b)    <u>Delivery of Discharge</u>. At least one (1) Business Day prior to the scheduled closing of a Qualified Sale, the holder of the Allowed Miscellaneous Secured Claim on the property to be sold shall deliver a discharge and release of its Liens on the property to be sold to the Reorganized Debtors' closing attorney for the sale.

(c)    <u>Payment/Recording of Discharge</u>. Within one (1) Business Day after the closing of a Qualified Sale, the Reorganized Debtors shall deliver to the holder of the Allowed Miscellaneous Secured Claim on the property to be sold: (A) the final Proceeds Analysis, and (B) if applicable, the final HUD-1 settlement statement. Upon the delivery of the final Proceeds Analysis and the final HUD-1 settlement statement, the Reorganized Debtors' closing attorney shall cause the discharge and release of the Lien on the property sold to be recorded.

(3)    <u>Disputed Amounts</u>. In the event of a dispute over the distribution of the proceeds of the sale, the amount in controversy shall be held by the Reorganized Debtors' closing attorney in escrow until the dispute is resolved by the Plan Arbitrator according to the Dispute Resolution Procedures.

(4)    <u>Discharge of Liens</u>. Upon payment in full of any Allowed Miscellaneous Secured Claim: (1) all Liens securing such Allowed Miscellaneous Secured Claim shall be deemed canceled, discharged and released, and (2) the holder of such Allowed Miscellaneous Secured Claim shall be required to deliver to the Reorganized Debtors, within one (1) Business Day of the payment in full of such Allowed Miscellaneous Secured Claim, all UCC terminations, mortgage discharges and any other documents necessary to effect the discharge and release of the Liens securing such Allowed Miscellaneous Secured Claim.

**F.    Subordination.** The holders of Allowed Miscellaneous Secured Claims shall subordinate their Liens to any financing that pays in full or in part an Allowed Claim secured by a Senior Lien. The holders of Allowed Miscellaneous Secured Claims shall, within three Business Days of a request from the Reorganized Debtors, execute and deliver to the Reorganized Debtors such documents to evidence the subordination of their respective Liens as may be reasonably required by the party providing the financing.

**G.    Indubitable Equivalent.** The holder of any Allowed Miscellaneous Secured Claim shall receive such additional or other treatment as may be necessary, as determined by the Bankruptcy Court or agreed to between the Debtors and the holder of the Allowed Miscellaneous Secured Claim, to permit the holder of the Allowed Miscellaneous Secured Claim to realize the indubitable equivalent of its Allowed Claim.

**6.7**    **Class 5 – Mechanics Lien Claims.**

**A.**    **Classification.**  Class 5 consists of the Mechanics Lien Claims.

**B.**    **Impairment and Voting.**  The Mechanics Lien Claims are impaired under the Plan.  Each holder of a Mechanics Lien Claim shall be entitled to vote to accept or reject the Plan.

**C.**    **Allowance.**  A Claim allegedly secured by a Mechanics Lien shall be included in Class 5 only if it is Allowed.

**D.**    **Claim Treatment.**  In full and complete satisfaction, settlement, discharge and release of the Mechanics Lien Claims, the holders of Mechanics Lien Claims shall receive, commencing on the later to occur of the Effective Date or the date such Claim becomes an Allowed Claim, payments from Bovis from the funds paid by SW Boston pursuant to the Bovis Agreement.

**E.**    **Discharge of Liens.**  Upon the Effective Date: (1) all Liens securing all Mechanics Lien Claims shall be deemed canceled, discharged and released, and (2) each holder of a Mechanics Lien Claim shall deliver to the Reorganized Debtors, within ten (10) days of the Effective Date, all UCC terminations, mortgage discharges and any other documents necessary to effect the discharge and release of the Liens securing such Mechanics Lien Claim; provided that, if any holder of a Mechanics Lien Claim fails to deliver any document necessary to effect the discharge and release of the Liens securing such Mechanics Lien Claim within the time set forth above, the Debtor is authorized to execute and file any documents necessary to discharge and release such Liens on behalf of the holder of such Mechanics Lien Claim.

**F.**    **Indubitable Equivalent.**  The holder of any Mechanics Lien Claim shall receive such additional or other treatment as may be necessary, as determined by the Bankruptcy Court or agreed to between the Debtors and the holder of the Mechanics Lien Claim, to permit the holder of the Mechanics Lien Claim to realize the indubitable equivalent of its Allowed Claim.

**6.8**    **Class 6 – Bovis Allowed Claim.**

**A.**    **Classification.**  Class 6 consists of the Bovis Allowed Claim.

**B.**    **Impairment and Voting.**  The Bovis Allowed Claim is impaired under the Plan. The holder of the Bovis Allowed Claim shall be entitled to vote to accept or reject the Plan.

**C.**    **Allowance.**  The Claim asserted by Bovis shall be an Allowed Claim against SW Boston in the amount of the Bovis Allowed Claim.

**D.      Claim Treatment.** In full and complete satisfaction, settlement, discharge and release of the Bovis Allowed Claims, the holder of the Bovis Allowed Claim shall receive the treatment described in the Bovis Agreement.

**6.9      Class 7 – General Unsecured Claims.**

**A.      Classification.** Class 7 consists of the Allowed General Unsecured Claims.

**B.      Impairment and Voting.** Class 7 is impaired under the Plan. Each holder of a General Unsecured Claim shall be entitled to vote to accept or reject the Plan.

**C.      Allowance.** The Class 7 Claims shall be Allowed or disallowed through the claims objection process described in Article VI of the Plan.

**D.      Claim Treatment.** In full and complete satisfaction, settlement, release and discharge, each holder of an Allowed General Unsecured Claim shall receive, commencing upon the later to occur of the Effective Date or the date such Claim becomes an Allowed Claim, the following:

(1)      ~~Twenty-five percent (25%) of the~~ Interest.  Commencing on the Effective Date, interest shall accrue on each Allowed General Unsecured Claim ~~on the Effective Date~~at a rate: (a) of four and one-quarter percent (4.25%) per annum, or (b) determined by the Bankruptcy Court.

(2)      ~~Twenty-five~~ Thirty-three percent (~~25~~33%) of the Allowed General Unsecured Claim on the Effective Date.

~~(2)~~(3)      The aggregate of: (a) thirty-three percent (33%) of the principal balance of the Allowed General Unsecured Claim, and (b) all accrued interest, on the first anniversary of the Effective Date.

~~(3)      Twenty-five percent (25%) of the Allowed General Unsecured Claim on the second anniversary of the Effective Date.~~

(4)      ~~Twenty-five~~ The aggregate of: (a) thirty-four percent (~~25~~34%) of the principal balance of the Allowed General Unsecured Claim, and (b) all accrued interest, on the ~~third~~second anniversary of the Effective Date.

(5)      The unpaid balance of any Allowed General Unsecured Claim may be prepaid at any time without penalty.

**E.      Claims of Insiders.**

(1)      Insider Claims Against SW Boston.  ~~In full and complete satisfaction of all Claims of Insiders against SW Boston,~~As is described in Section 6.11(D), the Equity Interests in SW Boston shall be cancelled and new Equity Interests issued to 110 Stuart Street.  The Equity Interests in 110 Stuart Street shall be issued to

~~the Insiders of SW Boston~~SE Berkeley and SE McClellan in proportion to their respective Claims against and contributions to or on behalf of SW Boston. ~~In exchange for this treatment,~~, with SE Berkeley holding approximately 78% and SE McClellan holding approximately 22%, respectively, of the Equity Interests in 110 Stuart Street. The Equity Interests in 100 Stuart Street shall be cancelled and 100 Stuart Street shall be dissolved. The Trust, which holds the ~~non-SW Boston Insiders are either subordinating their Claims~~Equity Interests in the ~~Bankruptcy Cases to~~remaining Debtors, shall retain its Equity Interests in the ~~payment of all non-Insider Allowed Claims, or canceling those Claims under this Plan.~~remaining Debtors.

(2)    Other Inter-Debtor Claims. All of the Debtors' respective Claims against each other ~~non-SW Boston Debtors~~ shall be cancelled and discharged on the Effective Date

(3)    Non-Debtor Insider Claims. ~~All~~Except as provided in Section 4.7(e)(i) of the Plan, all non-Debtor Insider Claims against ~~non-SW Boston~~the Debtors shall be preserved.

(4)    No Distribution. Except as set forth in Section 4.7(e)(i~~,~~) of the Plan, no Insiders of the Debtors shall receive any distributions on account of their Allowed Claims until the Allowed Claims of all non-Insider creditors have been paid in full under the terms of the Plan.

**6.10    Class 8 – Convenience Class.**

**A.    Classification.** Class 8 consists of the Allowed Convenience Class Claims.

**B.    Impairment and Voting.** Class 8 is impaired under the Plan. Each holder of a Convenience Class Claim shall be entitled to vote to accept or reject the Plan.

**C.    Allowance.** The Convenience Class Claims shall be Allowed or disallowed through the claims objection process described in Article VI of the Plan.

**D.    Claim Treatment.** In full and complete satisfaction, settlement, release and discharge, each holder of an Allowed Convenience Class Claim shall receive, upon the later to occur of the Effective Date or the date such Claim becomes an Allowed Claim, the lesser of:

(1)    One-hundred percent (100%) of the holder's Allowed Class 8 Claim; or

(2)    $5,000.

**E.    Election.** Any creditor with an Allowed Claim in excess of $5,000, regardless of the nature of its Claim, may elect to become a Convenience Class Claim. Any creditor electing to accept treatment under Class 8 shall do so on the ballot approved by the Bankruptcy Court not later than the deadline for voting on the Plan.

**6.11    Class 9 – Equity Interests.**

A.    **Classification.**  Class 9 consists of the Allowed Equity Interests in the Debtors.

B.    **Impairment and Voting.**  Classes 9A and 9C are impaired under the Plan and shall be entitled to vote to accept or reject the Plan.  Classes 9B and 9D through 9H are unimpaired under the Plan, and shall not be entitled to vote to accept or reject the Plan.

C.    **Allowance.**  All Equity Interests in the Debtors shall be Allowed on the Effective Date.

D.    **Treatment.**  The holders of Allowed Equity Interests shall receive the following:

(1)    Class 9A – On the Effective Date, the Equity Interests in SW Boston shall be cancelled and new equity interests in SW Boston shall be issued to 110 Stuart Street.  The equity interests in 110 Stuart Street shall be issued on the Effective Date in accordance with Section 4.7(e)(i) of the Plan.

(2)    Class 9C – On the Effective Date, either: (a) the Equity Interests in 100 Stuart Street shall be cancelled and 100 Stuart Street shall be deemed dissolved without the need for further documentation, or (b) 100 Stuart Street shall be merged with 110 Stuart Street.

(3)    Classes 9B, 9D to 9H – The holders of the Equity Interests in 30-32 Oliver Street, 131 Arlington Street, Auto Sales, Sawyer Corporation, General Land and General Trading shall retain their respective Equity Interests.

**6.12    Reservation of Rights With Respect to Claims.**

The Debtors reserve the right to, among other things, (a) contest the right of the holder of any Claim to vote on the Plan, or designate the vote of the holder of any Claim (b) contest the right of the holder of any Claim to receive distributions under the Plan, and (c) seek to subordinate any Claim for inequitable conduct or otherwise.

**6.13    Plan Implementation.**

The Plan will be funded from the Debtors' Property, the income derived from that Property, the Cash Collateral, the sale of Real Estate and the sale of Residences.  The Debtors shall be authorized to use the Cash Collateral for all purposes provided for in the Plan including, but not limited to: (i) pay the Allowed Prudential Claim, (ii) pay the Allowed Administrative Claims, (iii) provide each Debtor with cash to fund each Debtor's Working Capital Reserve to the Working Capital Minimum, (iv) pay the Budgeted Expenses, and (v) after the payment in full of the Allowed Prudential Claim, pay the Allowed City Claim.

**6.14    Sales of Property.**

Any sale, transfer or other disposition of Property under or in conjunction with the Plan shall be free and clear of all Liens, Claims and interests pursuant to Section 363(f) of the Bankruptcy Code and shall be entitled to the protection of Section 12.2 of the Plan.  The Reorganized Debtors need not obtain Bankruptcy Court approval of any post-Effective Date sale, transfer or other disposition of Property.

**6.15    Execution of Necessary Documents.**

A.    Confirmation of the Plan shall constitute authorization by the Bankruptcy Court for the Reorganized Debtors to enter into all documents, instruments and agreements necessary to effectuate the terms of the Plan.  The form and/or content of the documents, instruments and agreements necessary to effectuate the terms of the Plan shall be subject to the approval of the Reorganized Debtors, in their sole discretion.

B.    All matters provided for in the Plan involving any corporate action required by the Debtors or Reorganized Debtors in connection with the Plan shall be deemed to have occurred, and shall be in effect, without any requirement of further action by the Reorganized Debtors, their agents, representatives, members, managers, officers, directors or Affiliates.

**6.16    Organization Documents and Good Standing.**

As of the Effective Date, the Debtors' respective Organization Documents shall be amended as necessary to effectuate the terms of the Plan and shall become the Organization Documents of the Reorganized Debtors.  To the extent that there is any inconsistency between the Plan and any of the Organization Documents, the terms of the Plan shall control.  To the extent any of the Debtors is not in compliance as of the Effective Date with any state or local law requirements necessary to remain as an organized legal entity in good standing and/or remain authorized as an organized legal entity to conduct business in any jurisdiction, the Debtors and/or the Reorganized Debtors, as the case may be, shall be deemed to be in compliance with any such laws if they comply with such laws within six months after the Effective Date.  Carol S. Parks will continue to act as the president, manager or trustee, as the case may be, of the Debtors after the Effective Date at her pre-petition salary, which shall not be increased until all holders of Allowed Claims are paid in full under the Plan.  Carol S. Parks will be the manager of 110 Stuart Street.

**6.17    Revesting of Property.**

Except as otherwise provided in the Plan, each of the Reorganized Debtors, as of the Effective Date, shall be vested with all of the assets of each respective Debtor.

**6.18    Preservation of Causes of Action.**

Except as provided in, and unless expressly waived, relinquished, exculpated, released, compromised or settled in the Plan, the Confirmation Order, any Non-Appealable Order, or in any contract, instrument, release or other agreement entered into or delivered in connection with the Plan, the Reorganized Debtors will exclusively retain and may enforce, and the Debtors expressly reserve and preserve for these purposes, in accordance with sections 1123(a)(5)(A) of the Bankruptcy Code, any Claims, demands, rights and Causes of Action that the Debtors or their respective Estates may hold against any person or entity.  No preclusion doctrine, including, without limitation, the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise) or laches shall apply to them by virtue of or in connection with the confirmation, consummation of effectiveness of the Plan.  The Debtors are not aware of any Causes of Action that will have a meaningful effect on the amounts available to creditors under the Plan.

SW Boston has a cause of action against Prudential under Section 547 of the Bankruptcy Code to avoid Liens granted to Prudential on two bank accounts.  The deadline to file this Avoidance Action, and to challenge any of Prudential's other Liens, is currently set for May 30, 2011.  In the event the Plan is confirmed, SW Boston does not intend to bring an Avoidance Action against Prudential.  As to any remaining Avoidance Actions held by the Debtors, the Debtors do not intend to pursue any Avoidance Actions because creditors are being paid in full.

**_____6.19    Dissolution of the Committee.**

_____The Committee shall dissolve automatically on the Effective Date.  Upon such dissolution, its members, professionals, and agents shall be released from any further duties and responsibilities in the Bankruptcy Case and under the Bankruptcy Code, except with respect to applications for Professional Fee Claims or reimbursement of expenses incurred as a member of the Committee.

### 6.20    Consolidation.

Except as expressly provided in the Plan, the Reorganized Debtors shall continue to maintain their separate corporate existence for all purposes other than the treatment of Claims under the Plan. The Debtors are proposing that the Debtors be substantively consolidated under the Plan on the Effective Date pursuant to Section 1123(ea)(5)(C) of the Bankruptcy Code and the Confirmation Order. The effect of such substantive consolidation would be that: (i) all assets (and all proceeds thereof) and liabilities of each Debtor shall be deemed merged or treated as though they were merged into and with the assets and liabilities of all other Debtors, (ii) except as set forth in Section 4.7(e)(i) of the Plan, no cash distributions shall be made under the Plan on account of intercompany Claims among the Debtors and all such Claims shall be eliminated, (iii) all guarantees of any Debtor of the obligations of any other Debtor shall be deemed eliminated and extinguished so that any Claim against any Debtor and any guarantee thereof executed by the other and any joint and several liability of any Debtor shall be deemed to be one obligation of the consolidated cases, (iv) each and every Claim filed or to be filed in the Chapter 11 Case of any Debtor shall be deemed filed against the consolidated Debtors, and (v) for purposes of determining the availability of the right of setoff under Section 553 of the Bankruptcy Code, the Debtors shall be treated as one entity so that, subject to the other provisions of Section 553 of the Bankruptcy Code, debts due to any Debtor may be set off against the debts of any other Debtor. Such substantive consolidation shall not (other than for purposes related to the Plan) affect the legal and corporate structures of the Reorganized Debtors.

### 6.21    Assumption of Executory Contracts and Unexpired Leases.

Pursuant to Sections 1123(b)(2) and 365(a) of the Bankruptcy Code, any executory contract or unexpired lease (excluding insurance policies) that (i) has not expired by its own terms on or prior to the Confirmation Date, (ii) has not been assumed, assumed and assigned or rejected with the approval of the Bankruptcy Court on or prior to the Confirmation Date, (iii) is not the subject of a motion to assume or reject which is pending at the time of the Confirmation Date, or (iv) is not designated by the Debtors as being an executory contract or unexpired lease to be assumed at the time of confirmation of the Plan, shall be deemed rejected on the Effective Date. The entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of such rejection pursuant to Sections 365(a) and 1123(b)(2) of the Bankruptcy Code.

_____    Among the contracts SW Boston presently intends to assume and assign in the event the Hotel Sale occurs, or to assume in the event it does not, are the contracts that provide for management and operation of the Hotel.  More specifically, SW Boston presently intends to assume the Hotel Management Agreement (the "HMA") originally executed by SW Boston and Starwood dated August 23, 2005 as amended to set forth the terms relating to operation and management of the spa, the Restaurant Management Agreement between SW Boston and Culinary Concepts (Boston) LLC dated September 11, 2009, and the Technical Services Agreement (the "TSA") executed by SW Boston and Starwood dated August 23, 2005.

Starwood disputes SW Boston's view of the cure obligations associated with the foregoing executory contracts. Starwood contends that there exist, and remain, non-monetary defaults that are incapable of cure, and, therefore, neither assumption and assignment, nor assumption, may take place absent a consensual resolution of those outstanding defaults. In the alternative, Starwood contends that, if those defaults are subject to being monetized, the resulting monetary cure amount exceeds the amounts asserted by SW Boston.

Among the non-monetary defaults that Starwood contends exist, are the following: (i) failure by SW Boston to complete the "Initial Capital Program" through completing construction of all elements of the Hotel and opening of all planned elements on or before the February 28, 2010 extended deadline established in an amendment to the HMA; (ii) as a result of SW Boston's failure to complete construction and attain the opening of all elements of the Hotel, failure to achieve the "Opening Date," by the February 28, 2010 extended deadline established in an amendment to the HMA and, in large part because the Theme Bar is still not complete and open, SW Boston's continuing failure to achieve the Opening Date; (iii) SW Boston's failure to achieve the extended completion and opening date of the Theme Bar by the February 28, 2010 extended deadline established in an amendment to the HMA, and continuing failure to do so; (iv) SW Boston's failure to achieve the completion and opening of the spa by the February 26, 2010 extended deadline established in an amendment to the HMA, the Bliss Spa currently in operation at the Hotel having not been completed and opened until August 18, 2010; (vi) SW Boston's use of a Starwood trademark as part of the SW Boston name in violation of a naming conventions provision in the HMA; and (vii) SW Boston's failure to construct, fit out and furnish the residential condominium unit lobby in compliance with the requirements of the Technical Services Agreement, the Hotel Management Agreement and the Condominium Marketing License Agreement (the "CMLA") dated July 27, 2006.

Starwood contends that the existing defaults are non-monetary, several of which cannot be cured such that assumption and assignment or assumption can only be achieved with Starwood's consent. It contends, in the alternative, that the only referenced defaults arguably subject to monetary cure are the failures to achieve the Opening Date timely due to failure to complete construction of, and render operational, the spa and the Theme Bar, which could in theory be monetized at an amount equal to the HMA-established base fee, incentive fee and marketing fee that would have been realized by Starwood on the revenues that would have been generated had the late delivered and as yet unconstructed elements of the Hotel been timely delivered by SW Boston. Starwood contends, however, that SW Boston's alleged continuing failure to achieve the Opening Date would require calculation of damages suffered to some as-yet unknown future date and, therefore, as a practical matter, consensual resolution of even those defaults arguably subject to being monetized is necessary before assumption or assumption and assignment should be authorized. Starwood further contends that the ongoing violation of the HMA-established naming convention is, under United States trademark law, irreparable harm for which there is no adequate remedy at law. Finally, Starwood contends that the ongoing failure of SW Boston to construct, fit out and furnish the residential lobby in compliance with the TSA, the HMA and the CMLA and the Brand Standards mandated by each of those agreements also causes it irreparable harm for which there is no adequate remedy at law.

SW Boston disputes Starwood's allegations regarding the alleged defaults under the executory contracts between SW Boston and Starwood, the amount of any monetary default

asserted by Starwood and that any non-monetary defaults cannot be cured by the payment of money.  SW Boston intends to discuss with Starwood the resolution of all issues relating to the executory contracts and believes that any outstanding issues will be resolved in conjunction with confirmation of the Plan.

### 6.22    Payments Related to The Assumption of Executory Contracts And Unexpired Leases.

A.    Payment of Claims Arising From Assumed Contracts And Leases.  Any Allowed Claims arising from the assumption of an executory contract or unexpired lease will receive, in full and complete satisfaction, settlement, release and discharge of such Claims, payment in the ordinary course of business as and when such Allowed Claims become due pursuant to such executory contract or unexpired lease.

B.    Disputed Claims and Bar Date.  If there is a dispute regarding (i) the amount of any claim arising from the assumption or rejection of an executory contract or unexpired lease, (ii) the ability of the applicable Debtor or any assignee to provide "adequate assurance of further performance," within the meaning of Section 365 of the Bankruptcy Code, under a contract or lease to be assumed, or (iii) any other matter pertaining to the assumption or assumption and assignment of any contract or lease, the payment of any Claim related to the foregoing will be made following entry of a Non-Appealable Order resolving the dispute and approving the assumption.

### 6.23    Rejection Damage Claims.

If the rejection of an executory contract or unexpired lease by the Debtors results in a Claim by the other party or parties to such contract or lease, any claim for damages, if not previously evidenced by a filed proof of claim, shall be forever barred and shall not be enforceable against the Estates, the Reorganized Debtors and their respective properties, agents, successors, or assigns, unless a proof of claim is filed with the Bankruptcy Court and served upon counsel for the Debtors on or before thirty (30) days following the later to occur of: (a) the rejection of such executory contract or unexpired lease, and (b) the Confirmation Date.  Unless otherwise ordered by the Bankruptcy Court or provided in the Plan, all such Claims for which proofs of claim are timely filed will be treated as General Unsecured Claims subject to the provisions of the Plan.  The Debtors or the Reorganized Debtors, as the case may be, shall have the right to object to any such Claim for rejection damages in accordance with the Plan.

### 6.24    Discharge.

Except as otherwise expressly provided in Section 1141 of the Bankruptcy Code or the Plan, the distributions made pursuant to and in accordance with the applicable terms and conditions of the Plan are in full and final satisfaction, settlement, release and discharge as against the Debtors and the Reorganized Debtors of any debt or obligation of the Debtors that

arose before the Effective Date, and any debt of the Debtors of a kind specified in Section 502(g), 502(h), or 502(i) of the Bankruptcy Code, and all Claims against the Debtors or their Estates of any nature, including, without limitation, any interest accrued thereon from and after the Petition Date, whether or not (i) a proof of claim based on such debt, obligation or Equity Interest is filed or deemed filed under Section 501 of the Bankruptcy Code, (ii) such Claim is Allowed under Section 502 of the Bankruptcy Code, or (iii) the holder of such Claim has accepted the Plan.

### 6.25    Injunction Relating to the Plan.

As of the Effective Date, all Persons are hereby permanently enjoined from commencing, continuing or enforcing in any manner or in any place, any action or other proceeding, whether directly, indirectly, derivatively or otherwise against the Debtors, their Estates or the Reorganized Debtors, on account of, or respecting any Claims, debts, rights, obligations, Causes of Action or liabilities discharged pursuant to the Plan, except to the extent expressly permitted under the Plan.

### 6.26    Releases.

Except as otherwise set forth in the Plan, as of the Effective Date, in consideration for, among other things, the obligations of the Debtors under the Plan and other contracts, instruments, releases, agreements or documents to be entered into or delivered in connection with the Plan, (a) each holder of a Claim or Interest that votes in favor of the Plan and (b) to the fullest extent permissible under applicable law, as such law may be extended or interpreted subsequent to the Effective Date, each Person that has held, holds or may hold a Claim or Equity Interest or at any time was a creditor or equity holder of any of the Debtors and that does not vote on the Plan or votes against the Plan, in each case will be deemed to forever release, waive and discharge all claims (including any derivative claims), obligations, suits, judgments, damages, demands, rights, causes of action and liabilities (other than the right to enforce the Reorganized Debtors' obligations under the Plan and the contracts, instruments, releases, agreements and documents delivered under the Plan), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising in law, equity or otherwise, that are based in whole or in part on any act, omission, transaction or other occurrence taking place on or prior to the Effective Date in any way relating to a Debtor, the Bankruptcy Cases or the Plan that such entity has, had or may have against any Debtor, the Estates, the Estate's Assets, the Reorganized Debtors and/or the Reorganized Debtors' Assets.

### 6.27    Cancellation of Existing Indebtedness and Liens.

Except as may otherwise be provided in the Plan, on the Effective Date: (a) all credit agreements, promissory notes, mortgages, security agreements, invoices, contracts, agreements and any other documents or instruments evidencing Claims against the Debtors, together with any and all Liens securing same, shall be canceled, discharged and released without further act or action by any Person under any applicable agreement, law, regulation, order or rule, (b) the obligations of the Debtors thereunder shall be deemed cancelled, discharged and released, and (c) all of the right, title and interest of any holder of such mortgages, deeds of trust, liens or other security interests, including any rights to any collateral thereunder, will revert to the Reorganized Debtors. To the extent deemed necessary or advisable by the Reorganized Debtors, any holder of a Claim shall promptly provide the Reorganized Debtors with an appropriate instrument of cancellation, discharge or release, as the case may be, in suitable form for recording wherever necessary to evidence such cancellation, discharge or release, including the cancellation, discharge or release of any Lien securing such Claim.

### 6.28    Exculpation.

Except as otherwise set forth in the Plan, neither the Debtors, the Reorganized Debtors, the Committee nor any of their respective present or former members, managers officers, directors, employees, general or limited partners, advisors, attorneys, agents, successors or assigns, shall have or incur any liability to any holder of a Claim or an Interest, or any other party in interest, or any of their respective agents, employees, representatives, financial advisors, attorneys, or affiliates, or any of their successors or assigns, for any act or omission in connection with, relating to, or arising out of, the administration of these Chapter 11 bankruptcy proceedings, the pursuit of confirmation of the Plan, the Disclosure Statement, the consummation of the Plan, or the administration of the Plan or the property to be distributed under the Plan occurring prior to the Effective Date, provided that the terms of this Section 9.5 shall not apply to any liability for willful misconduct or ultra vires acts.

### 6.29    Setoffs.

Except as otherwise provided in the Plan, nothing contained in the Plan shall constitute a waiver or release by the Estates of any rights of setoff the Estates may have against any Person.

### 6.30   Tax Consequences of the Plan.

The following is a general summary of certain material federal income tax consequences of the Plan and the distributions provided under the Plan. This summary does not discuss all aspects of federal taxation that may be relevant to a particular creditor in light of its individual investment circumstances or to certain creditors or shareholders subject to special treatment under the federal income tax laws (for example, tax-exempt organizations, financial institutions, broker-dealers, life insurance companies, foreign corporations or individuals who are not citizens or residents of the United States). This summary does not discuss any aspects of state, local or foreign taxation. The impact on foreign holders of claims and equity interests is not discussed.

This summary is based upon the Internal Revenue Code of 1986, as amended (the "IRC"), the Treasury regulations (including temporary regulations) promulgated thereunder, judicial authorities and current administrative rulings, all as in effect on the date hereof and all of which are subject to change (possibly with retroactive effect) by legislation, administrative action or judicial decision. Moreover, due to a lack of definitive judicial or administrative authority or interpretation and the complexity of the transactions contemplated in the Plan, substantial uncertainties exist with respect to various tax consequences of the Plan. The Debtors have not requested a ruling from the Internal Revenue Service (the "IRS") with respect to these matters and no opinion of counsel has been sought or obtained by the Debtors with respect thereto. There can be no assurance that the IRS or any state or local taxing authorities will not challenge any or all of the tax consequences of the Plan, or that such a challenge, if asserted, would not be sustained. **FOR THE FOREGOING REASONS, CREDITORS ARE URGED TO CONSULT WITH THEIR OWN TAX ADVISORS AS TO THE SPECIFIC TAX CONSEQUENCES (FOREIGN, FEDERAL, STATE AND LOCAL) TO THEM OF THE PLAN. THE DEBTORS ARE NOT MAKING ANY REPRESENTATIONS REGARDING THE PARTICULAR TAX CONSEQUENCES OF THE CONFIRMATION AND CONSUMMATION OF THE PLAN AS TO ANY CREDITOR, NOR ARE THE DEBTORS RENDERING ANY FORM OF LEGAL OPINION AS TO SUCH TAX CONSEQUENCES.**

### A.   Federal Income Tax Consequences to the Debtors.

Cancellation of Indebtedness. Generally, the Debtors will realize cancellation of debt ("COD") income to the extent, if at all, that the Debtors pay a creditor pursuant to the Plan an amount of consideration in respect of a Claim against the Debtors that is worth less than the amount of such Claim. For this purpose, the amount of consideration paid to a creditor generally will equal the amount of cash or the fair market value of property paid to such creditor. Because the Debtors will be in a bankruptcy case at the time the COD income is realized (if any is realized), the Debtors will not be required to include COD income in gross income, but rather will be required to reduce tax attributes by the amount of COD income so excluded.

### B.   Tax Consequences to Creditors.

In General. The federal income tax consequences of the implementation of the Plan to a holder of a Claim will depend, among other things, on: (a) whether such Claim constitutes a debt

or a security for federal income tax purposes, (b) whether the holder of the Claim receives consideration in more than one tax year, (c) whether the holder of the Claim is a resident of the United States, (d) whether all the consideration received by the holder of the Claim is deemed to be received by the holder of the Claim as part of an integrated transaction, (e) whether the holder of the Claim reports income using the accrual or cash method of accounting, and (f) whether the holder has previously taken a bad debt deduction or worthless security deduction with respect to the Claim.

Gain or Loss on Exchange.  Generally, a holder of an Allowed Claim will realize a gain or loss on the exchange under the Plan of his or her Allowed Claim for cash and other property in an amount equal to the difference between (i) the sum of the amount of any cash and the fair market value on the date of the exchange of any other property received by the holder (other than any consideration attributable to accrued but unpaid interest on the Allowed Claim), and (ii) the adjusted basis of the Allowed Claim exchanged therefore (other than basis attributable to accrued but unpaid interest previously included in the holder's taxable income). Any gain recognized generally will be a capital gain (except to the extent the gain is attributable to accrued but unpaid interest or accrued market discount, as described below) if the Claim was a capital asset in the hands of an exchanging holder, and such gain would be a long-term capital gain if the holder's holding period for the Claim surrendered exceeded one (1) year at the time of the exchange.

Any loss recognized by a holder of an Allowed Claim will be a capital loss if the Claim constitutes a "security" for federal income tax purposes or is otherwise held as a capital asset. For this purpose, a "security" is a debt instrument with interest coupons or in registered form.

## C.   Information Reporting and Backup Withholding.

Under the backup withholding rules of the Internal Revenue Code, holders of Claims may be subject to backup withholding at the rate of 31 percent with respect to payments made pursuant to the Plan unless such holder (i) is a corporation or comes within certain other exempt categories and, when required, demonstrates this fact, or (ii) provides a correct taxpayer identification number and certifies under penalties of perjury that the taxpayer identification number is correct and that the holder is not subject to backup withholding because of a failure to report all dividends and interest income.  Any amount withheld under these rules will be credited against the holder's federal income tax liability.  Holders of Claims may be required to establish exemption from backup withholding or to make arrangements with respect to the payment of backup withholding.

**THE FOREGOING IS INTENDED TO BE A SUMMARY ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL.  THE FEDERAL, STATE, AND FOREIGN TAX CONSEQUENCES OF THE PLAN ARE COMPLEX AND, IN MANY AREAS, UNCERTAIN.  ACCORDINGLY, EACH HOLDER OF A CLAIM OR EQUITY INTEREST IS STRONGLY URGED TO CONSULT WITH HIS OWN TAX ADVISOR REGARDING SUCH TAX CONSEQUENCES.**

## VII.   MISCELLANEOUS

### 7.1    Exemption from Transfer Taxes.

As is described above, the Plan is predicated on the sale or transfer of Property to satisfy the Allowed Claims of creditors.  Section 1146(c) of the Bankruptcy Code provides that transfers of property pursuant to a confirmed plan are not subject to any document recording tax, stamp tax, conveyance fee or other similar tax, mortgage tax, real estate transfer tax, mortgage recording tax or other similar tax or governmental assessment.  Sales of Property after the Confirmation Date, including any sales of Residences and Real Property owned by the Debtors will not, therefore, be subject to any such tax or assessment.

## VIII.   FEASIBILITY AND LIQUIDATION ANALYSES

**8.1    Feasibility of the Plan**

The Plan provides for the payment in full to the holders of all Allowed, non-Insider Claims from the income generated by the Debtors' operations and the sale of certain of the Debtors' assets.  On March 28, 2011, SW Boston filed a motion to sell the Hotel Condominium and the Parking Condominium to a subsidiary of Pebblebrook Hotel Trust ("Pebblebrook") for a purchase price of $89.5 million.  The net proceeds of the Hotel Sale will be paid to Prudential and will substantially reduce Prudential's Claim.  The Residences will be retained by SW Boston and sold in the ordinary course of business with the proceeds paid to creditors in accordance with the Plan.  The Debtors and their advisors have prepared projections, attached as Exhibit B, showing the income and expenses and the payment of creditors claims based on the Hotel Sale, the subsequent orderly sellout of the Residences and the use of the Debtors' Excess Cash.

If the Hotel Sale to Pebblebrook does not occur, the Plan will be funded by the sale of the Residences in the ordinary course of business, the income from the Hotel (as defined below) and the Debtors other operations, and the sale or refinancing of the Hotel prior to December 31, 2016, the restructured maturity date of the Allowed Prudential Claim.  Attached as Exhibit C are projections (together with the projections attached as Exhibit B the "Projections") that demonstrate the Debtors' ability to pay the holders of Allowed, non-insider Claims in full without the Hotel Sale.  Under either scenario, the holders of Allowed, non-insider Claims against the Debtors will be entitled to receive payment in full of their Allowed Claims in accordance with the Plan.

Pursuant to the CMLA, SW Boston receives the right to use certain intellectual property rights of, and receive certain services from, Starwood in connection with the design, marketing and sale of the residential condominium units.  That agreement, in conjunction with other agreements between SW Boston and Starwood, also provides for certain interrelationships between the Hotel and the Residences.  The CMLA expires by its terms in July, 2011.  Starwood contends that expiration of the CMLA will end SW Boston's ability to market the Residential Units as "W"-branded units and end its use of the Starwood intellectual property and sales and marketing platform.  The projections attached to this Disclosure Statement assume that SW Boston and Starwood will enter into an extension of the CMLA and that SW Boston will continue to pay Starwood a four percent (4%) fee on each Unit sale.  SW Boston intends to commence substantive discussions regarding the potential for an extension of the CMLA in conjunction with the proceedings seeking assumption of the Starwood executory contracts.

As with any plan of reorganization, there are risks attendant to the payment of Allowed claims under the Plan.  In this case, those risks include: (a) that sales of the Residences do not occur at the prices and velocity set forth in the Projections, (b) that Prudential's Allowed Claim is substantially greater than projected, (c) that Prudential's post-confirmation interest rate is substantially higher than the interest rates set forth in the Projections, (d) that the Starwood executory contracts are not assumed on terms substantially similar to those contained in the current Starwood executory contracts.

Based on the foregoing, the Plan is feasible.

### 8.2    Best Interests of Creditors And Comparison With Chapter 7 Liquidation

As a condition to confirmation of the Plan, Section 1129(a)(7)(A)(ii) of the Bankruptcy Code requires that each holder of a claim or an interest in an impaired Class of Claims or Equity Interests must either accept the Plan or receive or retain at least the amount or value it would receive if the Debtors were liquidated under Chapter 7 of the Bankruptcy Code on the Effective Date of the Plan.

Upon liquidation, it is unlikely that creditors, other than Prudential and the City, would receive a meaningful dividend on account of their claims.  Upon conversion to Chapter 7, the Debtors operations would cease and a trustee would be appointed to liquidate the Debtors' assets.  The amount that would be realized from the sale of the Debtors' assets at liquidation is substantially less than the going concern value that will be realized under the Plan from an orderly sale and/or operation of those assets.  The revenue from the Debtors' continued operations would be lost to creditors upon conversion to Chapter 7.  The liquidation of the Debtors' assets in Chapter 7 would result in substantial additional administrative costs as the Chapter 7 trustee would need to hire new professionals to analyze and liquidate the Debtors' assets.  This would delay both the liquidation of the Debtors' assets and the payment of creditors. The resolution of inter-Debtor claims alone, which are cancelled under the Plan, would be both time consuming and expensive to bring to conclusion.  In Chapter 7, the non-Debtor Insider Claims, which total approximately $29,102,372, would share in and substantially dilute any dividend that might be paid to non-priority unsecured creditors.

[this space intentionally left blank]

In contrast, the Plan provides for the continued operation of the Debtors and the use of the income from those operations, as well as the orderly sale of the Residences over several years and the orderly sale of other assets, to pay creditors in full.  Under the Plan, the inter-Debtor Claims are cancelled or subordinated and the non-Debtor Insider Claims are subordinated to the payment of all other Allowed Claims.  The Plan provides for the payment of non-priority unsecured creditors in full, with payments commencing on the Effective Date, within three years of the Effective Date.  Accordingly, confirmation of the Plan will result in a substantially more certain and greater return to unsecured creditors than might be realized if these cases were converted to cases under Chapter 7 of the Bankruptcy Code.

Dated: ~~March 31~~May 5, 2011

SW BOSTON HOTEL VENTURE LLC,
a Delaware limited liability company

> By:    100 Stuart Street LLC,
>           a Delaware limited liability company, its Manager
>
>     By:    Frank Sawyer Corporation, its Manager
>
>     By:    */s/ Carol S. Parks*_____
>              Carol S. Parks, President

[signatures cont'd on next page]

100 STUART STREET LLC,
a Delaware limited liability company

By:    Frank Sawyer Corporation, Manager,
       a Massachusetts corporation


By:    */s/ Carol S. Parks*
       Carol S. Parks, President

FRANK SAWYER CORPORATION,
a Massachusetts corporation


By:    */s/ Carol S. Parks*
       Carol S. Parks, President


[signatures cont'd on next page]

GENERAL TRADING COMPANY, d/b/a Sawyer Enterprises,
a Massachusetts corporation


By:_____*/s/ Carol S. Parks*_____
       Carol S. Parks, President


30-32 OLIVER STREET CORPORATION,
a Massachusetts corporation


By:_____*/s/ Carol S. Parks*_____
       Carol S. Parks, President


GENERAL LAND CORPORATION,
a Massachusetts corporation

By:_____*/s/ Carol S. Parks*_____
       Carol S. Parks, President


[signatures cont'd on next page]

THE 131 ARLINGTON STREET TRUST

*/s/ Carol S. Parks*
Carol S. Parks, Trustee

*/s/ Hana D. Parks*
Hana D. Parks, Trustee

[signatures cont'd on next page]

AUTO SALES & SERVICE, INC.,
a Massachusetts corporation


By:___/s/ Carol S. Parks_____
       Carol S. Parks, President




/s/ Harold B. Murphy_____
MURPHY & KING, P.C.
One Beacon Street
Boston, MA  02108
Attn:   Harold B. Murphy, Esq. (BBO #362610)
       D. Ethan Jeffery, Esq. (BBO #559609)
       John C. Elstad, Esq. (BBO#654469)
Telephone: (617) 423-0400
Facsimile:  (617) 556-8985

| 592430595154