## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MASSACHUSETTS
## EASTERN DIVISION

| | |
|---|---|
| In re )  )  ) **SW BOSTON HOTEL VENTURE LLC**, *et al.*,[1] )  ) **Debtors.** )  )  ) | Chapter 11  Case No. 10-14535 (JNF)  Jointly Administered |

## ORDER (I) AUTHORIZING THE SALE OF THE DEBTOR'S COMMERCIAL UNIT, PARKING GARAGE UNIT AND RELATED ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, INTERESTS AND ENCUMBRANCES, (II) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES IN CONNECTION THEREWITH AND (III) GRANTING RELATED RELIEF

This matter coming before the Court on the motion, dated March 28, 2011 (the "Sale Motion")[2] (Docket No. 495), of SW Boston Hotel Venture LLC ("SW Boston" or the "Debtor") for, among other things, the entry of an order (the "Sale Approval Order"), pursuant to sections 105, 363 and 365 of the United States Bankruptcy Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code"), Rules 2002, 6004 and 6006 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rules 2002-1, 2002-5 and 6004-1 of the Local Bankruptcy Rules for the United States Bankruptcy Court for the District of Massachusetts: (i) authorizing and approving the Purchase and Sale Agreement, dated as of March 28, 2011, as amended by that

---

[1] The other debtors in the jointly administered cases besides SW Boston are Auto Sales & Service, Inc. (Case No. 10-14528-JNF), General Trading Company (Case No. 10-14532-JNF), Frank Sawyer Corporation (Case No. 10-14533), 100 Stuart Street, LLC (Case No. 10-14534-JNF), 30-32 Oliver Street Corporation (Case No. 10-16173-JNF), General Land Corporation (Case No. 10-16174-JNF), and 131 Arlington Street Trust (Case No. 10-16177-JNF) (these debtors, not including SW Boston, the "Affiliated Debtors").

[2] Unless otherwise stated, all capitalized terms not defined herein shall have the meanings ascribed to them in the Sale Motion.

First Amendment ("First Amendment") to Purchase and Sale Agreement dated May [__], 2011

(including all exhibits, schedules and ancillary agreements related thereto, the "Agreement"),

substantially in the form attached to the Sale Motion as Exhibit A, by and between Razorbacks

Owner LLC, a Delaware limited liability company, as purchaser (the "Purchaser"),[3] and the

Debtor, as seller, whereby the Debtor has agreed to sell substantially all of the assets related to

its Commercial Unit and Garage Unit (each as described in the Agreement and the Master Deed

of the 100 Stuart Street Primary Condominium Association dated December 9, 2009, recorded

with the Suffolk County Registry of Deeds at Book 45835, Page 189), the Commercial Unit and

the Garage Unit, and certain personal and intellectual property related to the Commercial Unit

and Garage Unit, and the Assumed Contracts (as defined below) (collectively, the "Property") to

the Purchaser (collectively, the "Sale"); (ii) authorizing and approving the sale by the Debtor of

the Property, free and clear of all liens, claims, encumbrances and interests other than the

Permitted Exceptions and the Assumed Liabilities; (iii) authorizing the assumption and

assignment to the Purchaser of certain executory contracts and unexpired leases of the Debtor in

connection with the Sale (collectively, the "Assumed Contracts") identified on Exhibit 1 to this

Sale Approval Order; (iv) authorizing the assumption and assignment to the Purchaser of the

Starwood Agreements as defined in Paragraph AA below; and (v) granting other related relief;

objections to the Sale Motion having been timely filed by Culinary Concepts (Boston) LLC

(Docket No. 571), The Prudential Insurance Company of America ("Prudential") (Docket No.

592), and Starwood Hotels & Resorts Worldwide, Inc. and certain of its affiliates including, but

not limited to, W Hotel Management, Inc. (Docket No. 593) (collectively, the "Sale Motion

---

[3] The defined term "Purchaser" sometimes (i) includes Razorbacks Lessee LLC, a Delaware limited liability company, an affiliate of Razorbacks Owner LLC and (ii) substitutes Razorbacks Lessee LLC for Razorbacks Owner LLC, where and to the extent that such inclusion or substitution, as the case may be, is required by the Agreement.

*and the objections of Starwood and Prudential were reported as resolved in open court at the hearing held on May 24, 2011*

Objections"); no other objections to the Sale Motion have been filed with the Court or otherwise

asserted at the Sale Hearing (defined below); the Court having conducted a hearing on the Sale

Motion on May 18, 2011 and May 24, 2011 (the "Sale Hearing") at which time all interested

parties were offered an opportunity to be heard with respect to the Sale Motion; the Court having

reviewed and considered (a) the Sale Motion and all of the exhibits thereto, (b) the Agreement

(c) this Court's prior order (Docket No. 509), dated March 30, 2011 (the "Sale Procedures

Order") approving certain procedures for the sale of the Property (the "Sale Procedures"), (d) the

Sale Motion Objections, the Agreement, or the Sale filed in accordance with the Sale Procedures *

Order, and (e) the arguments of counsel made, and the evidence proffered or adduced, *in particular,* at the Sale

Hearing; and due notice of the Sale Motion and the Sale Procedures Order having been provided

to all parties who requested or are entitled to such notice; and the Court having concluded that

the relief requested in the Sale Motion is in the best interests of the Debtor and the Affiliated

Debtors in these chapter 11 cases, their estates and creditors, and all other parties in interest; and

upon the complete record of the Sale Hearing and these chapter 11 cases; and after due

deliberation thereon; and good cause appearing therefor,

### IT IS HEREBY FOUND AND DETERMINED THAT:

#### JURISDICTION, FINAL ORDER AND STATUTORY PREDICATES

A.      This Court has jurisdiction over the Sale Motion, the transactions

contemplated by the Agreement and all other ancillary documents and agreements related thereto

pursuant to 28 U.S.C. §§ 157(b)(1) and 1334(a).  This matter is a core proceeding pursuant to 28

U.S.C. §§ 157(b)(2)(A), (N) and (O).  Venue of these cases and the Sale Motion in this district is

proper under 28 U.S.C. §§ 1408 and 1409.

B.      This Sale Approval Order constitutes a final and appealable order within

the meaning of 28 U.S.C. § 158(a).  Notwithstanding Bankruptcy Rules 6004(h) and 6006(d), the

*\* The unrebutted offers of proof made at the Sale hearings*

Court expressly finds that there is no just reason for delay in the implementation of this Sale

Approval Order, and expressly directs entry of judgment as set forth herein.

      C.    The statutory predicates for the relief sought in the Sale Motion are

sections 105(a), 363(b), (f) and (m) and 365(a), (b) and (f) of the Bankruptcy Code and

Bankruptcy Rules 2002, 6004 and 6006.

### SOUND BUSINESS PURPOSE

      D.    The Debtor seeks to convey the Property, all of which is related to the

Debtor's Commercial Unit and Garage Unit.

      E.    The Debtor has demonstrated, and the Agreement reflects, both (1) good,

sufficient, and sound business purposes and justifications for the Sale, and (2) compelling

circumstances for the Sale outside of the ordinary course of the Debtor's business pursuant to

section 363(b) of the Bankruptcy Code prior to, and outside of, a plan of reorganization

inasmuch as the value to be obtained as a result of the Sale will result in an immediate and

substantial reduction of the Debtor's secured indebtedness, thereby enhancing the ability of SW

Boston and the Affiliated Debtors to satisfy their remaining indebtedness. Accordingly, time is

of the essence in consummating the Sale.

      F.    The consummation of the Sale pursuant to the Agreement neither

impermissibly restructures the rights of the Debtor's creditors nor impermissibly dictates the

terms of a plan of reorganization of the Debtor. The Sale does not constitute a *sub rosa* or *de

facto* plan of reorganization.

      G.    The Agreement was not entered into, and neither the Debtor nor the

Purchaser have entered into the Agreement or propose to consummate the Sale, for the purpose

of hindering, delaying or defrauding the Debtor's creditors. Neither the Debtor nor the Purchaser

has entered into the Agreement or propose consummate the Sale fraudulently for the purpose of

statutory or common law fraudulent conveyance or fraudulent transfer claims, whether under the

Bankruptcy Code or under the laws of the United States, any state, territory or possession

thereof, or the District of Columbia or any other applicable jurisdiction with laws substantially

similar to the foregoing.

## HIGHEST AND BEST OFFER

H.    On March 30, 2011, this Court entered the Sale Procedures Order

approving the Sale Procedures for the Property.  The Sale Procedures provided a full, fair and

reasonable opportunity for any entity to make an offer to purchase the Property.  The Debtor and

the Purchaser complied with the Sale Procedures Order in all respects.

I.    As demonstrated by the testimony and other evidence proffered or

adduced at the Sale Hearing, (1) the Debtor has actively and adequately marketed the Property

for sale; (2) the purchase price contained in the Agreement constitutes the highest and otherwise

best offer for the Property and provides fair and reasonable consideration for the Property ; (3)

the Sale will provide a greater recovery for the Debtor's creditors than would be provided by any

other practical available alternative including, without limitation, liquidation under chapter 7 or

chapter 11 of the Bankruptcy Code; (4) the Sale under section 363 of the Bankruptcy Code is

desirable and preferable to a sale under a plan of reorganization because, among other reasons,

there is no assurance that the Purchaser will be willing to await the outcome of a lengthy and

likely contested plan confirmation process and hearing; (5) a private sale of the Property

pursuant to the Sale , as opposed to a public sale, is in the best interests of the Debtor's estate,

among others reasons, because it will result in an immediate and substantial reduction of the

Debtor's indebtedness to its primary secured creditor; (6) no other party has offered to purchase

the Property for greater economic value to the Debtor or its estate; and (7) the Agreement and the

consideration to be paid by the Purchaser under the Agreement constitutes reasonably equivalent value and fair consideration as those terms are defined in each of the Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act and section 548 of the Bankruptcy Code and under the laws of the United States, any state, territory or possession thereof or the District of Columbia. The Debtor's determination that the Agreement constitutes the highest and best offer for the Property constitutes a valid and sound exercise of the Debtor's business judgment.

## BEST INTERESTS OF CREDITORS

J.      Approval of the Agreement and the consummation of the Sale to the Purchaser at this time are in the best interests of the Debtor, its creditors, its estates and other parties in interest in these chapter 11 cases, including, without limitation, the Affiliated Debtors and their estates and creditors.

## GOOD FAITH

K.      The Purchaser is not an "insider" of any of SW Boston or the Affiliated Debtors, as that term is defined by section 101(31) of the Bankruptcy Code.

L.      The Agreement and each of the transactions contemplated therein were negotiated, proposed and entered into by the Debtor and the Purchaser in good faith, without collusion and from arm's-length bargaining positions. The Purchaser has proceeded in good faith in all respects in connection with this proceeding, is a "good faith purchaser" within the meaning of section 363(m) of the Bankruptcy Code and, as such, is entitled to all the protections afforded thereby. Neither the Debtor nor the Purchaser have engaged in any conduct that would cause or permit the Agreement to be avoided; that would tend to hinder or delay creditors; or impose costs and damages under section 363(n) of the Bankruptcy Code.

## NOTICE OF THE SALE MOTION, THE AUCTION AND THE CURE AMOUNTS

M.     As evidenced by the certificates of service filed with the Court, (1) proper, timely, adequate and sufficient notice of the Sale Motion and the Sale Hearing has been provided by the Debtor; (2) such notice was good, sufficient and appropriate under the particular circumstances; and (3) no other or further notice of the Sale Motion, the proposed Sale, the Sale Procedures, or the Sale Hearing is necessary or shall be required.  A reasonable opportunity to object or be heard with respect to the Sale Motion and the relief requested therein has been afforded to all interested persons and entities, including, but not limited to:

(i)     counsel to the Official Committee of Unsecured Creditors in these jointly administered bankruptcy cases;

(ii)     counsel to Prudential and the City of Boston, the Debtor's prepetition lenders;

(iii)     any party who, in the past year, expressed in writing to the Debtor an interest in the Property;

(iv)     non-debtor parties to the Assumed Contracts;

(v)     all parties who are known or reasonably believed to have asserted a lien, encumbrance, claim or other interest in the Property;

(vi)     the Securities and Exchange Commission;

(vii)     the Internal Revenue Service;

(viii)     the Massachusetts Attorney General and the Massachusetts Department of Environmental Protection;

(ix)     all applicable state and local taxing authorities;

(x)     the Office of the United States Trustee for the District of Massachusetts;

(xi)     the Federal Trade Commission;

(xii)     the United States Attorney General/Antitrust Division of Department of Justice;

(xiii)     the Environmental Protection Agency;

(xiv)   the U.S. Department of Labor and the Massachusetts Department of Labor;

(xv)   the United States Attorney;

(xvi)   Corporation Counsel for the City of Boston, Massachusetts;

(xvii)   Director of the Department of Neighborhood Development, Public Facilities Commission, City of Boston, Massachusetts

(xviii)   all attorneys who have filed notices of appearance in these jointly administered chapter 11 cases;

(xix)   all entities that have requested notice in the jointly administered chapter 11 cases;

(xx)   all of the employees of the Debtor; and

(xxi)   all other parties identified on the creditor matrix in these cases.

N.   With regard to (1) all parties who have claims against the Debtors but whose identities are not reasonably ascertainable by the Debtors, and (2) all other persons or entities, the Court finds that notice of the Sale was sufficient and reasonably calculated under the circumstances to reach such parties, persons and entities.

O.   In accordance with the provisions of the Sales Procedures Order, the Debtor has served notice of its intent to assume and assign the Assumed Contracts and of the related proposed Cure Costs (the "Sale Notice") upon each non-debtor counterparty to the Assumed Contracts. The service of such notice was good, sufficient and appropriate under the circumstances and no further notice need be given with respect to the Cure Costs for the Assumed Contracts and the assumption and assignment of the Assumed Contracts. All non-debtor parties to the Assumed Contracts have had an opportunity to object to both the Cure Costs listed in the Sale Notice and the assumption and assignment of the Assumed Contracts (including objections related to adequate assurance of future performance and objections based on whether applicable law excuses the non-debtor counterparty to each Assumed Contract from accepting

performance by, or rendering performance to, the Purchaser for purposes of section 365(c)(1) of the Bankruptcy Code).

### SECTION 363(F) REQUIREMENTS MET FOR FREE AND CLEAR SALES

P. The Debtor may sell the Property free and clear of all liens, claims, interests and Encumbrances (as defined below) of any kind or nature whatsoever (except for Permitted Exceptions), because, in each case, one or more of the standards set forth in sections 363(f)(1)-(5) of the Bankruptcy Code have been satisfied. "Encumbrance" and "Encumbrances" means: (1) any claim (as that term is defined in Section 101(5) of the Bankruptcy Code), community property interest, condition, equitable interest, lien (statutory or otherwise), license, option, mortgage, pledge, encumbrance, security interest, restriction under any applicable bulk sales law, right of first refusal or restriction of any kind, including any restriction on use, voting, transfer, receipt of income or exercise of any other attribute of ownership, and including tax, charges of any kind (including, without limitation, any conditional sale or other title retention agreement or lease in the nature thereof), any sale of receivables with recourse against Seller, any filing or agreement to file a financing statement as debtor under the Uniform Commercial Code or any similar statute (other than the Permitted Exceptions); and also including (2) any easement, covenant, right of way, or similar restrictions, other than easements and rights of way recorded in the Suffolk County, Massachusetts Register of Deeds, which are in force and effect, or shown on the Proforma Policy (as defined in the Agreement) or any exceptions to title shown in the Title Update (as defined in the Agreement) to which Purchaser does not object in accordance with paragraph 2.5 of the Agreement; and also including, (3) liens, mortgages or other security interests granted by the Debtors in connection with the Debtors' loan and financing agreements with Prudential Insurance Company of America and the City of Boston, respectively, and any and all claims, duties, liabilities, obligations, rights, and requirements

arising under and relating to those loan and financing agreements (and related mortgages and other security interests, and related and ancillary agreements) that relate to the Property being conveyed and transferred to Purchaser.

Q.     The assumption and assignment of each of the Assumed Contracts and the Starwood Agreements (as defined in Paragraph AA below) is also free and clear of all Encumbrances other than the payment of Cure Costs or as provided in this Sale Approval Order. Those holders of Encumbrances who did not object, or who withdrew their objections, to the Sale or the Sale Motion are deemed to have consented pursuant to section 363(f)(2) of the Bankruptcy Code. Those holders of Encumbrances who did object fall within one or more of the other subsections of section 363(f) of the Bankruptcy Code and are adequately protected by having their Encumbrances, if any, attach to the net proceeds of the Sale against which they have a Claim, in the same order of priority and with the same validity, force and effect that such Claim had prior to the Sale, subject to any defenses of the Debtor.

R.     The Debtor is the sole and lawful owner of the Property and no other person has any ownership right, title or interest therein.

S.     All holders of Encumbrances are adequately protected, and the Sale thus satisfies section 363(e) of the Bankruptcy Code, by having their Encumbrances, if any, attach to the net proceeds of the Sale against which they have an Encumbrance, in the same order of priority and with the same validity, force and effect that such Encumbrances had prior to the Sale, subject to any rights, claims and defenses of the Debtor.

T.     The Purchaser would not have entered into the Agreement and would not consummate the transactions contemplated thereby, thus adversely affecting the Debtor, its estate and its creditors, if the sale of the Property were not free and clear of all Encumbrances other

than the Permitted Exceptions, or if the Purchaser would, or in the future could, be liable for any

such Encumbrances.

U.      Except for the Assumed Liabilities or as provided in this Sale Approval

Order, the Sale shall not impose or result in the imposition of any liability or responsibility of the

Purchaser or its affiliates, successors or assigns or any of their assets (including the Property),

and the transfer of the Property to the Purchaser does not and will not subject the Purchaser or its

affiliates, successors or assigns or any of their assets (including the Property), to any liability for

any Encumbrances including, without limitation, successor liability or any products liability.

### ASSUMPTION AND ASSIGNMENT OF THE ASSUMED CONTRACTS

V.      The assumption and assignment of the Assumed Contracts and the

Starwood Agreements (as defined in Paragraph AA below) are integral to the Agreement, are in

the best interests of the Debtor and its estate, and represent the reasonable exercise of the

Debtor's sound business judgment.

W.      With respect to the assumption and assignment of each of the Assumed

Contracts and the Starwood Agreements (as defined in Paragraph AA below), the Debtor has met

all requirements of section 365(b) of the Bankruptcy Code.  Further, the Purchaser has provided

all necessary adequate assurance of future performance under the Assumed Contracts and the

Starwood Agreements (as defined in Paragraph AA below) in satisfaction of sections 365(b) and

365(f) of the Bankruptcy Code.  Accordingly, the Assumed Contracts and the Starwood

Agreements (as defined in Paragraph AA below) can be assumed by the Debtor and assigned to

the Purchaser, as provided for in the Sale Procedures Order, the Sale Motion and the Agreement.

### VALIDITY OF THE TRANSFER

X.      As of the closing of the Sale (the "Closing"), the transfer of the Property

to the Purchaser will be a full and final legal, valid, and effective transfer of the Property, and

will vest the Purchaser with all right, title and interest in and to the Property, free and clear of (1)

all Encumbrances other than the Permitted Exceptions and (2) all debts arising under or out of, in

connection with, or in any way relating to, any acts of the Debtors, claims (as that term is defined

in section 101(5) of the Bankruptcy Code), rights or causes of action (whether in law or in

equity, including, but not limited to, any rights or causes of action based on theories of transferee

or successor liability under any law, statute, rule or regulation of the United States, any state,

territory, or possession thereof or the District of Columbia), obligations, demands, guaranties,

rights, contractual commitments, restrictions, interests and matters of any kind or nature

whatsoever, whether arising prior to or subsequent to the commencement of these cases, and

whether imposed by agreement, understanding, law, equity or otherwise.

Y.      The Debtor (1) has full corporate power and authority to execute the

Agreement and all other documents contemplated thereby, and the Sale has been duly and

validly authorized by all necessary corporate action of the Debtor, (2) has all of the corporate

power and authority necessary to consummate the transactions contemplated by the Agreement,

(3) has taken all actions necessary to authorize and approve the Agreement and the

consummation by the Debtor of the transactions contemplated thereby and (4) no consents or

approvals, other than those expressly provided for in the Agreement, are required for the Debtor

to consummate such transactions.

### TRANSFER OF WARRANTIES

Z.      Prior to the commencement of these chapter 11 cases, the Debtor

employed Bovis Lend Lease LMB, Inc. ("Bovis") to serve as construction manager for the

construction of the Commercial Unit and the Garage Unit (as well as the Residential Unit).  On

or about September 12, 2007, the Debtor and Bovis executed certain American Institute of

Architects contracts with respect to such construction, including the following (individually and

collectively, the "Bovis Contracts"): (i) September 12, 2007 contract, relating to the construction

of the Commercial Unit and Residential Unit; (ii) July 27, 2009 contract, relating to the

construction of the Restaurant; (iii) September 29, 2009 contract, relating to the construction of

the Spa; and (iv) March 16, 2010 contract, relating to repair of certain heating, ventilation and air

conditioning systems. The Bovis Contracts provide, among other things, that certain warranties

(individually and collectively, the "Warranties") issued by Bovis' subcontractors (individually

and collectively, the "Subcontractors") would be assigned to the Primary Condominium

Association upon completion of the construction project and payment of the amounts due to the

Subcontractors. A schedule of the respective Subcontractors and Warranties, including the

amounts owed to the warranting Subcontractors (the "Warranty Claims"), is attached as

Schedule 1 to the Agreement between SW Boston Hotel Venture LLC and Bovis Lend Lease

LMB, Inc. [Docket No. 460], and such Subcontractors and Warranty Claims are included as part

of the Sale Notice.

### STARWOOD HOTELS & RESORTS WORLDWIDE, INC. AND ITS AFFILIATES.

     AA.    SL Boston Hotel Ventures, LLC (now known as SW Boston) and

Starwood Hotels & Resorts Worldwide, Inc. ("Starwood") entered into a certain

Management Contract dated August 23, 2005, which was thereafter (i) assigned by

Starwood to W Hotel Management, Inc. ("W Hotel Management") pursuant to an

Assignment and Assumption Agreement dated December 7, 2007 and (ii) amended pursuant

to a First Amendment dated January 15, 2008, a Second Amendment dated September 11,

2009, a Third Amendment dated September 30, 2009, a Fourth Amendment dated

September 30, 2009, and a Management Contract for Bliss Spa at W Boston dated

September 30, 2009 (the "Fifth Amendment" to the Management Contract or the "Spa

Agreement") (as assigned and amended, the "Management Contract"). On August 23, 2005,

SL Boston Hotel Ventures, LLC (now known as SW Boston) and Starwood entered into a

Technical Services Agreement in respect of the planning, designing, equipping, decorating and

furnishing of the Project (as defined therein), which was amended by a First Amendment dated

January 15, 2008 and the Spa Agreement (as amended, the "Technical Services Agreement").

On September 11, 2009. SW Boston and Culinary Concepts (Boston) LLC ("Culinary

Concepts") entered into a Restaurant Management Agreement in respect of the operation and

management of a restaurant and lobby bar which was amended by a First Amendment dated May

3, 2010 and regarding which SW Boston has sought authority to enter a Second Amendment

dated January 1, 2011 (the "Restaurant Management Agreement").   (Collectively, the

Management Contract, the Technical Services Agreement and the Restaurant Management

Agreement, the "Starwood Agreements")

BB.     In connection with, and as a condition of the effectiveness of, the Debtor's

assignment of the Management Contract. the Technical Services Agreement and the Restaurant

Management Agreement to Purchaser, (i) Purchaser and W Hotel Management will enter into a

Sixth Amendment to Management Contract (the "Sixth Amendment to Management Contract");

(ii) Purchaser and Starwood will enter into a Third Amendment to Technical Services Agreement

(the "Third Amendment to Technical Services Agreement"); and (iii) Purchaser and Culinary

Concepts will enter into a Third Amendment to Restaurant Management Agreement (the "Third

Amendment to Restaurant Management Agreement") each of which will then be deemed to be a

part of and to amend the Management Contract, the Technical Services Agreement and the

Restaurant Management Agreement, respectively, as stated therein.  The form and substance of

the Sixth Amendment to Management Contract has been previously agreed to and approved by

Purchaser and W Hotel Management.  The form and substance of the Third Amendment to

Technical Services Agreement has been previously agreed to and approved by Purchaser and

Starwood.  The form and substance of the Third Amendment to Restaurant Management

Agreement has been previously agreed to and approved by Purchaser and Culinary Concepts.

Because the Debtor is not a party to these amendments, this Court's approval thereof is not

required.

### NOW THEREFORE, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT:

#### GENERAL PROVISIONS

1.  The Sale Motion is granted in full and the Sale is approved as set forth in this Sale Approval Order.

2.  The findings of fact set forth above and conclusions of law stated herein shall constitute this Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent any finding of fact later shall be determined to be a conclusion of law, it shall be so deemed, and to the extent any conclusion of law later shall be determined to be a finding of fact, it shall be so deemed.

3.  The objections to the Sale Motion filed by Culinary Concepts (Boston) LLC (Docket No. 571) and Starwood Hotels & Resorts Worldwide, Inc. and certain of its affiliates including, but not limited to, W Hotel Management, Inc. (Docket No. 593) and all reservations of rights included therein have been withdrawn.  The objections to the Sale Motion filed by Prudential (Docket No. 592) and all reservations of rights included therein having been either withdrawn or overruled on the merits.  All other objections, if any, to the Sale Motion or the relief requested therein, are hereby overruled on the merits.

### APPROVAL OF THE AGREEMENT

4.      The Agreement, all transactions contemplated therein and all of the terms and conditions thereof are hereby approved.

5.      Pursuant to sections 105, 363 and 365 of the Bankruptcy Code, the Debtor is authorized to perform its obligations under and comply with the terms of the Agreement and consummate the Sale, pursuant to and in accordance with the terms and conditions of the Agreement and this Sale Approval Order.

6.      SW Boston, as well as its Affiliated Debtors, officers, employees and agents, are authorized to execute and deliver, and empowered to perform under, consummate and implement, the Agreement, in substantially the same form as the Agreement attached to the Sale Motion as Exhibit A, as amended pursuant to the First Amendment, together with all additional instruments and documents that may be reasonably necessary or desirable to implement the Agreement and to take all further actions as may be (a) reasonably requested by the Purchaser for the purpose of assigning, transferring, granting, conveying and conferring to the Purchaser, or reducing to possession, the Property, (b) necessary or appropriate to the performance of the obligations contemplated by the Agreement, and (c) as may be reasonably requested by the Purchaser to implement the Agreement and consummate the Sale in accordance with the terms thereof, all without further order of the Court.

7.      This Sale Approval Order and the Agreement shall be binding in all respects upon the Purchaser, the Debtor and its affiliates, any trustees appointed in the Debtor's or the Affiliated Debtors' bankruptcy cases (whether under chapter 7 or chapter 11 of the Bankruptcy Code), all creditors (both known and unknown) of the Debtor, each of the Affiliated Debtors in these chapter 11 cases and their creditors, all interested parties and their successors

and assigns including, but not limited to, any person or entity asserting an Encumbrance, and any

non-debtor counterparty to one of the Assumed Contracts.

        8.      Nothing contained in any chapter 11 plan confirmed in these bankruptcy

cases, or any order confirming any such chapter 11 plan shall conflict with or derogate from the

provisions of the Agreement and this Sale Approval Order, and to the extent of any conflict or

derogation between the Agreement and this Sale Approval Order and any such future plans or

orders, the terms of the Agreement and this Sale Approval Order shall control.

### TRANSFER OF DEBTOR'S PROPERTY

        9.      Pursuant to sections 105(a) and 363(f) of the Bankruptcy Code, the Debtor

is authorized to transfer the Property in accordance with the terms of the Agreement.  The

Property shall be transferred to the Purchaser, and upon consummation of the Sale, such transfer

shall (a) be valid, legal, binding and effective; (b) vest the Purchaser with all right, title and

interest of the Debtor in the Property; and (c) be free and clear of all Encumbrances except for

Permitted Exceptions with all Encumbrances to attach to the proceeds of the Sale, in the order of

their priority and with the same validity, force and effect which they now have against the

Property, subject to any claims and defenses the Debtor may possess with respect thereto.

       10.     Except as otherwise provided in the Agreement, all persons and entities

(and their respective successors and assigns) including, but not limited to, all debt security

holders, equity security holders, governmental, tax and regulatory authorities, lenders, trade and

other creditors, holding Encumbrances (whether legal or equitable, secured or unsecured,

matured or unmatured, contingent or non-contingent, senior or subordinated) except for

Permitted Exceptions, arising under or out of, in connection with, or in any way relating to, the

Debtor, the Property, the operation of the business of the Commercial Unit and the Garage Unit

prior to Closing, or the transfer of the Property to the Purchaser, are hereby forever barred,

estopped and permanently enjoined from asserting such Encumbrances against the Purchaser, its

successors or assigns, its property or the Property.  No such persons or entities shall assert

against the Purchaser or their successors in interest any liability, debt, claim or obligation arising

from, related to or in connection with the ownership or operation of the Property prior to the

Closing, except for Assumed Liabilities and Permitted Exceptions.

    11. This Sale Approval Order (a) shall be effective as a determination that, as

of Closing, all Encumbrances other than Assumed Liabilities and Permitted Exceptions relating

to the Property have been unconditionally released, discharged and terminated, and that the

conveyances described herein have been effected, and (b) is and shall be binding upon and

govern the acts of all entities, including, without limitation, all filing agents, filing officers, title

agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds,

administrative agencies, governmental departments, secretaries of state, federal and local

officials and all other persons and entities who may be required by operation of law, the duties of

their office, or contract, to accept, file, register or otherwise record or release any documents or

instruments, or who may be required to report or insure any title or state of title in or to any

lease; and each of the foregoing persons and entities is hereby directed to accept for filing any

and all of the documents and instruments necessary and appropriate to consummate the

transactions contemplated by the Agreement.

    12. If any person or entity that has filed financing statements, mortgages,

mechanic's liens, *lis pendens* or other documents or agreements evidencing Encumbrances

against or in the Debtor or the Property shall not have delivered to the Debtor prior to the

Closing of the Sale, in proper form for filing and executed by the appropriate parties, termination

statements, instruments of satisfaction, releases of all interests which the person or entity has

with respect to the Debtor or the Property or otherwise, then only with regard to the Property that

is purchased by the Purchaser pursuant to the Agreement and this Sale Approval Order (a) the

Debtor and the Purchaser are hereby authorized and directed to execute and file such statements,

instruments, releases and other documents on behalf of the person or entity with respect to the

Property, provided, however, that in the event the release is in respect of the mortgage filed by

Prudential, Prudential shall be reasonably satisfied with the legal description of the Property

being released pursuant thereto, and (b) the Purchaser is hereby authorized to file, register or

otherwise record a certified copy of this Sale Approval Order, which, once filed, registered or

otherwise recorded, shall constitute conclusive evidence of the release of all Encumbrances

against the Property other than the Permitted Exceptions.  This Sale Approval Order is deemed to

be in recordable form sufficient to be placed in the filing or recording system of each and every

federal, state or local government agency, department or office.

      13.    SW Boston and the Purchaser are hereby authorized to execute and deliver

such other documents, statements, instruments and notices which may be necessary or desirable

to fully consummate the Agreement and the Sale.

      14.    All persons or entities in possession of some or all of the Property are

directed to surrender possession of such property to the Purchaser or its designee at the time of

Closing of the Sale.

      15.    Following the Closing of the Sale, no holder of any Encumbrance shall

interfere with the Purchaser's title to or use and enjoyment of the Property based on or related to

any such Encumbrance, or based on any actions the Debtor may take in this chapter 11 case.

16.     All persons and entities are prohibited and enjoined from taking any action to adversely affect or interfere with the ability of the Debtor to transfer the Property to the Purchaser in accordance with the Agreement and this Sale Approval Order.

17.     To the extent provided by section 525 of the Bankruptcy Code, no governmental unit may revoke or suspend any permit or license relating to the operation of the Property sold, transferred and conveyed to the Purchaser on account of the filing or pendency of these chapter 11 cases or the consummation of the Sale.

### ASSUMPTION AND ASSIGNMENT OF ASSUMED CONTRACTS

18.     Pursuant to sections 105(a) and 365 of the Bankruptcy Code, the Debtor's assumption and assignment to the Purchaser of the Assumed Contracts listed on <u>Exhibit 1</u>, is hereby approved, and all requirements of section 365 of the Bankruptcy Code are hereby deemed satisfied.

19.     The Debtor is hereby authorized in accordance with sections 105(a) and 365 of the Bankruptcy Code to assume and assign the Assumed Contracts to the Purchaser free and clear of all Encumbrances, and to execute and deliver to the Purchaser such documents or other instruments as may be necessary to assign and transfer the Assumed Contracts to the Purchaser.

20.     The Assumed Contracts shall be assigned to, and remain in full force and effect for the benefit of, the Purchaser in accordance with their respective terms, notwithstanding any provision in any such Assumed Contract (including those of the type described in sections 365(e)(1) and (f) of the Bankruptcy Code) that prohibits, restricts or conditions such assignment or transfer. There shall be no rent accelerations, assignment fees, increases or any other fees charged to the Purchaser or the Debtor as a result of the assumption or assignment of the Assumed Contracts. No Assumed Contract may be terminated, or the rights of any party

modified in any respect, including pursuant to any "change of control" clause, by any other party thereto as a result of the transactions contemplated by the Agreement.

21.     The Cure Costs under the Assumed Contracts arising or accruing prior to the date of this Sale Order are shown on <u>Exhibit 1</u>. On or before the Closing (as defined in the Agreement), the Debtor is authorized to use the proceeds of the Sale, and is directed to, and therefore shall, pay all Cure Costs in accordance with the terms of this Sale Approval Order and the Agreement, and Section 365 of the Bankruptcy Code.

22.     Payment of the Cure Costs shall be a full and final satisfaction of any and all defaults by the Debtor under the Assumed Contracts, whether monetary or non-monetary. Each non-debtor party to an Assumed Contract hereby is forever barred, estopped and permanently enjoined from asserting against the Debtor or the Purchaser, their successors or assigns or the property of any of them, any default based on all known and unknown facts and circumstances existing as of the date of the Sale Hearing regardless of whether such default was raised or asserted prior to or at the Sale Hearing. Notwithstanding the foregoing and for the avoidance of doubt, all of the Debtor's rights to assert, and interests in, all credits, chargebacks, setoffs, recoupments, rebates and other claims under and/or relating to the Assumed Contracts are purchased by and assigned to the Purchaser, and are preserved for the Purchaser's benefit.

23.     The failure of the Debtor or the Purchaser to enforce at any time one or more terms or conditions of any Assumed Contract shall not be a waiver of such terms or conditions, or of the Debtor's and the Purchaser's rights to enforce every term and condition of the Assumed Contracts.

24.     Upon the Closing of the Sale, the Purchaser shall be fully and irrevocably vested with all right, title and interest of the Debtor in and to the Assumed Contracts.

25.     The assignments of each of the Assumed Contracts are made in good faith under sections 363(b) and (m) of the Bankruptcy Code.

### TRANSFER OF WARRANTIES

26.     Without limitation to any other provision of this Sale Approval Order with respect to the assumption and assignment of the Assumed Contracts:[4]

(a)     If, as of the Closing, (1) a Final Order confirming a plan of reorganization of the Debtor (a "Plan") has not been entered by this Court, (2) the Plan's effective date (as defined therein) has not occurred, and (3) the Debtor has not paid the Warranty Claims, in full, to the holders of Warranty Claims such that all Warranties have been conveyed by the Debtor to the Primary Condominium Association effective immediately and unconditionally as of the Closing, then, the full amount of such Warranty Claims shall be paid directly to the holders of the Warranty Claims from the Purchase Price at Closing.  If the Court enters an order providing that the amount of the Warranty Claims, or any one of them, is less or greater than the amounts set forth for such Warranty Claims as stated in the Agreement and the Sale Notice, then the Agreement and the Sale Notice shall be deemed to be automatically amended by such order so as to reflect the amounts actually due to the holders of such Warranty Claim pursuant to such order, and, subject to the occurrence of conditions set forth in this Paragraph 26, the full amount of such Warranty Claims, as amended, shall be paid directly to the holders of such Warranty Claims from the Purchase Price at Closing.

---

[4]  For purposes of this Paragraph 26 only, capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Agreement.

## PROVISIONS RELATING TO AGREEMENTS WITH STARWOOD HOTELS & RESORTS WORLDWIDE, INC., W HOTEL MANAGEMENT, INC. AND CULINARY CONCEPTS (BOSTON) LLC

27.    The Debtor's assumption of each of the Management Contract and the Technical Services Agreement is approved.

28.    Upon the Closing of the Agreement, the Debtor's assignment to Purchaser of each of the Management Contract and the Technical Service Agreement is approved; provided that before such assignment will be effective, (i) Purchaser and W Hotel Management will each enter into and deliver to the other the Sixth Amendment to Management Contract and (ii) Purchaser and Starwood will each enter into and deliver to the other the Third Amendment to Technical Services Agreement.

29.    There are no monetary defaults or past due obligations payable pursuant to Section 365(b) of the Bankruptcy Code and applicable law currently outstanding under the Management Contract and, therefore, no monetary amounts will be paid as Cure Costs to W Hotel Management and Starwood in connection with the assumption and assignment of the Management Contract (the "Management Contract Cure Costs"). Non-monetary defaults under, and adequate assurances of future performance of, the Management Contract will be provided in accordance with and under the terms of the Sixth Amendment to the Management Contract and as provided in Paragraph 34 herein.

30.    The total monetary defaults and past due obligations pursuant to Section 365(b) of the Bankruptcy Code and applicable law to be paid to Starwood in connection with the assumption and assignment of the Technical Services Agreement equal $22,899.60 (the "Technical Services Agreement Cure Costs"). The Debtor will pay all of the Technical Services Agreement Cure Costs in full satisfaction thereof. Non-monetary defaults under, and adequate assurances of future performance of, the Technical Services Agreement will be provided for in

accordance with and under the terms of the Third Amendment to the Technical Services
Agreement and as provided in Paragraph 34 herein.

31.    The Debtor's assumption of the Restaurant Management Agreement as
amended by the Second Amendment to the Restaurant Management Agreement is approved.

32.    Upon the Closing of the Agreement, the Debtor's assignment to Purchaser
of the Restaurant Management Agreement is approved; provided that before such assignment
will be effective, Purchaser and Culinary Concepts will each enter into and deliver to the other
the Third Amendment to Restaurant Management Agreement.

33.    There are no monetary defaults or past due obligations payable pursuant to
Section 365(b) of the Bankruptcy Code and applicable law currently outstanding under the
Restaurant Management Agreement and, therefore, no monetary amounts will be paid as Cure
Costs to Culinary Concepts in connection with the assumption and assignment of the Restaurant
Management Agreement (the "Restaurant Management Agreement Cure Costs").  Non-monetary
defaults under, and adequate assurances of future performance of, the Restaurant Management
Agreement will be provided in accordance with and under the terms of the Third Amendment to
Restaurant Management Agreement and as provided in Paragraph 34 herein.

34.    Notwithstanding anything to the contrary in the Sale Motion, the
Agreement, this Sale Approval Order or any other document or agreement entered into by (i) the
Debtor or Starwood, W Management and/or Culinary Concepts on the one hand, and (ii) the
Purchaser on the other hand, the Purchaser and its successors and assigns, shall, in all respects,
constitute the "Owner" under the Management Contract, the Technical Services Agreement and
the Restaurant Management Agreement upon such agreements' assumption by the Debtor and
their assignment to the Purchaser, and the Purchaser shall be responsible for all (i) "Claims" as

defined in and for which indemnification is due under Paragraph 12.8 of the Management

Contract, (ii) "Claims" as defined in Exhibit "B" of the Technical Services Agreement and for

which indemnification is due under Section 12.1 of the Technical Services Agreement, (iii)

"Losses" as defined in Section 18.1 of the Restaurant Management Agreement and for which

indemnification is due under Section 18.2 of the Restaurant Management Agreement, regardless

of the date incurred or arising and whether notice was provided or received before or after the

date of this Sale Approval Order, and (iv) such other fees, claims, debts, demands, obligations

and liabilities of the "Owner" under the Management Contract, the Technical Services

Agreement and the Restaurant Management Agreement (collectively, the "Liabilities") but

specifically excluding the Liabilities which constitute monetary defaults or which are past due

Liabilities under Section 365(b) of the Bankruptcy Code as of the date of the Closing of the

transactions contemplated by the Agreement.

35.    Nothing contained in Paragraph 34 above will affect or be deemed to

modify, in whole or in part, the Debtor's liability for claims and expenses of Starwood, W Hotel

Management, or Culinary Concepts, in accordance with this Sale Approval Order, the

Agreement, and Section 365 of the Bankruptcy Code and applicable law.  Accordingly, if, after

the Closing of the transactions contemplated by the Agreement, any monies are paid to

Starwood, W Hotel Management, or Culinary Concepts by the Purchaser (i) under Paragraph 34

above or (ii) which constitute obligations of the Debtor under the Agreement or this Sale

Approval Order, then the Purchaser shall be entitled to an allowed administrative expense claim

against the Debtor under section 503(b) of the Bankruptcy Code for the full amount paid by the

Purchaser to Starwood, W Hotel Management, or Culinary Concepts.  Purchaser's allowed

administrative expense claim will be paid to Purchaser, in full, within 20 days following

Purchaser's provision of written notice to the Debtor of such administrative expense claim. Any

plan of reorganization of the Debtor and/or its affiliated debtors in these bankruptcy cases, and

any order confirming such a plan of reorganization, will provide that any payment due to

Purchaser under this Paragraph 35 will be paid by the Debtor, or the reorganized debtors as the

case may be, to the Purchaser, in full, within 20 days following Purchaser's provision of written

notice to the Debtor, or the reorganized debtors as the case may be, of such administrative

expense claim.

36.     Notwithstanding Paragraphs 34 and 35 above, nothing contained in this

Sale Approval Order will, or will be deemed to: (i) modify the provisions of the Agreement

related to the allocation of expenses between the Debtor and the Purchaser in accordance with

the Agreement; or (ii) release or discharge the Debtor from its obligation to pay all

administrative expense claims under Management Contract, the Technical Services Agreement,

and the Restaurant Management Agreement which occur or arise after the commencement of

these bankruptcy cases and before the Closing of the transactions contemplated by the

Agreement.

37.     W Hotel Management, Starwood, and/or Culinary Concepts will assist and

cooperate with Purchaser in Purchaser's filing and making a claim against Debtor's or

Purchaser's, as the case may be, insurance policy(ies) with respect to any and all claims under

Management Contract, the Technical Services Agreement, or the Restaurant Management

Agreement and Paragraphs 34, 35 and 36 above; provided that any limitation and denial of such

insurance will not limit or release Purchaser's liability under Paragraph 34 above.

38.     As further adequate assurances of future performance of the Purchaser's

performance under the Management Contract, Purchaser shall deposit into the Hotel operating

account the amount of four hundred thousand dollars ($400,000) and the funds in the Hotel's reserve account as of the "Cut-Off Time," as that term is defined in the Agreement, shall be transferred to, and deposited in, the account established by the Purchaser as the Hotel reserve account, consistent with the terms of the Agreement.

39.     Nothing contained in this Sale Approval Order shall, or shall be deemed to, expand the scope of the indemnification provided by "Owner:" (i) under the Management Contract to W Hotel Management and Starwood; (ii) under the Technical Services Agreement to Starwood; and/or (iii) under the Restaurant Management Agreement to Culinary Concepts. Nothing contained in this Sale Approval Order shall, or shall be deemed to, limit or otherwise affect the obligations: (i) of W Hotel Management and Starwood to "Owner" under the Management Contract; (ii) of Starwood to "Owner" under the Technical Services Agreement; and (iii) of Culinary Concepts to "Owner" under the Restaurant Management Agreement.

### DELIVERY OF PROCEEDS

40.     At least two (2) business days prior to the Closing, the Debtor shall deliver to Prudential a schedule of the estimated allocation of the Purchase Price and a reasonably detailed schedule of adjustments to the Purchase Price pursuant to the Agreement or Sale Approval Order ("Purchase Price Adjustments") and Closing Costs and amount escrowed in respect of completion of the Theme Bar (the "Theme Bar Escrow Account"). Such estimated allocation shall set forth the amount of net proceeds that will be paid to Prudential at Closing. Debtor and Purchaser agree that on the date of Closing, the net proceeds of the Sale shall be sent via wire transfer directly to Prudential in reduction of the Debtor's obligations outstanding under the Prudential Loan Documents. In the event that any funds held-back or reserved by the Debtor in respect of Closing Costs or the Theme Bar Escrow Account are not utilized or paid by the

Debtor, such unused funds shall be paid to Prudential in reduction of the Debtor's obligations to

Prudential *immediately upon release of the funds from the Theme Bar escrow account.*

## ADDITIONAL PROVISIONS

41.     Except as expressly set forth in the Agreement and in this Sale Approval

Order, the Purchaser and its successors or assigns shall have no liability for any liability, claim

(as that term is defined in section 101(5) of the Bankruptcy Code), damages or other obligation

of or against the Debtor related to the Property by reason of the transfer of the Property to the

Purchaser. The Purchaser shall not be deemed, as a result of any action taken in connection with

the purchase of the Property, to: (a) be a legal successor, or otherwise be deemed a successor to

the Debtor or the Affiliated Debtors (other than with respect to any obligations arising under the

Assumed Contracts or the Starwood Agreements from and after the Closing); (b) have, *de facto*

or otherwise, merged with or into the Debtor or the Affiliated Debtors; (c) be a mere

continuation or substantial continuation of the Debtor or the Affiliated Debtors, or the enterprise

of the Debtor or the Affiliated Debtors; or (d) have any liability whatsoever, other than the

Assumed Liabilities, under any theory of, without limitation, environmental, labor and

employment, products or antitrust liability, whether known or unknown at the Closing, now

existing or hereafter arising, asserted or unasserted, fixed or contingent, liquidated or

unliquidated.

42.     Effective upon the Closing, all persons and entities are forever prohibited

and enjoined from commencing or continuing any action or proceeding, at law or in equity,

against the Purchaser, its affiliates, successors and assigns, or the Property, with respect to any

(a) Encumbrance other than the Permitted Exceptions or (b) successor liability of the Purchaser for any of the Debtors.

43.    Effective upon the Closing, no default shall exist under any of the Assumed Contracts and no non-debtor counterparty to any of the Assumed Contracts shall be permitted to declare a default by the Purchaser or otherwise take action against the Purchaser as a result of the Debtor's financial condition, bankruptcy, or failure to perform any duty or obligation under any of the Assumed Contracts.

44.    Effective upon the Closing, the Subordination and Non-Disturbance Agreements executed by Starwood, SW Boston and The Prudential Insurance Company of America, and the Subordination and Non-Disturbance Agreements executed by Starwood, SW Boston and the City of Boston shall be deemed terminated, except as to the CMLA, and as it may be amended, provided however that the Purchaser shall have no obligation thereunder and the SNDA shall have no force or effect with respect to the Property *and nothing in the SNDA shall alter or amend the termination Rights provided to Starwood in the CMLA, as amended.*

45.    So long as the Closing occurs, and thus the Deed reflecting the transfer of the Real Property (as such terms are defined in the Agreement) is recorded on or after the date that an order is entered confirming a plan of reorganization of the Debtor, the transfer of the Real Property to the Purchaser under this Sale Approval Order shall be exempt from any transfer or stamp tax under Bankruptcy Code Section 1146(a), whether imposed or assessable against the Debtor or the Purchaser; provided, however, that nothing contained in this Paragraph 45 shall be deemed to amend the Agreement so as to extend or delay the Closing Date or the Outside Closing Date (as such terms are defined in the Agreement).

46.    While the Debtor's bankruptcy case, or any subsequent chapter 7 bankruptcy case of the Debtor, is pending, this Court shall retain jurisdiction to, among other

things, interpret, enforce and implement the terms and provisions of this Sale Approval Order and the Agreement, all amendments thereto, any waivers and consents thereunder (and of each of the agreements executed in connection therewith in all respects) and to adjudicate disputes related to this Sale Approval Order or the Agreement.

47.     Nothing in this Sale Approval Order or the Agreement releases, nullifies, or enjoins the enforcement of any liability to a governmental unit under environmental statutes or regulations (or any associated liabilities for penalties, damages, cost recovery or injunctive relief) that any entity would be subject to as the owner or operator of the Property after the date of entry of this Sale Approval Order.  Notwithstanding the foregoing sentence, nothing in this Sale Approval Order shall be interpreted to deem the Purchaser as the successor to the Debtors under any state law successor liability doctrine with respect to any liabilities under environmental statutes or regulations for penalties for days of violation prior to entry of this Sale Approval Order or for liabilities relating to off-site disposal of waste by the Debtor prior to entry of this Sale Approval Order.

48.     No bulk sales law, or similar law of any state or other jurisdiction shall apply in any way to the transactions contemplated by the Agreement, the Sale Motion and this Sale Approval Order.

49.     The transactions contemplated by the Agreement are undertaken by the Purchaser in good faith, as that term is used in section 363(m) of the Bankruptcy Code, and accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the Sale shall not affect the validity of the Sale to the Purchaser, unless such authorization is duly stayed pending such appeal.

50.     The terms and provisions of the Agreement and this Sale Approval Order shall be binding in all respects upon, and shall inure to the benefit of, the Debtors, their estates and their creditors, the Purchaser, and their respective affiliates, successors and assigns, and any affected third parties including, but not limited to, all persons asserting claims in the Property to be sold to the Purchaser pursuant to the Agreement, notwithstanding any subsequent appointment of any trustee, examiner or receiver under any chapter of the Bankruptcy Code or any other law, and all such provisions and terms shall likewise be binding on such trustee (whether under chapter 7 or chapter 11 of the Bankruptcy Code), examiner or receiver and shall not be subject to rejection or avoidance by the Debtor, its estate, its creditors, its shareholders or any trustee, examiner or receiver.

51.     The failure specifically to include any particular provisions of the Agreement in this Sale Approval Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the Agreement be authorized and approved in its entirety.

52.     The Agreement, and any related agreements, documents or other instruments, may be modified, amended or supplemented by the parties thereto, in a writing signed by both parties, and in accordance with the terms thereof, without further order of the Court, provided that any such modification, amendment or supplement does not materially change the terms of the Agreement.

53.     In the event that there is a direct conflict between the terms of this Sale Approval Order and the Agreement, the terms of this Sale Approval Order shall control.

54.     Each and every federal, state and local governmental agency, department or official is hereby directed to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the Agreement.

55.     As provided by Rules 6004(h) and 6006(d) of the Federal Rules of Bankruptcy Procedure, this Sale Order shall not be stayed for 14 days after the entry of the Sale Approval Order and shall be effective immediately upon entry, and the Debtor and the Purchaser are authorized to close the Sale immediately upon entry of this Sale Approval Order.

Dated:   Boston, Massachusetts
         May 24, 2011

_____
UNITED STATES BANKRUPTCY JUDGE

#596896

# EXHIBIT 1

## LIST OF ASSUMED CONTRACTS

### [See Attached]

# EXHIBIT 1

## ASSUMED CONTRACTS

<u>**Cure Amount**</u>

1. <u>**W Hotel Management, Inc.**</u> Management Contract dated as of August 23, 2005 by and between SW Boston Hotel Venture LLC and Starwood Hotels & Resorts Worldwide, Inc. ("Starwood"), as assigned by Starwood to W Hotel Management, Inc., a Delaware corporation pursuant to that certain Assignment and Assumption Agreement dated as of December 7, 2007, and amended by a First Amendment to Management Contract dated January 15, 2008; a Second Amendment dated September 11, 2009; a Third Amendment dated as of September 30, 2009; and a Fourth Amendment to Management Contract dated September 30, 2009. — $0.00

2. <u>**W Hotel Management, Inc.**</u> Management Contract for Bliss Spa at the W Boston dated as of September 30, 2009 by and between SW Boston Hotel Venture LLC and W Hotel Management, Inc. — $0.00

3. <u>**Culinary Concepts (Boston) LLC.**</u> Restaurant Management Agreement dated September 11, 2009 between SW Boston Hotel Venture LLC and Culinary Concepts (Boston) LLC, as amended by a First Amendment to Restaurant Management Agreement dated as of May 3, 2010 and the Second Amendment to the Restaurant Management Agreement. — $0.00

4. <u>**Ultimate Parking, LLC.**</u> Valet Parking Agreement dated September 30, 2009 by and between SW Boston Hotel Venture LLC and Ultimate Parking, LLC, as amended by a First Amendment to Valet Parking Agreement dated as of March 29, 2010. — $0.00

5. <u>**Wink Retail Group, Inc.**</u> Retail Management Agreement dated September 30, 2009 between SW Boston Hotel Venture LLC and Wink Retail Group, Inc. — $0.00

6. <u>**Starwood Hotels & Resorts Worldwide, Inc.**</u> Technical Services Agreement dated August 23, 2005 between Starwood Hotels & Resorts Worldwide, Inc. and SW Boston Hotel Venture LLC, as amended by that certain First Amendment to Technical Services Agreement dated as of January 15, 2008 and by that certain Management Contract for Bliss Spa at the W Boston dated September 30, 2009. — $21,094.99

7. <u>**ADP, Inc.**</u> Participation Agreement by and between ADP, Inc. and SW Boston Hotel Venture LLC dated December 21, 2009. — $0.00

8. <u>**Book4Time, Inc.**</u> License & Service Agreement by and between — $0.00

#592456

Book4Time, Inc. and SW Boston Hotel Venture LLC dated November 22, 2010.

9.  **Certegy Check Services, Inc.**  Warranty Agreement by and between Certegy Check Services, Inc. and SW Boston Hotel Venture LLC dated October 16, 2009.                                                                    $0.00

10. **Elavon, Inc.**  Agreement Terms and Conditions by and between Elavon, Inc. and SW Boston Hotel Venture LLC dated October 1, 2009.      $0.00

11. **EZ Yield.com, Inc.**   Subscriber Agreement by and between EZ Yield.com, Inc. and SW Boston Hotel Venture LLC dated May 11, 2009.                                                                             $0.00

12. **Fifth Avenue Limousine Service, Inc.**  Limousine Services Agreement by and between Fifth Avenue Limousine Service, Inc. (aka Dav El of Boston) and SW Boston Hotel Venture LLC dated October 31, 2009.       $0.00

13. **Galaxy Hotel Systems LLC**  Galaxy System and Services Agreement by and between Galaxy Hotel Systems LLC and SW Boston Hotel Venture LLC dated April 14, 2009.                                              $0.00

14. **Global Business Center, Inc.**  GBCblue Technology Solutions and Services Special Terms Sheet by and between Global Business Center, Inc. and SW Boston Hotel Venture LLC dated July 23, 2010.               $0.00

15. **Guest-Tek Interactive Entertainment Inc.**  Guest-Tek IP Systems and Services Purchase Agreement by and between Guest-Tek Interactive Entertainment Inc. and SW Boston Hotel Venture LLC dated August 17, 2009.                                                               $0.00

16. **Gym Services** Service Contract Proposal by and between Gym Services and SW Boston Hotel Venture LLC.                                       $0.00

17. **John's Sewer & Pipe Cleaning, Inc.**  Service Agreement by and between John's Sewer & Pipe Cleaning, Inc. and SW Boston Hotel Venture LLC dated September 22, 2009.                                          $0.00

18. **LodgeNet Interactive Corporation** LodgeNet SigNETure TV HD Agreement and Customer Purchase Order by and between LodgeNet Interactive Corporation and SW Boston Hotel Venture LLC dated August 10, 2009.                                                               $0.00

19. **Lutron Services Co., Inc.** Support and Maintenance Plan Order Form by and between Lutron Services Co., Inc. and SW Boston Hotel Venture LLC dated January 12, 2011.                                                    $0.00

20. **Metropolitan Linen Services** Metropolitan Linen Service Agreement      $0.00

by and between Metropolitan Linen Services and SW Boston Hotel
Venture LLC dated October 20, 2010.

| | | |
|---|---|---|
| 21. | **MICROS** MSA Proposal by and between MICROS and SW Boston Hotel Venture LLC dated October 4, 2010. | $0.00 |
| 22. | **Milton CAT** Customer Service Agreement by and between Milton CAT and SW Boston Hotel Venture LLC dated October 7, 2009. | $0.00 |
| 23. | **MD Cleaning, Inc.** Service Agreement by and between MD Cleaning, Inc. and SW Boston Hotel Venture LLC dated August 5, 2009. | $0.00 |
| 24. | **MusicStyling.com Ltd.** Second Schedule United States Participating Hotel Addendum by and between MusicStyling.com Ltd. and SW Boston Hotel Venture LLC dated May 2, 2009. | $0.00 |
| 25. | **PAETEC Communications, Inc.** Service Agreement by and between PAETEC Communications, Inc. and SW Boston Hotel Venture LLC. | $0.00 |
| 26. | **Pitney Bowes, Inc.** Hardware Service Agreement Multi-Vendor Services by and between Pitney Bowes, Inc. through its Global Mainstream Solutions Division and W Boston dated December 3, 2009.* | $0.00 |
| 27. | **Prolitect, Inc.** Master Client Agreement by and between Prolitect, Inc. and Bliss World LLC dated October 21, 2009.* | $0.00 |
| 28. | **Audio Visual Services Group, Inc.** Hotel Service Agreement by and between Audio Visual Services Group, Inc. and SW Boston Hotel Venture LLC dated June 3, 2009. | $0.00 |
| 29. | **Ricoh Americas Corporation** Order Agreement by and between Ricoh Americas Corporation and SW Boston Hotel Venture LLC dated August 26, 2006 and October 18, 2009. | $0.00 |
| 30. | **Royal Hospitality Services, Inc.** Laundry Service Contract by and between Royal Hospitality Services, Inc. and SW Boston Hotel Venture LLC dated May 12, 2009. | $0.00 |
| 31. | **Royal White Laundry** Laundry/Dry Cleaning Off-Site Services Agreement by and between Royal White Laundry and SW Boston Hotel Venture LLC dated November 1, 2009. | $0.00 |
| 32. | **Save that Stuff, Inc.** Service Agreement by and between Save that Stuff, Inc. and W Hotel.* | $0.00 |
| 33. | **Shift 4 Corporation** Corporate Affiliate Agreement by and between Shift 4 Corporation and SW Boston Hotel Venture LLC dated | $0.00 |

#592456

October 21, 2009.

| | | |
|---|---|---|
| 34. | **SpaFinder, Inc.**  Agreement by and between SpaFinder, Inc. and SW Boston Hotel Venture LLC dated September 27, 2010. | $0.00 |
| 35. | **The Customer Connection, Inc.**  Gift Card Services Contract by and between The Customer Connection, Inc. and SW Boston Hotel Venture LLC dated November 23, 2009. | $0.00 |
| 36. | **TelNet Corporation**  Master Maintenance Agreement by and between TelNet Corporation and SW Boston Hotel Venture LLC dated October 4, 2010. | $0.00 |
| 37. | **TRAVELCLICK, Inc.**  Form of Hotel Agreement by and between TRAVELCLICK, Inc. and W Boston dated July 9, 2010.* | $0.00 |
| 38. | **Cellco Partnership, dba Verizon Wireless** Major Account Agreement by and between Cellco Partnership, dba Verizon Wireless and SW Boston Hotel Venture LLC dated July 6, 2009. | $0.00 |
| 39. | **The 100 Stuart Street Primary Condominium Association** Collection Agreement by and between The 100 Stuart Street Primary Condominium Association and SW Boston Hotel Venture LLC and as acknowledged by The 110 Stuart Street Residential Condominium Association dated as of November 15, 2010. | $0.00 |
| 40. | **Bliss World Card Company** Stored Value Card Agreement by and between Bliss World Card Company and SW Boston Hotel Venture LLC dated as of November 23, 2009. | $0.00 |
| 41. | **BRA** Cooperation Agreement by and between the BRA and SW Boston Hotel Venture LLC dated June 14, 2007. | $0.00 |
| 42. | **Office of Jobs and Community Services** Memorandum of Understanding by and between the Office of Jobs and Community Services and SW Boston Hotel Venture LLC dated June 26, 2007. | $0.00 |
| 43. | **Office of Jobs and Community Services** First Source Agreement by and between the Office of Jobs and Community Services and SW Boston Hotel Venture LLC dated June 26, 2007. | $0.00 |
| 44. | **Boston Employment Commission** Boston Residents Construction Employment Plan for W Boston Hotel and Residences by and among the BRA, the Boston Employment Commission and SW Boston Hotel Venture LLC dated June 26, 2007. | $0.00 |
| 45. | **Boston Transportation Department** Transportation Access Plan Agreement by and between Boston Transportation Department and SW | $0.00 |

#592456

Boston Hotel Venture dated December 12, 2007, as amended by that First Amendment to Transportation Access Plan Agreement dated March 31, 2010.

| | | |
|---|---|---|
| 46. | **Bay Village Neighborhood Association, Inc.**   Bay Village Neighborhood Cooperation Agreement by and among the Bay Village Neighborhood Association, Inc., SW Boston Hotel Venture LLC, 131 Arlington Street Trust, General Land Corp., the Boston Redevelopment Authority, and The City of Boston dated August 8, 2001. (To be partially assigned to Purchaser) | $0.00 |
| 47. | **Leasing Associates of Barrington, Inc.**   Lease Agreement by and between Leasing Associates of Barrington, Inc. and SW Boston Hotel Venture LLC dated June 17, 2009. | $0.00 |
| 48. | **LodgeNet Interactive Corporation** LodgeNet SigNETure TV HD Agreement and Customer Purchase Order by and between LodgeNet Interactive Corporation and SW Boston Hotel Venture LLC dated August 10, 2009. | $0.00 |
| 49. | **Pitney Bowes** Pitney Bowes Lease dated November 9, 2009. | $0.00 |
| 50. | **Ricoh Americas Corporation** Ricoh Lease Agreement (Quote 413593) by and between Ricoh Americas Corporation and SW Boston Hotel Venture LLC dated August 26, 2009. | $0.00 |
| 51. | **Ricoh Americas Corporation** Ricoh Lease Agreement (Quote 413625) by and between Ricoh Americas Corporation and SW Boston Hotel Venture LLC dated August 26, 2009. | $0.00 |
| 52. | **Ricoh Americas Corporation** Ricoh Lease Agreement (Quote 449798) by and between Ricoh Americas Corporation and SW Boston Hotel Venture LLC dated October 18, 2009. | $0.00 |

*While these agreements do not explicitly name SW Boston Hotel Venture LLC as one of the parties thereto, the obligations thereunder are acknowledged to be obligations of SW Boston Hotel Venture LLC.

#592456

## LICENSES AND PERMITS

| License/Permit/Certificate | License/Permit/Certificate Number |
|---|---|
| **Licenses:** | |
| 1. City of Boston Entertainment License | 907 |
| 2. City of Boston Fuel Storage License | BFD0216912 |
| 3. Massage License | 455 |
| 4. Cosmetology License/Aesthetic | 64907 |
| 5. Cosmetology License/Manicure | 65621 |
| **Permits:** | |
| 6. BFD1 (W Lounge) | BFD0214200 |
| 7. BFD2 (Mezzanine Level – Meeting Rooms) | BFD0214202 |
| 8. BFD3 (Lobby - CCJG Restaurant – Market) | BFD0214201 |
| 9. BFD4 (Bliss acetone/alcohol permit) | BFD0220587 |
| 10. Health Permit (Market) | 33807, 33808, 34703 |
| 11. Health Permit (Banquet) | 33809 |
| 12. Health Permit (Lounge) | 33811 |
| 13. Health Permit (Bliss) | 37171 |
| 14. ISD 1 (Meeting Rooms) | 73173 |
| 15. ISD 2 (Market) | 73174 |
| 16. ISD 3 (Lobby Bar) | 73172 |
| 17. ISD 4 (Hotel) | 73171 |
| 18. Certificate of Occupancy | COO36204 |
| 19. Valet Parking Permit | |

BOS111 12561244.11

**Certificates**:

| | | |
|---|---|---|
| 20. | Elevator – Bliss (Spa-1) | I-P-12933 |
| 21. | Elevator – Descent (TB-1) | I-P-12934 |
| 22. | Elevator – H1 | I-P-12827 |
| 23. | Elevator – H2 | I-P-12828 |

BOS111 12561244.11