# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MASSACHUSETTS
### EASTERN DIVISION

|  |  |  |
|---|---|---|
| In re | ) | Chapter 11 |
|  | ) | Case No. 10-14535 (JNF) |
| **SW BOSTON HOTEL VENTURE, LLC, *et al.*,**[1] | ) |  |
|  | ) | Jointly Administered |
| Debtors. | ) |  |
|  | ) |  |

## OBJECTION OF THE PRUDENTIAL INSURANCE COMPANY OF AMERICA TO CONFIRMATION OF THE JOINT PLAN OF REORGANIZATION OF SW BOSTON HOTEL VENTURE, LLC AND ITS AFFILIATED DEBTORS

Dated:  June 24, 2011

GOODWIN PROCTER LLP
Emanuel C. Grillo
The New York Times Building
620 Eighth Avenue
New York, New York 10018-1405
Telephone:  (212) 813-8800
Facsimile:  (212) 355-3333
Email:  egrillo@goodwinprocter.com

GOODWIN PROCTER LLP
Gina Lynn Martin
Exchange Place
Boston, Massachusetts 02109
Telephone:  (617) 570-1000
Facsimile:  (617) 523-1231
Email: gmartin@goodwinprocter.com

*Attorneys for The Prudential Insurance Company of America on Behalf and Solely for the Benefit of, and with its Liability Limited to the Assets of, its Insurance Company Separate Account, PRISA*

---

[1]    The "**Debtors**" are SW Boston Hotel Venture, LLC (Case No. 10-14535-JNF), Auto Sales & Service, Inc. (Case No. 10-14528-JNF), General Trading Company (Case No. 10-14532-JNF), Frank Sawyer Corporation (Case No. 10-14533-JNF), 100 Stuart Street, LLC (Case No. 10-14534-JNF), 30-32 Oliver Street Corporation (Case No. 10-16173-JNF), General Land Corporation (Case No. 10-16174-JNF), and 131 Arlington Street Trust (Case No. 10-16177-JNF).

**Table of Contents**

                                                                                      **Page**

PRELIMINARY STATEMENT ................................................................................1

FACTS AND PROCEDURAL BACKGROUND ................................................6

A.      The Prudential Loan.................................................................................6

B.      Bankruptcy Proceedings ........................................................................9

C.      Prudential has been and Remains Oversecured in these Chapter 11 Cases Up
        to the Value of the Collateral ................................................................12

D.      Other Claims and Intercreditor Issues ..............................................14

E.      The Plan.....................................................................................................15

ARGUMENT.....................................................................................................................16
        I.      Prudential is Oversecured and Entitled to the Full Amount of Accrued
                Postpetition Interest, Fees and Costs To The Extent of the Value of Its
                Collateral..................................................................................16
        II.     The Debtors Must Establish that the Plan Is Confirmable By Clear and
                Convincing Evidence .............................................................20
        III.    The plan Improperly Imposes substantive consolidation On Prudential
                Offensively..............................................................................21
                A.      Substantive Consolidation Only Prejudices Prudential ............ 22
                B.      The Debtors Have Not Satisfied the Strict Standards for
                        Substantive Consolidation ................................................ 23
        IV.     The Debtors Cannot Cram The Plan Down On Prudential Under
                Section 1129(b) of the Bankruptcy Code...............................25
                A.      The Plan is Not Fair and Equitable ........................................... 25
                B.      The Plan Violates the Absolute Priority Rule........................... 32
        V.      The Debtors' Lackluster Sales, Lack of Earnings And Weak Capitalization
                Render the Plan Not Feasible.................................................33
                A.      The Debtors' Sales Remain Weak ............................................ 35
                B.      The Reorganized Debtors Will Have No Earnings.................... 35
                C.      The Reorganized Debtors will Have Inadequate Capital upon
                        Emergence from Chapter 11 ................................................... 36
                D.      The Debtors' Management Will Remain the Same ................... 37
                E.      If Starwood Terminates the CMLA, the Value of the Residences
                        Will Plummet.......................................................................... 37
        VI.     The Plan Cannot Satisfy the Best Interests Test Provided for Pursuant to
                Section 1129(a)(7) of the Bankruptcy Code ..........................38
        VII.    The Plan Fails to Comply with the Applicable Provisions of the
                Bankruptcy Code as requred by section 1129(**a**)(1) ..............41

A.      The Plan Fails to Comply with Section 1122 of the Bankruptcy
        Code ............................................................................................................ 41

B.      The Plan Fails to Prohibit the Issuance of Nonvoting Equity
        Securities in Violation of Section 1123(a)(6) ............................................ 42

VIII.   The Debtors Have Not Complied With The bankruptcy Code as Required
        By Section 1129(A)(2) ..........................................................................................43

IX.     THE Plan's treatment of insiders demonstrates the lack of good faith and
        violates section 1129(a)(3) ...................................................................................44

X.      The Plan Violates Section 1129(a)(5) because it Fails to Identify the
        Reorganized Debtors' Officers and Directors and Their Respective
        Compensation .......................................................................................................47

XI.     The Plan Fails to Properly Implement the Subordination Agreement
        between Prudential and the City ...........................................................................48

A.      The Ballots Cast by Prudential on Behalf of the City Must be
        Counted In Lieu of any Ballots Submitted by the City Itself .................. 49

ii

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*ACC Bondholder Group v. Adelphia Commc'ns Corp. (In re Adelphia Commc'ns Corp.)*,
  361 B.R. 337 (S.D.N.Y. 2007) ................................................................................38

*Ahlers v. Norwest Bank Worthington (In re Ahlers)*,
  794 F.2d 388 (8th Cir. 1986) ...............................................................................17

*Beal Bank, S.S.B. v. Waters Edge Ltd. P'ship*,
  248 B.R. 668 (D. Mass. 2000) .............................................................................20

*Broad. Capital, Inc. v. Davis Broad., Inc. (In re Davis Broadcasting, Inc.)*,
  169 B.R. 229 (Bankr. M. D. Ga. 1994)................................................................50

*Chesapeake Investment Servs., Inc. v. Olive Group Corp.*,
  No. 022654, 2003 WL 369682 (Mass. Super. Jan 30, 2003)................................51

*Dewsnup v. Timm*,
  502 U.S. 410 (1992)..............................................................................................18

*In re Addison Properties Ltd. P'ship*,
  185 B.R. 766 (Bankr. N.D. Ill. 1995) ..................................................................19

*In re Aerosol Packaging, LLC*,
  362 B.R. 43 (Bankr. N.D. Ga. 2006) ..............................................................50, 51

*In re Ambanc La Mesa Ltd. P'Ship*,
  115 F.3d 650 (9th Cir. 1997) ...............................................................................45

*In re American Homepatient, Inc.*,
  298 B.R. 152 (Bankr. M.D. Tenn. 2003) ..............................................................28

*In re Augie/Restivo Baking Co., Ltd.*,
  860 F.2d 515 (2d Cir. 1988)....................................................................22, 23, 24

*In re Auto-Train Corp., Inc.*,
  810 F2d 270 (D.C. Cir. 1987) ..............................................................................23

*In re Avondale Gateway Center Entitlement, LLC*,
  No. 10-1772, 2011 WL 1376997 (D. Ariz. Apr. 12, 2011) .............................50, 51

*In re Bank of New England Corp.*,
  364 F.3d 355 (1st Cir. 2004).................................................................................51

*In re Bank of New England Corp.*,
    404 B.R. 17 (Bankr. D. Mass. 2009) ....................................................................49

*In re Barney*,
    170 B.R. 17 (1994)..............................................................................................42

*In re Barr*,
    38 B.R. 323 (Bankr. E.D. Mich. 1984) ...............................................................45

*In re Bergman*,
    585 F.2d 1171 (2d Cir. 1978).......................................................................33, 35

*In re Blake*,
    2009 WL 4349787 (Bankr. D. Mass. Nov. 30, 2009)..............................17, 18, 19

*In re Block Shim Dev. Company–Irving*,
    939 F.2d 289 (5th Cir. 1991) ..............................................................................44

*In re Bryson Properties, XVIII*,
    961 F.2d 496 (4th Cir. 1992) ........................................................................25, 26

*In re Cajun Elec. Power Coop.*,
    150 F.3d 503 (5th Cir. 1998) ..............................................................................44

*In re Camesinos Unidos, Inc.*,
    219 B.R. 886 (Bankr. S.D. Cal. 1998) .................................................................34

*In re Coram Healthcare Corp.*,
    271 B.R. 228 (Bankr. D. Del 2001) .....................................................................44

*In re Credit Industrial Corp.*,
    366 F2d 402 (2d Cir. 1966)..................................................................................49

*In re Curtis Center Ltd. P'ship*,
    192 B.R. 648 (Bankr. E.D. Pa. 1996) ..................................................................50

*In re Duval Manor Assoc.*,
    191 B.R. 622 (Bankr. E.D. Pa. 1996) ............................................................19, 20

*In re Erickson Retirement Communities, LLC*,
    425 B.R. 309 (Bankr. N.D. Tex. 2010)................................................................50

*In re Future Energy Corp.*,
    83 B.R. 470 (Bankr. S.D. Ohio 1988)..................................................................45

*In re Genesis Health Ventures, Inc.*,
    266 B.R. 591 (Bankr. D. Del. 2001) ........................................................20, 21, 44

2

*In re Global Ocean Carriers Ltd.*,
    251 B.R. 31 (Bankr. D. Del. 2000) ...................................................................39

*In re Grenada Wines, Inc.*,
    748 F.2d 42 (1st Cir. 1984) ...........................................................................41

*In re Griswold Bldg, LLC*,
    420 B.R. 666 (Bankr. E.D. Mich. 2009) .........................................................30

*In re Harford Sands Inc.*,
    372 F.3d 637 (4th Cir. 2004) .........................................................................46

*In re Ion Media Networks, Inc.*,
    419 B.R. 585 (Bankr. S.D.N.Y. 2009) ...........................................................50

*In re Johns-Manville Corp.*,
    68 B.R. 618 (Bankr. S.D.N.Y. 1986 ..........................................................41, 43

*In re Johnson*,
    145 B.R. 108 (Bankr. S.D. Ga. 1992) ............................................................17

*In re JRV Indus., Inc.*,
    344 B.R. 679 (Bankr. M.D. Fla. 2006) .......................................................33, 34

*In re Kain*,
    86 B.R. 506 (Bankr. W.D. Mich. 1988) ..........................................................17

*In re Kors*,
    819 F.2d 19 (2d Cir. 1987) .............................................................................49

*In re Landing Assoc., Ltd.*,
    122 B.R. 288 (Bankr. W.D. Tex. 1990) ..........................................................17

*In re Leslie Fay Co.*,
    207 B.R. 764 (Bankr. S.D.N.Y. 1997) ...........................................................44

*In re Madison Hotel Assocs.*,
    749 F.2d 410 (7th Cir. 1984) .........................................................................44

*In re MCorp Fin., Inc.*,
    137 B.R. 219 (Bankr. S.D. Tex. 1992) ...........................................................21

*In re Miami Ctr. Assocs., Ltd.*,
    144 B.R. 937 (Bankr. S.D. Fla. 1992) ............................................................21

*In re Montgomery Apartments of Ingham County, Ltd.*,
    141 B.R. 324 (Bankr. S.D. Oh. 1992) ............................................................26

3

*In re Northern Outer Banks Assoc., LLC,*
   2010 WL 4630348 (Bankr. E.D.N.C. Nov. 8, 2010) ............................................42

*In re Northwest Timberline Enters. Inc.,*
   348 B.R. 412 (Bankr. N.D. Tex. 2006)..............................................................30

*In re Orfa Corp. of Philadelphia,*
   129 B.R. 404 (Bankr. E.D. Pa. 1991) ...............................................................34

*In re Owens Corning,*
   419 F.3d 195 (3d Cir. 2005)...........................................................3, 21, 22, 24

*In re Pacific Lumber Co.,*
   584 F.3d 229 (5th Cir. 2009) ..........................................................................31

*In re Reddington/Sunarrow Ltd. P'ship,*
   119 B.R. 809 (Bankr. D.N.M. 1990) ............................................................17, 19

*In re Rusty Jones, Inc.,*
   110 B.R. 362 (Bankr. N.D. Ill. 1990) ................................................................39

*In re Schoeneberg,*
   156 B.R. 63 (Bankr. W.D. Tex. 1993)................................................................34

*In re SCOPAC,*
   624 F.3d 274 (5th Cir. 2010) ...........................................................................20

*In re Seip,*
   116 B.R. 709 (Bankr. D. Neb. 1990) .................................................................17

*In re Shadow Bay Apartments, Ltd.,*
   157 B.R. 363 (Bankr. S.D. Ohio 1993)...............................................................21

*In re Snyder,*
   967 F.2d 1126 (7th Cir. 1992) .........................................................................45

*In re Stolrow's Inc.,*
   84 B.R. 167 (B.A.P. 9th Cir. 1988)....................................................................44

*In re Sunset Hollow Props. LLC,*
   359 B.R. 366 (Bankr. D. Mass. 2007) ...............................................................49

*In re T-H New Orleans Ltd. P'Ship,*
   116 F.3d 790 (5th Cir. 1997) ......................................................................17, 18

*In re Teltronics Servs., Inc.,*
   29 B.R. 139 (Bankr. E.D.N.Y. 1983)..................................................................46

4

*In re Tools-4-Hire, Inc.*,
438 B.R. 440 (Bankr. D. Mass. 2010) ...................................................................19

*In re Toy & Sports Warehouse, Inc.*,
37 B.R. 141 (Bankr. S.D.N.Y. 1984) ..............................................................41, 43

*In re Urban Broad. of Cincinnati, Inc.*,
No. , 1994 WL 646176 (E.D. La. Nov. 16, 1994) ...............................................50

*In re Walker*,
165 B.R. (E.D. Va. 1994) ...................................................................................34

*In re Waterville Valley Town Square Assocs.*,
208 B.R. 90 (Bankr. D.N.H. 1997) ......................................................................21

*In re Weber*,
209 B.R. 793 (Bankr. D. Mass. 1997) .................................................................44

*In re Zenith Elecs. Corp.*,
241 B.R. 92 (Bankr. D. Del. 1999) ......................................................................44

*Pepper v. Litton*,
308 U.S. 295 (1939).............................................................................................46

*Pizza of Hawaii, Inc. v. Shakey's, Inc. (In re Pizza of Hawaii, Inc.)*,
761 F2d 1374 (9th Cir. 1985) ..............................................................................33

*Till v. SCS Credit Corp.*,
541 U.S. 465 (2004)..............................................................................29, 30, 31

## STATUTES

11 U.S.C. § 362.........................................................................................................10

11 U.S.C. § 506..............................................................................................17, 18, 20

11 U.S.C. § 507.........................................................................................................20

11 U.S.C. § 510.................................................................................................. passim

11 U.S.C. § 1107.........................................................................................................9

11 U.S.C. § 1108.........................................................................................................9

11 U.S.C. § 1122....................................................................................................6, 41

11 U.S.C. § 1123....................................................................................................6, 42

11 U.S.C. § 1125..................................................................................................43, 44

5

11 U.S.C. § 1126 ..................................................................................................................43

11 U.S.C. § 1129 ........................................................................................................... passim

**OTHER AUTHORITIES**

BANKRUPTCY LAW MANUAL § 11A:31 ..................................................................................45

BANKRUPTCY LAW MANUAL § 65 ..........................................................................................17

F. R. Bankr. P. 3018 ...............................................................................................................51

F. R. Bankr. P. 9010 ...............................................................................................................51

H.R. REP. NO. 95-595 (1977) ........................................................................................41, 43

*James F. Queenan, et al.*, 6 *Chapter 11 Theory and Practice: A Guide to Reorganization*,
    § 31.05 (1994) ..................................................................................................................21

S. REP. NO. 95-989 (1978) ...........................................................................................41, 43

6

The Prudential Insurance Company of America, on behalf and solely for the benefit of, and with its liability limited to the assets of, its insurance company separate account, PRISA (collectively "**Prudential**"), by and through its undersigned counsel, hereby submits this objection (the "**Objection**") to the Joint Plan of Reorganization of SW Boston Hotel Venture, LLC and its Affiliated Debtors (as amended, the "**Plan**").[2]  In support of its Objection, Prudential respectfully states as follows:

**PRELIMINARY STATEMENT**

Now that the Hotel assets have been sold, the Plan before this Court is simply a straight-forward plan of liquidation.  There is no reorganization.  The Plan is merely a vehicle to subvert the structural priorities of payment under the Bankruptcy Code in order to pay junior creditors (including unsubstantiated Insider claims), to fund operations and to establish working capital reserves all from the proceeds of Prudential's diminishing collateral.  The Debtors propose to make these payments before the payment of Prudential's senior secured claim and its attendant post-petition interest.  This Court found that Prudential was over-secured when it denied Prudential's motion to lift the automatic stay, expressly stating that Prudential had an equity cushion in excess of $19 million at that time.  While the Debtors (and The City of Boston, among others) advocated for that decision then, they now seek to avoid its inevitable consequence, reinforced by the subsequent sale of the Hotel assets, because payment of the post-petition interest to Prudential will eliminate any chance for an indirect or direct recovery for Ms. Parks – the primary purpose of these chapter 11 cases.[3]  In view of the value of Prudential's collateral and its right to payment of post-petition interest, fees and expenses, Prudential is entitled to a

---

[2]     Capitalized terms not otherwise defined in the Motion have the meaning ascribed to them in the Plan.

[3]     The City seeks to avoid the full brunt of the impact Prudential's entitlement to postpetition interest would have on their loan by claiming that Prudential only became oversecured as of the date of the Hotel Sale, which flies in the face of the Court's ruling if the Lift Stay Memorandum

secured claim after application of all proceeds received through May 31, 2011, in the amount of

$82,672,809, not $50-55 million as the Debtors suggest.

Unwilling to pay Prudential its post-petition interest or the full amount of its claim at an

established market rate of interest, the Debtors propose to confirm a plan replete with

insurmountable infirmities, contradictions and omissions. To avoid paying the full amount of

Prudential's secured claim and interest in satisfaction of the cramdown requirements of Section

1129(b), the Debtors rely on their financial advisor's "expert" report that, on its face, neither

reviews nor analyzes the correct, current version of the Plan or related disclosure statement.

Moreover, this report contains only vague conclusory statements about the market, appropriate

interest rates and the feasibility of the plan. Instead, the report relies primarily on impermissible

legal arguments in lieu of financial market data – all to support a below-market rate of interest

that defies commercial logic. The Debtors must hope that the imprimatur of their expert's

historical experience will carry more weight with this Court than the extremely limited substance

of his report.

To end-run the absolute priority rule further, the Debtors manufacture claims for the

benefit of insider affiliates against debtor SW Boston through a letter of credit issued by a third-

party bank in support of the guaranty issued by an indirect owner of SW Boston, the Frank

Sawyer Corporation. The Debtors' conspicuous failure to object to or oppose these claims

constitutes a clear violation of the good faith requirement of Section 1129(a)(3). There is no

documentation evidencing an intercompany claim. Frank Sawyer Corporation, the party for

whom the letter of credit was advanced, expressly waived all rights of subrogation in respect of

any payment made to Prudential. The Debtors represented and covenanted in the Loan

Agreement that no intercompany claims existed. Lastly, the preservation of such intercompany

2

claims would contradict the "deemed substantive consolidation" of SW Boston and its affiliates sought in the Plan and described in more detail below. What is more surprising is that the Debtors adopted this approach despite the admonition in the treatise authored by this Court which expressly states that "a plan proponent's favorable treatment of an insider *will prevent a finding that the plan has been proposed in good faith.*" While the Debtors have retained two highly respected financial advisory firms and distinguished counsel, none of them have apparently explored or investigated the validity or propriety of these claims.

To deprive Prudential of its vote and distributions in the cases of the affiliated debtors, the Debtors offensively employ the "deemed substantive consolidation" expressly rejected by the United States Court of Appeals for the Third Circuit in *Owens Corning*. Despite their reliance on substantive consolidation, the Debtors cannot even demonstrate the predicate elements for such a claim under any precedent. There has been no commingling of assets or inadequate record-keeping among the Debtors required to prove substantive consolidation. Nor can any argument be made that Prudential relied on the "breakdown of entity borders" in its dealings with the Debtors. As further evidence of the impropriety of substantive consolidation here, the Debtors propose to eliminate only some, not all, of the alleged intercompany claims in this maneuver. This tactic creates two principal benefits for the Debtors. First, it allows SW Boston to fund the expenses of the Debtors. Second, it allows Ms. Parks to retain the equity in SW Boston, the owner of the W Residences. Confirmation of this Plan unequivocally requires this Court to disregard the Third Circuit's holding in *Owens Corning* and its progeny.

To skirt their burden on feasibility, the Debtors have engaged in a number of clever tactics intended to create an illusion of potent sales and to hide their actual anemic performance. The Debtors have cobbled together cumulative projections for the sales of condominiums based

solely on the conclusory statements of their broker that have failed to attract the scrutiny of their

financial advisory firm or their feasibility "expert."  In fact, in pre-trial deposition testimony, one

of the Debtors' key advisors has even admitted that they backed into the projected revenue

numbers from aggregate sales number provided by their paid broker.[4]

Furthermore, notwithstanding the Debtors' broker's anticipated testimony that sales will

accelerate and prices will escalate, a "bottom-up" analysis of (i) the closings to date, (ii) the

existing executed (but unconsummated) agreements, as well as (iii) the "reservations" for units

repeatedly touted by Mr. Ahearn, reveals a number of fundamental weaknesses of the revenue

projections advanced by the Debtors.  First, a simple analysis of the various lines of apartments

indicates that, in the three years that the Debtors have marketed the W Residences, the Debtors

have not sold a single E-line (two bedroom plus study) unit to date and only two units in each of

the B and G lines (both two bedroom).  Second, sales prices for other lines have trended

downward over the last year and the average prices per square foot for certain lines of units do

not even approach the projected averages set forth in the Disclosure Statement.  Implicitly

acknowledging these facts, the Debtors have sought to revise minimum release prices <u>downward</u>

for a significant number of units despite their broker's claims of the purported strength of the

market.

The uncertainty surrounding sales also provides substantial evidence that the Plan fails

the best interests test under Section 1129(a)(7).  The leakage of Prudential's collateral to pay

Plan Obligations, pre-petition unsecured claims and operating expenses ahead of Prudential's

secured claims substantially increases the likelihood that Prudential will not recover in these

---

[4]     No new officers and directors have been suggested by the Debtors.  Rather, the same team that was
unsuccessful selling units in the first place will now take the helm again with no marketing plan other than
some redecoration (which will also be funded out of the Prudential's collateral).  Ms. Parks and Mr. Ahearn are

Chapter 11 Cases as much as it would recover in a Chapter 7 case for these Debtors. According to the projections submitted with the Disclosure Statement, the Debtors will pay approximately $3,000,000 in SW Boston Plan Obligations, almost $1,400,000 in Residence Sales Staff and other Overhead expenses and another $250,000 in Additional Working Capital in the first year alone. Thus, in these categories alone, nearly $4,000,000 will be paid ahead of Prudential's claims within twelve months. Indeed, unsecured creditors will be paid in full before Prudential under the terms of the Plan. Thus, the Plan shifts the risk of recovery under the Plan from junior and administrative creditors to Prudential, the undisputed senior secured creditor. This would explain the absence of a formal liquidation analysis and a pro-forma opening balance sheet in the Disclosure Statement.

There are significant additional challenges to a finding that this Plan is even remotely feasible. As they are liquidating and have sold the Hotel assets, the Debtors have no regular earnings other than modest and finite rental income. In addition, the Debtors have inadequate capital to ensure the successful and timely liquidation of the condo units. The Debtors therefore will not be able to access the capital markets on any terms that would allow the Plan to be feasible. Finally, Starwood, the owner of the valuable "W" brand, has not yet formally agreed to provide the services and amenities that the owners of the W Residences believed that they were getting in connection with ownership of a W Residence. Furthermore, Starwood has reserved the right to terminate the Condominium License Marketing Agreement if it is unsatisfied with the Debtors' financial condition at confirmation.

The Plan's infirmities do not end there. By its glaring omissions, the Plan violates a number of other provisions of Section 1129(a) and the Bankruptcy Code more broadly rendering

---

apparently relying on the emergence from bankruptcy (in the face of current market conditions) as the sole driver of sales.

it patently uncofirmable.  Failing to comply with these other provisions means that the Plan

violates Section 1129(a)(2) as well.  The Plan fails to disclose the identity and compensation of

the Debtors' officers and directors upon confirmation in violation of Section 1129(a)(5).

Second, the Plan's separate classification and treatment of the Bovis claims violate Section 1122.

Third, the Plan does not prohibit the issuance of non-voting securities as required by Section

1123(a)(6).  Fourth, the Plan fails to honor the Intercreditor Agreement between Prudential and

The City of Boston contrary to Section 510(a).

In the end, this Court should see this Plan for what it is – a transparent attempt by the

Debtors' equity holders to retain some prospect of recovery by denying Prudential the benefit of

its bargain and by stripping Prudential of the protections provided to senior secured creditors

under the Bankruptcy Code.

## FACTS AND PROCEDURAL BACKGROUND

### A.    The Prudential Loan

Prudential is a secured creditor of the Debtors, having provided up to $192.2 million in

financing (the "**Prudential Loan**") for the construction of a mixed use hotel and residence

complex (the "**W Hotel and Residences**") consisting of a "W" brand hotel (the "**Hotel**") and

123 residential condominium units (the "**Residences**").[5]  In connection with the loan, SW Boston

issued a promissory note to Prudential (the "**Prudential Note**", and together with the Prudential

Loan Agreement and all exhibits, schedules, related documents, amendmentsand supplements

thereto, including the Loan Documents (as defined in the Prudential Loan Agreement), and as

may be amended from time to time, the "**Prudential Loan Documents**") for the full amount of

the Prudential Loan.

---

[5]    Prudential, SW Boston, and the other parties thereto are parties to that certain Construction Loan Agreement,
dated as of January 15, 2008 (as amended, the "**Prudential Loan Agreement**").

6

The Prudential Loan Documents contain the terms of the Debtors' repayment of the loan, providing for a three year term with certain extension options.  The contract rate of interest is 9.5 percent and increases to 14.5 percent following the occurrence of certain Events of Default under the Prudential Loan Documents.[6]  The Debtors are required to pay down the Prudential Loan from proceeds of the sale of the Residences.  The Prudential Loan sets minimum prices at which the Residences can be sold so as to ensure that the Prudential Loan can be repaid in full.  The Prudential Loan requires the Debtor to remit 92 percent of the proceeds of each Residence sale to Prudential to be applied to the Prudential Loan in accordance with the terms of the Prudential Loan Documents.

To secure SW Boston's obligations under the Prudential Loan Agreement, SW Boston and Prudential entered into that certain Mortgage, Security Agreement, Fixture Filing and Assignment of Sales Contracts and Deposits (the "**Prudential Security Agreement**"), granting Prudential a first priority security interest and mortgage on substantially all of SW Boston's property, and the proceeds of all of the foregoing (the "**SW Boston Security**").

Also in connection with the Prudential Loan, each of the remaining Debtors issued a guaranty for the benefit of Prudential and pledged the following collateral as additional security (collectively, the "**Additional Security**" and, together with the SW Boston Security, the "**Prudential Collateral**"):

---

[6]    Pursuant to the Prudential Loan Agreement, the "Applicable Interest Rate" is defined to mean 9.50% per annum.  *See* Prudential Loan Agreement § 1.1 (Definitions).  Paragraph 2.2.3 further provides that "[i]n the event that, and for so long as, any Event of Default shall have occurred and be continuing, the outstanding principal balance of the Loan, and to the extent permitted by applicable Legal Requirements, overdue interest in respect of the Loan, shall accrue interest at the Default Rate, calculated from the date the Default occurred which led to such Event of Default; *provided, however*, if such Event of Default consists of a failure to pay interest due on the Loan in accordance with the Loan Documents, then interest at the Default rate shall not begin to accrue on the Loan on account of such Default until such Default remains uncured for more than fifteen (15) days."  The "Default Rate" is defined as the lesser of (i) the maximum rate permitted by applicable law, or (ii) five percent (5%) above the Applicable Interest Rate (*i.e.*, 14.5%).  *See* Prudential Loan Agreement

7

- Frank Sawyer Corporation ("**FSC**") issued a Payment Guaranty, a Carveout Guaranty and a Completion Guaranty (the "**FSC Guarantees**") and executed pledge and control agreements with respect to a securities account. FSC also collaterally assigned its interest in the subscription agreement of the Frank Sawyer Trust;

- 30-32 Oliver Street Corporation granted Prudential a first priority mortgage on, and an assignment of leases and rents from, real property located at 25 and 27 Pinckney Street, Boston, Massachusetts and guaranteed FSC's obligations under the FSC Guarantees;

- Auto Sales & Services, Inc. guaranteed FSC's obligations under the FSC Guarantees and executed pledge and control agreements with respect to a securities account;

- General Trading Company guaranteed FSC's obligations under the FSC Guarantees and executed pledge and control agreements with respect to a securities account;

- SW Boston additionally executed pledge and control agreements with respect to two accounts at Sovereign Bank;

- 131 Arlington Trust guaranteed FSC's obligations under the FSC Guarantees and granted Prudential a first lien mortgage on real property located at 131 Arlington Street, Boston, Massachusetts;

- 100 Stuart Street LLC pledged 100% of its membership interests in SW Boston Hotel Venture LLC.

- General Land Corporation guaranteed FSC's obligations under the FSC Guarantees and granted Prudential a first lien mortgage on real property located at 109 and 121-127 Arlington Street, Boston, Massachusetts;

---

§ 1.1 (Definitions). On March 31, 2010, the Debtors' failed to make a principal payment, thereby triggering an

In addition, non-debtor affiliates SE Berkeley Street, LLC and SE McClellan Highway, LLC are parties to that certain Credit Agreement with Sovereign Bank, dated as of January 9, 2008, pursuant to which Sovereign issued a letter of credit in favor of Prudential in the approximate amount of $17.3 million (the "**Letter of Credit**").

In addition to the Prudential Loan, on December 9, 2009, SW Boston entered into a Subordinate Loan Agreement (the "**City Loan Agreement**") with the City of Boston (the "**City**"), pursuant to which the City agreed to lend SW Boston $10,5000,000.  The proceeds of the City Loan were intended to finance completion of construction of certain facilities related to the W Hotel and Residences.  The City has second liens on much of the same collateral on which Prudential has a first lien, and SW Boston pledged an additional $4 million in cash to the City, which is held in a separate account.  Prudential and the City entered into that certain Intercreditor and Subordination Agreement, dated as of December 29, 2009 (the "**Subordination Agreement**") pursuant to which the City agreed to subordinate its right to payment to that of Prudential and to assign certain rights to Prudential including its right to vote on the Plan under Section 8(c).

## B.    <u>Bankruptcy Proceedings</u>

On April 28, 2010 (the "**Petition Date**"), five of the Debtors commenced their cases in the United States Bankruptcy Court for the District of Massachusetts (the "**Bankruptcy Court**"). On June 4, 2010, the remaining three Debtors commenced their chapter 11 cases.  Pursuant to sections 1107 and 1108 of the Bankruptcy Code, the Debtors, whose cases are being jointly administered, are operating their businesses as debtors in possession.

---

Event of Default and the imposition of the Default Rate.  *See* Prudential Loan Agreement § 2.4.3(a), 9.1(a)(i).

On the Petition Date, the Debtors had defaulted under the Prudential Loan Agreement and were indebted to Prudential in the principal amount of approximately $180.8 million (exclusive of accrued interest and costs).  Immediately following the Petition Date, Prudential exercised its right to draw on the Letter of Credit in its full amount (approximately $17.3 million).

On August 3, 2010, Prudential filed the Motion of The Prudential Insurance Company of America for Relief from the Automatic Stay Pursuant to 11 U.S.C. § 362(d) [Docket No. 201] (the "**Lift Stay Motion**") seeking to lift the automatic stay to permit Prudential to exercise its rights and remedies under the Prudential Loan Documents.  On January 28, 2011, the Bankruptcy Court issued its memorandum decision and order denying the relief sought by Prudential in the Lift Stay Motion [Docket No. 436] (the "**Lift Stay Memorandum**").[7]  In the Lift Stay Memorandum, this Court denied Prudential's request for relief under section 362(d)(1) of the Bankruptcy Code finding that Prudential was oversecured by approximately $19 million. Lift Stay Memorandum at 39.

On March 28, 2011, SW Boston filed two motions (collectively, the "**Sale Motion**") with the Bankruptcy Court seeking, among other things, approval of the sale of the Hotel and certain other related facilities (the "**Hotel Sale**").  In connection with the Hotel Sale, the Debtor entered into a purchase and sale agreement (the "**Hotel PSA**") with Razorbacks Owner LLC, an affiliate of Pebblebrook Hotel Trust (collectively, "**Pebblebrook**" or "**Purchaser**"), with a purchase price of $89.5 million.

---

[7]    Prudential subsequently appealed the Bankruptcy Court's decision.  However, in light of the Debtors' filing of their Plan and Disclosure Statement and the Sale Motion (defined below), on April 7, 2011, Prudential filed with the United States District Court for the District of Massachusetts its motion to dismiss the Lift Stay appeal, which was granted.

LIBNY/5047184.7

On May 24, 2011, this Court approved the Hotel Sale [Docket No. 627]. The Hotel Sale

closed on June 8, 2011, and in connection therewith, Prudential received $83,322,017 in net sales

proceeds.

The Debtors continue to finance their operations and the Chapter 11 Cases almost

exclusively through the use of Prudential's cash collateral. In fact, the Debtors have expended

approximately $3.1 million of the proceeds of Prudential's collateral during the Chapter 11

Cases. (See Expert Report of Marti P. Murray SW Boston Hotel Venture LLC, et al. Plan of

Reorganization, dated June 16th 2011 (the "**Murray Report**") at 18-19.)Prior to the Hotel Sale,

Prudential's cash collateral consisted of the proceeds of both on-going operations (primarily of

the Hotel), as well as the proceeds of Residence sales. After the Hotel Sale, Prudential's cash

collateral is almost exclusively comprised of Residence sale proceeds. Pursuant to the cash

collateral order entered in these cases [Docket No. 114], the Debtors have been paying a portion

of the proceeds from such sales to Prudential. While the Loan Agreement requires payment to

Prudential of 92% of the Residence sales proceeds, actual payments of proceeds have equaled

approximately 82% of sales proceeds.

On April 15, 2011, Prudential filed the Motion of The Prudential Insurance Company of

America for an Order Authorizing the Application of Payments Received During the Chapter 11

Cases to Payment of Postpetition Interest Pursuant to Section 506(b) of the Bankruptcy Code

(the "**Motion for Postpetition Interest**"). In the Motion for Postpetition Interest, Prudential has

requested entry of an order declaring that it is oversecured and therefore entitled to post-petition

interest and is authorized to apply certain payments to fees and interest before principal.

11

**C.      Prudential has been and Remains Oversecured in these
Chapter 11 Cases Up to the Value of the Collateral**

As was the case at the time of the Lift Stay Decision, Prudential remains to this day an

oversecured secured creditor entitled to post-petition interest.  Prudential timely filed a proof of

claim in each of the Debtors' cases asserting a secured claim, as of the Petition Date, in the

amount of not less than $180,803,186, plus all fees, costs and interest accrued and unpaid prior to

and subsequent to the Petition Date (approximately $2,042,646).  When accrued interest, fees

and expenses are included, Prudential's prepetition claim totals $182,892,659.  The draw under

the Letter of Credit reduced Prudential's claim by $17,300,000 to $165,592,659.

As of the hearing on confirmation, the collateral securing the Prudential Loan is valued at

$190,924,382 (Murray Report at 16), rendering Prudential oversecured with an equity cushion of

$25,331,723.  (Id.)  Consequently, during the pendency of these Chapter 11 Cases, interest, fees

and costs have continued to accrue and Prudential has continued to receive a portion (though less

than the required amount under the Prudential Loan Agreement) of the proceeds of Residence

sales.  The Loan Agreement permits Prudential, after an Event of Default, to apply monies

received in its discretion.  *See* Loan Agreement § 9.2(d).  Thus, Prudential should be permitted to

apply payments received from the Debtors first to costs, next to accrued interest and fees, and

finally to principal.  After application of the payments received in this manner, Prudential has a

projected total claim as of the proposed Confirmation Date equal to $171,212,200.  Such claim is

broken down as follows:

12

| Claim | Amount |
|---|---:|
| Principal | $162,392,566 |
| Remaining Accrued Post-Petition Interest at the Default Rate[8] | $8,819,634 |
| Total | $171,212,200 |

This claim, however, must be further adjusted for (i) estimated additional fees and expenses through an assumed effective date of the Plan, (ii) estimated default interest through an assumed effective date of the Plan, and (iii) the receipt of the net proceeds from the Hotel Sale. Incorporating these adjustments, Prudential's remaining secured claim, as of a July 14, 2011 assumed effective date, equals $90,432,714, calculated as follows:

| Claim | Amount |
|---|---:|
| Claim as of 5/31/11 | $171,212,200 |
| Estimated Additional Fees & Expenses (through assumed effective date of 7/14/11) | $750,000 |
| Estimated Default Interest 6/1/11 – 7/14/11 | $1,792,531 |
| Net Proceeds from Hotel Sale | ($83,322,017) |
| Potential Prudential Secured Claim Through Effective Date | $90,432,714 |

The Bankruptcy Code provides a secured creditor with a claim in an amount equal to the value of the collateral securing such claim. To the extent that the value of the collateral is less than the claim itself, Prudential's secured claim must be capped at the collateral value as of Confirmation. The Debtors and Prudential have stipulated that the value of the remaining Prudential Collateral as of May 31, 2011, is $82,672,809, calculated as follows:[9]

---

[8]    The amount remaining is accrued and unpaid interest calculated at the default rate after application of payments received, on a contemporaneous basis, to fees, costs, interest and principal, respectively.

[9]    Pursuant to the Stipulation Regarding (I) Discovery Schedule in Connection with Hearings on June 17, 2011 and (II) For Purposes of Such Hearings, the Value of the Remaining Condominium Units, filed with the Court on June 20, 2011 (the "**Discovery Stipulation**"), such amounts will be updated immediately prior to the Confirmation Hearing to reflect additional Residence sales that occurred after May 31, 2011.

LIBNY/5047184.7

| Collateral | Amount |
|---|---:|
| August 1, 2010 FTI Appraisal – 107 Units | $90,600,000 |
|     Less:  Payments to Prudential | ($23,818,935) |
|     (8/1/10 – 5/31/11 (23 Units)) | |
| Stipulated Value of Remaining 84 Units | $66,781,065 |
| | |
| Plus Stipulated Value of Other Collateral: | |
|     Cash (Sovereign Account) | $1,494,000 |
|     131 Arlington Street | $1,850,000 |
|     Boston, MA | |
|     109 & 121-127 Arlington Street | $2,400,000 |
|     Boston, MA | |
|     25 Pinckney Street | $1,160,000 |
|     Boston, MA | |
|     27 Pinckney Street | $1,020,000 |
|     Boston, MA | |
|     Securities (Auto Sales) | $   205,267 |
|     Securities (General Trading) | $1,246,456 |
|     Securities (Frank Sawyer Corp.) | $6,516,021 |
| | |
|     Total | $82,672,809 |

Accordingly, taking into account the value of the Prudential Collateral as of Confirmation,

Prudential's secured claim as of Confirmation is equal to the value of the Prudential Collateral,

or **$82,672,809**.  (Murray Report at 18.)

D.    **Other Claims and Intercreditor Issues**

In addition to Prudential's secured claim, the City has also asserted a subordinated

secured claim in the amount of $10,500,000, which claim arises under the City Loan Agreement.

At the time that the City Loan Agreement was executed, Prudential and the City executed the

Subordination Agreement which (i) subordinates the City's payment rights to those of Prudential

from collateral other than that specifically identified in the Subordination Agreement, (ii)

prohibits the City from receiving payments from the Debtors while the Debtors' obligations to

Prudential remain outstanding and (iii) requires the City to surrender any such payments received

from the Debtors to Prudential.  (Subordination Agreement at § 7(a).)  Further, it provides that

upon Prudential's request, the City must assign to Prudential its right to vote on any plan of

14

reorganization related to the Debtors' estates on account of its claims.  (Subordination

Agreement at § 8(c).)  Prudential has repeatedly demanded in writing that the City (a) remit any

interest payments that it has received from the Debtors during their Chapter 11 Cases to

Prudential (to the extent payable under the Subordination Agreement) and (b) assign its right to

vote on the Plan to Prudential.  The City has failed to comply with these demands and remains in

breach of the Sunrdination Agreement.

    As a result of the City's failure to comply and pursuant to Prudential's entitlement to do

so under section 8(c) of the Subordination Agreement, Prudential timely cast ballots on behalf of

the City's Claims to reject the Plan.

    In addition to the City's claim, the aggregate of non-insider, unsecured claims against all

of the Debtors is estimated to be between $3 million and $4 million.

**E.    The Plan**

    On March 31, 2011, the Debtors filed their Joint Plan of Reorganization of SW Boston

Hotel Venture LLC, Auto Sales & Service, Inc., General Trading Company, Frank Sawyer

Corporation, 100 Stuart Street, LLC, 30-32 Oliver Street Corporation, General Land Corporation

and 131 Arlington Street Trust (as amended, the "**Plan**"), and accompanying disclosure

statement (as amended, the "**Disclosure Statement**").  On May 5, 2011, the Debtors filed

amended versions of the Plan and the Disclosure Statement.  On May 24, 2011, the Court

approved the Disclosure Statement over the objection of Prudential [Docket No. 632], and set the

hearing to consider confirmation of the Plan for June 27, 2011.

    The Plan proposes to pay Prudential on account of its secured claim by March 31, 2014

with interest accruing at 4.25 percent per annum.  (Plan at § 4.2(d)-(e).)  Neither the Plan nor the

Disclosure Statement provide that Prudential is entitled to post-petition interest on its secured

claims.  (Disclosure Statement at 10-11; Plan at § 1.10.)  The Plan indicates that the Debtors will

15

make the payments due to Prudential under the Plan from proceeds of the sale of the remaining

unsold Residences.  (Plan at § 4.2(e).)

Further, the Plan proposes to pay the City on account of its junior secured claim interest

at a rate of 8 percent, 5 percent paid monthly and 3 percent held back by the Debtors.  (Plan at

§ 4.2(d).)  These payments will continue until the Prudential claim is paid in full, after which

time the City will receive payments of principal and interest in accordance with the City Loan

Agreement.  (Plan at § 4.2(d).)  The maturity date of the City's claim is December 9, 2019.  (Plan

at § 4.2(e).)  Non-insider unsecured creditors will receive interest at a rate of 4.25 percent and

three annual payments in amounts sufficient to satisfy the full amount of their claims.  (Plan at

§ 4.7(d).)

The Debtors' Plan also attempts to effect substantive consolidation of the Debtors for the

limited purpose of Plan distributions.  (Plan at § 5.8.)  The Debtors provide no explanation of the

legal basis for such consolidation.  (*See* Disclosure Statement at § 6.20.)  The primary effect of

the deemed substantive consolidation of the Debtors' estates is to release the guarantees provided

by affiliates of SW Boston, which guarantees were given as credit enhancement to induce

Prudential to provide the Prudential Loan (and the City to make the City Loan).  (Plan at § 5.8.)

Finally, the Plan functionally allows the Debtors' insiders and current equity holders to

retain all of the equity of the reorganized entities.  (Plan at §§ 4.7(e), 4.9.)

## **ARGUMENT**

**I.     PRUDENTIAL IS OVERSECURED AND ENTITLED TO THE FULL
        AMOUNT OF ACCRUED POSTPETITION INTEREST, FEES AND COSTS
        TO THE EXTENT OF THE VALUE OF ITS COLLATERAL**

The proper determination of the allowable amount of Prudential's secured claim for

purposes of cramdown under section 1129(b)(2)(A)(i) dictates the Debtors' ability to confirm the

Plan in these Chapter 11 Cases.  The primary discrepancy between the Debtors' and Prudential's

16

respective calculations of Prudential's secured claim at confirmation relates to Prudential's

entitlement to postpetition interest, the date from which such entitlement is calculated and the

applicable rate (contract rate versus default rate).

Because the valuation here is being done for purposes of determining the confirmability

of the Plan, a calculation as of the confirmation date is required.  Section 506(a), which provides

for the determination of the value of a secured creditors' claim, specifically directs that "[s]uch

value *shall be determined in light of the purpose of the valuation*…."  11 U.S.C. § 506(a).

Accordingly, in the context of confirmation, the appropriate date on which to value such

collateral is the confirmation date.  Nancy C. Dreher and Joan N. Feeney, 11A BANKRUPTCY

LAW MANUAL § 65 (5th ed. West 2010-1); *In re Seip*, 116 B.R. 709, 711 (Bankr. D. Neb. 1990);

*Ahlers v. Norwest Bank Worthington (In re Ahlers),* 794 F.2d 388, 399 (8th Cir. 1986), *rev'd on*

*other grounds*, 485 U.S. 197 (1988); *In re Landing Assoc., Ltd.*, 122 B.R. 288, 290 (Bankr. W.D.

Tex. 1990) ("When the valuation is for purposes of plan confirmation, however, value must be

determined as of *that* date.") (emphasis in original); *In re Reddington/Sunarrow Ltd. P'ship*, 119

B.R. 809, 814 (Bankr. D.N.M. 1990); *In re Kain*, 86 B.R. 506, 515 n.28 (Bankr. W.D. Mich.

1988); *In re Johnson*, 145 B.R. 108, 112 (Bankr. S.D. Ga. 1992).  According to the court in

*Landing Associates*:

> The inescapable conclusion from the foregoing statutory provisions is that a secured
> creditor's interest in the estate's interest in property may well *grow* during the pendency
> of a case, augmenting the secured creditor's secured claim.  The *entire* secured claim
> must be properly treated pursuant to Section 1129 or the plan cannot be confirmed.  The
> allowed secured claim to which Section 1129 refers must mean the claim allowed *as of*
> *confirmation*.

*Landing Assoc.*, 122 B.R. at 293 (emphasis in original).[10]

---

[10]    While *In re T-H New Orleans Ltd. P'Ship*, 116 F.3d 790 (5th Cir. 1997) was decided after *Landing Associates*,
*T-H New Orleans* held only that the date on which collateral is valued for 506(b) purposes should be flexible.
It did not hold that confirmation was, in any way, an inappropriate time to value collateral.  Prudential
respectfully submits that *Landing Associates*, *Blake*, and the numerous other cases that hold confirmation is the

Section 506(b) then provides that "[t]o the extent an allowed secured claim is secured by property the *value of which*…is greater than the amount of such claim, there shall be allowed to the holder of such claim, interest on such claim, and any reasonable fees, costs, or charges provided for under the agreement…under which such claim arose." 11 U.S.C. § 506(b) (emphasis added). Unlike section 506(a), section 506(b) does not provide a date upon which the value of the property securing the claim is to be fixed. Instead, the "value" referenced in section 506(b) relates back to the value fixed pursuant to section 506(a). In this instance, that value is determined at confirmation.

Importantly, section 506(b)'s grant of postpetition interest, fees and costs to an oversecured creditor has no temporal limitations – *i.e.* it does not restrict interest, fees and costs to only those time periods throughout a chapter 11 case where collateral value is in excess of the claim. Rather, it contains a single point of comparison that is tied to the collateral's valuation under section 506(a), and if the collateral's value is in excess of the claim amount, interest, fees and costs are awarded. An increase in collateral value over the course of a bankruptcy case rightly accrues to the benefit of the secured lender. *See Dewsnup v. Timm*, 502 U.S. 410, 417 (1992) ("Any increase over the judicially determined valuation during bankruptcy rightly accrues to the benefit of the creditor, not to the benefit of the debtor and not to the benefit of other unsecured creditors whose claims have been allowed and who had nothing to do with the mortgagor-mortgagee bargain.").

This concept has been recognized by courts in this District as well. For example, in *In re Blake*, 2009 WL 4349787 (Bankr. D. Mass. Nov. 30, 2009), the Bankruptcy Court for the

---

appropriate date to value collateral in connection with the determination of a secured creditor's claim for cram down purposes are the better-reasoned decisions. In any event, *T-H New Orleans* is by no means binding on this Court.

LIBNY/5047184.7

District of Massachusetts held that the proper date to value collateral for purposes of section

1129(b)(2)(A)(i) was the confirmation date.  *Id*. at *5.  Indeed, interest and fees that accrued

under section 506(b) would not be known or have matured at the petition date.  *Id.* at *5.  The

court also noted that such a result was consistent with congressional intent, which indicates "an

intent to assure that a secured creditor receives such value as it would receive if the collateral (up

to the value of the secured claim) were simply handed over to the secured creditor on the

effective date of confirmation."  *Id.* at *5.  In other words, valuing the collateral as of

confirmation ensures that collateral value appreciation inures to the benefit of the secured

creditor up to the allowed amount of the claim.  According to *Blake*, this amount must include

postpetition interest and fees under 506(b).  *See also In re Tools-4-Hire, Inc.*, 438  B.R. 440, 447

(Bankr. D. Mass. 2010) ("The Plan and Confirmation Order were required to and did determine

what Wells Fargo was entitled to recover on account of its secured claim as of the date of

confirmation.").

A number of courts have recognized that a value determination for purposes of adequate

protection is distinct from the value determination that must occur at confirmation.  *See In re

Reddington/Sunarrow Ltd. P'ship*, 119 B.R. 809, 814 (Bankr. D.N.M. 1990) ("a value

determination for plan confirmation purposes is not the same as a value determination for

automatic stay purposes or for determining the allowed amount of a secured claim").  A number

of courts have embraced a dual-valuation approach.  The court in *In re Addison Properties Ltd.

P'ship*, 185 B.R. 766 (Bankr. N.D. Ill. 1995) held that "[a]t confirmation, the secured claim is

revalued…If the collateral package at the time of confirmation exceeds the amount of the

creditor's total prepetition claim, the creditor is entitled to interest and costs under section 506(b)

to the extent of the surplus."  *Id.*; *see also In re Duval Manor Assoc.*, 191 B.R. 622, 633-634

(Bankr. E.D. Pa. 1996). These courts implicitly recognize that collateral value appreciation rightly inures to the benefit of the secured creditor to the extent of the value of the claim, which includes postpetition interest, fees and costs. *See id.*

Thus, while the Debtors want to limit Prudential's entitlement to postpetition interest to the period between the Hotel Sale and Confirmation, such a restriction is not warranted, nor does it comport with the weight of the case law to have considered the issue.[11]

## II.    THE DEBTORS MUST ESTABLISH THAT THE PLAN IS CONFIRMABLE BY CLEAR AND CONVINCING EVIDENCE

The Debtors bear the burden of proof with respect to establishing that the Plan complies with each of the requirements set forth in section 1129 of the Bankruptcy Code. *Beal Bank, S.S.B. v. Waters Edge Ltd. P'ship*, 248 B.R. 668, 690 (D. Mass. 2000); *In re Genesis Health Ventures, Inc.*, 266 B.R. 591, 599 (Bankr. D. Del. 2001). If, as is the case here, not all impaired

---

[11] In the event that this Court determines that Prudential is not oversecured, Prudential is entitled to an administrative claim for the diminution in the value of its collateral. *In re SCOPAC*, 624 F.3d 274 (5th Cir. 2010). In *Scopac*, the court held that "[a] secured creditor whose collateral is subject to the automatic stay may first seek adequate protection for diminution of the value of the property…and then, if the protection ultimately proves inadequate, a priority administrative claim under § 507(b)." *Id.* The court went on to note that:

> Section 507(b) of the Bankruptcy Code allows an administrative expense claim under § 503(b) where adequate protection payments prove insufficient to compensate a secured creditor for the diminution in the value of its collateral. It is an attempt to codify a statutory fail-safe system in recognition of the ultimate reality that protection previously determined the "indubitable equivalent"…may later prove inadequate.

*In re SCOPAC*, 624 F.3d at 282 (internal quotations omitted).

In these cases, Prudential certainly has sought adequate protection from the diminution in its collateral. While the Court determined that Prudential was adequately protected by its equity cushion, if Prudential is not granted postpetition interest, there will have been significant "leakage" of Prudential's collateral throughout these cases. Ultimately, the money used to fund these cases did not benefit Prudential and, therefore, represents a diminution in the value of the collateral, thereby entitling Prudential to an administrative expense claim.

20

creditors vote in favor of the plan, the Court must find that the plan complies with the "cramdown" provisions under section 1129(b), in addition to section 1129(a), in order to confirm the Plan. *In re Waterville Valley Town Square Assocs.*, 208 B.R. 90, 94 (Bankr. D.N.H. 1997).

The Debtor must prove compliance with the cramdown rules by "clear and convincing evidence." *In re Miami Ctr. Assocs., Ltd*., 144 B.R. 937, 940 (Bankr. S.D. Fla. 1992) (to satisfy requirements of § 1129(b), the debtor must show by clear and convincing evidence that the plan is fair and equitable); *In re MCorp Fin., Inc.*, 137 B.R. 219, 225 (Bankr. S.D. Tex. 1992) (plan proponent's burden of proof under § 1129(b) calls for clear and convincing evidence). *See also James F. Queenan, et al.*, 6 *Chapter 11 Theory and Practice: A Guide to Reorganization*, § 31.05 (1994) (a cramdown plan often presents serious questions about the fairness of its economic terms; if confirmed, the plan will bind dissenting claimants and a higher standard of proof is therefore justified). In addition, the Code imposes an independent duty upon the court to determine whether a plan satisfies each element of § 1129, even in the absence of objections to confirmation. *In re Genesis Health Ventures, Inc.*, 266 B.R. at 599 (*citing to In re Bolton*, 188 B.R. 913, 915 (Bankr. D. Vt. 1995)); *In re Shadow Bay Apartments, Ltd.*, 157 B.R. 363, 365 (Bankr. S.D. Ohio 1993).

## III. THE PLAN IMPROPERLY IMPOSES SUBSTANTIVE CONSOLIDATION ON PRUDENTIAL OFFENSIVELY

The voting and treatment offered to creditors under the Plan is predicated in its entirety on the substantive consolidation of the Debtors. However, the consolidation sought by the Debtors is not true substantive consolidation, but an artificial "deemed" consolidation that has no basis in law or equity and has been specifically rejected by the latest Circuit-level court to consider substantive consolidation. *See In re Owens Corning*, 419 F.3d. 195, 212 (3d Cir. 2005).

21

Specifically, the Third Circuit enumerated several principals for a court to consider and warned litigants that substantive consolidation "may not be used offensively (for example, having a primary purpose to disadvantage tactically a group of creditors in the plan process or to alter creditor rights)." *Id.* This is <u>precisely</u> its purpose in these cases, that is, to disenfranchise Prudential.

### A. <u>Substantive Consolidation Only Prejudices Prudential</u>

Under Section 5.8 of the Plan, the Debtors are seeking substantive consolidation pursuant to section 1123(a)(5)(C) "and the Confirmation Order." But, as noted above, the substantive consolidation sought by the Debtors is not the permanent consolidation sought in many cases as an equitable remedy. Rather, the Debtors seeks substantive consolidation for only limited purposes under the Plan, including that

> (i) all assets (and all proceeds thereof) and liabilities of each Debtor shall be deemed merged or treated as though they were merged into and with the assets and liabilities of all other Debtors, (ii) except as set forth in Section 4.7(e) of the Plan, no cash distributions shall be made under the Plan on account of intercompany Claims among the Debtors and all such Claims shall be eliminated, [and] (iii) ***all guarantees of any Debtor of the obligations of any other Debtor shall be deemed eliminated and extinguished*** so that any Claim against any Debtor and any guarantee thereof executed by the other and any joint and several liability of any Debtor shall be deemed to be one obligation of the consolidated cases….

(Plan § 5.8.) (emphasis added). Ignoring for the moment the utter lack of support for such dramatic relief, substantive consolidation is inappropriate in this case because it is being sought for the exact opposite reason for which the remedy exists in the first place. Substantive consolidation is an equitable *remedy* that exists to redress harm caused to creditors by debtors that either hold themselves out as one entity or who have failed to separately account for claims to the point where untangling the debtors' assets and liabilities would disadvantage all creditors.

22

*See, e.g. Owens Corning*, 419 F.3d at 210; *In re Augie/Restivo Baking Co., Ltd.*, 860 F.2d 515, 518 (2d Cir. 1988).

Under the Debtors' Plan, however, the Debtors employ substantive consolidation offensively to disenfranchise Prudential (and, to an extent, the City). Nowhere is this more evident than the fact that under the Debtors' version of substantive consolidation, affiliated-debtor guarantees are wiped out, while Insider intercompany claims of non-Debtors are expressly preserved. (Plan § 5.8.) Under the Plan, the release of these preserved intercompany Insider claims then constitutes the consideration for which equity interests in 110 Stuart Street, the to-be-formed entity that will hold the majority of the estates' post-confirmation assets, are issued to those very Insiders. Indeed, because Prudential is the largest creditor of each of the affiliated Debtors, it would hold a blocking position to confirmation of the Plan in the individual case of each affiliated Debtor.

Furthermore, the Debtors seek to substantively consolidate the Debtors to shed the guarantee obligations imposed on the Affiliate Debtors in connection with the Prudential Loan Agreement. Once those obligations are shed, the Debtors are inexplicably restored to their separate corporate existences for all purposes other than the treatment of Claims under the Plan. (Plan at § 5.8.) The law regarding substantive consolidation runs directly counter to the relief the Debtors are seeking and, as such, the Plan cannot be confirmed as a matter of law.

**B.      The Debtors Have Not Satisfied the Strict Standards for Substantive Consolidation**

Substantive consolidation is an "extreme" remedy to be sparingly allowed. In these Chapter 11 Cases, the Debtors have failed to submit any evidence sufficient to establish the existence of even a single element of substantive consolidation. Worse, the evidence that does exist weighs exclusively in favor of treating the Debtors as separate entities.

The three leading tests for substantive consolidation are set forth in *In re Auto-Train Corp., Inc.,* 810 F2d 270 (D.C. Cir. 1987), *In re Augie/Restivo Baking Co., Ltd.*, 860 F.2d 515 (2d Cir. 1988), and, most recently, in *In re Owens Corning*, 419 F.3d 195 (3d Cir. 2005).  In *Auto Train*, the Court of Appeals for the District of Columbia set forth the following three-part test for substantive consolidation:

1.  Is there a substantial identity between the entities to be consolidated?

2.  Is consolidation necessary to avoid some harm or to realize some benefit?

3.  If a creditor objects and demonstrates that it relied on the separate credit of one of the entities and that it will be prejudiced by the consolidation, will the demonstrated benefits of consolidation heavily outweigh the harm to the objecting creditor?

810 F.2d at 276 (citations omitted).  By contrast, the Second Circuit set forth a two-part test in *Augie/Restivo* that focuses on the degree of a creditor's reliance.  The Second Circuit asks:

1.  Have creditors dealt with the entities as a single economic unit rather than relying on their separate identities in extending credit?

2.  Are the affairs of the debtors so entangled that consolidation will benefit all creditors?

860 F.2d at 518.  And, lastly, the most recent Court of Appeals case, *Owens Corning*, establishes the most stringent standard of all.  Under *Owens Corning,* a proponent of substantive consolidation must prove:

1.  Prepetition, the entities for whom consolidation is sought disregarded separateness so significantly that their creditors relied on the breakdown of entity borders and treated them as one legal entity; or

2.  Postpetition, their assets and liabilities are so scrambled that separating them is prohibitive and hurts all creditors.

24

419 F.3d at 211.  Regardless of which standard is employed here, the Debtors have simply failed

to establish a single element of any test.  The cases unequivocally hold that the proponent of

substantive consolidation has, at least, the initial burden of proving its case.  Here, the Debtors

have not offered a single piece of proof or justification for substantively consolidating their

cases.  Indeed, the only evidence in the record that bears on substantive consolidation falls

exclusively and heavily against ordering the remedy, including:

- The Debtors have maintained separate books and records from before and throughout
  these Chapter 11 Cases, as evidence by the Monthly Operating Reports and the
  Projections attached to the Disclosure Statement and draft financial statements;

- The Debtors have filed separate tax returns;

- Substantive consolidation only benefits the Debtors' Insiders; and

- Prudential's guarantees of the initial Prudential Loan will be wiped out to Prudential's
  detriment.

Quite simply, in seeking substantive consolidation, the Debtors have chosen to not only ignore

the standards set forth by every Circuit-level court to consider the question of substantive

consolidation, but also their own evidentiary burden.  As such, their attempt to employ

substantive consolidation to prejudice their creditors for the benefit of insiders must fail.

## IV.    THE DEBTORS CANNOT CRAM THE PLAN DOWN ON PRUDENTIAL UNDER SECTION 1129(B) OF THE BANKRUPTCY CODE

### A.    The Plan is Not Fair and Equitable

Section 1129(b)(1) permits confirmation of a plan notwithstanding its rejection by an

impaired class provided that, among other things, the plan is "fair and equitable" with respect to

such rejecting class.  11 U.SC. § 1129(b)(1).  "A plan must be fair and equitable in a broad sense

as well as in the particular manner specified in Section 1129(b)(2)."  *In re Bryson Properties,*

25

*XVIII*, 961 F.2d 496, 505 (4th Cir. 1992), *cert. den.,* 506 U.S. 866 (1992).  In *Bryson*, the Court of

Appeals noted that any plan that adjusts the interests of only one creditor, like this Plan does,

requires the court to "scrutinize closely the equities involved."  *Id.*, 961 F.2d at 505.  A

nonconsensual plan may not "unduly shift the risk of reorganization" to the dissenting class of

creditors.  *In re Montgomery Apartments of Ingham County, Ltd.,* 141 B.R. 324, 326 (Bankr.

S.D. Oh. 1992).  The Plan before this Court falls far short of this standard as well as the specific

elements of Section 1129(b)(2)(A).

Section 1129(b)(2)(A) provides three avenues by which a plan may satisfy the "fair and

equitable" requirement with respect to secured creditors.  A plan is fair and equitable as to a class

of secured claims if that plan provides:

> (i)
>> (I) that the holders of such claims retain the liens securing such
>> claims, whether the property subject to such liens is retained by the
>> debtor or transferred to another entity, to the extent of the allowed
>> amount of such claims; and
>>
>> (II) that each holder of a claim of such class receive on account of
>> such claim deferred cash payments totaling at least the allowed
>> amount of such claim, of a value, as of the effective date of the
>> plan, of at least the value of such holder's interest in the estate's
>> interest in such property;
>
> (ii) for the sale, subject to section 363 (k) of this title, of any property that
> is subject to the liens securing such claims, free and clear of such liens,
> with such liens to attach to the proceeds of such sale, and the treatment of
> such liens on proceeds under clause (i) or (iii) of this subparagraph; or
>
> (iii) for the realization by such holders of the indubitable equivalent of
> such claims.

*See* 11 U.S.C. § 1129(b)(2)(A).  In this case, the Debtors are trying to cram down the Plan over

Prudential's objection by invoking subparagraphs (i) or (iii).

### (1)    The Plan Fails to Provide That Prudential Will Retain All of its Liens on the Collateral

While in describing Prudential's treatment under the Plan, the Plan states that "the Liens on the Prudential Collateral shall be retained" by Prudential, other sections of the Plan indicate that, in fact, Prudential will not be retaining its entire lien package. (*See* Plan § 4.2(f)(i).) When taken together, the Plan and the associated projections contemplate a significant "leakage" of Prudential's collateral value to pay junior creditors that does not inure to Prudential's benefit. First, without justification or support, the Plan contemplates that on a post-confirmation basis, the Debtors will collectively operate with a Working Capital Minimum of $1,575,000. (*See* Plan § 1.111.) As each Residence is sold, Prudential's lien on each unit is released upon Prudential's receipt of the corresponding Residence Net Sales Proceeds. (Plan § 4.2.) Residence Net Sales Proceeds, however, is adjusted so that the Debtors may replenish their Working Capital Minimums *before* Prudential is paid. The result is that the value of Prudential's liens are dissipated as the Debtors dip into their Working Capital Minimums to fund operations. Prudential is forced, under the Plan, to release its liens on the sold Residences even though it is not getting the full proceeds of their collateral to which it is entitled.

Second, and more obvious, is that $2 million of the funds that are to be used to satisfy Plan obligations are derived from the sale of "Affiliated Debtor Collateral" – that is, collateral owned by Debtors other than SW Boston. The problem, of course, is that Prudential has a lien on this "Affiliated Debtor Collateral" as well. Yet, under the Plan, Prudential will lose its lien so that the Debtor can fund Plan obligations to more junior creditors. Such a result is directly contradictory to 1129(b)(2)(A)(i)(I), which requires that secured claimholders retain their liens.

27

    **(2)**    **The New Note Given to Prudential is Not a Market Loan and
Therefore Fails to Provide Prudential with Deferred Cash Payments
Equal to Its Allowed Secured Claim**

Even ignoring the Debtors' attempts to strip Prudential of its liens, the practical effect of

section 1129(b)(2)(A)(i) is to allow a debtor to satisfy the "fair and equitable" standard by

issuing a secured creditor a new secured note, secured by liens on the same collateral.  This

section is satisfied only if the secured lender both retains its liens securing its claim and receives

on account of its secured claim "deferred cash payments totaling at least the allowed amount of

such claim, of a value, as of the effective date of the plan, of at least the value of such holder's

interest in the estate's interest in such property."  11 U.S.C. § 1129(b)(2)(A)(i)(II).  In other

words, the new note given Prudential under the plan must contain a "market rate" of interest,

otherwise the statutorily required present value calculation yields a value, as of the effective date

of the plan, that is *less* than the value of the secured creditor's interest in its property.  *In re

American Homepatient, Inc.*, 298 B.R. 152 (Bankr. M.D. Tenn. 2003).

        **i.**    **The Plan Does not Provide for Deferred Cash Payments
Totaling the Allowed Amount of Prudential's Claim Because it
Fails to Account for Postpetition Interest**

The Plan fails to satisfy the requirements of section 1129(b)(2)(A)(i) on two accounts.

First, the Plan improperly fixes Prudential's claim at **$180,803,186.86** less all payments received

by Prudential during the course of the Chapter 11 Cases.  No provision is made for allowed post-

petition interest, to which Prudential, as an oversecured secured creditor, is entitled.  The Plan,

instead, contemplates payments to Prudential totaling **$55,113,424**.  Using an appropriate interest

rate of 9.8%, the present value of the payment streams provided for under the Plan is

**$53,402,896**.  (*See* Murray Report at 5.)  As noted above, the Plan does not provide for any

postpetition interest to have accrued on Prudential's claim.  With the addition of such interest,

which is required under the Prudential Loan Documents, Prudential's actual secured claim as of

LIBNY/5047184.7

confirmation is projected to be **$82,672,809**.  (*See* Murray Report at 8.)[12]  As such, Prudential's

actual claim exceeds the present value of the payments to be received under the Plan by more

than $29 million.  Thus, unless adjusted to account for this differential, the Plan cannot satisfy

the "fair and equitable" standard.

> ### ii.    The Plan's 4.25% Interest Rate is Not a Market Rate of Interest

Assuming the Plan is amended to account for the increased amount of Prudential's claim,

the second component to satisfying the "fair and equitable" standard under section

1129(b)(2)(A)(i) is that the "deferred cash payments" provided for under the Plan must total "at

least the allowed amount of such claim" and be "of a value, as of the effective date of the plan, of

at least the value of such holder's interest in the estate's interest in such property."  11 U.S.C. §

1129(b)(2)(A)(i).  To satisfy this prong, the interest rate provided under the new note must be a

"market" rate of interest.  If a market rate of interest is not employed, then the present value

calculation required by that section of the Bankruptcy Code, by definition, will not equal the

value of the secured creditor's interest in its collateral as of the effective date.

Here, the Debtors have proposed to pay 4.25% per annum on the principal balance of the

remaining Prudential loan.[13]  This interest rate, however, is not a market rate of interest.  As

evidenced by the Murray Report, a market rate of interest for this loan would be *at least* 9.25%

per annum (compounded monthly).

In choosing a 4.25% interest rate, the Debtors appear to be following the formulaic

approach adopted in *Till v. SCS Credit Corp.*, 541 U.S. 465 (2004).  In its *Till* decision, the

---

[12]    This amount will be adjusted immediately prior to the confirmation hearing to take into account sales of the
Residences after May 31, 2011 (the cut off date used in the Murray Report).

[13]    While the Prudential Loan Agreement provides for interest on the principal balance to compound monthly, no
compounding schedule is set forth in the Plan, and so it remains unclear how interest should be compounded if
the Plan were to become effective.

Supreme Court adopted a formula to determine the appropriate cramdown interest rate, which consists of using the national prime rate and then adding a risk adjustor based on the particular characteristics of the subject loan and go-forward credit-worthiness of the reorganized debtor. *See id.* The *Till* court, however, also noted that in the context of a chapter 11 case, the formula approach to determining a cramdown interest rate should only be employed where no "efficient market" exists for such loans. Where an efficient market exists, the market rate of interest should be used.

Without justification, explanation or support, the Debtors have assumed that no efficient market rate of interest exists for the New Prudential Loan. The report prepared by the Debtors' expert contains unsupported conclusory statements denying the existence of a market for Fractured Condo Loans. (*See* Expert Report of M. Freddie Reiss ("**Reiss Report**") at 16.) The 4.25% interest rate is thus presumably arrived at by taking the national prime rate, which is currently 3.25%, and adding a risk adjustment factor of 1%. This formulaic approach is not appropriate for at least two reasons. First, as evidenced by the Murray Report, an efficient market does exist for this type of loan. (*See* Murray Report at 22.) And, using a market analysis, the interest rate paid to Prudential should be at least 9.8%.

Second, even if the formula approach is appropriately used, a 1% risk adjustment is wholly inadequate in this instance. The *Till* Court did not "decide the proper scale for the risk adjustment," but rather left that determination to bankruptcy courts that could weigh various risk factors, such as "the circumstances of the estate, the nature of the security, and the duration and feasibility of the reorganization plan." *Till*, 541 U.S. at 479. Courts that have applied the formula approach in Till have applied a broad range of premiums over the applicable prime rate to adjust for risk, and even the contract rate. *See, e.g., In re Northwest Timberline Enters. Inc.*,

30

348 B.R. 412 (Bankr. N.D. Tex. 2006) (assigning a 5.75 % risk adjustment); *In re Griswold*

*Bldg, LLC*, 420 B.R. 666, 696 (Bankr. E.D. Mich. 2009) (applying upward risk adjustment of

5%); *In re Sylvan I-30 Enters.,* 2006 WL 2539718 (Bankr. N.D. Tex. 2006) (applying prepetition

rate)..  In this instance, a number of risk factors require a significant upward adjustment of the

interest rate such that, even using the *Till* formula, the appropriate interest rate here is at least

9.25%.

First, as noted above, the new Prudential Note will be a security with a 100% loan to

value.  As such, the risk of any deterioration in collateral value will rest exclusively with

Prudential.  Second, while the Debtors have predicted their ability to sell out the Residences by

the second quarter of 2014, their historical sales pace indicates that it is likely the sellout period

will be much longer.  (*See* Murray Report, Ex. C.)  Indeed, when one looks at the remaining

inventory mix of the Residences, the Debtors' inventory is skewed towards units that have

historically had difficulty selling and have reduced prices.  Indeed, certain "lines" of Residences

have sold few, or no, units to date.  (*See* Murray Report, Ex. C.)  This is especially troubling

because it seems as though none of the Debtors' professionals have considered this fact in their

go-forward projections or plan.  Third, macro-economic conditions have not indicated that there

is a likelihood of broad growth for at least the next six to twelve months.  Given these additional

risk factors, an interest rate of at least 9.25% is appropriate.

### (3)    Under the Plan, Prudential will Not Realize the "Indubitable Equivalent" of Its Claims

The next way for the Debtors to satisfy the "fair and equitable" requirement of section

1129(b) is to show that, under the Plan, Prudential will realize the "indubitable equivalent of [its]

claims."  11 U.S.C. § 1129(b)(2)(A)(iii).  Because the Plan does not contemplate the return to

Prudential of any of its collateral, the indubitable equivalence test can only be satisfied if the

31

payment streams due under the Plan have a present value of not less than the value of

Prudential's secured claim. *See In re Pacific Lumber Co.*, 584 F.3d 229, 244 (5th Cir. 2009)

("[P]resent cash payments to the [secured] class less than the amount of the allowed secured

claims would not satisfy the standard.") (quoting Kenneth N. Klee, *All You Ever Wanted to

Know About Cram Down under the Bankruptcy Code*, 53 Am. Bankr. L.J. 133, 171 (1979)).  In

this way, for this case, the test of indubitable equivalence is tied to whether Prudential is

receiving a market rate of interest on its claim.  For all the reasons stated above, Prudential is not

receiving a market rate of interest and is, therefore, not receiving the indubitable equivalent of its

secured claim.  Consequently, the Plan fails the "fair and equitable" test under this approach as

well.

> **B.      The Plan Violates the Absolute Priority Rule**

The Plan contemplates a payment scheme that fundamentally violates the absolute

priority rule, as codified in section 1129(b) of the Bankruptcy Code.  The absolute priority rule

provides that, absent full satisfaction of a creditor's allowed claims, no member of a class junior

in priority to that creditor may receive any distribution on account of their claim or equity

interest.  See 11 U.S.C. § 1129(b).

The Plan contemplates paying out Prudential on account of its claim at an interest rate far

below market.  The Plan fails to provide for payment of post-petition interest.  This treatment

severely impairs Prudential, the Debtors' senior secured creditor; yet holders of the City of

Boston Secured Claim, the Bovis Allowed Claim and General Unsecured Claims will all receive

payment in full under the Plan (including post-confirmation interest on their claims) before

Prudential is paid in full – a result that clearly violates the absolute priority rule and requires

close scrutiny.  *See In re Bryson Props.*, 961 F.2d at 505..

LIBNY/5047184.7

In addition to the below-market rate of interest, the basket of rights that Prudential would

be left with if the Plan is confirmed is so radically different than the rights provided for under the

Prudential Loan Documents that the Plan would still fall short of providing Prudential the

"indubitable equivalent" of its claims.  Section 4.2(l) of the Plan provides that:

> To the extent that the Prudential Loan Documents contain any
> terms, covenants, representations and warranties, and/or remedies
> that impose obligations upon the Debtors that are inconsistent with
> or more expansive than the terms of the Plan, such terms,
> covenants, representations and warranties, and/or remedies are
> deemed cancelled and any obligations of the Debtors and/or
> Claims by the holder of the Allowed Prudential Claim arising from
> such terms, covenants, representations and warranties, and/or
> remedies shall be discharged upon the Effective Date.

Plan at § 4.2(l).

Given the acutely anemic rights and remedies provided to Prudential under the Plan,

including the requirement that Prudential submit to binding arbitration in the event of any

dispute, a number of economically valuable rights would be lost, including, for example, the loss

of guarantees provided by the Affiliated Debtors and the loss of the environmental indemnity

provided by SW Boston to Prudential.

**V.    THE DEBTORS' LACKLUSTER SALES, LACK OF EARNINGS AND WEAK
CAPITALIZATION RENDER THE PLAN NOT FEASIBLE**

Section 1129(a)(11) of the Bankruptcy Code requires that for a plan to be confirmed, the

court must find that "[c]onfirmation of the plan is not likely to be followed by the liquidating, or

the need for further financial reorganization, of the debtor or any successor to the debtor under

the plan…."  11 U.S.C. § 1129(a)(11).  In general, the feasibility test mandates that the plan

permit the reorganized debtor to emerge both solvent and with a reasonable prospect of financial

survival, stability, and profitability.  *In re JRV Indus., Inc.*, 344 B.R. 679, 682 (Bankr. M.D. Fla.

2006).  The purpose of the feasibility test is to avoid "visionary schemes" that promise creditors

more than the debtor can deliver under the plan.  "The test is whether the things that are to be done after confirmation can be done as a practical matter under the facts."  *In re Bergman*, 585 F.2d 1171, 1179 (2d Cir. 1978); *Pizza of Hawaii, Inc. v. Shakey's, Inc. (In re Pizza of Hawaii, Inc.)*, 761 F2d 1374, 1382 (9th Cir. 1985).

To find the Plan feasible, the Court must decide whether it is more probable than not that the Debtors will meet their plan projections.  *See In re Schoeneberg*, 156 B.R. 963, 974 (Bankr. W.D. Tex. 1993); *see also In re Camesinos Unidos, Inc.*, 219 B.R. 886, 887 (Bankr. S.D. Cal. 1998).  In making such a determination, "past performance of the debtor can add clarity to the a plan's feasibility." *In re JRV Indus., Inc.*, 344 B.R. at 683.  In addition, the Debtors must show adequate means for implementing the plan.  *In re Walker*, 165 B.R. 994, 1004 (E.D. Va. 1994) (citation omitted).

Courts have used, among others, the following factors to determine a plan's feasibility:

- the prospective earnings of the business or its earning power;

- the soundness of the reorganized debtor's capital structure;

- Adequacy of working capital;

- Prospective availability of credit;

- Economic and market conditions;

- the ability of management, and the likelihood that the same management will continue;

- the means of implementation of the plan;

- the length of the payout period; and

- any other factors affecting the likelihood that the debtor's operations will be sufficiently successful to enable it to perform the plan provisions.

34

*See, e.g., In re Orfa Corp. of Philadelphia*, 129 B.R. 404, 411 (Bankr. E.D. Pa. 1991); *In re JRV Indus., Inc.*, 344 B.R. at 683.  Feasibility, as noted by the Second Circuit, contemplates "the probability of actual performance of the provisions of the plan…The test is whether the things which are to be done after confirmation can be done as a practical matter under the facts." *Bergman*, 585 F.2d at 1179.  Here, a number of the foregoing factors weigh heavily against a finding that the Plan is feasible.

### A.      The Debtors' Sales Remain Weak

As the Plan before the Court is a liquidating plan, the paramount question is whether the Debtors can sell the remaining units within a time frame and at prices consistent with the projections set forth in the Disclosure Statement.  As evidenced in Exhibit C of the Murray Report, they cannot.  The Debtors have failed to move units in the B, E and G lines, having closed on only 4 of the 36 unites in the two and one-half years since sales began.  Indeed, as part of the Plan, the Debtors intend to implement minimum price *reductions* for these units, effectively acknowledging their current lack of sales appeal.  Other lines have not approached the average per square foot prices set forth in the projections.  The Debtors' apparent inability to meet their goals as set forth in their projections casts serious doubt as to whether they will be able to satisfy their obligations under the Plan.

Despite having two financial advisory firms retained in these Chapter 11 Cases, the Debtors have failed to scrutinize the projections derived from their interested broker.  As a result, the Debtors must convince this Court to adopt "hockey-stick" revenue estimates that bear little relationship to reality.

### B.      The Reorganized Debtors Will Have No Earnings

With the sale of the Hotel, the Reorganized Debtors will have no virtually ongoing revenue-generating operations, except some modest leasing intended to spur sales of the

Residences.  And, unlike an operating business with a renewable revenue cycle, as the

Residences are sold, the Reorganized Debtors' available asset base will be reduced

proportionately.  In other words, the only source of revenue for the Reorganized Debtors' post-

confirmation efforts will be the proceeds of the liquidation of Prudential's ollateral (*i.e.*, the

Residences).  Without renewable revenue and earnings, the Debtors will not be able to make up

ground from prior weak sales.

        **C.**     **The Reorganized Debtors will Have Inadequate
Capital upon Emergence from Chapter 11**

Upon emergence from Chapter 11, the Reorganized Debtors will be balance sheet

insolvent.  (*See* Murray Report at 37.)  The only way to provide for the payments required under

the Plan is to leave the post-reorganization Debtors dangerously overleveraged.  To compound

matters, the Debtors' only source of revenue is sales of the Residences.  With the Debtors'

outsized debt load, any variation in their projections for sales velocity and price will prove

difficult, if not impossible, to absorb given the Debtors' post-reorganization capital structure.

Unlike many typical reorganizations, here, the Debtors have done *nothing* to deleverage

their balance sheets.  Instead, the Debtors' apparent chapter 11 strategy has been to "wait and

see" if the real estate market would return to pre-recession levels such that the increase in the

value of the underlying properties would inure to their benefit.  While the Hotel Sale

significantly reduced the Debtors' overall debt load, the collateral securing the claims was also

reduced, such that leverage remains virtually unchanged.  This leaves the Debtors in a precarious

position on a go-forward basis and, again, shifts the risk of failure squarely on Prudential.

The overleveraged position also leaves the Debtors without a meaningful way to finance

any additional capital expenditures that arise.  Such expenditures could include significant work

that will need to be done to repair and restore the leased Residences to saleable condition, as well

LIBNY/5047184.7

as any work that will need to be done to modify slow-moving units to accelerate the sales of certain units in the problem lines.  (*See* Murray Report at 38.)

### D.    The Debtors' Management Will Remain the Same

According to the Debtors, Ms. Parks will lead the Reorganized Debtors, as she has done thus far.  Indeed, it appears that the exact same team responsible for the initial development of the W Hotel and Residences, and its fall into bankruptcy, will continue their stewardship post-confirmation.  Yet, this management group has consistently failed to perform or meet their own projections.  They are operating without any new marketing or go-forward plan designed to sell Residences, especially those that have historically underperformed.  In sum, this Plan will be found feasible *despite* the management team, not because of them.

### E.    If Starwood Terminates the CMLA,
the Value of the Residences Will Plummet

Starwood and the Debtors are party to a Residence Management Licensing Agreement (the "**CMLA**"), pursuant to which the Debtors are able to sell the Residences as "W" branded. On June 8, 2011, contemporaneously with the closing of the Hotel Sale, SW Boston and Starwood entered into that certain First Amendment to Residence Marking License Agreement ("**CMLA Amendment**").  Notwithstanding that the CMLA Amendment extends the CMLA until the Debtors sell out the remaining Residences (so long as that period does not exceed ten years), the order approving the CMLA Amendment provides Starwood the ability to terminate the CMLA if Starwood is not comfortable with the go-forward financial condition of the Reorganized Debtors.  Prudential and the Debtors have collectively acknowledged throughout these Chapter 11 Cases that a significant amount of the Residences' value derives from the fact that they are "W" branded residences.  Indeed, the Debtors agree:  "SW Boston's ability to market the Residences as "W" branded luxury condominiums materially enhances the value of

those condominium units." (*See Motion by SW Boston Hotel Venture, LLC to Approve*

*Assumption of Amended Condominium Marketing Licensing Agreement*, dated June 21, 2011

[Dkt. No. 673], at ¶ 8.)  In the event Starwood decides to stop licensing the "W" name, the value

of condo units would plummet.  And, given the tenuous financial condition of the post-

confirmation Reorganized Debtors, the risk of Starwood exercising any option it may have to

terminate the CMLA is very real.  This type of uncertainty is fatal to a feasibility finding.

In addition, the Debtors and Starwood have not entered into an agreement for Starwood

to provide certain basic services (room service, concierge services, bellhop etc.), as well as

certain requested services (housekeeping, laundry services, personal services etc) to owners of

the Residences.   Like the "W" brand itself, assurance of the provision of these services is critical

to the Residences' maintaining their value.  Yet, as of Confirmation, no agreement is in place

between Starwood and the Debtors to provide such services.  This is a material risk to the Plan's

feasibility as prospective buyers will not know whether such services will be provided, nor at

what cost, which could have a material impact on sales.  The Debtors, however, have failed to

account for, or even disclose, this possibility.

## VI.    THE PLAN CANNOT SATISFY THE BEST INTERESTS TEST PROVIDED FOR PURSUANT TO SECTION 1129(A)(7) OF THE BANKRUPTCY CODE

To confirm a plan, a plan proponent bears the burden of satisfying the "best interest of

creditors" test set forth in section 1129(a)(7).  Specifically, section 1129(a)(7)(A)(ii) requires that

each non-accepting holder in each impaired class of claims or interests:

> receive or retain under the plan on account of such claim or interest
> property of a value, as of the effective date of the plan, that is not
> less than the amount that such holder would so receive or retain if
> the debtor were liquidated under Chapter 7 of [the Bankruptcy
> Code].

38

11 U.S.C. § 1129(a)(7)(A)(ii).  In other words, to confirm the Plan, the Debtors must show that

each non-accepting creditor will receive property under the Plan that has a present value equal to

what such creditor would recover in a chapter 7 liquidation.  *See, e.g., ACC Bondholder Group v.*

*Adelphia Commc'ns Corp.* (*In re Adelphia Commc'ns Corp.*), 361 B.R. 337, 364 (S.D.N.Y.

2007).  The Debtor bears the burden of satisfying the best interest of creditors test.  *In re Global*

*Ocean Carriers Ltd.*, 251 B.R. 31, 46 (Bankr. D. Del. 2000).  And to carry this burden, the

Debtors need to present plausible, complete evidence as to the current value of their assets.  *See*

*In re Rusty Jones, Inc.*, 110 B.R. 362, 373-74 (Bankr. N.D. Ill. 1990).

Here,  for the same primary reasons that the Plan is not fair and equitable, the Plan also

fails the best interests test.  The Debtors have failed to present any evidence that demonstrates

Prudential will receive more under the Plan than they could otherwise receive in a hypothetical

liquidation.  Indeed, the Debtors cannot show this because in a Chapter 7 liquidation, which

would proceed strictly according to the parties' relative priorities, Prudential would be entitled to

receive the full value of their collateral *before* any chapter 11 administrative creditors or general

unsecured creditors were paid.  Under the Plan, Prudential is forced to wait for payment while

the proceeds of its collateral fund payments to the City, unsecured creditors, and as the

operations of the Debtors' enterprise.  And, in addition to that, equity holders will also be

receiving a distribution of property under the Plan before Prudential is paid in full – a result that

would not stand under a Chapter 7 liquidation.[14]

---

[14]   The Plan provides that "Except as set forth in Section 4.7(e)(i), no Insiders of the Debtors shall receive any distributions on account of their Allowed Claims until the Allowed Claims of all non-Insider creditors have been paid in full under the terms of the Plan."  First, noticeably carved out of this prohibition is the substantial distribution Insiders will receive by way of the equity interests in 110 Stuart Street.  But, even beyond that, the Plan makes no provision for subsequent distribution to Insiders, so it is unclear how the Debtors propose to implement these delayed distributions.

39

It is not surprising therefore that the liquidation analysis set forth in the Disclosure

Statement is appallingly inadequate. In fact, the meager liquidation analysis set forth by the

Debtors themselves proves that Prudential would be better off in a liquidation scenario than

under the Plan. First, the Debtors' concede that "upon liquidation, it is unlikely that creditors,

other than Prudential and the City, would receive a meaningful dividend on account of their

claims" (Disclosure Statement at 46.)[15]  The Debtors continue:

> Upon conversion to Chapter 7, the Debtors' operations would
> cease and a trustee would be appointed to liquidate the Debtors'
> assets. The amount that would be realized from the sale of the
> Debtors' assets at liquidation is substantially less than the going
> concern value that will be realized under the Plan from an orderly
> sale and/or operation of those assets. The revenue from the
> Debtors' continued operations would be lost to creditors upon
> conversion to Chapter 7.

(*Id.*). The fundamentally flawed premise in the liquidation analysis is that the Debtors have

"operations" to continue that will inure to the benefit of creditors. After the sale of the Hotel, the

Debtors have no significant operations. Its nearly only function going forward is to sell –

*i.e.*, liquidate, the remaining Residences. This is the *exact* function a Chapter 7 trustee would

serve – the orderly liquidation of the estates' assets. As such, the Debtors' acknowledgement

that no creditors other than Prudential, and possibly, the City, would receive a distribution in a

Chapter 7 liquidation should still hold true under the Plan.

While the Debtors failed to perform a liquidation analysis, Prudential did. As evidenced

by Exhibit E to the Murray Report, Prudential would fare significantly better under a Chapter 7

scenario. Under a hypothetical liquidation scenario, Prudential would receive between $9

million and $16 million *more* than Prudential is set to receive under the Plan. *See* Murray

---

[15]    Any attempt by the Debtors to use the premium received for the sale of the Hotel to get around this admission
is disingenuous, as the Hotel sale was clearly contemplated at the time the Disclosure Statement was approved.

40

Report, Ex. E.  If the current Plan treatment is discounted for its present value, the differential is even greater.  Thus, the Plan cannot be confirmed because, (at least) as to Prudential, it cannot meet the best interest of creditors test in respect of Prudential's claims.

## VII.  THE PLAN FAILS TO COMPLY WITH THE APPLICABLE PROVISIONS OF THE BANKRUPTCY CODE AS REQURED BY SECTION 1129(a)(1)

Section 1129(a)(1) of the Bankruptcy Code requires that a plan must "compl[y] with the applicable provisions of [the Bankruptcy Code]."  11 U.S.C. § 1129(a)(1).  The legislative history of section 1129(a)(1) informs that this provision encompasses the requirements of sections 1122 and 1123 of the Bankruptcy Code governing classification of claims and contents of a plan, respectively.  H.R. REP. NO. 95-595, at 412 (1977); S. REP. NO. 95-989, at 126 (1978); *see also In re Johns-Manville Corp.*, 68 B.R. 618, 629 (Bankr. S.D.N.Y. 1986), *aff'd in part, rev'd in part on other grounds*, 78 B.R. 407 (S.D.N.Y. 1987), *aff'd, Kane v. Johns-Manville Corp.*, 843 F.2d 636 (2d Cir. 1988); *In re Toy & Sports Warehouse, Inc.*, 37 B.R. 141, 149 (Bankr. S.D.N.Y. 1984).

Here, the Plan fails to comply with the requirements of sections 1122 and 1123, as well as other applicable provisions of the Bankruptcy Code.

### A.      The Plan Fails to Comply with Section 1122 of the Bankruptcy Code

Section 1122(a) of the Bankruptcy Code provides in pertinent part as follows:

> (a)    Except as provided in subsection (b) of this section, a plan may place a claim or interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class.

11 U.S.C. § 1122(a).  In the First Circuit, "[t]he general rule regarding classification is that 'all creditors of equal rank with claims against the same property should be placed in the same class.'"  *In re Grenada Wines, Inc.*, 748 F.2d 42, 46 (1st Cir. 1984) (*quoting In re Los Angeles Land and Investments, Ltd.*, 282 F. Supp. 448, 453 (D. Haw. 1968), *aff'd*, 447 F.2d 1366

41

(9th Cir. 1971)).  The *Grenada Wines* court held that "[s]eparate classifications for unsecured

creditors are only justified where the legal character of their claims is such as to accord them a

status different from the other unsecured creditors."  *Id.* at 47.

Here, the Debtors have offered no proof, or even an explanation, as to why Class 6 –

Bovis Allowed Claims are separately classified from other unsecured creditors.  While the Bovis

Claims are covered under a stipulation with the Debtors, such claims remain general unsecured

claims against these estates.  As such, the "legal character" of the Bovis Claims is identical to

that of General Unsecured Claims.  They should accordingly be classified together and treated

identically given that they are being paid from Prudential's collateral and no longer rendering

services.  The Bovis Stipulation requires Bovis to vote in favor of the Plan.  Thus, any attempt to

separately classify Bovis is merely an attempt to ensure that the Debtors have at least one

impaired accepting class.

In evaluating the presence of a legally viable distinction, the Court will look at the rank,

status and character of the separately classified unsecured creditors.  *In re River Valley Fitness*

*One Ltd. Pshp.*, No. 01-12829, 2003 WL 22298573 at * 9 (Bankr. D.N.H Sep. 19, 2003).  It is

the Debtors' burden to provide a rational distinction between that which has been separately

classified, so as to support a finding that there is a distinction with respect to the legal nature of

the claim.  *In re Barney*, 170 B.R. 17, 24 (Bankr. D. Mass. 1994).  Here, none has been given.

**B.     The Plan Fails to Prohibit the Issuance of Nonvoting Equity Securities in
        Violation of Section 1123(a)(6)**

Section 1123(a)(6) of the Bankruptcy Code provides that a plan shall "provide for the

inclusion in the charter of the debtor, if the debtor is a corporation…of a provision prohibiting

the issuance of nonvoting equity securities."  11 U.S.C. § 1123(a)(6).  Courts have held that the

term "corporation," as defined under the Bankruptcy Code, includes limited liability companies.

*See In re Northern Outer Banks Assoc., LLC*, 2010 WL 4630348, at *2 (Bankr. E.D.N.C. Nov. 8, 2010). Here, the Plan simply fails to include a provision prohibiting the issuance of nonvoting securities as is clearly required by section 1123(a)(6).

## VIII.   THE DEBTORS HAVE NOT COMPLIED WITH THE BANKRUPTCY CODE AS REQUIRED BY SECTION 1129(A)(2)

Section 1129(a)(2) of the Bankruptcy Code requires that a plan proponent "compl[y] with the applicable provisions of [the Bankruptcy Code]." The legislative history of section 1129(a)(2) reflects that this provision is intended to encompass the disclosure and solicitation requirements under section 1125 and 1126 of the Bankruptcy Code. *See* H.R. Rep. NO. 950595, at 412; S. Rep. NO. 95-989, at 126 (1978) ("Paragraph (2) [of § 1129(a)] requires that the proponent of the plan comply with the applicable provisions of chapter 11, such as section 1125 regarding disclosure."); *see also In re Johns-Manville Corp.*, 68 B.R. at 630; *In re Toy & Sports Warehouse, Inc.*, 37 B.R. at 149. Here, the Debtors have not complied with the disclosure requirements under section 1125 of the Bankruptcy Code.

Proper solicitation of acceptances or rejections of a plan after the commencement of a bankruptcy case must occur pursuant to a disclosure statement found to contain "adequate information." The Disclosure Statement approved in these Chapter 11 Cases remains deficient as a matter of law. Accordingly, the Debtors have not complied with the provisions of the Bankruptcy Code as contemplated by section 1129(a)(2). The Disclosure Statement failed to provide necessary information that numerous courts have found to be required. Such information deficiencies include:

- inadequate description of insider claims;

- the failure to include a proper liquidation analysis;

- the failure to meaningfully describe the risks associated with the Plan; and

- the failure to provide an analysis of the Debtors' possible avoidance actions or other litigation claims.

Accordingly, the Disclosure Statement used to solicit acceptances of the Plan did not contain "adequate information," as is required pursuant to section 1125 of the Bankruptcy Code and necessary for the Debtors to satisfy section 1129(a)(2).

## IX. THE PLAN'S TREATMENT OF INSIDERS DEMONSTRATES THE LACK OF GOOD FAITH AND VIOLATES SECTION 1129(A)(3)

In order to be confirmed, a plan must be proposed in good faith. *In re Weber*, 209 B.R. 793, 797 (Bankr. D. Mass. 1997) (even where all creditors vote to accept the plan, the good faith requirement contained in § 1129(a)(3) must still be satisfied). The Bankruptcy Code does not define "good faith" in the § 1129(a)(3) context. However, the Court must look to whether there was "fundamental fairness" in dealing with the creditors. *In re Stolrow's Inc.*, 84 B.R. 167, 172 (B.A.P. 9th Cir. 1988); *In re Coram Healthcare Corp.*, 271 B.R. 228, 234 (Bankr. D. Del 2001); *In re Leslie Fay Co.*, 207 B.R. 764, 781 (Bankr. S.D.N.Y. 1997). The issue of good faith looks to the purposes that would be achieved by the proposed plan, *In re Genesis Health Ventures, Inc.*, 266 B.R. 591, 609 (Bankr. D. Del. 2001), and a plan proposed in good faith must foster a result that is consistent with the Bankruptcy Code's objectives. *In re Block Shim Dev. Company–Irving*, 939 F.2d 289, 292 (5th Cir. 1991); *In re Madison Hotel Assocs.*, 749 F.2d 410, 425 (7th Cir. 1984); *In re Zenith Elecs. Corp.*, 241 B.R. 92, 107 (Bankr. D. Del. 1999). The central question to a "good faith" determination "is the plan itself and whether such plan will fairly achieve a result consistent with the objectives and purposes of the Bankruptcy Code." *In re Madison Hotel Assoc.*, 749 F.2d 410, 425 (7th Cir. 1984). The determination of good faith must be based on the totality of the circumstances present in the case. *In re Cajun Elec. Power*

LIBNY/5047184.7

*Coop.*, 150 F.3d  503, 519 (5th Cir. 1998); *Coram Healthcare Corp.*, 271 B.R. at 234; *Leslie Fay Co.*, 207 B.R. at 781.

Here, the Plan proposed by the Debtors falls far short of satisfying the good faith requirement.  Indeed, the Plan is designed to benefit the Debtors' insiders and current equity holders at the expense of Prudential.  In this way, the Plan violates the good faith requirement of section 1129(a)(3) because any "attempt by a debtor-in-possession to give favorable treatment to an insider is violative of § 1129(a)(3)'s good faith requirement." *In re Future Energy Corp.*, 83 B.R. 470, 487 (Bankr. S.D. Ohio 1988); *In re Barr*, 38 B.R. 323, 325 (Bankr. E.D. Mich. 1984); Nancy C. Dreher and Joan N. Feeney, 11A Bankruptcy Law Manual § 31 (5th ed. West 2010-1).

The Plan prefers the Debtors' Insiders to Prudential in a number of ways.  First, the fact that Insiders are retaining their equity interests in the face of the impairment of the senior secured creditors smacks of insider preferential treatment.  Under any interpretation of the absolute priority rule, equity holders may not retain their interests where senior priority claims are not paid in full.  The only exception to this is, of course, a "new value" exception.  *See, e.g., In re Ambanc La Mesa Ltd. P'Ship*, 115 F.3d 650, 654 (9th Cir. 1997).

However, here no new value is being contributed.  Indeed, the only consideration being offered by the Insiders is the release of certain Insider claims.  First, as a matter of law, the release of claims cannot be considered "new value." *See, e.g., In re Snyder*, 967 F.2d 1126 (7th Cir. 1992).  But, even beyond that, the Debtors have made no attempt to explain or value such Insider claims.  Nowhere do the Debtors enumerate or describe in any detail what claims the Insiders have or to what extent such claims are valid.  Under the Plan, creditors are supposed to take at face value that the release of the Insider claims constitutes valuable consideration

45

sufficient enough to justify that those same Insiders will receive 100% of the new equity interests in 110 Stuart Street, the newly formed entity that will hold, own and control the Residences. This result is especially egregious when one considers the law surrounding dealings between a debtor and its insiders. "Where a claimant is an insider or an affiliate of the debtor, or where the creditor exercises control over or domination of the debtor, his dealings with the debtor are subject to strict scrutiny." *In re Harford Sands Inc.*, 372 F.3d 637, 640 (4th Cir. 2004); *Pepper v. Litton*, 308 U.S. 295, 306-07 (1939).  In such cases, the "burden is on an insider claimant to show the inherent fairness and good faith of the challenged transaction." *In re Teltronics Servs., Inc.*, 29 B.R. 139 (Bankr. E.D.N.Y. 1983).  The Debtors have made no effort to sustain their burden.  Indeed, as noted above, they have not even provided the barest details about the nature or amount of, or legal support for, Insider claims provided for under the Plan.

The Plan also givers preferential treatment to the City, who, as a secured creditor junior to Prudential, should receive *nothing* until Prudential is paid in full.  Indeed, under the Intercreditor Agreement, the City is required to turn over to Prudential all money it receives on account of its claim until Prudential is paid in full.  Yet, notwithstanding the City's subordinated position, under the Plan, the City will receive post-Effective Date interest at the rate of *8% per annum* (compared to Prudential's 4.25%), with interest payments to commence on the Effective Date (i.e. before Prudential is paid in full).  (Plan § 4.3(d)(i).)  In addition, the Plan reinstates any prepayment penalties provided for under the City Loan Documents in the event the Reorganized Debtors prepay the City Claim, whereas, for Prudential, the Plan explicitly states that the Reorganized Debtors may prepay the Prudential Claim without penalty.  Plan §4.2(e).

Lastly, as noted above, the deemed substantive consolidation sought in the Plan is further evidence of its lack of good faith.  Substantive consolidation in this case will work to subvert the

46

goals of the Bankruptcy Code in favor of the Debtors' insiders.  Indeed, substantive

consolidation will work the exact type of injustice that a good faith finding is designed to protect

against.

It is important to note that, while this Court has noted that other parties in interest,

especially the Creditors Committee, have appeared supportive of the Debtors' efforts, such

support is to be expected, even notwithstanding the inappropriate goals of the Plan.  Unsecured

Creditors are getting a payment in full, plus post-confirmation interest, in a case where, if

distributions were in accord with the absolute priority rule, distributions to unsecured creditors

would likely be significantly reduced, if not eliminated altogether.  Thus, their economic

incentive is to support the Debtors' Plan, in which they are paid with proceeds of Prudential's

collateral.  Such support, however, should not be interpreted to give credence to the Debtors'

efforts; rather, it should be interpreted for what it is, justifiably self-interested economic actors

seeking the best recovery on their claims.

## X.    THE PLAN VIOLATES SECTION 1129(A)(5) BECAUSE IT FAILS TO IDENTIFY THE REORGANIZED DEBTORS' OFFICERS AND DIRECTORS AND THEIR RESPECTIVE COMPENSATION

Section 1129(a)(5) of the Bankruptcy Code provides, in relevant part, that for a plan to be

confirmed, the plan must meet with the following criteria:

> (A)(i)  the proponent of the plan has disclosed the identity and
> affiliations of any individual proposed to serve, after confirmation
> of the plan, as a director, officer, or voting trustee of the
> debtor…or a successor to the debtor under the plan; and
>
> (ii)      the appointment to, or continuance in, such office of such
> individual, is consistent with the interests of creditors and equity
> security holders and with public policy; and
>
> (B)      the proponent of the plan has disclosed the identity of any
> insider that will be employed or retained by the reorganized debtor,
> and the nature of any compensation for such insider.

47

Here, the Plan simply ignores the requirements of section 1129(a)(5).  The Disclosure

Statement states that "Carol S. Parks will continue to act as the president, manager or trustee, as

the case may be, of the Debtors after the Effective Date at her pre-petition salary…."  Disclosure

Statement at 37.  The Disclosure Statement fails to disclose, however, (i) whether Ms. Parks will

be the sole officer and director and (ii) because Ms. Parks is an insider, her compensation.

Disclosing that her compensation will be equal to her pre-petition salary is meaningless unless

the Debtors also disclose her pre-petition salary.  Disclosure of this information is not optional,

and, as such, the Debtors must make more fulsome disclosure before the Plan can satisfy section

1129(a)(5).

Moreover, once disclosed, the Bankruptcy Court must make a determination as to

whether those proposed to serve as post-confirmation officers and directors be in the best

interests of creditors and equity holders and comport with public policy.  First, without full

disclosure, it is impossible for this Court to make even the baseline evaluation.  Next, the

Debtors have again failed to sustain their burden by neglecting to proffer any evidence that

having Ms. Parks continue in her prepetition role is consistent with the interests of creditors.

Indeed, given the Debtors historical performance, as well as Ms. Parks lack of experience with

residential condominium development, especially in a distressed environment, more is needed

before the Court can make the requisite finding.

## XI.    THE PLAN FAILS TO PROPERLY IMPLEMENT THE SUBORDINATION AGREEMENT BETWEEN PRUDENTIAL AND THE CITY[16]

Section 510(a) of the Bankruptcy Code provides that "[a] subordination agreement is

enforceable under applicable nonbankruptcy law."  11 U.S.C. § 510(a).  Thus, under

---

[16]    At the request of the Court, contemporaneously with the filing of this Objection, Prudential will file an
additional legal memorandum addressing, among other things, the enforceability of voting assignments in

48

section 510(a) of the Bankruptcy Code, subordination agreements must be enforced according to

their terms.  *See In re Bank of New England Corp.*, 404 B.R. 17, 22 (Bankr. D. Mass. 2009)

*aff'd*, 426 B.R. 1 (D. Mass. 2010) (subordination agreements should is to be enforced according

to their terms); *In re Sunset Hollow Props. LLC*, 359 B.R. 366, 376 (Bankr. D. Mass. 2007) (an

unambiguous subordination agreement must to enforced according to its terms); *In re Kors*,

819 F.2d 19, 24 (2d Cir. 1987) (subordination agreement are uniformly upheld by the courts); *In

re Credit Industrial Corp.*, 366 F2d 402, 408-10 (2d Cir. 1966) (bankruptcy courts "must enforce

lawful subordination agreement according to their terms").

In this case, the Plan ignores the Intercreditor Agreement in its entirety.  The Intercreditor

Agreement prohibits the City from receiving or retaining any payments on account of its loan

until Prudential is paid in full.  (Intercreditor Agreement § 7(a))  Yet, under Section 4.3(d)(ii)(1)

of the Plan, commencing shortly after the Effective Date, the City will receive monthly

installments of interest at the rate of 8% per annum.  (See Plan § 4.3(d)(ii)(1).)  These interest

payments to the City are directly contrary to the provisions of the Intercreditor Agreement.

Indeed, under the Intercreditor Agreement, the City is required to turn over to Prudential any and

all such payments, or risk an enforcement action brought in state court.

A.    **The Ballots Cast by Prudential on Behalf of the City Must be Counted <u>In
Lieu of any Ballots Submitted by the City Itself</u>**

As noted above, Prudential cast votes on account of the City's Class 3A, 3B, 3D, 3F and

3G claims to reject the Plan.  Prudential is entitled to do so because the City consented to

assignment of their right to vote on a plan of reorganization on account of their claim while the

Prudential Loan remained outstanding under the clear and unambiguous terms of the

---

subordination agreements.  Prudential refers the court to that legal memorandum for a fuller discussion of the
issues addressed in this Section XII of the Objection.

Intercreditor Agreement.  (Intercreditor Agreement § 8(c).)  The terms of the Intercreditor

Agreement, including the voting assignment, are enforceable under the Bankruptcy Code.  The

Court should therefore recognize Prudential's Class 3A, 3B, 3D, 3F and 3G ballots as valid,

declare any Class 3A, 3B, 3D, 3F and 3G votes cast by the City invalid, and reject the Plan if

Prudential's Class 3A, 3B, 3D, 3F and 3G votes to reject the Plan render the Plan

unconfirmable.[17]

Section 510(a) of the Bankruptcy Code states that "[a] subordination agreement is

enforceable in a case under this title to the same extent that such agreement is enforceable under

applicable nonbankruptcy law."  11 U.S.C. § 510(a).  Accordingly, courts have repeatedly

affirmed the effectiveness of provisions in subordination agreements in which a party waives or

assigns its rights as a creditor under bankruptcy law.  *See, e.g.*, *In re Avondale Gateway Center

Entitlement, LLC*, No. 10-1772, 2011 WL 1376997 at *4 (D. Ariz. Apr. 12, 2011) (enforcing

subrogation of all rights related to subordinated debtor's claim to senior creditor, including the

right to vote on a plan, in intercreditor agreement); *In re Erickson Retirement Communities, LLC*,

425 B.R. 309, 316 (Bankr. N.D. Tex. 2010) (enforcing waiver of legal and statutory rights that

would conflict with "stand still" provision in subordination agreement); *In re Ion Media

Networks, Inc.*,  419 B.R. 585, 595 (Bankr. S.D.N.Y. 2009) (enforcing waiver of second lien

creditor's right to challenge liens and priority of first lien creditor in subordination agreement).

More specifically, courts have enforced assignments of a subordinated creditor's right to vote on

a plan of reorganization on account of its claims in nearly all instances under section 510(a).  *In

re Aerosol Packaging, LLC*, 362 B.R. 43, 47 (Bankr. N.D. Ga. 2006); *In re Curtis Center Ltd.*

---

[17]    Prudential reserves any and all of its rights and remedies against the City under the Intercreditor Agreement,
including, without limitation, to recover from the City any and all losses, costs, damages and expenses suffered
by Prudential as a result of the intentional and continuing breach of the Intercreditor Agreement by the City.
*See* Intercreditor Agreement at § 8(c).

*P'ship*, 192 B.R. 648, 659-660 (Bankr. E.D. Pa. 1996); *In re Urban Broad. of Cincinnati, Inc.*,

No. , 1994 WL 646176 at *2 (E.D. La. Nov. 16, 1994); *Broad. Capital, Inc. v. Davis Broad.,*

*Inc., (In re Davis Broadcasting, Inc.)*, 169 B.R. 229 (Bankr. M. D. Ga. 1994), *rev'd on other*

*grounds*, 176 B.R. 290 (M.D. Ga. 1994); *see also Avondale*, 2011 WL 1376997 at *4

(concluding that a creditor's right to vote on a plan can be assigned).[18]

The Intercreditor Agreement states "[i]n the event of . . . bankruptcy . . . Junior Lender

will at Senior Lender's request . . . assign to Senior Lender the voting rights of Junior Lender in

such proceeding . . ."  Intercreditor Agreement at § 8(c).  Thus, in accordance with section

501(a), Prudential is entitled to vote the City's claim unless the Intercreditor Agreement is

unenforceable under state law.  *In re Bank of New England Corp.*, 364 F.3d 355, 363 (1st Cir.

2004) ("applicable nonbankruptcy law referred to in section 510(a) is state law (and, particularly,

state contract law)").  Subordination agreements are generally given their practical effect under

Massachusetts law.  *See Chesapeake Investment Servs., Inc. v. Olive Group Corp.*, No. 022654,

2003 WL 369682 at *6 (Mass. Super. Jan 30, 2003) (citing *Grise v. White*, 355 Mass 698, 703-

04 (1969)).  There is no indication, under Massachusetts law or otherwise, that the Intercreditor

Agreement or the provisions therein related to assignment of the City's right to vote on a plan of

reorganization is unenforceable.

The City, a sophisticated party, represented by sophisticated counsel, knowingly agreed

to provide subordinated debt and, in exchange, received an interest rate that reflected the

---

[18]    A single decision, In re 203 N. LaSalle Limited P'Ship, has come to the contrary conclusion that such voting
assignments made in pre-petition subordination agreements are unenforceable.  246 B.R. 325, 330-32 (Bankr.
N.D. Ill. 2000).  In Aerosole Packaging the secured creditor correctly argued, and the court agreed, that the
rationale of the N. LaSalle decision rests on (i) a flawed reading of an implied prohibition of assignment of
voting rights into sections 1126(a) and F. R. Bankr. P. 3018 and 9010, and (ii) a misapprehension of prior case
law relating to unenforceability of waivers of bankruptcy rights made by debtors.  362 B.R. at 46.  No court
has followed N. LaSalle in finding an explicit assignment of voting rights made in a pre-petition subordination
agreement unenforceable.

increased risk associated with such debt and entered into the Intercreditor Agreement, which

governs its rights.  The Intercreditor Agreement is the legal mechanism by which Prudential's

seniority is effectuated and there is no basis to disregard or ignore it.  The Court should therefore

enforce the terms of the Intercreditor Agreement, specifically the voting transfer provisions, and

allow Prudential its right to vote the Class 3A, 3B, 3D, 3F and 3G ballots on behalf of the City.

**WHEREFORE**, Prudential respectfully requests that the Court deny confirmation of the

Plan and order such other relief as it deems just and proper.

Dated:  June 24, 2011

> THE PRUDENTIAL INSURANCE COMPANY
> OF AMERICA
>
> By:  */s/ Gina L. Martin*
> Gina L. Martin (BBO# 643801)
> GOODWIN PROCTER LLP
> Exchange Place
> 53 State Street
> Boston, Massachusetts 02109
> Telephone (617) 570-1000
> Facsimile (617) 523-1231
> Email: gmartin@goodwinprocter.com
>
> -and-
>
> Emanuel C. Grillo
> GOODWIN PROCTER LLP
> The New York Times Building
> 620 Eighth Avenue
> New York, New York  10018
> Telephone (212) 813-8800
> Facsimile (212) 355-3333
>
> *Attorneys for The Prudential Insurance Company of*
> *America on Behalf of and Solely for the Benefit of,*
> *and with its Liability Limited to the Assets of, its*
> *Insurance Company Separate Account, PRISA*

53

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MASSACHUSETTS
### EASTERN DIVISION

_____ )
In re                                        )
                                             )        **Chapter 11**
**SW BOSTON HOTEL VENTURE LLC, *et al.***    )        **Case No. 10-14535 (JNF)**
                                             )
           **Debtors.**                      )        **(Jointly Administered)**
_____ )

## CERTIFICATE OF SERVICE

I, Gina L. Martin, hereby certify that on June 24, 2011, I caused a true and correct copy of this

document to be served upon each of the parties listed on <u>Schedule A</u> attached hereto via the

CM/ECF system and upon each of the parties listed on <u>Schedule B</u> attached hereto via electronic

mail.


                              /s/  Gina L. Martin
                              Gina L. Martin (BBO# 643801)
                              GOODWIN PROCTER LLP
                              Exchange Place
                              53 State Street
                              Boston, Massachusetts 02109
                              Telephone: (617) 570-1000
                              Facsimile: (617) 523-1231
                              Email: gmartin@goodwinprocter.com

## SCHEDULE A

**VIA ECF**

John Fitzgerald, Esq.
Paula R. C. Bachtell, Esq.
Office of the United States Trustee
5 Post Office Square, Suite 1000
Boston, MA 02109
Email: USTPRegion01.BO.ECF@USDOJ.GOV
paula.bachtell@usdoj.gov

John J. Monaghan, Esq.
Lynne B. Xerras, Esq.
Holland & Knight LLP
10 St. James Avenue
Boston, MA 02116
Email: bos-bankruptcy@hklaw.com
*(Counsel to Culinary Concepts and  Starwood
Hotels and Resorts Worldwide, Inc. and certain of
its affiliates, including, but not limited to, W Hotel
Management, Inc.)*

Harold B. Murphy, Esq.
D. Ethan Jeffery, Esq.
Christopher M. Condon, Esq.
Natalie B. Sawyer, Esq.
Charles R. Bennett, Esq.
John C. Elstad, Esq.
Murphy & King, P.C.
One Beacon Street, 21st Floor
Boston, MA 02108
Email: nbs@murphyking.com
crb@murphyking.com
dej@murphyking.com
cmc@murphyking.com
pas@murphyking.com
bankruptcy@murphyking.com
ddk@murphyking.com
icm@murphyking.com
jce@murphyking.com
plb@murphyking.com
*(Counsel to SW Boston Hotel Venture LLC, et al)*

Kate Buyuk, Esq.
Joseph F. Ryan, Esq.
Lyne, Woodworth, & Evarts LLP
12 Post Office Square
Boston, MA 02109
Email: kbuyuk@lwelaw.com
jryan@lwelaw.com
*(Counsel to City of Boston)*

Michael J. Fencer, Esq.
Brendan C. Recupero, Esq.
Bruce F. Smith, Esq.
Steven C. Reingold, Esq.
Jager Smith, PC
One Financial Center
Boston, MA 02111
Email: mfencer@jagersmith.com
brecupero@jagersmith.com
bankruptcy@jagersmith.com
sreingold@jagersmith.com
bsmith@jagersmith.com
*(Counsel to Official Committee of Unsecured
Creditors)*

James F. Coffey, Esq.
Nutter McClennen & Fish LLP
World Trade Center West
155 Seaport Boulevard
Boston, MA 02210
Email jcoffey@nutter.com
epleadings@nutter.com
*(Counsel to Sovereign Bank)*

Richard N. Gottlieb, Esq.
Law Offices of Richard N. Gottlieb
11 Beacon Street, Suite 625
Boston, MA 02108
Email: rnglaw@verizon.net
hk.gottlieblaw@verizon.net
*(Counsel to Woodmeister Master Builders, Inc.)*

Joseph D. Frank, Esq.
Frank/Gecker LLP
325 North LaSalle Street, Suite 625
Chicago, Illinois 60654
Email: jfrank@fgllp.com
ccarpenter@fgllp.com
*(Counsel to Jones Lang LaSalle Americas, Inc.)*

David N. Crapo, Esq.
Gibbons, P.C.
One Gateway Center
Newark, NJ 07102
Email: dcrapo@gibbonslaw.com
*(Counsel to Trigen-Boston Energy Corporation)*

E. Todd Sable, Esq.
Honigan Miller Schwartz and Cohn LLP
660 Woodward Avenue
2290 First National Building
Detroit, MI 48226-3506
Email: tsable@honigman.com
*(Counsel to Razorbacks Owner LLC)*

James S. LaMontagne, Esq.
Sheehan Phinney Bass + Green, P.A.
1000 Elm Street
Manchester, NH 03105
Email: jlamontagne@sheehan.com
nhbankruptcycourt@sheehan.com
ntoli@sheehan.com
*(Counsel to Front Line, Inc.)*

John L. Whitlock
Edwards Angell Palmer & Dodge LLP
111 Huntington Avenue
Boston, MA 02199
Email: jwhitlock@eapdlaw.com

Victor Bass, Esq.
Burns & Levinson LLP
125 Summer Street
Boston, MA 02110
Email: vbass@burnslev.com
cparis@burnslev.com
*(Counsel to Bovis Lend Lease LMB, Inc.)*

Thomas S. Vangel, Esq.
Ryan M. MacDonald, Esq.
Murtha Cullina LLP
99 High Street
Boston, MA 02110
Email: tvangel@murthalaw.com
rmacdonald@murthalaw.com
kbratko@murthalaw.com
*(Counsel to E.M Duggan, Inc.)*

David M. Banash, Esq.
David M. Banash, P.C.
375 Totten Pond Road, Suite 102
Waltham, MA 02451-2010
Email: d.banash1@verizon.net
*(Counsel to Stephen T. Sonis)*

Bertin C. Emmons, Esq.
Sovereign Bank
75 State Street
Boston, MA 02109
(617) 757-5440
Email: bemmons@sovereignbank.com

Roger N. LeBoeuf, Esq.
Heald & LeBoeuf, Ltd.
One Turks Head Place
76 Westminster Street, Suite 600
Providence, RI 02903
Email: rnl@healdandleboeuf.com
*(Counsel to Kenvo Floor Co., Inc.)*

## SCHEDULE B

**VIA ELECTRONIC MAIL**

Sarah B. Boehm, Esq.
McGuireWoods LLP
One James Center
901 East Cary Street
Richmond, Virginia 23219
Email: sboehm@mcguirewoods.com
(*Counsel for The Guardian Life Insurance
Company of America*)

Jager Smith P.C.
One Financial Center
Boston, Massachusetts 02111
Email: sreingold@jagersmith.com
mfencer@jagersmith.com;
brecupero@jagersmith.com

Murphy & King, P.C.
One Beacon Street
21st Floor
Boston, MA 02108
Email: bankruptcy@murphyking.com
nbs@murphyking.com

IKON Financial Services
Bankruptcy Administration
Attn: Christine R. Etheridge
1738 Bass Road
P.O. Box 13708
Macon, GA 31208
Email: christine.etheridge@ikonfin.com

Duff & Phelps LLC
Attention: Christopher C. Matteson, Esq.
Duff & Phelps
12595 Collection Center Drive
Chicago, IL 60693
Email: chris.matteson@duffandphelps.com

Gilmartin, Magence & Ross LLP
376 Boyston Street
Boston, MA 02116
Email: craig@gmr-law.com

Otis & Ahearn
Attn: Kevin Ahearn
200 Newbury Street
Boston, MA 02116
Email: kahearn@otisahearn.com

FTI Consulting, Inc.
c/o Robert Duffy
200 State Street, 9th Floor
Boston, MA  02109
Email: bob.duffy@fticonsulting.com

Argus Management Corporation and Financial
Advisors
c/o John G. Haggerty
15 Ketih Hill Road
Suite 100
Grafton, MA  01519
Email: jhaggerty@arguscorp.net

Peter Friedenberg, Esq.
Sherin & Lodgen LLP
101 Federal Street, 30th floor
Boston, MA
Email: pfriedenberg@sherin.com
(*Counsel to Kevin Bright*)

Jennifer V. Doran, Esq.
Hinckley, Allen & Snyder LLP
28 State Street
Boston, MA 02109
Email: jdoran@haslaw.com
calirm@haslaw.com
(*Counsel to J. Derenzo Co.*)

Karen R. Pifer, Esq.
Honigan Miller Schwartz and Cohn LLP
38500 Woodward Avenue
Suite 100
Bloomfield Hills, MI 48304
Email: kpifer@honigman.com
(*Counsel to Pebblebrook Hotel Trust*)