> **THIS IS NOT A SOLICITATION OF ACCEPTANCES OF THE PLAN.  ACCEPTANCE MAY NOT BE SOLICITED UNTIL THE DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT UNDER SECTION 1125 OF THE BANKRUPTCY CODE.  THIS FORM OF DISCLOSURE STATEMENT HAS BEEN SUBMITTED TO THE BANKRUPTCY COURT, BUT HAS NOT BEEN APPROVED.**

### UNITED STATES BANKRUPTCY COURT
### DISTRICT OF MASSACHUSETTS
### EASTERN DIVISION

_____

| | | |
|---|---|---|
| In re | ) | |
| | ) | **Chapter 11** |
| **SW BOSTON HOTEL VENTURE LLC,** *et al.*,[1] | ) | **Case No. 10-14535 (JNF)** |
| | ) | |
| **Debtors** | ) | **Jointly Administered** |

_____

---

### [PROPOSED]
### DISCLOSURE STATEMENT WITH RESPECT TO
### PLAN OF REORGANIZATION UNDER CHAPTER 11 OF
### THE UNITED STATES BANKRUPTCY CODE PROPOSED BY THE
### PRUDENTIAL INSURANCE COMPANY OF AMERICA, ON BEHALF AND SOLELY
### FOR THE BENEFIT OF, AND WITH ITS LIABILITY LIMITED TO THE
### ASSETS OF, ITS INSURANCE COMPANY SEPARATE ACCOUNT, PRISA

---

Dated: June 27, 2011

GOODWIN PROCTER LLP
Emanuel C. Grillo
The New York Times Building
620 Eighth Avenue
New York, New York 10018-1405
Telephone:  (212) 813-8800
Facsimile:  (212) 355-3333
Email:  egrillo@goodwinprocter.com

GOODWIN PROCTER LLP
Gina Lynn Martin
Exchange Place
Boston, Massachusetts 02109
Telephone (617) 570-1000
Facsimile (617) 523-1231
Email: gmartin@goodwinprocter.com

---

[1]     The "Debtors" are SW Boston Hotel Venture LLC (Case No. 10-14535-JNF), Auto Sales & Service, Inc. (Case No. 10-14528-JNF), General Trading Company (Case No. 10-14532-JNF), Frank Sawyer Corporation (Case No. 10-14533-JNF), 100 Stuart Street, LLC (Case No. 10-14534-JNF), 30-32 Oliver Street Corporation (Case No. 10-16173-JNF), General Land Corporation (Case No. 10-16174-JNF), and 131 Arlington Street Trust (Case No. 10-16177-JNF) (their cases collectively the "Chapter 11 Cases").

LIBNY/5047583.4

# I.    INTRODUCTION

Pursuant to Section 1125 of the United States Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.* (the "**Bankruptcy Code**"), Prudential Insurance Company of America, on behalf of and solely for the benefit of, and with its liability limited to the assets of, its Insurance Company Separate Account, PRISA ("**Prudential**"), provides this disclosure statement (the "**Disclosure Statement**") to all of the known creditors and parties in interest of SW Boston Hotel Venture LLC, Auto Sales & Service, Inc., General Trading Company, Frank Sawyer Corporation, 100 Stuart Street, LLC, 30-32 Oliver Street Corporation, General Land Corporation And 131 Arlington Street Trust (collectively the "**Debtors**").  The purpose of this Disclosure Statement is to provide the information deemed necessary for creditors to make an informed decision in exercising their rights to vote on the *Plan of Reorganization Under Chapter 11 of the United States Bankruptcy Code Proposed by Prudential Insurance Company of America, on Behalf of and Solely for the Benefit of, and Wth Its Liability Limited to the Assets of, Its Insurance Company Separate Account, PRISA* (the "**Plan**") dated as of the date of this Disclosure Statement, a copy of which is attached as <u>Exhibit A</u>.  Prudential has filed the Plan simultaneously with the filing of this Disclosure Statement.  A summary of the Plan, the estimated claims against the Debtors and the estimated dividend is set forth below.

Prudential recommends that you vote to accept the Plan.  Each creditor should, however, review the Plan and this Disclosure Statement carefully in order to determine whether or not to accept or reject the Plan based upon that creditor's independent judgment and evaluation.  The description of the Plan in this Disclosure Statement is in summary form and is qualified by reference to the actual terms and conditions of the Plan, which should be reviewed carefully before making a decision to accept or reject the Plan.

Capitalized terms not otherwise defined in this Disclosure Statement have the meanings ascribed to them in the Plan.

The information contained in this Disclosure Statement has been provided by Prudential based upon the Debtors' public filings with the Bankruptcy Court.  Except as otherwise expressly indicated, such information has not been subject to audit or independent review.  Although great effort has been made to be accurate, neither Prudential, the Debtors nor their respective professional advisors warrant the accuracy of the information contained in this Disclosure Statement.

No representations concerning the Debtors, including the value of their assets or the aggregate dollar amount of claims which may be allowed, are authorized other than as set forth in this Disclosure Statement.  Any representations, warranties or agreements made to secure acceptance or rejection of the Plan that differ from those contained in this Disclosure Statement should not be relied upon in voting on the Plan.

Any descriptions of legal principles contained in this Disclosure Statement do not constitute a legal opinion and may not be relied upon by any creditor or party in interest.  Each creditor or party in interest should consult with their own legal advisors with respect to any legal principles described in this Disclosure Statement.

LIBNY/5047583.4

This Disclosure Statement has been prepared by Prudential to provide creditors and interest holders with adequate information so that they can make an informed judgment about the Plan.  Each creditor or interest holder should read this Disclosure Statement and the Plan in their entirety before voting on the Plan.  No solicitation of votes on the Plan may be made except pursuant to this Disclosure Statement, and no person has been authorized to utilize any information concerning the Debtors' businesses or assets other than the information contained in this Disclosure Statement.

Prudential believes that the Plan provides the quickest recovery to creditors and will maximize the return to creditors on their Claims.  **ACCORDINGLY, PRUDENTIAL URGES ALL CREDITORS TO VOTE IN FAVOR OF THE PLAN.**

## II.    SUMMARY OF THE PLAN

The Plan provides for (a) reinstatement of the Debtors' secured debt on the same or similar terms and (b) payment in full to the holders of all Allowed, non-Insider, non-affiliate Unsecured Claims from the income generated by the Debtors' operations, liquidation of the Affiliate Debtors assets and the Prudential Cash Contribution.  Prudential and their advisors will provide projections showing the income and expenses and the payment of creditors claims based on the Debtors operations and available cash in the Plan Supplement.

A summary of the types of Claims and the recovery for each type of Claim follows.

| Type of claim | Estimated Amount of Claims at Petition Date | Plan Recovery | Voting Status |
|---|---|---|---|
| Administrative Claims | $0 | Paid in the ordinary course of business | N/A |
| Professional Fee Claims | Undetermined | Paid in full | N/A |
| Priority Tax Claims | $0 | Paid in full | N/A |
| Class 1 A – H Other Priority Claims | $0 | Paid in full | Unimpaired |
| Class 2 H Prudential Loan Claims against SW Boston | $182,892,659 | Issued New Prudential Note and 100% of the equity interests in Reorganized SW Boston | Impaired |
| Class 3 A – G Prudential Guaranty Claims | Undetermined | Paid in full | Impaired |
| Class 4 A, C, D, F and H City Claims | $10,704,247 | Paid in full | Impaired |
| Class 5 A – H Other Secured Claims | Undetermined | Paid in full | Unimpaired |
| Class 6 A – H General Unsecured Claims | $1,200,000 | Paid in full | Impaired |
| Class 7 A – H Non-Debtor Insider and Affiliate Claims | N/A | No distribution | Deemed to reject |
| Class 8 A – H Interests In the Debtors | N/A | No distribution | Deemed to Reject |

The description of the Claims and estimation of the recoveries set forth above does not constitute an admission that the claims are Allowed Claims.  The Plan recovery is a projection and Prudential and the Debtors reserve all of their rights, claims and defenses with respect to any and all Claims.

LIBNY/5047583.4

### III.   INFORMATION ABOUT THE REORGANIZATION PROCESS

#### 3.1   Purpose Of Disclosure Statement

This Disclosure Statement includes background information about the Debtors and also identifies the classes into which creditors have been placed by the Plan.  This Disclosure Statement describes the proposed treatment of each of those classes if the Plan is confirmed.  In addition, this Disclosure Statement contains information concerning the prospects for creditors in the event of confirmation or, in the alternative, the prospects if confirmation is denied or the proposed Plan does not become effective.

Upon approval by the Bankruptcy Court and in accordance with the provisions of the Bankruptcy Code, this Disclosure Statement and any exhibits will have been found to contain adequate information of a kind and in sufficient detail that would enable reasonable, hypothetical investor typical of a holder of impaired claims or interests to make an informed judgment about the Plan.  Approval of this Disclosure Statement by the Bankruptcy Court, however, does not constitute a recommendation by the Bankruptcy Court either for or against the Plan.

#### 3.2   Voting Procedure

All creditors entitled to vote on the Plan may cast their votes for or against the Plan by completing, dating, signing and causing the Ballot Form accompanying this Disclosure Statement to be returned to the following address in the enclosed envelope:

Emanuel C. Grillo
Goodwin Procter LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018

Ballots must be received **on or before 5:00 P.M.  (Eastern Daylight Savings Time) on _____, 2011** to be counted in the voting.  Ballots received after this time will not be counted in the voting unless the Bankruptcy Court so orders.

Prudential recommends a vote for "<u>ACCEPTANCE</u>" of the Plan.

#### 3.3   Ballots

Accompanying this Disclosure Statement is a ballot for acceptance or rejection of the Plan (a "**Ballot**").  Each party in interest entitled to vote on the Plan will receive a Ballot.  All Classes except Class 1 (Other Priority Claims) and Class 4 (Other Secured Claims) are impaired.  All impaired classes except Class 7 (Insider and Affiliate Debtor Unsecured Claims) and Class 9 (Interests in the Debtor) may vote on the Plan.  Each member of a voting Class will be asked to vote for acceptance or rejection of the Plan.  A party who holds claims in more than one Class should complete a Ballot for each Class with respect to the applicable portion of its claim included in each Class.

5

### 3.4     The Confirmation Hearing

The Bankruptcy Court has scheduled a hearing on confirmation of the Plan to commence on_____, 2011 at_____:_____ __.m., or as soon thereafter as the parties can be heard. The Confirmation Hearing will be held before the Honorable Joan N.  Feeney, United States Bankruptcy Judge, Courtroom 1, 12th Floor, 5 Post Office Square, Boston, Massachusetts, 02109.  At the hearing, the Bankruptcy Court will consider whether the Plan satisfies the various requirements of the Bankruptcy Code, including whether it is feasible and whether it is in the best interests of holders of claims and interests.  The Bankruptcy Court will also receive and consider a Report of Plan Voting prepared by Prudential and summarizing the votes for acceptance or rejection of the Plan by the parties entitled to vote.

### 3.5     Acceptances Necessary to Confirm Plan

At the Confirmation Hearing, the Bankruptcy Court must determine, among other things, whether each impaired Class has accepted the Plan.  Under Section 1126 of the Bankruptcy Code, an impaired Class is deemed to have accepted the Plan if at least 2/3 in amount and more than 1/2 in number of the Allowed Claims of Class members who have voted to accept or reject the Plan have voted for acceptance of the Plan.  Unless there is acceptance of the Plan by all members of an impaired Class, the Bankruptcy Court must also determine that Class members will receive under the Plan property of a value, as of the Effective Date, that is not less than the amount that such Class members would receive or retain if the Debtors were liquidated under Chapter 7 of the Bankruptcy Code on the Effective Date.

### 3.6     Confirmation of The Plan Without The Necessary Acceptances.

The Plan may be confirmed notwithstanding that one or more impaired Classes have not accepted the Plan if the Bankruptcy Court finds that the Plan does not discriminate unfairly against and is fair and equitable as to such Class or Classes.  This provision is set forth in Section 1129(b) of the Bankruptcy Code and requires that, among other things, the claimants must either receive the full value of their claims or, if they receive less, no Class with junior liquidation priority may receive anything unless the junior class provides "new value" or other consideration to the Debtors.  For example, if the holders of Allowed Priority Tax Claims are not paid in full, the holders of General Unsecured Claims are not permitted to receive anything on account of their claims.  This is known as the "absolute priority rule."

Prudential may, at its option, choose to rely on Section 1129(b) to seek confirmation of the Plan if it is not accepted by all impaired Classes of Creditors.

## IV.     GENERAL INFORMATION

### 4.1     Description of the Debtors

The Bankruptcy Cases were filed to prevent foreclosure upon the Debtors' assets and to accomplish the financial restructuring of the Debtors' businesses.  SW Boston owns the W Residences.  Each of the other Debtors provided credit support for the loans used to construct the

6

W Hotel and Residences and each was forced to file bankruptcy along with SW Boston to restructure its obligations arising from that loan.

### A.    Background

The W Hotel and Residences opened on October 29, 2009, and comprises a 350,650 square foot, 26-story building located at 100 Stuart Street in the heart of Boston's Theatre District.  The W Hotel and Residences contains the W Hotel Boston (the "**Hotel**"), a 235-room, four-star hotel, 123 residential condominiums, and a two-story underground parking garage with capacity for 142 vehicles (the "**Garage**").  The W Hotel and Residences was designed by the internationally-known architectural firm of William Rawn and Associates Architects, together with the architect of record TRO/Jung Brannen, Inc.  The Hotel is branded as a "W"® Hotel -the only W Hotel in New England - and is a first-class hotel serving Boston's national and international visitors and tourists.  The Hotel includes a retail store (the "**Store**"), a signature restaurant at a prominent location along Tremont Street, a second floor spa with a first floor entrance and related retail space on the Stuart Street side of the W Hotel and Residences (the "**Spa**"), and a theme bar with an entrance adjacent to the spa entrance on Stuart Street (the "**Theme Bar**").  Construction of the Theme Bar is still underway, with an estimated opening date of late summer.  The Hotel restaurant (the "**Restaurant**"), Market by Jean-Georges Vongreichten, is a 6,000 square foot, first-class, full-service restaurant located on the first floor of the Hotel along Tremont Street.  In addition to Market, the Hotel has a lobby bar  (the "**Lobby Bar**") located on the first floor.  The Residences consist of 122 luxury condominium 1, 2 and 3 bedroom units.  Pricing for the Residences ranges from $600,000 to over $4,000,000.

### B.    The Debtors

SW Boston is a Delaware limited liability company.  The membership interests in SW Boston are owned by 100 Stuart Street, a Delaware limited liability company formed to own the membership interests in SW Boston.  Approximately sixty-five percent (65%) of the membership interests in 100 Stuart Street are owned by Frank Sawyer Corp., a Massachusetts corporation, with the remaining membership interests in 100 Stuart Street owned by non-debtors William Sawyer Corporation (approximately eight percent) and Terminal Taxi Company (approximately twenty-seven percent).  Frank Sawyer Corp. manages 100 Stuart Street.  The Frank Sawyer Revocable Trust (the "**Trust**") owns 100% of the stock in Sawyer Corporation.

General Trading is a Massachusetts corporation all the stock of which is owned by the Trust.  General Trading provides administrative services for the Debtors as well as various non-debtor affiliates of the Debtors.  Auto Sales is a Massachusetts corporation all of whose stock is owned by the Trust.  General Land Corp. is a Massachusetts corporation which owns and operates three (3) parking lots in Boston, Massachusetts.  The Trust owns all of the stock in General Land.  Oliver Street Corp. is a Massachusetts corporation which owns and operates a seven (7) unit residential building located at 25-27 Pinckney Street, Boston, Massachusetts (the "**Oliver Street Real Property**").  The Trust owns all of the stock in Oliver Street Corp.  Arlington Street Trust is a Massachusetts business trust which owns a commercial building located at 131 Arlington Street, Boston, Massachusetts.  The Trust is the sole beneficiary of Arlington Street Trust.

LIBNY/5047583.4

### C.   Events Precipitating The Bankruptcy Cases

As is set forth below, the Hotel (including the Restaurant) and the Garage opened on October 29, 2009.  Construction of a portion of the W Residences had been completed and closings on units on these floors commenced immediately thereafter.  Construction of the remaining floors of the condominium units was completed in January 2010.  Sales of the condominium units, however, were slower than initially projected at the time of the closing of the senior loan on the Project (January 2008) due in part to the economic crisis.

Prior to the Petition Date, SW Boston had extensive discussions with Prudential requesting the restructuring.  The Debtors declined to restructure their loan on terms acceptable to Prudential.  Because the Debtors' bank accounts and assets were exposed to foreclosure and seizure by Prudential, the Debtors filed their bankruptcy proceedings.

### 4.2   The Debtors' Assets[2]

SW Boston's primary assets consist of 81 unsold W Residences and cash in various accounts.  In its decision dated January 28, 2011, denying the Prudential's motion for relief from the automatic stay (described in <u>Section 5.5</u>, below), the Court determined that the value of the W Residences owned by SW Boston at that time was $88,000,000.  As of the Petition Date, SW Boston had cash in various accounts totaling approximately $3,151,000.  Of this amount, approximately $1,660,000 was held in accounts used by Starwood to operate the Hotel.  On the Petition Date, SW Boston had an interest in an escrow account, with a balance of approximately $3,375,000, consisting of the remaining proceeds of the City Loan (as defined below).  Prudential asserts first priority Liens against the remaining W Residences and various of SW Boston's bank accounts.  The City asserts a second priority Lien against the W Residences.

Frank Sawyer Corp.'s primary assets consist of securities and cash that totaled approximately $10,845,000 as of the Petition Date, and its membership interest in 100 Stuart Street.  Of this amount, approximately $6,834,000 consisted of securities that are subject to Liens in favor of Prudential, and $4,000,000 is cash held in an account that is pledged to the City to secure the Allowed City Claim.  Frank Sawyer Corp.'s membership interests in 100 Stuart Street are also pledged to Prudential to secure the Allowed Prudential Claim.  100 Stuart Street's sole asset is its membership interests in SW Boston, which are pledged to Prudential to secure the Allowed Prudential Claim.  General Trading's primary asset is an account, pledged to Prudential to secure its Allowed Claim, containing securities with a value as of the Petition Date of approximately $1,385,000.  Auto Sales' primary asset is an account, pledged to Prudential to secure its Allowed Claim, containing securities with a value as of the Petition Date of approximately $224,000.  Oliver Street Corp.'s primary asset is real property located at 25 and 27 Pinckney Street, Boston, Massachusetts with a Debtor appraised value as of September 14, 2010, of $2,180,000.  Oliver Street Corp.'s real property is subject to mortgages in favor of Prudential and the City to secure their Allowed Claims.  Arlington Street Trust's primary asset is real property located at 131 Arlington Street, Boston, Massachusetts with a Debtor appraised value as of September 14, 2010, of $1,850,000.  Arlington Street Trust's real property is subject

---

[2] The Debtors have not included inter-Debtor claims in the description of their assets.  Prudential asserts that such claims are unenforceable and the Debtors receive no distributions on account of such claims under the Plan..

to mortgages in favor of Prudential and the City to secure their Allowed Claims.  General Land Corp. owns and manages three (3) parking lots in Boston, Massachusetts, located at (a) 109 & 121-127 Arlington Street (the "**Arlington Lot**"), (b) India Wharf and Wells Street, and (c) 38 Isabella Street.  The parking lot located at 109 & 121-127 Arlington Street had a Debtor appraised value, as of September 14, 2010, of approximately $2,400,000.  General Land Corp.'s parking lots located at India Wharf and Wells Street and 38 Isabella Street have assessed values, for real estate tax purposes of $554,000 and $1,179,000, respectively.  General Land Corp. owns 100% of the shares of 200 Newbury Street Corporation ("**Newbury**"), a non-debtor affiliate of the Debtors and the owner of the retail and commercial building located at 200 Newbury Street, Boston, Massachusetts that is subject to a mortgage in favor of Guardian Life Insurance Company of America to secure a loan of approximately $16,000,000.

### 4.3      The Debtors' Liabilities[3]

Upon a motion by the Debtors, the Court entered an order [docket no. 290] establishing November 1, 2010 (the "**Bar Date**"), as the date by which all parties must file proofs of claim against the Debtors.  The description of the Claims in this Disclosure Statement is based on the Debtors' respective Schedules and the proofs of claim filed by creditors by the Bar Date and information included in the Debtors' Disclosure Statement (as defined below).

### A.      The Prudential Claim

The construction financing for the W Hotel and Residences was provided by Prudential pursuant to a *Construction Loan Agreement Between SW Boston Hotel Venture LLC and The Prudential Insurance Company of America* (the "**Prudential Loan Agreement**") dated January 15, 2008, as amended.  As of the Petition Date, SW Boston owed Prudential approximately $180,800,000 (the "**Prudential Loan**").  To secure the Prudential Loan, SW Boston granted Prudential a mortgage on, assignment of leases and rents and security interest in the W Hotel and Residences and executed pledge agreements and account control agreements in favor of Prudential with respect to two (2) bank accounts in SW Boston's name at Sovereign Bank.

Frank Sawyer Corp., General Trading, Auto Sales, General Land Corp., Oliver Street Corp. and Arlington Street Trust provided full or partial guaranties of SW Boston's obligations under the Prudential Loan Agreement and provided collateral to secure such guaranties as described in Section 4.2, above.

SE Berkeley and SE McClellan, two non-debtor affiliates of the Debtors, provided additional credit support for the Prudential Loan by obtaining a letter of credit from Sovereign Bank in favor of Prudential in the face amount of $17,300,000 (the "**Letter of Credit**").  Following the Petition Date, Prudential made a draw on the Letter of Credit and Sovereign Bank paid Prudential $17,300,000 for application against the Prudential Loan.

---

[3] Prudential's description of the claims set forth in this section of the Disclosure Statement does not constitute an admission that the claims are Allowed Claims.  Prudential and the Debtors reserve all of their rights, claims and defenses with respect to any and all claims.  Unless stated otherwise, all estimated amounts of Claims and Interests are as stated in the Debtors' Disclosures Statement.

LIBNY/5047583.4

Prudential has filed proofs of claim against the Debtors asserting to be owed, as of the Petition Date, $180,803,186.86.  Between the Petition Date and June 24, 2011, Prudential has been paid $17,300,000 from the Letter of Credit Draw, $83,322,017 from the Hotel Sale (as defined and discussed below) and approximately $26,827,781 from sales of Residences.[4]  The Prudential Loan Claim shall include post-petition interest, as provided for under the Prudential Loan Documents, from the Petition Date through and including the Confirmation Date.  The deadline for the Debtors and/or the Committee to challenge any of Prudential's Liens is currently June 30, 2011.

### B.    City of Boston Secured Claim

On December 9, 2009, SW Boston and the City entered into a *Subordinate Loan Agreement* (the "**City Loan Agreement**") whereby the City agreed to provide $10,500,000 (the "**City Loan**") to finance the completion of the Restaurant, Spa and the Theme Bar.  As collateral for the City Loan, SW Boston granted the City a second mortgage on and assignment of leases and rents with respect to the W Hotel and Residences.  Frank Sawyer Corp., General Land Corp., Oliver Street Corp. and Arlington Street Trust have partially guaranteed SW Boston's obligations under the City Loan Agreement and provided second liens on certain of their assets, as described in <u>Section 4.2</u>, above, to secure such guaranties.

SE Berkeley provided additional credit support for the City Loan by granting the City a second mortgage on real property located at 142 Berkeley Street, Boston, Massachusetts.  SE McClellan provided additional credit support for the City Loan by granting the City a second mortgage on real property located at 415 McClellan Highway, Boston, Massachusetts.

Pursuant to the City Loan Agreement, the entire amount of the City Loan was funded into an escrow account (the "**Fidelity Account**") in the name of SW Boston at Fidelity National Title Insurance Company ("**Fidelity**").  Under the City Loan Agreement and various related documents, requisitions for funds from the City Loan are made by SW Boston and then reviewed by International Valuation & Inspection, Inc., the City's construction consultant.  As of the Petition Date, there was approximately $2,670,000 in the Fidelity Account.

As of the Petition Date, the outstanding balance of the City Loan was approximately $10,704,247.  Since the Petition Date, the City has received payments from the Fidelity Account totaling approximately $448,182.

### C.    Other Secured Claims

On or after the Petition Date, four parties (the "**Mechanics Lien Claimants**") filed notices of mechanics' liens against the W Hotel and Residences as follows:  (a) Rosario Cabinets, asserting an amount due of approximately $32,000, (b) Kenvo Floor Co., Inc., asserting an amount due of approximately $41,536, (c) Frontline, Inc., asserting an amount due of approximately $13,311, and (d) E.M. Duggan, Inc., asserting an amount due of approximately

---

[4] Pursuant to various orders of the Bankruptcy Court, Prudential continues to receive the net proceeds from the sales of W Residences.  As a result, the Allowed Prudential Claim will be reduced further prior to the Confirmation Hearing.

LIBNY/5047583.4

$193,000. Each of the Mechanics Lien Claimants assert that they have provided goods or services, as subcontractors of Bovis, relating to the construction of the W Hotel and Residences. Prudential and the Debtors do not concede the validity of any mechanics lien asserted or the amount claimed to be owed by the Mechanics Lien Claimants.

As of the Petition Date, SW Boston owed approximately $229,800 in unpaid condominium fees (the "**Pre-petition Condominium Fees**") to the 100 Stuart Street Primary Condominium Association and the 110 Stuart Street Residential Condominium Association (collectively the "**Condominium Associations**"). As the Pre-petition Condominium Fees would have constituted a lien on the Residences, SW Boston requested and received authority from the Court to pay the Pre-petition Condominium Fees and subsequently paid the Pre-petition Condominium Fees in full.

### D.    Administrative Claims

Since the Petition Date, the Debtors have been paying their obligations in the ordinary course of business and, therefore, do not believe that there will be any substantial unpaid administrative claims on account of post-petition trade debt.

The Debtors' and the Committee's professionals, whose claims constitute Administrative Claims, have been authorized to be paid ninety percent (90%) of their fees and 100% of their expenses on a monthly basis in accordance with the Bankruptcy Court's order dated June 11, 2010 (the "**Interim Compensation Order**")[docket no. 140]. Pursuant to orders date November 10, 2010 and March 14, 2011, the Court approved interim fee applications filed by the Debtors' and the Committee's professionals and authorized the Debtors to pay the amount held back from those professionals under the Interim Compensation Order. The Debtors intend to continue to pay the fees and expenses of the Debtors' and the Committee's professionals in accordance with the Interim Compensation Order and any other orders of the Court.

### E.    Priority And Priority Tax Claims

Prior to the Petition Date, and consistent with its recent practice, the Debtors made advance payment to employees for wages and salaries. While Prudential does not believe that the Debtors owe any base wages that may constitute priority claims under Section 507 of the Bankruptcy Code, there may be amounts, accrued in the ordinary course of business, owed on account of overtime pay, expense reimbursement, benefits and vacation and sick pay that may constitute priority claims.

Three creditors have filed proofs of claim against SW Boston asserting Priority Claims. Barbara Mihalko and Lara Rosenburgh have filed proofs of claim asserting Priority Claims of $1,000 and $500, respectively, for pre-petition commissions due on the sale of Residences. On May 4, 2010, the Court authorized the Debtors to pay pre-petition priority wage claims, and SW Boston has paid these claims. Robert Carmel, a counter-party to a purchase and sale agreement for a Residence, filed a proof of claim asserting a priority claim of $2,600 and a non-priority unsecured claim of $78,400. SW Boston intends to object to this claim and Prudential does not believe that it will be allowed as either a priority or a non-priority unsecured claim.

The Internal Revenue Service (the "**IRS**") filed a proof of claim in the amount of $2,000 against SW Boston only.  The IRS subsequently amended its proof of claim to state that no amount is due from S W Boston.  The Massachusetts Department of Revenue filed proofs of claim against Arlington Street Trust and General Land Corp. asserting priority claims of approximately $2,770 and $1,435, respectively.

###   F.     General Unsecured Claims

As of the Petition Date, the General Unsecured Claims against SW Boston totaled approximately $3,302,909, exclusive of claims arising from the operation of the Hotel.[5]  Of the General Unsecured Claims against SW Boston, the Claims asserted by Bovis total approximately $2,136,837 and the remaining non-Insider General Unsecured Claims total approximately $1,166,152.

As of the Petition Date, General Unsecured Claims against Frank Sawyer Corp. totaled approximately $236,084 on the Petition Date.  As of the Petition Date, the General Unsecured Claims against General Trading totaled approximately $306,653 on the Petition Date.  As of the Petition Date, the General Unsecured Claims against General Land Corp. totaled approximately $123 on the Petition Date.  As of the Petition Date, the General Unsecured Claims against Arlington Street Trust totaled approximately $502 on the Petition Date.  No non-Insider General Unsecured Claims exist against Auto Sales, 30-32 Oliver Street and 100 Stuart Street.

###   G.     Insider and Affiliate Debtor Unsecured Claims

Prudential believes that Insider and Affiliate Debtor Unsecured Claims should not be allowed.  Accordingly, under the Plan, such Insider and Affiliate Debtor Unsecured Claims no not receive distributions.  The Debtors estimated the amounts of such claims in the Debtors' Disclosure Statement to be the following:

As of the Petition Date, Non-Debtor Insider Unsecured Claims against SW Boston totaled approximately $37,272,580, including the Claims of SE Berkeley and SE McClellan that aggregate approximately $27,800,000.  On June 24, 2011, Prudential filed an objection to all Proofs of Claim filed by SE Berkeley and SE McClellan on the grounds that no money is due and owing to either.  Inter-Debtor Claims against SW Boston total approximately $9,472,580.

As of the Petition Date, Insider Unsecured Claims against Frank Sawyer Corp. totaled approximately $40,013,236.  Inter-Debtor Claims against Frank Sawyer Corp. total approximately $899,500.

As of the Petition Date, Insider Unsecured Claims against General Trading totaled approximately $$18,889,157  Inter-Debtor Claims against General Trading total approximately $122,200.

---

[5] In order to avoid any disruption in the operation of the Hotel, the Debtor requested and received the authority to pay the non-Insider, pre-petition unsecured claims relating to the operation of the Hotel and Parking Garage in the ordinary course of business, and these claims have been paid.

LIBNY/5047583.4

As of the Petition Date, Insider Unsecured Claims against General Land Corp. totaled approximately $28,968,453.  Inter-Debtor Claims against General Land total approximately $183,378.

As of the Petition Date, Insider Unsecured Claims against Arlington Street Trust Corp. totaled approximately $27,831,749.  Inter-Debtor Claims against 131 Arlington Street total approximately $31,460.

As of the Petition Date, Insider Unsecured Claims against Auto Sales, Oliver Street Corp. and 100 Stuart Street total $27,859,000, $27,800,000 and $27,800,000, respectively.  The inter-Debtor General Unsecured Claims against Auto Sales total $9,000.  There are no inter-Debtor Claims against 30¬32 Oliver Street and 100 Stuart Street.

## V.   SIGNIFICANT POST PETITION EVENTS

### 5.1   General Information

On April 28, 2010, SW Boston, General Trading, Frank Sawyer Corp., 100 Stuart Street and Auto Sales filed voluntary petitions for relief under Chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the District of Massachusetts.  On June 4, 2010, General Land Corp., Oliver Street Corp. and Arlington Street Trust filed voluntary petitions for relief under Chapter 11.  By orders of the Court dated May 3, 2010 and June 10, 2010, the Bankruptcy Cases are being jointly administered.  The Debtors continue to operate as debtors and debtors-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

### 5.2   Appointment of Creditors' Committee

On May 13, 2010, the Office of the United States Trustee appointed an Official Committee of Unsecured Creditors (the "**Committee**") in SW Boston's case consisting of the following creditors:  (a) Bovis Lend Lease LMB, Inc.; (b) MS Signs Inc.; (c) Meichi Peng Design Studio; (d) GS Associates, Inc.; (e) TRO Jung Brannen; (f) NSTAR Electric and Gas Corp.; and (g) International Valuation & Inspection, Inc.  The Committee retained Jager Smith P.C.  as counsel.

### 5.3   Chapter 11 Activity

### A.   First Day Motions

Shortly after filing their Chapter 11 petitions, SW Boston, General Trading, Frank Sawyer Corp., 100 Stuart Street and Auto Sales filed various so-called "first day" motions, including the *Motion For Authorization of (1) The Interim And Permanent Use of Cash Collateral, (2) The Granting of Replacement Liens, (3) Entry of Scheduling Order Regarding Continued Use of Cash Collateral and (4) Additional Relief* (the "**Cash Collateral Motion**") [docket no. 9], the *Debtors' Motion For Authority to (A) Assume And Consummate Pending Purchase And Sale Agreements For Condominium Units; (B) Make And Consummate New Sales For Condominium Units; And (C) For Related Relief* (the "**Unit Sale Motion**") [docket no. 10],

LIBNY/5047583.4

and the *Motion Filed by Debtor SW Boston Hotel Venture LLC to Pay Prepetition Wages, Salaries And Benefits, And Use Existing Payroll Accounts And Business Forms* (the "**Wage Motion**") [docket no. 12].

The Cash Collateral Motion requested authority to continue to use cash collateral (as defined in the Bankruptcy Code) to fund the Debtors' ongoing expenses, including the payment of real estate taxes and condominium fees on unsold Residences. The Cash Collateral Motion also requested the authority to pay the pre-petition claims arising from the Hotel's operations in the ordinary course of business. Prudential objected to the Cash Collateral Motion. The Court granted the Cash Collateral Motion, allowing for use of cash collateral on an interim basis.

The Unit Sale Motion requested the authority to consummate pre-petition purchase and sale agreements for Residences, and for the authority to sell Residences free and clear of liens, claims and interests in the ordinary course of business. SW Boston, Prudential and the City were able to reach agreement on a form of order granting the Unit Sale Motion, and the Court then granted the Unit Sale Motion.

The Wage Motion sought permission to pay pre-petition wages and benefits that would otherwise constitute priority unsecured claims pursuant to Section 507(a)(4) of the Bankruptcy Code. The Court granted the Wage Motion by order dated May 4, 2010 [docket no. 39].

### B.    Continued Use of Cash Collateral

Following the June 4, 2010, filing of the Chapter 11 petitions for General Land, 30-32 Oliver Street and 131 Arlington Street, these three debtors requested the use of cash collateral to fund operations in the ordinary course of business. The Debtors negotiated a form of cash collateral order with Prudential, the City and the Committee that permitted the continued use of cash collateral through August 31, 2010. On August 18, 2010, the Court held a hearing on the continued use of cash collateral for all of the Debtors. Prior to the hearing, the Debtors negotiated with Prudential, the City and the Committee, a form of order that permitted the consensual use of cash collateral through November 30, 2010.

On November 10, 2010, the Debtors filed their *Third Statement Regarding Continued Use of Cash Collateral*, requesting the use of cash collateral through June 30, 2011. On November 15, 2010, Prudential objected to the Debtors' continued use of cash collateral arguing, among other things, that the Debtors had failed to meet their financial projections, that the value of Prudential's collateral was eroding and that Prudential's interests were not adequately protected. The City and the Committee supported the Debtors' continued use of cash collateral. After a hearing on November 17, 2010, the Court granted the use of cash collateral through June 30, 2011.

On June 16, 2011, the Debtors filed their *Motion to Continue the Use of Cash Collateral on the Same Terms and Conditions*, requesting use of cash collateral through September 30, 2011. On June 24, 2011, Prudential filed an objection to the Debtors' continued use of its cash collateral. The Bankruptcy Court set a hearing on the matter for June 27, 2011.

14

### C.      The Lease Motion

On August 20, 2010, SW Boston filed the *Motion by SW Boston Hotel Venture, LLC For Authority to Lease Condominium Units in The Ordinary Course Of Business* (the "**Lease Motion**") [docket no. 241] requesting the authority to lease up to twenty-five (25) of the unsold Residences for terms of more than six (6) months but less than one (1) year.  Prudential objected to the Lease Motion.  After an evidentiary hearing, the Court approved the Lease Motion.  Since the approval of the Lease Motion, SW Boston has leased twelve (12) Residences, which generate rental income of approximately $62,060 per month.

### D.      Sale And Lease of Residences

Since the Petition Date, SW Boston has closed nineteen 26 sales of Residences resulting in payments to Prudential totaling $26,827,781.

### E.      The Bovis Settlement

Bovis was the construction manager for the construction of the W Hotel and Residences.  As a result of Bovis' role as construction manager, Bovis holds the largest non-priority unsecured claim against SW Boston.  Bovis, in turn, has subcontractors with claims for work performed on the W Hotel and Residences.

On November 1, 2010, Bovis filed a proof of claim against SW Boston in the amount of $2,478,447 for pre-petition goods and services provided in the construction of the W Hotel and Residences (the "**Bovis Pre-Petition Claim**").  Bovis also asserted that it was owed approximately $400,000 for post-petition services under the Bovis Contracts (with the Bovis Pre-Petition Claim, the "**Bovis Claim**").  SW Boston disputed the amount of the Bovis Claim and asserted that it has counterclaims and offsets against Bovis' asserted claims.

SW Boston and Bovis reached an agreement, subject to Court approval, to the amount of Bovis' Allowed Claim, a mechanism for the assignment of the remaining warranties to the W Hotel and Residences, and the assumption and assignment of a contract related to the Theme Bar to a new contractor who would complete the Theme Bar.  The Court approved the agreement on March 30, 2011.  Pursuant to the agreement, Bovis' Allowed Claim to be paid under the Plan is $1,943,803.  The Bovis Allowed Claim is a General Unsecured Claim.

### F.      Prudential's Motion For Relief From Stay

On August 2, 2010, Prudential filed a motion for relief from the automatic stay (the "**Prudential MFR**")[docket no. 197] as to only the W Hotel and Residences.  In the Prudential MFR, Prudential asserted that it was entitled to relief from the automatic stay because, among other things, SW Boston did not have sufficient Residence sales, could not close existing Residence sales or obtain new sales and did not have the ability to successfully emerge from Chapter 11.  SW Boston opposed the motion for relief.  The City and the Committee joined SW Boston in opposing the Prudential MFR.

The Court conducted a three day evidentiary hearing on the Prudential MFR.  On January 28, 2011, the Court denied the Prudential MFR.  Among other things, the Court found

15

that Prudential's interest in the W Hotel and Residences was adequately protected.  The Court found that the value of the Hotel was $65,600,000 and the value of the Residences was $88,000,000, and that Prudential was, therefore, undersecured as to SW Boston.  The Court also held that SW Boston had no equity in the W Hotel and Residences but that a plan of reorganization was in prospect.  Prudential filed a notice of appeal of the Court's order denying the Prudential MFR, but later withdrew the appeal.

### G.  Extension of The Exclusivity Periods

On August 3, 2010, the Debtors filed the *Motion by Debtors Pursuant to 11 U.S.C. §§ 1121(D) And 362(D)(3) to Extend The Deadlines to File a Plan Of Reorganization And Solicit Acceptances of Plan* (the "**First Exclusivity Motion**") [docket no. 203] requesting an extension of the exclusive deadlines for the Debtors to file and solicit a plan of reorganization (collectively the "**Exclusivity Deadlines**").  Prudential opposed the First Exclusivity Motion.  The Debtors and Prudential negotiate consensual extensions of the Exclusivity Deadlines to November 26, 2010 and January 25, 2011, respectively.

On November 10, 2010, the Debtors filed the *Second Motion by Debtors Pursuant to 11 U.S.C. §§ 1121(D) And 362(D)(3) to Extend The Deadlines to File a Plan Of Reorganization And Solicit Acceptances of Plan* (the "**Second Exclusivity Motion**") [docket no. 350] requesting a second extension of the Exclusivity Deadlines.  Prudential opposed the Second Exclusivity Motion.  At a hearing on November 17, 2010, the Court granted an extension of the Exclusivity Deadlines to March 31,2011, and May 31,2011, respectively.  Prudential filed a notice of appeal of the Court's order granting the Second Exclusivity Motion.  All appellate briefs have been filed in that appeal and the parties are awaiting a further order or decision from the appellate court.

On March 31, 2011, the Debtors filed the Motion by Debtors for Order Extending Deadline to Solicit Acceptances of the Plan (the "**Third Exclusivity Motion**") [docket no. 551] requesting a third extension of the period to solicit acceptances of the Prudential Plan (as defined below) until a date fifteen days after the occurrence of a hearing on confirmation of the Prudential Plan.  Prudential opposed the Third Exclusivity Motion.  On May 4, 2011, the Court granted the Debtors continued exclusivity but limited the duration of their extension to a date two days prior to the hearing on confirmation of the Prudential Plan.  The Court scheduled the hearing on confirmation of the Prudential Plan for June 27, 2011.  The Debtors' exclusive period to solicit acceptances of a plan of reorganization lapsed on June 25, 2011.

### H.  The Hotel Sale

On March 28, 2011, SW Boston filed the Debtor's Motion For Order (I) Authorizing The Sale of The Debtor's Commercial Unit, Parking Garage Unit And Related Assets Free And Clear of All Liens, Claims, Interests And Encumbrances, (II) Authorizing The Assumption And Assignment of Certain Executory Contracts And Unexpired Leases in Connection Therewith And (III) Granting Related Relief (the "**Hotel Sale Motion**") [docket no. 495] requesting the sale of the Hotel, including the Theme Bar, the Spa, the Lobby Bar, the Restaurant and the Store, and the Garage  to Pebblebrook for a price of $89,500,000.  SW Boston also filed an accompanying motion to establish bid procedures, approve an expense reimbursement and a break-up fee to Pebblebrook of $500,000 and $2,800,000, respectively, and to establish various other sale

16

procedures.  SW Boston and Pebblebrook signed, subject to Court approval, a purchase and sale agreement (the "**P&S**") containing the proposed terms and conditions of the Hotel Sale.  A copy of the P&S is attached to the Hotel Sale Motion.  The P&S requires that the Hotel be sold free and clear of liens, claims and interests pursuant to Section 363(f) of the Bankruptcy Code, with all valid liens attaching to the proceeds of the sale to the same extent, priority and validity of such liens as existed on the Petition Date.

On May 24, 2011, the Court approved the Hotel Sale [Docket No. 627].  Closing of the Hotel Sale occurred on June 2, 2011.  The final Hotel Sale purchase price to be paid by Pebblebrook is $89,500,000.  $83,322,017 in proceeds from the Hotel Sale were paid to Prudential.

As a result of the Hotel Sale, SW Boston's only remaining assets related to the W Hotel and Residences are the 81 unsold W Residences.

## I.    The Debtors' Plan of Reorganization

On March 31, 2011, the Debtors filed their *Joint Plan of Reorganization of SW Boston Hotel Venture LLC, Auto Sales & Service, Inc., General Trading Company, Frank Sawyer Corporation, 100 Stuart Street, LLC, 30-32 Oliver Street Corporation, General Land Corporation and 131 Arlington Street Trust*, and accompanying disclosure statement.  On May 5, 2011, the Debtors filed amended versions of the Joint Plan (the "**Debtors' Plan**") and the accompanying disclosure statement (the "**Debtors' Disclosure Statement**").  On May 24, 2011, the Court approved the Debtors' Disclosure Statement over the objection of Prudential [docket no. 632].  The Court scheduled a hearing on confirming the Debtors' Plan for June 27, 2011.

The Debtors' Plan proposes to pay Prudential on account of its secured claim by March 31, 2014 with interest accruing at 4.25 percent (assuming consummation of the Hotel Sale).  Neither the Debtors' Plan nor the Debtors' Disclosure Statement provide that Prudential is entitled to post-petition interest on its secured claims.  The Debtors' Plan indicates that the Debtors will make the payments due to Prudential under the Debtors' Plan from proceeds of the sale of the remaining unsold Condominiums.  The Debtors project that all of the W Residences will be sold by March 31, 2014 at a price sufficient to pay Prudential's claim, cover the Debtors' costs associated with sale of the W Residences and fund the Debtors' working capital needs over that period.

Further, the Debtors' Plan proposes to pay the City on account of its junior secured claim interest at a rate of 8 percent, 5 percent paid monthly and 3 percent held back by the Debtors.  These payments will continue until the Prudential claim is paid in full, after which time the City will receive payments of principal and interest in accordance with the City Loan Agreement.  The maturity date of the City claim is December 9, 2019.  Non-insider unsecured creditors will receive interest at a rate of 4.25 percent and three annual payments in amounts sufficient to satisfy the full amount of their claims.

The Debtors' Plan effects substantive consolidation of the Debtors for limited purposes.  The Debtors provide no explanation of the legal basis for such consolidation.  The Debtors' proposed substantive consolidation of their estates under the Debtors Plan has the effect of,

17

among other things, releasing obligations of Guarantors under the FSC Guaranty Documents and Additional Guaranty Documents.  Finally, the Debtors Plan allows the Debtors' insiders and current equity holders to retain all of the equity of the Debtors.

Prudential voted its secured claim to reject the Debtors' Plan.  Further, Prudential voted the City's secured claims on the City's behalf to reject the Debtors' Plan, as it was entitled to under an intercreditor agreement executed between Prudential and the City related to City Loan.[6]  On June 24, 2011, Prudential filed an objection to the Debtors' Plan.

## VI.    DESCRIPTION OF THE PLAN

The following is a summary of the significant provisions of the Plan and is qualified in its entirety by the provisions of the Plan, a copy of which accompanies this Disclosure Statement.  In the event and to the extent that the description of the Plan contained in this Disclosure Statement is inconsistent with any provisions of the Plan, the provisions of the Plan shall control and take precedence.  All creditors are urged to carefully read the Plan.

### 6.1    Unclassified Claims.

As provided in Section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims and Priority Tax Claims are not classified for the purposes of voting on, or receiving distributions under, the Plan.  All such Claims are instead treated separately in accordance with the terms set forth in Article 2 of the Plan.

### A.    Administrative Expense Claims.

General.  Subject to the provisions of sections 328, 330(a), and 331 of the Bankruptcy Code, if applicable, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Administrative Claim, each Holder of such Allowed Administrative Claim shall be paid in full in Cash, or be paid otherwise in the ordinary course of business, the unpaid portion of such Allowed Administrative Claim or otherwise receive such treatment as to render such Holder Unimpaired.

Reorganized SW Boston shall make payments to Holders of Allowed Administrative Claims on behalf of such Claims (except to the extent that a holder of an Allowed Administrative Claim agrees to a different treatment) on, or as soon thereafter as is reasonably practicable, the later of the Effective Date and the first Business Day after the date that is thirty (30) calendar days after the date an Administrative Claim becomes an Allowed Claim; provided, however, that Allowed Administrative Claims representing liabilities incurred in the ordinary course of business by the Debtors, as Debtors in possession, shall be paid by the Debtors or Reorganized SW Boston, as applicable, in the ordinary course of business, consistent with past practice and in accordance with the terms and subject to the conditions of any orders or agreements, governing instruments evidencing, or other documents relating to, such liabilities.

---

[6] At a Pre-Trial Conference on June 23, 2011, the Bankruptcy Court requested that the parties submit briefs on issues related to the City's assignment of its voting rights in the intercreditor agreement.  On June 24, 2011, Prudential, the City and the Debtors each submitted a related brief.

U.S. Trustee's Fees. Quarterly fees owed to the Office of the U.S. Trustee shall be paid when due in accordance with applicable law. Reorganized SW Boston shall continue to file reports to show the calculation of such fees for the Estates until the Chapter 11 Cases are closed under Section 350 of the Bankruptcy Code.

Professional Compensation and Expense Reimbursement Claims. Professionals or other Entities asserting a Fee Claim for services rendered before the Effective Date must File and serve on Reorganized SW Boston and such other Entities that are designated by the Bankruptcy Rules, the Confirmation Order, or such other order of the Bankruptcy Court an application for final allowance of such Fee Claim no later than forty-five (45) days after the Effective Date. Objections to any Fee Claim must be Filed and served on Reorganized SW Boston and the requesting party by the later of (x) forty-five (45) days after the Effective Date and (y) twenty (20) days after the Filing of the applicable request for payment of the Fee Claim. To the extent necessary, this Plan and the Confirmation Order shall amend and supersede any previously entered order regarding the payment of Fee Claims.

Upon the Effective Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and Reorganized SW Boston may employ and pay any Professional for services rendered or expenses incurred after the Effective Date in the ordinary course of business without any further notice to any party or action, order, or approval of the Bankruptcy Court.

## B.    Priority Tax Claims.

Except to the extent the Holder of an Allowed Priority Tax Claim agrees otherwise, each Holder of an Allowed Priority Tax Claim will be paid, at the sole option of the Debtors, in respect of such Allowed Priority Tax Claim either (a) the full amount thereof, without post-petition interest or penalty, in Cash, as soon as practicable after the later of (i) the Effective Date and (ii) the date of which such Claim becomes an Allowed Claim or (b) Cash payments made in equal annual installments beginning on or before the first anniversary following the Effective Date with the final installment being payable no later than the fifth anniversary of the Petition Date of such Allowed Priority Tax Claim or (c) such lesser amount as the Holder of an Allowed Priority Tax Claim and the Debtors or Reorganized SW Boston otherwise agree.

## 6.2    Classification.

All Claims and Interests, other than Administrative Claims and Priority Tax Claims, except where noted, are classified in the Classes set forth in this Article III for all purposes, including voting, Confirmation, and distributions pursuant hereto and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code. A Claim or Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest qualifies within the description of such other Classes. A Claim or Interest is also classified in a particular Class for the purpose of receiving distributions pursuant to this Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

19

**6.3    Class 1 – Allowed Other Priority Claims.**

**A.    Classification**

(i)      Class 1-A consists of all Other Priority Claims against Arlington Street Trust.

(ii)     Class 1-B consists of all Other Priority Claims against Auto Sales.

(iii)    Class 1- C consists of all Other Priority Claims against Frank Sawyer Corp.

(iv)    Class 1-D consists of all Other Priority Claims against General Land Corp.

(v)     Class 1-E consists of all Other Priority Claims against General Trading.

(vi)    Class 1-F consists of all Other Priority Claims against Oliver Street Corp.

(vii)   Class 1-G consists of all Other Priority Claims against Stuart Street.

(viii)  Class 1-H consists of all Other Priority Claims against SW Boston.

**B.    Impairment and Voting.**  Classes 1 is unimpaired under the Plan.  The holder of a Class 1 Other Priority Claim shall not be entitled to vote to accept or reject the Plan.

**C.    Distributions**.  In full and complete satisfaction, settlement, release and discharge of and in exchange for each Allowed Other Priority Claim, each holder of an Allowed Other Priority Claim shall receive payment in full in Cash on the later to occur of the Effective Date or the date such Other Priority Claim becomes an Allowed Other Priority Claim.

**6.4    Class 2 - Prudential Loan Claim.**

**A.    Classification**.

(i)      Class 2-H consists of all Prudential Loan Claims against SW Boston.

**B.    Impairment and Voting.**  Class 2 is Impaired, and Holders of Class 2 Prudential Loan Claims are entitled to vote to accept or reject this Plan.

**C.    Allowance**.  All Prudential Loan Claims asserted by Prudential shall be an Allowed Prudential Loan Claims in the amount of the Allowed Prudential Loan Claim.

**D.    Claim Treatment**.  In full and final satisfaction, settlement, release and discharge of the Allowed Prudential Loan Claims, Prudential, as the holder of the Allowed Prudential Loan Claims, shall receive:

(1)     The New Prudential Loan (as further described below in Section 6.15); and.

(2)      100 percent of the New SW Boston Interests

20

**F.    Prudential Liens** Prudential's Liens on the Prudential Collateral shall remain validly perfected, first priority Liens on such Collateral until the payment in full of the New Prudential Note.**Prudential Consideration.**  In addition to the release of the Allowed Prudential Loan Claims, in consideration for the distributions and releases received pursuant to the Plan, Prudential shall contribute the Prudential Debt Contribution, which shall, upon the Effective Date, be converted into equity in Reorganized SW Boston. **Loan Documents.**  As of the Effective Date [and with the exception of the Prudential Note, which shall be deemed cancelled upon the issuance of the New Prudential Note], the Prudential Loan Documents shall be deemed amended and restated, without further action, as necessary to reflect and incorporate the terms of the Plan.  To the extent that the Prudential Loan Documents contain any terms, covenants, representations and warranties, and/or remedies that impose obligations upon the Debtors that are inconsistent with or more expansive than the terms of the Plan, such terms, covenants, representations and warranties, and/or remedies are deemed cancelled and any obligations of the Debtors and/or Claims by the holder of the Allowed Prudential Loan Claim arising from such terms, covenants, representations and warranties, and/or remedies shall be discharged upon the Effective Date.  To the extent that there is any inconsistency between the Plan and any of the Prudential Loan Documents, the terms of the Plan shall control.**Class 3 - Prudential Guaranty Claim.**

**A.    Classification**.

(i)    Class 3-A consists of all Prudential Guaranty Claims against Arlington Street Trust.

(ii)    Class 3-B consists of all Prudential Guaranty Claims against Auto Sales.

(iii)    Class 3- C consists of all Prudential Guaranty Claims against Frank Sawyer Corp.

(iv)    Class 3-D consists of all Prudential Guaranty Claims against General Land Corp.

(v)    Class 3-E consists of all Prudential Guaranty Claims against General Trading.

(vi)    Class 3-F consists of all Prudential Guaranty Claims against Oliver Street Corp.

(vii)    Class 3-G consists of all Prudential Guaranty Claims against Stuart Street.

**B.    Impairment and Voting**.  Class 3 is Impaired, and Holders of Class 3 Prudential Guaranty Claims are entitled to vote to accept or reject this Plan.

**C.    Allowance**.  All Prudential Guaranty Claims asserted by Prudential shall be an Allowed Prudential Guaranty Claim in the amount of the Allowed Prudential Guaranty Claim.

**D.    Claim Treatment**.  In full and final satisfaction, settlement, release and discharge of the Allowed Prudential Guaranty Claims, Prudential, as the holder of the Allowed Prudential Guaranty Claims shall receive 100% of the Equity Interests in the Reorganized Post Effective-Date Liquidating Entity as realized until the Allowed Prudential Guaranty Claims are paid in full.  Cash realized form the liquidation of the Estates from the liquidation of the Estates of the Affiliate Debtors shall be applied to the principal balance of the New Prudential Note.

**6.6**     **Class 4 – City Claim.**

**A.**     **Classification**.

(i)     Class 4-A consists of all City Claims against Arlington Street Trust.

(ii)     Class 4- C consists of all City Claims against Frank Sawyer Corp.

(iii)     Class 4-D consists of all City Claims against General Land Corp.

(iv)     Class 4-F consists of all City Claims against Oliver Street Corp.

(v)     Class 4-H consists of all City Claims against SW Boston.

**B.     Impairment and Voting**.  Class 4 is Unimpaired, and Holders of Class 4 City Claims are conclusively presumed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Class 4 City Claims are not entitled to vote to accept or reject this Plan.

**C.     Allowance**.  The City Claim asserted by the City shall be an Allowed City Claim in the amount of the Allowed City Claim.

**D.     Claim Treatment**.  In full and complete satisfaction, settlement, discharge and release of the City Claim, the holder of the Allowed City Claim shall receive the following treatment:

(A)     <u>Loan Reinstatement</u>:  On the Effective Date, the City Loan shall be reinstated in full so as to render the City unimpaired under the Plan and shall remain, to the extent not inconsistent with the Plan, subject to the terms and conditions of the City Loan Documents.

(B)     <u>Liens:</u>  The Liens held by the holder of the Allowed City Claim shall be retained by such holder until the payment in full of the City Claim, in accordance with the City Loan Documents.  Upon the payment in full of the City Claim, the Liens on the City Collateral shall be discharged and released and the holder of the Allowed City Claim shall be required to deliver to Reorganized SW Boston, within one (1) Business Day of the payment in full of the Allowed City Claim, all UCC terminations, mortgage discharges and any other documents necessary to effect the discharge and release of the Liens on the City Collateral.

**E.     Loan Documents**.  As of the Effective Date, the City Loan Documents shall be deemed amended and restated, without further action, as necessary to reflect and incorporate the terms of the Plan.  To the extent that the City Loan Documents contain any terms, covenants, representations and warranties, and/or remedies that impose obligations upon the Debtors that are inconsistent with or more expansive than the terms of the Plan, such terms, covenants, representations and warranties, and/or remedies are deemed cancelled and any obligations of the Debtors and/or Claims by the holder of the Allowed City Claim arising from such terms,

22

covenants, representations and warranties, and/or remedies shall be discharged upon the Effective Date.  To the extent that there is any inconsistency between the Plan and any of the City Loan Documents, the terms of the Plan shall control.

**6.7    Class 5 - Other Secured Claims.**

**A.    Classification**.

(i)    Class 5-A consists of all Other Secured Claims against Arlington Street Trust.

(ii)    Class 5-B consists of all Other Secured Claims against Auto Sales.

(iii)    Class 5- C consists of all Other Secured Claims against Frank Sawyer Corp.

(iv)    Class 5-D consists of all Other Secured Claims against General Land Corp.

(v)    Class 5-E consists of all Other Secured Claims against General Trading.

(vi)    Class 5-F consists of all Other Secured Claims against Oliver Street Corp.

(vii)    Class 5-G consists of all Other Secured Claims against Stuart Street.

(viii)    Class 5-H consists of all Other Secured Claims against SW Boston.

**B.    Impairment and Voting**.  Class 5 is Unimpaired, and Holders of Class 5 Other Secured Claims are conclusively presumed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Class 5 Other Secured Claims are not entitled to vote to accept or reject this Plan.

**C.    Allowance**.  The Class 5 Claims asserted shall be Allowed or disallowed through the claims objection process described in Article 9 of the Plan.

**D.    Claim Treatment**.  : Other Secured Claims shall be reinstated and rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code.  Each holder of an Allowed Other Secured Claim shall retain the Liens securing its Allowed Other Secured Claim as of the Effective Date until full and final payment of such Allowed Other Secured Claim is made as provided herein.  On the full payment or other satisfaction of such Claims in accordance with the Plan, the Liens securing such Allowed Other Secured Claim shall be deemed released, terminated and extinguished, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order or rule or the vote, consent, authorization or approval of any Person.

**6.8    Class 6 - General Unsecured Claims.**

**A.    Classification**.

(i)    Class 6-A consists of all General Unsecured Claims against Arlington Street Trust.

23

    (ii)     Class 6-B consists of all General Unsecured Claims against Auto Sales.

    (iii)    Class 6- C consists of all General Unsecured Claims against Frank Sawyer Corp.

    (iv)    Class 6-D consists of all General Unsecured Claims against General Land Corp.

    (v)     Class 6-E consists of all General Unsecured Claims against General Trading.

    (vi)    Class 6-F consists of all General Unsecured Claims against Oliver Street Corp.

    (vii)   Class 6-G consists of all General Unsecured Claims against Stuart Street.

    (viii)   Class 6-H consists of all General Unsecured Claims against SW Boston.

**B.**    **Impairment and Voting**.  Class 6 is Impaired.  Holders of Class 6 General Unsecured Claims are entitled to vote to accept or reject this Plan.

**C.**    **Allowance**.  The Class 6 Claims shall be Allowed or disallowed through the claims objection process described in Article 9 of the Plan.

**D.**    **Claim Treatment**. <u>Treatment for Class 6</u>: Except to the extent that a Holder of a General Unsecured Claim in Class 6 agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each such General Unsecured Claim, each Holder of an Allowed General Unsecured Claim in Class 6 shall be paid in full (excluding post-petition interest) in Cash on the Effective Date, or as soon as is practicable thereafter.

**6.9**    **Class 7 – Insider and Affiliate Debtor Unsecured Claims**

**A.**    **Classification**.

    (i)     Class 7-A consists of all Insider and Affiliate Debtor Unsecured Claims against Arlington Street Trust.

    (ii)    Class 7-B consists of all Insider and Affiliate Debtor Unsecured Claims against Auto Sales.

    (iii)   Class 7- C consists of all Insider and Affiliate Debtor Unsecured Claims against Frank Sawyer Corp.

    (iv)   Class 7-D consists of all Insider and Affiliate Debtor Unsecured Claims against General Land Corp.

    (v)    Class 7-E consists of all Insider and Affiliate Debtor Unsecured Claims against General Trading.

    (vi)   Class 7-F consists of all Insider and Affiliate Debtor Unsecured Claims against Oliver Street Corp.

LIBNY/5047583.4

(vii)    Class 7-G consists of all Insider and Affiliate Debtor Unsecured Claims against Stuart Street.

(viii)    Class 7-H consists of all Insider and Affiliate Debtor Unsecured Claims against SW Boston.

**B.      Impairment and Voting**.  Class 7 is Impaired and Holders of Class 7 Insider and Affiliate Debtor Unsecured Claims are conclusively presumed to have rejected this Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Class 7 Insider and Affiliate Debtor Unsecured Claims are not entitled to vote to accept or reject this Plan.

**C.      Allowance**.  On the Effective Date, Non-Debtor Inisder and Affiliate Unsecured Claims shall be disallowed in full and deemed extinguished.

**D.      Claim Treatment**.  Holders of Insider and Affiliate Debtor Unsecured Claims shall receive no distribution under the Plan.

**6.10    Class 8 -– Interests the Debtors.**

**A.      Classification**.

(i)      Class 8-A consists of all Interests in Arlington Street Trust.

(ii)      Class 8-B consists of all Interests in Auto Sales.

(iii)      Class 8-C consists of all Interests in Frank Sawyer Corp.

(iv)      Class 8-D consists of all Interests in General Land Corp.

(v)      Class 8-E consists of all Interests in General Trading.

(vi)      Class 8-F consists of all Interests in Oliver Street Corp.

(vii)      Class 8-G consists of all Interests in Stuart Street.

(viii)      Class 8-H consists of all Interests in SW Boston.

**B.      Impairment and Voting**.  Class 8 is Impaired.  Holders of Class 8 Interests are conclusively presumed to have rejected this Plan pursuant to Section 1126(f) of the Bankruptcy Coe.  Therefore, Holders of Class 8 Interests are not entitled to vote to accept or reject this Plan.

**C.      Allowance**.  On the Effective Date, all Interests in the Debtors shall be disallowed in full and deemed extinguished.

**D.      Treatment**.  Holders of Interests in the Debtors shall receive no distribution under the Plan.  On the Effective Date, all Interests in the Debtors shall be deemed extinguished and the Certificates and all other documents representing such Interests shall be deemed cancelled and of no force and effect.

**6.11     Reservation of Rights With Respect to Claims.**

Prudential and the Debtors reserve the right to, among other things, (a) contest the right of the holder of any Claim to vote on the Plan, or designate the vote of the holder of any Claim (b) contest the right of the holder of any Claim to receive distributions under the Plan, and (c) seek to subordinate any Claim for inequitable conduct or otherwise.

**6.12     Plan Implementation.**

All consideration necessary for Reorganized SW Boston to make the payments and distributions required under the Plan on account of Claims against and Interests in the Debtors, unless otherwise stated in the Plan, shall be funded from (i) Cash from the Debtors, including Cash from operations, (ii) to the extent necessary to satisfy in full the Plan Obligations, the Prudential Cash Contribution and (iii) liquidated of the Affiliated Debtors by the Post Effective-Date Liquidating Entity.

**6.13     New Prudential Note.**

On the Effective Date, Reorganized SW Boston shall issue to Prudential the New Prudential Note and execute the New Prudential Loan Documents.  The terms of the New Prudential Note and the New Prudential Loan Documents shall be governed by that certain Amended and restated Construction Loan Agreement by and between Reorganized SW Boston as borrower, Prudential as lender and the other parties thereto dated as of the Effective Date.

The New Prudential Note shall be in the principal amount of the Allowed Prudential Loan Claim on the Effective Date.

**6.14     Prudential Debt Contribution.**

In addition to the release of the Allowed Prudential Loan Claims, in consideration for the distributions received pursuant to the Plan, Prudential shall contribute a portion of its Allowed Prudential Claim in the notional amount of $20,000,000 to Reorganized SW Boston in consideration for the distributions and releases received by Prudential pursuant to the Plan. Upon the Effective Date, the Prudential Loan Contribution shall be converted to equity in Reorganized SW Boston.

**6.15     Prudential Cash Contribution.**

In addition to the release of the Allowed Prudential Loan Claims and the Prudential Debt Contribution, in consideration for the distributions received pursuant to the Plan, Prudential shall contribute Cash in an amount necessary to fund the Plan Obligations as they become due.

**6.16     Resignation of Current Officers.**

Upon the Effective Date, each Current Officer shall resign, or shall be deemed to have resigned, their positions as officers of the Debtors.

26

**6.17    Corporate Existence.**

Except as expressly provided in the Plan, Reorganized SW Boston shall continue to exist after the Effective Date as separate corporate entities, with all the powers of a corporation, limited liability company or limited partnership, as applicable, pursuant to the applicable law in the jurisdiction in which such Reorganized Debtor is incorporated and pursuant to the respective Organization Documents amended by the plan, which documents require no further action or approval.

**6.18    Cancellation of Existing Equity Interests in Affiliate Debtors.**

Except as otherwise set forth herein, on the Effective Date all agreements, Instruments, and other documents evidence any equity Interest in the Affiliate Debtors, and any right of any Holder in respect thereof including any Claim related thereto, shall be deemed cancelled, discharged and of no force or effect.

**6.19    Issuance of New Membership Interest/Common Stock.**

On the Effective Date, Reorganized SW Boston shall issue the New SW Boston Interests for distribution to the Holder of the Prudential Loan Claim in accordance with Article 4.2 of the Plan.

The New SW Boston Interests issued and distributed pursuant to the Plan shall be duly authorized, validly issued and fully paid and non-assessable. Each distribution and issuance under the Plan shall be governed by the terms and conditions set forth herein applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance.

**6.20    Section 1145 Exemption**

Pursuant to section 1145 of the Bankruptcy Code, the offering, issuance, and distribution of any securities contemplated by the Plan, including without limitation the New SW Boston Interests and all agreements incorporated herein shall be exempt from, among other things, the registration requirements of section 5 of the Securities Act and any other applicable law requiring registration prior to the offering, issuance, distribution, or sale of securities.

**6.21    Post Effective-Date Liquidating Entity.**

The Post Effective-Date Liquidating Entity shall be an entity designed by, or incorporated or formed by, Prudential prior to the Effective Date, which entity shall liquidate the Estates of the Affiliated Debtors after the Effective Date

**6.22    Vesting of Assets in the Post Effective-Date Liquidating Entity.**

Unless otherwise dealt with under this Plan, the property of the Estates of the Affiliated Debtors shall vest in the Post Effective-Date Liquidating Entity for the purpose of liquidating such Estates and consummating the Plan.  The Post-Effective-Date Liquidating Entity shall

27

liquidate such property as soon as commercially practicable. After costs and expenses of the Post Effective-Date Liquidating Entity are paid, proceeds of such liquidation shall be applied to the principal balance of the New Prudential Note.

### 6.23     Vesting of Assets in Reorganized SW Boston.

On and after the Effective Date, all property in the Estates of SW Boston, all Causes of Action (except those released pursuant to the Debtors Release) shall vest Reorganized SW Boston, free and clear of all Liens, Claims, charges, or other encumbrances (except for Liens granted to secure (i) the Prudential Loan Claims under the New Prudential Loan Agreement, and the related loan documents described in the New Prudential Loan Agreement, and (ii) the reinstated City Loan). On and after the Effective Date, except as otherwise provided in the Plan, Reorganized SW Boston may operate its business and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules. Notwithstanding anything to the contrary in this Plan, Claims against the Debtors or Reorganized SW Boston shall remain the obligations solely of the Debtors or Reorganized SW Boston following the Effective Date.

### 6.24     Cancellation of Securities and Agreements.

On the Effective Date, except as otherwise specifically provided for in the Plan, the obligations of the Debtors pursuant, relating, or pertaining to any agreements, indentures, certificates of designation, bylaws, or certificate or articles of incorporation or similar documents governing the shares, Certificates, notes, bonds, indentures, purchase rights, options, warrants, or other instruments or documents evidencing or creating any indebtedness or obligation of the Debtors (except such agreements, Certificates, notes, or other instruments evidencing indebtedness or obligations of the Debtors that are specifically reinstated pursuant to the Plan) shall be released and discharged.

### 6.25     Operation Between the Confirmation Date and the Effective Date.

During the period from the Confirmation Date through and until the Effective Date, the Debtors shall continue to operate their businesses as Debtors-in-Possession, subject to the oversight of the Bankruptcy Court as provided in the Bankruptcy Code, the Bankruptcy Rules and all orders of the Bankruptcy Court that are then in full force and effect.

### 6.26     Restructuring Transactions.

On the Effective Date or as soon as reasonably practicable thereafter, Reorganized SW Boston may take all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan, including: (1) the execution and delivery of appropriate certificates of incorporation, bylaws, or other documents containing terms that are consistent with or reasonably necessary to implement the terms of this Plan and that satisfy the requirements of applicable law; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any property, right, liability, duty, or obligation on terms consistent with the terms of this Plan; and (3) all other actions that Reorganized SW Boston determines are necessary or appropriate.

**6.27    Corporate Action; Amended Articles of Incorporation and Amend Plan.**

Upon the Effective Date, all actions contemplated by the Plan shall be deemed authorized and approved in all respects.  All matters provided for in the Plan involving the corporate structure of the Debtors or Reorganized SW Boston, and any corporate action required by the Debtors or Reorganized SW Boston in connection with the Plan shall be deemed to have occurred and shall be in effect, without any requirement of further action by the security holders, directors or officers of the Debtors or Reorganized SW Boston.

On the Effective Date, the amended certificates of incorporation and amended bylaws, or other applicable corporate organizational documents, of Reorganized SW Boston shall be amended and restated and deemed authorized in all respects and shall contain a provision prohibiting the issuance of non-voting equity securities to the extent such provision is required by section 1123(a)(6) of the Bankruptcy Code.

**6.28    Effectuating Documents; Further Transactions.**

On and after the Effective Date, Reorganized SW Boston and the managers, officers and members of the boards of directors thereof, is authorized to and may issue, execute, deliver, file, or record such contracts, securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of this Plan and the securities issued pursuant to this Plan in the name of and on behalf of Reorganized SW Boston, without the need for any approvals, authorization, or consents except for those expressly required pursuant to this Plan.

**6.29    Exemption from Certain Taxes and Fees.**

To the fullest extent permitted under section 1146(a) of the Bankruptcy Code, any transfers of property pursuant the Plan shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax or other similar tax or governmental assessment, and the Confirmation Order shall direct and be deemed to direct the appropriate state or local governmental officials or agents to forgo the collection of any such tax or governmental assessment and to accept for filing and recordation instruments or other documents pursuant to such transfers of property without the payment of any such tax or governmental assessment.  Such exemption specifically applies, without limitation, to (1) the creation of any mortgage, deed of trust, lien or other security interest; (2) the making or assignment of any lease or sublease; (3) any restructuring transaction authorized by Article 6.9 hereof; (4) the issuance, distribution and/or sale of any of the New Common Stock, the Shareholder Warrants and any other Securities of the Debtors or Reorganized SW Boston, or (5) the making or delivery of any deed or other instrument of transfer under, in furtherance of or in connection with the Plan, including: (a) any merger agreements; (b) agreements of consolidation, restructuring, disposition, liquidation, or dissolution; (c) deeds; (d) bills of sale; or (e) assignments executed in connection with any Restructuring Transaction occurring under the Plan.

LIBNY/5047583.4

**6.30    Preservation of Rights of Action.**

In accordance with section 1123(b) of the Bankruptcy Code, and except where such Causes of Action have been expressly released (including, for the avoidance of doubt, pursuant to the Debtors Release provided by Article 10.3 of the Plan), Reorganized SW Boston shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, including any actions specifically enumerated in the Plan Supplement, and Reorganized SW Boston's rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date.  Reorganized SW Boston may pursue such Causes of Action, as appropriate, in accordance with the best interests of Reorganized SW Boston.  No Entity may rely on the absence of a specific reference in the Plan or the Plan Supplement to any Cause of Action against them as any indication that the Debtors or Reorganized SW Boston, as applicable, did not retain or will not pursue any and all available Causes of Action against them.  Except with respect to Causes of Action as to which the Debtors or Reorganized SW Boston have released any Person or Entity on or prior to the Effective Date (pursuant to the Debtors Release or otherwise), the Debtors or Reorganized SW Boston, as applicable, expressly reserves all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan.  Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Bankruptcy Court order, Reorganized SW Boston expressly reserves all Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of Confirmation or Consummation.

**6.31    Assumption of Executory Contracts and Unexpired Leases.**

Except as otherwise provided in the Plan, or in any contract, instrument, release, indenture, or other agreement or document entered into in connection with the Plan, as of the Effective Date, the Debtors shall be deemed to have assumed each Executory Contract and Unexpired Lease (including all insurance policies), unless such Executory Contract or Unexpired Lease:  (i) previously has been assumed or rejected pursuant to a Final Order of the Bankruptcy Court, (ii) is designated specifically or by category as a contract or lease to be rejected on the Schedule of Rejected Contracts and Leases, if any, or (iii) is the subject of a separate motion to assume or reject filed under section 365 of the Bankruptcy Code by the Debtors prior to the Effective Date.  As of and subject to the occurrence of the Effective Date, all contracts identified on the Schedule of Rejected Contracts and Leases shall be deemed rejected.  Subject to the occurrence of the Effective Date, entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of such assumptions and rejections pursuant to sections 365(a) and 1123 of the Bankruptcy Code.  Each Executory Contract and Unexpired Lease assumed pursuant to this Article 7 shall revest in and be fully enforceable by the Debtors in accordance with its terms, except as modified by the provisions of the Plan, or any order of the Bankruptcy Court authorizing and providing for its assumption or applicable federal law.

Notwithstanding the foregoing paragraph, after the Effective Date, Reorganized SW Boston shall have the right to terminate, amend, or modify any intercompany contracts, leases, or other agreements without approval of the Bankruptcy Court.

**6.32     Payments Related to The Assumption of Executory Contracts And Unexpired Leases.**

With respect to any Executory Contracts and Unexpired Leases to be assumed by the Debtors pursuant to the Plan (including pursuant to Article 7.1 thereof) or otherwise, Cure Claims shall be satisfied, pursuant to section 365(b) of the Bankruptcy Code, by payment of the Cure Claims in Cash on the Effective Date or as soon as reasonably practicable thereafter or on such other terms as the parties to each such Executory Contract or Unexpired Lease may otherwise agree.  In the event of a dispute regarding: (1) the amount of any Cure Claim; (2) the ability of Reorganized SW Boston to provide "adequate assurance of future performance" (within the meaning of section 365(b) of the Bankruptcy Code), if applicable, under the Executory Contract or the Unexpired Lease to be assumed; or (3) any other matter pertaining to assumption, the Cure Claims shall be paid following the entry of a Final Order resolving the dispute and approving the assumption of such Executory Contracts or Unexpired Leases; provided, however, that the Debtors or Reorganized SW Boston may settle any dispute regarding the amount of any Cure Claim without any further notice to, or action, order, or approval of, the Bankruptcy Court.

**6.33     Claims Arising From Rejection of Executory Contracts and Unexpired Leases.**

All Claims arising from the rejection of Executory Contracts or Unexpired Leases, if any, will be treated as General Unsecured Claims subject to the provisions of Article 4 of the Plan, subject to any limitation on allowance of such Claims under section 502(b) of the Bankruptcy Code or otherwise.  Except as otherwise ordered by the Bankruptcy Court, in the event that the rejection of an Executory Contract or Unexpired Lease by the Debtors pursuant to this Plan results in damages to the other party or parties to such contract or lease, a Claim for such damages shall be forever barred and shall not be enforceable against the Debtors or Reorganized SW Boston, or their respective properties or interests in property as agents, successors, or assigns, unless a Proof of Claim has been filed with the Bankruptcy Court and served upon counsel for the Debtors on or before the date, and in the form and manner set forth in the order authorizing the rejection.

**6.34     Intercompany Contracts, Contracts, and Leases Entered Into After the Petition Date.**

On and after the Effective Date, the Debtors, or Reorganized SW Boston, as applicable and in their sole discretion, may perform or continue to perform under Intercompany Contracts, contracts, and leases entered into after the Petition Date by the Debtors in the ordinary course of business.

**6.35     Modifications, Amendments, Supplements, Restatements, or Other Agreements.**

Unless otherwise provided in the Plan, each assumed Executory Contract or Unexpired Lease shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and all

31

Executory Contracts and Unexpired Leases related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or is rejected under the Plan.

Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

### 6.36    Reservation of Rights.

Neither the exclusion nor inclusion of any contract or lease in the Plan Supplement, nor anything contained in the Plan, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that Reorganized SW Boston has any liability thereunder.  In the event of a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors or Reorganized SW Boston, as applicable, shall have ninety (90) days following entry of a Final Order resolving such dispute to alter the treatment of such contract or lease as otherwise provided in the Plan.

### 6.37    Discharge of Claims and Termination of Interests.

Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in full and final satisfaction, settlement, release, and discharge, effective as of the Effective Date, of all Claims, Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Interests in, the Debtors or any of its assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not: (1) a Proof of Claim or Proof of Interest based upon such Claim, debt, right, or Interest is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (2) a Claim or Interest based upon such Claim, debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (3) the Holder of such a Claim or Interest has accepted the Plan.  Except as otherwise provided herein, any default by the Debtors or its Affiliates with respect to any Claim or Interest that existed immediately prior to or on account of the filing of the Chapter 11 Cases shall be deemed cured on the Effective Date.  The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the Effective Date occurring, except as otherwise expressly provided in the Plan.

**6.38    Compromise and Settlement of Claims, Interests, and Controversies.**

Pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good faith compromise of all Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a Holder of a Claim may have with respect to any Allowed Claim or Interest, or any distribution to be made on account of such Allowed Claim or Interest.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, its Estate, and Holders of Claims and Interests and is fair, equitable, and reasonable.  In accordance with the provisions of the Plan, pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019(a), without any further notice to or action, order, or approval of the Bankruptcy Court, after the Effective Date, Reorganized SW Boston may compromise and settle Claims against its and Causes of Action against other Entities.

**6.39    Debtor Release of Prudential.**

**Notwithstanding anything contained in the Plan to the contrary, on the effective date and effective as of the effective date (such that Reorganized SW Boston will not receive any Claim or Cause of Action released hereunder), for the good and valuable consideration provided by the Debtors Releasee, including: the discharge of debt and all other good and valuable consideration paid pursuant hereto; the Debtors (in their individual capacity and as Debtors in Possession) hereby discharge and release and shall be deemed to have forever provided a full discharge and release to the Debtors Releasee (and each such Debtor Releasee so released shall be deemed fully released and discharged by the Debtors) and their respective property from any and all causes of action, whether known or unknown, foreseen or unforeseen, liquidated or unliquidated, contingent or non-contingent, existing as of the Effective Date in law, at equity, whether for tort, fraud, contract, violations of federal or state securities laws or otherwise, arising from or related in any way to the Debtors or Reorganized SW Boston, including those in any way related to the Chapter 11 Cases or the Plan or agreement related thereto, including those that the Debtors or Reorganized SW Boston would have been legally entitled to assert in their own right or that any Holder of a Claim or an Interest or other Entity would have been legally entitled to assert on behalf of the Debtors or any of their estates; provided, further, that the Debtors specifically waive and release all Claims arising under section 547 of the Bankruptcy Code against Holders of General Unsecured Claims; provided, however, that the foregoing "Debtor Release" shall not operate to waive or release any Causes of Action of the Debtors: (1) against a Debtor Releasee arising from any contractual obligations owed to the Debtors on or after the effective date; or (2) expressly set forth in and preserved by the Plan, the Plan Supplement, or related documents, including, without limitation, any Cause of Action arising under or related to the New Prudential Loan or the New Prudential Loan Agreement.**

**ENTRY OF THE CONFIRMATION ORDER SHALL CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL, PURSUANT TO BANKRUPTCY RULE 9019,**

33

**OF THE DEBTORS' RELEASE, WHICH INCLUDES BY REFERENCE EACH OF THE RELATED PROVISIONS AND DEFINITIONS CONTAINED HEREIN, <u>AND FURTHER</u>, SHALL CONSTITUTE THE BANKRUPTCY COURT'S FINDING THAT THE DEBTORS RELEASE IS: (1) IN EXCHANGE FOR THE GOOD AND VALUABLE CONSIDERATION PROVIDED BY THE DEBTORS RELEASEES AND THE THIRD PARTY RELEASEES; (2) A GOOD FAITH SETTLEMENT AND COMPROMISE OF THE CLAIMS RELEASED BY THE DEBTORS RELEASE; (3) IN THE BEST INTERESTS OF THE DEBTORS AND ALL HOLDERS OF CLAIMS; (4) FAIR, EQUITABLE AND REASONABLE; (5) GIVEN AND MADE AFTER DUE NOTICE AND OPPORTUNITY FOR HEARING; AND (6) A BAR TO THE DEBTORS OR REORGANIZED SW BOSTON ASSERTING ANY CLAIM OR CAUSE OF ACTION RELEASED PURSUANT TO THE DEBTOR RELEASE.**

**6.40    Injunctions.**

**Except as otherwise provided in the Plan or the Confirmation Order, but subject to the occurrence of the Effective Date, all Entities who have held, hold or may hold Claims, Interests, Causes of Action or liabilities that: (1) have been discharged pursuant to Article 10.1 of the Plan; or (2) have been released pursuant to Article 10.3 of the Plan; are permanently enjoined and precluded, from and after the Effective Date, from: (a) commencing or continuing in any manner any Action or other proceeding of any kind against any Entity so released, discharged, or exculpated (or the property or estate of any entity so released, discharged, or exculpated) on account of or in connection with or with respect to any such released, discharged, or exculpated Claims, Interests, Causes of Action or liabilities; (b) enforcing, levying, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against any entity so released, discharged, or exculpated (or the property or estate of any entity so released, discharged, or exculpated) on account of or in connection with or with respect to any such released, discharged, or exculpated claims, interests, causes of action, or liabilities; (c) creating, perfecting or enforcing any Lien, Claim, or encumbrance of any kind against any entity so released, discharged, or exculpated (or the property or estate of any entity so released, discharged, or exculpated) on account of or in connection with or with respect to any such released, discharged, or exculpated Claims, Interests, Causes of Action, or liabilities; (d) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from any Entity so released, discharged, or exculpated (or the property or estate of any entity so released, discharged, or exculpated) on account of or in connection with or with respect to any such released, discharged, or exculpated Claims, Interests, Causes of Action or liabilities unless such Holder has filed a motion requesting the right to perform such setoff on or before the Confirmation Date, and notwithstanding any indication in a Proof of Claim or Interest or otherwise that such Holder asserts, has or intends to preserve any right of setoff pursuant to section 553 of the Bankruptcy Code or otherwise; and (e) commencing or continuing in any manner any action or other proceeding of any kind against any Entity so released, discharged, or exculpated (or the property or estate of any entity so released, discharged, or exculpated) on account of or in connection with or with respect to any such released, discharged, or exculpated Claims, Interests, Causes of Action, or liabilities released or settled pursuant to the Plan; <u>provided</u>, <u>however</u>, that nothing**

LIBNY/5047583.4

**contained herein shall preclude such persons from exercising their rights, or obtaining benefits, pursuant to and consistent with the terms of the Plan.**

### 6.41    Setoffs.

Except as otherwise provided in the Plan, pursuant to the Bankruptcy Code (including section 553 of the Bankruptcy Code), applicable non-bankruptcy law, or as may be agreed to by the Holder of a Claim or Interest, Reorganized SW Boston may set off against any Allowed Claim or Interest and the distributions to be made pursuant to the Plan on account of such Allowed Claim or Interest (before any distribution is made on account of such Allowed Claim or Interest), any Claims, rights, and Causes of Action of any nature that the Debtors or Reorganized SW Boston, as applicable, may hold against the Holder of such Allowed Claim or Interest, to the extent such Claims, rights, or Causes of Action against such Holder have not been otherwise compromised or settled on or prior to the Effective Date (whether pursuant to the Plan or otherwise); provided, however, that neither the failure to effect such a setoff nor the allowance of any Claim or Interest pursuant to the Plan shall constitute a waiver or release by Reorganized SW Boston of any such Claims, rights, and Causes of Action that Reorganized SW Boston may possess against such Holder.  In no event shall any Holder of Claims or Interests be entitled to setoff any Claim or Interest against any Claim, right, or Cause of Action of the Debtors or Reorganized SW Boston, as applicable, unless such Holder has Filed a motion with the Bankruptcy Court requesting the authority to perform such setoff on or before the Confirmation Date, and notwithstanding any indication in any Proof of Claim or Interest or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to section 553 or otherwise.

### 6.42    Release of Liens.

Except as otherwise provided in the Plan or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estate shall be fully released and discharged, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to Reorganized SW Boston and its successors and assigns.

### 6.43    Tax Consequences of the Plan.

The following is a general summary of certain material federal income tax consequences of the Plan and the distributions provided under the Plan.  This summary does not discuss all aspects of federal taxation that may be relevant to a particular creditor in light of its individual investment circumstances or to certain creditors or shareholders subject to special treatment under the federal income tax laws (for example, tax-exempt organizations, financial institutions, broker-dealers, life insurance companies, foreign corporations or individuals who are not citizens or residents of the United States).  This summary does not discuss any aspects of state, local or foreign taxation.  The impact on foreign holders of claims and equity interests is not discussed.

LIBNY/5047583.4

This summary is based upon the Internal Revenue Code of 1986, as amended (the "**IRC**"), the Treasury regulations (including temporary regulations) promulgated thereunder, judicial authorities and current administrative rulings, all as in effect on the date hereof and all of which are subject to change (possibly with retroactive effect) by legislation, administrative action or judicial decision.  Moreover, due to a lack of definitive judicial or administrative authority or interpretation and the complexity of the transactions contemplated in the Plan, substantial uncertainties exist with respect to various tax consequences of the Plan.  Niether Prudential nor the Debtors have requested a ruling from the Internal Revenue Service (the "**IRS**") with respect to these matters and no opinion of counsel has been sought or obtained by Prudential or the Debtors with respect thereto.  There can be no assurance that the IRS or any state or local taxing authorities will not challenge any or all of the tax consequences of the Plan, or that such a challenge, if asserted, would not be sustained.  **FOR THE FOREGOING REASONS, CREDITORS ARE URGED TO CONSULT WITH THEIR OWN TAX ADVISORS AS TO THE SPECIFIC TAX CONSEQUENCES (FOREIGN, FEDERAL, STATE AND LOCAL) TO THEM OF THE PLAN.  PRUDENTIAL IS NOT MAKING ANY REPRESENTATIONS REGARDING THE PARTICULAR TAX CONSEQUENCES OF THE CONFIRMATION AND CONSUMMATION OF THE PLAN AS TO ANY CREDITOR, NOR IS PRUDENTIAL RENDERING ANY FORM OF LEGAL OPINION AS TO SUCH TAX CONSEQUENCES.**

A.      **Federal Income Tax Consequences to the Debtors.**

Cancellation of Indebtedness.  Generally, the Debtors will realize cancellation of debt ("**COD**") income to the extent, if at all, that the Debtors pay a creditor pursuant to the Plan an amount of consideration in respect of a Claim against the Debtors that is worth less than the amount of such Claim.  For this purpose, the amount of consideration paid to a creditor generally will equal the amount of cash or the fair market value of property paid to such creditor.  Because the Debtors will be in a bankruptcy case at the time the COD income is realized (if any is realized), the Debtors will not be required to include COD income in gross income, but rather will be required to reduce tax attributes by the amount of COD income so excluded.

B.      **Tax Consequences to Creditors.**

In General.  The federal income tax consequences of the implementation of the Plan to a holder of a Claim will depend, among other things, on:  (a) whether such Claim constitutes a debt or a security for federal income tax purposes, (b) whether the holder of the Claim receives consideration in more than one tax year, (c) whether the holder of the Claim is a resident of the United States, (d) whether all the consideration received by the holder of the Claim is deemed to be received by the holder of the Claim as part of an integrated transaction, (e) whether the holder of the Claim reports income using the accrual or cash method of accounting, and (f) whether the holder has previously taken a bad debt deduction or worthless security deduction with respect to the Claim.

Gain or Loss on Exchange.  Generally, a holder of an Allowed Claim will realize a gain or loss on the exchange under the Plan of his or her Allowed Claim for cash and other property in an amount equal to the difference between (i) the sum of the amount of any cash and the fair market value on the date of the exchange of any other property received by the holder (other than

any consideration attributable to accrued but unpaid interest on the Allowed Claim), and (ii) the adjusted basis of the Allowed Claim exchanged therefore (other than basis attributable to accrued but unpaid interest previously included in the holder's taxable income). Any gain recognized generally will be a capital gain (except to the extent the gain is attributable to accrued but unpaid interest or accrued market discount, as described below) if the Claim was a capital asset in the hands of an exchanging holder, and such gain would be a long-term capital gain if the holder's holding period for the Claim surrendered exceeded one (1) year at the time of the exchange.

Any loss recognized by a holder of an Allowed Claim will be a capital loss if the Claim constitutes a "security" for federal income tax purposes or is otherwise held as a capital asset. For this purpose, a "security" is a debt instrument with interest coupons or in registered form.

### C.     Information Reporting and Backup Withholding.

Under the backup withholding rules of the Internal Revenue Code, holders of Claims may be subject to backup withholding at the rate of 31 percent with respect to payments made pursuant to the Plan unless such holder (i) is a corporation or comes within certain other exempt categories and, when required, demonstrates this fact, or (ii) provides a correct taxpayer identification number and certifies under penalties of perjury that the taxpayer identification number is correct and that the holder is not subject to backup withholding because of a failure to report all dividends and interest income. Any amount withheld under these rules will be credited against the holder's federal income tax liability. Holders of Claims may be required to establish exemption from backup withholding or to make arrangements with respect to the payment of backup withholding.

**THE FOREGOING IS INTENDED TO BE A SUMMARY ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL. THE FEDERAL, STATE, AND FOREIGN TAX CONSEQUENCES OF THE PLAN ARE COMPLEX AND, IN MANY AREAS, UNCERTAIN. ACCORDINGLY, EACH HOLDER OF A CLAIM OR EQUITY INTEREST IS STRONGLY URGED TO CONSULT WITH HIS OWN TAX ADVISOR REGARDING SUCH TAX CONSEQUENCES.**

### VII.     FEASIBILITY AND LIQUIDATION ANALYSES

### 7.1     Feasibility of the Plan

The Bankruptcy Code requires that, in order to confirm the Plan, the Bankruptcy Court must find that confirmation of the Prepackaged Plan will not likely be followed by liquidation or the need for further financial reorganization. For the Plan to meet the "feasibility test," the Bankruptcy Court must find that the Debtors will possess the resources and working capital necessary to fund the Debtors' operations and that the Debtors will be able to meet the Plan Obligations.

The Plan provides for (a) reinstatement of the Debtors' secured debt on the same or similar terms and (b) payment in full to the holders of all Allowed, non-Insider, non-affiliate Unsecured Claims from the income generated by the Debtors' operations and the Prudential

Cash Contribution.  Prudential has analyzed the Debtors' ability to meet the Plan Obligations.
As part of Prudential's analysis, Prudential has considered forecasts of the Debtors financial
performance after completion of the proceedings to confirm the Plan.  These projections and the
significant assumptions on which they are based will be provided in the Plan Supplement.
Prudential believes, based on its analysis, that the Plan provides a feasible means of
reorganization from which there is a reasonable expectation that, following the effectiveness of
the Prepackaged Plan, the Debtor will possess the resources and working capital necessary to
fund the Debtor's operations and to meet the Debtor's obligations under the Prepackaged Plan.

As with any plan of reorganization, there are risks attendant to the payment of Allowed
claims under the Plan.  In this case, those risks include:  (a) that the Plan will not be confirmed
and the chapter 11 cases are converted to chapter 7 cases, and (b) that the Court determines that
Non-Debtor Inside and Affiliate Unsecured Claims to be allowed claims and entitled to
distributions.

Based on the foregoing, the Plan is feasible.

### 7.2    Best Interests of Creditors And Comparison With Chapter 7 Liquidation

As a condition to confirmation of the Plan, Section 1129(a)(7)(A)(ii) of the Bankruptcy
Code requires that each holder of a claim or an interest in an impaired Class of Claims or Equity
Interests must either accept the Plan or receive or retain at least the amount or value it would
receive if the Debtors were liquidated under Chapter 7 of the Bankruptcy Code on the Effective
Date of the Plan.  Prudential's liquidation analysis is attached hereto as <u>Exhibit B</u>.

After consideration of the effects that a Chapter 7 liquidation would have on the ultimate
proceeds available for distribution to creditors in a Chapter 11 case, including:

- the increased costs and expenses of a liquidation under Chapter 7 arising from fees
  payable to a trustee in bankruptcy and professional advisors to such trustee;

- the erosion in value of assets in a Chapter 7 case in the context of the expeditious
  liquidation required under Chapter 7 and the 'forced sale' atmosphere that would prevail;
  and

- substantial increases in claims which would be satisfied on a priority basis or on a parity
  with creditors in a Chapter 11 case,

Prudential has determined that confirmation of the Plan will provide each creditor and equity
holder with a recovery that is not less than it would receive pursuant to our liquidation under
Chapter 7 of the Bankruptcy Code.  Specifically, Prudential believes that liquidation would
render creditors, other than Prudential and the City, unlikely to receive a meaningful dividend on
account of their claims.  Moreover, Prudential believes that the value of any distributions from
the liquidation proceeds to each class of allowed claims and interests in a Chapter 7 case would
be less than the value of distributions under the Plan because such distributions in Chapter 7 may
not occur for a substantial period of time.  In this regard, it is possible that distribution of the

38

proceeds of the liquidation could be delayed for a substantial time after the completion of such liquidation to resolve all objections to claims and prepare for distributions.

Prudential's belief that confirmation of the Plan will provide each holder of a claim or interest in an impaired class with a recovery at least equal to the recovery that such holder would receive pursuant to a liquidation under Chapter 7 of the Bankruptcy Code is based on a comparison of the liquidation values set forth in the liquidation analysis above with our estimate of the value of the distributions to the holders of claims pursuant to the Plan.

[remainder of page intentionally left blank]

Dated: June 27, 2011
    Boston, Massachusetts

Respectfully submitted,

THE PRUDENTIAL INSURANCE COMPANY OF
AMERICA, ON BEHALF AND SOLELY FOR THE
BENEFIT OF, AND WITH ITS LIABILITY LIMITED
TO THE ASSETS OF, ITS INSURANCE COMPANY
SEPARATE ACCOUNT, PRISA

By: _/s/ Joanna Mulford_____
    Name:  Joanna Mulford
    Title:  Vice President

By:  _/s/ Gina L. Martin_____
Gina L. Martin (BBO# 643801)
GOODWIN PROCTER LLP
Exchange Place
53 State Street
Boston, Massachusetts 02109
Telephone (617) 570-1000
Facsimile (617) 523-1231
Email: gmartin@goodwinprocter.com

-and-

Emanuel C. Grillo
GOODWIN PROCTER LLP
The New York Times Building
620 Eighth Avenue
New York, New York  10018
Telephone (212) 813-8800
Facsimile (212) 355-3333

40