# UNITED STATES BANKRUPTCY COURT
## FOR THE
### DISTRICT OF MASSACHUSETTS

~~~~~~~~~~~~~~~~~~~~~~~~~~~~

In re:

**SW HOTEL VENTURE, LLC, et al.,[1]**                     Chapter 11
       Debtors                                    Case No. 10-14535-JNF
                                  (Jointly Administered)

~~~~~~~~~~~~~~~~~~~~~~~~~~~~

## MEMORANDUM

## I. INTRODUCTION

The matter before the Court for determination is the "Motion of The Prudential

Insurance Company of America for an Order Authorizing the Application of Payments

Received during the Chapter 11 Cases to Payment of Postpetition Interest pursuant to

Section 506(b) of the Bankruptcy Code" (the "506(b) Motion").[2] Through its 506(b) Motion,

---

[1] The other Debtors in these jointly administered cases are Auto Sales & Service, Inc. (Case No. 10-14528-JNF), General Trading Company (Case No. 10-14532-JNF), Frank Sawyer Corporation (Case No. 10-14533-JNF), 100 Stuart Street, LLC (Case No. 10-14534-JNF), 30-32 Oliver Street Corporation (Case No. 10-16173-JNF), General Land Corporation (Case No. 10-16174-JNF), and 131 Arlington Street Trust (Case No. 10-16177-JNF) (the "Affiliated Debtors").

[2] The Prudential Insurance Company of America appears in this case as follows: "on behalf and solely for the benefit of, and with its liability limited to the assets of, its insurance company separate account PRISA." In its Proposed Findings of Fact and Conclusions of Law, it states that "Prudential (PRISA) is a private real estate investment fund, not a commercial bank or an insurance company."

The Prudential Insurance Company of America ("Prudential" or the "Secured Claimant"),

which purportedly holds a first mortgage on real property owned by SW Hotel Venture,

LLC ("SW" or the "Debtor"), as well as other collateral owned by SW and the Affiliated

Debtors (together with SW, the "Debtors"), seeks a determination that it is an oversecured

creditor entitled to accrued interest under 11 U.S.C. § 506(b) from the petition date[3] at the

default rate of interest set forth in loan documents executed by the parties.  It also seeks an

order authorizing the application of postpetition payments made to it by the Debtors first

to postpetition interest, fees and costs, and then to the principal balance of its loan.  The

Debtors, as well as the City of Boston (the "City"), object  to the 506(b) Motion.  The

Debtors contend that  Prudential was undersecured as to SW until June 8, 2011 following

the closing of the sale of the W Hotel (the "Hotel") and is an undersecured creditor as to

the remaining Affiliated Debtors and as such is not entitled to default interest as Prudential

requests.  Furthermore, the Debtors and the City maintain that the default rate of interest

---

[3] On September 15, 2011, SW and the Affiliated Debtors commenced an adversary proceeding against Prudential, captioned "Complaint to Avoid Liens and Claims Asserted by the Prudential Insurance Company of America."  Specifically, in Count I, SW asserted that Prudential's liens against certain accounts granted on or around April 20, 2010 with respect to two Collateral Pledge and Security Agreements and two Limited Access Service Agreements at Sovereign Bank are avoidable preferential transfers under 11 U.S.C. §§ 547 and 551.  Additionally, in the remaining twelve counts, certain of the Affiliated Debtors sought to avoid liens on their respective assets, namely those of Auto Sales & Service, Inc., Frank Sawyer Corporation, 30-32 Oliver Street Corporation, General Trading Company, General Corporation, and 131 Arlington Street Trust pursuant to 11 U.S.C. §544 and Mass. Gen. Laws ch. 109A, §§ 5 and 6.  Because the adversary proceeding has been pending for less than three weeks, the Court finds that, although it would appear to be predicated upon causes of action which the Debtors knew or should have known about early in their respective cases, the Complaint can have no effect on the Court's rulings at this time.

sought by Prudential is unreasonable and inequitable; that it should not be allowed to accrue any interest; that Prudential should not be able to recover interest at the default rate set forth in the Loan Documents; and that Prudential has not itemized any fees or costs.

The Court held an evidentiary hearing on the 506(b) Motion in conjunction with the hearing on confirmation of the Debtors' Modified First Amended Joint Plan of Reorganization, and Prudential's Objection to that plan. After a three day trial beginning on June 27, 2011 and extensive briefing by the parties, the Court took the 506(b) Motion under advisement. As the Court observed in note 3, the Debtors commenced an action against Prudential on September 15, 2011 seeking to avoid various liens under 11 U.S.C. §§ 544 and 547.

The issues presented include whether Prudential is an oversecured creditor entitled to accrue and be paid postpetition interest after the commencement of the Debtors' Chapter 11 cases, and, if so, whether it is entitled to interest at the default rate. Resolution of those issues requires the Court to decide at what point in time a creditor's secured status is determined during the pendency of a Chapter 11 case for the purpose of determining whether a secured claimant is entitled to postpetition interest and other charges as an oversecured creditor pursuant to 11 U.S.C. § 506(b).

## II. PROCEDURAL AND FACTUAL BACKGROUND

A. <u>Procedural Background</u>

On April 28, 2010 (the "Petition Date"), SW, General Trading Company ("General Trading"), Frank Sawyer Corporation ("FSC"), 100 Stuart Street, LLC ("Stuart Street"), and

Auto Sales & Service, Inc. ("Auto Sales") filed voluntary Chapter 11 petitions.

Subsequently, on June 4, 2010, General Land Corporation ("General Land"), 30-32 Oliver

Street Corporation ("Oliver Street"), and Arlington Street Trust ("Arlington Street Trust")

also filed voluntary Chapter 11 petitions.[4] Approximately one year after the

commencement of the Debtors' cases, Prudential, on April 15, 2011, filed its 506(b) Motion,

asserting that it is entitled to default interest from April 28, 2010 in the amount of

$24,740,835.30. The Debtors and the City filed Objections to the 506(b) Motion on June 21,

2011.

On November 1, 2010, Prudential filed proofs of claim in the Debtors' cases,

---

[4] In their Amended Disclosure Statement, the Debtors disclosed, and evidence
submitted at trial established, the relationship among the Debtors and non-debtor
affiliates. The Debtors consist of eight related companies, which are part of a larger
corporate group that is owned directly or indirectly by the Frank Sawyer Revocable
Trust (the "Trust'), a non-debtor entity. The Trust owns 100% of FSC, Auto Sales,
General Trading, General Land and Oliver Street, as well as two non-debtors, SE
Berkley Street LLC and SE McClellan Highway LLC. FSC, in turn, owns approximately
65% of the membership interests in 100 Stuart Street, LLC, as well as some cash and an
investment account. The remaining interests in 100 Stuart Street are owned by
non-debtor affiliates, namely William Sawyer Corporation (in turn owned by the
William Sawyer Revocable Trust), and Terminal Taxi Company (in turn owned by the
Trust). The limited liability company known as 100 Stuart Street was formed to own
100% of the membership interests in SW. SW was formed to own and develop the real
estate associated with the W Hotel and Residences. Oliver Street owns two improved
pieces of real estate, which it leases to tenants and which generate approximately $3,700
in net income per month. Arlington Trust holds a piece of real property located at 131
Arlington Street. The property is used by the Debtors to store the records of the Debtors
and their affiliates. General Trading is the entity that employs all of the Debtors'
personnel and performs the administrative functions for the consolidated group of
Debtors and non-debtor affiliates. General Land operates four parking lots located in
Boston, three of which it owns directly. Carol Sawyer Parks is the president or manager
of each of the Debtors and the sole manager of two non-debtor affiliates: SE Berkeley
Street, LLC and SE McClellan Highway LLC.

identifying itself as the holder of a secured claim in an amount of "[n]ot less than $180,803,185.93 (plus all interest, costs, and fees)." Prudential attached to its proofs of claim an Addendum containing a narrative description of its claim and a schedule - - Schedule 1 - - in which it referenced "Construction Loan Documents," including a Construction Loan Agreement dated January 15, 2008, a Promissory Note dated January 15, 2008, a First Priority Mortgage, Security Agreement, Fixture Filing, and Assignment of Sales Contracts and Deposits dated as of January 15, 2008 (the "Mortgage") on the land, improvements and personal property located on 100 Stuart Street, Boston, Massachusetts, and various other guaranties, assignments, pledge agreements, and mortgages affecting property of the Affiliated Debtors (the "Construction Loan Documents"). Despite the instruction on the proof of claim form (Official Form 10) to "attach copies of lien documentation," none of the documents were attached to the proofs of claim, and, except for the Construction Loan Agreement, none of the loan documents, including amendments to the Construction Loan Agreement, the Promissory Note and the Mortgage on 100 Stuart Street, were introduced into evidence at the trial.

Prudential specifically asserted in paragraph 3(a) of the Addendum that, in addition to the aggregate principal amount of $180,803,185.93, it was owed "all interest accrued and unpaid both prior and subsequent to the Petition Date [April 28, 2010], calculated in accordance with the Construction Loan Documents, plus all fees, expenses and other amounts owed to Prudential pursuant to the Construction Loan Documents. . . . ." Moreover, in paragraph 3(b) of the Addendum, Prudential asserted the following:

In addition to the principal balance of the Construction Loan, both prior and subsequent to the Petition Date, the Debtors are obligated and liable to the Claimant for all other amounts under the Construction Loan Documents including, but not limited to, (i) costs and expenses of counsel relating thereto including, without limitation, fees and expenses of counsel, experts, consultants, and witnesses; (ii) indemnification costs; (iii) all costs incurred in the payment, performance, cure or remedy of any defaults, failed payments, or failure to act of any of the Debtors, (iv) accrued and unpaid Net Sales Proceeds (as defined in the Construction Loan Agreement); (v) costs incurred in connection with any filing and recording fees and expenses, title insurance and other similar expenses incurred in creating and perfecting the Liens and Guaranty Obligations . . ., (vi) costs incurred in connection with enforcing or preserving any rights in response to third party claims or the prosecuting or defending of any action or proceeding or other litigation or otherwise affecting any of the Debtors, (vii) costs incurred in enforcing any obligations of or collecting any payments due from any of the Debtors . . . , (viii) contract damages arising from misrepresentations, defaults and breaches of representations, warranties, and covenants under the Construction Loan Documents, (ix) fees, costs and additional interest; (x) accrued and unpaid interest, including default rate interest; and (xi) any and all other fees, expenses, charges or amounts, whether arising under federal or state law or under principles of equity or otherwise.

Prudential did not attach to its proofs of claim any accounting of any amounts owed for prepetition interest, postpetition interest, or any of the fees, costs or charges it now seeks. As noted above, it did not attach to its proofs of claim any of the Construction Loan Documents to which it referred in the Addendum, including the Construction Loan Agreement, Promissory Note or Mortgage.

On August 3, 2010, Prudential filed a Motion for Relief from the Automatic Stay pursuant to 11 U.S.C. § 362(d) (the "Lift Stay Motion") with respect to the real property located at 100 Stuart Street, comprised of the Hotel and over 120 condominium units (the "Residences" or the "Condominiums"). On January 28, 2011, after briefing and a three-day

evidentiary hearing, the Court denied the relief sought by Prudential.  In the Court's

Memorandum (the "Lift Stay Memorandum"), *see* <u>In re SW Boston Hotel Venture LLC</u>, 449

B.R. 156 (Bankr. D. Mass. 2011),  the Court denied Prudential's request for relief from the

automatic stay after finding that when the total value of its collateral package was

evaluated an equity cushion in excess of $19 million existed as to the amount of

Prudential's claim.

Approximately two months after the Court issued the Lift Stay Memorandum and

Order with respect to the Lift Stay Motion, the Debtors, on March 28, 2011, filed a motion

seeking Court approval of the sale of the Hotel located at 100 Stuart Street owned by SW,

along with approval of sales procedures for the Residences, specifically "Debtor's Motion

for Order (I) Authorizing the Sale of the Debtor's Commercial Unit, Parking Garage Unit

and Related Assets Free and Clear of All Liens, Claims, Interests and Encumbrances, (II)

Authorizing the Assumption and Assignment of Certain Executory Contracts and

Unexpired Leases in Connection Therewith and (III) Granting Related Relief" (the "Sale

Motion").

The Sale Motion evidenced that the Debtors had entered into a purchase and sale

agreement with Razorbacks Owner LLC (the "Purchaser"), an affiliate of Pebblebrook

Hotel Trust, pursuant to which the Purchaser agreed to acquire the Hotel for $89.5 million,

subject to higher and better offers.  On May 24, 2011, the Court approved the sale of the

Hotel pursuant to 11 U.S.C. § 363 to the Purchaser.  The closing occurred on June 8, 2011.

After the closing, the Debtors caused net sale proceeds in the sum of $83,322,017 to be  paid

to Prudential.

Prior to the closing of the sale of the Hotel and other assets, the Debtors, on March 31, 2011, filed a Joint Plan of Reorganization and a Disclosure Statement.  Prudential filed an Objection to the original Disclosure Statement on April 29, 2011.  On May 5, 2011, the Debtors filed a First Amended Joint Plan of Reorganization, together with an Amended Disclosure Statement.  On May 24, 2011, the Court approved the Amended Disclosure Statement, and scheduled a confirmation hearing for June 27, 2011.  On June 24, 2011, Prudential filed an Objection to the Amended Plan; on June 27, 2011, the Debtors filed a Modified First Amended Joint Plan of Reorganization (the "Plan").

Through their Plan, the Debtors propose to pay, in full, the "Allowed Prudential Claim," adjusted for amounts paid during the pendency of the Chapter 11 cases and to pay that claim by March 31, 2014 with interest accruing at 4.25% per year or another rate determined by the Court.  The Plan in paragraph 1.10 contains a definition of the term "Allowed Prudential Claim" as follows:

> (a) $180,803,186.86 [sic] less all payments made to, or received by, Prudential on account of its Claims against the Debtors from the Petition Date through the Effective Date including, without limitation, (i) the Letter of Credit Draw, and (ii) payments made to Prudential from the proceeds of the sale of Residences and/or Real Estate, or (b) such other amount that is determined by the Bankruptcy Court."[5]

In paragraph 4.2(k), the Debtors provide that Prudential "shall receive such additional or other treatment as may be necessary, as agreed to between the Debtors and . . . Prudential

---

[5] In its proofs of claim, Prudential set forth a principal amount due of $180,803,185.<u>93</u>, not $180,803,185.<u>86</u>.

. . . or as determined by the Bankruptcy Court, to permit . . . Prudential . . . to realize the indubitable equivalent of its Allowed Claim."

Under the Plan, the Debtors propose to pay Prudential, monthly, the aggregate of the Debtors' cash in excess of fixed working capital amounts;[6] proceeds from the sale of Residences, less 8% for closing costs, any amounts, if necessary, to pay outstanding real estate taxes or condominium fees, and the amount, if necessary, to pay SW Boston's budgeted expenses;[7] and the proceeds of the sale of real estate other than the Residences, including property not subject to Prudential's liens, less costs and expenses of sale.[8]

The Debtors in paragraph 4.7(e)(iv) of their Plan agreed that no insiders would receive cash distributions on account of their allowed claims until the allowed claims of all non-insider creditors have been paid in full. In paragraph 4.2(h), the Debtors also agreed to provide Prudential with monthly, quarterly, and yearly financial reports. Specifically, on a monthly basis, they agreed to provide Prudential with

---

[6] Excess Cash" is defined at paragraph 1.54 of the Plan as "such Debtor's cash on a book basis, excluding amounts in Investment Accounts held by such Debtor in excess of the Working Capital Minimum." "Working Capital Minimum" is defined at paragraph 1.114 for each Debtor. By way of example, the Working Capital Minimum for SW is the sum of not more than $1,250,000, while the Working Capital Minimum for General Trading is the sum of not more than $100,000..

[7] *See* the definition of "Residence Net Sales Proceeds" at paragraph 1.98 of the Plan.

[8]"Real Estate Net Sales Proceeds are defined at paragraph 1.90 as "the proceeds of such sale less the costs and expenses of selling the Real Estate, including, without limitation, applicable taxes, municipal charges, professional fees, broker's fees and costs, and other customary closing costs."

(i) an accounting of the Excess Cash, (ii) the Debtors' financial statements for the previous month, (iii) copies of all leases executed since the prior monthly report, (iv) copies of all new purchase and sale agreements with respect to the Residences or the other Real Estate executed since the prior monthly report, and (v) copies of account statements for accounts that contain Cash Collateral.

Additionally, on a quarterly basis, Debtors agreed, at paragraph 4.2(h)(iii), to provide Prudential with a comparison of their actual expenses and their budgeted expenses and to annually provide Prudential with unaudited financial statements and tax returns within 10 days of filing.

The Debtors, at paragraph 4.2(d)(iii), of their Plan agreed that payments made on account of the Allowed Prudential Claim would be applied first to accrued interest and second to the principal balance of the claim. The Debtors did not expressly provide that Prudential is entitled to postpetition interest on its secured claim. Indeed, in their Amended Disclosure Statement, the Debtors state that "because Prudential is undersecured as to each Debtor," it is not entitled to postpetition interest, cost or attorneys' fees. *See* Amended Disclosure Statement at 11 (Docket Entry # 587). In addition, the Debtors did not provide for payments to Prudential using the default rate of interest, although the parties stipulated that, at the Petition Date, the Prudential loan was in default.

In paragraph 5.8, the Debtors provided the following:

Except as expressly provided in the Plan, the Reorganized Debtors shall continue to maintain their separate corporate existence for all purposes other than the treatment of Claims under the Plan. The Debtors are proposing that the Debtors be substantively consolidated under the Plan on the Effective Date pursuant to Section 1123(a)(5)(C) of the Bankruptcy Code and the Confirmation Order. The effect of such substantive consolidation would be

that: (i) all assets (and all proceeds thereof) and liabilities of each Debtor shall be deemed merged or treated as though they were merged into and with the assets and liabilities of all other Debtors, (ii) except as set forth in Section 4.7(e)(i) of the Plan, no cash distributions shall be made under the Plan on account of intercompany Claims among the Debtors and all such Claims shall be eliminated, (iii) all guarantees of any Debtor of the obligations of any other Debtor shall be deemed eliminated and extinguished so that any Claim against any Debtor and any guarantee thereof executed by the other and any joint and several liability of any Debtor shall be deemed to be one obligation of the consolidated cases, (iv) each and every Claim filed or to be filed in the Chapter 11 Case of any Debtor shall be deemed filed against the consolidated Debtors, and (v) for purposes of determining the availability of the right of setoff under Section 553 of the Bankruptcy Code, the Debtors shall be treated as one entity so that, subject to the other provisions of Section 553 of the Bankruptcy Code, debts due to any Debtor may be set off against the debts of any other Debtor. Such substantive consolidation shall not (other than for purposes related to the Plan) affect the legal and corporate structures of the Reorganized Debtors.

The Debtors in Exhibit A to their Plan also established negative covenants to limit or prohibit their ability to exceed budgeted expenses; to permit any additional liens on collateral, subject to Prudential's Mortgage or that of the City of Boston, unless the lien secures financing allowing payment of the Allowed Prudential Claim in full; to change their management structure; to guaranty or become liable for any indebtedness or obligation of a non-Debtor insider; to be a party to a merger or reorganization, unless the Debtor is the surviving entity; to purchase or acquire stock in another organization, other than in the ordinary course of business; or to make any distribution to equity.

In Exhibit A to the Plan, the Debtors also established 20 affirmative covenants for the benefit of Prudential and other creditors, which include requirements to (i) file all post-Effective Date tax returns; (ii) pay all post-Effective Date Residence fees promptly

-11-

when due; (iii) make cumulative payments to the holder of the Allowed Prudential Claim in accordance with a Schedule attached to the Plan, until such time as  the Allowed Prudential Claim is paid in full; (iv) maintain insurance for each of the Debtors and their respective properties; and (v) perform and/or observe all of the material covenants and agreements required to be performed and observed under the existing agreements with Starwood Hotels & Resorts Worldwide, Inc. ("Starwood"), the manger of the Hotel, as well as the Bliss Spa, Culinary Concepts (Boston) LLC, Ultimate Parking, LLC, and Wink Retail Group, Inc.

    B. <u>Prudential Loan Documents and Collateral</u>

        1. The Construction Loan Agreement and the Guarantees

    The Debtors initially approached Prudential about financing the development of the W Hotel and Residences after a loan from a German commercial bank lender, HSH Nordbank, failed to close. On January 15, 2008, Prudential and SW entered into an agreement, captioned, "Construction Loan Agreement," whereby Prudential provided up to approximately $190 million in construction financing for the construction of a hotel and residence complex.[9]  SW ostensibly issued a Promissory Note to Prudential for the full

---

    [9] Although the Borrower is identified as SW, the Construction Loan Agreement was executed on its behalf by Carol Parks as president of FSC, the manager of 100 Stuart Street LLC, which, in turn, is the manager of SW.  Carol Parks also signed the Construction Loan Agreement as president of FSC on behalf of 100 Stuart Street as an SPC Party.  The Construction Loan Agreement was also executed by Stuart Street as the "SPC Party."  FSC, by its president executed and guaranteed the contract.  Auto Sales, General Trading and Oliver Street also were parties to the contract as guarantors and Carol Parks signed the contract on their behalf as president of each of those three entities.

amount of the loan, i.e., $190,225,000.00. Although the Construction Loan Agreement references a Promissory Note in the sum of $190,255,000.00, as noted above, Prudential did not attache it to its proofs of claim, and Prudential did not offer it into evidence in conjunction with the Lift Stay Motion or the 506(b) Motion. Under the Construction Loan Agreement, the amounts borrowed from Prudential were due on the loan maturity date of January 15, 2011.

Under the Construction Loan Agreement, the loan balance accrued interest at the rate of 9.5% per year. In the event of a default, the outstanding principal balance of the loan and any overdue interest were to accrue interest at the default rate of interest of 14.5% per annum. *See* Prudential's Exhibit 3, Construction Loan Agreement, at paragraph 2.3.3. In addition, the Construction Loan Agreement provided for a Late Payment Charge in paragraph 2.3.4. That section provided:

> If any principal, interest or any other sum due under the Loan Documents, other than a payment of principal due on the Maturity Date, is not paid by Borrower on the date on which it is due, Borrower shall pay to Lender upon demand an amount equal to $2,500 in order to defray the expense incurred by Lender in handling and processing such delinquent payment and to compensate Lender for the loss of the use of such delinquent payment. Any such amount shall constitute a portion of the outstanding principal balance of the Loan unless and until repaid and shall be secured by the Mortgage and the other Loan Documents.

Under paragraph 4.1.13 of the Construction Loan Agreement, the Borrowers agreed as follows:

> In the event (a) that Lender consults with an attorney in connection with the

Loan, (b) any enforcement action is considered or brought under any Loan Document, including, without limitation, foreclosure of the Mortgage or placement of the Note or any other Loan Document into the hands of an attorney for collection, suit, action or foreclosure, (b) [sic] of the foreclosure of any Lien or mortgage prior to or subsequent to the Mortgage in which proceeding Lender is made a party, (c) of the bankruptcy, insolvency, rehabilitation or other similar proceeding in respect of Borrower or an assignment by Borrower or any other Loan Party for the benefit of its creditors, or (d) Lender shall remedy or attempt to remedy any default or Event of Default, Borrower shall be chargeable with and agrees to pay all Costs incurred by Lender as a result thereof, including, without limitation, costs of collection and defense (including, without limitation, reasonable attorneys', experts', consultants' and witnesses' fees and disbursements) in connection therewith and in connection with any appellate proceeding or post-judgment action involved therein, which shall be due and payable on demand, together with interest thereon from the date incurred by Lender at the Default Rate, and together with all required service or use taxes Borrower agrees to pay all other Costs of Lender promptly following demand. All Costs due from Borrower shall constitute a portion of the outstanding principal balance of the Loan and shall be secured by the Loan Documents.

According to Prudential, as noted above, the Debtor executed a Promissory Note evidencing the loan obligation and a Mortgage to secure the Note and Construction Loan Agreement. The parties appear to agree that to secure the Debtors' obligations to Prudential, SW Boston entered into a First Priority Mortgage, Security Agreement, Fixture Filing, and Assignment of Sales Contracts and Deposits, previously identified as the "Mortgage," with Prudential which granted Prudential a first priority mortgage and security interest on SW Boston's real and personal property and the proceeds from the sale of real and personal property. SW Boston also executed pledge and control agreements with respect to two accounts at Sovereign Bank, which were not submitted into evidence, and certain of the Affiliated Debtors, including FSC, Arlington Street Trust, General Land,

General Trading, Oliver Street, and Auto Sales, executed guarantees of SW's obligations to Prudential, which are discussed in more detail below.

FSC executed its "Payment Guaranty" on January 15, 2008, as did Oliver Street, Auto Sales, and General Trading. General Land and Arlington Street Trust executed their guaranties on December 22, 2008 at the time the Construction Loan Agreement, according to those guaranties, "was amended by that certain First Amendment to Construction Loan Agreement dated as the date hereof." Prudential did not submit into evidence that or any other amendments to the Construction Loan Agreement. Additionally, like the Promissory Note, it did not introduce the Mortgage into evidence at the trial concerning the 506(b) Motion, or at any stage of this case. To date, neither the Debtors nor the Official Committee of Unsecured Creditors (the "Creditors' Committee") has claimed that the Mortgage was not recorded, although the Debtors recently commenced an adversary proceeding against Prudential, captioned "Complaint to Avoid Liens and Claims Asserted by the Prudential Insurance Company of America."

In addition to the collateral provided by SW Boston, the Affiliated Debtors provided guarantees to Prudential and pledged additional collateral as security for repayment of the Construction Loan. FSC issued what Prudential describes as "a Payment Guaranty, a Carveout Guaranty, and a Completion Guaranty" (the "FSC Guarantees"), although only the Payment Guaranty was introduced into evidence. FSC also executed pledge and control agreements with respect to a securities account and, according to Prudential, assigned its interest in the subscription agreement of Frank Sawyer Trust. The FSC

Payment Guaranty defined "Guaranteed Obligations" as follows:

> (a) the full, complete, and prompt payment of any and all Mandatory Principal Payments under the Loan, (b) all Operating Deficits . . . (c) prompt reimbursement to Lender of the LD Payment to the extent paid by Lender, and (d) the full prompt payment of all amounts due or arising out of the obligations, duties and agreements referred to this definition, [sic] including without limitation, Enforcement Costs as set forth in <u>Section 2(g)</u> below.[10]

Oliver Street granted Prudential a first priority mortgage on, and an assignment of leases and rents from, real property located at 25 and 27 Pinckney Street, Boston, Massachusetts and guaranteed FSC's obligations under the FSC Guarantees. Auto Sales guaranteed FSC's obligations under the FSC Guarantees and executed pledge and control agreements for a securities account. General Trading guaranteed FSC's obligations under the FSC guarantees and executed pledge and control agreements for a securities account. Arlington Street Trust guaranteed FSC's obligations under the FSC Guarantees and granted Prudential a first priority mortgage on real property located at 131 Arlington Street, Boston, Massachusetts. Stuart Street pledged 100% of its membership interests in SW Boston. General Land guaranteed FSC's obligations under the FSC Guarantees and granted Prudential a first priority mortgage on real property located at 109 and 121-127 Arlington Street, Boston, Massachusetts

Except for the Payment Guaranty executed by FSC, the various guarantees executed by the Affiliated Debtors define "Guaranteed Obligations" in paragraph 1, captioned "Defined Terms," as follows:

---

[10] The LD Payment is a reference to "Starwood Liquidated Damages," which is defined in the Construction Loan Agreement at paragraph 4.1.4.

> "Guaranteed obligations" shall mean (a) the full, complete and prompt payment and performance of the "Guaranteed Obligations" under and as defined in each of the FSC Guaranties, (b) the full, complete and prompt payment by FSC of any and all Mandatory Principal Payments under the Loan, (c) the full, complete and prompt payment by FSC of any Operating Deficits, (d) the full, complete and prompt reimbursement by FSC to Lender of the LD Payments to the extent paid by Lender, (e) the full, complete and punctual observance, performance, and satisfaction by FSC of all of the obligations, duties, and agreements of Borrower under the Loan Agreement and the other Loan Documents relating to the Final Completion of the Improvements in accordance with the terms and conditions of the Loan Agreement,  . . .(f) the full, complete and prompt payment by FSC of all amounts required to be deposited or paid by Borrower to keep the Loan In-Balance at all times, (g) the full, complete and prompt payment by FSC of any and all Losses arising out of any Recourse Event other than the Recourse Events identified in subparagraphs (a), (b), (c) and (d) of the definition of Recourse Events . . .,(h) the full, complete and prompt payment by FSC of all obligations of Borrower under the Loan Documents in the event of a Recourse Event . . ., (i) the full, complete and prompt payment of all amounts due or arising out of the obligations, duties and agreements referred to this definition, [sic] including, without limitation, Enforcement Costs as set forth in <u>Section 3(g)</u> below.

(emphasis in original).  The definition of Guaranteed Obligations referenced the payment of Enforcement Costs as set forth in Section 3(g) of the guaranties, and in Section 2(g) of the FSC Payment Guaranty. That section of the guaranties set forth the following intentions:

> to indemnify, protect, hold harmless and defend Lender . . . from and against any and all Losses incurred by any of them arising out of or by reason of entering into this Guaranty or the consummation of the transactions contemplated by this Guaranty and to pay or reimburse Lender for the fees and disbursements of counsel reasonably incurred in connection with any investigation, litigation or other proceedings (whether or not Lender is a party thereto) arising out of or by reason of any of the aforesaid (collectively, **"Enforcement Costs"**).

(emphasis in original).  In summary, the Construction Loan Documents entitle Prudential

to seek or collect attorneys' fees from SW, as well as interest and late charges, and they entitle Prudential to seek such enforcement costs from the Affiliated Debtors who executed Guarantees of FSC's obligations.

### 2. Prudential Letter of Credit

Two of the Debtors' non-debtor affiliates, SE Berkeley Street, LLC ("SE Berkeley") and SE McClellan Highway, LLC ("SE McClellan"), are parties to a creditor agreement with Sovereign Bank.  Pursuant to their agreement, Sovereign Bank issued a letter of credit in favor of Prudential for approximately $17.3 million (the "Letter of Credit").  Shortly after the Debtors' filings, Prudential drew the full amount of the Letter of Credit and applied the funds to the principal balance due on the Construction Loan.

### 3. Subordination Agreement between Prudential and the City of Boston

The City has a secured claim in the amount of $10.5 million arising from a loan agreement dated December 9, 2009 between SW and the City.  At the time it executed its agreement with SW, the City entered into an Intercreditor and Subordination Agreement (the "Subordination Agreement") with Prudential pursuant to which it subordinated certain payment rights to those of Prudential.  The Intercreditor and Subordination Agreement also prohibited the City from receiving certain payments from the Debtors while the Debtors' obligations to Prudential remain outstanding, and required the City to surrender any payments received from the Debtors to Prudential.  The agreement also provided that the City must assign to Prudential, upon Prudential's request, its voting rights concerning the Debtors' Plan.

C. <u>Prudential Collateral Values</u>

Putting aside Prudential's failure to submit complete proof of its secured status, and the challenge to its liens raised in the Debtors' recently filed adversary proceeding, the Court observes that the positions of Prudential and the Debtors with respect to the value of the Prudential collateral and its concomitant status as an undersecured or oversecured creditor, have vacillated during the course of the Debtors' Chapter 11 cases in response to pending motions pertinent to the use of cash collateral, relief from the automatic stay, plan confirmation and the instant 506(b) Motion.

As of the Petition Date, the Debtors, in their schedules, stated, under the penalty of perjury, that the property owned by SW at 100 Stuart Street had a value of $223,287,214.10 *See* Schedule A-Real Property filed in the SW case (Docket Entry # 94).  In the parties' Joint Pretrial Memorandum filed in conjunction with the Lift Stay Motion, the parties stipulated that the value of all real estate securing Prudential's claim, other than 100 Stuart Street, and excluding marketable securities and cash, was $7,075,000 in the Fall of 2010.  *See* Joint Pretrial Memorandum (Docket Entry #338).  Therefore, as of the Petition Date, using Debtors' valuation of 100 Stuart Street and the agreed values set forth in the Joint Pretrial Memorandum, the aggregate value of the collateral securing Prudential's claim was approximately $231,000,000.00, whereas the amount owed Prudential was approximately $180,000,000.  Adding the value of marketable securities referenced by the Debtors in their Opposition to the Lift Stay of approximately $8.5 million, the collateral package far exceeded the amount of the debt. *See* Opposition by Debtors to Prudential's Lift Stay

-19-

Motion (Docket Entry # 227).[11] Thus, at the outset of this case, the Debtors maintained that

Prudential was oversecured, whereas they now claim that Prudential was not oversecured

until after closing of the sale of the Hotel on June 8, 2011.

Prudential claimed it was undersecured throughout much of the Debtors' cases.

In its Lift Stay Motion, dated August 3, 2010, Prudential asserted that the value of 100

Stuart Street was $141,000,000 in relation to its debt at that time which it asserted was

approximately $162.4 million. *See* Prudential's Lift Stay Motion (Docket Entry # 201).

On January 28, 2011, the Court, in denying Prudential's Lift Stay Motion, found that

the value of the Hotel and Residences was $153,600,000.00 and that the parties had

stipulated that the value of other collateral, including securities, was $14,754,000.00 (the

stipulated values of real property other than Stuart Street was $7,715,000 plus securities

of approximately $7 million). Thus, the Court determined that Prudential was oversecured

if its debt was compared to the total value of all its collateral.  Adding the stipulated value

of all collateral other than 100 Stuart Street with the value of 100 Stuart Street resulted in

a total collateral package of $168,354,000.00 to secure an obligation of $154,000,000.  When

SW's cash collateral was added, the Court concluded: "[g]iven the total value of the

collateral package, an equity cushion exists with respect to Prudential's claim in an amount

---

[11] As of June 23, 2011, the parties stipulated that the Arlington Street Trust held
property worth $1.85 million, General Land held property worth $2.4 million, Oliver
Street held property worth $2.18 million, that Auto Sales held securities worth $230,308,
General Trading held securities worth $1,399,242, and FSC held securities worth
$6,141,870 for a total of $14,201,420, plus cash in the amount of $354,049 held by SW for
a grand total of $14,555,468.

in excess of $19 million." In re SW Boston Hotel Venture, LLC, 449 B.R. at 176.

On March 28, 2011, SW filed the Sale Motion to which it attached a Purchase and Sale Agreement with Razorbacks Owner LLC, dated the same day, with a stated purchase price of $89.5 million.  The Court entered an order granting the Sale Motion on May 24, 2011, and, on June 8, 2011, Prudential received net proceeds of $83,322,017 from the sale of the Hotel and other assets.

As of May 31, 2011, the parties stipulated to the aggregate value of Prudential's collateral, other than the Hotel at $82,781,809.   If the offer price for the Hotel is added to that sum, the total collateral package could be valued at $172,172,809 ($15,891,744 + $66,781,065 + $89.5 million). *See* Stipulation and Amended Stipulation Regarding (I) Discovery Schedule in Connection with Hearings on June 27, 2011 and (II) for Purposes of Such Hearings, the Value of the Remaining Condominium Units (Docket Entries #667 and #716); and the Sale Motion (Docket Entry #495).

As of June 23, 2011, the aggregate value of Prudential's collateral was $78,327,688, which sum is determined by  adding the stipulated value of the remaining Residences ($63,772,219) and the stipulated value of all collateral other than 100 Stuart Street ($14,555,469).  As of August 12, 2011, the aggregate value of Prudential's collateral was $76,624,688, which sum is determined by subtracting from the last stipulated value for the remaining Residences the net proceeds of the sales of Residences in July 2011 ($63,772,219 - $1,676,000), and then adding to that  result  the last stipulated value of all collateral, other than 100 Stuart Street ($62,096,219 + $14,528,469).

### D. Prudential Payments

In addition to the Letter of Credit ($17.3 million) and the net proceeds from the sale

of the Hotel ($83,322,017 on June 8, 2011), the Debtors have reduced Prudential's secured

claim by payments of net proceeds from the sale of Residences.  Between April 28, 2010 and

November 3, 2010, the Debtors paid Prudential $9,153,883 in proceeds from the sales of

Condominiums.   Between November 4, 2010 and May 31, 2011, they paid Prudential

$15,775,673 in proceeds from the sales of  the Residences.  Between June 1, 2011 and June

23, 2011, they paid Prudential $3,320,000 in proceeds from the sales of Condominiums, plus

$83,322017 from the sale of the Hotel, resulting in a debt to Prudential of $55,834,959,

excluding interest, fees and charges. (Debtors' Exhibit 6).  According to Debtors' Status

Report filed on August 12, 2011, they paid Prudential  $1,676,000 in proceeds from the sales

of Residences in July and that, as of the date of the Report, they had paid Prudential

approximately $29.6 million in proceeds from the sales of Residences, and owe Prudential

between $52 and $53 million, exclusive of postpetition interest, fees and charges.

### E. Trial Testimony

At the hearing on the 506(b) Motion, Joanna Mulford ("Ms. Mulford"), a Vice

President of The Prudential Insurance Company of America, testified on behalf of

Prudential.  Her Declaration was introduced into evidence as her direct testimony, and she

was cross-examined by Debtors' counsel pursuant to an agreement of the partes.  Ms.

Mulford indicated that the principal amount of Prudential's loan had been  reduced from

$180.8 million to $163.5 million by application of $17.3 million attributable to the Letter of

Credit proceeds.  She also reported that the Debtors have paid Prudential approximately

$22.2 million from the sale of Residences.  She compared the amount due Prudential for

postpetition interest, as of April 25, 2011, prior to the sale of the Hotel in June of 2011, using

the non-default contract rate of interest and the default rate of interest.  Using the 9.5%

contract rate, Ms. Mulford calculated interest owed at  $16,209,512.78.  Using the 14.5%

default rate of interest, she calculated interest owed at $24,740,835.30.  Ms. Mulford,

however, did not explain how she actually computed those figures.

Ms. Mulford testified that she was responsible for the loan after it was originated

and that another group, "[o]n the portfolio side," actually originated the loan.  She also

testified that the rates of interest set forth in the Construction Loan Agreement were

predicated on similar loans in the market at the time of the loan's origination, "whether it

be a loan that we're originating or a loan that we're actually taking out on one of our

properties."  She added that she did not engage in any analysis with respect to the

anticipated costs, or losses, that Prudential might sustain as a result of a default.  Ms.

Mulford conceded that she did not engage in any analysis with respect to whether the

default rate of interest, which is 5% higher than the non-default contract rate, reasonably

anticipated Prudential's costs and expenses in the event of a default.  Indeed, she admitted

that she made no inquiries to determine on what basis they established the default rate of

interest.

On redirect examination, Ms. Mulford described PRISA as a private investment

fund, similar to a hedge fund.  She emphasized that interest rates in the Construction Loan

Agreement were similar to those in situations where Prudential is both a lender and a borrower.

## III.  POSITIONS OF THE PARTIES

### A. <u>Prudential</u>

Prudential seeks postpetition interest, fees and costs under 11 U.S.C. § 506(b) on the ground that it has an allowed, secured claim which exceeds the value of its collateral. Maintaining that it is an oversecured creditor entitled to postpetition interest and reasonable fees, costs and charges, Prudential seeks to recover postpetition interest from the date of the filing of the petition.  It relies upon the Lift Stay Memorandum in which this Court determined for purposes of 11 U.S.C. § 362(d)(1) that "[g]iven the total value of the collateral package, an equity cushion exists with respect to Prudential's claim in an amount in excess of $19 million." 449 B.R. at 176.  Prudential estimates that its collateral, consisting of the Hotel, the Residences, plus additional collateral in the form of cash, securities and real estate of the Affiliated Debtors, had a value of approximately $200,000,000 at the commencement of these cases when it was owed approximately $180,800,000.

Prudential further argues, however, that, for purposes of confirmation of the Debtors' plan, it is owed $90,432,714.  It asserts that its claim as of May 31, 2011 was $171,212,200 to which it adds both estimated additional fees and expenses of $750,000 using a Plan Effective Date of July 14, 2011 and estimated default interest of $1,792,531 from June 1, 2011 to July 14, 2011 [sic], and from which it subtracts the proceeds from the sale of the Hotel in the sum of $83,322,017.  Using a total collateral package valued at $73,327,688, it

states: "taking into account the value of the Prudential Collateral as of Confirmation, Prudential's secured claims as of Confirmation are equal to the value of the Prudential Collateral, or $78,300,688."[12] It also asserts that "*the parties agree that, as of the confirmation date, Prudential is oversecured*." (emphasis in original).[13]

Prudential argues that it has been an oversecured creditor of the Debtors in the aggregate and that it has been oversecured throughout the Debtors' Chapter 11 cases. It emphasizes that the Hotel sold for a sum well in excess of the value this Court determined in its Lift Stay Memorandum dated January 28, 2011.

In connection with the confirmation hearing, the Debtors and Prudential agreed that the value of the collateral held by Prudential as of the confirmation hearing was $14,555,469 in cash, securities and mortgages on properties owned by Arlington Street Trust, General Land and Oliver Street, and that the value of the remaining unsold Residences was $63,772,219, totaling $78,327,688. Prudential argues that it is entitled to the benefit of any

---

[12] Prudential mistakenly uses the sum of $78,300,688 in its Proposed Findings, the result of a transposed number with respect to the value of securities owned by Auto Sales. The parties stipulated to a value of $230,308. Prudential used a figure of $203,308, thereby unintentionally reducing the value of its collateral.

Additionally, in its proposed findings, it indicated that its prepetition claim was $182,892,659, reduced by $17.3 million, resulting in a claim of $165,592,659. There is no explanation for the $5.6 million dollar difference between its asserted claim as of May 31, 2011 and its claim at the outset of the Debtors' cases, i.e, the difference between $171,212,200 and $165,592,659.

[13] Prudential did not attempt to reconcile the inconsistency of its positions, namely that its claim of $90 million is secured by collateral worth $78.3 million and that it has been oversecured since the commencement of the case and at the time of the confirmation hearing.

increase in values during the bankruptcy proceeding through allowance of the 506(b) Motion.

As noted above, Prudential seeks default interest from the petition date, and, specifically, default interest in the sum of $1,792,531 from June 1, 2011 through July 14, 2011 (the conclusion of the confirmation hearing and the hearing on the 506(b) Motion). It also seeks estimated additional fees and expenses in the sum of $750,000. Prudential, however, did not submit an itemization of those fees and expenses, the Promissory Note or Mortgage, and the documentation in the form of Guarantees to support its entitlement to attorneys' fees raises a number of issues, including whether its claim to attorneys' fees is secured.

In sum, Prudential argues that it is entitled to the default rate of interest provided in the Construction Loan Agreement, adding that application of the default rate of interest is enforceable under state law. It asserts that the default rate of interest is within the range typically charged by commercial lenders, is not inequitable, and will not negatively affect the dividend to junior creditors.

B. The Debtors

The Debtors seek denial of Prudential's 506(b) Motion, except as to postpetition interest at the non-default rate of 9.5% per annum accruing beginning June 8, 2011, the date SW conveyed the proceeds from the sale of the Hotel and other assets pursuant to the Court's allowance of the Sale Motion on May 24, 2011. According to the Debtors, Prudential's loan balance was approximately $56 million at that time. They argue that

Prudential should only be allowed postpetition, preconfirmation interest at the rate of 9.5% per annum from June 8, 2011 to the Effective Date, while accounting for payments made after that date.

The Debtors maintain that they have paid Prudential $83,322,017 in net sale proceeds from the sale of the Hotel and related assets approved by the Court on May 24, 2011, as well as $17.3 million from the Letter of Credit and proceeds from the sales of Residences since the commencement of Debtor' cases and have reduced its claim on the petition date from $182,078,243[14] to $53,537,825 as of June 24, 2011, excluding postpetition interest.

The Debtors object to Prudential aggregating the value of all its collateral for purposes of its 506(b) Motion. They maintain that, on the petition date, Prudential was undersecured as to SW and to each Affiliated Debtor and remained so when this Court issued its Lift Stay Memorandum on January 28, 2011. The Debtors also argue that not only was Prudential undersecured as to SW until June 8, 2011, it is undersecured as to each Affiliated Debtor, adding that the determination, in the context of the Lift Stay Motion that Prudential was undersecured as to SW is res judicata on the issue.

The Debtors observe that Prudential has not submitted evidence with respect to the

---

[14] The Debtors' Exhibit 6 sets forth the above figure, beginning with a debt balance of $181,359,970 as of March 31, 2010. The Court notes that Prudential's witness, Marti P. Murray, in her Expert Report, indicated that Prudential held a prepetition claim in the sum of $182,892,659, calculated by adding prepetition accrued interest of $2,042,646 and prepetition fees and expenses of $46,827 to the balance of $180,803,186. The Court is unable to reconcile the $814,416 difference.

reasonableness of its fees and costs.  They also contend that Prudential should not be allowed the default rate of interest in the sum of 14.5% per annum because, in their view, that rate is an unreasonable penalty, particularly as allowance of postpetition, preconfirmation interest at the contract rate of 9.5% could add as much as $16,209,512.78 to the principal balance, if the Court were to allow interest from the petition date.

The Debtors assert that as of the petition date the amount owed to Prudential for principal and  interest was $182,078,243, and that at the time  of the hearings on the Lift Stay Motion, Prudential was owed $155,644,359, largely due to the payment of $17.3 million from the Letter of Credit.  In the context of the Lift Stay Motion, the Court determined that the value of the Hotel was $65,600,000.  In the context of the 506(b) Motion and  confirmation of the Debtors' Plan, the parties have stipulated that the value of the Residences was $63,772,219, although in November of 2010 at the time of the trial on the Lift Stay Motion, the value of the Residences was $82,556,736.

Although the Debtors sold the Hotel, they assert that the amount set forth in the Asset Purchase Agreement filed with the Sale Motion on March 28, 2011, should not be determinative of the Hotel's value because there were material risks associated with closing the sale, as well as hold backs and adjustments.  Prudential was paid $83,322,017 in net sale proceeds on June 8, 2011, the date the sale of the Hotel and other assets closed, reducing the balance of Prudential's loan to $55,834,959, exclusive of postpetition interest.  The Debtors maintain that as of the date of the confirmation hearing on June 24, 2011, Prudential was owed $53,537,825 excluding postpetition, preconfirmation interest and

-28-

costs.

The Debtors object to consideration of the value of Prudential's collateral in the
aggregate and assert that given the stipulated value of the collateral of each individual
Debtor, Prudential was undersecured until June 8, 2011, the date when the Hotel sale
closed and the stipulated value of the Residences was $66,069,053 with respect to SW and
is still undersecured with respect to remaining Debtors. They argue that Prudential cannot
aggregate the value of all of the Debtors' assets to establish an entitlement to postpetition
interest. Emphasizing that SW is the primary obligor and the Affiliated Debtors are
guarantors who have secured their guarantees with mortgages or other pledged assets, the
Debtors argue that Prudential was undersecured prior to the Hotel sale on June 8, 2011 and
should be bound by its earlier contention that it was undersecured. The Debtors also
maintain that Prudential was undersecured with respect to the Affiliated Debtors whose
assets on an individual basis were and are worth less than the total amount due to
Prudential.[15]

_____

[15] The Debtors utilize the following table:

| Affiliated Debtor | Collateral Value (6/23/11) | Source |
|---|---|---|
| General Trading | $1,399,242 | Trial Stipulation |
| Sawyer Corp. [FSC] | $6,141,870 | Trial Stipulation |
| Auto Sales | $230,308 | Trial Stipulation |
| General Land | $2,400,000 | Trial Stipulation |
| 131 Arlington | $1,850,000 | Trial Stipulation |
| 30-32 Oliver | $1,160,000 | Trial Stipulation |

The Debtors object to the 14.5% default rate of interest claimed by Prudential because it is five points above the non-default rate set forth in the Construction Loan Agreement and because Prudential failed to submit any "evidence that the default rate of interest was reasonably related to the anticipated costs and damages expected to be incurred by Prudential in the event that the Debtors defaulted under the Prudential Loan Documents," adding that it did not submit "any evidence that it has incurred $8.5 million in damages, the difference between Prudential's asserted claim for interest at the contract rate [i.e., $16,209,512.78] and its asserted claim for interest at the default rate [i.e., $24,740,835.30] as a result of any default under the Prudential Loan Documents."

Not only do the Debtors contend that the default interest rate is unreasonable, they contend that payment of default interest is inequitable because Prudential received enhancement of its collateral and received substantial proceeds from the sales of the Hotel and Residences during the pendency of the Chapter 11 cases. In short, they maintain that payment of default interest would be a windfall to Prudential, particularly as Prudential has opposed virtually every motion made by the Debtors, creating market uncertainty, adversely affecting sales and making their reorganization efforts more difficult and expensive. In the Debtors' view, Prudential's allowed secured claim always has been adequately protected, and the Debtors have reduced its claim substantially during the pending Chapter 11 cases. The Debtors emphasize that because Prudential has not

| 100 Stuart | $-0- | *See* Kravetz Affidavit ¶ 11 |

-30-

documented or itemized its fees and has not filed a fee application for attorneys' fees, it cannot obtain an award of fees.

   C.  City of Boston

The City opposes Prudential's request for accrual and payment of interest under U.S.C. § 506(b) to the extent that Prudential seeks interest prior to the date of the closing of the sale of the Hotel.  Moreover, the City objects to payment of any interest at the default rate, arguing that the default rate will penalize the City and severely compromise its ability to recover money lent to SW under a program to stimulate local real estate development. Noting that it pledged its present and future affordable housing and economic development revenue to fund the loan it made, it states that "[i]f Prudential is permitted to recover postpetition interest at the default rate of 14.5%, the City's standing to recover its affordable housing and economic development money will be severely compromised," adding that it would be particularly inequitable to allow interest at the default rate where the City's funds have been used and continue to be used to increase the value of Prudential's collateral.

**IV.  DISCUSSION**

   A.  Entitlement to Postpetition Interest

       1. Applicable Law

Section 502(b) of the Bankruptcy Code sets forth the general rule applicable to bankruptcy cases that, subject to certain exceptions, "the court shall determine the amount of [a] claim . . . as of the date of the filing of the petition, and shall allow such claim in such

amount , except to the extent that . . . such claim is for unmatured interest." 11 U.S.C. §

502(b)(2). The rule, as noted, is subject to an important exception applicable to secured

creditors. Section 506(b) provides:

> To the extent that an allowed secured claim is secured by property the value
> of which, after any recovery under subsection (c) of this section, is greater
> than the amount of such claim, there shall be allowed to the holder of such
> claim, interest on such claim, and any reasonable fees, costs, or charges
> provided for under the agreement or State statute under which such claim
> arose.

11 U.S.C. § 506(b). The United States Supreme Court has made clear that an oversecured

creditor is unqualifiedly entitled to postpetition interest on its oversecured claim. United

States v. Ron Pair Enters., Inc., 489 U.S. 235 (1989).[16] Section 506(b) applies only from the

petition date through the date of confirmation of any plan. *See* Rake v. Wade, 508 U.S. 464,

468 (1993), *superseded by statute on other grounds*, ("It is generally recognized that the interest

---

[16] The Court stated:

> The relevant phrase in § 506(b) is: "[T]here shall be allowed to the holder
> of such claim, interest on such claim, and any reasonable fees, costs, or
> charges provided for under the agreement under which such claim arose."
> "Such claim" refers to an oversecured claim. The natural reading of the
> phrase entitles the holder of an oversecured claim to postpetition interest
> and, in addition, gives one having a secured claim created pursuant to an
> agreement the right to reasonable fees, costs, and charges provided for in
> that agreement. Recovery of postpetition interest is unqualified. Recovery
> of fees, costs, and charges, however, is allowed only if they are reasonable
> and provided for in the agreement under which the claim arose.
> Therefore, in the absence of an agreement, postpetition interest is the only
> added recovery available.

489 U.S. at 241.

allowed by § 506(b) will accrue until payment of the secured claim or until the effective

date of the plan.").   It is the burden of a secured creditor who claims entitlement to post-

petition interest to prove, by a preponderance of the evidence, that it is oversecured "to

what extent, and for what period of time."   In re Jack Kline Co., Inc., 440 B.R. 712, 732

(Bankrs. S.D. Tex. 2010); In re Grabill Corp., 121 B.R. 983, 992 (Bankr. N.D. Ill. 1990)

(citations omitted).

    The starting point for determining whether a secured creditor is entitled to interest

is § 506(a), which governs the determination of secured status.   Section 506(a) provides:

in pertinent part:

> (a)(1) An allowed claim of a creditor secured by a lien on property in which
> the estate has an interest . . .  is a secured claim to the extent of the value of
> such creditor's interest in the estate's interest in such property . . . is an
> unsecured claim to the extent that the value of such creditor's interest . . . is
> less than the amount of such allowed claim. *Such value shall be determined in
> light of the purpose of the valuation and of the proposed disposition or use of such
> property, and in conjunction with any hearing on such disposition or use or on a
> plan affecting such creditor's interest.*

11 U.S.C. § 506(a) (emphasis supplied).

    A creditor is considered to be oversecured when the value of its collateral exceeds

the amount of the creditor's allowed claim.  *See* United States. v. Ron Pair Enters., Inc., 489

U.S. at 239.   Undersecured creditors are not entitled to accrual or payment of postpetition

interest.  *See* United Savs. Ass'n of Texas v. Timbers of Inwood Forest Assocs., Ltd., 484

U.S. 365 (1988).  In Timbers, the Court stated:

> Even more important for our purposes than § 506's use of terminology is its
> substantive effect of denying undersecured creditors postpetition interest on

their claims-just as it denies *over* secured creditors postpetition interest to the extent that such interest, when added to the principal amount of the claim, will exceed the value of the collateral.  . . . Since this provision permits postpetition interest to be paid only out of the "security cushion," the undersecured creditor, who has no such cushion, falls within the general rule disallowing postpetition interest. *See* 11 U.S.C. § 502(b)(2). If the Code had meant to give the undersecured creditor, who is thus denied interest on his *claim,* interest on the value of his *collateral,* surely this is where that disposition would have been set forth, and not obscured within the "adequate protection" provision of § 362(d)(1). Instead of the intricate phraseology set forth above, § 506(b) would simply have said that the secured creditor is entitled to interest "on his allowed claim, or on the value of the property securing his allowed claim, whichever is lesser."

Id. at 372-73 (emphasis in original).

Section 506(a) further provides that the secured status of a creditor's claim must be determined in light of the purpose of the valuation and the proposed disposition or use of the property that is collateral.  *See* In re Winthrop Old Farm Nurseries, Inc. v. New Bedford Inst. for Savs. (In re Winthrop Old Farm Nurseries, Inc.), 50 F. 3d 72, 75-76 (1st Cir. 1995) ("a court remains faithful to the dictates of § 506(a) by valuing the creditor's interest in the collateral in light of the proposed post-bankruptcy reality: no foreclosure sale and economic benefit for the debtor derived from the collateral equal to or greater than its fair market value. Our approach allows the bankruptcy court, using its informed discretion and applying historic principles of equity, to adopt in each case the valuation method that is fairest given the prevailing circumstances.").  Consistent with the conclusions of the First Circuit in Winthrop Old Farm, and contrary to the Debtors' arguments, a finding that collateral has a certain value at the inception of a case is not binding on the court when it is conducting a valuation for another purpose later in the case.  *See* Baybank-Middlesex v.

Ralar Distribs., Inc., 69 F.3d 1200, 1203 (1st Cir. 1995); In re Richardson, 97 B.R. 161, 162

(Bankr. W.D.N.Y. 1989).

In order to determine secured status, the amount due to the secured creditor is

compared to the value of its collateral. *See* Assocs. Commercial Corp. v. Rash, 520 U.S. 953,

961 (1997). Moreover, the application of § 506(a) is a multi-step process.[17] First, the court

analyzes the estate's interest in the collateral. Next, the court must determine the interest

of the secured creditor in the estate's property. *See* Fin. Security Assurance Inc. v. T-H

Orleans Ltd. P'ship (Matter of T-H Orleans Ltd. P'ship), 116 F. 3d 790, 797 (5th Cir. 1997).

The reference in the statute  to "the creditor's interest in property" is to the creditor's

security interest without taking into account the secured creditor's right to possession of

the collateral on default. United Savs. Ass'n of Texas v. Timbers of Inwood Forest Assocs.,

Ltd., 484 U.S. at 372. Third,  the court must determine the value of the secured creditor's

---

[17] According to the Supreme Court,

> To separate the secured from the unsecured portion of a claim, a court
> must compare the creditor's claim to the value of "such property," i.e., the
> collateral. That comparison is sometimes complicated. A debtor may own
> only a part interest in the property pledged as collateral, in which case the
> court will be required to ascertain the "estate's interest" in the collateral.
> Or, a creditor may hold a junior or subordinate lien, which would require
> the court to ascertain the creditor's interest in the collateral. The § 506(a)
> phrase referring to the "creditor's interest in the estate's interest in such
> property" thus recognizes that a court may encounter, and in such
> instances must evaluate, limited or partial interests in collateral. The full
> first sentence of § 506(a), in short, tells a court what it must evaluate, but it
> does not say more; it is not enlightening on how to value collateral.

520 U.S. at 961.

collateral or setoff rights.  *See* McDonald v. Master Fin., Inc. (In re McDonald), 205 F.3d 606,

609 (3d Cir. 2000), *cert. denied,* 531 U.S. 822 (2000).

For the purpose of making the comparison of the debt owed to the secured creditor

and the value of collateral, all of the collateral pledged by affiliated debtors who have

commenced Chapter 11 cases is considered in determining whether a creditor has a fully

secured claim. *See* In re Urban Communicators PCS L.P., 379 B.R. 232, 244 (Bankr. S.D. N.Y.

2008), *rev'd on other grounds*,  394 B.R. 325 (S.D. N.Y. 2008);[18] In re Fiberglass Indus., Inc., 74

B.R. 738, 740 (Bankr. N.D.N.Y. 1987) (aggregating collateral of debtors who operated as an

"integrated entity," but excluding collateral pledge by non-debtors). *But see* In re Toy King

Distribs., Inc., 256 B.R. 1, 187 (Bankr. M.D. Fla. 2001) (observing that although the collateral

subject to the creditor's loan included the property of the individual guarantors and

property of the debtor, only the debtor's property is relevant to the court's determination

of the secured status of the creditor's claim against the debtor under § 506, noting that the

debtor has no legal or beneficial interest in cash, cash equivalents or real estate collateral

pledged by individual, non-debtor guarantors to secure the loan).

The provisions of both § 506(a) and (b)  raise temporal issues.  The timing of the

comparison between the amount of debt and the value of the collateral required by § 506(a)

and (b) is crucial in determining the allowed amount of the secured claim and whether the

---

[18] The bankruptcy court did not expressly state that it was considering a total
collateral package available to the secured creditor. Nevertheless, the court valued all
the collateral of the affiliated debtors in determining that the lender, Gabriel, was
oversecured.

secured creditor is oversecured.   The bankruptcy court must determine the appropriate

date for assessing the value of collateral, as values may decrease, increase or fluctuate over

time during the pendency of the case, as evidenced by what has transpired in the Debtors'

cases where both the amount of debt and the value of the collateral have declined due to

payments to Prudential and sales of the Hotel and Residences, respectively. Thus, the

application of  § 506(a) and (b) often presents difficulties in the context of determining a

secured creditor's entitlement to postpetition interest during the pendency of the  Chapter

11 case (often referred to as "pendency interest") where a debtor has made significant

payments to the secured creditor and substantially paid down the balance owed to the

creditor during the case due to sales of assets or the appreciation of the value of the secured

creditor's collateral during the case.

The first issue that must be determined is when should a valuation occur for the

purpose of determining a secured creditor's entitlement to postpetition interest and fees.

Although in Chapter 7 and 13 cases, § 506 (a) mandates that the amount of a claim secured

by a security interest in personal property be determined as of the petition date, *see* 11

U.S.C. § 506(a)(2), the Bankruptcy Code does not reference any particular date for such

determinations in Chapter 11 cases.  The timing inquiry under § 506(b) in a Chapter 11 case

is to be contrasted with the determination of the amount of a secured claim for the

purposes of determining the propriety of a proposed treatment of a secured party's claim

in a plan of reorganization under 11 U.S.C. § 1129(b)(2)(A)(i).  Under the latter provision

relating to approval of a cramdown plan, courts agree that the appropriate time for

valuation of a secured claim is the date of the hearing on confirmation of a plan.  *See* <u>In re</u>

<u>Blake</u>, No. 07-12445-FJB, 2009 WL 4349787 at *5 (Bankr. D. Mass.  Nov. 30, 2009); <u>In re</u>

<u>Landing Assocs., Ltd.</u>, 122 B.R. 288, 293 (Bankr. W.D. Tex. 1990) (for plan confirmation, the

date of determination of secured claim is date of confirmation hearing).  The <u>Blake</u> court

reasoned that because § 506(b) contemplates postpetition interest and charges, the date of

the filing is not the appropriate date for quantification of the secured portion of a secured

claim for plan treatment purposes.   Moreover, § 506(b) does not apply to a secured

creditor's entitlement to postconfirmation interest which is governed by § 1129 and the

guidelines articulated by the Supreme Court in <u>Till v SCS Credit Corp.</u>, 541 U.S. 465 (2004).

There is considerable disagreement among courts on the issue of what is the

appropriate date for determining entitlement to postpetition, preconfirmation interest and

charges under § 506(b).  Courts have adopted a variety of approaches.  As noted by the

Court in <u>Toy King</u>,

> Some courts have held that a creditor's secured claim is always determined
> on a specific date. *See, e.g.*, <u>Community Bank of Homestead v. Torcise (In re</u>
> <u>Torcise)</u>, 187 B.R. 18, 23 (S.D. Fla.1995) ("The amount by which a claim is
> oversecured must be determined as of the petition date."), *rev'd on other*
> *grounds*, 162 F.3d 1084, 1087 (11th Cir.1998); <u>NCNB Texas National Bank v.</u>
> <u>Hulen Park Place, Ltd. (In re Hulen Park Place, Ltd.)</u>, 130 B.R. 39, 43 (N.D.
> Tex. 1991) (issue of whether creditor is oversecured is determined as of the
> petition date); <u>Landing Associates</u>, 122 B.R. at 293 (measurement date is
> confirmation date).

<u>Toy King</u>, 256 B.R. at 190.  A number of courts fix the secured creditor's interest in property

of the estate, namely the amount of its secured claim, at the petition date.  *See, e.g.*,

<u>Empresas Inabon, Inc.v. Hotay (In re Empresas Inabon, Inc.)</u>, 358 B.R. 487, 526 (Bankr. D.

P.R. 2006) ("A secured claim is 'oversecured' to the extent that the value of the creditor's interest in the estate's interest in property is greater than the amount of the creditor's allowed prepetition claim."); In re Kalian, 169 B.R. 503 (Bankr. D. R. I. 1994) (claim of undersecured creditor in Chapter 11 case does not increase by virtue of rental income); In re Reddington/Sunarrow Ltd. P'ship, 119 B.R. 809 (Bankr. D. N.M. 1990) (secured claim was fixed as of petition date for purpose of determining adequate protection). Those courts rely on the Supreme Court's ruling in Timbers that an undersecured creditor whose collateral is not declining during the pendency of a bankruptcy case is not entitled to postpetition interest. "Any portion of postpetition interest and allowed fees, costs or charges that exceed the oversecured amount would not be allowed as part of the secured claim under § 506(b) but, rather, excess postpetition fees, costs and charges constitute an unsecured claim against the estate, and excess postpetition interest is subject to disallowance under § 502(b)(2)." See In re Empresas Inabon, Inc., 358 B.R. at 526 (citing Baybank-Middlesex v. Ralar Distrbs., Inc., 69 F.3d 1200, 1202 (1st Cir. 1995). Accordingly, under this approach if a secured claim is not fully secured on the petition date, the secured creditor will not be entitled to postpeption interest or fees under § 506(b).

The single valuation approach has been criticized as creating an incentive on the part of debtors to delay the case as long as possible. See In re Vermont Inv. Ltd. P'ship, 142 B.R. 571, 574 (Bankr. D. D. C. 1992). Other courts have commented that the single valuation approach is inconsistent with the Supreme Court's statement in Dewsnup that any increase in valuation during bankruptcy should accrue to the benefit of the mortgagee, not the

debtor or unsecured creditors. *See, e.g.*, <u>In re Union Meeting Partners</u>, 178 B.R. 664, 675

(Bankr. E.D. Pa. 1995) (citing <u>Dewsnup</u>, 502 U.S. at 417).  The most compelling criticism of

the single valuation, filing date approach is that it is contradictory to the express language

in § 506(a) and its legislative history  that valuations under§ 506 are to be made in light of

the purpose of the valuation and that valuations are not binding in later proceedings.

    Utilizing another approach, referred to as the "dual valuation" approach,  several

courts have determined secured status twice, once at the petition date and once at the

hearing on confirmation of a plan of reorganization.  *See, e.g.*, <u>In re Addison Props. Ltd.</u>

<u>P'ship</u>, 185 B.R. 766, 784 (Bankr. N.D. Ill. 1995); <u>In re Kennedy</u>, 177 B.R. 967 (Bankr. S.D.

Ala. 1995).  Those courts recognize that it is necessary to determine secured status through

valuation at the outset for adequate protection purposes, and at confirmation for the

purpose of determining treatment under the plan and reducing the amount of the secured

claim by any payments made by the debtor.  "If the collateral package at the time of

confirmation exceeds the amount of the creditor's total prepetition claim, the creditor is

entitled to interest and costs under Section 506(b) to the extent of the surplus." <u>In re</u>

<u>Addison Props. Ltd. P'ship</u>, 185 B.R at 784.  Under the dual valuation approach an

oversecured creditor's claim for postpetition interest, which is determined near the

conclusion of the case, "must be denied to the extent that, together with the principal

amount of the claim, it exceeds the value of the collateral . . . [o]r put another way, the

oversecured creditor's allowed secured claim for postpetition interest is limited to the

amount that a creditor was oversecured at the time of filing." *See* <u>Orix Credit Alliance, Inc.</u>

v. Delta Resources, Inc. ( In re Delta Resources, Inc.), 54 F. 3d 722, 729 (11th Cir. 1995), *cert.*

*denied,* 516 U.S. 980 (1995).   The Eleventh Circuit in Delta Resources, recognized that it is

not possible to determine postpetition interest until a time near the conclusion of the

Chapter 11 case.  Id.

Where collateral is sold during the pendency of a Chapter 11 case, a number of

courts use the date of approval of a sale to determine when a claim is secured for § 506(b)

purposes.  *See, e.g.,* Ford Motor Credit Co. v. Dobbins, 35 F. 3d 860, 870 (4th Cir. 1994).  *See*

*also* Takisaki v. Alpine Group, Inc. (In re Alpine Group, Inc.), 151 B.R. 931, 935-36 (B.A.P.

9th Cir. 1993).  The Fourth Circuit in Dobbins, explained the approach, stating:

> When determining if and to what extent the value of secured collateral
> exceeds the value of a secured creditor's claim for purposes of § 506(b), if the
> collateral has been sold, should the value of the collateral be the sale price or,
> alternatively, some other valuation made earlier in the Chapter 11
> proceedings? We hold that when secured collateral has been sold, so long as
> the sale price is fair and is the result of an arm's-length transaction, courts
> should use the sale price, not some earlier hypothetical valuation, to
> determine whether a creditor is oversecured and thus entitled to postpetition
> interest under § 506(b).").

Dobbins, 35 F.3d at 870.   Courts using the price obtained at an arm's-length sale to

determine the amount of the allowed secured claim conclude that, if the secured party is

undersecured at the time of the sale,  it is not entitled to postpetition interest, even if it were

oversecured at the time the case was commenced.   They reason that payment of

postpetition interest under those circumstances would be unfair to unsecured creditors.

*See* In re Toy King Distribs., Inc., 256 B.R. at 191.

The majority of courts utilize more flexible approaches than the courts in the

decisions referenced above in determining secured status. Based upon the language of §

506(b) they look to the circumstances of the case and purpose of the valuation. Toy King,

at 190.    Adopting a "continuous valuation approach," a number of courts determine

secured status at various times throughout the case, causing a fluctuation depending on

payments or changing values. *See* In re Addison Props. Ltd. P'ship, 185 B.R. at 776 (citing

In re Union Meeting Partners, 178 B.R. 664 (Bankr. E.D. Pa. 1995); In re Columbia Office

Assocs. Ltd P'ship, 175 B.R. 199 (Bankr. D. Md. 1994)).    Other courts, the majority, have

endorsed a similar, case by case approach, but refuse to pick a specific point in time for the

debt/value comparison, focusing instead on the matter before the court. *See, e.g.,* In re T-H

New Orleans Ltd. P'ship, 116 F.3d at 798; In re Southeastern Steel Co., No. 00-09225-W,

2001 WL 1804303 at *2 (Bankr D. S.C. Dec. 7, 2001).    Those courts reason that because of the

various issues posed by a request for a determination of a secured claim, it is inappropriate

to limit valuation to a particular point in time. Thus, for the purpose of determining the

amount of adequate protection to which a secured creditor may be entitled, it may be

appropriate to value collateral as of the petition date, although for the purposes of

determining the amount of the secured claim for treatment under a plan of reorganization,

the appropriate time for valuation may be the hearing on confirmation. *See* In re Delta

Resources, Inc., 54 F.3d at 729-30.

The leading decision in which the court adopted the flexible approach is T-H New

Orleans Ltd. P'ship, 116 F.3d at 798.    In a thorough and well-reasoned opinion, the court

of appeals rejected the single valuation approach, and stated the following:

We decline to follow such a narrow path. Therefore, we conclude that for
purposes of determining whether a creditor is entitled to accrue interest
under § 506(b) in the circumstance where the collateral's value is increasing
and/or the creditor's allowed claim has been or is being reduced by cash
collateral payments, such that at some point in time prior to confirmation of
the debtor's plan the creditor may become oversecured, valuation of the
collateral and the creditor's claim should be flexible and not limited to a
single point in time, such as the petition date or confirmation date. We
further hold that, notwithstanding the bankruptcy court's determination of
a creditor's secured status as of the petition date (if such a finding is made),
the party who contends that there is a dispute as to whether a creditor is
entitled to interest under § 506(b) must motion the bankruptcy court to make
such a determination. The creditor though bears the ultimate burden to
prove by a preponderance of evidence its entitlement to postpetition interest,
that is, that its claim was oversecured, to what extent, and for what period of
time. . . .

A flexible approach recognizes the fact that a creditor's allowed claim, which
is being reduced over time, may become entitled to accrue postpetition
interest, and that under the plain language of § 506(b) there is nothing
limiting that right. . . . A flexible approach also recognizes that any increase
over the judicially determined valuation during bankruptcy rightly accrues
to the benefit of the creditor, and not to the debtor. . . .

Id. (citations omitted).

In T-H New Orleans, the Fifth Circuit took specific note of the change in the secured

party's status during the pendency of the case as the secured creditor's claim was being

reduced by payments made postpetition, the debtor's hotel was appreciating in value from

the petition date to the confirmation hearing, and the creditor's claim went from being

undersecured to oversecured. The bankruptcy court made a factual finding, which the

United States Court of Appeals for the Fifth Circuit determined was supported by the

evidence, as to the particular point in time when the creditor became oversecured. With

respect to the accrual of postpetition interest and the extent to which the secured creditor

-43-

was entitled to such interest, the Fifth Circuit ruled:

> The measuring date on which the status of a creditor's collateral and claim
> are compared is determinative of a creditor's right to accrue interest under
> § 506(b). Thus, a secured creditor's entitlement to accrue interest under §
> 506(b) matures at that point in time where the creditor's claim becomes
> oversecured. However, as Timbers dictates, accrued interest under § 506(b)
> is not paid to an oversecured creditor until the plan's confirmation or its
> effective date, whichever is later. United Sav. Ass'n. of Texas v. Timbers of
> Inwood Forest Assoc., Ltd. (In re Timbers of Inwood Forest Assoc., Ltd.), 793
> F.2d 1380, 1381, 1407 (5th Cir.1986), on reh'g, 808 F.2d 363 (5th Cir.1987 (en
> banc court reinstating panel opinion)), aff'd, 484 U.S. 365, 108 S.Ct. 626, 98
> L.Ed.2d 740 (1988).

116 F.3d at 799.  Finally, the Fifth Circuit rejected the secured creditor's argument that it

was entitled to the postpetition interest that would have accrued during the entire

postpetition, preconfirmation period on its claim since the petition date.  Id. The court

ruled that the amount of interest allowed under § 506(b), as explicated by the Supreme

Court in Timbers, is limited to the amount of interest which, when added to the allowed

claim, will not exceed the value of the collateral.  In other words, an oversecured creditor's

claim may include interest up to the value of the collateral.  Id.

Following the reasoning of the Fifth Circuit in T-H New Orleans, the United States

Bankruptcy Court for the Southern District of New York in In re Urban Communicators

PCS, Ltd. P'ship., 379 B.R. 232 (Bankr. S.D.N.Y. 2008), aff'd in part, rev'd in part on other

grounds, 394 B.R. 325 (S.D.N.Y. 2008), considered whether  a secured creditor was entitled

to § 506(b) pendency interest where its secured claim was oversecured on the petition date,

became undersecured thereafter due to depreciation during the case, and finally  became

oversecured again due to a sale of the collateral for a price sufficient to pay the secured

claim in full.  Adopting the flexible approach to fixing the date for determining a secured

claim for § 506(b) purposes, the court was persuaded that, where a sale of collateral has

occurred, the sale price is the value of the collateral.  The court determined that despite the

temporary decrease in value, the ultimate increase in collateral value entitled the secured

creditor to earn postpetition interest on its oversecured claim.  379 B.R. at 245.  The court

reasoned:

> This Court agrees that bankruptcy courts have flexibility in determining
> entitlements to post-petition interest, including in situations like this one
> where the entitlements turn on determinations as to collateral value.
> Recognition of that flexibility is, after all, consistent with attention to the
> needs and concerns of junior creditors, and, more significantly, language in
> section 506(a) that bankruptcy courts engage in any analysis of collateral
> value "in light of the purpose of the valuation and the proposed disposition
> or use of such property." The statutory guidance appearing as part of section
> 506(a) is the antithesis of a hard-and-fast rule, and instead embodies a more
> functional approach. But acknowledging, as this Court does, that a
> bankruptcy court has flexibility in making a collateral valuation decision
> does not mean that the Court should disregard the best evidence of collateral
> value—what the collateral actually fetched. Rather, that flexibility should
> permit this Court's resort to the best available evidence of collateral value
> except where the circumstances dictate a different approach. And the Court
> must also note the context in which the Fifth Circuit in T–H New Orleans
> made the observations upon which the Debtors rely. This flexible approach,
> the Fifth Circuit noted, ensures that "any increase over the judicially
> determined valuation during the bankruptcy rightly accrues to the benefit of
> the creditor, and not to the debtor."

Id. at 243 (footnote omitted).  The court found that the creditor was entitled to pendency

interest from the petition date based upon its determination that the creditor was

oversecured as of the date of the sale of collateral, which it viewed as conclusive on the

issue of valuation. Id. at 244.

Although the bankruptcy court's decision was reversed in part based upon its ruling with respect to its computation of the default interest rate, the court's decision was affirmed with respect to that part of its decision relating to the time for determining the creditor's secured status. The district court determined that, although there was a substantial period of time during the Chapter 11 case in which the secured creditor's collateral was worth less than its claim, based upon the sale price obtained for the collateral in good faith and at arm's length, the secured creditor had an oversecured claim and was entitled to receive postpetition interest. *See* Urban Communicators PCS Ltd. P'ship v. Gabriel Capital, L.P., 394 B.R. 325, 336-37 (S.D.N.Y. 2008).

The decision of the the United States Court of Appeals for the First Circuit in Baybank-Middlesex v. Ralar Distribs., Inc., 69 F. 3d 1200 (1st Cir. 1995), does not compel this Court to accept the argument made by the Debtors that this Court's prior finding with respect to collateral values and its ruling that Prudential was undersecured in the context of the Debtors' request to use cash collateral and adequate protection is binding in a later dispute. In Ralar Distribs., Inc., the secured creditor did not argue that collateral valuations made at an adequate protection hearing had no binding effect in the context of a valuation made for another purpose at a later time. The First Circuit refused to consider the valuation issue resulting in a change in values and payments as not squarely presented by the secured creditor. 69 F.3d at 1203 n. 5.

As referenced above, the creditor bears the burden of proving, by a preponderance of the evidence, that its claim is oversecured. *See* In re Jack Kline Co., Inc., 440 B.R. at 712.

In short, it has the ultimate burden of proof of showing entitlement to postpetition interest and fees, including "proving a referenced agreement with the debtor or a state statute which allows the over-secured creditor to collect post-petition attorneys' fees." Id. at 732-33 (footnote omitted).


2. Analysis

This Court adopts the view espoused by the majority of courts, in particular the decisions of the courts in T-H New Orleans and  Urban Communicators, which have adopted the flexible approach as to the timing of the determination of secured status.  This Court rejects the single valuation approach as unfair to the secured creditor and inconsistent with the plain language of § 506(a) and the Supreme Court's directives in Timbers and Dewsnup that the debtor should not reap the benefit of postpetition appreciation.  The flexible approach has the advantage of fairness, in that it does not favor debtors over secured creditors or vice-versa.  Moreover, the flexible approach is faithful to the statute's language and history that determinations of value are to be performed in light of their purpose and the disposition of collateral.

Applying  the principles set forth in decisions adopting the majority view  to the facts of the present case, there are several options for the choice of dates that the Court could use to fix the secured status of Prudential's claim: 1)  the petition date; 2) the date the Court determined Prudential's Lift Stay Motion, namely January 28, 2011; 3) the date that SW signed the Purchase and Sale Agreement with Razorbacks Owner LLC  and filed its

Sale Motion, namely March 28, 2011; 4) the date the Court granted the Sale Motion, namely

May 24, 2011; 5) the date the sale to Razorbacks Owner LLC closed, namely June 8, 2011

or 6) the date of the confirmation hearing.  Prudential argues that it is entitled to

postpetition interest from the petition date, but it did not establish that it was a fully

secured creditor at that time.  Indeed, in litigating the Lift Stay Motion, it maintained that

it was not fully secured.

    The Court finds that June 8, 2011, the date of the closing of the sale, is the

appropriate time for fixing Prudential's oversecured status.  On that date, it was

unequivocally established and beyond dispute that Prudential was an oversecured

creditor.  Prudential did not submit evidence of oversecured status at the commencement

of the Debtors' cases, and there was no evidence substantiating the values utilized by the

Debtors in their Schedules of Assets.  The Court's decision with respect to the Lift Stay

Motion was based upon expert testimony, not the operation of the market place in which

a willing seller and willing buyer agreed to a purchase price.  The filing of the Sale Motion

and the Purchase and Sale Agreement with Razorbacks Owner LLC setting forth a sale

price of $89.5 million on March 28, 2011 provided strong evidence that the appraised values

ascribed to the Hotel by the expert appraisers engaged by the parties were conservative

and that Prudential was oversecured by the assets of SW alone.  Nevertheless, as the

Debtors and the City argue, there were a variety of contingencies associated with the sale

to Razorbacks Owner LLC which could have derailed the sale even after the Court

approved the Sale Motion on May 24, 2011.  Accordingly, the Court adopts the flexible

-48-

approach and shall utilize the price obtained at an arm's length sale of the Debtors' Hotel

as the best indicator of value for purposes of determining secured status, in conjunction

with the stipulated value of the remaining Residences and other collateral.  *See* Urban

Communicators PCS Ltd. P'ship v. Gabriel Capital, L.P., 394 B.R. at 337; and Debtors'

Exhibit 6.[19]  Although in Urban Communicators, the secured creditor was oversecured at

the inception of the case, this Court finds that Prudential failed to submit sufficient

evidence to warrant the conclusion that it was oversecured in April of 2010.

    As noted, subsequent events, including the Sale of the Hotel, which brought a price

far in excess of the values ascribed to it by expert witnesses engaged by Prudential and the

Debtors, and the ongoing sales of Residences, establish Prudential's oversecured status as

of June 8, 2011.  In view of the evidence and the decisions recognizing that the actual sale

price is the best indicator of value, the Court finds that Prudential is entitled to postpetition

interest during the pendency of this case, commencing on June 8, 2011.

    The Court unequivocally rejects the argument made by the Debtors that each

Affiliated Debtor's assets and liabilities, including the debt owed to Prudential, must be

compared on a piecemeal basis for the purpose of determining whether Prudential has a

fully secured claim, particularly in view of the provisions of its Plan.

---

[19] As of March 18, 2011, the Debtors calculated that they owed Prudential approximately $149.3 million; on March 30, 2011 that amount had been reduced to $148.3 million  The value of the Residences were agreed to be approximately $76.2 million on March 18th, and $75.2 million on March 30th, respectively.  When the value of the cash, securities and real estate of the Affiliated Debtors (approximately $78 million)  is added to the value of Residences, it is evident that Prudential was oversecured.

"For purposes of determining the value of [a creditor's] security . . . under Code §

506(a), . . . the Court is solely concerned with property in which the debtors have an

interest." In re Fiberglass Indus., Inc., 74 B.R. 738, 740 (Bankr. N.D.N.Y. 1987) (aggregating

collateral of debtors who operated as an "integrated entity," but excluding collateral pledge

by non-debtors). This follows because § 506(a) refers to "a lien on property in which the

estate has an interest." *See* Assocs. Commercial Corp. v. Rash, 520 U.S. at 961. Thus, the

determination of Prudential's status as an oversecured (or undersecured) creditor must be

made aggregating the collateral of all the Debtors - - SW and the Affiliated Debtors. Such

a determination is consistent with the Debtors' merger for purposes of Plan payments on

the Effective Date "pursuant to Section 1123(a)(5)(C) of the Bankruptcy Code and the

Confirmation Order" set forth in paragraph 5.8 of the Plan.

B.  Interest Rate

1.  Applicable Law

Section 506(b) provides that a fully secured creditor may be allowed "interest on

such claim, and *any reasonable fees, costs or charges provided for under the agreement or State*

*Statute under which such claim arose.*" 11 U.S.C. § 506(b) (emphasis added). Recovery of

postpetition interest is unqualified if a secured creditor is oversecured. The United States

Court of Appeals for the Second Circuit in  Key Bank Nat'l Assoc. v. Milham (In re

Milham), 141 F.3d 420 (2d Cir. 1998), *cert. denied,* 525 U.S. 872 (1998), explained:

> [S]ection 506(b) does not say that the oversecured creditor collects pendency
> interest at the contractual rate. In United States v. Ron Pair Enters., Inc., 489
> U.S. 235, 241, 109 S.Ct. 1026, 1030, 103 L.Ed.2d 290 (1989), the Supreme Court

held that the phrase "provided for under the agreement under which such claims arose" does not modify the phrase "interest on such claim." Unlike prepetition interest, pendency interest is not based upon contract. *See* Rake v. Wade, 508 U.S. 464, 468, 113 S.Ct. 2187, 2190, 124 L.Ed.2d 424 (1993) ("[T]he right to postpetition interest under § 506(b) is unqualified and exists regardless of whether the agreement giving rise to the claim provides for interest.") (internal quotation marks omitted). The appropriate rate of pendency interest is therefore within the limited discretion of the court. *See* In re DeMaggio, 175 B.R. 144, 148 (Bankr. D. N.H. 1994). Most courts have awarded pendency interest at the contractual rate; but nevertheless, however widespread this practice may be, it does not reflect an entitlement to interest at the contractual rate.

Id. at 423.  Recovery of fees, costs, and charges, however, is allowed only if they are reasonable, and provided for in the agreement under which the claim arose.  U.S. v.  Ron Pair Enterprises, 489 U.S. at 241.

Most courts hold that entitlement to default interest is a matter of federal law.  *See* In re Route One West Windsor Ltd. P'ship, 225 B.R. 76, 86 (Bankr. D. N.J. 1998)*;* In re Consol. Properties Ltd. P'ship, 152 B.R. 452, 456 (Bankr. D. Md. 1993); *but see* 201 Forest Street LLC v. LBM Fin. LLC (In re 201 Forest Street LLC), 409 B.R. 543, 565 (Bankr. D. Mass. 2009).  In Forest Street, the court, citing Massachusetts cases, stated "Massachusetts law examines a default interest rate to ascertain whether it is a permissible liquidated damages clause or an unenforceable penalty." 409 B.R. at 565 (citing TAL Fin. Corp. v. CSC Consulting, Inc., 446 Mass. 422, 430, 844 N.E.2d 1085, 1092 (Mass.2006), and De Cordova v. Weeks, 246 Mass. 100, 104–05, 140 N.E. 269, 270–71 (1923)).  This Court disagrees with the decision in Forest Street, which also placed the burden on the debtors to prove the unenforceability of default interest rates of 20% and 25% in two notes executed by the

debtors. Id. This Court agrees with the decision in Route One West, in which the court

observed:

> The allowance of interest on claims in bankruptcy has long been determined
> by federal law. Vanston Bondholders Protective Committee v. Green, 329
> U.S. 156, 162–63, 67 S.Ct. 237, 91 L.Ed. 162 (1947). The touchstone of such
> decisions "has been a balance of equities between creditor and creditor or
> between creditors and the debtor." Id. at 165, 67 S.Ct. 237. The continuing
> validity of these principles under the Code was acknowledged in United
> States v. Ron Pair Enterprises, Inc., 489 U.S. 235, 248, 109 S.Ct. 1026, 103
> L.Ed.2d 290 (1989).

225 B.R. at 86.

Although courts disagree on whether a creditor is entitled to interest at the default

rate provided for in a loan agreement, the majority of courts has concluded that where a

debtor is in default in the payment of a loan owed to an oversecured creditor, there is a

presumption that postpetiiton interest should be computed at the default rate provided for

in the applicable agreement.  *See* The Southland Corp. v. Toronto-Dominion (In re

Southland Corp.), 160 F.3d 1054, 1059-60 (5th Cir. 1998) (citing In re Terry, Ltd. P'ship, 27

F.3d 241, 243-44 (7th Cir. 1994), *cert. denied,* Invex Holdings, N.V. v. Equitable Life Ins. Co.

of Iowa, 513 U.S. 948 (1994)); *see also* Riley v. Tencara, LLC (In re Wolverine Proctor &

Schwartz), 449 B.R. 1, 5 (Bankr. D. Mass. 2011).[20]  Nevertheless, courts have ruled that

---

[20] In In re Wolverine Proctor & Schwartz, this Court, citing In re AE Hotel
Venture, stated:

> Generally speaking, interest compensates for the delay in
> receiving money owed: "the loss of the time value of
> money." In re Continental Ill. Sec. Litig., 962 F.2d 566, 571
> (7th Cir.1992); *see also* Art Press Ltd. v. Western Printing
> Mach. Co., 852 F.2d 276, 278 (7th Cir.1988). GMACCM

default interest is not an entitlement, but is essentially a charge, and that it must be

reasonably related to a lender's costs to be allowed.  *See, e.g.*, <u>In re Market Center East</u>

<u>Retail Prop., Inc.</u>, 433 B.R. 335, 357-58 (Bankr. D. N.M. 2010); <u>In re AE Hotel Venture</u>, 321

---

arrived at the interest rate it believed would compensate for
that loss in the Note: a rate of 9.72%. That being so, the
difference between the original rate and the 14.72% default
rate—a difference of 5%—could not have been meant to
perform the usual function of interest. The time value of
GMACCM's money, after all, did not magically increase by
5% once AE Hotel defaulted.

Default interest is instead designed to reimburse creditors
for "extra costs incurred after default." <u>In re Consol. Props.</u>
<u>Ltd. P'ship</u>, 152 B.R. 452, 455 (Bankr.D.Md.1993); *see also* <u>In</u>
<u>re Vest Assocs.</u>, 217 B.R. 696, 701 (Bankr.S.D.N.Y.1998).
Default interest, then, is not true interest at all. It is a form of
late charge and thus is a "charge" for purposes of section
506(b). *See* <u>Fischer Enters., Inc. v. Geremia (In re Kalian)</u>, 178
B.R. 308, 316–17 (Bankr.D.R.I.1995) (deeming default interest
to be a "charge"); *see also* <u>Consol. Props.</u>, 152 B.R. at 455
(noting that default interest is "more in the nature" of a
charge); *but see* 4 A. Resnick & H. Sommer, Collier on
Bankruptcy ¶ 506.04[2][b][ii] at 506–112 (15th rev. ed. 2004)
(stating that "[i]n general, a default rate of interest is
properly a form of interest").

In re AE Hotel Venture, 321 B.R. at 215–16 (footnote omitted). The court
concluded: "[b]ecause GMACCM's default interest is actually a charge, it
must be 'reasonable' to be allowed." <u>Id.</u> at 216 (citing 11 U.S.C. § 506(b),
and <u>Consol. Props.</u>, 152 B.R. at 456), adding "[d]efault interest is not a
'reasonable' charge, however, if it compensates for an injury that has
already been compensated in some other way under the parties'
agreement." <u>Id.</u> (citing <u>In re 1095 Commonwealth Ave. Corp.</u>, 204 B.R. 284,
305 (Bankr.D.Mass.1997), and <u>Consol. Props.</u>, 152 B.R. at 458).

<u>In re Wolverine Proctor & Schwartz</u>, 499 B.R. at 5-6( footnote omitted).

-53-

B.R. 209, 215-16 (Bankr. N.D. Ill. 2005); <u>Fischer Enters., Inc. v. Geremia (In re Kalian)</u>, 178

B.R. 308, 316-17 (Bankr. D. R.I. 1995). Those courts recognize that use of the default rate is

presumed, but the presumption is rebuttable. *See* <u>In re General Growth Props., Inc.</u>, No.

09-11977, 2011 WL 2974305 (Bankr. S.D. N.Y. July 20, 2011). In <u>General Growth Properties</u>,

the court stated:

> 11 U.S.C. § 506(b) requires payment of post-petition interest to an
> oversecured creditor . . . and a rebuttable presumption exists favoring the
> payment of such interest at the contractual rate. Courts in this and other
> circuits have been reluctant to modify private contractual arrangements
> imposing default interest rates—particularly in cases involving a solvent
> debtor—except where: (i) there has been creditor misconduct; (ii) application
> of the contractual interest rate would cause harm to unsecured creditors; (iii)
> the contractual interest rate constitutes a penalty; or (iv) its application
> would impair the debtor's fresh start.

<u>General Growth Props., Inc.</u>, 2011 WL 2974305 at * 4 (citations omitted). *See also* <u>In re Jack</u>

<u>Kline Co., Inc.</u>, 440 B.R. 712, 745 (Bankr. S.D. Tex. 2010);[21] In <u>General Growth Properties</u>,

---

[21] In <u>Jack Kline Co., Inc.</u>, the court fashioned as seven part, balancing the equities test that weigh against a presumptively valid default rate of postpetition interest as follows:

> They exercise discretion in fixing the § 506(b) interest rate and consider a
> number of equitable factors in determining whether an oversecured
> creditor is entitled to the contractual default rate of interest, including:
> 1) the effect of the interest rate on other junior creditors; 2) whether
> imposition of the default rate would impede the debtor's fresh start; 3)
> whether the oversecured creditor obstructed the bankruptcy process; 4)
> the level of the requested interest; 5) whether the secured creditor had a
> realistic risk of nonpayment of its debt; 6) whether there is any
> justification for an increased rate to compensate for an assumed increased
> risk following default; and (7) whether liquidation of assets will benefit
> parties in interest.

<u>Id.</u> at 745 (citations omitted).

the bankruptcy court imposed the default rate where the commencement of the bankruptcy case was the default and the debtor was solvent.

### 2. Analysis

In the present case, the Court finds that the contractual default interest rate of 14.5% should be the rate accruing on Prudential's secured claim after June 8, 2011. Unquestionably, there was a payment default by SW under the Construction Loan Agreement prior to the commencement of the Chapter 11 cases. It also is undisputed that SW was in default on the petition date. Because the Debtors propose to pay all creditors in full, other creditors will not be harmed by the payment of pendency interest at the default rate. While the Court is sympathetic to the City's arguments, the Debtors' Plan provides for its payment in full. Moreover, although Prudential was litigious during the Debtors' cases, raising multiple objections to virtually every motion made by the Debtors, its pursuit of its legal rights and remedies did not rise to the level of obstruction of the bankruptcy process. There has been no suggestion or evidence presented of misconduct by Prudential in connection with the Construction Loan Agreement or the Debtors' cases.

Prudential introduced unrebutted evidence through the testimony of Ms. Mulford, that default rates of interest in loans of the type made and received by Prudential contain default rates of interest that are consistent with the default rate set forth in the Construction Loan Agreement. Thus, the Court concludes that a default rate which is 5% higher than the non-default contract rate is neither a penalty nor inequitable as the Debtors and the City assert. Moreover, the Court rejects the Debtors' argument that the 5% spread between

the non-default and the default rates of interest is more than twice the spread that courts typically find reasonable. For example, in Urban Communicators PCS Ltd. P'ship v. Gabriel Capital, L.P., 394 B.R. 325 (S.D.N.Y. 2008), the district court reversed the bankruptcy court's decision to reduce an award of interest to a twenty-five percent simple interest equivalent (from thirty-eight percent) in order to compensate the debtors for their efforts to protect their interests in licenses. The district court stated: "it is not inequitable to cut down the interest of Debtors' shareholders by interest payments at a default rate to which Debtors contractually agreed." 394 B.R. at 340. The court, citing Ruskin v. Griffiths, 269 F.2d 827 (2nd Cir. 1959), and In re Int'l Hydro-Electric Sys., 101 F.Supp. 222 (D. Mass. 1951), added:

> "A variable interest rate provision in the event of a stated default . . . . can be beneficial to a debtor in that it may enable him to obtain money at a lower rate of interest than he could otherwise obtain it, for if a creditor had to anticipate a possible loss in the value of the loan due to his debtor's bankruptcy or reorganization, he would need to exact a higher uniform interest rate for the full life of the loan."

Urban Communicators PCS, 394 B.R. at 340 (quoting Ruskin, 269 F.2d. at 832).

The Debtors have not shown any reason for avoiding the contractual default rate of interest. Based on Ms. Mulford's testimony, the Court finds that the default rate of interest is not a penalty as loans made and obtained by Prudential had similar rates. Allowance of interest at the default rate will not impair the Debtors' fresh start because under their Plan the Debtors are paying all creditors in full in a relatively short period of time. Although the Debtors have rapidly paid down the principal amount owed to

Prudential and introduced evidence at the confirmation hearing that they will have in

excess of $20,000,000 in cash, plus $15,000,000 in other assets upon completion of their Plan,

those factors are not relevant to a decision on whether the default rate of interest is

appropriate, but rather are more relevant to the amount to be paid on account of

postconfirmation interest for a restructured loan.  The present case has none of the factors

that have justified imposition of an interest rate lower than the default rate.  The Debtors

failed to rebut the presumption that the contract default rate of interest should apply.

C. <u>Fees and Other Charges</u>

In its 506(b) Motion, Prudential seeks a determination that it is entitled to apply the

postpetition payments it has received from the Debtors (in the approximate sum of

$100,000,000) first to interest and next to its fees and costs.  Prudential references $750,000

in estimated fees in its Proposed Findings of Fact, but it is unclear whether those are

attorneys' fees that were incurred prepetition or postpetition.  Prudential's proofs of claim

are deficient in that they have no accounting of the amount due for any attorneys' fees or

other fees and charges.  Prudential has not submitted an application for fees under Fed. R.

Bankr. P. 2016 and MLBR 2016-1(a).

Section 506(b) provides that an oversecured creditor may recover its reasonable fees

as provided for in the applicable agreement or state statute under which the claim arose.

In order for fees, costs, or charges to be recoverable under § 506(b), the secured creditor

must show that those charges arose under the agreement giving rise to the claim and that

the fees, costs, or charges are reasonable.  *See* <u>In re 1095 Commonwealth Corp.</u>, 236 B.R. 530

-57-

(D. Mass. 1999) (adding that "[t]he weight of authority is that only federal law governs the enforcement of attorneys' fees provisions in connection with secured claims in bankruptcy, without regard to potentially contrary state law"). A creditor seeking fees, costs or charges under § 506(b) has the burden of proof on each of the requirements for recovery, and with respect to attorneys' fees, it must provide supporting documentation that the fees are authorized by the agreement and were necessary and reasonable. *See* In re Woods Auto Gallery, Inc., 379 B.R. 875, 885 (Bankr. W.D. Mo. 2007).

The United States Court of Appeals for the First Circuit, in Gencarelli v. UPS Capital Business Credit (In re Gencarelli), 501 F.3d 1 (1st Cir. 2007), explained the relationship between § 506(b) and § 502. It stated:

> There is universal agreement that whereas section 506 furnishes a series of useful rules for determining whether and to what extent a claim is secured (and, therefore, entitled to priority), it does not answer the materially different question of whether the claim itself should be allowed or disallowed. *See* 4 Lawrence P. King et al., *Collier on Bankruptcy* § 506.01, at 506-6 (15th ed. 2007). Rather, the general rules that govern the allowance or disallowance of claims are set out in section 502. *See* id. It follows that:
>
> > If a creditor is generally entitled to add postpetition . . . fees to its secured claim because of the existence of an oversecurity, and the claim for . . . fees is valid under the agreement and applicable state law, but is disallowed by the bankruptcy court for want of reasonableness, the amount so disallowed should be treated as an unsecured claim against the estate.
>
> Id. § 506.04[3][a], at 506-120 to 506-121; *see* Daniel R. Cowans, *Bankruptcy Law & Practice* § 17.22, at 305 (7th ed.1999) (noting that the "limits of § 506(b) are applicable to the secured nature of the claim and any excess under the contract may be filed as an unsecured claim").

Gencarelli, 501 F.3d at 5-6. The First Circuit added: "once a claim for fees is found to be

allowable under section 502, it then must be assessed for reasonableness under section 506 in order to determine its priority . . . [and] . . . [t]o the extent that the contract between the parties calls for unreasonable fees, the fees should be bifurcated and the unreasonable portion should be treated as an unsecured claim. Id. at 6 (citing Welzel v. Advocate Realty Inv., LLC (In re Welzel), 275 F.3d 1308, 1318 (11th Cir.2001)).

In its post-filing brief, Prudential has not indicated the specific provision(s) in the Note and Mortgage that give rise to entitlement to attorneys' fees and other fees and charges. The Court's review of the Construction Loan Agreement provides for the payment of reasonable attorneys' fees, but Prudential did not introduce the Promissory Note or Mortgage into evidence. The Guarantees also provide that the Affiliated Debtors, with the exceptions of SW and FSC, guarantee payment of Prudential's attorneys' fees and expenses for services in enforcing FSC's Guaranty. Because the Debtors have proposed to pay Prudential's Allowed Secured Claim and all unsecured claims in full, it would appear that Prudential is entitled to its attorneys' fee as part of its claim if those fees are provided for in the Note and Mortgage and had they been itemized in conjunction with the hearing on its 506(b) Motion.

Prudential has not provided any statement or itemization of its fees or costs, other than a reference in its Proposed Findings to "$750,000 of additional fees and expenses after May 31, 2011." As noted, Prudential has not filed an application for compensation in accordance with Fed. R. Bankr. P. 2016 (a) as required by M.L.B.R. 2016-1 as a predicate for allowance of attorneys' fees under § 506(b). In the absence of compliance with this rule,

this Court does not have sufficient information to award or allocate fees among the

Affiliated Debtors according to the Guarantees.

The Construction Loan Agreement contains a provision for the payment of late

charges.  Prudential's submissions are also deficient with respect to late charges as it has

not provided any accounting or itemization of any late charges.  Thus, the Court cannot

determine the reasonableness of those charges, particularly in view of the allowance of

interest at the default rate from June 28, 2011.

## V.  CONCLUSION

For the foregoing reasons, the Court grants in part and denies in part Prudential's

506(b) motion.  The Court shall allow postpetition interest on Prudential's secured claim

at the default rate from June 8, 2011, pending a further order liquidating the amount of

Prudential's claim.  The Court denies Prudential's request for fees, costs and other charges.


By the Court,


_Joan N. Feeney_


Joan  N. Feeney
United States Bankruptcy Judge

Dated:  October 4, 2011


-60-