## UNITED STATES BANKRUPTCY COURT
## FOR THE
## DISTRICT OF MASSACHUSETTS

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

In re:

**SW BOSTON HOTEL VENTURE, LLC, et al.,[1]**          Chapter 11
          Debtors          Case No. 10-14535-JNF
                                   (Jointly Administered)

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

## MEMORANDUM

## I. INTRODUCTION

The matters before the Court for determination are the Debtors' Modified First Amended Joint Plan of Reorganization (the "Plan") and the Objection to Confirmation of the Plan filed by Prudential Insurance Company of America ("Prudential").[2]  Interested party, the City of Boston (the "City"), supports confirmation of the Plan.  The Debtors are SW Boston Hotel Venture, LLC ("SW"), Auto Sales & Service, Inc. ("Auto Sales"), General

---

[1] The other Debtors in these jointly administered cases are Auto Sales & Service, Inc. (Case No. 10-14528-JNF), General Trading Company (Case No. 10-14532-JNF), Frank Sawyer Corporation (Case No. 10-14533-JNF), 100 Stuart Street, LLC (Case No. 10-14534-JNF), 30-32 Oliver Street Corporation (Case No. 10-16173-JNF), General Land Corporation (Case No. 10-16174-JNF), and 131 Arlington Street Trust (Case No. 10-16177-JNF) (the "Affiliated Debtors").

[2] The Prudential Insurance Company of America appears in this case as follows: "on behalf and solely for the benefit of, and with its liability limited to the assets of, its insurance company separate account PRISA."  In its Proposed Findings of Fact and Conclusions of Law, it states that "Prudential (PRISA) is a private real estate investment fund, not a commercial bank or an insurance company."

-1-

Trading Company ("General Trading"), Frank Sawyer Corporation, 100 Stuart Street, LLC

("100 Stuart Street"), 30-32 Oliver Street Corporation ("Oliver Street"), General Land

Corporation ("General Land"), and 131 Arlington Street Trust ("Arlington Street")

(collectively, the "Debtors").

The Court conducted a three-day evidentiary hearing on June 27, 28, and 29, 2011

with respect to this contested matter, as well as the contested matter relating to Prudential's

Motion for an Order Authorizing the Application of Payments Received during the

Chapter 11 Cases to Payment of Postpetition Interest pursuant to Section 506(b) of the

Bankruptcy Code (the "506(b) Motion"). Nine witnesses testified and 28 exhibits were

introduced into evidence. On October 4, 2011, this Court issued a decision with respect to

the 506(b) Motion, which is incorporated herein by reference. *See* In re SW [Boston] Hotel

Venture, LLC, __ B.R. __, 2011 WL 4704215 (Bankr. D. Mass. Oct. 4, 2011). On October 20,

2011, the Court entered an "Order Fixing Amount of Allowed Prudential Secured Claim

as of October 4, 2011."

The parties submitted Proposed Findings of Fact and Conclusions of Law and briefs

on August 1, 2011, at which time the Court took these matters under advisement. The

Court now makes the following findings of fact and conclusions of law in accordance with

Fed. R. Bankr. P. 7052.

## II. BACKGROUND

### A. Procedural Posture of the Debtors' Cases

On April 28, 2010, SW, Auto Sales, General Trading, Frank Sawyer Corporation, and

100 Stuart Street filed voluntary petitions for relief under Chapter 11 of the Bankruptcy

Code in this Court.  On June 4, 2010, General Land, Arlington Street and Oliver Street filed

Chapter 11 petitions.  The Debtors' cases are the subject of an order for joint administration.

All of the Chapter 11 Debtors have continued as debtors-in-possession since the

commencement of the cases.  The United States trustee appointed an Official Committee

of Unsecured Creditors (the "Committee") which serves in all of the cases.  The Committee

supports confirmation of the Debtors' Plan.

   After evidentiary hearings held in November of 2010, the Court denied Prudential's

Motion for Relief from the Automatic Stay.  *See* In re SW Boston Hotel Venture, LLC, 449

B.R. 156 (Bankr. D. Mass. 2011).  The Court found that there was no cause for relief from

the automatic stay under 11 U.S.C. § 362(d)(1) because Prudential did not lack adequate

protection for its security interest as the value of all of the collateral it had been pledged by

all the Debtors exceeded its loan balance, and, thus, it was adequately protected by an

equity cushion.  The Court also found that even though the value of the assets of  SW,

principally the W Hotel and condominiums, was less than the amount owed to Prudential,

the Debtors had sustained their burden of demonstrating that a plan was in prospect, and,

therefore, Prudential was not entitled to relief from stay under 11 U.S.C. § 362(d)(2).

   As the Court observed in the Memorandum issued in conjunction with Prudential's

506(b) Motion, in light of events that transpired after the Memorandum  issued on January

28, 2011, neither the parties nor the Court accurately valued the W Hotel as it sold for

substantially more than the opinions expressed by both parties' appraisers and the value

determined by the Court.   In March of 2011, the Debtors entered into a purchase and sale agreement for the sale of the W Hotel to Razorbacks Owner LLC, an affiliate of Pebblebrook Hotel Trust, for the sum of $89.5 million. The sale required resolution of several contingencies, including the assent of the manager of the W Hotel, an affiliate of Starwood Worldwide Hotels and Resorts, Inc. ("Starwood"), and the assignment of warranties by the building's contractor, Bovis Lend Lease LMB, Inc. ("Bovis").   The contingencies were favorably resolved by agreements among the Debtors, Starwood and Bovis, and the sale of the W Hotel closed on June 8, 2011.   As a result of the sale closing, Prudential was paid the total net proceeds of the sale, namely $83,322,017.

The Debtors filed their Joint Plan of Reorganization and Disclosure Statement on March 31, 2011.   Thereafter, the Debtors amended their  plan and subsequently filed a further modification.   On June 27, 2011, the Debtors filed their Modified First Amended Joint Plan of Reorganization  which is the subject of the Debtors' request for confirmation and  Prudential's Objection.   In summary, the Plan provides for payment in full of all allowed claims held by non-insiders from the income generated by the Debtors' operations and the sale of the Debtors' assets.   The Debtors propose to sell the condominiums in the ordinary course of SW's business and the proceeds of the sales of the condominiums, and the assets and income of the affiliated Debtors will be used as necessary to pay allowed claims in full with interest.

B.  <u>Class 2 - Prudential's Secured Claim</u>

The treatment of Prudential's allowed secured claim is set forth in Sections 1.10 and

4.2 of the Plan.  The Allowed Prudential claim is defined in the Plan as "$180,803,187.86 less

all payments made to, or received by, Prudential on account of its Claims against the

Debtors from the Petition Date through the Effective Date . . ." or such other amount as

determined by the Court.  According to the Plan, Prudential's allowed Class 2 claim will

be paid in full prior to March 31, 2014 with post-confirmation interest at a rate of 4.25 %,

or such other rate as determined by the Court.  Additionally, through the Plan, the Debtors

propose that Prudential shall retain its prepetition liens on the Debtors' property and it will

be paid the "Residence Net Sales Proceeds," specifically defined at Section 1.98, but

generally the sales price of the condominiums, less 8 % for closing costs and the amount

necessary to pay outstanding real estate taxes and condominium fees, as well as budgeted

operating expenses.  Prudential also will receive, on a monthly basis, the aggregate of the

Debtors' cash in excess of working capital amounts.

In addition, the Plan establishes both affirmative and negative covenants for the

benefit of Prudential, as well as the City of Boston's Class 3 claim.  The covenants are set

forth in Exhibit A to the Plan.  Generally, the Plan restricts the Debtors' ability to exceed

budgeted expenses, to grant  liens, to change management, to buy assets other than in the

ordinary course of business, or to make any distribution to the holders of the equity

interests in the Debtors.  The affirmative covenants require the Debtors to file all post-

confirmation tax returns, pay all condominium fees promptly, and maintain appropriate

insurance policies.  In addition, the Plan requires the Debtors to submit monthly financial

reports to Prudential, including accountings of excess cash, financial statements, copies of

leases and purchase and sale agreements for the condominiums, and bank account statements. The Debtors also must provide Prudential with quarterly reconciliations of actual and budgeted expenses, as well as annual unaudited financial statements and tax returns.

The Plan also established minimum prices for the sale of the condominiums which are approximately 2.5 % lower than the contractual release prices in the prepetition Prudential loan documents. Finally, the Plan provides for Prudential to receive such additional treatment as the Court determines is necessary to provide Prudential with the indubitable equivalent of Prudential's allowed claim.

C. Class 3 - City of Boston's Secured Claim

The Plan provides that the allowed secured claim of the City will be paid in full including interest at the contract rate of 8 %. The City's allowed secured claim is defined at "$10,704,247 less all payments made to, or received by the City" on account of its claim during the pendency of the case. According to the Plan, the City will only be paid interest on account of its secured claim pending payment in full of Prudential's claim. The City will retain its liens on the Debtors' property.

D. Class 6 - The Bovis Claim

The Plan provides for treatment of Bovis's claim in Class 6. Bovis was the construction manager for the SW project. The Plan incorporates a compromise between the Debtors and Bovis with respect to alleged breaches of contract pertaining to construction, payment, and contractual warranties. SW and Bovis agreed to a compromise,

which the Court approved on March 30, 2011, after notice and a hearing and without objection from any creditors, including Prudential. Under the Plan, Bovis is a separately classified, impaired class. It will have an allowed claim in the approximate amount of $1.9 million to be paid in two equal installments, the first on the effective date of the Plan and the second in one year from the effective date. Bovis accepted and supports the Plan.

 E. <u>Classes 4 and 5 - Miscellaneous Secured Claims and Mechanics Lien Claims</u>

 The Plan, in Class 5, provides that all creditors with mechanics liens against the Debtors' property will receive full payment of their claims from Bovis in accordance with the Court-approved compromise. Class 4 pertains to Miscellaneous Secured Claims, which shall be allowed or disallowed through the claims objection process.

 F. <u>Classes 7 and 8 - General Unsecured Claims</u>

 In Class 7 of their Plan, the Debtors provide for treatment of general unsecured claims in two separate classes. Class 7 consists of allowed, nonpriority, unsecured claims who do not elect treatment in Class 8. Class 8 is a convenience class consisting of allowed, nonpriority, unsecured creditors with claims of $5,000 or less who elect to participate in that class. They will receive cash on the effective date equal to the lesser of their allowed claim or $5,000.

 Class 7 claimants will receive payment in full of their allowed claims, with interest after the effective date of 4.25 % in three equal payments, the first of which will be on the effective date, and then on the first and second anniversaries of the effective date. Class 7 also contains the Debtors' proposed treatment of the claims of insiders. Except for the

claims of affiliates of the Debtors, SE Berkeley Street, LLC ("SE Berkeley") and SE McClellan Highway LLC ("SE McClellan"), who are non-debtor, insider entities that are wholly owned by another non-debtor, the Frank Sawyer Trust, the general unsecured claims of non-debtor, insiders are preserved, but they are not entitled to receive any payment until the claims of other creditors are paid in full. The claims of SE McClellan and SE Berkeley, arise in large part out of the purchase of a Letter of Credit in favor of Prudential in the amount of $17.3 million which was drawn upon shortly after the petition date and reduced Prudential's allowed secured claim in that amount. The claims of SE Berkeley and SE McClellan are being satisfied by issuance of equity interests in a new entity, denominated 110 Stuart Street, LLC, a Delaware limited liability company to be formed prior to the effective date to hold the new equity interests in reorganized SW.

Inter-company claims of the Debtors against one another are cancelled and are entitled to no payment. In addition, the Plan, except with respect to the claims of SE Berkeley and SE McClellan against SW, provides that non-debtor insiders of the Debtors shall not receive any distributions on account of their claims until the claims of all non-insider creditors have been paid in full.

G. Class 9 - Equity Interests

Under the Plan, equity interests in SW and 100 Stuart Street are cancelled and new equity interests in SW shall be issued to 110 Stuart Street, LLC ("110 Stuart"). 100 Stuart Street shall be deemed dissolved. Equity interests in 110 Stuart will be issued to SE Berkeley and SE McClellan on account of, and in proportion to, their respective claims

against and monetary contributions and advances to or on behalf of SW. Equity interests in Oliver Street, Arlington Street, Auto Sales, Frank Sawyer Corporation, General Land and General Trading are being retained by the current equity holders.

      H.  <u>Plan Implementation: Consolidation</u>

      The Plan provides that the payment of claims will be made from sales and income from the Debtors' properties. In addition, according to the Plan, as provided in Section 5.8, the Debtors "shall continue to maintain their separate existence for all purposes other than the treatment of Claims under the Plan."  Notwithstanding that provision, the Debtors propose that they shall be "substantively consolidated under the Plan on the Effective Date pursuant to 11 U.S.C. § 1123(a)(5)(C) of the Bankruptcy Code and the Confirmation Order." According to the Debtors, the effect of such consolidation would be  1) the merger of all their assets and liabilities, except with respect to the insider claims of SE Berkeley and SE McClellan against SW;  and 2) the elimination of all inter-company claims and guarantees, such that the payment of all claims will be the joint and several liability of all of the Debtors.

      At the conclusion of the confirmation hearing, the Debtors' attorney stated on the record a clarification of the Debtors' intention with respect to Section 5.8.  He indicated that all of the Debtors are liable for payment to all creditors and inter-company claims among all of the Debtors are eliminated.  Prudential did not object to the clarification and the Court deems counsel's statement on the record to be a further modification of the Plan.

I. <u>Report of Plan Voting</u>

The Debtors submitted a Report of Plan Voting.  Prudential is the only creditor and

class which voted against the Plan.  All other classes of creditors accepted or are deemed

to have accepted the Plan.  The City cast its own vote in favor of the Plan.

Prudential submitted a ballot rejecting the Plan on behalf of the City.  Prudential is

seeking to strike the City's vote and cast its own vote against the Plan on behalf of the City

pursuant to an Intercreditor and Subordination Agreement (the "Intercreditor

Agreement").   The Intercreditor Agreement between the City as Junior Lender and

Prudential as Senior Lender is dated January 2009  and was executed in connection with

the City's $10 million loan to SW to assist it in completing construction of the project.

Prudential contends that the City agreed to assign its voting rights to Prudential based

upon Section 8(c) of the Intercreditor Agreement.

Three impaired classes, Classes 5, 7, and 8 voted to accept the plan.  Class 6, Bovis,

also voted to accept the Plan, although its vote was filed late.

At the hearing on confirmation, the Debtors proposed to resolve three of

Prudential's objections to their Plan by agreeing to  include in a confirmation order the

following provisions: 1) a representation that they would not issue any non-voting

securities; 2) a representation that they would indemnify Prudential for any environmental

liabilities; and 3) a representation that they would remain liable for the claims of Prudential

and the City, notwithstanding Section 5.8 of the Plan, which provides for consolidated

treatment of the Debtors' liabilities.  Prudential did not oppose the statement on the record

by Debtors' counsel further amending the Plan to comply with the stated objections of Prudential.

## III.  POSITIONS OF THE PARTIES

### A.  Prudential's Objections

Prudential argues that the Plan does not satisfy multiple provisions of 11 U.S.C. § 1129 and cannot be confirmed for a number of reasons.  In the first place, Prudential asserts that the Plan does not comply with the requirements of the Bankruptcy Code because it does not provide a fair and equitable treatment of its secured claim in violation of 11 U.S.C. 1129(b)(2).  It argues that the Plan does not provide specifically for payment of postpetition interest to which it is entitled as a fully secured creditor and does not provide fair and equitable treatment of its claim due to the inadequate rate of interest to be paid to it on its restructured obligation.

Secondly, Prudential maintains that the Plan is premised on the improper substantive consolidation of the Debtors which it asserts prejudices it.

Thirdly, Prudential argues that the Plan violates the absolute priority rule which requires that, absent full satisfaction of a creditor's allowed claim, no member of a class junior in priority to the class of that creditor, may receive any distributions on account of their claim or interest.

Prudential also argues that the Debtors' Plan is not feasible as it is based on projections that exceed historical performance and, accordingly, does not satisfy the requirement of 11 U.S.C. § 1129(a)(11).  Additionally, Prudential asserts that the Plan does

not pay to creditors at least the amount they would receive in a Chapter 7 case and, thus, does not satisfy the "best interests of creditors" test set forth in 11 U.S.C. § 1129(a)(7).

Prudential adds to its list of objections the assertion that the Plan improperly classifies certain creditors' claims, in particular the Bovis claim provided for in Class 6.

Prudential also asserts that the Debtors have not proposed the Plan in good faith in violation of 11 U.S.C. § 1129(a)(3). In support of that assertion, it maintains that the Plan improperly benefits the Debtors' insiders and that the new value being provided is artificial. It also asserts that the Plan gives preferential treatment to the City.

Prudential further faults the Plan on the ground that it does not enforce the subordination agreement between Prudential and the City required by 11 U.S.C. §510(a). According to Prudential, the City may not receive any payments until Prudential is paid in full. Moreover, because the Intercreditor Agreement required the City to assign its voting rights in any bankruptcy case involving SW to Prudential, Prudential maintains that it may vote the City's claim and has cast a vote rejecting the Plan on the City's behalf. According to Prudential, the City's own vote should be disregarded as invalid, and the Court should rule that the City has rejected the Plan due to Prudential's rejection on its behalf.

B. The City's Arguments

The City opposes Prudential's exercise of its voting rights with respect to the Plan. It cast its own vote to accept the Plan and maintains that its vote in favor of the Plan is determinative of Class 3's acceptance, not Prudential's surrogate vote. The City argues that

-12-

the purported assignment of voting rights in the Intercreditor Agreement is unenforceable as parties cannot contractually annul provisions of the Bankruptcy Code.  Furthermore, the City argues that it has other collateral subject to security interests and liens, namely, its second mortgages and assignments of rents on properties at 142 Berkeley Street and McClellan Highway, as well as the so-called "City Account," namely a bank account at Boston Private Bank and Trust Company with a balance of approximately $4 million.  According to the City, that account specifically is excluded from, and is  not subject to, the Intercreditor Agreement.  Accordingly, the City maintains that Prudential has no right to insist that it be paid in full before the City receives interest payment on account of those secured claims.  The City supports confirmation of the Plan in all respects.

C.  The Debtors' Arguments

The Debtors request that the Plan  be confirmed over the objection of Prudential. They point out that the Plan has been accepted by all creditors other than Prudential and it satisfies the requirements of 11 U.S.C. § 1129 for a "cramdown," that is confirmation over the objection of the sole dissenting class, Prudential.  The Debtors emphasize that the Plan provides for payment in full of all allowed, non-insider claims, plus post-confirmation interest, which amounts are to be paid from the Debtors' income from operations and sales of assets.   The Debtors maintain that the treatment of its largest secured creditors, Prudential and the City, satisfy 11 U.S.C. § 1129(b) because they are retaining their liens and receiving deferred cash payments which total their allowed claims and have a present value equal to their claims or the indubitable equivalent of their claims.  They add that the

Plan can be confirmed over the objection of either creditor, under the so-called "cramdown" method because the Plan complies with that subsection's requirements for treatment of the claim:  either deferred cash payments with retention of liens until the claims are paid in full with interest, fair and equitable treatment, or the indubitable equivalent of the claim.

As to the treatment of the City's claim, the Debtors argue that they have provided for the appropriate treatment of the claim as the Plan does not alter the debt service payments or the maturity date of the City's loan set forth in the loan documents and provides for payment by December 9, 2019.  They state that principal and interest payments to the City as provided in the City loan documents will only begin after the Prudential claim has been paid in full, although the City will receive accrued interest and receive interest payments from the $4 million of cash collateral in the City Account subject to its lien.  The Debtors also agree with the position of the City with respect to its voting rights, and request that the Court determine that the purported assignment of the City's voting rights is unenforceable and that Prudential is not entitled to vote the City's claim.

As to the treatment of Prudential's claim, the Debtors submit that because Prudential's allowed claim will be paid in full by March 31, 2014 with post-confirmation interest at the rate of 4.25 % per year, which sums shall be payable from sales in the ordinary course of business of the condominium units that constitute Prudential's collateral, as well as the covenants attached as Exhibit A to the Plan, all of which reasonably protect Prudential's interest as mortgagee, the Plan provides for a proper treatment of

-14-

Prudential's claim under all of the subsections of 11 U.S.C. § 1129(b)(2). The Debtors argue

that 4.25% is an appropriate and adequate rate of post-confirmation interest. They point

to evidence they presented through credible expert opinions that there is no efficient

market for comparable loans and that the amount of interest was formulated using the

guidelines established by the Supreme Court in <u>Till v. SCS Credit Corp.</u>, 541 U.S. 465

(2004). The Debtors criticize the opinion of Prudential's expert as being based on a number

of  erroneous assumptions. In particular, they point to the testimony that there is an

efficient market for a loan with similar characteristics to Prudential's loan, the use of an

inaccurate loan to value ratio, and the  failure to recognize that the Plan is feasible.

The Debtors maintain that the substantial and persuasive evidence they presented

in support of the Plan establish that the Plan is feasible. They argue that their projections

for the sale of condominiums over a three year period are reasonable and are supported

by the record of sales during the pendency of their cases.

The Debtors also assert that the separate classification of the Bovis claim is proper.

Due to the creditor's unique construction lien and claims relating to warranties, which had

to be delivered to Starwood,  SW and Bovis entered into an agreement, approved by the

Court, which provided for completion of the project's Theme Bar and delivery of

construction warranties, in addition to a consensual treatment of the Bovis claim in the

Plan. The Debtors emphasize that Prudential did not object to the compromise with Bovis,

which was the subject of notice and a hearing and which included a provision for the

separate classification of its claim. The Debtors request that the Court overrule Prudential's

objection to confirmation based on the separate classification of the Bovis claim.

The Debtors report that the Plan has been accepted by the affirmative votes of several impaired classes of creditors:  the City, Bovis, the secured creditors in Class 5, pertaining to Mechanics Lien Claims, and the general unsecured creditor classes in Classes 7 and 8.

The Debtors maintain that Prudential's Objection to the Plan based on an alleged violation of the absolute priority rule, which is an element of confirmation under 11 U.S.C. § 1129(b)(2)(B), is without merit.  First, the Debtors emphasize that secured creditors such as Prudential do not have standing to assert a violation of the absolute priority rule where, as here, the rights of junior creditors do not affect the treatment of Prudential's allowed secured claim, and where Prudential is being paid in full.  Moreover, the Debtors assert that the Plan satisfies the absolute priority rule as all creditors, including  unsecured creditors, are being paid in full with interest.

The Debtors further argue that the Plan does not contain improper provisions relating to the consolidation of the Debtors.  They emphasize, in lieu of guarantees, all Debtors will be jointly and severally liable to Prudential with respect to its allowed claim. According to the Debtors, Prudential has no standing to raise that argument, as it will suffer no harm or prejudice from the consolidation provision set forth in Section 5.8.

The Debtors maintain that the Plan satisfies the best interest of creditors test as Prudential and other creditors are being paid in full and it cannot receive more than its legal entitlement.

-16-

The Debtors counter Prudential's contention that the Plan has not been filed in good faith with their assertion that the Plan proposes to pay all creditors in full with interest. They emphasize that certain claims of non-debtor affiliates, namely SE Berkeley and SE McClellan against them, are to be converted to equity and all other non-debtor insider claims are being subordinated to the payment in full of all allowed claims of non-insider creditors. Moreover, they add that inter-company claims are being extinguished and no distribution will be made on account of insider claims or equity interests until all non-insider claims have been paid in full. Accordingly, the Debtors submit that the Plan complies with all of the requirements of 11 U.S.C. § 1129.

D. <u>The United States Trustee's Position</u>

The United States trustee submitted a Statement requesting that any order confirming the plan include provisions requiring post-confirmation financial reporting to the United States trustee.

## IV. FINDINGS OF FACT AND CONCLUSIONS OF LAW

Rather than summarizing the evidence adduced at the evidentiary hearing followed by an explication of the law and a discussion of the evidence in relation to the provisions of § 1129, the Court elects to discuss the evidence and the law pertinent to each subsection of § 1129 which is the subject of dispute.

A. <u>Confirmation Standards</u>

A plan proponent has the burden of proving by a preponderance of the evidence, that the plan satisfies the 14 applicable requirements for confirmation of a plan as set forth

in § 1129(a) of the Bankruptcy Code.  *See* In re Salem Suede, Inc., 219 B.R. 922, 932 (Bankr.

D. Mass. 1998).  This Court has an independent obligation to review the Plan to make sure

that it satisfies the requirements for plan confirmation set forth in § 1129.  Id.  For the

following reasons, this Court finds that the Plan satisfies the applicable confirmation

requirements including those contested by the sole objecting party, Prudential.

    B.  Acceptance of the Plan

    Prudential rejected the Plan as a Class 2 claimant.  Class 4, consisting of the claims

of impaired miscellaneous secured creditors, did not vote.  Thus, Class 4 is deemed to have

accepted the Plan.  *See* Heins v. Ruti-Sweetwater, Inc. (In re Ruti-Sweetwater, Inc.), 836 F.2d

1263, 1267-68 (10th Cir. 1988).  Class 5, consisting of impaired mechanics lien claims, voted

to accept the Plan, as did Bovis, the sole creditor in Class 6, although its vote was untimely.

Assuming this Court were to disregard the late filed vote, it still can be deemed to have

accepted the Plan, having failed to vote against it.  Eight claimants in  Class 7, consisting

of impaired general unsecured claims, voted to accept the Plan.  In Class 8, the convenience

class, one creditor voted to accept the Plan.

    C.  The Voting Dispute between Prudential and City of Boston

    Two sets of ballots were submitted with respect to Class 3, the impaired class

representing the claim of the City.  The City voted to accept the Plan; Prudential cast a

ballot on behalf of the City rejecting the Plan. Resolution of the dispute requires an

examination of the provisions of the Intercreditor Agreement.  It provides in pertinent part

the following:

-18-

7. <u>Payment Subordination</u>

(a)  . . . all of Junior Lender's rights to payment of the Junior Loan and the obligations evidenced by the Junior Loan Documents are hereby subordinated to all of Senior Lender's rights to payment of the Senior Loan and the obligations secured by the Senior Loan Documents , and Junior Lender shall not accept or receive payments (including without limitation, whether in cash or other property and whether received directly, indirectly or by set-off, counterclaim or otherwise) from Borrower, the Premises or any other source prior to the date that all obligations under the Senior Loan Documents Are paid, except only insofar as the payments relate to Junior Lender's rights as a municipal corporation to require payment of amounts otherwise due Junior Lender unrelated to the Junior Loan (including, by way of example and without limitation, real property taxes) and except for payments realized under Junior Lender's documents which are not part of the Junior Loan Documents from the 142 Berkeley Property or the McClellan Property or from the $4,000,000 Pledge Amount.

8.  <u>Rights of Subrogation: Bankruptcy</u>

(c) In the event of . . . a bankruptcy . . . reorganization . . . whether or not pursuant to bankruptcy laws . . . Junior Lender will assign to Senior Lender the voting rights of Junior Lender in such proceeding, and will hold in trust for Lender and pay over to Lender, in the form received (together with any necessary endorsement), to be applied to the Senior Loan, any and all monies, dividends, or other assets received in any such proceedings on account of the Junior Loan, unless and until the Senior Loan is unconditionally and irrevocably paid in full, except that the foregoing provisions in this subsection (c) shall not apply to Junior Lender's claims, interests, benefits, proceeds, rights and remedies with respect to the 142 Berkeley Property and the McClellan Property and the $4,000,000 Pledge Amount subject to the $4,000,000 Pledge and Security Agreement. . . .

The Court finds that the assignment of voting rights by the City to Prudential is not

enforceable.  Although 11 U.S.C. § 510(b) provides for the enforceability of subordination

agreements, such agreements cannot nullify provisions of the Bankruptcy Code.  To the

extent a provision in a subordination agreement purports to alter substantive rights under

the Bankruptcy Code, it is invalid.  This Court follows and adopts the reasoning of Judge

-19-

Wedoff in <u>Bank of Amer. v. N. LaSalle Street Ltd. P'ship (In re 203 N. LaSalle Street P'ship)</u>, 246 B.R. 325, 331 (Bankr. N.D. Ill. 2000), in which he ruled that a provision in a subordination agreement in which the subordinated creditor purported to agree to assign its voting rights in a future Chapter 11 case to a senior secured creditor was contrary to 11 U.S.C. § 1126(a) ("The holder of a claim or interest allowed under section 502 of this title may accept or reject a plan. . . .") and was unenforceable. The court reasoned that a creditor cannot waive plan voting rights, relying on <u>Beatrice Foods Co. v. Hart Ski Mfg. Co. (In re Hart Ski Mfg. Co.)</u>, 5 B.R. 734 (Bankr. D. Minn. 1980), because Congress did not intend to permit creditors to alter substantive provisions of bankruptcy law. Although the Court recognizes that there exists contrary authority, *see* <u>Blue Ridge Investors, II, LP v. Wachovia Bank (In re Aerosol Packaging, LLC)</u>, 362 B.R. 43 (Bankr. N.D. Ga. 2006), the Court finds that the decision of the courts in <u>LaSalle</u> and <u>Hart</u> are more persuasive.

In the present case, the Court finds that the City's vote accepting the Plan was valid and that Prudential cannot be permitted to reject the Plan on behalf of the City. Moreover, because three other impaired classes voted to accept the Plan, the voting dispute between Prudential and the City is irrelevant. Nevertheless, assuming the Court were to deem the vote of Prudential on behalf of the City to be the controlling vote, the treatment of the City's secured claim under the Plan is appropriate and complies with the provisions of § 1129 (b)(2)(A)(i) and (iii). The Debtors' proposed treatment of the City's claim, in essence, provides for maintenance of their contractual obligations to the City. In other words, the obligations are not being modified under the Plan. Prudential's argument that the City is

receiving amounts contrary to the Intercreditor Agreement is without merit. As the City correctly points out, its interest in the City Account with a balance of approximately $4 million is not subject to Prudential's liens, and it is only receiving interest payments from that account until Prudential is paid in full.

As noted, three impaired classes affirmatively voted to accept the plan, Class 5, Class 7 and Class 8. Without regard to the dispute between the City and Prudential or the late Bovis vote, the Court finds that the Plan has been accepted by at least one class of impaired claims. Thus, the Plan complies with the requirements of 11 U.S.C. § 1129(a)(10) that at least one class of impaired claims accepts the Plan.

D. <u>Separate Classification of the Bovis Claim</u>

The Court rules that separate classification of the Bovis claim under the Plan is legally permissible under the standards articulated by the United States Court of Appeals for the First Circuit in <u>Granada Wines, Inc. v. New England Teamsters and Trucking Indus. Pension Fund</u>, 748 F. 2d 42, 46-47 (1st Cir. 1984). Bovis's claim is legally distinguishable from general unsecured claims because of its entitlement to assert lien rights as a contractor under applicable Massachusetts law. Thus, its claim is of a different legal character than those of other secured and unsecured creditors, and separate classification of the Bovis claim is proper. Moreover, the compromise with Bovis providing for separate classification is binding on all creditors, including Prudential, as the order approving the settlement was the subject of notice and a hearing and is a final order.

E. Treatment of Secured Claims

With respect to Prudential's secured claim, the Court made findings of fact and conclusions of law in its Memorandum dated October 4, 2011. *See* In re SW [Boston] Hotel Venture, LLC, __ B.R. , __, 2011 WL 4704215 (Bankr. D. Mass. Oct. 4, 2011). Pursuant to that decision, and this Court's October 20, 2011 "Order Fixing Amount of Allowed Prudential Secured Claim as of October 4, 2011," Prudential is owed the approximate sum of $52 million on account of its secured claim as a result of the Court's October 20, 2011 Order. The Plan provides that the Debtors will pay the restructured loan with interest at the rate of 4.25 % until the loan is paid in full by March 31, 2014.

A Chapter 11 plan may be confirmed over the objection of a class of secured claims if the plan treatment is fair and equitable and does not discriminate unfairly. 11 U.S.C. § 1129(b)(1). The requirement of fair and equitable treatment can be satisfied if under the plan the secured creditor retains its lien on its collateral and receives deferred cash payments which total the allowed amount of its secured claim "of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estates's interest" in the property. 11 U.S.C. § 1129(b)(2)(A)(i). A plan proponent also can satisfy the fair and equitable requirement by providing the secured party with the "indubitable equivalent" of its claim. 11 U.S.C. § 1129 (b)(2)(A)(iii). Payment of the value of the secured creditor's claim on the effective date of the plan requires a determination of the amount of post-confirmation interest that will compensate the secured creditor for the risk attendant to the restructured loan. In Till v. SCS Credit Corp., 541 U.S. 465 (2004), a plurality of the

-22-

Justices of the United States Supreme Court directed that the so-called "formula approach" be utilized in determining the appropriate rate of interest rate for a restructured "cramddown" loan in Chapter 13 cases.  It stated:

> The formula approach has . . . begins by looking to the national prime rate, reported daily in the press, which reflects the financial market's estimate of the amount a commercial bank should charge a creditworthy commercial borrower to compensate for the opportunity costs of the loan, the risk of inflation, and the relatively slight risk of default. Because bankrupt debtors typically pose a greater risk of nonpayment than solvent commercial borrowers, the approach then requires a bankruptcy court to adjust the prime rate accordingly. The appropriate size of that risk adjustment depends, of course, on such factors as the circumstances of the estate, the nature of the security, and the duration and feasibility of the reorganization plan. The court must therefore hold a hearing at which the debtor and any creditors may present evidence about the appropriate risk adjustment. Some of this evidence will be included in the debtor's bankruptcy filings, however, so the debtor and creditors may not incur significant additional expense. Moreover, starting from a concededly low estimate and adjusting upward places the evidentiary burden squarely on the creditors, who are likely to have readier access to any information absent from the debtor's filing (such as evidence about the "liquidity of the collateral market" . . . .

541 U.S. at 478-49 (footnote omitted).  The Supreme Court also observed that in Chapter 11 cases there may be an efficient market for restructured loans.  <u>Id.</u> at 476 n.14.  Thus many courts attempting to determine the appropriate rate for post-confirmation interest of a restructured loan in Chapter 11 cases follow a two-step process.  Courts first inquire whether there exists an efficient market for cramdown financing; if so, the market rate will apply.  If there is no efficient market for the restructured loan, courts should  follow the formula approach adopted in <u>Till</u>.  *See infra,* pages 25-26.

In determining whether there is an efficient market for a cramdown loan, a court

must analyze the terms of the restructured debt, the type of collateral, the duration of the

loan, and the amount of the loan.  *See* Gen. Elec. Credit Equities, Inc. v. Brice Road Devs.,

LLC (In re Brice Road Devs., LLC), 392 B.R. 274, 280-81 (B.A.P. 6th Cir. 2008).  A market

analysis by experts should be performed to ascertain whether the type of loan that the

debtor is proposing in a plan can be obtained or whether an efficient market is lacking.  A

debtor, however, is not required to show that it was unsuccessful in attempting to obtain

postpetition financing in order for the court to find that an efficient market does not exist.

*See* SPCP Group, LLC v. Cypress Creek Assisted Living Residence, Inc., 434 B.R. 650, 658

(M.D. Fla. 2010).  To determine whether there is an efficient market for the loan at issue,

most courts look to expert evidence and evidence of actual loan offers. *See, e.g.*, In re Deep

River Warehouse, Inc., No. 04-52749, 2005 WL 2319201 at *12 (Bankr. M.D. N.C. Sept. 22,

2005).  As one court observed before Till, consideration should be given to the "current

market rate for loans that are similar in term, quality of security, and risk of repayment or

financial condition of the borrower." In re One Times Square Assocs. Ltd. P'ship, 159 B.R.

695, 706 (Bankr. S.D.N.Y. 1993), *aff'd,* 165 B.R. 773 (S.D.N.Y. 1994), *aff'd*, 41 F.3d 1502 (2nd

Cir. 1994), *cert. denied,* 513 U.S. 1153 (1995).  As another court noted:  "The interest rate

under an original loan agreement is informative as to a proposed cramdown interest rate's

merits to the extent that the original rate was set near in time to a debtor's chapter 11

proceeding and in a period in which market conditions were substantially similar to

present conditions." In re Cellular Info. Sys. Inc., 171 B.R. 926, 938 (Bankr. S.D.N.Y. 1994)

(citations omitted).  Other courts have looked to tiered financing to determine whether a

-24-

market interest rate exists. The tiered financing or band of investment approach calls for the court to consider whether the debtor can obtain a loan through a combination of different tranches of financing. The interest rates of these tranches are then blended to determine the appropriate rate.  *See, e.g.*, <u>Pac. First Bank v. Boulders on the River, Inc. (In re Boulders on the River, Inc.)</u>, 164 B.R. 99, 102–03, 107 (B.A.P. 9th Cir. 1994) (affirming the bankruptcy court decision applying a blended interest rate of 9%); <u>In re N. Valley Mall, LLC</u>, 432 B.R. 825, 832–36 (Bankr. C.D. Cal. 2010) (applying a blended interest rate of 8.5 %); <u>In re Cellular Info. Sys., Inc.</u>, 171 B.R. at 944 (applying the band of investment approach and denying confirmation because the plan's cramdown interest rate was lower than the blended rate).

Where an efficient market for a Chapter 11 cramdown loan is absent, the overwhelming majority of courts applies the "formula" approach articulated by the plurality of the United States Supreme Court in <u>Till</u> to determine whether an appropriate cramdown rate of interest is being paid to a secured creditor under a Chapter 11 plan  to comply with § 1129(b)(2)(A).  *See, e.g.*, <u>Bank of Montreal v. Off. Comm. of Unsecured Creditors (In re Am. Homepatient, Inc.)</u>, 420 F. 3d 559, 568 (6th Cir. 2006), *cert. denied,* 549 U.S. 942 (2006)  (" . . . the market rate should be applied in Chapter 11 cases where there exists an efficient market.  But where no efficient market exists for a Chapter 11 debtor, then the bankruptcy court should employ the formula approach endorsed by the <u>Till</u> plurality."); <u>In re Brice Road Devs, L.L.C.</u>, 392 B.R. at 280 ("in a chapter 11 case where an 'efficient market' exists, the market rate should be applied, and where no 'efficient market'

exists, the formula approach endorsed by the Supreme Court in <u>Till</u> . . . should be employed"); <u>In re N. Valley Mall, LLC</u>, 432 B.R at 831-2 (" . . . it is necessary to adopt some kind of a formula approach in order to approximate as nearly as is possible compensation for the risks that proposed to be imposed upon the [secured creditor]."); <u>In re Prussia Assocs.</u>, 322 B.R. 572, 589-90 (Bankr. E.D. Pa. 2005) (where there was insufficient evidence of market rate for cramdown loan, court applied formula approach to determine appropriate cramdown rate of interest).

In applying the formula approach, the Supreme Court in <u>Till</u> directed that the first step is to determine a risk free rate, such as the national prime rate, and make additional adjustments to it to account for risk factors, including the risk of nonpayment, the debtor's circumstances, the nature and value of the collateral, the loan to value ratio, the term of the proposed loan, and the feasibility of the plan, that is the likelihood of the plan's success. *See, e.g.*, <u>SPCP Group, LLC v. Cypress Creek Assisted Living Residence, Inc</u>., 434 B.R. at 660; <u>In re Village at Camp Bowie I, L.P.</u>, 454 B.R. 702 (Bankr. N.D. Tex. 2011); <u>In re 20 Bayard Views, LLC</u>, 445 B.R. 83 (Bankr. E.D.N.Y. 2011).

Applying these standards to the facts of the present case, the Court finds that the credible evidence supports a finding that a market for exit financing of the type of loan proposed by the Debtors does not exist.  On the issue of whether an efficient market exists and an appropriate rate, the Debtors offered the expert testimony of Freddie Reiss ("Mr. Reiss"), who has over 30 years experience in the restructuring industry, has written and lectured extensively in his field, and has testified as an expert in numerous contested

Chapter 11 cases.  Mr. Reiss expressed the opinion that there is currently no efficient

market for a loan such as the one proposed by the Debtors in their Plan.  He based his

opinion on his knowledge and involvement of his firm's real estate loan transactions, his

review of publications and research materials, his communications with a number of large

commercial lenders whose responses to the opportunity to make a loan to the Debtors on

terms set forth in the Plan he described as "less than tepid," as well as current poor market

conditions. In reaching his opinion, Mr. Reiss reviewed the unprecedented negative market

conditions for financing in the present economy, the nature and type of the cramdown loan

proposed under the Plan, the amount due to Prudential, the characteristics of the loan, in

particular, the rapid amortization which has occurred during these cases and which is

projected to continue, and the proposed loan terms, especially the quarterly minimum

payments.  He and his company surveyed a number of commercial mortgage lenders, and

he reviewed a number of other real estate Chapter 11 cases in which his company had been

involved, and he found that there was no interest in this type of loan.  Mr. Reiss's opinion

was credible and substantiated by substantial evidence.

On the efficient market issue, Prudential proffered the opinion of Ms. Marti Murray.

("Ms. Murray").  Ms. Murray is a hedge fund and distressed debt specialist.  She expressed

the opinion that an efficient market exists for the restructured loan proposed in the

Debtors' Plan.  In reaching that conclusion, she relied on discussions with a mortgage

broker, an investment banker, a loan officer, and her own review of web sites and emails

to potential lenders.  She indicated that she received information from a potential lender

who makes loans to owners of apartment buildings at a rate of 4.9 %.  In her testimony, Ms.

Murray described  the Plan's cramdown loan as a "fractured condo loan," a term which

refers to an unfinished condo project.  The Court finds that Ms. Murray inaccurately

described the characteristics of the Debtors' property which serves as Prudential's collateral

in reaching her conclusion.  The restructured loan under the Debtors' plan is  not a

fractured condo loan as the Debtors' condominiums are fully completed, numerous units

are  occupied by residents, and the W Hotel, where the condominiums are located, is fully

operational with significant amenities available to condominium residents.  In her report,

Ms. Murray relied on the existence of a number of loans to distressed borrowers, identified

as Sheffield 57 and Comstock. The Court finds that the transactions considered by Ms.

Murray are different from, and not comparable to, the cramdown loan in the Debtors' Plan.

The Sheffield property contained unfinished condominiums and lacked amenities, while

the Comstock loan was for less than $12 million.  Moreover, those properties were being

financed in bundles and did not have records of sales comparable to what SW has achieved

since the commencement of this case.  Accordingly, those loans are not reliable indicators

to support a finding that an efficient market for a loan such as the Debtors' cramdown loan

exists.

   With respect to the efficient market issue, the Court finds that Mr. Reiss's opinion

is entitled to more weight than the opinion of Ms. Murray.  Ms Murray's background as

a manager of a financial firm which purchases distressed debt is not as relevant to, or

reliable  as, the background and experience as Mr. Reiss for the purpose of an opinion on

the efficient market for a Chapter 11 cramdown loan.  Moreover, prior to her testimony in

this case, Ms. Murray had never been retained as an expert and never qualified as an expert

witness and her qualifications and experience are inferior to those of Mr. Reiss.

Here, the evidence shows that there is not a market for the type of loan proposed in

the Plan.  The Court rejects Ms. Murray's conclusion that there is an efficient market for this

loan and accepts the opinion of the Debtors' expert who stated that an efficient market does

not exist for a loan of the size required by the Debtors' Plan and secured by existing

collateral.  His testimony was grounded in his years of experience in real estate finance as

well as his inquiries to prospective lenders. Those inquiries led him to conclude that

financiers in the business of making loans were not likely or willing to make a loan of the

nature proposed in the Plan.  Prudential introduced no credible or reliable evidence that

other financing is available to the Debtors.  Based upon the evidence presented, the Court

finds that, in the absence of an efficient market, the formula approach must be utilized.

Ms. Murray opined that the appropriate interest rate for a cramdown loan in this

case would be 9.8 %, although she did not conduct a <u>Till</u> analysis or apply the formula

approach.  Her opinion was based on a loan to value ratio.  One of her critical assumptions

was that Prudential would be owed approximately $82 million at confirmation.  That

assumption proved to be flawed.   At the present time, due to payments by the Debtors

generated from condominium sales, Prudential is owed approximately $52 million, which

includes interest at the default rate from the date the Court found it to be warranted.  Ms.

Murray also assumed that the risk of nonpayment by the Debtors was substantial.  That

assumption is inconsistent with the Debtors' rapid amortization of the Prudential loan during the pendency of their cases. Moreover, Ms. Murray expressed the view that the Debtors' Plan is not feasible due to what she considered excessive pricing of the condominium units. Ms. Murray, however, is neither an experienced real estate broker nor a licensed appraiser. She merely based her opinion that the Debtors' Plan lacked feasibility on discussions with unnamed local brokers. Even though Ms. Murray conceded that the projected payout period for the Prudential loan over a three to four year period is reasonable, she did not give that factor appropriate weight in reaching her opinion for a post-confirmation loan rate.

Unlike Ms. Murray, Mr. Reiss conducted a <u>Till</u> analysis using the formula approach. He opined that under that approach the appropriate cramdown interest rate should be 4.25%. Mr. Reiss started with application of the national prime rate of 3.25 %. The Debtors' Exhibit 11 indicates that the treasury rate for loans of up to 7 years is less than 3%. Mr. Reiss opined that one percentage point must be added to the cramdown loan for risk, considering the circumstances of the estates, the nature and value of the collateral, the term of the Plan, and the feasibility of the Plan. Mr. Reiss credited the Debtors' principals and management for their commitment to the project, their development of another project, and, most importantly, the accomplishments of the Debtors' broker in selling units during the pendency of the SW case and substantially meeting projections. Mr. Reiss evaluated the collateral available to satisfy Prudential's claim and concluded that the loan to value ratio would be 66 % as of the proposed effective date of the Plan. Noting that the

Prudential debt was expected to fully amortize in approximately two years, he concluded that the loan to value ratio was 33 %. Based upon those facts, Mr. Reiss concluded that the Debtors did not pose a substantial risk of nonpayment following their emergence from bankruptcy.

Mr. Reiss specifically found that an upward adjustment of one half of one percent was necessary to compensate for a feasibility risk. He also opined that a one half of one percent adjustment was appropriate due to the duration of the loan, which is expected to be from two to four years. As to the nature of the collateral securing the cramdown loan, Mr. Reiss noted that the payments to Prudential over time are secured by a first mortgage on the condominium units that they are part of the W Hotel, a luxury chain, and that the loan to value ratio (an approximate $52 million loan balance compared to a $61.5 million value and $14 million in additional assets available to secure the loan) required no further risk adjustment to the 4.25 % interest rate. Mr. Reiss observed that when Prudential made the original $180 million loan, the interest rate was 2.25 % more than the prime rate. If that differential were applied today, the interest rate for the cramdown loan would be 5.5 %.

The Court credits Mr Reiss's opinion for a variety of reasons, including his qualifications, wealth of experience, excellent reputation as a restructuring advisor, and the detailed and legally appropriate approach he followed in applying the <u>Till</u> formula. Accordingly, the Court finds that the interest rate of 4.25 % for the cramdown loan will provide Prudential with deferred cash payments equal to the allowed amount of its claim as of the effective date with retention of its liens and the indubitable equivalent of its claim.

This interest rate will result in a stream of payments to Prudential under the Debtors' Plan with a present value equal to its allowed secured claim.   The Court accepts the only evidence on the issue of an appropriate risk adjustment point, namely the opinion of Mr. Reiss.   The Court emphasizes that Prudential did not introduce any evidence of the appropriate interest rate based on the <u>Till</u> formula approach, preferring to rely exclusively on its contention that there is an efficient market for the cramdown loan.

The Court finds that the Debtors' proposed treatment of Prudential's allowed secured claim over its objection meets the requirements for a cramdown under 11 U.S.C. § 1129(b)(2)(A).   Prudential will retain its lien and receive payments with interest at an appropriate rate from the sale of the condominiums, a lien it will retain until its claim its allowed secured claim is paid in full.   The Debtors intend to satisfy Prudential's lien in a relatively short period of time, rapidly amortizing the loan no later than March 31, 2014. The Debtors' treatment of Prudential's secured claim is fair and equitable and does not unfairly discriminate.   Moreover, the Plan provides Prudential with the indubitable equivalent of its claim and the treatment complies with the requirements of  11 U.S.C. § 1129(b)(2)(A)(i) and (iii).

F. <u>Feasibility</u>

Section 1129(a)(11) of the Bankruptcy Code provides that a plan may only be confirmed if confirmation is not likely to be followed by liquidation, or the need for further financial reorganization. 11 U.S.C. § 1129(a)(11).   Commonly referred to as the feasibility requirement, the purpose of this test is to ensure that the plan is not a "visionary scheme."

*See* In re Merrimack Valley Oil Co., Inc., 32 B.R. 485, 488 (Bankr. D. Mass. 1983). Stated

another way, "[t]he purpose of the feasibility test is to determine whether there is a

reasonable probability that creditors will receive the payments provided for in the plan."

In re Trenton Ridge Investors, LLC, __ B.R. __, 2011 WL 4442270 at *25 (Bankr. S.D. Ohio

Jun. 23, 2011) (citations omitted). A plan proponent need not guarantee the success of the

plan, but rather must introduce evidence that its plan is realistic. In re Brice Road Devs.

LLC., 392 B.R. at 283. Courts consider the following factors in assessing feasibility:

> (1) the adequacy of the capital structure; (2) the earning power of the
> business; (3) economic conditions; (4) the ability of management; (5) the
> probability of the continuation of the same management; and (6) any other
> related matter which determines the prospects of a sufficiently successful
> operation to enable performance of the provisions of the plan.

In re Trenton Ridge Investors, LLC, 2011 WL 4442270 at * 25 (footnote omitted) (citing In

re U.S. Truck Co., Inc., 800 F.2d 581, 589 (6th Cir. 1986)). *See also* In re Orfa Cop. of Phil.,

129 B.R. 404, 411 (Bankr. E.D. Pa. 1991).

The primary funding source for the Debtors' Plan is the sale of condominiums which

are integrated with the W Hotel, located at 100 Stuart Street. SW owned the W Hotel and

operated it through Starwood until the hotel was sold on June 8, 2011 for $89.5 million to

a third party buyer, resulting in a payment to Prudential in excess of $83 million.

Prudential was owed approximately $180,000, 000 as of the commencement of these cases

in March of 2010 and due to the sale of the W Hotel, the draw on the letter of credit, and

sales of condominiums during the pendency of these cases, it now is owed approximately

$52 million, which includes postpetition interest, as a result of the Court's rulings as set

forth in the 506(b) Memorandum.

The Debtors' projections for sales of condominiums over the next three years, which were attached to their Disclosure Statement and referenced in the affidavit and testimony of Paul Griesmer ("Mr. Griesmer"), a designated Counselor of Real Estate, a Fellow in the Royal Institute of Chartered Surveyors, a state certified general real estate appraiser, and a licensed real estate broker, as well as the testimony of the Debtors' turnaround consultant, Derrick Flanagan ("Mr. Flanagan"). The Debtors project that condominium sales will occur at the approximate rate of three per month, which will generate cash flow of approximately $80 million over the Plan period. In addition to cash flow from which the Debtors intend to make Plan payments, the Debtors have approximately $14 million in cash and other assets to support the Plan.

The Debtors' real estate broker in charge of marketing and selling the condominiums, Kevin Ahearn ("Mr. Ahearn"), one of the premier real estate brokers in Boston, Massachusetts, expressed the opinion that the three-year sell out period projected by the Debtors is reasonable based upon his knowledge of the market and familiarity with similar projects. Mr. Griesmer confirmed that the three-year sell out period was feasible. Indeed Ms. Murray, Prudential's expert, agreed that the projected sales rate was reasonable.

During the bankruptcy cases, Mr. Ahearn has been responsible for the sales and marketing of the condominiums. The Debtors have substantially met the sales projections and have sold condominiums at an average rate of three per month for prices within the

range of their projections.  During the pendency of the bankruptcy cases, the Debtors have been fairly successful in selling the condominiums, notwithstanding the stigma and uncertainties of bankruptcy and the economic difficulties of the past several years.  During the 14 months prior to the hearing on confirmation, the Debtors generated net sales proceeds of $33.7 million compared to their projection of $34.3 million.  SW sold 22 condominiums between  November 1, 2010 and  June 30, 2011, netting proceeds of $25.2 million compared to projected net proceeds of $25,582,000.

Mr. Ahearn testified that SW's bankruptcy case had a negative effect on sales.  He explained that the inventory of luxury condominium units in Boston is decreasing and that the overall prices for luxury condominiums have maintained stability.  Thus, in his view, condominium sales will be positively affected by existing market conditions.

Mr. Ahearn also testified that the Debtors will be able to achieve the number of sales and the price per square foot set forth in the projections.  The Debtors projected an average price per square foot of $950, which represents an increase over the average price obtained during bankruptcy proceedings of approximately $898 per square foot.  He explained that when SW exits bankruptcy, sales will improve.  He indicated that overall prices in the Boston condominium market will increase, especially for luxury units like SW's units.  Accordingly, in his view, the Debtors' projections are not overly optimistic.  Even if SW were to realize only $898 per square foot, the average price obtained during the pendency of the Chapter 11 case, the Debtors would still generate cash flow of approximately $77.5 million for the term of the Plan.  In other words, even if the Debtors are unable to realize

their projections, they still will have the ability to fund the Plan if they maintain their existing track record of sales.

The credible evidence submitted at the confirmation hearing compels a finding that the Plan is feasible. The Debtors have shown that it is likely they will be able to pay creditors the amounts required under the Plan and the Court's orders within the time contemplated under the Plan. The projections for the sales of condominiums are realistic and workable and are supported by SW's track record of sales. SW has accomplished, on average, sales of three units per month and the prices obtained are within the range of reasonableness compared to the projected prices. During these cases, SW has been able to realize an average price of $ 898 per square foot which is within 5 % of the projections. It has substantially met its projections during the pendency of the bankruptcy cases, despite the stigma of and uncertainty resulting from the pendency of a Chapter 11 case and market conditions. Mr. Ahearn acknowledged that the pendency of these Chapter 11 cases has hurt sales, but once SW emerges from bankruptcy and that stigma is removed, there will be a more positive sales climate. His opinion was credible and well supported by the data he referenced in his testimony.

The Debtors' track record during this case strongly supports a finding of feasibility. The Court finds that the anticipated sales prices for the condominiums and the rate of sales are obtainable and that the Debtors likely will generate sufficient cash flow to make Plan payments. Even if the Debtors are unable to meet the projections and realize only the average amount per square foot they have obtained during these cases, they will still be

able to fund the Plan from net cash flow.  Moreover, the additional assets which Debtors

own, totaling approximately $14 million, provide additional support for  finding that the

Plan is feasible.

The Court rejects Prudential's assertion that the Plan is no more than a "visionary

scheme."  It argues that the Debtors have attempted to decrease leverage by failing to

include postpetition interest to which it is entitled.  The Court, however, has determined

the rate of postpetition interest to which Prudential is entitled using the Till factors, which

Prudential did not address through the submission of evidence.  The Debtors have the

ability to satisfy the Prudential claim at the interest rate provided in the Plan and there is

a sufficient cushion from additional assets in the event they do not meet their  projections.

Prudential also challenges the Debtors' sales and pricing projections as "unrealistic,"

extrapolating that they lack significant reserves to cover unexpected costs and putting their

collateral at risk.  SW's track record, however, speaks to the Debtors' abilities to meet their

projections.  Prudential also points to Mr. Ahearn's admission that the overall health of the

real estate market is depressed and the continuation of the Debtors' existing management

team, emphasizing the lack of a budgeted line item of financial professionals.  Prudential's

attempt to impugn the Debtors' success at selling the condominiums is based on snapshots,

and not an overall view of the actual postpetition events.  Prudential also criticized the

abilities of the Debtors' management team, in particular Ms. Carol Parks.  Prudential,

however, ignores Ms. Parks's substantial business and  management experience with other

ventures and her successful development of the so-called Niketown project on Newbury

Street in Boston.

Prudential further maintains that the Debtors will have inadequate capital if their Plan is confirmed and they exit Chapter 11. This argument ignores the unrebutted evidence of a favorable loan to value ratio and adequate capital structure. As supported by the affidavit and testimony of Mr. Reiss, when a comparison is made of the amount Prudential is owed (which is $51,740,786 as a result of the Court's Order dated October 20, 2011) to the stipulated value of the condominiums projected as of the date of confirmation, approximately $61 million, plus the stipulated value of the $14 million dollars in additional assets owned by the Debtors, it is clear that the Debtors have a favorable loan to value ratio with respect to the Prudential loan. Mr. Reiss also analyzed the Debtors' cash position and other Plan obligations and concluded their capital was adequate. He noted that the Debtors will have unrestricted cash on hand of approximately $250,000 as of the effective date of the Plan and additional collateral which can be liquidated in the sum of $3.1 million. Considering the Debtors' effective date obligations of approximately $2.1 million, the Debtors will have a cash balance of $1.25 million as of the effective date of the Plan. He also observed that the Debtors' additional assets could be available to enhance the Debtors' cash position. In light of the unrebutted evidence, the Court finds that the Debtors' capital structure upon confirmation is likely to be adequate to support the Plan payments.

Although Prudential correctly points out that market conditions are uncertain, the Court finds that it failed to undermine the weight of the evidence submitted by the Debtors. As many bankruptcy courts recognize, debtors are not required to guarantee the

success of their plans. *See* <u>In re Brice Road Devs., LLC</u>, 392 B.R. at 283. The Debtors have

sustained their burden on feasibility and have produced sufficient evidence from which

this Court can find that their Plan satisfies the requirement of 11 U.S.C. § 1129(a)(11).

G. <u>Absolute Priority Rule</u>

The provisions of 11 U.S.C. § 1129(b)(2)(B) and (C) require that for a plan to be

confirmed with respect to an impaired, dissenting class of unsecured claims or interests,

a Chapter 11 plan must provide that each holder of a claim must receive property of a

value as of the effective date of the plan equal to the allowed amount of its claim or the

holder of a claim or interest that is junior to the claims of such class will not receive or

retain under the plan any property on account of such junior claim. *See* 11 U.S.C. §

1129(b)(2)(B)(i), (ii) and (C). Commonly referred to as the absolute priority rule, the

statute's requirements prevent a lower class of unsecured creditors or equity interests from

receiving money or property where senior classes and senior interests are not being paid

in full.

The Court rejects Prudential's argument that the Debtors' Plan violates the

provisions of § 1129(b)(2) (B)(i) and (ii), for a number of reasons. First, the absolute priority

rule is not implicated in this case as no class of unsecured claims has rejected or objected

to the Plan. Secondly, the Plan provides for payment to unsecured creditors in full over

time with interest and, thus, the Plan satisfies the absolute priority rule. Thirdly,

Prudential has not asserted an unsecured claim and, in any event, the proposed treatment

of its secured claim requires payment in full with interest. Finally, Prudential does not

have standing to assert the absolute priority rule as a secured creditor, and it has not shown that it will sustain any harm from the Plan's provisions respecting treatment of unsecured creditors. *See* In re Wabash Valley Power Ass'n, 72 F.3d 1305, 1314 (7th Cir. 1995), *cert. denied,* 519 U.S. 965 (1996) ("In its origins, the absolute priority rule was a judicial invention designed to preclude the practice in railroad reorganizations of 'squeezing out' intermediate unsecured creditors through collusion between secured creditors and stockholders (who were often the same people.")); Corestates Bank, N.A. v. United Chemical Techs., Inc., 202 B.R. 33, 54-55 (E.D. Pa. 1996) (courts limit the application of the absolute priority rule to unsecured creditors); In re Cypresswood Land Partners, I, 409 B.R. 396, 419 (Bankr. S.D. Tex. 2009); (same); In re New Midland Plaza Assocs., 247 B.R. 877, 893 (Bankr. S.D. Fla. 2000) ("As a fully secured creditor . . . [the objecting party] . . . does not have standing to assert the absolute priority rule of § 1129(b)(2)(B)(ii)).

In footnote 11 to its Proposed Findings of Fact and Conclusions of Law, Prudential makes a somewhat oblique assertion that it has an unsecured claim against the Debtor, Frank Sawyer Corporation, due to a deficiency in the value of that Debtor's assets compared to Prudential's claim against that Debtor. Prudential, however, has not filed an unsecured claim in that case and is not treated as an unsecured creditor in the Debtors' Plan. In the Court's October 4, 2011 Memorandum, Prudential vehemently argued, and the Court ruled, that it was a creditor with an allowed secured claim and that it held no unsecured deficiency claim. The basis for Prudential's assertion that it has an unsecured claim in the case of Frank Sawyer Corporation is unclear. The Court finds that Prudential

-40-

failed to sustain its burden of proof as to its status as the holder of an unsecured claim. Moreover, even if it had such a claim, a dissenting unsecured creditor in an accepting class cannot assert the absolute priority rule.  In re United Marine, Inc., 197 B.R. 942, 948 (Bankr. S.D. Fla. 1996).  Two classes of unsecured creditors, Class 7 and Class 8 accepted the Plan.

In the same vein, Prudential complains that the unsecured claims asserted by insider affiliates of the Debtors,  SE Berkeley and SE McClellan, must be disallowed prior to the Court's consideration of the Plan and that the Debtors' treatment of those claims violates the absolute priority rule.  Prudential states that the participation of those insider creditors in the Plan and their receipt of membership interests issued by 110 Stuart Street, LLC is tantamount to the current equity interest of the Debtors being paid ahead of other creditors.

Steven Kravetz ("Mr. Kravetz"), the Debtors' chief financial officer, testified that the non-debtor,  insider claimants contributed  $17.3 million dollars towards the purchase of the letter of credit from Sovereign Bank which was used to pay Prudential after SW defaulted under the Construction Loan Agreement.  In addition, he testified that SW agreed to repay the claims arising from the letter of credit, although that agreement was not reduced to a writing.  In the proofs of claim filed by SE Berkeley and SE McClellan, which were filed in the case of SW, the claims are described as claims for contribution and reimbursement by affiliates of the Debtors by virtue of their having obtained the $17.3 million letter of credit from Sovereign Bank for the benefit of Prudential.

Under the Plan, the claims of SE Berkeley and SE McClellan will receive equity

interests in a newly formed entity whose capital structure is unknown.  They will not

receive any cash payments.  The treatment of those claims does not violate the absolute

priority rule.  As in the case of <u>In re Ion Media Networks, Inc</u>. 419 B.R. 585 (Bankr. S.D. N.Y.

2009), the  issuance of equity through the creation of memberships in a new, limited

liability company does not enable any creditor or interest holder to retain or recover any

value under the Plan.  The Plan provisions do not harm Prudential or any other creditors

who are being paid 100 % of their allowed claims plus interest.  The provision of Section

4.7(e)(1) of the Plan is a device to allow the Debtors to satisfy the claims of SE Berkeley and

SE McClellan and to effectuate a new corporate structure;  it is not an allocation of value

to interest holders to the detriment of other creditors who are all being paid in full with

interest under the Plan.  SE Berkeley and SE McClellan have valid claims against the

Debtors arising from the draw on the $17.3 million letter of credit issued by Sovereign Bank

and from the $10.5 million guarantees of the City loan.  Regardless of how those claims are

characterized, and, in particular, how the letter of credit claims are characterized, whether

as claims for  contribution, reimbursement, subrogation, unjust enrichment or quantum

meruit, SE Berkeley and SE McClellan have claims of at least $17.3 million because they

paid  a debt incurred by SW.  Moreover, the issuance of new equity to claimants SE

Berkeley and SE McClellan is not the functional equivalent of old equity retaining their

interests. The evidence introduced at trial mandates the conclusion that those entities have

the right to assert claims against the Debtors for whose benefit they advanced funds which

were ultimately paid to Prudential.  Under the Plan, the Debtors are obligated to repay SE

Berkeley and SE McClellan for their purchase of the letter of credit through the issuance

of equity interests.   Regardless of the legal theories of contribution, reimbursement,

subrogation or quantum meruit, Prudential has failed to establish that SE Berkeley did not

advance funds for the purchase of the letter of credit for the benefit of Prudential in

conjunction with SW's Construction Loan Agreement, that the equity interests in the newly

formed entity either harm it in any way or that the value of the equity interests in 110

Stuart Street, LLC is grossly disproportionate in value to the sums advanced.  In summary,

the Court finds and rules that the absence of documentation does not negate the validity

of their claims, as urged by Prudential, and that the Plan does not violate the absolute

priority rule.

    H.   The Plan's Consolidation Provision

     The Court finds that the consolidation provision of the Plan is an appropriate

method for implementing the Plan under 11 U.S.C. § 1123(a)(5)(C) under the circumstances

of these cases.  In Section 5.8 of the Plan, the Debtors reference substantive consolidation.

The  actual language and intent of the Section 5.8 appears to be different than the typical

instances where debtors seek substantive consolidation as a remedy to address disregard

of the corporate form.

    Numerous courts acknowledge that under appropriate circumstances substantive

consolidation is an appropriate remedy for failure to adhere to corporate formalities. *See,*

*e.g.* Union Savs. Bank v. Augie/Restivo Baking Co., Ltd. (In re Augie/Restivo Baking Co.,

Ltd., 860 F.2d 515 (2d Cir. 1988); Drabkin v. Midland-Ross Corp. (In re Auto-Train Corp.),

810 F.2d 270 (D.C. Cir. 1987).  As the court observed in  In re Owens Corning, 419 F.3d 195

(3d Cir. 2005), *cert. denied,* 547 U.S. 1123 (2005):

> Ultimately most courts slipstreamed behind two rationales-those of the
> Second Circuit in Augie/Restivo and the D.C. Circuit in Auto-Train. The
> former found that the competing "considerations are merely variants on two
> critical factors: (i) whether creditors dealt with the entities as a single
> economic unit and did not rely on their separate identity in extending credit,
> . . . or (ii) whether the affairs of the debtors are so entangled that
> consolidation will benefit all creditors. . . ." In re Augie/Restivo, 860 F.2d at
> 518 (internal quotation marks and citations omitted). Auto-Train touched
> many of the same analytical bases as the prior Second Circuit cases, but in the
> end chose as its overarching test the "substantial identity" of the entities and
> made allowance for consolidation in spite of creditor reliance on separateness
> when "the demonstrated benefits of consolidation 'heavily' outweigh the
> harm." In re Auto-Train, 810 F.2d at 276 (citation omitted).

Owens Corning, 419 F.3d at 207-08.  In Owens Corning, the court fashioned the following

test, absent consent, regarding entities for whom substantive consolidation is sought: " (1)

prepetition they disregarded separateness so significantly their creditors relied on the

breakdown of entity borders and treated them as one legal entity, or (2) postpetition their

assets and liabilities are so scrambled that separating them is prohibitive and hurts all

creditors." Id. at 212 (footnote omitted).  The Third Circuit recognized that  substantive

consolidation can be "bad news for certain creditors, [because] instead of looking to assets

of the subsidiary with whom they dealt, they now must share those assets with all creditors

of all consolidated entities, raising the specter for some of a significant distribution

diminution." Id. at 206.

Although courts have approved plans that provide for substantive consolidation,

other courts have ruled that provisions in Chapter 11 plans resulting in "deemed"

consolidation or "partial" consolidation of joint debtors are legally impermissible. In those cases, the plan implementation provisions do not constitute substantive consolidation in the usual bankruptcy sense recognized by the Third Circuit. Thus, in Owens Corning, the Third Circuit held that the "deemed" consolidation of a corporate debtor and related entities that had guaranteed their borrowing was impermissible as it deprived the lender of the guarantees for which it had bargained. *See also* Genesis Health Ventures, Inc. v. Stapleton (In re Genesis Health Ventures Inc.), 402 F.3d 195 (3d Cir. 2005) (court disapproved deemed consolidation provision in a plan which had as its purpose the avoidance of quarterly fees payable to the office of the United States trustee for each joint debtor). *See also* In re New Century TRS Holdings, Inc., 407 B.R. 576 (D. Del. 2009). In Owens Corning, the Third Circuit Court of Appeals set forth a number of principles for the purpose of assessing whether to order substantive consolidation, one of which was that "[w]hile substantive consolidation may be used defensively to remedy the identifiable harms cause by entangled affairs, it may not be used offensively (for example, having a primary purpose to disadvantage tactically a group of creditors in the plan process or to alter creditor rights)." 419 F.3d at 211. Thus, when substantive consolidation is used offensively for an improper purpose which is detrimental to creditors, a court should not permit its use.

In the present case, the consolidation set forth in the Debtors' Plan is legally permissible for several reasons. Unlike the provisions in the Third Circuit decisions, the consolidation provision does not affect the distributions to the Debtors' creditors and does

not result in discrimination against certain creditors or result in disenfranchisement of

certain classes of claimants. Section 5.8 of the Plan does not impact the rights of creditors

as all creditors are being paid 100 % of their claims and no creditor is sustaining a loss by

virtue of this Plan provision. Moreover, no interested party other than Prudential raised

an issue or objected to the substantive consolidation provision of the Plan that provides for

consolidation of the Debtors for Plan distribution purposes. The consolidation provisions

do not affect Prudential's secured claim or its treatment, and Prudential has not shown that

it will suffer any harm from the consolidation provision, particularly where the Debtors

clarified at the hearings on confirmation that they will all remain jointly and severally liable

to Prudential for payment of its allowed secured claim, as well as the claims of other

creditors. Contrary to Prudential's assertion, Section 5.8 does not destroy Prudential's

claims against the various Debtors. In fact, the Plan provides that Prudential's claims

against the various Debtors are preserved and are being modified only with regard to

amount owed and the interest rate.

In addition, the decisions which have criticized limited consolidation, which are not

from this circuit, have done so where creditors were being prejudiced by such the

consolidation provisions. Here, creditors are not being harmed by virtue of the limited

consolidation provision. In contrast, in In re New Century TRS Holdings, Inc., the plan

provided for the aggregation of multiple debtors into debtor groups to resolve claims and

effected an impermissible substantive consolidation because it called for a merger of a

number of entities into three groups, and continuation of inter-entity liabilities, whereas

under the typical scenario multiple separate entities are merged into a single entity and

inter-entity liabilities are erased. 407 B.R. at 591. As the court observed:

> Typical or not, however, the many-into-three framework still presents the
> same potential inequities for creditors as would be presented in the
> many-into-one framework, namely that creditors face increased competition
> for a consolidated pool of assets and a re-valued claim that is less precise
> than if the creditors were dealing with debtors individually. This is the
> 'rough justice' against which <u>Owens Corning</u> warns and, because it is
> effected by aggregating multiple debtors into one or more debtor groups, it
> falls within the definition of substantive consolidation.

<u>Id.</u> Section 5.8 of the Plan does not consolidate different Debtors into different groups,

while ignoring the relative rights of creditors against different Debtors, a circumstance

which the court in <u>New CenturyTRS Holdings, Inc.</u> found impermissible.

I. <u>Best Interests of Creditors</u>

In order for a Chapter 11 plan to be confirmed, 11 U.S.C. § 1129(a)(7) requires that

each nonaccepting holder of an impaired class of claims or interests will retain or receive

property of a value as of the effective date in an amount that is not less than the amount

such holder would receive or retain if the debtor were liquidated under Chapter 7 of the

Bankruptcy Code. Prudential complains that the Plan does not pass the best interests of

creditors test.  In doing so, it misconstrues this requirement of § 1129(a)(7).  First, the test

only applies to nonaccepting creditors, as accepting creditors can waive the requirement.

Prudential's interpretation of the test is that if liquidation of collateral in a Chapter 7 case

would result in a secured creditor being paid quicker than through a Chapter 11 plan, the

plan fails the best interests test.

Section 1129(a)(7) requires only that the present value of the distribution under the plan, which must account for the time value of money, must be no less than a dividend upon liquidation. *See* N. Dreher and J. Feeney, *Bankruptcy Law Manual* § 11:63 (West 2011). "The best interests valuation is to be based on evidence not assumptions, but it is not an exact science." In re Multiut Corp. 449 B.R. 323, 344 (Bankr. N.D. Ill. 2011) (citations omitted).

The treatment of Prudential's claim that postpones payment in full for the life of the Plan is not a violation of the best interests test as long as Prudential is receiving payment in full and an appropriate rate of interest to compensate it for the time it must wait to be paid. The Plan provides that Prudential will be paid in full on its allowed secured claim by March 31, 2014 with interest as determined by the Court. Prudential cannot be paid more than its allowed secured claim, and payment in full of its allowed secured claim, with interest at the proper post-confirmation rate, is the amount to which Prudential is entitled, not the amount Prudential claims it would be entitled under its prepetition loan documents. The best interests test does not require accelerated payment to Prudential where its treatment is legally permissible under § 1129(b)(2)(A)(i) and (iii).

J. Good Faith

In order for a plan to be confirmed, 11 U.S.C. § 1129(a)(3) requires proof that the plan was proposed in good faith and not by any means forbidden by law. The term "good faith" is not defined in the Bankruptcy Code, but has been construed to mean honesty in purpose and full disclosure of relevant facts. *See* J. Feeney and N. Dreher, *Bankruptcy Law*

*Manual* at § 11:63.   "[T]he term is generally interpreted to mean that there exists a reasonable likelihood that the plan will achieve a result consistent with the objective and purposes of the Bankruptcy Code." <u>In re Weber</u>, 209 B.R. 793, 797 (Bankr. D. Mass. 1997) (citations omitted).   An unwarranted and discriminatory treatment of insiders' claims that favors those claims over those of creditors may preclude a finding of good faith.   *See* <u>In re Future Energy Corp.</u>, 83 B.R. 470, 487  (Bankr. S. D Ohio 1988).   For purposes of confirming a Chapter 11 plan, "the Court must determine whether the Plans, given the totality of the Debtors' circumstances, satisfy the purposes underlying Chapter 11 . . .[namely] . . . 'the preservation of businesses as going concerns, and the maximization of the assets recoverable to satisfy unsecured claims.'" <u>In re Trenton Ridge Investors, LLC</u>, 2011 WL 4442270 at *16.

Prudential maintains that the Debtors have not sustained their burden of establishing good faith. Under the Plan, the Debtors are being reorganized, new equity is being issued, and all creditors are being paid in full with interest. Although new equity interests are being issued by a new company to SE Berkeley and SE McClellan, those entities made valuable contributions through their agreement to convert their $17.3 million claim to equity.   The purpose of  the Plan is not to impermissibly favor insiders.   In fact, other than the distribution of equity interests in a newly formed entity to SE Berkeley and SE McClellan, insider claims are subordinated  to the claims of non-insider creditors under the Plan.   The Plan provides for cancellation of all inter-company claims.   Thus, insider claimants are  treated less favorably than other  creditors, a result that is not necessarily

mandated under the Bankruptcy Code. There is no discrimination against any non-insider creditors in this Plan. Creditors, including Prudential, are receiving full payment and all except Prudential agree, either affirmatively or by their silence, to such treatment. Under the test articulated by the courts in cases such as <u>Weber</u> and <u>Trenton Ridge</u>, the Court finds that the Debtors have satisfied the good faith requirement set forth in § 1129(a)(3).

     K.  <u>Additional Requirements of Confirmation</u>

Through the testimony of their chief financial officer, Mr. Kravetz, the Debtors have established that the Plan satisfies all of the other requirements of 11 U.S.C. § 1129(a) of the Bankruptcy Code, namely that the Plan complies with the provisions of the Bankruptcy Code, that all payments have been disclosed, that professional fees have been or shall be subject to Court approval, that the Debtors have disclosed the identity of officers, directors and managers, and that all U.S trustee fees that have accrued have been paid and the Debtors agree that they will be paid as they become due pending a final decree.

**V. CONCLUSION**

For the foregoing reasons the Court shall enter an order confirming the Debtors' Modified First Amended Joint Plan of Reorganization in accordance with this decision.

     By the Court,

*Joan N. Feeney*

Joan N. Feeney
United States Bankruptcy Judge

Dated: November 14, 2011